IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| **JEFFERSON COUNTY, ALABAMA, a** | ) | **Case No. 11- 05736-9-9** |
| **political subdivision of the State of** | ) | |
| **Alabama,** | ) | **Chapter 9 Proceeding** |
| | ) | |
| Debtor. | ) | |

## MEMORANDUM IN SUPPORT OF ELIGIBILITY

**I.      Introduction.**

On November 9, 2011 (the "Filing Date"), Jefferson County, Alabama, a political subdivision of the State of Alabama (the "County"), filed a voluntary petition for relief under Chapter 9 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

The County has worked tirelessly for three and a half years in an attempt to overcome unprecedented financial obstacles without seeking bankruptcy protection.  Although the County has fought to regain economic stability through aggressive cost-cutting measures, negotiations with major creditor constituencies and appeals to the Alabama Legislature for authority to replace lost revenues, the County has exhausted its options.  The County needs to resolve its outstanding liabilities comprehensively and in a single forum.  Accordingly, the County has filed the instant case under Chapter 9 of the Bankruptcy Code as a last resort and in a good faith effort to adjust its debts for the benefit of its creditors and citizens.

**II.      Factual Background.**

As set forth in more detail below, the confluence of two principal factors led to this Chapter 9 filing.  First, the County has been overwhelmed by debt service obligations related to

1

Case 11-05736-TBB9    Doc 10    Filed 11/09/11    Entered 11/09/11 18:50:23    Desc Main
Document      Page 1 of 64

its sanitary sewer system (the "Sewer System"), which in turn led to credit rating downgrades and accelerated repayment schedules not only with respect to the Sewer System's outstanding debt of over $3.1 billion in principal alone, but also with respect to millions of dollars of the County's long-term general obligations. Although the Sewer System indebtedness is non-recourse, the ripple effects of the financial calamity associated with the Sewer System have touched all aspects of the County's finances. To cite just one example, as a result of the financial problems directly related to the County's Sewer System liabilities, approximately $105.0 million of certain of the County's general obligation warrants have been accelerated and are now due and payable, a liability that far exceeds the available cash in the County's general fund.

The massive liabilities and financial distress that the County now faces are the result of conduct and circumstances beyond the County's control. As discussed in greater detail below, the 2008 credit rating downgrades of the companies that insured the Sewer System debt led to hundreds of millions of dollars of additional Sewer System liabilities. The Sewer System's entire debt structure was infected with fraud and corruption on the part of representatives of JPMorgan Securities, Inc. ("JPMorgan Securities"), the primary author and marketer of the transactions that resulted in the outstanding Sewer System warrants, and a former County official who acted far beyond the bounds of morality and law. JPMorgan Securities is an affiliate of JPMorgan Chase Bank, N.A. ("JPMorgan Chase" and together with JPMorgan Securities, "JPMorgan"), the County's largest creditor on those debt obligations. As partial compensation for its wrongdoing in connection with the Sewer System indebtedness, JPMorgan Securities subsequently paid approximately $75.0 million and JPMorgan Chase waived approximately $647.0 million in swap termination fees pursuant to a settlement with the federal Securities and Exchange Commission (the "SEC").

1/2245516.4

In the years that followed, the County attempted unsuccessfully to reach binding, comprehensive agreements with holders of the Sewer System indebtedness — a conflicted and often divided group of insurance companies, banks and, increasingly, hedge funds. Earlier this year, the County sought and obtained assistance from the Office of the Governor of Alabama, Robert Bentley, in an effort to induce the Sewer System creditors to act reasonably. As a result of the Governor's intercession earlier this year, the County's settlement efforts finally appeared to gain traction, resulting in the County's execution in September 2011 of a non-binding term sheet for the restructuring of the Sewer System indebtedness (the "Term Sheet"). The Term Sheet was countersigned by John S. Young, Jr., LLC, a court-appointed receiver for the Sewer System (the "Receiver"), who presented himself[1] to the County as an intermediary for holders of the vast majority of the Sewer Warrant indebtedness. Mr. Young and the Commission worked to make the transaction contemplated in the Term Sheet a reality. The hope that the Term Sheet would result in a comprehensive, out-of-court restructuring was short-lived, however, as the Receiver and certain holders of the Sewer Warrant indebtedness backtracked on the commitments set forth in the Term Sheet and refused to enter into any definitive agreement with the County consistent with transactions contemplated in the Term Sheet.

Despite the County's efforts to achieve a settlement that would be fair to all parties concerned, all the while the Receiver has hung over the collective heads of the County's residents his declared efforts to raise Sewer System revenues by 25% as soon as possible (with an increase as early as next month) through a hodgepodge of proposed double-digit rate increases, triple-digit increases in certain surcharges, and the levying of a new "monthly service charge" upon all

---

[1] As explained in more detail below, the Sewer System's court-appointed receiver is John S. Young, Jr., LLC. John S. Young, Jr. is the majority member and chief executive officer of the receiver. While the County recognizes that the receiver is not Mr. Young, individually, for ease of reference, this Memorandum refers to this receiver as "he," "him" or "his" throughout.

3

Case 11-05736-TBB9    Doc 10    Filed 11/09/11    Entered 11/09/11 18:50:23    Desc Main
Document    Page 3 of 64

Sewer System customers. The Receiver made clear that these were but the first of many rate increases to come, notwithstanding the fact that the County's sewer rates have more than quadrupled over the past 15 years. The Receiver tacitly acknowledged that his proposed rate increases would violate Alabama law (which mandates that rates be reasonable and nondiscriminatory) by concurrently proposing that the County subsidize the proposed rate increase from its own general funds. To attempt to address this problem, the Receiver demanded that the County pay to him immediately $75 million in cash from its general funds, on the novel theory that he — not the County — was the rightful recipient of the $75.0 million received by the County from JPMorgan Securities pursuant to a settlement with the SEC that was intended to compensate the County for the harm it suffered, not to be recirculated back to those who caused the harm. The County therefore faced the intolerable circumstance of having an unelected third party attempt both to impose unreasonable sewer rate increases on the County's citizens and to seize the last monies in the County's general fund reserves, all for the benefit of the holders of the very indebtedness that has wreaked havoc on County's solvency and financial wherewithal. To compound matters, one of the insurers of the Sewer System debt launched litigation against the County in New York, forcing the County to divert precious general fund dollars to defend that action. Unfortunately, and despite herculean efforts in the two months since the execution of the term sheet, the County could not achieve a settlement that fairly adjusted the Sewer System liabilities.

Second, while the Sewer System calamity was unfolding, a combination of litigation and lack of legislative action left the County without the ability to collect an occupational tax, one of the County's principal sources of revenue and the only significant source of revenue without earmarks. The loss of the occupational tax eliminated over $75.0 million of annual revenues

1/2245516.4

used to fund the County's general operations and payment of long-term general obligations, forcing the County to implement severe cuts in services. To compound matters, the County faced potential liability of approximately $100.0 million related to occupational taxes collected while legal challenges were pending.[2] Efforts to address the general fund crisis through legislative action have been unsuccessful.

The general fund crisis is severe and requires urgent legislative action now more than ever. The Chapter 9 filing will not, in and of itself, remove the need for this legislative action. However, the fact remains that the Sewer System calamity is the principal precipitating cause of this Chapter 9 filing. The Sewer System crisis has triggered the acceleration of tens of millions of dollars of long-term general fund obligations, forced the County to incur massive legal fees, and diverted the resources and attention of County officials, thereby materially contributing to the general fund crisis. Moreover, the uncertainty and litigation surrounding the Sewer System has clouded the County's efforts to convince legislators to reauthorize the County's collection of its occupational tax. The County has been forced to deal with concerns that any revenues restored to the County's general fund might somehow fall into the hands of the Sewer System creditors via the Receiver, as opposed to benefiting the residents of the County and the County's general fund creditors. The Chapter 9 case will prevent the non-recourse Sewer System creditors from taking any such action, and will allow the County to deliver a clear message to the Alabama Legislature that restoration of the County's general fund revenues will benefit only the County's residents and its general fund creditors.

## A.     The Chapter 9 Case.

There has been a wholesale change in the makeup of the five-member Jefferson County Commission (the "County Commission") over the past 17 months. The financial problems of the

---

[2] As described in detail below, the County disputes any such liability.

Case 11-05736-TBB9    Doc 10    Filed 11/09/11    Entered 11/09/11 18:50:23    Desc Main
Document      Page 5 of 64

County were severe and well-known when each of the Commissioners took their current offices. The newly-elected Commissioners have inherited the problems before them, and are determined to restore the County's finances and clean up the lingering mess resulting from the Sewer System fraud.

The County has negotiated extensively with creditors in good faith over the past three and a half years. Over the past several months, the County Commission has pursued these negotiations with particular vigor, proceeding so far as to approve a comprehensive term sheet outlining a global debt restructuring plan. The combined loss of the occupational tax, the failure to replace that revenue source through legislation, the threatened loss of the County's remaining cash reserves, and the intransigence of many of the County's main creditors have rendered further out-of-court efforts fruitless. Based on the cumulative effect of these factors, relief in this Court is necessary to structure a long term plan for the County's financial viability pursuant to a Chapter 9 plan of adjustment.

Although the County's commencement of this Chapter 9 case is a bitter, albeit necessary pill, the filing will confer immediate benefits on the County and its residents.

First, the automatic stay imposed under Sections 362 and 922 of the Bankruptcy Code gives the County and its citizens a respite against time-consuming and expensive litigation. The automatic stay will stop the Receiver's reign over the Sewer System, acting as an unelected agent for the interests of the very creditor constituencies so heavily responsible for the County's present financial predicament. The automatic stay will restore control of the Sewer System to the County Commission, which is uniquely responsible for balancing sometimes competing constituencies and concerns for the entire County's well-being.

1/2245516.4

Second, with respect to the Sewer System debt in particular, Chapter 9 not will not change the fact that, as a matter of contract and state law, this indebtedness is and remains a non-recourse liability entitled to repayment solely from the net revenues derived from the Sewer System. On the contrary, specific provisions of Chapter 9 expressly recognize both the non-recourse status of this liability and the right of the County to recover costs associated with the operations of the Sewer System out of and from Sewer System revenues. *See* 11 U.S.C. §§ 927 and 928(b). Chapter 9 specially empowers the Bankruptcy Court to determine the amount of any allowed secured claim held by those creditors and to enable the County to discharge the balance of that debt, forever, from its books. In short, Chapter 9 recognizes that the Sewer System creditors' sole right is to receive repayment from net revenues derived from the operation of the Sewer System. The amount to be repaid will be based on the Court's valuation of the creditors' interest in the net Sewer System revenues, which will fix the amount of the creditors' secured claim.

Third, the Chapter 9 filing should bolster the County's plea for prompt legislative action to restore a source of funding for the general fund so that the County can continue to provide a modicum of services for the County's residents. By commencing this case, the County has taken an important step toward bringing about a resolution, once and for all, of its financial problems. With the County now poised to restructure the Sewer System debt through Chapter 9, the Alabama Legislature can now confidently do its part to address the County's general fund crisis.

Finally, Chapter 9 permits the County to continue to hold JPMorgan accountable for the damages it inflicted on the County through continued prosecution of the County's pending action against JPMorgan in the Jefferson County Circuit Court. This is an asset that belongs to the County for the benefit of its residents and its creditors.

7

As demonstrated below, the County meets each and every requirement enumerated under Section 109(c) of the Bankruptcy Code for eligibility for Chapter 9 relief.

**B.      Lack of Home Rule.**

Understanding why the County is eligible for Chapter 9 relief requires a brief discussion of how the County raises revenues, how the loss of the occupational tax has affected the County's general fund finances, and how the Sewer System crisis dramatically affected the County's finances despite the non-recourse status of the Sewer System indebtedness. The Alabama Constitution contains no local government article and does not provide for home rule for counties. Section 44 of the Alabama Constitution vests all legislative power in the Alabama Legislature. Because counties are instrumentalities of the State and have only such power as granted them by the State, county governments in Alabama have no general authority to act. Additionally, Section 104 of the Alabama Constitution prohibits the Alabama Legislature from passing local bills on a number of specific subject areas. As a result, a statewide vote is required to permit the legislature to pass many bills related to local issues. Furthermore, although the Alabama Constitution gives counties the power and authority to levy property taxes and issue debts, the tax and debt limits were set in 1901 and are so low that it has been necessary over the years to adopt numerous constitutional amendments to allow appropriate levels of property taxes and debt limits for various counties, including the County.

**C.      Earmarking.**

The lack of home rule and the attendant concentration of power in the Alabama Legislature frequently result in the "earmarking" of any County revenue sources the Alabama Legislature approves. These earmarks are not necessarily aligned with the funding needs of the County. In some instances, revenues are earmarked for uses wholly unrelated to the County. As

1/2245516.4

a result, much of the revenue collected by the County cannot be used by the County in its discretion.

Two examples illustrate the lack the County's lack of autonomy over the revenue it collects. The County collects a two-cents-per-dollar general sales tax, which on average generates $14.0 million of revenues monthly. Collections from this sales tax are allocated as follows:

1) one cent of each two cents collected is dedicated solely to the payments of the County's so-called "School Warrants" (on average, approximately $7.0 million a month);

2) collections on the next one-half-of-a-cent in tax are allocated as follows:

    a.) a collection cost of generally 1.5% is first paid to the County (around $52,500 monthly);

    b.) of the balance of collections remaining —

        i.) 9% goes to the Jefferson County Board of Health (around $310,275 monthly);

        ii.) 91% goes to Jefferson County Indigent Care Fund (around $3.137 million monthly);

3) collections on the remaining one-half-of-a-cent in tax are allocated as follows:

    a.) the first $100,000 of monthly collections is paid to the Jefferson County Civic Center Authority;

    b.) of the balance of collections remaining —

        i.) 31% goes to the Jefferson County Board of Health (approximately $1.054 million monthly); and

        ii.) 69% goes to the Jefferson County Treasurer for general fund purposes (around $2.346 million monthly).

As a result, for every dollar the County collects in sales tax, only about 16.76 cents may be used by the County without restriction.

1/2245516.4

Likewise, for each dollar the County collects in *ad valorem* taxes, approximately 45% is allocated to roads and bridges and approximately 5% is allocated to Sewer System improvements, leaving only roughly 50% of *ad valorem* taxes for use by the County without restriction.

### D. Loss of Occupational Tax.

#### 1. Origin of the Occupational Tax.

Given the limitations on the County's ability to raise revenue and the earmarks on its revenue sources, the County has often struggled to fund the basic services for its citizens. In 1967, the Alabama Legislature passed an act authorizing the County to collect an occupational tax on earnings of workers employed in the County (the "Occupational Tax"), as well as a business license fee. The original version of the Occupational Tax did not contain any earmarks, and the County relied on the Occupational Tax as its primary source of unrestricted general fund revenues for decades.

Between 2000 and 2009, the Occupational Tax provided roughly $600 million to the County and provided over 40% of the funding for the County's general administration and the Sheriff's department. For fiscal year 2010, which ended on September 30, 2010, unrestricted revenues in the County's general fund (the "Unrestricted General Fund Revenues") totaled approximately $207.2 million. Approximately $50 million of the 2010 Unrestricted General Fund Revenues were related to one-time non-recurring revenue events. For fiscal year 2010, revenues from the Occupational Tax and business license fees totaled approximately $75.7 million, accounting again for roughly 48% of recurring Unrestricted General Fund Revenues. By contrast, for fiscal year 2011 – the year in which the County lost the Occupational Tax (as described further below) – Unrestricted General Fund Revenues totaled approximately $152.47 million, with approximately $46.9 million of that amount attributable to non-recurring revenue

10

1/2245516.4

events. The County collected only $15.3 million in Occupational Taxes from the beginning of the 2011 fiscal year and December 1, 2010 – the date that a judgment invaliding the tax became final.

### 2. The Courts' Invalidation of the Occupational Tax.

The Occupational Tax has been the subject of nearly continuous litigation from 1987 through the present. Considerable litigation focused on the constitutionality of the Occupational Tax. To date, the Occupational Tax has been challenged in court no fewer than 17 times. Until recently, the Occupational Tax had survived all legal challenges, including two trips to the United States Supreme Court.

#### a. The Edwards Case.

In 2007, certain taxpayers initiated a lawsuit (the "Edwards Case") attacking the Occupational Tax. The County vigorously defended the lawsuit. In January 2009, the trial court ruled that, based on legislative action taken in 1999 to repeal the Occupational Tax, the County had been collecting the tax without due statutory authority since 1999.

The trial court in the Edwards Case stayed its judgment to afford the Alabama Legislature an opportunity to reinstate the Occupational Tax. However, the Alabama Legislature did not pass legislation to revive the Occupational Tax during the 2009 regular session, and the stay expired. Having lost its critical source of General Unrestricted Fund Revenues, the County implemented severe spending cuts and laid off more than 1,000 workers, severely limiting its ability to perform its core governmental functions.

In light of the County's fiscal emergency, then-Governor Bob Riley called a special session of the Alabama Legislature, during which it enacted a new statute authorizing future collection of the Occupational Tax and ratifying, validating and confirming the County's collection of the Occupational Tax retroactive to 1999.

1/2245516.4

In August 2009, the Alabama Supreme Court affirmed the trial court's decision in the Edwards Case, but recognized that the County had a valid claim to the Occupational Taxes collected between the time of the trial court's ruling and the effective date of the 2009 legislation that retroactively authorized the County's collection of the Occupational Tax.

Earlier this year, the County and the plaintiffs in the Edwards Case reached a settlement regarding the Occupational Tax collected during this gap period. This settlement provides for the payment of approximately $6.4 million to the County from previously escrowed funds, with the Edwards plaintiffs and their counsel receiving approximately $31.7 million. The trial court in the Edwards Case held a fairness hearing on this settlement on August 8, 2011, at which the settlement was approved.[3]

### b.      The Weissman Case.

The 2009 legislation reauthorizing the County's collection of the Occupational Tax was challenged in a class action lawsuit brought by taxpayers against the County in December 2009 (the "Weissman Case"). Again, the County vigorously defended the lawsuit. The trial court eventually ruled that, because of the Alabama Legislature's failure to comply with certain publication requirements, the 2009 legislation was unconstitutional and void. However, the trial court denied the plaintiffs' request that the County be ordered to refund approximately $100 million of Occupational Tax collected between the effective date of the 2009 legislation and the date of the trial court's final judgment in the Weissman Case.

Both the County and the plaintiffs appealed the trial court's ruling to the Alabama Supreme Court. On March 16, 2011, the Alabama Supreme Court upheld the trial court's ruling that the 2009 legislation was unconstitutional and void, once again cementing the County's loss

---

[3] Two intervenors have appealed the final approval order to the Alabama Supreme Court. The County has moved to dismiss that appeal.

1/2245516.4

of the Occupational Tax. Still pending before the Alabama Supreme Court is the issue of whether the County must refund the approximate $100 million in Occupational Tax collected between the effective date of the 2009 legislation through the date of the trial court's final judgment. As set forth more fully below, the County has insufficient cash on hand to repay this $100 million claim if the Alabama Supreme Court reverses the lower court's ruling in the Weissman Case.

### 3. Unsuccessful Legislative Efforts to Provide Financial Relief to the County.

Following the court rulings in the Weissman Case, the County made a concerted effort to persuade the Alabama Legislature to pass legislation during its regular 2011 session to remedy the County's revenue problems caused by the loss of the Occupational Tax. The first option was to pass "limited home rule" legislation that would grant the County limited authority to raise tax revenue without specific state legislative approval. The second option was to pass "un-earmarking" legislation that removed certain restrictions on the County's use of tax revenues, which would have improved the County's ability to adapt to changing economic circumstances by allowing the County to allocate funds where needed.

The "home rule" legislation was approved in the Alabama House of Representatives and enjoyed the support of a majority of the County's delegation in the Alabama Senate. However, under state legislative procedures related to bills affecting local issues, a lone State Senator blocked a vote on the legislation in the Alabama Senate, effectively killing the "home rule" bill. Likewise, the "un-earmarking" legislation faced opposition from state legislators that were intent on preserving earmarks for certain County functions. As a result, the regular 2011 legislative session concluded without a legislative fix for the loss of Occupational Tax revenues.

1/2245516.4

### E.     The County Slashes Expenses.

Independent of its efforts to persuade the Alabama Legislature to pass legislation to help the County with its revenue problems, the newly-elected members of the County Commission made drastic cuts in the County's expenditures in an attempt to make up for the loss of the Occupational Tax.  The spending cuts affected nearly every County department and resulted in sweeping reductions in basic services.  In the first few months of 2011, the County Commission reviewed the budget approved by the previous commission to look for ways to reduce expenditures without laying off employees.  The County Commission identified and promptly implemented measures to reduce the County's expenditures by over $30 million on an annualized basis, trimming $22.3 million in budgeted expenses from the general operating fund, $4.2 million from the capital projects fund, and $3.9 million from the County-operated Cooper Green Hospital's budget.

Even after these cuts were made, the County still faced a significant operating deficit due to the Alabama Legislature's failure to restore the Occupational Tax during the regular 2011 legislative session.  The County Commission again took action.  In June 2011, the County placed approximately 500 employees on leave without pay and eliminated approximately 160 remaining vacant positions, trimming over $11 million from the County's annual general fund budget.  The County Commission also made cuts to various contracts with outside vendors and suppliers, resulting in additional annualized savings of approximately $1.0 million.

During 2011, the County has taken numerous cost-cutting measures, including:

- All employees in the Sheriff's department have been placed on a reduced workweek.

- Curtailment of generally all of the Sheriff's law enforcement actions, including responding to traffic accidents.

- Cessation of most street paving and all roadside mowing.

14

1/2245516.4

- Drastic reductions in maintenance on all County buildings.

- Drastic reductions in security services at County courthouses, resulting in stop-gap funding for security at criminal, domestic relations and family courts through the end of fiscal year 2011, with no permanent solution.

- Closure of the County's four satellite courthouse locations and consolidation of services at the Birmingham courthouse.

- Termination of all non-essential County contracts.

- Strict monitoring and restriction of overtime.

- Strict monitoring and restriction of discretionary expenditures.

- Strict implementation of hiring freeze with exceptions made only where critical need is demonstrated.

- Formation of an internal investment committee to replace external investment advisory services.

The County Commission's efforts to reduce expenses continue, including the recent retention of financial advisors to assist the County in maximizing operational efficiencies.

### F. The April 27, 2011 Tornadoes and the County's Clean-Up Costs.

On April 27, 2011, communities throughout the County were devastated by damage from numerous tornadoes that tore through the region. Tragically, at least 21 people in the County were killed by these tornadoes. The worst of the tornadoes hit late that afternoon, when a massive category EF-4 tornado moved through the heart of the County and decimated the communities of Pleasant Grove and Concord, among others. Earlier that day, a category EF-2 tornado caused extensive damage through communities in the southernmost part of the County.

The County immediately undertook the daunting task of cleaning up the physical damage the tornadoes left behind. These clean-up efforts have imposed additional, unexpected costs upon the already cash-strapped County. Recognizing the importance and urgency of the situation, the County Commission authorized the usage of up to $25.0 million of the County's

15

1/2245516.4

remaining operating reserves to finance the clean-up efforts. To date, the County has drawn $20.0 million from its operating reserve to fund these efforts. Of that amount, the County has been reimbursed approximately $7.28 million by the Federal Emergency Management Agency ("FEMA"), which funds the County has used to replenish its meager operating reserve. The County is hopeful that, over time, FEMA will reimburse the County for all of its costs incurred responding to the tornado damage. Until then, however, the substantial costs of the storm clean-up have further strained the County's cash position.

### G. The Financial Problems of the Sewer System Result in Substantial Claims against the County's General Funds.

As described in greater detail below, the County's outstanding Sewer System warrants are non-recourse debts for which the County's general fund has no repayment obligation. Nevertheless, the financial problems of the Sewer System have caused significant and unexpected claims against the County's general fund to be asserted or accelerated. These claims include the following:

- The acceleration of the $105.0 million of the County's outstanding Series 2001-B general obligation warrants (the "Series 2001-B GO Warrants"), which warrants were otherwise due to mature in 2021 (see Section II.I below for further discussion);

- The demand made by the Receiver for the payment of $75 million from the County's operating fund, which demand is premised on the Receiver's contention that money paid by JPMorgan to the County pursuant to JPMorgan's settlement with the SEC is subject to clawback by him for the benefit of the Sewer System's non-recourse creditors (see Sections II.H.4.a and II.H.6 below for further discussion);[4]

- The assertion of claims and counterclaims against the County by certain insurers and holders of the Sewer System warrants, alleging that the County's general fund should be liable for alleged improper conduct of the County with respect to the

---

[4] As discussed below, the County disputes the Receiver's claims.

1/2245516.4

non-recourse Sewer System warrants (see Section II.H.4.b below for further discussion);[5] and

- The incurrence of substantial legal fees defending claims asserted by one of the insurers of the Sewer System warrants.

By itself, the County's undisputed liability for the accelerated Series 2001-B GO Warrants vastly exceeds the balance of the County's general fund reserves.

### H. Sewer System Debt Crisis.

#### 1. Consent Decree.

The County's financial distress related to its Sewer System originated with a consent decree (the "Consent Decree") entered by the United States District Court for the Northern District of Alabama in 1996. The Consent Decree imposed extremely burdensome requirements on the County, including a provision that the County could allow *"no* sewer overflows,"[6] which is an unattainable objective. Moreover, the Consent Decree called for compliance with these burdensome objectives by 2007, an unreasonably aggressive schedule that forced the County to come into compliance in less than half the time given to other systems throughout the country. For example, in a 2010 consent decree, the EPA gave the City of Honolulu 25 years to come into compliance.

While initial projections of the cost of implementation ranged between $250 million and $1.2 billion, the costs ultimately ended up being far higher than anyone had anticipated. Under the Consent Decree, the County agreed to take responsibility for a consolidated Sewer System serving twenty-one municipalities, whose sewer lines generally were in far worse condition than the parties to the Consent Decree originally had anticipated. Contracting inefficiencies, certain engineering decisions, and the corruption of certain public officials contributed to the increased

---

[5] As discussed below, the County disputes these claims.
[6] Sewer overflows are common to all sewer systems. Hard rains cause groundwater to rise and infiltrate sewer pipes, increasing the amount of water that the system has to process.

17

cost of the Sewer System. Some of the engineering decisions relate directly to the "no sewer overflows" mandate set forth in the Consent Decree, but the County also expanded the capacity of the Sewer System to accommodate anticipated increases in usage that have not materialized. Moreover, more than twenty County officials, contractors, and other parties have been indicted for federal crimes, including, in some of these cases, for bribery of public officials in connection with the letting of contracts related to the Sewer System and the transactions that resulted in the County's current Sewer System debt structure.

As a result of the foregoing factors — and due to refinancing efforts that generated hundreds of millions of dollars in transactional costs — the overall debt associated with the improvements to the Sewer System and related financing today exceeds over $3.1 billion in principal alone. Since 1997, in an effort to service this Sewer System debt, the County increased Sewer System rates by a total of 329% through a series of incremental rate increases.

### 2. Corruption and the Sewer System's Risky Financial Structure.

To fund the cost of the improvements to the Sewer System, the County issued the following non-recourse debt obligations: Sewer Revenue Warrants Series 1997-A-B-C, Series 1997-D, Series 1999-A, Series 2001-A, Series 2002-A, Series 2002-B, Series 2002-C, Series 2002-D, Series 2003-A, 2003-B and Series 2003-C (collectively, the "Sewer Warrants").[7] Significantly, as noted, the Sewer Warrants are not backed by the full faith and credit of the County. Under the Trust Indenture dated as of February 1, 1997 (as supplemented and amended, the "Indenture")[8] and Alabama Code §11-28-3, the only collateral for the Sewer Warrants is the "net" revenues of the Sewer System. The "net" revenues are the revenues produced by the

---

[7] The Series 1997-A, 2001-A, 2002-A, 2002-C, 2003-A, 2003-B, and 2003-C warrants remain outstanding. For a detailed discussion of the County's debt structure, including a more detailed description of the Sewer Warrants, see the attached Exhibit A.

[8] A copy of the Indenture (including all supplemental indentures) is being filed with the Court under separate cover contemporaneously herewith.

1/2245516.4

Sewer System (the "System Revenues") that remain *after* the payment of the Operating Expenses[9] of the Sewer System (the "Net System Revenues").[10] Thus, the holders of the Sewer Warrants have no legal right to the County's general fund or to the County's other assets for repayment.

The parties' rights and obligations with respect to the Sewer Warrants are governed in large part by the Indenture. The Bank of New York Mellon Trust Company, N.A. (the "Indenture Trustee") serves as the trustee pursuant to the Indenture. The Indenture contains, among other things, a covenant (the "Rate Covenant") that requires the County to fix, revise and maintain rates sufficient to cover, *to the extent permitted by law,* all payments of principal, interest and premium due under the Sewer Warrants.

The law referenced in the Indenture includes, most prominently, Amendment 73 to the Alabama Constitution. Amendment 73 vests the County with the authority over the sewers:

---

[9] As used herein, the term "Operating Expenses" has the meaning set forth in the Indenture, which states:

> "Operating Expenses" means, for the applicable period or periods, (a) the reasonable and necessary expenses of efficiently and economically administering and operating the System, including, without limitation, the costs of all items of labor, materials, supplies, equipment (other than equipment chargeable to fixed capital account), premiums on insurance policies and fidelity bonds maintained with respect to the System (including casualty, liability and any other types of insurance), fees for engineers, attorneys and accountants (except where such fees are chargeable to fixed capital account) and all other items, except depreciation, amortization, interest and payments made pursuant to Qualified Swaps, that by generally accepted accounting principles are properly chargeable to expenses of administration and operation and are not characterized as extraordinary items, (b) the expenses of maintaining the System in good repair and in good operating condition, but not including items that by generally accepted accounting principles are properly chargeable to fixed capital account, and (c) the fees and charges of the Trustee. Payments or transfers of Sewer Revenues into the General Fund of the County shall constitute payments of Operating Expenses if and to the extent that the services or benefits for which such payments or transfers are made are such that payments to a Person other than the County for such services or benefits would constitute payments of Operating Expenses.

Indenture, p. 8-9.

[10] Section 11-28-3 of the Alabama Code serves as the basis for the County's statutory power to grant a lien to secure limited obligation warrants, like the Sewer Warrants. Accordingly, Article 9 of the Uniform Commercial Code, as adopted in Alabama, does not govern the grant of this lien. See Ala. Code § 7-9A-109(c)(2) and -109(d)(14). The Indenture is not intended to, and cannot, expand the County's statutory power to grant a lien to secure the Sewer Warrants. See Ala. Code § 11-28-3; see generally, *Cooper v. Houston Cnty.*, 112 So. 2d 496, 498 (Ala. App. 1959) ("Counties are governmental agencies of the State, and are liable for those claims only which the law empowers them to contract for...and ordinarily a recovery cannot be had on a contract entered into with a county governing body if the contract is beyond the authority given the governing body by statute within constitutional limitations.").

19

1/2245516.4

"The governing body of Jefferson county shall have full power and authority to manage, operate, control and administer the sewers and plants herein provided for." Ala. Const. amend. 73. To that end, the County Commission is empowered to "make any reasonable and nondiscriminatory rules and regulations fixing rates and charges, providing for the payment, collection and enforcement thereof, and the protection of its property." Amendment 73 makes clear — as a matter of Alabama constitutional law — that the County Commission has mandatory control over the Sewer System, including ratemaking. As a result, any right conferred upon creditors under the Indenture is a narrow, contractual, debt-collection remedy: the County did not alienate its Amendment 73 powers.

The 2002 and 2003 issuances and related agreements were authored and marketed primarily by JPMorgan and certain of its affiliates. The JPMorgan executive that marketed the current Sewer System debt products to the County has been convicted of crimes relating to a similar arrangement JPMorgan brokered in Philadelphia. Likewise, Larry Langford, then-President of the County Commission, also was convicted on bribery charges associated with these financing arrangements.

In a subsequent enforcement action related to the marketing and sale of the Sewer Warrants, the SEC determined that the County was directly harmed by JPMorgan's actions, including damage to the County's reputation, credit rating, and ability to refinance its debt. Pursuant to an order entered in that action (the "SEC Cease-and-Desist Order"),[11] the SEC found that representatives of JPMorgan funneled millions of dollars to local broker-dealers connected with certain former County Commissioners in order to secure JPMorgan's selection as underwriter and swap provider on several of the Sewer Warrant issuances and related swap

---

[11] A copy of the SEC Cease-and-Desist Order is being filed with the Court under separate cover contemporaneously herewith.

1/2245516.4

agreements. The SEC further determined that JPMorgan incorporated these funneled payments into higher swap interest rates, directly increasing the swap transaction costs to the County and its taxpayers.

Pursuant to the SEC Cease-and-Desist Order, the SEC required that JPMorgan pay the County $50.0 million, terminate its swap agreements with the County associated with the Sewer Warrants, waive approximately $647.0 million in swap termination fees, and pay $25.0 million into an SEC Fair Fund. The SEC's plan of distribution of the $25 million Fair Fund (the "Fair Fund Distribution Plan")[12] proposed to pay all those monies to the County. The SEC gave notice for parties to comment upon or object to the Fair Fund Distribution Plan. Pursuant to a subsequent order (the "Fair Fund Distribution Order"),[13] the SEC approved the Fair Fund Distribution Plan and disbursed the $25.0 million to the County as the sole party harmed by the wrongdoing. The Fair Fund Distribution Order noted that no objections or comments had been received by the SEC with respect to the Fair Fund Distribution Plan, nor did anyone assert a competing claim to the Fair Fund monies. The $75.0 million in total funds that the County received as a result of SEC's actions (the "SEC Compensation Funds") have been deposited into the County's general operating accounts along with the County's other unrestricted revenues.

The SEC enforcement action and related payment of the SEC Compensation Funds did not fully compensate the County for the harm caused by JPMorgan. Accordingly, the County filed a civil lawsuit against JPMorgan in the Circuit Court of Jefferson County, Alabama, case number CV-2009-903641.00, seeking damages for fraud associated with JPMorgan's role in the issuance of the Sewer Warrants and related agreements (the "JPMorgan Fraud Lawsuit"). The County has successfully overcome JPMorgan's attempts to dismiss the lawsuit on various

---

[12] A copy of the Distribution Plan is being filed with the Court under separate cover contemporaneously herewith.
[13] A copy of the Fair Fund Distribution Order is being filed with the Court under separate cover contemporaneously herewith.

1/2245516.4

procedural grounds, and remains determined to prosecute the lawsuit for the benefit of its citizens.

Of the series of Sewer Warrants issued in 2002 and 2003, nearly 95% are either variable rate demand warrants or auction rate warrants. The County's variable rate demand warrants set forth the timing and terms and conditions upon which the rate of interest will adjust. For some of the County's variable rate demand warrants, the rate of interest adjusts daily. For others, the rate of interest adjusts weekly. The County's auction rate warrants provide that such warrants are sold by "Dutch auction" on a set schedule (generally every week or every five weeks). The auction process determines the interest rate for the warrants until the next auction. If an auction fails, the holders of the warrants are entitled to a penalty rate of interest that compensates the holder for their inability to sell.

Because of the risk of fluctuations in interest rates, the variable rate demand warrants and auction rate warrants often were credit-enhanced by standby warrant purchase agreements, bond insurance, or both. Pursuant to standby warrant purchase agreements associated with the 2002 and 2003 variable rate Sewer Warrants, certain financial institutions agreed to purchase such warrants from the original warrant holders under certain conditions. Generally, the standby warrant purchase agreements required the County to pay a higher rate of interest to the purchasing financial institution. In some instances, the standby warrant purchase agreements also required the County to redeem the warrants from the financial institution on an accelerated schedule.[14]

Several companies, including Financial Guaranty Insurance Corporation ("FGIC"), Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc. ("Syncora"), and Assured

---

[14] One of the counterparties to the standby warrant purchase agreements was JPMorgan. Pursuant to such agreements, JPMorgan purchased millions of dollars of Sewer Warrants. JPMorgan has also purchased other Sewer Warrants and, upon information and belief, is currently the largest holder of the Sewer Warrants.

1/2245516.4

Guaranty Municipal Corporation ("Assured"), as successor to Financial Security Assurance, Inc. (collectively, the "Sewer Warrant Insurers"), insure payment of the principal and interest due on the 2002 and 2003 Sewer Warrants. The Sewer Warrant Insurers served as backstops for investors in the event of a County credit default. Because of the function of bond insurance with respect to the issuance of the Sewer Warrants, the level of the County's debt service obligations under the Sewer Warrants was tied directly to the credit ratings of the Sewer Warrant Insurers.

Pursuant to a financing structure formulated by JPMorgan and others, the County purportedly hedged against the uncertainty of the frequently resetting interest rates related to the variable rate demand warrants and auction rate warrants by entering into swap agreements with respect to certain of the Sewer Warrants (collectively, the "Sewer Swap Agreements"). The Sewer Swap Agreements thereby created a "synthetic" fixed interest rate. In other words, the County paid a fixed interest rate to certain swap providers (the "Sewer Swap Providers") in connection with the Sewer Swap Agreements. In exchange, the Sewer Swap Providers made payments to the County at rates tied to the London Interbank Offered Rate ("LIBOR") or the Securities Industry and Financial Market Association ("SIFMA") Index. Historically, payments from the Sewer Swap Providers always had been sufficient to cover the interest rates as reset under the variable rate demand warrants and auction rate warrants, achieving the desired "synthetic" fixed interest rate the County sought.

### 3. Triggering Events Related to Sewer System Crisis.

Until February 2008, the County remained current on all of its debt service obligations under the Sewer Warrants by raising rates substantially in accordance with the Rate Covenant. In fact, from 1997 to 2008, the County's ratepayers saw their monthly sewer bills more than quadruple. However, a series of unprecedented events in the financial markets caused the

1/2245516.4

County's obligations under the Sewer Warrants to skyrocket to levels at which compliance with the Rate Covenant proved impossible.

First, the credit ratings agencies downgraded the ratings of two of the Sewer Warrant Insurers. The downgrades were based on the insurers' exposure on policies issued by them as credit enhancements to mortgage backed securities collateralized by subprime home loans. Because of the credit downgrades to these insurers, the holders of variable rate Sewer Warrants exercised their option to tender their warrants to liquidity providers, triggering accelerated principal repayment schedules and default interest rates.

Second, when the insurers' credit ratings were downgraded, the auctions related to the County's auction rate warrants failed, as bidders declined to participate at auctions. While historically the Wall Street firms underwriting the auction rate warrants had served as buyers of last resort, in February 2008, they began to refuse to continue in their role as market makers in these securities. The failed auctions caused the rate of interest on the auction rate warrants to skyrocket to the maximum auction rate permitted under the Indenture.

Third, the Sewer Swap Agreements associated with the Sewer Warrants backfired. The variable rates paid to the County by the Sewer Swap Providers were expected to move in tandem with, and roughly match, the variable interest rates payable by the County on the Sewer Warrants. However, as a result of failed bond auctions and ratings downgrades in early 2008, the applicable interest rates on the variable rate and auction rate Sewer Warrants increased dramatically. At the same time, the LIBOR and SIFMA Index fell. As a consequence of this divergence in interest rates, the Sewer Swap Agreements had the opposite of their intended effect. Moreover, as a result of the downgrade of the County's underlying rating on the Sewer Warrants and the failure of the County to execute and deliver collateral agreements or to obtain

1/2245516.4

an insurance policy, one or more termination events occurred under each of the Sewer Swap Agreements. All Sewer Swap Agreements have been terminated, triggering termination fees totaling over $100.0 million in the aggregate. This aggregate total of termination fees does not include $647.0 million in fees that would have been owing to JPMorgan with respect to the Sewer Swap Agreements had such fees not been waived pursuant to the SEC Cease-and-Desist Order.

### 4. Litigation and Appointment of Receiver.

#### a. Receivership Litigation.

In October 2008, the Indenture Trustee, Syncora, and FGIC filed suit against the County in the United States District Court for the Northern District of Alabama, seeking the appointment of a rate-making receiver under the Indenture. Though the plaintiffs sought the appointment of a receiver on an emergency basis, the federal court attempted to foster a consensual resolution to the crisis by appointing special masters to analyze the Sewer System debt crisis and to propose solutions. Those masters, John Young and John Ames, were appointed in November 2008 and produced their initial report in February 2009. After the report was published, the federal court set the plaintiffs' emergency motion for the appointment of a receiver for a hearing. The County raised two jurisdictional defenses— the Johnson Act, 28 U.S.C. § 1342, and abstention under the *Thibodeaux* doctrine — that persuaded the federal court to abstain. The federal court entered its abstention order in June 2009.

In *The Bank of New York Mellon, et al, v. Jefferson County, Alabama,* CV-2009-002318 (the "Receivership Case"), the Indenture Trustee (but not the Sewer Warrant Insurers) filed suit in Jefferson County Circuit Court (the "State Court") seeking the appointment of a receiver to facilitate collection of the Sewer Warrant indebtedness. The case was stayed until late December at the Indenture Trustee's request, pending resolution of a recusal issue relating to the appointed

Case 11-05736-TBB9    Doc 10    Filed 11/09/11    Entered 11/09/11 18:50:23    Desc Main
Document      Page 25 of 64

judge. After accelerated discovery, the State Court granted the Indenture Trustee's motion for partial summary judgment. Pursuant to an order effective as of September 22, 2010 (the "Receiver Order"),[15] the State Court, relying upon Alabama Code § 6-6-620 (which is specifically part of the Remedies Chapter, *i.e.,* Chapter 6 of Title 6 of the Alabama Code) and Section 13.2 of the Indenture (titled "Remedies on Default"), appointed the Receiver to operate the Sewer System.

On July 8, 2011, the State Court entered a further order directing the County to provide the Receiver signature authority over all existing bank accounts relating to the Sewer System and any other Cash Equivalent Assets (as that term is defined in the Receiver Order) of the Sewer System.

On June 14, 2011, the Receiver published his First Interim Report on Finances, Operations, and Rates of the Jefferson County Sewer System (the "Receiver's Interim Report").[16] In the Receiver's Interim Report, the Receiver announced his intention to take immediate, unilateral measures to increase Sewer System revenues by 25%, through the levying of a higher "monthly service charge" on all Sewer System customers, increases of the Sewer System's volumetric rates upon certain customers, and the doubling (or more) of certain surcharges. The net effect of the Receiver's interim proposals would be a 25.37% immediate increase in residential rates and a 21.72% immediate increase in non-residential rates (excluding rates for grease and septage, and other surcharges).

The Receiver's Interim Report acknowledged that these proposed measures and any future rate increases would not be sufficient to repay the outstanding Sewer System debt. Nevertheless, the Receiver noted that he would also "implement multiple rate increases until

---

[15] A copy of the Receiver Order is being filed with the Court under separate cover contemporaneously herewith.
[16] A copy of the Receiver's Interim Report (without exhibits) is being filed with the Court under separate cover contemporaneously herewith.

1/2245516.4

revenues are sufficient." The Receiver did not provide any analysis of what "sufficient" rates or revenues would be, asserting instead that rates, fees and other charges must rise even in the absence of any comprehensive plan to restructure the Sewer System debt.

The Receiver recognized that a 25% revenue increase would impose a severe burden on many residential customers, particularly low income users. Even though, as noted, Alabama law requires that rates be reasonable and nondiscriminatory, and even though the Indenture Trustee's lien extends only to Net System Revenues, the Receiver proposed that the *County* should subsidize the Receiver's proposed rate increase from its own general funds. Specifically, the Receiver demanded that the County pay him $75 million from its general fund based on his theory that the holders of the Sewer Warrants (including the largest holder of them all, JPMorgan) — and not the County and its citizens — were the rightful beneficiaries of JPMorgan's settlement with the SEC.[17]

Recognizing the potential harm to ratepayers that would result from such a drastic increase in Sewer System usage rates, fees and other charges, Luther Strange, Attorney General of the State of Alabama (the "Attorney General"), filed a motion to intervene in the Receivership Case to protect the interest of ratepayers and to enforce Alabama law. On July 25, 2011, the court granted the Attorney General's motion.

### b. New York Bond Insurer Litigation.

Prepetition, the County also was engaged in litigation brought by two of the three principal Sewer Warrant Insurers, Syncora and Assured. Syncora sued the County and JPMorgan in New York Supreme Court, claiming that the County and JPMorgan defrauded Syncora in two ways: (1) failing to disclose JPMorgan's bribery of County officials; and (2)

---

[17] The County disputes any claim of the Receiver to the County's general funds and his claim that the Receiver and the Sewer Warrant Creditors – and not the County – should have received the SEC Compensation Funds.

1/2245516.4

failing to disclose an independent engineer's report from March 2003 that predicted that substantial increases in Sewer System revenue would be necessary to finance the Sewer System debt. JPMorgan has cross-claimed against the County for indemnification, asserting in this case the same claim that is raised by JPMorgan's counterclaim in the JPMorgan Fraud Lawsuit. Syncora claims in excess of $400 million in compensatory damages, as well as punitive damages. As with the potential adverse judgment in the Weissman Case, the County has insufficient cash on hand or future revenues to pay any adverse judgment in this litigation with Syncora.

Assured's suit is substantially similar to Syncora's, but Assured did not sue the County. Instead, it sued JPMorgan for fraud in New York Supreme Court. JPMorgan then filed a third-party complaint against the County for indemnification. JPMorgan's claim against the County in the Assured lawsuit is substantially similar to its counterclaim in the JPMorgan Fraud Lawsuit and its cross-claim in the Syncora case.

c.        **Ratepayer Litigation.**

In a class action lawsuit styled *Charles Wilson, et al., v. JPMorgan Chase & Company, et al.,* CV-08-901907 (the "Wilson Case"), a putative class of ratepayers has sued the County for, among other things, a declaration that the County's current volumetric sewer rates are unreasonably and unlawfully high, and that the Indenture is void. In many ways, the plaintiffs in the Wilson Case seek the opposite relief from that being pursued by the financial institutions that have sued the County: while the Indenture Trustee has attacked the County for failing to charge enough for sewer service, the ratepayers allege that the fraud and corruption of the sewer construction and financing make the current rates illegally and unconstitutionally excessive.

1/2245516.4

### 5. Negotiations Regarding the Sewer Warrants.

Starting in the spring of 2008 and continuing through the Filing Date, the County attempted to engage in good faith negotiations with the Indenture Trustee, holders of the majority of the Sewer Warrants, and the Sewer Warrant Insurers that issued insurance with respect to the Sewer Warrants (collectively, the "Sewer Warrant Creditors"). From the beginning, the County's efforts were complicated by the fact that the Sewer Warrant Creditors are divided and highly conflicted. Although various Sewer Warrant Creditors were willing to consider concessions, several different constituencies developed within the larger body of the Sewer Warrant Creditors, and these constituencies took different and often adverse positions regarding how concessions should be structured and shared. Certain of the Sewer Warrant Creditors assert claims against one another, and some are even suing one another. At no point during the ensuing three and one half years have the Sewer Warrant Creditors organized and maintained themselves as a cohesive bargaining unit. The County has proposed various financing structures, including multiple written offers of a debt exchange. In all instances, the Sewer Warrant Creditors either rejected (or ignored) the County's offer of a debt exchange. In all negotiations, the Sewer Warrant Creditors have insisted on a refinancing, which will require legislation and other factors the County does not control. However, even when the County recently proposed to *refinance* the Sewer Warrants and agreed to a detailed term sheet with the Receiver regarding that proposal, the necessary Sewer Warrant Creditors failed to support such a deal.

For example, in September 2010 County representatives again asked the Sewer Warrant Creditors to consider a debt exchange. The Sewer Warrant Creditors declined. In expectation of the imminent appointment of the Receiver, several Sewer Warrant Creditors told the County that they want to "see what the Receiver will do" before negotiating further with the County. After

29

appointment of the Receiver, the County urged the Receiver to solicit a settlement offer from the Sewer Warrant Creditors. As reflected in the Receiver's Interim Report, the Receiver encountered problems similar to what the County faced: a divided and conflicted group of creditors that could not reach consensus or speak with a common voice.

In April 2011, the Receiver reported to the County that he was not authorized to make an offer on behalf of the Sewer Warrant Creditors, but did communicate to the County a series of preconditions that the Sewer Warrant Creditors would place on any negotiated settlement, including a requirement of a refinancing. As presented to the County, the Sewer Warrant Creditors' preconditions included action by the Alabama Legislature and other steps beyond the County's control. On May 10, 2011, the County's representatives responded with a letter to the Receiver discussing various points raised by the Sewer Warrant Creditors and requesting further discussions. The County received no response to this letter.

This past summer, when the County's efforts to negotiate any reasonable settlement with the Sewer Warrant Creditors appeared at an impasse, the Attorney General and Governor Bentley expressed a willingness to assist in negotiations with the Sewer Warrant Creditors. Moreover, the Governor expressed the State's willingness to support legislative action in the form of a credit enhancement in connection with a possible *refinancing* of a portion of the outstanding Sewer Warrants. As a result of these developments and with the County's support, on June 27, 2011, the Director of the Alabama Department of Finance (the "Finance Director") and the Receiver agreed that, from June 27, 2011 to July 29, 2011 (the "Standstill Period"): (a) the County would not seek relief under Chapter 9 of the Bankruptcy Code; and (b) the Receiver would not pursue certain of his debt-collection efforts, including his plan to increase sewer rates

Case 11-05736-TBB9   Doc 10   Filed 11/09/11   Entered 11/09/11 18:50:23   Desc Main
Document   Page 30 of 64

immediately by approximately 25% and his demand that the County pay him $75 million immediately from its general funds.[18]

On or about July 11, 2011, the County and the State submitted a good faith settlement offer (the "County/State Settlement Offer") to the Sewer Warrant Creditors. The County/State Settlement Offer was contingent on enactment of legislation by the Alabama Legislature, including the enactment of a revenue replacement tax to fill the funding gap created by the loss of the Occupational Tax. Within two days of the expiration of the Standstill Period, the Receiver delivered to the County and the State an outline of conditions to settlement (the "Receiver Outline"), unsigned by any of the Sewer Warrant Creditors, that set forth what the Receiver believed the Sewer Warrant Creditors would find acceptable. This was the first proposal ever presented with some imprimatur of the Sewer Warrant Creditors, although not a single one of them signed the proposal. Because the timing of the Receiver Outline left the County and the Governor with little time for evaluation and response, and again with the County's support, the Receiver and the Finance Director agreed to a one week extension of the Standstill Period to August 4, 2011.

On August 4, 2011, the County Commission agreed to an extension the Standstill Period until August 12, 2011, in order to facilitate further settlement discussions.

On August 8, 2011, the County submitted a good faith counter-offer to the Receiver Term Sheet. On August 11, the Receiver presented to the County and the State a revised outline of conditions to settlement (the "Revised Receiver Outline"). After considered review, the County Commission determined that the settlement terms set forth in the Revised Receiver Outline were not acceptable for multiple reasons.

---

[18] The Receiver's ongoing debt collection efforts are described in greater detail in Section H.6 below.

Case 11-05736-TBB9    Doc 10    Filed 11/09/11    Entered 11/09/11 18:50:23    Desc Main
Document      Page 31 of 64

On August 12, 2011, the County Commission met to discuss whether to authorize an immediate Chapter 9 filing for the County. In the weeks preceding that meeting, settlement discussions were conducted largely between the Governor's office and the Receiver, with little or no direct communications between the County's representatives and the actual holders of the Non-Recourse Sewer Debt. While appreciative of the efforts of the Governor and the Receiver, the County Commission recognized that the communications between these intermediaries had reached an impasse and that direct negotiations between the County and the actual holders of the Non-Recourse Sewer Debt would be necessary to break the stalemate. Accordingly, the County Commission elected not to authorize a Chapter 9 filing at that time, and instead extended the Standstill Period once again until September 16, 2011 to facilitate direct negotiations with the actual holders of the Non-Recourse Sewer Warrants.

Between August 12, 2011 and September 16, 2011, the County diligently pursued settlement discussions. Arrangements were promptly made for Commissioners Carrington and Stephens to travel to New York in late August to meet face-to-face with representatives of several material holders of the Sewer Warrants to discuss debt restructuring options. The County Commissioners diligently prepared for those meetings by, among other things, meeting with the Governor's Office and with the Receiver to solicit their input on settlement prospects. In August, Commissioners Carrington and Stephens flew to New York and met with representatives of several key creditors of the County, including JPMorgan and the Sewer Warrant Insurers. The meetings were productive and resulted in some apparent progress being made. Upon returning to Birmingham, the County Commissioners continued discussions with the Sewer Warrant Creditors in pursuit of a definitive, comprehensive agreement. County officials also met with

1/2245516.4

various state legislators and representatives of cities located within the County to brief them on the status of negotiations and to solicit their input about the County's debt restructuring.

On or about September 14, 2011, the County submitted the Term Sheet to the Receiver, setting forth the terms and conditions of the County's good faith proposal to refinance the Sewer Warrants. On September 16, 2011, after a properly noticed public hearing, the County Commission passed a resolution approving the Term Sheet.[19] The Term Sheet proposed a definitive debt restructuring agreement to refinance Sewer Warrant indebtedness in the principal amount of $2.05 billion. The Term Sheet also contemplated annual increases of sewer rates of approximately 8.25% for the first three years with subsequent annual rate increases to follow. The Receiver represented to the County that the Term Sheet was supported by holders of a vast majority of the Sewer Warrants.[20]

After over six weeks of negotiations, however, the County has been unable to obtain the agreement of Sewer Warrant Creditors to a definitive settlement agreement that adheres to and is consistent with the terms and conditions of the Term Sheet; on the contrary, the Sewer Warrant Creditors backed away from key concessions previously made, thus rendering a definitive agreement impossible.

### 6. The Receiver's Debt Collection Efforts Hasten Chapter 9.

Continued debt collection efforts by the Receiver have undermined any further out-of-court negotiations regarding the County's debt restructuring and forced the County to seek Chapter 9 protection. The Receiver previously made demand upon the County of over $75 million from the County's general fund. On June 21, 2011, the Receiver demanded in writing

---

[19] A copy of the resolution approving the Term Sheet, along with the Term Sheet, is being filed with the Court under separate cover contemporaneously herewith.

[20] On his website, the Receiver wrote that, pursuant to the Term Sheet, that "[c]reditor's agreed to more than $1 billion in concessions." See John Young, Jr., *Jefferson County is on the brink of financial success*, at www.jeffcowastewaterfacts.com. About the County's approval of the Term Sheet, the Receiver said: "It was a courageous vote — an act of leadership — by the commission . . . ." *Id.*

Case 11-05736-TBB9    Doc 10    Filed 11/09/11    Entered 11/09/11 18:50:23    Desc Main
Document    Page 33 of 64

that the County pay him, within seven days, $75 million on account of the SEC Compensation Funds (the "Receiver's Demand Letters").[21] The Receiver took the position that, notwithstanding the SEC's findings and its decision to pay the funds directly to the County, the funds paid by JPMorgan to the County in connection with JPMorgan's wrongdoing should be applied for the benefit of the Sewer Warrant Creditors — *including JPMorgan.* While settlement negotiations were pursued over the past several months, the Receiver agreed to forbear from pursuing his $75 million demand. Now that certain Sewer Creditors have refused to enter into any definitive agreement consistent with the Term Sheet and further negotiations have been proved impracticable, the Receiver's efforts to collect the $75 million from the County will resume. As the County currently has less than $75 million in unrestricted funds, the Receiver's demand poses a direct and imminent threat to the County's general operations.

The Receiver also has never relented from his plans to impose rate increases upon the Sewer System's customers. In the Receiver's Interim Report, the Receiver stated his intention to increase sewer revenues by 25%. The Receiver then published notice of a public hearing on June 29, 2011 to hear comments about his proposed rate increases. The Receiver's Interim Report stated that, subject to comments received from the public at such hearing, "the Receiver will take the steps necessary to implement the rates described herein." *See* Receiver's Interim Report, p. 71. The Receiver postponed his originally-scheduled public hearing to facilitate the County's settlement efforts over the past several months. The Receiver then indicated he would proceed with a smaller initial increase whether or not the County acquiesced.

---

[21] Copies of the Receiver's Demand Letters are being filed with the Court under separate cover contemporaneously herewith.

1/2245516.4

## I.    Accelerated Obligations Under General Obligation Warrants.

While the Sewer Warrants are non-recourse obligations, as noted above, the problems with those warrants nevertheless have had a profound, adverse financial effect on the County's general fund obligations.  Within two months of the onset of the financial crisis associated with the Sewer System debt, certain of the County's general obligation warrants were purchased by liquidity banks pursuant to standby warrant purchase agreements.  Specifically, the County's Series 2001-B GO Warrants were used to refund in part certain general obligation warrants issued in 1996 and 1999.[22]  The Series 2001-B GO Warrants were issued as variable rate demand warrants with an interest rate that reset weekly.  Holders of the Series 2001-B GO Warrants have the right to tender such warrants for purchase at par, plus accrued interest.  Shortly after the Sewer System debt structure imploded in early 2008, holders of the Series 2001-B GO Warrants began to tender the 2001-B GO Warrants at a rapid pace.

Pursuant to standby warrant purchase agreements, as of March 13, 2008, JPMorgan Chase Bank (successor by merger with Morgan Guaranty Trust Company of New York) and Bayerische Landesbank (formerly known as Bayerische Landesbank Girozentrale) (the "Series 2001-B GO Warrant Liquidity Providers") had purchased approximately $118.75 million in tendered Series 2001-B GO Warrants.  Pursuant to the standby warrant purchase agreement, the County was required to redeem the tendered Series 2001-B GO Warrants in six equal semiannual installments in the amount of $19.79 million each, beginning on September 15, 2008 and continuing through March 15, 2011.

On September 15, 2008, the County, in an attempt to avoid a devastating hit to its general fund, entered into a forbearance agreement with the Series 2001-B GO Warrant Liquidity

---

[22] For a detailed discussion of the County's debt structure, including a more detailed description of the general obligation warrants, see the attached <u>Exhibit A</u>.

Case 11-05736-TBB9    Doc 10    Filed 11/09/11    Entered 11/09/11 18:50:23    Desc Main
Document      Page 35 of 64

Providers. The forbearance agreement was extended again on September 30, 2008 and October 7, 2008. In connection with an October 31, 2008 extension of the forbearance agreement, the County made a partial principal payment of $10.0 million with respect to the Series 2001-B GO Warrants. In connection with a January 15, 2009 extension of the forbearance agreement, the County made a partial principal payment of $5.0 million with respect to the Series 2001-B GO Warrants. The County and the Series 2001-B GO Warrant Liquidity Providers extended the forbearance agreement on March 12, 2009, and the forbearance agreement expired on June 20, 2009 with no further extensions.

Under the accelerated repayment schedule set forth in the standby warrant purchase agreement, the outstanding principal balance owing under the Series 2001-B GO Warrants totaled approximately $105.0 million as of the Filing Date. Representatives of these holders have made it clear that they are not willing to reinstate this indebtedness, but rather, require that the County pay the full amount owing. The County does not have, and does not project that it will have, sufficient cash to pay the debt currently due under the Series 2001-B GO Warrants while also maintaining basic services to its citizens.

### J.     The Cumulative Effect.

The County has struggled on multiple fronts for the past three and a half years to avoid filing a Chapter 9 case. The County attempted to work with the Sewer Warrant Creditors almost immediately upon the onset of the financial crisis that triggered defaults on the Sewer System debt. The County cooperated with the federal court, the special masters, the State Court, and the Receiver in an attempt to reach a long-term solution to the Sewer System debt issues. The County worked tirelessly to persuade the Alabama Legislature to assist not only in a solution to the Sewer System debt crisis, but also with respect to the preservation of the Occupational Tax, the County's key source of unrestricted general revenues. The County fought in the trial courts

36

and before the Alabama Supreme Court to avoid the loss of Occupational Tax revenue. Notwithstanding all of these efforts, the County now has confirmed that its non-bankruptcy efforts are unavailing and will not provide an answer to the County's financial problems.

Accordingly, the County Commission met on November 9, 2011 to consider its options. By a majority vote, the County Commission authorized the County to file its Chapter 9 petition in order to preserve its ability to continue providing essential services to its constituents and to seek adjustment of its debts through this Court.

The decision to file was not made before all other options had been fully explored and pursued. The County did not immediately seek relief under Chapter 9 when the complex Sewer System debt financing instruments imploded, triggering accelerated debts, terminated swaps, and failed auctions. The County did not file when the SEC exposed the inherent corruption of the entire Sewer System debt structure, or when Syncora inexplicably sued the County for fraud associated with that debt. The County did not seek bankruptcy relief upon the state court appointment of the Receiver or after the multiple times the Sewer Warrant Creditors rejected the County's offers without proposing any counteroffers. The County did not file when the Sewer Warrant Creditors insisted on legislative action that the County has no control over.

The County did not seek bankruptcy relief when the judge in the Edwards Case struck down the County's main source of non-earmarked revenue or when the Alabama Supreme Court upheld that decision. The County did not file when the Alabama Legislature failed to provide a legislative fix, choosing instead to make painful cuts to the County's budget. The County did not file when the trial court in the Weissman Case struck down the 2009 Act or when the Alabama Supreme Court affirmed that decision. The County did not seek bankruptcy protection when the

37

Alabama Legislature failed to provide limited relief to the County during its regular session in 2011, determining instead to again reduce expenses to balance its budget.

The County has filed only now, after the exhaustion of all efforts to deal with the myriad financial catastrophes outside of this Court and the recognition that any further negotiation by the County is impracticable and futile.

## III.    Bases for Relief.

Section 109(c) of the Bankruptcy Code sets forth the eligibility requirements under Chapter 9 of the Bankruptcy Code:

> An entity may be a debtor under Chapter 9 of this title if and only if such entity —
>
> (1)    is a municipality;
>
> (2)    is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
>
> (3)    is insolvent;
>
> (4)    desires to effect a plan to adjust such debts; and
>
> (5)    (A)    has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (B)    has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (C)    is unable to negotiate with creditors because such negotiation is impracticable; or
>
> (D)    reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

38

1/2245516.4

To be eligible for relief under Chapter 9, a petitioner must meet these statutory criteria. "Section 109(c)'s eligibility requirements 'are to be construed broadly to provide access to relief in furtherance of the Code's underlying policies.'" *In re Valley Health Sys.,* 383 B.R. 156, 163 (C.D. Cal. 2008) (quoting *Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro Dist.)*, 143 F.3d 1381, 1384 (10th Cir. 1998)). "[The] general policy of Chapter 9 is to give a debtor a breathing spell from debt collection efforts so that it can work out a repayment plan with creditors." *In re County of Orange,* 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 263 (1977)). The burden of proving eligibility under Section 109(c) is on the party filing the petition. *Id.* at 599. Bankruptcy courts must balance constitutional concerns regarding federalism with the congressional intent that the provisions of Chapter 9 "provide ready access to the bankruptcy courts." *See In re New York City Off-Track Betting Corp.,* 427 B.R. 256, 265 (Bankr. S.D.N.Y. 2010) (quoting S. Rep. No. 94-458, at 13, 94th Cong. 1st Sess. (1975)).

In addition to the eligibility requirements in Section 109(c), Section 921(c) requires that a Chapter 9 petition be filed in "good faith."

As discussed below, the County satisfies each of the elements of Sections 109(c) and 921(c) and, therefore, is eligible to file for relief under Chapter 9.

### A.     The County is a Municipality.

The County is a municipality for purposes of Section 109(c)(1) of the Bankruptcy Code. Section 101(40) of the Bankruptcy Code defines a municipality as a "political subdivision or public agency or instrumentality of a State." A political subdivision of a state includes a county, parish, city, town, village, borough, township, or other municipality. *County of Orange,* 183 B.R. at 601-02. The County falls within the definition of municipality for purposes of filing for

1/2245516.4

Chapter 9 protection.  *See* Ala. Code § 11-1-1 (dividing the State into "67 counties," including the County).

### B. The County is Specifically Authorized by Alabama Law to be a Debtor Under Chapter 9 of the Bankruptcy Code.

Pursuant to Section 109(c)(2) of the Bankruptcy Code, the County specifically is authorized to be a debtor under State law.  Section 11-81-3 of the Alabama Code provides that without limiting the power of the governing body of a county to restructure bond debt consistent with applicable law, such governing body "shall have the power to take all steps and proceedings contemplated or permitted by any act of the Congress of the United States relating to the readjustment of municipal indebtedness...."  Moreover, under Section 11-81-3, "the State of Alabama hereby gives its assent thereto and hereby authorizes each county . . . in the state to proceed under the provisions of the acts for the readjustment of its debts."  Pursuant to this statute, other counties in Alabama have filed Chapter 9 cases.  *See, e.g., In re Greene County,* Case Number 96-72047-CMS-9, United States Bankruptcy Court for the Northern District of Alabama, Western Division.

The County Commission serves as the governing body of the County pursuant to Section 11-3-11 of the Alabama Code.  As the County's governing body, the County Commission is specifically authorized under Section 11-81-3 to file a Chapter 9 petition, as the filing constitutes the County's "steps and proceedings contemplated or permitted by any act of the Congress of the United States relating to the readjustment of municipal indebtedness...." Moreover, the State of Alabama has given its assent to and authorizes the County "to proceed under the provisions of the acts for the readjustment of its debts." Ala. Code § 11-81-3.  Based on the State's grant of power to the County to file for Chapter 9 protection and the State's assent to the County's

1/2245516.4

bankruptcy filing, the County is specifically authorized to be a debtor under Section 109(c)(2) of the Bankruptcy Code.

On November 9, 2011, the County Commission, as the governing body of the County, authorized the County's filing of a Chapter 9 petition at its regular meeting in accordance with Alabama law. Accordingly, the County Commission has, pursuant to applicable Alabama law, properly authorized the instant Chapter 9 filing.[23]

### C. The County is Insolvent.

Section 109(c)(3) of the Bankruptcy Code requires that a municipality be "insolvent" as a condition to seeking Chapter 9 relief. The Bankruptcy Code provides that a municipality is "insolvent" if it is:

> i. generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or
>
> ii. unable to pay its debts as they become due.

11 U.S.C. § 101(32)(C).

As explained in *In re City of Bridgeport,* 129 B.R. 332 (Bankr. D. Conn. 1991), "[t]he two parts of § 101(32)(C) are joined by the disjunctive 'or.' [Bankruptcy] Code § 102(5) provides that 'or' is not exclusive.... The legislative history of § 102(5) states that if a party may do (a) or (b) then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives." *Id.* at 336 (internal quotation marks omitted). As

---

[23] The County notes that the United States District Court for the Southern District of Alabama recently certified to the Alabama Supreme Court an unresolved issue of state law concerning the interpretation of Section 11-81-3. *See City of Prichard, Ala. v. Balzer (In re City of Prichard, Ala.),* Case No. 1:10-00622-KD-M, United States District Court for the Southern District of Alabama. The specific issue certified in that case is "[w]hether Ala. Code § 11-81-3 (1975) (as amended) requires that an Alabama municipality have refunding or refunding bond indebtedness as a condition of eligibility to proceed under Chapter 9 of Title 11 of the United States Code?" *See The City of Prichard, Alabama v. Balzer,* Case No. 1100950, Supreme Court of Alabama. The County has filed an *amicus curiae* brief with the Alabama Supreme Court regarding this issue. Section 11-81-3 authorizes all cities, counties and towns to seek protection under Chapter 9. Regardless of the outcome of that case, however, unlike Prichard, the County previously authorized the issuance of bonds and has substantial long-terms debt currently outstanding in the form of warrants, thus placing the County indisputably within the protections of Section 11-81-3.

1/2245516.4

such, although the County qualifies under both tests, it need qualify under only one to be eligible for Chapter 9 relief.

Insolvency is determined based on the debtor's financial condition as of the bankruptcy filing date. *City of Bridgeport,* 129 B.R. at 337. A municipality is not required to wait until it runs out of money and defaults on its debts before it is deemed to be insolvent: "A construction of § 101(32)(c) under which a [municipality] would not be able to seek Chapter 9 protection unless and until it was actually not paying its bills could defeat [the purpose of Chapter 9], as actually not paying bills could lead to the non-delivery of services." *Id,* To the contrary, a municipality may prove its insolvency for Section 109(c) purposes by showing it will be unable to pay its debts as they become due in the current or next fiscal year. *Id.* at 338; *see also New York City Off Track Betting Corp.,* 427 B.R. at 271-72 (despite having some cash on hand, debtor was insolvent where it would run out of out of funds to continue operations within forthcoming months). This is a cash flow, not a budgetary deficit, analysis. *See In re Pierce County Hous. Auth.,* 414 B.R. 702, 711 (Bankr. W.D. Wash. 2009) (debtor was insolvent as it did not have a tangible reserve fund from which debts could be paid); *see also New York City Off-Track Betting Corp.,* 427 B.R. at 271; *In re McCurtain Mun. Auth.,* No. 07-80363, 2007 WL 4287604, at *3 (Bankr. E.D. Okla. Dec. 4, 2007) (quoting *Hamilton Creek Metro. Dist.,* 143 F.3d at 1384) ("the test under 101(32)(c)(ii) is an equitable, prospective test looking to future inability to pay").

Because it was generally not paying its debts — both with respect to the general fund and with respect to the Sewer System — as they came due, the County is insolvent under Section 101(32)(C)(i). In addition or alternatively, the County is unable to pay its debts as those debts become due, and, therefore, is insolvent under Section 101(32)(C)(ii).

1/2245516.4

1.	**The County Was Generally Not Paying Its Debts as They Became Due.**

a.	**The County Was Generally Not Paying Its General Fund Obligations as They Became Due.**

The Series 2001-B GO Warrants were accelerated in 2008. The County has been unable to pay those accelerated debts, and the County's obligation to repay these claims remains due and payable. The County cannot pay that matured, $105 million debt, as its only unrestricted general funds as of the Filing Date consisted of approximately $74.1 million total in the County's operating accounts and unrestricted reserves. Given the magnitude of Series 2001-B GO Warrant obligation the County is insolvent under Section 101(32)(C)(i). *In re All Media Props., Inc.,* 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980) ("generally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments which are significant in amount in relation to the size of the debtor's operation"), *aff'd,* 646 F.2d 193 (5th Cir. 1981).[24]

b.	**The County has Generally Failed to Make Payments when Due on the Non-Recourse Sewer Debt.**

The County has failed to pay its debts associated with the outstanding Sewer Warrants as they have come due. As stated in the Receiver Order, between June 2008 and July 2010, the County failed to pay over $515.9 million of accelerated principal redemption payments due with respect to the Sewer Warrants. Since July 2010, an additional $184.2 million of accelerated

---

[24] The precedential effect of this case in the Eleventh Circuit was recognized by the Court in *Trusted Net Media Holdings, LLC v. Morrison Agency, Inc. (In re Trusted Net Media Holdings, LLC),* 550 F.3d 1035, 1042 (11th Cir. 2008) (*en banc*). Although the Court did reject *All Media*'s holding that the elements of Section 303(b) were jurisdictional, *id.* at 1046, it did not disturb *All Media*'s analysis of what it means to be generally not paying debts. Numerous cases are in accord with this principle. *See In re Century/ML Cable Venture,* 294 B.R. 9, 32 n. 37 (Bankr. S.D.N.Y. 2003) ("The failure to pay a single debt can satisfy the requirement of generality where the debt is sufficiently substantial."); *In re Food Gallery,* 222 B.R. 480, 487-88 (Bankr. W.D. Pa. 1998) (not paying single large creditor sufficient; collecting authorities); *In re Int'l Teldata Corp.,* 12 B.R. 879, 883 (Bankr. D. Nev. 1981) (same).

1/2245516.4

principal redemption payments have come due.  These redemption payments have not been paid by the County.[25]

On top of those amounts, the unpaid termination fees associated with the Sewer Swap Agreements (excluding those termination fees waived by JPMorgan under the SEC Cease-and-Desist Order) remain due and payable from the Net System Revenues.  According to the County's records, those unpaid and unwaived termination fees total over $100.0 million.

The Net System Revenues are insufficient to pay the Sewer System debts currently due.  The Receiver recognized as much in the Receiver's Interim Report, writing: "It is obvious the System does not currently generate sufficient revenues to meet its operational, maintenance, and appropriate debt service costs (nor has it for almost all of its 110 years of existence)." *See* Receiver's Interim Report, p. 45.  For this reason, the County is insolvent for purposes of Section 109(c)(3) of the Bankruptcy Code.

That the Sewer Warrants and the termination fees under the Sewer Swap Agreements are non-recourse obligations does not alter the fact that the non-payment of those obligations renders the County insolvent.  In the Receiver Order, the State Court found that "Events of Default have occurred and are continuing under ... the Indenture as a result of the County's failure to make $515,942,500 in rapidly amortizing principal redemption payments *due on* June 2, 2008, August 1, 2008, October 1, 2008, January 1, 2009, February 20, 2009, April 1, 2009, July 1, 2009, October 1, 2009, January 1, 2010, April 1, 2010, and July 1, 2010." *See* Receiver Order, 115 (emphasis added).  The principal redemption obligations on the Sewer Warrants constitute "debts," as such term is used in Section 109(c)(3).  *See 11* U.S.C. § 101(12) (defining "debt");

---

[25] At least some of these payments have been made by the Sewer Warrant Insurers pursuant to their obligations under their respective insurance policies.  The County's obligation to make these payments has not been extinguished, however.  To the extent that the Sewer Warrant Insurers have made these payments, under the terms of the Indenture and the Sewer Warrant Insurers' insurance policies, the County now owes those amounts to the Sewer Warrant Insurers.

1/2245516.4

*Johnson v. Home State Bank,* 501 U.S. 78, 84-85, 111 S.Ct. 2150, 2154 (1991) (non-recourse obligations constitute "claims" and, therefore, "debts" under the Bankruptcy Code); *Lindsey, Stephenson, & Lindsey v. Fed. Deposit Ins. Corp. (Matter of Lindsey, Stephenson & Lindsey),* 995 F.2d 626, 629-29 (5th Cir. 1993) (non-recourse obligation was "debt" under Bankruptcy Code for purposes of determining eligibility to file for Chapter 12 protection); *In re Berkelhammer,* 279 B.R. 660, 669 (Bankr. S.D.N.Y. 2002) (non-recourse obligation is a "debt" under Bankruptcy Code). Because these nine-figure "debts" are now "due" yet linger in default for non-payment, the County is insolvent under 11 U.S.C. § 109(c)(3).

      **2.**      **The County is Unable to Pay Its Debts as They Come Due.**

            **a.**      **The County is Unable to Pay its General Recourse Obligations as They Come Due.**

Attached hereto as <u>Exhibit B</u> (the "Cash Flow Projections") is the projection of the County's general fund cash flow had it not filed for Chapter 9. The Cash Flow Projections do not reflect any revenues or Operating Expenses of the Sewer System, which are required to be paid from System Revenue in accordance with the Indenture. The Cash Flow Projections assume — as they must, because the County does not have home rule — that the Alabama Legislature would not have taken any action to restore the Occupational Tax, or to remove earmarks from any of the County's earmarked funds, or to take any other action to enhance the County's revenues, had the County not filed for Chapter 9. With respect to liabilities, the Cash Flow Projections assume that the County does not and will not have any obligation to the Receiver for the $75 million he has demanded from the County's general fund, nor any obligation to the plaintiffs in the Weissman Case for their $100 million claim currently under review by the Alabama Supreme Court.[26] In addition, and quite significantly, the Cash Flow

---

[26] Taking into account contingent or disputed obligations is appropriate under 11 U.S.C. § 101(32)(C)(ii), although

Case 11-05736-TBB9    Doc 10    Filed 11/09/11    Entered 11/09/11 18:50:23    Desc Main
Document      Page 45 of 64

Projections do not reflect the County's payment of its fully matured, $105.0 million repayment obligation for the Series 2001-B GO Warrants, even though that obligation is currently due in full.

The Cash Flow Projections show that, had the County not filed for Chapter 9 protection, it would not have had sufficient unrestricted cash with which to pay its debts as they came due. The Cash Flow Projections show that the County currently has only $74.1 million of unrestricted cash at its disposal, with that figure dropping to $54.8 million in March 2012. As noted above, the Cash Flow Projections do not contemplate the County paying the outstanding principal amount of the Series 2001-B GO Warrants, even though those obligations have been accelerated and are fully due and payable now. When that $105.0 million matured obligation is taken into account, the Cash Flow Projections show that, had no Chapter 9 been filed, the County would not have had sufficient cash during the 2012 fiscal year to pay its ongoing general fund obligations as they come due. *See McCurtain Mun. Auth.*, 2007 WL 4287604, at *3 (municipality was insolvent under Section 101(32)(C)(ii) where it had only $70,000 of unrestricted funds, but was liable for undisputed recourse claims in excess of $200,000); *see also City of Bridgeport,* 129 B.R. at 337-38 (debtor not required to wait until it actually runs out of money and defaults on its debts before it is deemed to be insolvent).

The County's cash position would be made even more dire if the Receiver were successful with his $75 million demand upon the County's general fund or if the plaintiffs in the Weissman Case succeeded with their efforts to overturn on appeal the denial of their $100 million claim against the County. If either of those claims – both of which are vigorously

---

not under 11 U.S.C. § 101(32)(C)(i). *See In re Hudson & Manhattan R.R. Co.*, 138 F. Supp. 195, 200-02 (S.D.N.Y. 1955). *Hudson* is a case under former Chapter X – and Section 130 – of the Bankruptcy Act, whose language is sufficiently similar to current Chapter 9 that decisions construing that language in the Act are useful guides for the interpretation of the comparable language in the Code. *City of Bridgeport*, 129 B.R. at 336 n. 7.

1/2245516.4

disputed by the County – were allowed, the County's inability to pay its general fund obligations as they came due would be all the more evident. Accordingly, the County is insolvent under Section 101(32)(C)(ii).

> **b.** **The County is Unable to Pay Its Non-Recourse Sewer Debt as it Comes Due.**

As noted above, the County has generally failed to pay its Sewer System debts as they become due. The County will continue to be unable to pay its principal and interest obligations with respect to the Sewer System debt as they become due during the Fiscal Year ending September 30, 2012. In FYE 2012, over $109.0 million of principal and interest will become due under the Sewer Warrants. These amounts are in addition to the hundreds of millions of dollars of principal and interest payments that are already past due with respect to the Sewer System debt. Even if sewer rates were increased immediately to the levels proposed by the Receiver, the Sewer System would not generate sufficient Net System Revenues in FYE 2012 to pay these obligations. Because the Sewer System cannot pay the Sewer System debt obligations as they come due in the forthcoming fiscal year, the County is insolvent under Section 101(32)(C)(ii) of the Bankruptcy Code,

> **D.** **The County Desires to Effect a Plan to Adjust its Debts.**

Section 109(c)(4) requires that a municipality seeking relief under Chapter 9 desire to effect a plan to adjust its debts. The inquiry under Section 109(c)(4) is a highly subjective one that may be satisfied with direct and circumstantial evidence. *In re Boise County,* No. 11-00481-TLM, 2011 WL 3875639 at *7 (Bankr. D. Idaho Sept. 2, 2011). A debtor may prove its desire by attempting to resolve claims, submitting a draft plan of adjustment, or by other evidence customarily offered to demonstrate intent. *Id.* (citing *City of Vallejo,* 408 B.R. at 295). "The evidence needs to show that the 'purpose of filing of the Chapter 9 petition not simply be to buy

Case 11-05736-TBB9   Doc 10   Filed 11/09/11   Entered 11/09/11 18:50:23   Desc Main
Document   Page 47 of 64

time or evade creditors.'" *City of Vallejo,* 408 B.R. at 295 (quoting 2 Collier 109.04[3][d]); *Boise County,* 2011 WL 3875639, at *7.

The County's desire to effect a plan for the adjustment of its debts is amply evidenced by the County's extensive prepetition efforts discussed herein to negotiate an out-of-court debt restructuring agreement. *See* Boise County, 2011 WL 3875639 at *7-8 (county's pre-petition efforts to negotiate a settlement with its key creditor satisfied Section 109(c)(4)'s eligibility requirement). In its Resolution authorizing the filing of this case, a copy of which was filed with the County's Chapter 9 petition, the County Commission unequivocally affirmed the County's continued desire to develop, confirm, and effect a Chapter 9 plan to adjust the County's debts. The County has met its burden under Section 109(c)(4).

### E.     The County Has Met the Negotiation Requirement under Section 109(c)(5).

Generally, Section 109(c)(5) of the Bankruptcy Code requires a Chapter 9 petitioner to show that it has satisfied or is excused from certain prepetition negotiations with respect to its creditors. Section 109(c)(5) sets forth four standards for satisfying this "negotiation requirement." A municipality can satisfy this requirement if it --

> (A)    has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (B)    has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (C)    is unable to negotiate with creditors because such negotiation is impracticable; or
>
> (D)    reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(5); *Valley Health Sys.,* 383 B.R. at 161-62.

1/2245516.4

The County has satisfied the "negotiation requirement" pursuant to the standards set forth in Subsections (B), (C), and (D) of Section 109(c)(5).

### 1. The County Has Negotiated in Good Faith Pursuant to Section 109(c)(5)(B).

The County has satisfied the requirement to negotiate in good faith pursuant to Section 109(c)(5)(B). The County made extensive multi-year efforts prepetition to negotiate an out-of-court restructuring agreement to avert Chapter 9.[27] The County engaged outside counsel in early 2008 to assist it with debt restructuring efforts and has retained such counsel at all times since then. The County has pursued settlement negotiations diligently and in good faith since early 2008 with numerous representatives of the Sewer Warrant Creditors and the Indenture Trustee. Earlier this year, the County Commission submitted the County/State Settlement Offer to representatives of the Sewer Warrant Creditors, outlining the County's reasonable, feasible, and comprehensive debt restructuring proposal. When that offer was rejected, the County Commission did not walk away from the negotiating table, but instead regrouped and, with the cooperation of the Governor's office, submitted yet another global restructuring proposal, the County/State Counter-Proposal. When that proposal was not accepted, the County Commission passed its resolution approving the Term Sheet with the belief that it would lead to the execution and implementation of a definitive settlement agreement with the Sewer Warrant Creditors. Despite the good faith negotiating efforts of the County and others, the parties were unable to reach an out-of-court debt adjustment agreement.

The County's good faith, but ultimately unsuccessful, negotiations with the Sewer Warrant Creditors is sufficient, in and of itself, to satisfy the good faith standard of Section

---

[27] See SEC Cease-and-Desist Order, ¶ 47 (finding that "[s]ince March 2008, the County has engaged in negotiations with JPMorgan Securities and other sewer debt-related creditors and third parties, seeking a refinancing or other restructuring of the sewer debt in an effort to achieve such a refinancing or other restructuring and avoid the County filing for bankruptcy."

1/2245516.4

109(c)(5)(B).  *See, e.g., McCurtain Mun. Auth.,* 2007 WL 4287604, at *4 (municipality's prepetition settlement discussions with its most significant and problematic creditor satisfied the good faith negotiation requirement); *see also In re Sullivan County Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 78 (Bankr. D. N.H. 1994) (submission of a formal Chapter 9 plan is not required to establish good faith negotiations).  Indeed, in the out-of-court phase, the County's intent was to negotiate a settlement of the economic and legal issues surrounding the Sewer Warrants and obtain legislation that, via restoration of funding for the County's general fund, would enable the County to reinstate or otherwise pay in full all of its remaining indebtedness.  The focus of the County's negotiations, quite properly, was with the class of creditors whose rights the County intended to adjust, or impair: namely, the Sewer Warrant Creditors.  The County engaged in extensive negotiations with those creditors and therefore plainly satisfied Section 109(c)(5)(B).

The County's negotiations did not end there.  The County's negotiation efforts have also included discussions with holders of the County's general obligation warrants.  With respect to the accelerated Series 2001-B GO Warrants, for example, the County offered to reinstate the maturity schedule of those warrants and pay them in full according to the original amortization schedule.  The holders of those warrants rejected this offer, however, insisting unreasonably on additional accelerated payments.  Moreover, the County recently negotiated and obtained court approval of its settlement with the plaintiffs in the Edwards Case.

The County did not file this case rashly, improperly, or with any improper intent; rather, it did so deliberately and grudgingly, yet with the desire to effect a prompt, efficient adjustment of its debts through the Chapter 9 process.  The County did not approach prepetition negotiations inflexibly or unreasonably; rather, it engaged in lengthy, complex negotiations involving the good faith exchange of offers, counter-offers, and counter-counter-offers, including in the period

50

immediately preceding the filing almost round-the-clock negotiations with multiple counter-parties. In a last ditch effort to salvage and document the deal set out in the Term Sheet, the County Commission even delayed a meeting for over a day in an effort to close an agreement, but ultimately that proved impossible to obtain. Accordingly, the County's good faith is unassailable. *See County of Orange,* 183 B.R. at 608 (good faith determination in Chapter 9 analyzes "whether the debtor is attempting to unreasonably deter and harass its creditors or attempting to effect a speedy, efficient reorganization on a feasible basis"); *see also In re Ellicott School Bldg. Auth.,* 150 B.R. 261, 266 (D. Colo. 1992) ("no true good faith negotiations took place" where debtor only made "take it or leave it" proposal before filing for Chapter 9).

### 2. The County Was Unable to Negotiate with Its Creditors Because Such Negotiations Were Impracticable.

As an alternative to demonstrating good faith negotiations, a debtor may establish that negotiations are impracticable. 11 U.S.C. § 109(c)(5)(D); *Valley Health System,* 383 B.R. at 165. "'Impracticable' means 'not practicable; incapable of being performed or accomplished by the means employed or at commend; infeasible.' In the legal context, 'impracticability' is defined as 'a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty.'" *City of Vallejo,* 408 B.R. at 298 (quoting *Valley Health System,* 383 B.R. at 163); *Boise County,* 2011 WL 3875639, at *8. "Whether negotiations with creditors is *[sic]* impracticable depends upon the circumstances of the case." *Pierce County Hous. Auth.,* 414 B.R. at 713 (quoting *City of Vallejo,* 408 B.R. at 298).

While the County engaged in extensive, good faith negotiations before filing this case, numerous factors made any further negotiations futile.

1/2245516.4

### a. The Receiver's Actions Rendered Further Negotiations Impracticable.

When a liquidity crisis threatens a municipality's continued operations, it becomes impracticable for the municipality to pursue further negotiations to formulate a meaningful plan of debt adjustment before filing for bankruptcy relief *See Valley Health Sys.,* 383 B.R. at 165. Likewise, when a municipality must act to preserve its assets, and a delay in filing a Chapter 9 petition in order to negotiate with creditors might result in a significant loss of those assets, negotiations are impracticable for Section 109(c)(5)(C). *Id.* at 163 (citing *County of Orange,* 183 B.R. at 607-08).

The Receiver's looming demand for the payment of $75 million from the County and the possibility that the Receiver might succeed with his efforts to seize all the County's remaining unrestricted general funds rendered impracticable all further negotiations with the County's creditors. The County's unrestricted funds currently are less than $75 million. As set forth above, as a result of the loss of the Occupational Tax, and notwithstanding the draconian spending cuts already implemented by the County over the past several months, the County cannot afford to lose its cash reserves. The County already has tapped its cash reserves to cover expenses related to the storm cleanup and, as evidenced in the Cash Flow Projections, will continue to tap into cash reserves just to fund basic services mandated by Alabama law. The County could not risk the loss of $75 million to the Receiver while attempting to negotiate with all the County's creditors. *See Valley Health Sys.,* 383 B.R.at 165; *City of Vallejo,* 408 B.R. at 298 (a petitioner also may show impracticability by a need to act quickly to protect the public from harm); *Boise County,* 2011 WL 3875639, at *8 (ditto).

Similarly, the looming threat of the Receiver's imminent, *initial* increase of residential sewer rates by up to 25%, its imposition of the increased "monthly service charge" on all Sewer

1/2245516.4

System customers, and the Receiver's other overzealous revenue-raising efforts, excused the County from pursuing further negotiations with its creditors. A cornerstone of the County's comprehensive debt restructuring plans has been the implementation of reasonable, sustainable, and legally defensible sewer rate increases over a period of time, in the interests of generating additional Net System Revenues to service the Sewer System's restructured debt. The Receiver's contemplated residential and non-residential rate increases and the imposition of the new "monthly sewer charge," proposed in isolation and not as part of any long-term debt restructure agreement, presented an immediate threat to the County's long-standing and fragile restructuring efforts. The Receiver's proposed course of action would have undermined efforts to achieve a long-term solution to the County's financial problems, as it would have invited costly litigation regarding the reasonableness of the Receiver's proposed rates and the Receiver's usurpation of the County's exclusive rate-making authority, disrupted the County's complicated efforts to develop State support for passage of a comprehensive package of legislation to address the County's myriad financial problems, and potentially caused a decrease in Net System Revenues resulting from the foreseeable decline in Sewer System usage.

For months, the Receiver, an unelected party, has operated the Sewer System with the sole mission of maximizing the recoveries of the Sewer Warrant Creditors. The Receiver demanded $75 million on account of the County's receipt of the SEC Compensation Funds, even though those monies are not Net System Revenues. The Receiver's machinations to impose by fiat his massive revenue increase upon the County's residents and the related subsidization of residents via a hardship fund drawn from the County's general revenues are part of a concerted effort to convert the non-recourse Sewer System debt into recourse obligations of the County and its citizens. The Receiver's actions are pursued for the sole benefit of the Sewer Warrant

Creditors. The Sewer System debt is unmanageable because of the fraud perpetrated by certain of the very creditors the Receiver serves, as well as the corruption of officials who were bribed by these creditors. Unlike the Receiver, who has no accountability to the County's constituents and need only concern himself with the appeasement of the Sewer Warrant Creditors, the County Commission must and does concern itself about providing governmental services essential to the health, welfare and protection of the County and its constituents.

As recognized in *New Magma Irrigation & Drainage Dist. v. Board of Supervisors of Maricopa County (In re New Magma Irrigation & Drainage Dist.),* 193 B.R. 528 (Bankr. D. Ariz. 1994), one principal purpose of Chapter 9 is to restore to a municipality control over decisions concerning taxes and other burdens imposed on residents. Id. at 536. In filing for Chapter 9 as and when it did, the elected members of the County Commission not only have assumed control over the County's fundamental rate-making authority for the Sewer System, but also, and most importantly, have preserved the County's control over its ongoing efforts to effect a comprehensive debt adjustment plan.

### b. Pending Restoration of Funds to the General Fund, Negotiations with General Fund Creditors Was Impracticable.

Negotiations with respect to the County's long-term general obligations have been rendered impracticable. As set forth above, the County previously has negotiated extensively with the holders of the Series 2001-B GO Warrants, entering into forbearance agreements and making partial payments when its budget would allow. However, with the loss of the Occupational Tax — *which the County lacks home rule to replace* — further efforts to retire the Series 2001-B GO Warrants on their contractual terms are impossible. The County simply has no ability to negotiate with the Series 2001-B GO Warrant Liquidity Providers because, without a replacement of the revenues previously generated by the Occupational Tax, the County cannot

1/2245516.4

afford to fund even basic services to its citizens, let alone retire the debt associated with the Series 2001-B GO Warrants. Indeed, because a replacement for the Occupational Tax is uncertain, negotiations with essentially all other creditors are impracticable under Section 109(c)(5). *See City of Vallejo,* 408 B.R. at 298.

         **c.**      **The Number of Creditors and the Difficulties in Identifying Them Rendered Further Negotiations Impracticable.**

Courts frequently find that negotiations are impracticable under Section 109(c)(5)(C) where debtors have large numbers of creditors. *New York City Off-Track Betting,* 427 B.R. at 276; *Pierce County Hous. Auth.,* 414 B.R. at 713; *City of Vallejo,* 408 B.R. at 298; *County of Orange,* 183 B.R. at 607; *In re Villages at Castle Rock Metro Dist. No. 4,* 145 B.R. 76, 85 (Bankr. D. Colo. 1990). A municipality's inability to negotiate with one class of creditors may render impracticable the debtor's attempted negotiations with other classes. *See City of Vallejo,* 408 B.R. at 298.

The sheer number of the County's creditors and the difficulty of identifying such creditors have made further negotiations impracticable. The County does not know the identity of the beneficial holders of all of the Sewer Warrants, nor of all its general obligation warrants. As is customary, those warrants are generally registered in the "street name" of Cede & Co., as nominee for The Depository Trust Company, and not in the names of the actual beneficial holders. Any proposed restructuring of any series of the Sewer Warrants or general obligation warrants, however, would require the consent of all the holders of such warrants. For example, the resolution of the County Commission authorizing the issuance of the County's $94 million of Series 2003-A General Obligation Warrants specifically requires the consent of all holders of those warrants to any modification of the payment of principal or interest under those warrants or the interest rate applicable thereto. *See* Jefferson County Resolution and Order, Authorizing

1/2245516.4

Issuance of $94,000,000 Jefferson County, Alabama, General Obligation Capital Improvement and Refunding Warrants, Series 2003-A, dated March 6, 2003, at § 9.2.[28]  *See also* Indenture, § 15.2 (providing that each holder of a Sewer Warrant must consent to any restructuring of those warrants that proposes to "change the security for, the stated or mandatory redemption date of the principal of, or any installment of interest on, any [Sewer Warrant]", or to "reduce the principal amount [of any Sewer Warrant] or the interest thereon or any premium payable upon the redemption thereof").  Restructure of those obligations must be pursued given the Sewer System's inability to service the full amount of the outstanding Sewer Warrants and, with respect to the County's general obligation warrants, the County's loss of the Occupational Tax. Accordingly, negotiations regarding the adjustment of the County's warrants are not feasible or practicable.[29]  *See County of Orange,* 183 B.R. at 607-08 (finding negotiations impracticable "where the [debtor] has over 200 participants and hundreds of accounts with many complex accountings"); *Villages at Castle Rock,* 145 B.R. at 85 ("It certainly was impracticable for [the debtor] to have included several hundred Series D bondholders in these conceptual discussions.").

### 3. The County Reasonably Believed that a Creditor May Attempt to Obtain an Avoidable Preferential Transfer.

The County also has satisfied the requirements of Section 109(c)(5)(D).  This requirement "focuses on the reasonable belief of the debtor municipality that a creditor may attempt to obtain a preferential transfer." *Boise County,* 2011 WL 3875639, at *9.  To satisfy this standard, the municipality must simply "reasonably believe" that a transfer was preferential, even though the transfer may not have actually been so.  *Id.*

---

[28] A copy of the County Commission's resolution authorizing the 2003-A general obligation warrants is being filed with the Court under separate cover contemporaneously herewith.

[29] Negotiations with the County's trade creditors similarly are not practicable due to their sheer number.  As of the Filing Date, the County had approximately 400 trade creditors with outstanding claims.

1/2245516.4

The Receiver's efforts to seize $75 million from the County's general fund and apply them against the County's prepetition, non-recourse debts excused the County from engaging in further negotiations pursuant to Section 109(c)(5)(D) of the Bankruptcy Code, as the County reasonably believed that the Receiver's seizure of such funds would have constituted a preferential transfer. Accordingly, the County satisfies the standard set forth in 11 U.S.C. § 109(c)(5)(D).[30]

### F. The County Filed its Chapter 9 Petition in Good Faith.

The County filed its Chapter 9 petition in good faith as required by Section 921(c) of the Bankruptcy Code. Section 921(c) does not define "good faith." Courts have determined that the primary function of the good faith requirement in Section 921(c) is "to ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended." *Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 80. To determine whether a petition is filed in good faith, courts may evaluate "(i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by Chapter 9; (iii) whether the debtor filed its Chapter 9 petition for reasons consistent with the purposes of Chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practicable; (v) the extent that alternatives to Chapter 9 were considered; and (vi) the scope and nature of the debtor's financial problems." *Pierce County Hous. Auth.*, 414 B.R. at 714 (citing 6 Collier on Bankruptcy ¶ 921.04[2]. In

---

[30] The County foresees that the Receiver, the Indenture Trustee, and the Sewer Warrant Creditors may argue that the Receiver's demand for payment of $75 million on account of the County's receipt of the SEC Compensation Funds and application of those funds to payment of the Sewer Warrants (including those warrants held by JPMorgan) would not be avoidable as preferences pursuant to Section 926(b) of the Bankruptcy Code, which provides that transfers of property of the debtor "to or for the benefit of any holder of a bond or note, on account of such bond or note" are not subject to avoidance as preferences. The County disputes any such argument, as it would lead to the unimaginable consequence that the unauthorized seizure of an insolvent municipality's general funds and the application of the same against antecedent, non-recourse special revenue debt in the days or hours preceding a Chapter 9 filing could never be challenged as a preferential transfer. If such were the case, then the threat of such an unavoidable seizure of a municipality's general funds by non-recourse creditors or their agents certainly would warrant the filing of a Chapter 9 petition without pursuing negotiations in order to prevent such a potentially damaging and irremediable result from occurring.

1/2245516.4

short, to assess "good faith" under Section 921(c), courts consider essentially the same factors they consider in evaluating eligibility. For the reasons set forth above establishing the County's eligibility to file for Chapter 9 under Section 109(c), the County submits that its petition satisfies the "good faith" requirement of Section 921(c).

## IV. Conclusion.

Despite its best efforts, the County has run all possible out-of-court restructuring options to their conclusion. Absent Chapter 9, the County faced immediate and irreparable harm, including the potential loss of all its remaining unrestricted general fund reserves, the Receiver's impending escalation of sewer rates and imposition of new charges upon Sewer System users (including low-income residential customers), the collapse of the County's global debt restructuring efforts due to the refusal of certain Sewer Warrant Creditors to honor their commitments set forth in the Term Sheet, and the County's undisputed liability for the $105.0 million of general obligation warrants that have been accelerated are now fully due and payable. Additional delays will further harm the County's future prospects. Accordingly, the County, having demonstrated its eligibility under Section 109(c) and its good faith under Section 921(c), seeks Chapter 9 relief before the Court and the opportunity to bring all creditors to one negotiating table.

By separate motion, the County has requested that the Court set a deadline and establish procedures for the filing of any objections to the County's overwhelming case for Chapter 9 eligibility.

1/2245516.4

Respectfully submitted this 9th day of November, 2011.

By: /s/ Patrick Darby

**BRADLEY ARANT BOULT CUMMINGS LLP**

Counsel for Jefferson County, Alabama
Joseph Mays
Roger Jones
Patrick Darby
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8500
jmays@babc.com
rjones@babc.com
pdarby@babc.coni


and

By: /s/ Lee Bogdanoff

**KLEE, TUCHIN, BOGDANOFF & STERN LLP**

Counsel for Jefferson County, Alabama
Kenneth Klee *(pro hac vice* motion pending)
Lee Bogdanoff *(pro hac vice* motion pending)
David Stern *(pro hac vice* motion pending)
1999 Avenue of the Stars, Thirty-Ninth Floor
Los Angeles, CA 90067-5061
Telephone: (310) 407-4000
Facsimile: (310) 407-9090
kklee@ktbslaw.com
lbogdanoff@ktbslaw.com
dstern@ktbslaw.com

**ATTORNEYS          FOR          JEFFERSON COUNTY, ALABAMA**

1/2245516.4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 9, 2011, a copy of the foregoing and the exhibits thereto was served upon the parties identified in the attached service lists by the means set forth therein.

/s/ Chris Hawkins
OF COUNSEL

1/2245516.4

**MASTER SERVICE LIST**

**VIA E-MAIL:**

| | |
|---|---|
| Jefferson County, Alabama<br>c/o Patrick Darby<br>c/o Jay Bender<br>Bradley Arant Boult Cummings LLP<br>1819 Fifth Avenue North<br>Birmingham, AL  35203<br>pdarby@babc.com<br>jbender@babc.com | Jefferson County Special Counsel<br>J.F. "Foster" Clark, Esq.<br>Balch & Bingham, LLC<br>1901 6th Avenue North<br>2600 AmSouth Harbert Plaza<br>Birmingham, AL 35203-4644<br>fclark@balch.com |
| Jefferson County, Alabama<br>c/o Kenneth Klee<br>c/o Lee Bogdanoff<br>Klee, Tuchin, Bogdanoff & Stern, LLP<br>1999 Avenue of the Stars, Thirty-Ninth Floor<br>Los Angeles, CA  90067-5061<br>kklee@ktbslaw.com<br>lbogdanoff@ktbslaw.com | Jefferson County Special Counsel<br>J. Hobson Presley, Jr.<br>Presley Burton & Collier, LLC<br>2801 Highway 280 South, Suite 700<br>Birmingham, AL  35223-2483<br>hpresley@presleyllc.com |
| Jefferson County Attorney<br>Jeffrey M. Sewell, County Attorney<br>Room 280, Jefferson County Courthouse<br>716 North Richard Arrington Jr. Blvd.<br>Birmingham, AL  35203<br>sewellj@jccal.org | Bankruptcy Administrator for the Northern District of Alabama (Birmingham)<br>Office of the Bankruptcy Administrator<br>c/o J. Thomas Corbett, Esq.<br>United States Bankruptcy Court<br>Robert S. Vance Federal Building<br>1800 5th Ave. North<br>Birmingham AL 35203<br>Thomas_Corbett@alnaba.uscourts.gov |
| The Bank of New York Trust Company of Florida, N.A., as Indenture Trustee<br>c/o Gerald F. Mace<br>Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, TN  37219<br>gerald.mace@wallerlaw.com | The Bank of New York Trust Company of Florida, N.A., as Indenture Trustee<br>c/o Larry Childs, Esq.<br>Waller Lansden Dortch & Davis, LLP<br>Regions Harbert Plaza<br>1901 Sixth Avenue North, Suite 1400<br>Birmingham, AL 35203<br>larry.childs@wallerlaw.com |
| U.S. Bank, National Association, as Paying Agent<br>2204 Lakeshore Drive Suite 302<br>Mail Code: EX-AL-WWPH<br>Homewood, AL 35209<br>felicia.cannon@usbank.com | JPMorgan Chase Bank, as Liquidity Agent<br>c/o John A. Henry, Jr.<br>Kutak Rock LLP<br>1801 California Street, Suite 3100<br>Denver, CO  80202<br>john.henry@kutakrock.com |

61

1/2245516.4

| | |
|---|---|
| Bank of America, N.A.<br>c/o David L. Eades<br>Moore & Van Allen, PLLC<br>100 North Tryon Street, Suite 4700<br>Charlotte, NC 28202-4003<br>davideades@mvalaw.com | The Bank of New York Mellon<br>c/o Thomas C. Mitchell<br>Orrick, Herrington & Sutcliffe LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA 94105-2669<br>tcmitchell@orrick.com |
| State Street Bank and Trust Company<br>c/o William W. Kannel<br>Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, MA 02111<br>wkannel@mintz.com | The Bank of Nova Scotia<br>c/o James E. Spiotto<br>Chapman & Cutler LLP<br>111 West Monroe Street<br>Chicago, IL 60603-4080<br>spiotto@chapman.com |
| Lloyds TSB Bank PLC<br>c/o James E. Spiotto<br>Chapman & Cutler LLP<br>111 West Monroe Street<br>Chicago, IL 60603-4080<br>spiotto@chapman.com | JPMorgan Chase Bank<br>Steve M. Fuhrman, Esq.<br>Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, NY 10017<br>sfuhrman@stblaw.com |
| Societe Generale<br>c/o Mark J. Fiekers<br>c/o Joyce T. Gorman<br>Ashurst LLP<br>1725 I Street NW, Suite 300<br>Washington, DC 20006<br>mark.fiekers@ashurst.com<br>joyce.gorman@ashurst.com | Regions Bank<br>c/o Jayna Partain Lamar<br>Maynard Cooper & Gale, P.C.<br>AmSouth/Harbert Plaza, Suite 2400<br>1901 6th Avenue North<br>Birmingham, AL 35203-2618<br>jlamar@maynardcooper.com |
| Financial Security Assurance<br>c/o Mark N. Berman<br>Nixon Peabody LLP<br>100 Summer Street<br>Boston, MA 02110-2131<br>mberman@nixonpeabody.com | Financial Guaranty Insurance Company<br>c/o H. Slayton "Slate" Dabney, Jr.<br>King & Spaulding<br>1185 Avenue of the Americas<br>New York, NY 10036-4003<br>sdabney@kslaw.com |
| Syncora Guarantee, Inc.<br>c/o Quinn Emanuel Urquhart & Sullivan, LLP<br>Jonathan E. Pickhardt<br>Jake M. Shields<br>Jeffrey C. Berman<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>jonpickhardt@quinnemanuel.com<br>jakeshields@quinnemanuel.com<br>jeffreyberman@quinnemanuel.com | Receiver for County's Sewer System<br>John S. Young, Jr. LLC, as Receiver<br>c/o Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.<br>Timothy M. Lupinacci, Esq.<br>W. Patton Hahn, Esq.<br>1600 Wachovia Tower<br>Birmingham, AL 35203<br>tlupinacci@bakerdonelson.com<br>phahn@bakerdonelson.com |

62

| | |
|---|---|
| National Public Finance Guarantee<br>c/o Adam Bergonzi<br>Chief Risk Officer<br>113 King Street<br>Armonk, NY 10504<br>adam.bergonzi@nationalpfg.com | |

**VIA OVERNIGHT COURIER:**

| | |
|---|---|
| Cooper Shattuck, Esq.<br>Legal Advisor<br>Office of the Governor<br>State of Alabama<br>Office of the Governor<br>State Capitol, Room N-104<br>600 Dexter Avenue<br>Montgomery, AL 36130 | David Perry, Esq.<br>Finance Director<br>Office of the Governor<br>State of Alabama<br>Office of the Governor<br>State Capitol, Room N-104<br>600 Dexter Avenue<br>Montgomery, AL 36130 |
| Luther Strange, Esq.<br>Attorney General<br>State of Alabama<br>501 Washington Avenue<br>Montgomery, AL 36130 | Alabama Department of Environmental<br>Management<br>c/o Tom Johnston, Esq.<br>General Counsel<br>P. O. Box 301463<br>Montgomery AL 36130-1463 |
| Environmental Protection Agency<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460 | Environmental Protection Agency<br>Atlanta Federal Center<br>61 Forsyth Street, SW<br>Atlanta, GA 30303-3104 |
| The Securities and Exchange Commission<br>SEC Headquarters<br>100 F Street, NE<br>Washington, DC 20549 | Internal Revenue Service<br>Centralized Insolvency Operation<br>Post Office Box 21126<br>Philadelphia, PA 19114-0326 |
| JPMorgan Chase Bank<br>Attn: Michael Mak<br>60 Wall Street<br>New York, NY 10260 | Bayerische Landesbank<br>560 Lexington Avenue<br>18th Floor<br>New York, NY 10022<br>Attn: Francis X. Doyle<br>Second Vice President |
| The Depository Trust Company, on behalf of the<br>holders of the Jefferson County, Alabama, General<br>Obligation Capital Improvement Warrants, Series<br>2003-A and 2004-A<br>55 Water Street<br>New York, NY 10041 | JPMorgan Chase Bank<br>60 Wall Street<br>New York, NY 10260<br>Attn: William A. Austin |

1/2245516.4

| | |
|---|---|
| Shoe Station, Inc.<br>Attn: Michael T. Cronin, Esq.<br>Johnson Pope Bokor Ruppel & Burns, LLP<br>911 Chestnut Street<br>Clearwater, FL 33576 | U.S. Bank, National Association (as successor to SouthTrust Bank), as paying agent<br>Attn: Felicia Cannon<br>2204 Lakeshore Drive Suite 302<br>Mail Code: EX-AL-WWPH<br>Homewood AL 35209 |
| The Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company of Florida, N.A.), as registrar, transfer agent and paying agent<br>Attn: Charles S. Northen, IV<br>505 N. 20th Street<br>Suite 950<br>Birmingham, AL 35203 | National Public Finance Guarantee Corp. (f/k/a MBIA Insurance Corp.), as insurer of the General Obligation Capital Improvement and Refunding Warrants, 2003-A and Series 2004-A<br>Attn: Daniel McManus, General Counsel<br>113 King Street<br>Armonk, NY 10504 |
| Morris & Dickson Co LLC<br>P.O. Box 51367<br>Shreveport, LA 71135-1367 | City of Hoover<br>P.O. Box 360628<br>Hoover, AL 35236-0628 |
| University of Alabama Health Services Foundation, P.C.<br>P.O. Box 55309<br>Birmingham, AL 35255-5309 | Beckman Coulter<br>Dept. CH10164<br>Palatine, IL 60055-0164 |
| AMT Medical Staffing, Inc.<br>P.O. Box 12105<br>Birmingham, AL 35202 | Teklinks Inc.<br>201 Summit Parkway<br>Homewood, AL 35209 |
| UAB Health System<br>619 19th Street South<br>Jefferson Tower, Room J306<br>Birmingham, AL 35249-6805 | AMSOL<br>P.O. Box 6633<br>High Point, NC 27262 |
| AMCAD<br>15867 North Mountain Road<br>Broadway, VA 22815 | Augmentation, Inc.<br>3415 Independence Drive, Suite 101<br>Birmingham, AL 35209-8315 |
| John Plott Company Inc.<br>2804 Rice Mine Road NE<br>Tuscaloosa, AL 35406 | Brice Building Co., LLC<br>201 Sunbelt Parkway<br>Birmingham, AL 35211 |
| Universal Hospital Services<br>P.O. Box 86<br>Minneapolis, MN 55486-0940 | Laboratory Corporation of America<br>P.O. Box 12140<br>Burlington, NC 27216-2140 |
| Medical Data Systems Inc.<br>2001 9th Avenue<br>Suite 312<br>Vero Beach, FL 32963 | |

1/2245516.4