# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JEFFERSON COUNTY, ALABAMA, | ) | Case No.: 11-05736-TBB |
| a political subdivision of the | ) | |
| State of Alabama | ) | |
| | ) | Chapter 9 |
| Debtor. | ) | |

## MEMORANDUM OPINION

### I. Overview: The Parties, Positions Taken, Relief Requested, and Outcome

This Court is confronted by motions filed by The Bank of New York Mellon, as the Indenture Trustee for holders of warrants (Indenture Trustee) issued by Jefferson County, Alabama (hereinafter occasionally referenced as "the County"), and John S. Young, Jr. LLC, as Receiver of Jefferson County's sewer system properties (the Receiver), which have been either joined in or are supported by Syncora Guarantee Inc., Financial Guaranty Insurance Company, Assured Municipal Corporation, JP Morgan Chase Bank, N.A., Bank of America, N.A., Blue Ridge Investments, LLC, and a liquidity bank group comprised of Bank of Nova Scotia, Société Générale, New York Branch, State Street Bank and Trust Company, Lloyds TSB Bank PLC, Regions Bank, and The Bank of New York Mellon. The relief sought may be summarized relatively concisely. It is for this Court (1) to abstain "from taking any action to interfere with" the Alabama state court receivership case for Jefferson County's sewer system, (2) to determine that the automatic stays of 11 U.S.C. §§ 362(a), 922(a) do not apply to the Alabama receivership case or John S. Young, Jr. LLC, (3) to hold that John S. Young, Jr., LLC is entitled to continue as receiver of Jefferson County's sewer system properties, and (4) to modify the automatic stays of § 362(a) or § 922(a) should they apply to the Alabama receivership case or John S. Young, Jr., LLC so the receivership proceedings may continue unabated by Jefferson County's chapter 9 bankruptcy.

Summarizing the relief sought may have been relatively short. Counterposed to this brevity are legal arguments that are not just long, but also multitudinous. Many have been premised on failure to know the status in which properties are held by a receivership court and its receiver versus how they are held by a creditor with possession of collateral. Others are premised on the assumption that the jurisdictional grants of a bankruptcy court are actions of the court and not those self effectuating on the filing of a bankruptcy case. A few misapprehend the "first in time" concurrent court rules regarding *in rem* jurisdiction. Some wrongly extrapolate courts enforcing contract rights of private parties into acts of a state using its powers to control municipal subdivisions. One grouping seeks to have this Court overlook legislative history

1

evidencing an obvious Congressional intent to alter earlier applications of commercial finance laws and principles in a municipal bankruptcy setting. The nature of the legal arguments has made more difficult the sorting of those with merit from those without and analyzing those appearing to have merit to see if there are inherent flaws in the perceived merits. The details of these issues and arguments are presented in subsequent sections of this opinion.

The outcome of this process is as follows. Immediately on the filing of the County's chapter 9 case, the Alabama receivership court lost its possession and control over the County's property interests in its sewer system. Under Alabama's receivership law and comparable federal and state laws on receiverships, a court appointed receiver of the kind appointed in the Alabama receivership case holds all properties for the appointing court and has no interest in the properties held. Neither does the receivership court, other than for holding the properties in *custodia legis*. This applies to the Receiver in this case. Under the Supreme Court of the United States' *Taylor v. Sternberg,* 293 U.S. 470 (1935), interpretation of exclusive federal jurisdiction over properties of a debtor and of a bankruptcy estate, along with earlier and later consistent federal authorities, filing of the County's bankruptcy case automatically and immediately transferred the properties held by the Receiver for the Alabama receivership court to this Court's exclusive jurisdiction under the grant of 28 U.S.C. § 1334(e)(1) and the Receiver, at best, holds the County's sewer system for this Court, not another court.

With one exception, the automatic stays of 11 U.S.C. § 362(a) and 11 U.S.C. § 922(a) prevent the Indenture Trustee and the Receiver from taking further actions in the Alabama receivership case and with respect to the County's sewer system properties. The exception is that set forth in 11 U.S.C. § 922(d) for pledged special revenues and their application to payment of debts secured by revenues generated by the County's sewer system. Section 922(d)'s reference to pledged special revenues refers to all revenues against which the Indenture Trustee has been granted a lien under the loan documents by and between it and the County, and includes those in possession of the Indenture Trustee and the Receiver on the date of filing of the County's bankruptcy case, all that were in the possession or control of the County as of the filing of its bankruptcy, and all revenues against which the Indenture Trustee holds a lien that are received by the Indenture Trustee, the Receiver, or the County from on and after it filed bankruptcy. Therefore, the automatic stays of § 362(a) and § 922(a) are inapplicable to these pledged special revenues. For the post-bankruptcy period, the contested pledged special revenues should be continually paid to the Indenture Trustee for the benefit of the warrant holders consistent with the contractual requirements. There is one qualification. To the extent that these pledged special revenues are insufficient to cover the necessary operating expenses of the County's sewer system as referenced in 11 U.S.C. § 928(b), the amount of the pledged special revenues otherwise payable to the Indenture Trustee will have to be reduced.

All of the abstention requests that this Court cede jurisdiction over the County's bankruptcy case or over all matters involving the Alabama receivership case and the Receiver are denied. At this time, so too are the requests for modification of the automatic stays requested by the Indenture Trustee, the Receiver, and the parties joining in their requests. The "at this time"

2

qualifier to the stay modification denial is important. It does not preclude a future, justifiable request. As is indicated later in this opinion, one of the more difficult acquired legal skills is choosing the appropriate time to ask for what is desired. In this case, the Indenture Trustee, the Receiver, and those joining them were too quick to seek stay modification. What is in this opinion are the factual findings and legal conclusions of this Court.

## II. **The Torturous Route**

The origins of Jefferson County, Alabama's bankruptcy case are both recent in vintage and far removed from the filing date of its chapter 9 case on November 9, 2011. Two major factors precipitating its bankruptcy are crushing debt and the loss of a large part of its tax revenues that were not earmarked for specific purposes.

The latest loss of general revenue funds occurred in March 2011 when the Supreme Court of Alabama upheld a lower court's ruling striking down a business license and occupation tax that had been enacted by Alabama's Legislature to replace a prior, similar tax that had also been declared invalid by Alabama's courts. The primary reason for the 2011 ruling is that the tax was improperly advertised. The loss of the tax revenues for Jefferson County's general fund is not due to any actions by the County. Rather, it resides with the Alabama Legislature. In 2011, the County almost had a replacement tax for its lost general revenues. Unfortunately, Alabama's Legislature and more particularly due to Alabama's singular means of enacting taxing legislation for municipalities, the County's delegation to the House and Senate, was unable to pass the replacement tax bill. This, too, is not the fault of the County especially when one knows that the County has no home rule authority and it must resort to the Alabama Legislature to implement taxes of most, if not all, sorts. All of this precipitating factor is of recent vintage.

The far removed precipitating factor is also partly one of recent vintage. It is a debt load well in excess of $4,000,000,000.00. The majority of this debt is directly attributable to massive borrowing in the form of warrants issued from 1997 to 2003 to finance the construction and repair of a sewer system owned by the County. Some portion of this financing was caused by a 1996 consent decree entered by a federal court involving the County, the State of Alabama, and the Environmental Protection Agency and other plaintiffs in litigation over pollution caused by the County's and other Jefferson County located sewer systems. The aggregate of the warrants issued between 1997 and 2003 is $3,685,150,000.00 and the unpaid principal balance is around $3,200,000,000.00.

Part of the sewer related debt involves a complex and failed combination of swap and interest rate stabilization agreements. Simplistically and at the behest of former county commissioners, the County believed it could lower the interest on warrants by shifting from fixed rates to adjusting ones. Some of what failed was the structure the so-called experts sold to the county as being able to counteract the impact of an increase in interest rates.

Superficially, the indebtedness caused by the sewer system construction and repair might

3

appear to be only a relatively recent set of events. It is not. Why it is not is that sewer systems in the state of disrepair of those the County had and added to did not get to their level of disrepair over just the course of a few years or a few decades. Absent some catastrophic event, it took upwards of a century of neglect by the County and the other municipal governments from which the County acquired twenty some sewer systems. The many decades of failing to properly maintain these sewer systems is the farther in time factor.

When the County acquired these sewer systems from the governments located in Jefferson County, it was without compensation by any of them and without investigation of the systems' conditions by the County. The local governments in Jefferson County that gave their sewer systems to the County range from small cities to the largest in Alabama. But for the failure of many, if not all, of these twenty some odd local governments to maintain their sewer systems, a significant part of the debt incurred by the County for the sewer system improvements would not have had to been incurred by it. Just how much of the warrant liabilities of the County is attributable to these local governments is not part of the evidence.

Whatever these sums, they shifted the costs of disrepair from the local governments and their inhabitants to the County and its inhabitants. The shifting of costs from these local governments to the County and all of it inhabitants was not complete. Ironically, it is the structure of the debt incurred to finance the sewer system upgrades and repairs that has prevented its costs from being spread onto all of the individuals and businesses located in the County. It is also this structure that makes it highly unlikely that the value – not the gross amount – of what was loaned can ever be fully repaid.

The structure is warrants. Not warrants that are general obligations, repayment of which could come from general revenues of the County. Rather, the County utilized special revenue warrants making the revenues of the sewer system the sole source of repayment of the warrant debt. Conceptually, it is this limited source of repayment that keeps the inhabitants of the local governments paying for the failures of their localities to maintain their sewer systems. This arises from the fact that in large part those who were on the sewer systems of these local governments before they were transferred to the County are those who are on the sewer system afterwards. Essentially, the costs of the warrants have been internalized to be borne by those who were customers of the sewer system before the transfers to the County and those customers added after the transfers. Why these costs cannot be directly imposed on all of the inhabitants of the County is the limited source of repayment of the sewer system debt.

It also portends problems that have yet to occur. Currently, the repayment terms of the warrants allow the setting aside of $25,000,000.00 a year for capital expenditures when the current rate of depreciation on the capitalized portions of the sewer system was over $128,000,000.00 and more than $130,000,000.00 in the two most recent financial statements. Technicalities aside, and if the depreciation amounts are close to being accurate, it is quite possible that over time the sewer system will once again become degraded. Joined with this is that large parts of the sewer lines taken over by the County from the local governments are in

very poor shape and the costs of replacing and repairing these lines is not fully known. Nor is there a ready source of monies to correct the leaks from and incursions into these lines. Part of why this is the case is the limited amount of monies being set aside for capital expenditures and the liens given the warrant holders to secure payment of the warrants. Under the security documents, the warrant holders possess a lien that is first in priority and the ability of the County to borrow more monies is subject to rights accorded the warrant holders under the lending documents.

Over time, special revenue warrants have been utilized for project financing on a greater and greater scale and have become for some municipalities the exclusive means of borrowing for projects such as water systems, sewer systems and other wants and needs. Why this has occurred will vary from location and time of projects. However, all have certain characteristics that make them attractive to municipalities. In many states, special revenue warrants do not require a vote by the citizens of the municipality, while bonds frequently do. This is the case for Jefferson County. Another commonality is that special revenue warrants are not counted as debt for indebtedness limits imposed by states on its municipalities. This, too, is the case in Alabama. A third is that many states do not allow municipalities to encumber their properties with liens that could be enforced by foreclosure or repossession of the properties. Yet again, this is a feature Alabama shares with other states.

Notwithstanding lawyers, judges, politicians and those in the business of selling the means of financing for municipalities – who see these three common characteristics through a lens clouded by legal niceties, private preferences, and money making – the reality is that two are not true from an economic perspective. When one understands that for any capital project its value over a useful life span equates to the revenues it generates, the granting of a lien on the revenue stream for decades is not from an economist's view much different than having a lien on the capital good. Accentuating this economic viewpoint is the appointment of the Receiver for the County's sewer system with the sole authority to operate and control it for potentially decades, if not its useful life. This is not much different than a foreclosure or repossession. It effectively strips the County from control of its property and, if it lasts long enough, from the aggregate value of what is the sewer system.

In a similar vein, the concept that special revenue warrant financing is not a debt of the County may be accurate from a certain legal perspective. It is misguided and wrong in the realm of financial matters. This case is an example of why. When sewer usage charges increase beyond a point, the ability of the County to obtain revenue from other sources for other purposes is constrained. Despite the fact that the County has not pledged its full faith and credit for the payment of these warrants, this form of debt still indirectly impairs its ability to borrow and tax. At the point now reached by the County, the payment of increasing sewer charges takes monies from its residents that might otherwise have been available via taxes, assessments, fees, or other means. It also has caused the County to use non-sewer revenues and County properties to subsidize some costs and expenses attributable to the sewer system which have not been fully reimbursed from sewer system revenues. These indirect effects are some of what states wanted

5

their municipalities to avoid when they imposed debt limits on them: excessive borrowing that impairs municipal governments from getting monies via taxes, fees, or otherwise for other purposes and dedicating properties and monies to debt service that might be better used elsewhere.

The one correct common factor is that the special revenue warrant financing has reduced, if not avoided, input from all of the inhabitants of the County. No vote by the inhabitants of the County was required for the special revenue warrant financing. For those in the business of selling such financing and those desirous of building projects, this may be good, but for those who have to pay, it is not such a good thing when done in excess.

Excess is clearly what occurred with the County's special revenue warrant financing for the sewer system. Many causes for this excess have been presented to the Court. They include graft and fraud by former county commissioners and county employees; in particular, former county commissioners who headed the department overseeing the sewer system and certain of the department's top personnel. All of them have been found or plead guilty on federal bribery and related charges for obtaining monies and other benefits from contractors hired to build parts of the sewer system.

Not to be outdone by the public sector is the business sector. Here, numerous businesses and individuals who were officers, owners, or employees of businesses doing the construction work for the sewer system were charged with crimes including fraud and bribery associated with their work for the County. Just as with the former county commissioners and county employees, some plead guilty and others were convicted. So far, the total of public and private persons and entities determined to have committed crimes related to the County's sewer system is somewhere in the low twenties.

Those involved in investment banking and municipal finance were not out of the loop when it came to dishonest or inappropriate conduct. Some of those involved in the development and sales of the types of financial instruments used in part by the County for its sewer system's needs have committed crimes related to what was sold to the County. Others have not been charged with crimes, but have entered settlements with the United States Securities and Exchange Commission where there is no admission of wrongdoing, but payments in the tens of millions of dollars have been made.

The total cost to the residents of the County from the type of conduct of its former commissioners and employees, the businesses involved in the construction projects for the sewer system, and the persons and entities who/which sold the financing to the County is not known and may never be fully discoverable. What is certain is that there has been a cost that is not insignificant. To paraphrase what is now a colloquial expression, the County's inhabitants are in the midst of a perfect financial storm brought on by the convergence of prohibited, unethical and bad conduct by public and private persons and entities all while some were supposedly under the supervision of and regulation by state and federal agencies.

Starting with the first indenture (the Indenture) dated as of February 1, 1997, by and between the County and the Indenture Trustee, and through the course of eleven supplemental indentures, the County agreed to payment terms and secured payment of the warrants issued by it. Initially, the warrants bore fixed rates. By 2001, though, and continuing into 2003, the County issued variable rate and auction rate warrants. Both put the County at risk of interest rate fluctuations.[1]

Also in March of 2003, the County received a report from Paul B. Krebs & Associates on the sewer system that included an assessment of the County's ability to fund payment of the warrants. The report warns the County that additional revenues would be necessary to sustain the operations of the sewer system and pay the warrants. It contains a recommendation for sewer usage rate increases and other suggested revenue enhancements. The then county commissioners did very little of what was recommended with respect to rate increases and revenue enhancements. The Indenture Trustee contends that this report was not made known to warrant holders and no evidence has been provided that this is incorrect.

By February 2008, various defaults under the Indenture and the warrants had occurred and continued. In April 2008, the County was unable to make principal payments due on certain of the warrants. Between April of 2008 and August of that year, forbearance agreements were entered involving the County and representatives of warrant holders, among others. Unable to resolve matters with the County, the Indenture Trustee and others filed suit in September 2008, in the United States District Court for the Northern District of Alabama against the County and its then commissioners. The case is styled *The Bank of New York Mellon, et al. v. Jefferson County, Alabama, et al.*, case no. 2:08-CV-01703-RDP. Since the remedies sought in this federal case are substantially the same as those of a subsequent Alabama state court case, a detailed rendition of them is not given. It is sufficient to point out that one was the appointment of a receiver for the County's sewer system which was opposed by the County.

In November 2008, the U.S. District Court Judge appointed two individuals as special masters to investigate the sewer system and its operations. One of the two was John S. Young, Jr. Although the District Court Judge determined in June 2009, that there was justification for appointment of a receiver, he abstained from this request based on the Johnson Act, 28 U.S.C. § 1342, not allowing federal appointment of a receiver with rate setting authority. This was one of the Indenture Trustee's most desired functions for the sought after receiver. The abstention

---

[1] A fundamental, yet terrible error made by the County's experts in municipal finance is not paying attention to the fact that markets fail. This is the process that commenced in what is called the auction rate securities market in late 2007: purchasers of auction rate securities stopped purchasing them. There was no market for these and other types of securities. Once this occurred, the County's sewer system debt's fate was sealed and default was likely to follow with respect to the warrants. Despite being a simplistic explanation, the County's use of auction rate warrants was essentially taking advantage of short term interest rates to finance long term debt. To do this requires the existence of a market for short term debt refinancing, and when it became nonexistent, a critical part of the scheme collapsed.

order was entered on June 12, 2009, for the receivership portion of the complaint and the residual portions of the requested relief were not decided. There has been no Fed. R. Civ. P. 54(b) certification of the abstention order for finality purposes and whether it is a final order has been debated by the parties. At this time, the District Court case has been administratively closed without resolution of the other portions of the complaint.

In order to obtain a receiver with rate setting power for the sewer system, the Indenture Trustee initiated suit in the Circuit Court of Jefferson County, Alabama on August 3, 2009, in the case captioned *The Bank of New York Mellon, as Indenture Trustee v. Jefferson County, Alabama, et al.*, case number CV 2009-02318. Also named defendants in this suit were the then Jefferson County Commissioners . In this state court proceeding, the Indenture Trustee again sought appointment of a receiver for the County's sewer system, an accounting for the sewer system's revenues, *mandamus* against the county commissioners and prohibition against the county commissioners and the County regarding certain aspects of the operations of the sewer system, and a judgment for unpaid monies owed warrant holders.

Partially due to the absence of any dispute that the County had breached the terms of the Indenture and the warrants by both non-monetary and monetary defaults, the Alabama court judge granted partial summary judgment in favor of the Indenture Trustee by an order entered on September 22, 2010 (hereinafter "the Receiver Order"). By this order, John S. Young, Jr., LLC, a Delaware limited liability company, was appointed receiver for the County's sewer system and the Indenture Trustee was awarded a judgment of $515,942,500.11 against the County. Collection of the judgment is expressly limited to revenues available under the Indenture's terms to pay the sewer system indebtedness. The Receiver Order has not been appealed. To date, the other relief sought by the Indenture Trustee has not been ruled on and there has been no Ala. R. Civ. P. 54(b) certification for finality purposes of the court's grant of partial summary judgment. As in the federal court action by the Indenture Trustee, the Receiver Order's finality is the subject of dispute among the parties and has been extensively briefed and argued by them.[2]

---

[2] Whether either the Receiver Order or the abstention order in the federal receivership case against the County and its commissioners is a final one is disputed. Both cases involved multiple party defendants in addition to the County against whom relief was requested. At this time, no decision has been made in either case with respect to what was sought against the county commissioners and some of what was sought against the County. The County cites to Rule 54 of the Federal Rules of Civil Procedure and its Alabama counterpart as rendering the Receiver Order and the District Court's abstention order not final. The Indenture Trustee and others argue each is a final order based on federal and Alabama case law. All concede that the Receiver Order is appealable on an interlocutory basis under Alabama law. For the Receiver Order, the County also contends that because it is appealable on a interlocutory basis does not override Ala. R. Civ. P. 54(b)'s designation which, it argues, makes the Receiver Order non-final. The Indenture Trustee and others on its side assert case law either (i) from before Alabama and the United States by statute made orders appointing receivers appealable absent a final judgment, or (ii) after this statutory change that overlook the history behind the final judgment rule that was operative in Alabama and federal courts.

What happened before this statutory change was courts attempted to get around the harsh results of the final judgment rule by engrafting exceptions to the finality rule such as "practically final" and others. An early discussion of this problem in a receivership context is set forth in *Forgay v. Conrad*, 47 U.S. 201 (1848). What the parties did not discuss is whether the statutes making receivership orders appealable on an interlocutory basis alters application

8

Specific findings by the Alabama receivership court regarding the County and its sewer system are that the warrant holders have been harmed by the loss of sewer system revenues that resulted in lowering the amount of monies available for payment of the warrants by (i) not increasing sewer system usage rates as required by the Indenture, and (ii) not operating the sewer system in an "economical, efficient and proper manner."  More pointedly, the County did not timely and sufficiently increase customer sewer rates and failed to collect monies from sewer customers some of whom/which the County did not even know were using the sewer system. Other issues were excessive staffing and the County diverting sewer system monies for unauthorized purposes such as paying other, non-sewer related County expenses.  The repercussion of all of these and other failures by the County was to decrease monies available to pay the warrants.

Portions of the Receiver Order that are set forth later in this Memorandum Opinion will not be repeated in this fact portion.  Important for consideration now are those that demonstrate what was done by the Receiver Order and what was not done.  There is no doubt that the only purpose of the receivership is to force compliance with the terms of the Indenture as was requested by the Indenture Trustee.  The first paragraph of the order portion of the Receiver Order makes this absolutely clear by setting forth "[t]he purpose of the receivership is to operate and administer the System . . . in compliance with the terms and conditions of the Indenture." Absolutely nothing in the Receiver Order evidences or constitutes a public or governmental purpose behind its issuance or for its performance other than to enforce contract rights of creditors.  It is an order giving a private creditor a contracted for and statutory remedy to enforce portions of the indentures and warrants designed to protect interests of the warrant holders because the County had failed to do what was required of it under the terms of the loan documents.

Exclusive possession, custody and control of the sewer system along with certain non-sewer system properties and the exclusive authority to operate the sewer system was given to the Receiver.  The Receiver was also granted the authority to fix and charge sewer rates, collect the system's revenues, pay its bills, implement operational efficiencies and other revenue increasing measures, and a cadre of other rights and abilities designed to increase the revenues payable to the warrant holders be it from increased sewer rates, obtaining monies from other sources, or decreasing costs.

The Receiver was denied authority without some future "express order of [the Alabama receivership court] to sell or otherwise dispose" of the sewer system or any part of it.  Likewise, the Receiver Order does not alter the ownership and title to the sewer system properties.  All remain owned by and titled in the County.  The Receiver Order merely transfers possession and control of the sewer system properties to the Receiver who is "an appointee of [the Alabama receivership] Court . . . carrying out the orders of the Court."  The Receiver Order also specifies

---

of the case law developed exceptions to the Rule 54(b) finality determination. Because of the way this Court has ruled, the issue does not have to be resolved with respect to either order.

that "the Receiver and the Receiver Affiliates are not and shall not be considered public officials or public employees for any purpose, notwithstanding any other provision" of the Receiver Order. This is consistent with another paragraph of the Receiver Order delineating that the Receiver owes duties to the sewer system and the Court, not to the County, the Indenture Trustee, or others.

On top of these portions of the Receiver Order, two others need mentioning. One is that the order subjects the Receiver's performance to applicable federal laws. One applicable federal law recognized is bankruptcy law. Another is that the receivership is designed to be ongoing until "further order of the [receivership] Court." The pending further order portion of the Receiver Order at its end and an earlier provision restricting sale of the sewer system properties also indicate the Receiver Order is subject to future modification by the Alabama receivership court.

The evidence indicates that the Receiver has done a much better job during his tenure than was done by the County during the tenures of its former county commissioners. Excessive employees have been eliminated, and remaining employees have and continue to learn how to best maintain, repair, and improve the sewer system. Lost revenues have been captured by collecting from non-paying customers and finding those hooked onto the sewer system who were not known by the County to be using the system. The overwhelming majority of the approximate $3,000,000.00 in revenues collected from these sources is not from individuals, it is from businesses large and small. A third of these monies was collected from one non-profit institution, but represents only a small portion of the time for which it did not pay for use of the sewer system. The basis the Receiver used for limiting collection of unpaid sewer charges to one year has not been disclosed.

The one thing the Receiver has not accomplished is one of the most important to the Indenture Trustee: further increases in sewer usage rates. In fairness to the Receiver, it has looked at various revenue increasing means including non-user fees and other fees on residents and businesses located in the County who/which are not connected to the sewer system. The Receiver has also analyzed rate increases and was in the process of setting higher ones when the County filed its chapter 9 case. This has forestalled progress on rate increases for sewer system customers.

During the receivership period of a little over a year before the chapter 9, the Receiver acted as a go between in the efforts by the County, the Indenture Trustee, insurers of payments of certain of the warrants, banks providing liquidity to the parties, and others to resolve the sewer system related debts of the County. To that end, it appeared in mid 2011 that a compromise had been reached that would have reduced the warrant indebtedness to somewhere around $2,200,000,000.00 and involved the refinancing of the remaining debt.

On September 16, 2011, the Jefferson County Commission approved a term sheet with the Receiver establishing the framework for a settlement with its sewer system related creditors.

10

The perceived settlement was never finalized. Some of why it was not entails the inability to obtain the agreement of all necessary parties and a shifting of positions by some from what was the framework of the term sheet.

Despite the unequivocal evidence demonstrating that the Receiver has done a better job of managing the sewer system properties than was done by the prior county commissioners and former employees overseeing the sewer system, all of the corrupt and incompetent management predates the September 22, 2010 appointment of the Receiver. These events were also prior to the 2010 election of a Jefferson County Commission composed of all new members.[3] Other than inferring from actions and inactions of prior county commissioners and former employees that the entirely new Jefferson County Commission will do the same, there is no evidence that similar mismanagement will occur.

There is evidence that the new commissioners are willing to take unpopular stances and undertake certain actions that might be contrary to their best political interests when it comes to re-election. One is that as part of the term sheet framework they agreed to rate increases of 8.2% per year for three years commencing on November 1, 2011, followed by up to 3.25% per year increases for what is an untold number of years. This is despite the fact that the average sewer rates increased over 300% since 1997 and would increase by a further 527% based on rates desired by the Indenture Trustee. These sorts of increases would take the average monthly residential sewer bill of $63.00 per month up to above $360.00 per month under the Indenture Trustee's wishes. Recognizing the economic and legal limits on what rate increases could be made, the Receiver studied both the structure of the rates and the ability of users to pay increased rates. Its conclusion was an immediate 25% rate increase was justifiable with another 25% in a year achievable along with other yearly increases for the future. As is evident, none of the scenarios regarding rate increases is pleasant for those who must pay them, or for those who must thereafter face the voters.

The new county commissioners also have taken actions that were not desired by many of their constituents, including the business community, and by many Alabama legislators and the state's executive office holders. After failing at restructuring its sewer system indebtedness and losing a large part of its general tax revenues, the County has shuttered county facilities, laid off over 500 employees, eliminated overtime, cut work hours to as low as thirty-two per week for remaining hourly employees, and suspended hiring in many job classifications. Capital expenditures have been drastically reduced as have other expenditures. Perhaps the most controversial action the new county commissioners have taken is to file the County's chapter 9 bankruptcy case – an action which has been resisted by large segments of the political and business leadership of Alabama. It is clear to this Court at this time the new county

---

[3] Four were newly elected in November 2010. After serving a few months in 2010 following his appointment to replace another commissioner who had resigned when elected to another public office, one was re-elected in 2010. None of the current commissioners held office while the County's sewer system was controlled and operated by the County.

11

commissioners are reasonable and willing to take the necessary actions to rehabilitate the County and its various debts and obligations including those related to its sewer system properties. It is also certain that a critical portion of what needs to be done to adjust the debts of the County in a chapter 9 involves its sewer system properties and, in dollar amount, debt associated with the sewer system that is three quarters or more of its total debts.

The fights over the sewer system and its revenues have played out over the course of more than three years in two court systems, one federal and one state, without resolution of the sewer related obligations and, now more importantly, resolution of all of its various debts and obligations unrelated to its sewer system. If nothing more is known, it is that pre-bankruptcy the agreement of all creditors was necessary to restructure the County's financial affairs. Obviously, agreement by all was not obtained. If there is any bright side to the County's municipal bankruptcy, the consent of all creditors is not a requirement for, nor necessarily an impediment to, the County's ability to adjust its debts. It is from this factual backdrop that this Court must assess what the Indenture Trustee, the Receiver, and others seek.[4]

### III. Jurisdiction, Automatic Stays, and Exclusions/Exceptions to Automatic Stays

#### 1. Jurisdiction of Two Types

Despite beliefs of some parties to the contrary, what has occurred in this bankruptcy case

---

[4] The County relies on *In re Property Management & Investments, Inc.*, 17 B.R. 728, 730 (Bankr. M.D. Fla. 1982) for the proposition that the Receiver does not have standing in the County's case. The basis of the *Property Management* decision was that a receiver is not a creditor and does not represent a party in interest. The Receiver contends that it is a party in interest under 11 U.S.C. § 1109(b) which is incorporated into chapter 9 cases via 11 U.S.C. § 901(a). There is no definition of party in interest in the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* and § 1109(b) sets forth a nonexclusive listing of some parties in interest. *See In re Kaiser Steel Corp.*, 998 F.2d 783 (10th Cir. 1993). The determining factor is whether a person or entity has sufficient interest in the *proceeding* to merit representation, *see In re Amatex Corp.*, 755 F.2d 1034 (3d Cir. 1985), and the interest may be pecuniary or practical. *In re E.S. Bankest, L.C.*, 321 B.R. 590, 595-600 (Bankr. S.D. Fla. 2005); *In re Ofty Corp.*, 44 B.R. 479 (Bankr. D. Del. 1984).

   The County is correct that a receiver is not a creditor and does not represent a party in interest such as a creditor. This arises from the fact that a receiver is an arm of the court appointing him and as such is not an adverse claimant. *See Fahey v. Cook (In re Cook)*, 101 F.2d 394, 398 (7th Cir. 1938); *see also Sullivan Timber Co. v. Black*, 48 So. 870, 876 (Ala. 1909). However, the Receiver does have a sufficient practical interest in knowing whether and to what extent the automatic stays of 11 U.S.C. §§ 362(a), 922(a) apply to it and whether on the filing of the County's chapter 9 case it held any property interests of the County for the Alabama receivership court. This is enough for standing purposes when it comes to these issues and is why this Court overruled the County's objection to the Receiver's involvement in and allowed it to participate in the hearings on the stay motions and determination of property interests of the County.

   Additionally, the motions by the Receiver and Indenture Trustee are for all practical purposes identical and the joining parties incorporated by reference into their requests those of the Receiver. Thus, the Receiver's participation did not raise issues not otherwise before the Court. The Receiver's participation was expressly limited to the matters then before the Court and does not extend to other matters unless the Receiver is able to demonstrate the necessary interest in the subject matter. Given this Court's rulings in this opinion, it is not likely the Receiver will be able to show the requisite degree of interest in future matters considered by the Court.

is not the result of any affirmative act by this Court. To know the impact of the County's bankruptcy on the Receiver and the Indenture Trustee as a representative of various warrant holders, one must start with a consideration of the jurisdictional bases of a federal court sitting as one in bankruptcy. These are set forth in 28 U.S.C. § 1334(a):

> Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

It is this subsection of § 1334 that gives original and exclusive jurisdiction over a bankruptcy case to a federal court sitting as a bankruptcy court.[5] *Wood v. Wood (In re Wood)*, 825 F.2d 90, 92 (5th Cir. 1987). Along with the grant of jurisdiction over a bankruptcy case, another subsection of § 1334 sets forth a grant of *in rem* jurisdiction:

> (e) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction—
> (1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; . . .

28 U.S.C. § 1334(e)(1). The combined effect of these is that absent (i) some reason for not retaining jurisdiction over a bankruptcy case or a bankrupt's property interests, or (ii) a bankruptcy court not obtaining jurisdiction over a property interest that a debtor had as of the initiation of a bankruptcy case, the court acquires to the exclusion of all other courts and persons jurisdiction over the bankruptcy case and over a debtor's property and property of the bankruptcy estate. *In re Gandy*, 299 F.3d 489, 499 (5th Cir. 2002).

## 2. Protection of Jurisdiction and the Stays

In a municipal bankruptcy, section 103(f) makes only chapters 1 and 9 of the Bankruptcy Code applicable to a case such as the County's along, with those sections added by section 901(a). 11 U.S.C. §§ 103(f), 901(a). This is how the stay provisions of § 362(a) and § 922(a) are made applicable to a chapter 9 case. These statutorily imposed stays constitute one of the means by which this exclusive case and property jurisdiction is shielded from encroachments. Their imposition was simultaneous with the County's filing its bankruptcy petition. *In re Taylor*, 655 F.3d 274, 278 (3d Cir. 2011); *see also Atkins v. Martinez (In re Atkins)*, 176 B.R. 998, 1004 (Bankr. D. Minn. 1994) ("The automatic stay in bankruptcy comes into existence as a matter of law; it is self-effectuating."). Residual subsections of § 362 and § 922 delineate (i) exclusions from the stay imposed under § 362(a), such as those set forth in § 362(b), and (ii) the point at which a stay either ends or may be ended, *see, e.g.*, 11 U.S.C. § 362 (c) - (f), (h), (l), (m) & (n). Of potential importance in this chapter 9 case is that the automatic stay imposed under § 922(a) is, unlike that of § 362(a), not subject to the exclusions from application set forth in § 362(b),

---

[5] The designation authority under 28 U.S.C. § 151 and referral allowed under 28 U.S.C. § 157 are not discussed because they do not impact the jurisdiction discussion.

13

including those of § 362(b)(4) relating to a governmental unit's police and regulatory powers. Of § 362's subsections specifying when the automatic stay ends or may be ended, 11 U.S.C. § 362(c), (d), (e) & (f) are the only ones governing ending of the § 922(a) automatic stay. 11 U.S.C. § 922(b). Any reliance on § 362(b)(4) for the proposition that the actions and status of the Receiver are actions by the state under either its police or regulatory powers is inapt for the § 922(a) stay.

Having set forth the framework of the jurisdictional bases of this court and the automatic stays' protection of exclusive jurisdiction over a bankrupt's case and property, a recitation of what is violative of § 362(a) and § 922(a) will facilitate further analysis of the multitude of arguments presented by the Indenture Trustee and the Receiver regarding lack of case and *res* jurisdiction.

Section 362(a)(1) through (7) reads:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the

14

> debtor that arose before the commencement of the case under this title;
>
> (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor . . . .

11 U.S.C. § 362(a)(1)-(7). These seven subparts potentially apply to the Indenture Trustee and the Receiver. These might include the Indenture Trustee's continuation of its state court case against the County and its commissioners, enforcement against the County or its property of the judgment obtained by the Indenture Trustee before the filing of its chapter 9 case, obtaining possession of or exercising control over any of the County's property, enforcement of a lien against property of the County, and collection and recovery of a pre-bankruptcy claim against the County.

In a chapter 9 case, section 922(a) adds to the protection from encroachments on case and *res* jurisdiction by imposing another stay on all persons, estates, trusts, governmental units, and the United States trustee from:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor . . . .

11 U.S.C.§ 901(a)(1); *see also* 11 U.S.C. § 101(15). This portion of § 922(a) is designed to preclude actions not taken directly against the County, but those that may be taken against certain others that would have the effect of enforcing a claim against the County. Given that the County's commissioners are defendants in the state court receivership proceedings where other causes of action remain pending against them along with the specific grants of authority to the Receiver, including rate setting and raising of revenues for the sewer system,[6] the stay of this section is also potentially applicable to the Indenture Trustee and Receiver and impacts on the Receiver Order.

### 3. Jurisdictional Grant Distinguished From Protection by Stays

One must attend to the source of the case and *res* jurisdiction accorded bankruptcy courts and that it arises from a statute that is not the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* It is

---

[6] One of the avenues that has been considered by the Receiver is a non-user fee or assessment that would impose a periodic charge on inhabitants of the County who are not served by the sewer system. Although the structure of the warrants limits recourse to the revenues of the sewer system after deducting certain operating expenses and other sums which is nonrecourse against the full faith and credit of the County, a non-user fee or assessment would still be for payment of a claim as defined under 28 U.S.C. § 101(5) just as a rate increase would be one. Furthermore, the revenues of the sewer system are, even under the Receiver Order, property of the County.

contained in Title 28, not Title 11.  28 U.S.C. § 1334(a) & (e)(1).  The Title 11 means to protect this Court's Title 28 accorded jurisdiction over bankruptcy cases and property of a bankruptcy estate and, more particularly in this case, property of the County as a debtor does not limit the scope of either jurisdictional grant as they exist from the moment of filing a bankruptcy case up to when some action is taken to decline to continue to exercise or that results in the loss of either case or *res* jurisdiction.

From filing of the County's petition, it is undisputed that case jurisdiction rests with this Court subject to a post petition determination that either the County does not qualify as a chapter 9 debtor under 11 U.S.C. § 109(c) or a decision by this Court for some other legal reason to end its exercise of jurisdiction over the case.  Because the hearing on any objections to the County's qualification to be a debtor under the standards of § 109(c) was scheduled for another date and no such objections were raised by the movants as part of their motions, this Court assumes that the County qualifies as a debtor under § 109(c) solely for purposes of consideration of the other arguments regarding jurisdiction and application of the automatic stay provisions.  This leaves for determination (i) why this Court should not continue to exercise jurisdiction over the County's case under the abstention arguments addressed elsewhere, *see infra* at IV, and (ii) continued exercise of jurisdiction over the County's property, considered in the remaining portion of this part of this Memorandum Opinion.

### 4. The Property Defined and Stay Application

#### (a) *Butner* Revisited

Determination of the scope of the 28 U.S.C. § 1334(e)(1) grant of exclusive jurisdiction over a debtor's property is done by reference to Alabama law defining the County's property interests.  *Butner v. United States*, 440 U.S. 48 (1979).  Several analytical principles are of significance when making such a determination.  Although decided under the bankruptcy statute that immediately preceded the current one, the Supreme Court of the United States' analysis in *Butner* regarding how federal courts determine property of a bankrupt's estate remains applicable to cases brought under the current law.  *See Dewsnup v. Timm*, 502 U.S. 410, 419-20 (1992). The holding in *Butner* is that since Congress did not utilize its power to establish uniform laws on bankruptcy to define property interests of a debtor or the bankruptcy estate, one is to resort to state law to determine property interests.  The Supreme Court set forth in its *Butner* opinion:

> Property interests are created and defined by state law.
> Unless some federal interest requires a different result, there is
> no reason why such interests should be analyzed differently
> simply because an interested party is involved in a bankruptcy
> proceeding.  Uniform treatment of property interests by both
> state and federal courts within a State serves to reduce uncertainty,
> to discourage forum shopping, and to prevent a party from a
> windfall merely by reason of the happenstance of bankruptcy.

16

The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property.

440 U.S. at 55 (citations omitted) (internal quotation marks omitted). No one in this chapter 9 case contends that there is some federal interest that mandates deviation from the *Butner* principle for how the County's property interests are to be determined–including determination of security interests such as those held by the Indenture Trustee for the benefit of the warrant holders. Nor is there any meaningful difference in "property of a debtor" in a chapter 9 case for this Indenture Trustee-Receiver-County dispute that would alter application of *Butner*'s analytical methodology. Lastly and although there have been changes to what and how property becomes and remains property of a debtor and property of a bankruptcy estate between the current bankruptcy law and its predecessor statute,[7] the *Butner* reference point for how one defines the property interests is the same. It remains firmly founded in state laws. In this case, those of Alabama.

One other *Butner* principle needs to be kept in mind in resolving the property interests of the County: absent a provision of the Bankruptcy Code that requires a different treatment from what state law would dictate, a "federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee [lienholder] is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued." *Id.* at 56.

### (b) Receivership Alteration of Property of a Debtor or Not

The ownership and title to the various real and personal property interests that in the aggregate constitute the County's sewer system is beyond dispute by the Indenture Trustee, the Receiver, and those that have either joined with or supported the motions of the Indenture Trustee and the Receiver. Although the Receiver Order grants the Receiver the authority to administer and operate the sewer system as the system is defined in paragraph 4 of the Receiver Order, nothing in the Receiver Order changes ownership of and title to all of the real and personal properties aggregating the sewer system.[8] All remain with the County. Indeed, the July

---

[7] One example is exempt property. *See Shirley v. Leake*, 715 F.2d 859, 863 (4th Cir. 1983) ("Under the Bankruptcy Act of 1898, the bankrupt's estate that passed into the hands of the trustee consisted only of non-exempt property. . . . This concept of the bankrupt's estate has been substantially altered by the Bankruptcy Reform Act of 1978. Section 541 of Title 11 U.S.C. now provides . . . that the bankrupt's estate is comprised of 'all legal or equitable interests of the debtor in property as of the commencement of the case.' This includes all exempt property.").

[8] The type of receiver that John S. Young, Jr., LLC is was not briefed by the parties and may not have been considered. *See, e.g.*, Ralph Ewing Clark, *A Treatise on the Law and Practice of Receivers* (3d ed., photo. reprint 1992) (1913). Review of the Receiver Order makes clear that the Receiver is the type Alabama case law and comparable case law cited in this Memorandum Opinion refer to when discussing a receiver's status re the property and the appointing court. This is proven by the order portion of the Receiver Order. Paragraph 21 contains explicit

17

8, 2011 modification to the Receiver Order expressly sets forth that "[b]y changing the persons with signatory authority on the Existing Accounts (or any other accounts), the ownership of the funds in such accounts is not affected." The "Existing Accounts" just happen to be those into which revenues derived from the sewer system have been and continue to be deposited along with other monies obtained solely for utilization in connection with the sewer system. This further supports the County owning and having title to all of the real and personal property interests making up the sewer system.

This ownership and title status in the County is in accord with what Alabama's courts have long held. In *Sullivan Timber Co. v. Black*, 48 So. 870 (Ala. 1909), the Supreme Court of Alabama followed what the Supreme Court of the United States determined in *Union National Bank of Chicago v. Bank of Kansas City*, 136 U.S. 223 (1890). The Supreme Court of Alabama's words are:

> A receiver derives his authority as receiver from the act of the court appointing him, . . . and the utmost effect of his appointment is to put the property from that time into his custody as an officer of the court for the benefit of the party ultimately proved to be entitled, and not to change the title to, or even the right of possession in, the property.

*Sullivan Timber Co.*, 48 So. at 876. This holding was referred to by the Supreme Court of Alabama in *Oates v. Smith*, 57 So. 438, 440 (Ala. 1912), in which it again recognized that a receiver does not become vested in any interest in property held in *custodia legis*. A receiver merely obtains for the court possession of property pending a further order of the court. No order determines that the County is not the owner of the properties making up the sewer system. In fact, the Receiver Order has a provision prohibiting the sale of the sewer system or any portion of it. *Receiver Order* at par. 12. Both the Receiver Order and the decisions of the Supreme Court of Alabama regarding the property interests of the County confirm that the Receiver Order did not alter ownership of and title to any of the real or personal property interests composing the County's sewer system.

Since the earliest days of our federal form of government, this is how a federal court appointing a receiver to take possession of property has assessed the impact of a receivership on the property interests of parties. In *Forgay v. Conrad*, 47 U.S. 201 (1848), while examining whether an order was final in the context of a bankruptcy case where the bankrupt's property interests had been assigned to an individual who is the functional equivalent of a bankruptcy trustee, the Court discussed the interests in property delivered to a receiver appointed by a court. The Supreme Court concluded that orders transferring possession of property to such a receiver

_____

language making the Receiver an appointee of the Alabama receivership court, carrying out its orders, and specifying that it is not a public official or public employee for any purpose. Paragraph 34 continues the existence of the receivership until further order of the court and paragraph 12 precludes the Receiver from selling or otherwise disposing of any of the real an personal properties comprising the County's sewer system.

are interlocutory, not final, and that they are intended to preserve the subject matter in dispute from harm while keeping the property within the court's control until the rights of the parties in and to the property are determined by the court. The opinion delineates that a receiver does not have an interest in the property held for the court. *Forgay*, 47 U.S. at 204-05.

Again while analyzing whether an order appointing a receiver was a final judgment for purposes of appeal to the Supreme Court before enactment of the statute allowing certain interlocutory appeals, now 28 U.S.C. § 1292, Chief Justice Waite further articulated in his opinion for the Court the federal view of what happens to interests in property held by a court appointed receiver. What is set forth in *Grant v. Phoenix Mutual Life Insurance Co.* is:

> [T]he possession of the receiver is that of the court, and he holds, pending the suit, for the benefit of whomsoever it shall in the end be found to concern. *Neither the title nor the rights of the parties are changed by his possession.* He acts as the representative of the court in keeping the property so that it may be subjected to any decree that shall finally be rendered against it.

106 U.S. 429, 432 (1882) (emphasis added).

Although the existence of the receivership is a complication in this case that tends to cloud perception of what is property of the debtor for purposes of the County's chapter 9 case, the inescapable conclusion is that the Receiver Order did not alter the status of the County as the sole owner with title to all of the real and personal property interests comprising its sewer system. What remains is ascertaining the impact of its chapter 9 case on the Receiver's control over these real and personal property interests and whether any contractual agreements altered the County's property interests.

### (c) The Indenture Grants

Payment of all of the warrants issued in connection with either the Indenture or the eleven supplemental indentures is secured under the terms of the Indenture.[9] This arises from incorporation of the security provisions of the Indenture into all of the supplemental indentures. Under section 2.1 of the Indenture, securing the payment of the principal of and interest owed to the warrant holders, the County did "grant, bargain, sell and convey, assign, transfer and pledge" to the Indenture Trustee (1) revenues from the sewer system after payment of operating expenses, but excluding those obtained from a sewer tax and other tax revenues that are a portion of the sewer system's revenues, (2) monies required to be deposited in a debt service fund and a reserve fund, and (3) all monies and properties that are transferred to the Indenture Trustee as additional

---

[9] It is also secured by a statutory lien. *See* Ala. Code 1975 § 11-28-3(7).

security.  Section 1.1 of the Indenture defines "Pledged Revenues" to be "those of the System Revenues that are pledged, pursuant to Section 2.1 [of the Indenture] . . . to secure the payment of the [warrants]" (Pledged Revenues).  The Pledged Revenues as defined in the Indenture are also referred to by the parties as net revenues (Net Revenues).  Section 12.9 of the Indenture contains the County's agreement to ensure that the "pledge of the Pledged Revenues" is to be prior and superior to any other pledge of the Pledged Revenues.  That the status of the lien on the Pledged Revenues is valid and perfected and is first in priority is not contested.

Coupled with what was given to secure payment of the obligations of the County under the Indenture, the Pledged Revenues, the language of section 2.2 of the Indenture is payment of the principal of and interest on the warrants is "not a pledge of the full faith and credit of the County or a claim on the taxing power of the County or a charge against any debt limit on the County by the constitution or laws of the State of Alabama."  This limitation of recourse by the Indenture Trustee on behalf of the warrant holders is expanded in section 18.1 of the Indenture by the disclaimer of general liability of the County from any aspect of what the County has agreed to under the Indenture.  In part, section 18.1 sets forth that "no personal or general pecuniary liability or charge payable directly or indirectly from the general revenues of the County shall arise from [a breach of any provision of the Indenture and the warrants]."  Additionally, the warrants do not enlarge the scope of what the County granted to the Indenture Trustee to secure its obligations under the Indenture and they do not change the Indenture's provisions that limit payment of the warrants to only the Pledged Revenues.  The outcome of these portions of the contractual agreements between the County and the Indenture Trustee along with the warrant holders is that, although the County has dedicated a portion of the sewer system's revenues to pay the warrants, no contractual modification was made with respect to its ownership of and title to the various real and personal properties making up its sewer system.

The last portion of the Indenture that needs to be considered is section 13.2.  Under the terms of this section, the Indenture Trustee is given certain remedies on a default by the County of its obligations under the indentures and warrants.  One is the ability to accelerate payment of the warrants so they are immediately due and payable in full.  A second is institution of a suit to force compliance by the County and its officials with the terms of the Indenture, including the setting of sewer rates, collection of sewer system revenues, and the proper segregation and application of these revenues.  A third is obtaining the appointment of a receiver for the sewer system having the ability to administer and operate the sewer system, set sewer rates, collect sewer revenues, pay operating expenses and maintenance costs of the system, and to pay income and revenues of the sewer system in accordance with the Indenture and the Alabama statute governing the issuance of the warrants.  *Indenture* at § 13.2 (a)-(c).  As with the discussion of what was given to secure payment of the warrants, the remedies portion of the Indenture only accords the Indenture Trustee certain actions it may take to protect and enforce the County's obligations under the Indenture.

Nothing contained in section 13.2 makes a change in the property interests of the County in the real and personal properties aggregating its sewer system.  It simply sets forth the available

20

remedies. The effect of any exercise of the remedies on the County's property interests is not determined by the Indenture. Rather, it is Alabama law along with any applicable federal law that resolves the impact of a receivership on the County's property interests. As has been partially discussed above, no such change has happened.

### (d) Turnover's Absence and *Whiting Pools*

Undeterred by the fact that neither the receivership, nor the contractual provisions change the County's ownership of and title to the properties making up the sewer system, the Indenture Trustee and Receiver also assert another reason for limiting what are properties of the County. It is the inapplicability in a chapter 9 of the turnover provisions of 11 U.S.C. § 543, along with the Supreme Court's determinations in *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983), that supposedly support their arguments (i) the automatic stays do not protect property interests of the County in the sewer system against actions of the Receiver, and (ii) the Receiver has a property interest in the sewer system to which the automatic stays do not apply. Neither supports these positions.

Foremost for why these arguments are misplaced is the assumption that the Receiver as a receiver holds or possesses the properties making up the sewer system. As has been discussed, both Alabama law on receivers and its federal counterpart provide that a receiver's possession of property is for the appointing court pending further determinations of the court. It is the court that holds the property in *custodia legis*. *Phx. Mut. Life Ins. Co.*, 106 U.S. at 432; *Forgay*, 47 U.S. at 204-205; *Oates*, 57 So. at 440; *Sullivan Timber Co.*, 48 So. at 876. Since no creditor had possession of any of the County's property comprising the sewer system, this makes the state court's possession of it via the Receiver not the equivalent of a creditor possessing property of a debtor. This distinguishes *Whiting Pools* factually and, as discussed in detail in the next subpart, changes the legal issue from the use of turnover to expand what property interests a debtor has post bankruptcy to one where the debtor may have no need for the provision.

Even assuming for argument purposes that the Receiver does have any interest in the County's property, the same outcome occurs under *Whiting Pools*. *Whiting Pools* involved the Internal Revenue Service's pre-bankruptcy seizure of property of the debtor to enable it by a tax sale to enforce the tax lien that had attached to all of Whiting Pools' property. 462 U.S. at 199-200. Somewhat similar to what the Indenture Trustee and Receiver argue here, the Internal Revenue Service contended that the automatic stay of § 362(a) was inapplicable to it. In rejecting this argument, the Supreme Court discussed the turnover section of 11 U.S.C. § 542(a), the use, sale or lease authority of a trustee under 11 U.S.C. § 363, and the section delineating property of the estate, 11 U.S.C. § 541. The opinion sets forth that although these sections could be seen as limiting the estate to interests of a debtor in property at the time of filing a bankruptcy case, they are instead viewed by the Supreme Court as what is included, not as a limitation. *Whiting Pools*, 462 U.S. at 202-203. The Court understood that a bankruptcy case involving reorganizing a debtor's affairs along with Congress' intent for what is to be included in a bankruptcy estate requires an expansive definition of property of a debtor that becomes property

Case 11-05736-CRJ9    Doc 536    Filed 01/13/12    Entered 01/13/12 10:04:54    Desc Main
Document      Page 21 of 57

of a bankrupt's estate. As part of its discussion, the *Whiting Pools* opinion contains:

> Although Congress might have safeguarded the interests of secured creditors outright by excluding from the estate any property subject to a secured interest, it chose instead to include such property in the estate and to provide secured creditors with "adequate protection" for their interests.

*Id.* at 203-04 (citing 11 U.S.C. § 363(e)). In other words, the concept of property of the estate is inclusive by being expansive. Inclusion by the expansiveness has equal application for property of the debtor in cases involving adjustment of debts of a municipality like the County's.

The Supreme Court also recognized that interests of a debtor in a particular property were not kept out of property of the estate solely because they were not in the possession of a debtor as of the filing of a bankruptcy case. *Id.* at 206 n.11 ("[T]he estate includes property recovered by the trustee under section 542 . . . , if the property recovered was merely out of possession of the debtor, *yet remained 'property of the debtor*.'") (emphasis added) (internal quotation marks omitted). This is further evidence of the breadth of what is within property of the estate and, for purposes of this case, property of the debtor.

As in *Whiting Pools*, the existence or absence of a provision that would give possession to a debtor post-bankruptcy does not limit what is included within a debtor's property interests as of the initiation of a municipal bankruptcy case. The only limitation is that property interests that a debtor did not have as of the filing of a bankruptcy case do not become property of the estate or property of a debtor unless some provision of the Bankruptcy Code would enable a post petition expansion beyond what were a debtor's property interests on filing a bankruptcy case. *Id.* at 205-06, 209-10. More simply put, the turnover sections, §§ 542, 543, allow taking back possession of a debtor's property. They are accretive to, not restrictive of, a debtor's or bankruptcy estate's property interests.

This is decidedly different from arguing that the *in rem* jurisdiction of this Court is somehow lessened by the unavailability of § 543 in a chapter 9 case. The argued inability to regain possession and control of the sewer system does not change the County's ownership of and title to the real and personal properties that are its sewer system. Also, the contentions that actions of the Receiver holding, if at all, some possessory interest are not stayed under either 11 U.S.C. § 362(a) or 11 U.S.C. § 922(a) when they impact on other of the property interests of the County making up the sewer system is at variance with established law. Regardless of its so-called possession or control of the sewer system, actions of the Indenture Trustee and Receiver that violate a provision of the stays protecting the County's property interests in the sewer system are stayed unless and until some modification of the applicable automatic stay. *Thompson v. Gen. Motors Acceptance Corp.*, 566 F.3d 699 (7th Cir. 2009) (holding that a creditor who continued to hold collateral repossessed prepetition violated the automatic stay); *accord In re Yates*, 332 B.R. 1, 5 (B.A.P. 10th Cir. 2005) ("As a practical matter, there is little difference

22

between a creditor who obtains property of the estate before bankruptcy is filed, or after bankruptcy is filed.").

This point is highlighted by what the *Whiting Pools* court did not hold. There is no determination that a debtor holding all interests in property, yet not having possession, is not accorded the protections of the automatic stay with respect to those property interests owned. The Indenture Trustee and Receiver wrongly assume it does. This is another basis for why the *Whiting Pools*-§ 543 reasoning does not support the arguments that the automatic stay provisions allow the Receiver to utilize a possessory interest to overcome a stay designed to protect the County's interests in property and this Court's *in rem* jurisdiction.

All that is required is that some of the County's interests in the real and personal properties comprising the sewer system are within what is property of a chapter 9 debtor. These indisputably exist in the form of ownership and title to the properties of the sewer system. Once such property interests exist, 28 U.S.C. § 1334(e)(1) gives this Court exclusive jurisdiction over such interests and any Receiver actions affecting these interests in a manner proscribed by either of 11 U.S.C. § 362(a) or 11 U.S.C. § 922(a) are stayed. The absence of § 543 turnover authority does not alter the *in rem* jurisdiction of a bankruptcy court or the application of the automatic stays with respect to property subject to this Court's *in rem* jurisdiction. As is discussed next, a turnover provision is not necessary under federal case law for the County to obtain possession of its property interests.[10]

### (e) Race for the *Res* or Who Has It First Does Not Matter a/k/a Receivership Revisited

Knowing that one aspect of a bankruptcy case is to avoid pre-bankruptcy creditor races to court to enhance one's ability to be paid from a debtor's properties, *see, e.g.*, *Union Bank v. Wolas*, 502 U.S. 151, 160-62 (1991), allows one to know that another error is inherent in another of the Indenture Trustee's and Receiver's arguments for why the County's sewer system property interests are not within the *in rem* jurisdiction of this Court. The argument presented is that once the Receiver took possession and control over the sewer system and was given authority to operate it and set usage rates, this makes the state court the first court to take possession of the sewer system or the *res*. The Receiver and the Indenture Trustee recite to this Court case law for the proposition under both Alabama court decisions and those of federal courts that the first court, here the state receivership court, that obtains possession of property precludes a later court

---

[10] The absence of 11 U.S.C. § 543 in chapter 9 cases does not necessarily leave a chapter 9 debtor without the ability to obtain its property from others. Before enactment of the Chandler Act of 1938, June 22, 1938, ch. 575, 52 Stat. 883, amending former title 11, a trustee would frequently seek property of the bankruptcy estate by suit in a court of competent jurisdiction, be it a state or federal one. Some of what happened under the Chandler Act amendments to the prior bankruptcy statute is the plenary jurisdiction prerequisite for a turnover action was eliminated by basing such proceedings on summary jurisdiction over the *res*. *See Emil v. Hanley (In re John M. Russell, Inc.)*, 318 U.S. 515, 517-19 (1943); *In re Seven Springs Apartments, Phase II*, 33 B.R. 458, 468-69 (Bankr. N.D. Ga. 1983).

23

of equal status from acquiring concurrent *in rem* jurisdiction over the same property. Their citations are to *Kline v. Burke Construction Co.*, 260 U.S. 229 (1922); *Citibank, N.A. v. Data Lease Financial Corp.*, 645 F.2d 333 (5th Cir. 1981); *Ex parte Consolidated Graphite Corp.*, 129 So. 262, 265 (Ala. 1930); *Green v. City of Montgomery*, 55 So. 3d 256, 260 (Ala. Civ. App. 2009); *Garrett v. State*, 739 So. 2d 49, 52 (Ala. Civ. App. 1999). There is no doubt that this is the law between courts of equal status. The flaw as it applies to this case is revealed by examination of what is meant by courts of equal status.

In *Gross v. Irving Trust Co.*, 289 U.S. 342, 342-46 (1933), the Supreme Court dealt with a fact pattern similar to the one in this chapter 9. A New Jersey chancery court appointed a receiver who took possession of the assets of Crosby Stores, Inc. located in New Jersey and operated its New Jersey stores. *Id.* at 342-43. Later, Crosby Stores, Inc. was adjudicated a bankrupt and the trustee for the bankruptcy estate sold all of its properties including those that had been in possession of the New Jersey receiver. *Id.* In discussing why the first court in time *in rem* limitation does not apply to a bankruptcy court's acquisition of jurisdiction over the *res*, the Supreme Court's opinion contains:

> The fact that the jurisdiction of the bankruptcy court is paramount effectually distinguishes that class of cases which hold that as between courts of concurrent jurisdiction property already in the hands of a receiver of one of them cannot rightfully be taken from him without the court's consent by a receiver subsequently appointed by the other court. . . . *The present case falls within the . . . exception, since the jurisdiction of the bankruptcy court is paramount and not concurrent.*

*Id.* at 344-45 (emphasis added). The *Gross* ruling was relied upon by the Supreme Court in *Taylor v. Sternberg*, 293 U.S. 470, 472-73 (1935). In *Taylor*, which involved a fact context that is in all relevant respects the same as that in *Gross*, the Supreme Court reiterated its *Gross* ruling and expanded its discussion on what occurs on the filing of a bankruptcy case:

> Upon such filing, the jurisdiction of the bankruptcy court becomes paramount and exclusive; and thereafter that court's possession and control of the estate cannot be affected by proceedings in other courts, whether state or federal. This applies while the possession is constructive as well as when it becomes actual.
>
> *The status of a receiver is unlike, for example, that of an assignee for the benefit of creditors. The receiver is an officer of the court which appoints him. The property in his hands is not, in a legal sense, in his possession. It is in the possession of the court, whose appointee he is, by him as its officer. In the present case, with the supervening bankruptcy, the possession of the state court came to an*

24

> *end, and that of the bankruptcy court immediately attached. This result was binding upon the state court and equally binding upon the receiver as custodian for the court. . . .* But with the filing of the petition in bankruptcy, the power of the state court in that respect ceased . . . .
>
> *. . . That estate, including such sums, was still in custodia legis-only the possession had passed automatically from the state court to the bankruptcy court. Thereafter, the estate in its entirety was held by the receiver as a mere repository for the bankruptcy court.*

*Taylor*, 293 U.S. at 472-73 (emphasis added) (citations omitted); *see also, e.g.*, *Gilchrist v. General Elec. Capital Corp.*, 262 F.3d 295, 302-04 (4th Cir. 2001); *In re Weldon F. Stump & Co.*, 337 B.R. 636, 638 (Bankr. N.D. Ohio 2005).[11]

Why the state courts were dispossessed from control over the properties held by the respective receivers and how this impacts on the Receiver is that the Supreme Court in *Gross* and *Taylor* followed the traditional approach to concurrent *in rem* jurisdiction by courts of equal status, but recognized that there are exceptions. One has been and remains the supervening jurisdiction of a bankruptcy, which implicates the supremacy of the federal bankruptcy *in rem* jurisdiction over that obtained by state and other federal courts.[12, 13] The filing of a bankruptcy

---

[11]   The assertion that this Court is bound by the opinion of Unit B of the then extant United States Court of Appeals for the Fifth Circuit in *Data Lease Financial Corp.*, 645 F.2d at 358, is incorrect. The Fifth Circuit's panel opinion in *Data Lease* relied on *Burke Construction Co.*, 260 U.S. at 229, and restated the first in time concurrent *in rem* jurisdiction rule. The Indenture Trustee's and Receiver's reliance on *Data Lease* is misplaced due to the fact that the case dealt with a sale of property where no bankruptcy case had intervened or was otherwise involved. It is also the outcome caused by *Kline* not being a bankruptcy jurisdiction based case. It was one based on diversity of citizenship. As such, the *Kline* court did not consider or address the implications of a bankruptcy case on its discussion of *in rem* jurisdiction. This state of affairs in *Data Lease* and *Kline* coupled with the Supreme Court's post *Kline*, explicit consideration of the effect of a bankruptcy case on the first in time *in rem* rule in *Gross v. Irving Trust Co.*, 289 U.S. 342 (1933), and *Taylor v. Sternberg*, 293 U.S. 470 (1935), are why this Fifth Circuit's holding is inapposite.

[12]   This difference between state assertion of an interest in the County's property versus a state court receiver possessing property pending a further determination of the status of the property sought by a non-state party avoids consideration of the issue raised in Justice Thomas's dissent in *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 460-63 (2004) (Thomas J., dissenting) regarding federal Constitution Eleventh Amendment limits on *in rem* bankruptcy jurisdiction. This variance in what is before this Court was recognized by the majority in *Tennessee Student Assistance* as having been consistently viewed in both bankruptcy and admiralty *in rem* jurisdiction based cases as avoiding the Eleventh Amendment position espoused by Justice Thomas and was part of why it rejected his idea that the Court, had without a specific holding in one of its opinions, done away with prior precedent on bankruptcy *in rem* jurisdiction. *Id.* at 450.

[13]   One caveat should be discussed. It is that the acquisition of *in rem* jurisdiction by this bankruptcy court after a state court obtains possession of the *res* has been in the context of no assertion of ownership by the state other than that of Jefferson County to or in any of the property placed in the possession of the Receiver. This is one reason why the sovereignty arguments by the Indenture Trustee, the Receiver, and others do not apply to acquisition of *in*

25

case lessens the race to the courthouse by creditors seeking the appointment of a receiver. In a case such as the County's, it makes the first in time *in rem* jurisdiction rule not matter.

When it comes to this Court's acquisition of jurisdiction over all of the County's property as of the instant its chapter 9 case was filed, the law pertaining to exclusive jurisdiction is not changed by the existence of the Receiver. The County's ownership of its sewer system is property of the debtor within the ambit of 28 U.S.C. § 1334(c) and the stays of 11 U.S.C. §§ 362(a), 922(a) apply to the Indenture Trustee and Receiver unless excluded or excepted by statute or order of this Court.

## (f) Further Implications of *Taylor v. Sternberg*

Joined with this *Taylor* and *Gross* based dispatch of the contentions that the state court as the first to have possession of the properties constituting the County's sewer system prevents this Court from acquiring exclusive jurisdiction over them are the added implications from the Supreme Court's ruling in *Taylor*. These include jurisdiction of a bankruptcy court is exclusive regardless of the possession being constructive or actual. Additionally is the determination that a bankruptcy case not only ends the *in rem* jurisdiction of the state court over property of a debtor, but the possession of the property by the state court via the Receiver automatically passed to the bankruptcy court as a result of the County's chapter 9 filing. Under the *Taylor* opinion this means that the property of the County in the Receiver's possession are held by the Receiver as "a mere repository for the bankruptcy court." *Taylor*, 293 U.S. at 473. The upshot of this portion of *Taylor v. Sternberg* is that exclusive jurisdiction over the properties aggregating the County's sewer system are in this Count, not the state receivership court and most certainly not with the Receiver which, according to *Taylor*, he merely holds for this Court.

---

*rem* jurisdiction over the County's interests in the sewer system. If one thinks about their arguments, acceptance of them enlarges sovereignty of a state to encompass private parties' actions using state law based debt collection and enforcement mechanisms. This most certainly is not the case. *See The Southern Cross*, 120 F.2d 466, 468 (2d Cir. 1941); *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 769 (Bankr. S.D.N.Y. 1996); *Rohrig v. Whitney*, 12 N.W.2d. 866, 868 (Iowa 1944); *Kluckhuhn v. Ivy Hill Ass'n*, 461 A.2d 16, 21 (Md. Ct. Spec. App. 1983).

One must remember that all that has occurred is that the Indenture Trustee has exercised a remedy just as creditors in other receivership cases have done and continue to do. It is simply a use of state law to collect what is owed and to enforce agreements made with debtors to protect private interests, not those of a state. Property interests of the sort at issue in this case are precisely what the exclusive *in rem* jurisdiction provision of 28 U.S.C. § 1334(e)(1) has been designed to place within bankruptcy court jurisdiction and then shielded by the automatic stays until a later determination by a bankruptcy court alters or ends such exclusivity.

When seen for what the Receiver and the Receiver Order are, it is evident that there is no affront by 28 U.S.C. § 1334(e)(1) to sovereign interests of Alabama vis-a-vis inclusion of the County's property interests within what is property of the debtor. That this must be the case for *in rem* jurisdiction in the County's chapter 9 case is highlighted by the fact that were it otherwise all *in rem* jurisdiction of bankruptcy courts would be subject to the identical argument in cases involving only private parties and their properties. Acceptance of such a position would enable non-governmental parties to assert state sovereignty as a bar to federal *in rem* jurisdiction based solely on the existence of a pre-bankruptcy state court receivership. Should this be the state of the law, the race to the courthouse in advance of a bankruptcy filing would start anew.

26

Regardless of not being expressly stated, it is these further implications of *Taylor v. Sternberg* which implicitly underpin the basis for the County's post-bankruptcy November 9, 2011, letter to the counsel for the Receiver seeking that it relinquish possession and control over the County's sewer system property interests. The County's letter request was not premised on what the Indenture Trustee and the Receiver categorize as requiring a turnover action under a provision of the Bankruptcy Code that is not incorporated into Chapter 9: 11 U.S.C. § 543. See 11 U.S.C. §§ 103(f), 901(a). Rather, the County's position is firmly founded on these further implications of the Supreme Court's *Taylor v. Sternberg* opinion indicating that a receiver no longer holds any of a debtor's property for a state receivership court. This, too, is the situation of the Receiver.

### 5. Exclusions/Exceptions from Automatic Stay

A preliminary comment is one referenced earlier: § 364(b)(4) is not part of chapter 9 when it comes to the scope of the stay of § 922(a). See 11 U.S.C. § 922(b). Therefore, enforcement of claims of the Indenture Trustee or the warrant holders against the County via its officers or inhabitants is stayed under § 922(a). Another is that once one understands the further implications of *Taylor v. Sternberg*, most of the stay arguments may be seen for what they are: founded on the assumption that the state receivership court or the Receiver hold and control property of the County to the exclusion of this Court. Since this assumption is wrong, all this Court need address are two of the Indenture Trustee's and Receiver's assertions for why the automatic stays do not apply to them.

### (a) Section 362(b)(4) and Governmental Unit?

When it comes to the County's property interests constituting the sewer system, it is not sufficient to just determine whether the provisions of 11 U.S.C. § 362(a) appear to apply to its property interests. In this case, one must also see whether portions of 11 U.S.C. 362(b) make § 362(a) inapplicable and the effect of § 922(d) on certain property interests of the County. The only part of 11 U.S.C. § 362(b) cited to the Court is § 362(b)(4). This subsection makes § 362(a)(1), (2), (3) & (6) not apply to the:

> . . . continuation of an action or proceeding by a governmental unit . . .
> [seeking] to enforce such governmental unit's or organization's police and
> regulatory power, including the enforcement of a judgment other
> than a money judgment, obtained in an action or proceeding by the
> governmental unit to enforce such governmental unit's or organization's
> police or regulatory power . . . .

11 U.S.C. § 362(b)(4). Understanding why this subpart of § 362(b) does not take § 362(a)(1)-(3) & (6) conduct of the Indenture Trustee and Receiver out of the stay impositions of §§ 362(a) & 922(a) comes in part from knowing what the Receiver is and how the Receiver was appointed.

27

<u>(i) Impossibility of Governmental Unit Re: *Res*</u>

The Receiver was appointed in a civil action initiated by the Indenture Trustee in the Alabama court as one of its remedies under the Indenture and the laws of Alabama. The appointment was at the behest of a private party seeking to collect monies owed to warrant holders and to enforce the obligations of the County owed to the Indenture Trustee and the warrant holders. The counts in the complaint are for (i) appointment of a receiver pursuant to (a) the Indenture and (b) Alabama law, (ii) *mandamus*, (iii) specific performance of the obligations under the Indenture, (iv) a judgment for monies owed, and (v) an accounting. Nothing in the complaint hints, let alone specifies, that the litigation is more than a suit over a contract and its breach. As such, all of the Indenture Trustee's actions are those of a private party, not Alabama, seeking to enforce a contract. In these respects, the appointment of the Receiver and the authority given him are no different than they are in debtor-creditor receivership cases where all parties are private ones.

Other than enforcing the rights and remedies provided for in the Indenture and available under Alabama's laws, the state receivership court has not otherwise acted to control or regulate the County. This is evidenced by the terms of the Receiver Order. Paragraph 1 on page 8 of the Receiver Order stipulates that "[t]he purpose of the receivership is to operate and administer the System in an economical and efficient manner in compliance with the terms and conditions of the Indenture . . . subject to applicable state and federal law." In the next paragraph, the Receiver Order specifies the same. *Receiver Order* at par. 2. The Receiver Order sets forth that the Receiver is "an appointee of this Court and [is] carrying out the orders of this Court" and that the Receiver and those working for the Receiver are "*not and shall not be considered public officials or public employees for any purpose.*" *Id.* at par. 21 (emphasis added). Since under the Receiver Order the Receiver is not a public official and not a public employee, it is hard to extrapolate the Receiver into a governmental unit.

All of this is consistent with the previously discussed Alabama and federal case law holding that a receiver does not own, possess, or hold any property in his own right. It is merely held by him as a representative of the receivership court. So and on the acquisition by this Court of exclusive jurisdiction over the County's property, the state receivership court no longer had jurisdiction over the County's properties constituting its sewer system. *Taylor*, 293 U.S. at 472; *Gross*, 289 U.S. at 344; *see also supra* at III 4(b) & (e).

It bears repeating, but this state of affairs is the result of the jurisdictional grant of 28 U.S.C. 1334(e)(1), not the automatic stay provisions in §§ 362(a) & 922(a). This supervening exclusive jurisdiction operates differently when property is in the hands of a receiver than it does when a creditor acquired possession of a debtor's property pre-bankruptcy. This is why the Supreme Court in its *Taylor v. Sternberg* opinion made clear that "[t]he status of a receiver is unlike, for example, that of an assignee for the benefit of creditors." *Taylor*, 293 U.S. at 472. As differentiated from a receiver, a creditor having possession of a debtor's property holds it for the creditor, not a court, and there is no dispossession of a state court from jurisdiction over a *res*.

28

After the filing of a debtor's bankruptcy case, the property remains in the creditor's possession. Post bankruptcy for a state court appointed receiver, the entity for which the receiver holds the property, the state court, loses possession and the *res* is held for the bankruptcy court. *Taylor*, 293 U.S. at 472; *Gross*, 289 U.S. at 344.

Understanding this quintessential difference and how possession flows from a state court to the bankruptcy court is key to knowing why the Receiver cannot be the proffered governmental unit enforcing its police and regulatory powers. The only governmental unit that could have been exercising police and regulatory power over the sewer system during the pre-bankruptcy period would have been the state receivership court. This is because the Receiver held the property for the state court, not in the Receiver's own right. *Taylor*, 293 U.S. at 472; *Gross*, 289 U.S. at 344; *see also The Southern Cross*, 120 F.2d 466, 468 (2d Cir. 1941); *Rohrig v. Whitney*, 12 N.W.2d 866, 868 (Iowa 1944); *Kluckhuhn v. Ivy Hill Ass'n*, 461 A.2d 16, 21 (Md. Ct. Spec. App. 1983); *Williamson v. Wilson*, 1 Bland 418, 421 (High Ct. of Chancery of Md. 1826) ("A receiver is an officer of the court. He is considered as truly and properly the hand of the court; but his appointment determines no right; nor does it affect the title to the property in any way; it will not even prevent the running of the statute of limitations. The holding of the receiver, is the holding of the court for him from whom the possession was taken . . . .").

On the filing of the County's chapter 9 and the automatic, simultaneous dispossession of the Alabama court's jurisdiction over the sewer system caused by the grant of 28 U.S.C. § 1334(e)(1), no property of the debtor remained within the jurisdiction of the state receivership court for any exercise of what the moving parties in this case posit is an exercise of police and regulatory powers of a governmental unit of Alabama. It follows then that the § 362(b)(4) exclusion does not pertain in this case to the sewer system properties that are now within this Court's exclusive jurisdiction.

### (ii) The § 364(b)(4) Non-Exclusions

Notably absent from the police and regulatory power exclusion are acts by the Indenture Trustee or Receiver to create, perfect or enforce a lien against property of the County. *See* 11 U.S.C. § 362(b)(4); *NextWave Pers. Commc'ns, Inc. v. F.C.C.*, 254 F.3d 130, 135-36 (D.C. Cir. 2001); *Javens v. City of Hazel Park (In re Javens)*, 107 F.3d 359, 370 (6th Cir. 1997). The exclusions from stay application of § 362(b)(4) is only for subsections (1), (2), (3), & (6) of § 362(a). It does not apply to § 362(a)(4), (5), (7), & (8). What the Indenture Trustee is doing through the receivership remedy is enforcing against the County's property a lien that secures a claim that arose before the commencement of the bankruptcy case. Despite § 362(b)(4) and even if a governmental unit were involved, the § 362(a)(5) stay still proscribes the activities of the Indenture Trustee and those acting on its behest. Absent some other exclusion or further order of this Court, § 362(a)(5) stops actions in the receivership case and by the Receiver constituting creation, perfection or enforcement of a lien against property of the County. *See* 11 U.S.C. § 362(b)(4); *NextWave Personal Commc'ns*, 254 F.3d at 135-36; *Javens*, 107 F.3d at 370.

29

<u>(iii) Definitions and Case Law–No Governmental Unit</u>

Once again assuming for argument purposes that the movants could avoid these reasons for why no governmental unit's exercise of police and regulatory power involves the sewer system properties, the statutory definition and case law discussing the parameters of what is a governmental unit demonstrate that the argument that the Receiver is such a unit is incorrect. The definition of "governmental unit" under 11 U.S.C. § 101(27) is the:

> United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

Under § 101(27), the Receiver is not a governmental unit unless it is an instrumentality of the Alabama court. Case law demonstrates the Receiver is not within this definition. Courts have viewed receivers and trustees as not occupying the status of a governmental unit. *See, e.g.*, *Richardson v. Mt. Adams Furniture (In re Greene)*, 980 F.2d 590, 597 (9th Cir. 1992); *Cromelin v. United States*, 177 F.2d 275, 277 (5th Cir. 1949) ("The trustee, like a receiver, is an officer of [a] court, appointed by the court, directed by the court, and paid by the court from funds in the court. He is in no sense an agent or employee or officer of [the government].").

On the continuum of facts going from those not constituting a governmental unit to those that do, case law dealing with receivers closer on this continuum to being a governmental unit than the facts for this Indenture Trustee-County contract dispute demonstrate that the Receiver is not a governmental unit and that the receivership court is likewise not one with respect to the County's sewer system. Multiple courts have held that a receiver of the sort the Receiver is is not a sovereign and does not exercise the powers of or on behalf of a sovereign. *See, e.g., Southern Cross*, 120 F.2d at 468 (holding that the receiver appointed at the request of the United States to "promote some governmental policy respecting the merchant marine, does not convert the receiver into a governmental instrumentality" or a governmental subdivision); *Nakash v. Zur (In re Nakash)*, 190 B.R 763, 768-69 (Bankr. S.D.N.Y. 1996) (ruling that an Israeli government official serving as receiver for an insolvent bank is not acting in a sovereign capacity and is subject to automatic stay); *Rohrig*, 12 N.W.2d at 868 (holding that the state superintendent of banking while acting as the receiver of a failed financial institution operates in the capacity not involving exercise of sovereignty because he is a representative for the person whose property the receiver holds); *Kluckhuhn*, 461 A.2d at 21 ("A receiver, even when he is a state official, does not possess property in a sovereign capacity or in trust for the public. Nor does a receivership court possess receivership property in that capacity or for that purpose." (citation omitted)). As the Court of Appeals of Maryland set forth in its *Kluckhuhn* opinion:

> In other words, neither the court nor the receiver, in a receivership case, is asserting public rights on behalf of the people of the State

> or municipality. Rather, the assertion is of "merely private rights on behalf of a limited group."

461 A.2d at 21 (citing *Goldberg v. Howard County Welfare Bd.*, 272 A.2d 397, 401 (Md. 1971)). Case law over an extended period of time involving taking possession of property to protect interests of private persons, not a government, supports that a receiver's possession for a court and the appointing court's possession are not held in a sovereign capacity, nor in that of a governmental unit exercising police or regulatory powers. *See, e.g., The Southern Cross*, 120 F.2d at 468; *Nakash*, 190 B.R. at 769; *Rohrig*, 12 N.W.2d at 868; *Kluchhuhn*, 461 A.2d at 21; *Williamson*, 1 Bland at 421, 424, 427.

This was precisely the status of the Receiver and the Alabama state court before the County's bankruptcy. Even should one overlook the fact that the bankruptcy filing caused dispossession of the state court over the properties making up the sewer system, the Receiver's and state court's position vis-a-vis the sewer system properties would not change. No exercise of a governmental function is involved in the litigation between the Indenture Trustee and the County in the state receivership case. For this reason, the police and regulatory power exclusion of 11 U.S.C. § 362(b) does not apply to shield the Indenture Trustee or the Receiver from any of the stay subparts of 11 U.S.C. § 362(a).[14]

### (b) Section 922(d)'s Disambiguation–Special Revenues, a Pledge or Pledged.

### (i) Arguments–County vs. Indenture Trustee/Receiver

The other provision relevant for determining the scope of a stay under either of §§ 362(a) or 922(a) is 11 U.S.C. § 922(d). It provides:

> (d) Notwithstanding section 362 of this title and subsection (a) of this section, a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section [928] of this title to payment of indebtedness secured by such revenues.

Under 11 U.S.C. § 902(2)(A) "special revenues" is defined to include "receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used . . . to provide utility, or other services, including the proceeds of borrowings to finance the projects or systems." The Indenture Trustee and the Receiver agree that the revenues of the County's sewer system that are Pledged Revenues defined by sections 1.1 and 2.1 of the Indenture are special revenues under § 902(2)(A). For purposes of clarity, what the Indenture

---

[14] As a result of this determination, the Court does not address the other arguments presented by the County for why there is no exercise of police and regulatory powers by either the Receiver or the Alabama receivership court.

defines as Pledged Revenues will be referred in this portion of this opinion as Net Revenues.

What the parties do not agree on is what is meant by "pledged special revenues" for purposes of § 922(d). The disagreement is over its breadth. The County does not contest that the Net Revenues in possession of the Receiver or the Indenture Trustee as of its chapter 9 case filing may be applied to obligations of the County under the Indenture and the warrants. Likewise, there is no dispute that under 11 U.S.C. § 928(a) the lien granted under the Indenture on the special revenues continues after the filing of the County's chapter 9 case without action by the Court. 11 U.S.C. § 928(a).

However, the County interprets the term "pledged special revenues" for purposes of § 922(d)'s exclusion as limited solely to those special revenues held by a creditor as of the petition date. In other words, the County maintains, "pledged" as used in the § 922(d) phrase "pledged special revenues" is to be given a meaning which requires possession by the pledgee or one holding the property as a representative of the pledgee. *See Sec. Warehousing Co. v. Hand*, 206 U.S. 415, 421 (1907); *In re Interstate Dep't Stores, Inc.*, 128 B.R. 703, 705 (Bankr. N.D.N.Y. 1991). To reach this conclusion, the County focuses on the language of § 928(a) & (b), which specify:

> (a) Notwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

> (b) Any such lien on special revenues, other than municipal better assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.

11 U.S.C. § 928(a) & (b).

Essentially what the County argues is that given the simultaneous enactment of any "lien on" special revenues terminology in § 928 and the "pledged special revenues" wording of § 922(d) along with the way each is used in the respective subsections, "pledged" has a meaning different from a lien of all sorts. If it was meant to be something other than a possessory lien, the County believes that Congress would have so specified in § 922(d) by using a phrase such as "special revenues" or "special revenues subject to a lien" in lieu of the "pledged special revenues." This is a portion for why the County believes "pledged" has to reference the security mechanism whereby a creditor secures payment of a debt by taking possession of property and holding it until an obligation is satisfied. The County also advances that interpretation of § 922(d)'s "pledged" should be done in conjunction with its interaction with §§ 928, 552(a) & 362(a). This supposedly clarifies how "pledged special revenues" has to be limited to monies in

32

the possession of a creditor as of the filing of a bankruptcy case. Combined with these parts for how it reaches its conclusion, the County posits that there is no need to resort to legislative history to know that its interpretation of "pledged special revenues" is the correct one and that the Court should simply parse the language of §§ 922 & 928 without reference to anything beyond the words in these sections.

The Indenture Trustee and the Receiver, along with those that join with or support the positions espoused by them, argue that "pledged" as used in § 922 and § 928 is not so limited. They put forward that "pledged" is to be given a broader meaning associated with it in the realm of municipal finance which is not just that of a possessory lien. In other words, they contend that neither the Indenture Trustee, the Receiver, or someone else as a representative of the Indenture Trustee is required to have actual possession of the Net Revenues for purposes of § 922(d)'s exclusion of these monies from the stays of either § 362(a) or § 922(a). Their interpretation of "pledged" is also founded on what is revealed by merely considering the words of these two sections. The movants further support this view in substantial part by reference to the legislative history which they believe should be taken into account to properly interpret what "pledged special revenues" are excluded from the application of the automatic stays. If the meaning is this broader view, the outcome is that the Net Revenues as "pledged special revenues" received before and after the County's chapter 9 case are excluded from the stays imposed under §§ 362(a), 922(a). This side also adds this requires that all of these "pledged special revenues" are to be applied consistent with the terms of what was agreed to by the County under the documents governing the transactions. In other words, the Net Revenues are to be paid without interruption after bankruptcy just as they had been paid before a municipality's chapter 9 case.

Although the competing parties dispute whether legislative history should be consulted by this Court in deciding which meaning of "pledged" is the proper one for § 922(d), "pledged" is susceptible to two plausible meanings. If nothing more, the parties' arguing different interpretations of what is meant by "pledged special revenues" over the course of dozens of pages in multiple briefs evidences that there is an uncertainty in the meaning of the phrase. Indeed, some of the legal interpretation discussions presented on each side of the issue require more than a little linguistic gymnastics.

These juxtaposed interpretations are not a basis for assessing whether there is uncertainty or ambiguity in these section of the bankruptcy laws. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217 (11th Cir. 2001). Nor are they of this Court.

The reality is that "pledge" has two common legal usages. One is narrow and one is broad. Despite arising in a different factual background, other federal courts have recognized that "pledge" has multiple meanings. *See, e.g.*, *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929)*; United States v. Berman*, 21 F.3d 753, 756 (7th Cir. 1994); *United States v. Henderson*,

33

645 F.2d 569, 577 (7th Cir. 1981) (recognizing that "pledge" has a broader meaning of dedicate as collateral and a narrower one of transfer of possession of collateral as security). This uncertainty is shown by reference to most dictionaries. What is revealed is that the pledgor-pledgee bailment sort of relationship is not the most common usage of pledge. Instead, it is a promise to do or refrain from doing something. *The American College Dictionary* 930 (1961 ed.). Consistent with this nonlegal definition is its first usage in a legal dictionary as a formal promise or undertaking. *Black's Law Dictionary* 1192-93 (8th ed. 2004). Another legal dictionary sets the common legal usage as that of the bailment sort the County espouses. *Ballentine's Law Dictionary* 955 (3d ed. 1969). Added to these is that what is meant by "pledged special revenues" has great consequences within and beyond the confines of the County's chapter 9 case. Therefore, this Court will look to the legislative history as part of ascertaining what is at the heart of this dispute which is the uncertain scope of what is "pledged" for § 922(d) purposes. *United States v. Great N. Ry.*, 287 U.S. 144, 154-55 (1932) (observing that the process of statutory construction when a meaning is uncertain involves recourse to legislative history "of the measure and the statements by those in charge of it during its consideration by the Congress").

<u>(ii) Workings of a Pledge</u>

Sometimes consideration of the basics of what something is and how it is designed to operate helps decide how a word is intended to have been used in a statute. Sometimes this procedure avoids the haze enveloping a statute's meaning and its words that is created by technical legal arguments. In this case, knowing what a pledgor-pledgee relationship is and how it operates does just that. The meaning of a pledge of the sort the County wants imported into the meaning of "pledged special revenues" is:

> A bailment of personal property as security for a debt or obligation, redeemable upon terms, and with the implied power of sale on default.

*Ballentine's Law Dictionary* 955 (3d ed. 1969). How the form of pledge the County wants works is that one gives property to another person to hold to secure satisfaction of a debt or other obligation. Once the debt or other obligation is satisfied, the property is returned to the pledgor. A pledgee of this kind does not keep or use the property to satisfy a debt or other obligation unless there has been a default. *In re H.B. Hollins & Co.*, 230 F. 917, 919 (S.D.N.Y. 1915) (Learned Hand, J.); *Keeble v. Jones*, 65 So. 384, 386 (Ala. 1914). The problem with this usage for pledge is that it disregards how special revenue financing was structured in this case and was contemplated to be arranged by the drafters of § 922(d).

The revenue based financing of the County is organized so that the monies received from the operation of the county's sewer system are to be continuously used to pay the (i) operating expenses along with certain reserve and fund requirements of the system and (ii) Net Revenues. Under § 11.1 of the Indenture, a revenue account is created into which all sewer revenues plus other monies are to be deposited. From this revenue account, the Indenture sets forth how and

34

when these monies are to be paid to satisfy operating expenses, among others, and transferred into four different accounts: the Debt Service Fund, the Reserve Fund, the Rate Stabilization Fund, and the Depreciation Fund. The Indenture Trustee is the "depository, custodian, and disbursing agent" for the Debt Service Fund. It is into and from this account that principal and interest payments are made to pay the warrant holders. Indenture § 11.2.

The framework of this revenue financing is not holding the Net Revenues until some other source of payment is received. The Net Revenues were and remain the source for satisfaction of the debt. Similarly, the Net Revenues were never contemplated or agreed by the parties to the various indentures and warrants to be held by the Indenture Trustee until the sewer system indebtedness is satisfied from some other source of monies and then returned to the County. More basically, the financing of municipal projects and systems by securing repayment solely from its revenues does not call for holding of the very monies necessary to repay the indebtedness while it is satisfied from another source and then paying the revenues back to the system or project. This is one reason why the version of pledge that the County seeks is the wrong one for knowing the meaning of "pledged special revenues."

This inapplicability of the County's version of pledge is supported by opinions of the Supreme Court of Alabama. In *Heustess v. Hearin*, 104 So. 273, 274 (Ala. 1925), involving borrowings by a county board of education secured by a pledge of revenues, the Supreme Court determined that this sort of pledge:

> . . . is, of course, not used in the usual sense of a deposit or bailment
> as security for debt. It means set apart, appropriated, or charged
> with the payment of a specific obligation authorized by law. In such
> sense funds to accrue in future may be, and continually are, pledged
> by counties . . . to secure bonds, warrants, or other obligations.

In *Hall v. Underwood*, 63 So.2d 683, 693 (Ala. 1953), in which the Supreme Court of Alabama dealt with gasoline tax warrants to be paid from "designated funds," it quoted from its prior opinion in *Isbell v. Shelby County*, 180 So. 567, 569 (Ala. 1938). It referenced the portion of *Isbell* describing warrants that were not general obligation warrants as "merely evidence of transfer and pledge of a definite fund to their payment." The issuance of warrants and the pledge made were determined to "in effect [be] a sale by the county of the anticipated revenue to be derived from the . . . tax allocated . . . for these purposes." *Isbell*, 180 So. at 569.

The *Heustess*, *Hall*, and *Isbell* opinions show that Alabama's highest court attributed to "pledge" the meaning of being a dedication of a source of revenues, not the possessory lien the County wants. As the facts of each of these cases indicate, this Supreme Court of Alabama view of "pledge" occurred in the context of municipal financing. This is also how the statute governing the issuance of warrants for the County's sewer system treats the word "pledge." Pledged Funds is defined in Ala. Code § 11-28-1.1(4) as "any taxes, revenues or other funds pledged pursuant to section 11-28-3." Ala. Code § 11-28-3 allows a county commission to

35

"assign and specifically pledge for the payment of the . . . principal and interest on such limited obligation warrants the funds derived from any one or more of the following sources." One of the sources is revenue producing properties including a sewer system. Ala. Code § 11-28-3(7). What is allowed to be used to pay warrants are revenues from, in the County's case, a sewer system that are dedicated to repayment, not just those held in the possession of the County.

Not only does Alabama case law and its governing statute for the sewer warrants support an interpretation of "pledge" in the municipal financing setting to be more than a possessory lien, so does the Indenture. Section 1.1 defines Pledged Revenues to be System Revenues that are pledged pursuant to § 2.1 of the Indenture. System Revenues are under § 1.1 of the Indenture monies and income from all sources thereafter "received by or on behalf of the County from whatever source derived from the operation" of the sewer system. Under § 2.1 of the Indenture, the County "does hereby grant, bargain, sell and convey, assign, transfer and pledge" to the Indenture Trustee various properties, interests and rights to secure payment of the warrants. The wording of the Indenture makes clear that the Pledged Revenues are all revenues against which the Indenture Trustee is given a lien and not solely those in its possession.

The workings of a pledge proposed by the County for what is meant by "pledged special revenues" is inconsistent with how revenue based financing is structured. It is at odds with how the Supreme Court of Alabama and Ala. Code § 11-28-1 *et seq.* treat a pledge of revenues in municipal financing, and is the diametric opposite of what is a pledge under the Indenture. The County's interpretation is also contrary to the what is generally described by a pledge in revenue based municipal financing transactions. One municipal bond handbook contains the definition of "pledged revenues" as "revenues legally pledged to the repayment." Sylvan G. Feldstein & Frank J. Fabozzi, *The Handbook of Municipal Bonds* 1295 (2008).[15] The relevance of these sources for finding the meaning of "pledged" for § 922(d) arises from the legislative history for the amendments that added subsection (d). This reference explicitly sets forth the Congressional intent that the goal was to more closely conform chapter 9 to the workings of municipal finance, not commercial finance. S. Rep. No. 100-506, at 3-4 (1988) [hereinafter S. Rep.]. These nonbankruptcy sources assist in doing just that by demonstrating how "pledge" is used in revenue based municipal financing. This reference to state law is also part of the *Butner's* directive regarding state based lien interests being fathomed the same as with property interests. It is by reference to applicable state law. *Butner*, 440 U.S. at 55-56.

These reasons for why "pledged special revenues" is not what the County contends are

---

[15] The County's position on the § 922(d) "pledged special revenues" is in many respects identical to that espoused in 6 *Collier on Bankruptcy* ¶ 922.05[2]. This bankruptcy treatise's conclusions are cited to this Court as authority for the County's. One problem with Collier's viewpoint is the authority Collier's cites to in its footnote 4 is a quote from legislative history that does not uphold Collier's reading of § 922(d). See 6 *Collier on Bankruptcy* ¶ 922.05[2] n.4. Careful reading of the quote evidences that it supports the broader view that a pledge as used in § 922(d) is for all monies pledged including those possessed by a creditor and those not in the creditor's possession. The Collier position has also been disagreed with by others. *See, e.g.*, David L. Dubrow, *Chapter 9 of the Bankruptcy Code: A Viable Option for Municipalities in Fiscal Crisis?*, 24 Urb. Law. 539, 572-75 (1992).

36

not the only ones.  Another is found in the legislative history and statements by those in charge of the amendments that brought §§ 922(d) & 928(a)-(b) into chapter 9.

### (iii) Potential Loss of Lien

This legislative history is for the Municipal Bankruptcy Amendments of 1988, H.R. 5347, and S. 1863, from the 100th Congress, 2d session (hereinafter sometimes the 1988 amendments). It evidences that Congress became concerned about a disjunction that had occurred because municipal finance developed differently from that of commercial finance.  This was particularly problematic for municipal bankruptcies in the chapter 9 version enacted by the Bankruptcy Reform Act of 1978.  S. Rep. at 3-4.  Part of the concern was § 552(a) would cause a pre-petition lien to be extinguished with respect to property acquired by a municipal debtor after the commencement of a bankruptcy unless the pre-bankruptcy security agreement also encumbered proceeds, products, offspring or profits.  If it did, then the security interest is extended post petition to proceeds, products, offspring or profits to the extent provided under the security agreement and applicable nonbankruptcy law.  11 U.S.C. § 552(a) & (b)(1); *see also* S. Rep. at 4-5; H.R. Rep. No. 100-1011, at 4-7 (1988) [hereinafter H.R. Rep.].

For some financial transactions such as those creating a lien on inventory and proceeds from its sale, § 552(a) in conjunction with § 552(b) have the effect of preserving the lien after one files a bankruptcy case.  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forests Assocs.*, 484 U.S. 365, 374 (1988).  However in many municipal financing transactions, the lien is not against the underlying asset that generates the proceeds, products, offspring or profits.  It is only against the proceeds, products, offspring or profits.  What it is is a lien on only the stream of revenue from the underlying asset.  Because § 552(a) had the potential to eliminate the pre-bankruptcy lien on a revenue stream in instances where no lien existed against the property generating the revenues, Congress acted to do away with this possible result in chapter 9.  S. Rep. at 4-5; H.R. Rep. at 4-7.

As a result of state debt limits, taxing restrictions, and restraints on alienation of municipal properties potentially caused by enforcement of liens against properties, municipalities have utilized revenue based financing to borrow monies for purposes such as sewer systems.  Often, revenues dedicated from a property are not subject to restraints on liens on properties of a municipal government, indebtedness limits, and taxing restrictions.  How revenue based financing was structured is one of the areas Congress viewed municipal financing as having diverged from the commercial arena and is why it was concerned about the implications of § 552(a).  S. Rep. at 2-5; H.R. Rep. at 2-5 (explaining that avoidance under § 552(a) of a lien resulting from a pre-bankruptcy security interest on property acquired after the filing of a bankruptcy is "inconsistent with principles of municipal finance, particularly with respect to public works projects financed by revenue bonds").

Other problems that Congress addressed in the 1988 amendments included the potential for converting nonrecourse obligations into those that would be a claim against the general

37

revenues of a municipal government and use of monies from an avoided lien on pledged revenues for other purposes despite the fact that under state laws and by contract these revenues could not be otherwise applied. While discussing the nonrecourse problem, the Senate Report references that "[t]he problem is created by using private corporate debt principles and applying them in a municipal finance context." S. Rep. at 9. If nothing more is evident from this short review of the legislative history, it is that Congress intended that certain of the corporate finance principles be modified including changing how the automatic stay applies to revenue based financing for municipalities. Consistent with this is incorporation of the usage of words in their municipal finance meaning in lieu of that of general commercial usages. *See* S. Rep. at 1 ("The proposed amendments reflect principles that have long been the premise for municipal finance but that have not been expressly stated in the Bankruptcy Code."); H.R. Rep. at 3 (indicating that the 1988 amendments were intended to remedy "the inconsistencies between bankruptcy law and principles of municipal finance to remove the potential for problems that now exist").

### (iv) The Language of the Legislative History.

It is clear from both the House and the Senate Reports accompanying the 1988 amendments that eliminating the potential loss of a creditor's lien on revenues was a critical purpose behind the enactment of § 928 and § 922(d). The House Report sets forth that:

> *Section 4* adds a new subsection (2) to Bankruptcy Code Section 902 to provide a definition for special revenues in chapter 9. Defining special revenues is key to eliminate the possibility of avoiding a lien on post-petition special revenues under section 552(a) of the Bankruptcy Code.

H.R. Rep. at 4. Joined with this is a discussion that indicates an understanding of what consequences might occur that Congress did not intend by having made § 552(a) applicable to municipal bankruptcies:

> In a municipal bankruptcy, this means . . . *[t]he post-petition revenues generated by the asset financed would then not be used to repay holders of revenue bonds*. Instead, the revenues would go into the general treasury, for distribution to all creditors of the municipality . . . .

*Id.* (emphasis added). This is but one indication that Congress was trying to make certain that the revenues received post-petition would be used to pay holders of bonds repayment of which is secured by revenues generated by a system or project. Why this is so is further revealed by the discussion regarding what was section 5 of H.R. 5347:

> To help achieve a primary goal of the bill, new subsection (d) to section 922 states that the automatic stay of Bankruptcy

38

> Code section 362 does *not operate to stay paying pledged revenues*, consistent with new section [928] of the Bankruptcy Code, *to revenue bondholders holding liens on such revenues.*

H.R. Rep. at 7 (emphasis added). In the context of this quoted portion of the legislative history, what is shown is that "pledged" is greater in meaning than just revenues subject to a possessory lien. As it is used here, it is that portion of all revenues of the system or project that are dedicated or promised to be paid from the system against which the bondholder has a lien of any sort including, but not limited to, the possessory one that the County postulates.

In the last quoted portion of the legislative history, "pledged" shows not just that its meaning is broader than a possessory lien. As importantly when one remembers that the revenues being discussed in § 928 are special revenues "acquired by the debtor after the commencement of the case," it demonstrates that Congress wanted to ensure no delay occurred in payment to creditors secured by special revenues received by a municipal debtor post petition. The exception is in instances where the lien on pledged revenues is of such a magnitude that the necessary operating expenses of the project or system will not be paid. For instance, when the lien on pledged special revenues is a lien on gross revenues, the lien on pledged revenues is subordinated to payment of the necessary operating expenses. H.R. Rep. at 8.

While discussing what was to become the § 928(b) requirement that "[a]ny such lien on special revenues . . . derived from a project or system shall be subject to the necessary operating expenses," the House Report contains this:

> Subsection (b) sets forth a minimum standard for paying operating expenses ahead of debt service where *revenues are pledged.* It is not intended to displace any broader standard contained *in the terms of the pledge or applicable nonbankruptcy law.*

H.R. Rep. at 8 (emphasis added). This language points out "pledged" for § 922(d)'s reference to § 928(b) is a lien that is greater than just a possessory one. When discussing what post petition special revenues subject to a lien may be used to pay operating expenses of a project or system, Congress essentially views "pledged" as meaning "lien" in § 928(b). This is because while § 928(b)'s wording is "lien" on special revenues, the House of Representatives' discussion uses "pledged" and "pledge" synonymous with, if not greater than, "lien." Minimally, this indicates Congress' use of the word "pledged" in its discussion of subsection (b) encompasses something more than a possessory lien and is an indication that its use of "pledge" and "pledged" is not just to a lien created or perfected by possession.

A further review of the legislative history and comments of those in charge of drafting the relevant amendments to chapter 9 reveals the same. When it comes to repayment of bonds issued to finance projects such as a sewer system, "the revenues from such a project or program are

39

pledged to repay the bonds." S. Rep. at 4. This usage does not limit a pledge to a possessory one. Similarly in the immediately following sentence of this quoted portion of the Senate Report and while discussing general obligation bonds as being "bonds for which the general taxing power of the issuer is pledged to repay the bonds," pledge is not limited to a possessory lien. It is used in the broader sense of a promise or dedication of revenues to payment of bonds. S. Rep. at 5.

As part of the discussion on the problem that could occur with revenue based financing obligations if the impact of § 552(a) was not eliminated in chapter 9 cases, the pledged revenues phraseology is present in a context demonstrating the breadth of "pledged." For §§ 922 & 928 purposes, it is not limited to a possessory lien:

> If the municipality files for bankruptcy, Section 552(b) may permit general creditors of the municipality to seek payment from the *pledged* revenues and prohibit the specified payment of the pledged revenues to the bondholders. . . . Accordingly, there is a real concern that revenues *dedicated* to the repayment of municipal and local obligations will be diverted to other purposes once a municipality or local government enter bankruptcy.

S. Rep. at 5 (emphasis added). Here, "pledged" denotes a meaning more than that of a possessory lien. In its "Summary of Significant Amendments," the Senate Report contains this:

> Finally, the amendments insure that revenue bondholders receive the benefit of their bargain with the municipal issuer, namely, they will have *unimpaired rights to the project revenue pledged to them.*

S. Rep. at 12 (emphasis added). Pledged as used here is not just monies in possession of a creditor. Combined with this is that under the County's proffered definition of "pledged special revenues," the right of the warrant holders to the Net Revenues is impaired. This arises from delaying what was part of their bargain with the County: payment of Net Revenues pursuant to the terms of the Indenture and the warrants. *See* 11 U.S.C. § 1124; *L & J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc. (In re L & J Anaheim Assocs.)*, 995 F.2d 940, 942-43 (9th Cir. 1993).

Perhaps one of the clearest expressions of Congress's intent and purpose in engrafting § 922(d)'s exclusion of "pledged special revenues" from the automatic stays is:

> Likewise, the automatic stay that becomes effective against creditors of a municipality is made *inapplicable to the payment* of principal and interest on municipal bonds paid from pledged revenues. *In this context, "pledged revenues" includes funds in the possession of the bond trustee as well as other pledged*

*revenues.*

S. Rep. at 13 (emphasis added).  Nothing could be more certain from this language than "pledged special revenues" as used in § 922(d) includes all pledged revenues, not just those in the possession of a trustee such as the Indenture Trustee.  So too, does it support the continued payment of the Net Revenues to the Indenture Trustee.

Knowing that Congress meant "pledged special revenues" in § 922(d) to be all special revenues subject to a lien granted to a creditor gives one full comprehension of the import of this language from the Senate Report describing the overly broad nature of § 362's stay of collection activities in a chapter 9 case, including, but not limited to, application of monies held by a secured lender to secure a debt:

>This provision is overly broad in Chapter 9, requiring the delay and expense arising from a request for relief from the automatic stay to accomplish what many state statutes mandate: the application of pledged revenues after payment of operating expenses to the payment of secured bonds.  The automatic stay should specifically be inapplicable to application of such revenues.

S. Rep. at 11.  Because the Senate Report clearly indicates that "pledged" revenues "includes funds in the possession of the bond trustee as well as other pledged revenues," this discussion of the inapplicability of the automatic stay to these special revenues is not limited to those in the possession of the secured creditor.  The inapplicability of the automatic stays is to all pledged revenues.

This interpretation is consistent with what Congress intended by the 1988 amendments.  A major purpose was to change from using corporate debt principles in the municipal financing context when their application would be at odds with how municipal finance had evolved.  This was and remains especially apt for revenue based municipal financing transactions.

What has been set forth is sufficient for this Court to hold that the automatic stays of §§ 362(a) & 922(a) do not apply to the Indenture and warrant required payments of the Net Revenues to the Indenture Trustee for all Net Revenues in the Indenture Trustee's, the Receiver's or the County's possession as of the petition date of the County's chapter 9 case and for those that under the contract documents are to be paid to the Indenture Trustee even if such payment occurs during the post petition period.  If and how they are to be paid for the post petition period raises a potential complication.

### (c) Complication

One arises from how the parties to the Indenture structured the payments into the Debt Service Fund.  The sewer revenues go into a revenue fund account and from there certain of the

41

monies are transferred into the account for the Debt Service Fund. Indenture §§ 11.1 & 11.2. It is from the Debt Service Fund account that the Net Revenues are paid to the warrant holders. Under the Indenture, the revenue fund account is in the possession and control of the County. Indenture § 11.1. In contrast, the Debt Service Fund account is in the possession and control of the Indenture Trustee. Indenture § 11.2. Under this procedure, the flow of monies from the sewer system initially goes into an account that, but for the intervention of the receivership case, would have always remained in the possession of the County.

Flowing from jurisdiction of the Court over sewer system revenues constituting property of a debtor being coupled with the other implications from *Taylor v. Sternberg*, payment or not of the Net Revenues may be viewed by the County as its prerogative. In a November 9, 2011, letter to the Receiver's counsel, the County took the position that it once again has possession and control over the reserve fund. Additionally, it has already asserted that this Court cannot require transfer or payment of the Net Revenues to the Debt Service Fund due to the limitations imposed under 11 U.S.C. § 904(1) - (3). The effect of this section is that absent consent by the County and as property of the debtor, § 904 prevents this Court by use of a stay, order, or decree from interfering with any of the property or revenues of the County and its use or enjoyment of any income producing property. 11 U.S.C. § 904(2) & (3). Implicit in these positions made before this ruling on the inapplicability of the automatic stays to payment of Net Revenues to the Indenture Trustee is that this Court cannot force payment of the Net Revenues.

Some of what could occur has been ameliorated by the County's representation that it will segregate and not commingle the sewer system's revenues and that it will work with the Indenture Trustee to develop a protocol. The protocol as conceived by the County is to deal with an agreed method for segregating the encumbered system revenues and payment of operating expenses as defined under the Indenture or those that would be a surcharge under § 928(b). It does not include payment of the Net Revenues to the Indenture Trustee.

There are difficulties with just segregating the Net Revenues. One is that the continued flow of pledged special revenues, here the Net Revenues, is what Congress intended by its exclusion of such revenues from operation of the automatic stays of § 362(a) and § 922(a). A second and very important one is that the Net Revenues are not protected from further actions by the Indenture Trustee to acquire them from the County. Subject to this Court's setting of the amount of the Net Revenues, this means that resort to another court for the limited purpose of obtaining the Net Revenues is potentially available should the County not voluntarily remit the Net Revenues to the Indenture Trustee.

The complication at this juncture is how much of the Net Revenues are due to the Indenture Trustee. The Net Revenues may not be fully payable to the Indenture Trustee as a result of 11 U.S.C. § 928(b) subjecting the pledged special revenues to the "necessary operating expenses" of the sewer system. Should the Indenture's definition of operating expenses that may be paid out of the sewer system revenues be less than what are § 928(b)'s "necessary operating expenses," the full amount of Net Revenues otherwise payable to the Indenture Trustee will have

42

to be reduced. As of now, whether and the extent of any variance between the operating expenses as specified in the Indenture and those "necessary operating expenses" of § 928(b) is not known. Accordingly and should the Indenture Trustee and the County be unable to agree on the payment and the extent of the Net Revenues, the Court will hold a further hearing to fix the amount of post petition Net Revenues the Indenture Trustee is entitled to receive.[16]

---

[16] Another complication is that the warrant holders cannot be compensated for a loss caused by delay in receipt of what they are entitled to under the Indenture. The inability to protect the warrant holders for a loss caused by the automatic stays is tied into Congress's belief that, except for the § 928(b) subordination to necessary operating expenses, any "pledged special revenues" are not to be used for purposes other than those for which they have been pledged.

Under § 928(a), the lien granted under the Indenture attaches to special revenues received during the case. Due to the nonrecourse status of the obligation and the deficiency in revenues to repay the sewer system's warrant obligations within the terms set forth in the Indenture, no excess special revenues exist for other purposes at this time and for the foreseeable future.

Although Court required periodic payments by the County as adequate protection is not the sort of adequate protection sought nor available without (i) the County's consent, and (ii) the other requirements for adequate protection being met, analyzing why adequate protection is not possible, even if allowed, lets one understand the dilemma posed by the County's segregation only position. It also shows why, if it were allowed, the only form of adequate protection this Court could provide is the uninterrupted receipt of the Net Revenues during the pendency of the chapter 9.

This is due to the way revenue based municipal financing is configured to avoid making such financing a general obligation of a municipality. This is often a specific requirement under state laws to ensure that their payment is not from the general taxing power of the issuer. S. Rep. at 8-9. This is precisely how the agreement between the County and Indenture Trustee is configured. Sections 2.2 and 18.1 of the Indenture express that payment of the warrants is not a pledge of the full faith and credit of the County or a claim against its taxing power or directly or indirectly payable from the general revenues of the County. It is also how Alabama treats special, or limited, revenue financing. *Hall v. Underwood*, 63 So. 2d 683, 693 (Ala. 1953); *Isbell v. Shelby Cnty.*, 180 So. 567, 569 (Ala. 1938).

In chapter 9, providing adequate protection may, with the consent of a debtor, be by periodic payments pending implementation of a plan or relinquishment of the property. Other means exists such as a replacement lien on other properties or a supplemental lien. 11 U.S.C. § 361. Furthermore, a claim occasioned by failure of adequate protection to compensate for the imposition of the automatic stays or from the granting of a lien under § 364(d) is entitled to administrative expense treatment under 11 U.S.C. § 922(c). It is the source of payment of the periodic payments or the administrative claim that must be studied.

To maintain the nonrecourse nature of payment of debt secured solely by a pledge of revenues for a project or system such as the County's, the only source of periodic payments, a lien or payment of an administrative expense claim that does not convert, at least in part, the nonrecourse nature of the transaction into a general obligation of the municipality is from monies from or grant of a lien on the pledged special revenues. The same is true for an administrative claim. Preservation of the nonrecourse nature of special revenue financing and avoiding the state and federal law implications of a municipality being able to utilize general revenues to pay nonrecourse obligations or allowing special revenues to be used to pay general debts of a municipality are other specific issues that caused Congress to enact the 1988 amendments to chapter 9. S. Rep. at 5-6. In a case like this chapter 9, the substance is that allowance of adequate protection by providing something other than continued receipt of Net Revenues results in the warrant holders having to be provided adequate protection from the special revenues that would otherwise already be required to be paid to them. This means that such payments have to be treated as either an operating expense, a reduction in the dollars placed into funds such as the reserve funds or taken directly from the Net Revenues. Treating such payments as operating expenses has the effect of decreasing Net Revenues. Not paying monies required to be placed into the funds other than the one from which the Net Revenues are paid has same ultimate impact: Net Revenues decrease. Paying adequate protection periodic payments or an administrative claim

43

In summary, this Court's analysis of the interplay of section 922 with section 928 of chapter 9, 11 U.S.C. §§ 922, 928, is that "pledged special revenues" as used in § 922(d) includes all special revenues against which the County granted a lien under the Indenture, not just those in the possession of the Indenture Trustee or Receiver. It encompasses those Net Revenues that are received from the sewer system before and after the filing of the County's chapter 9. The structure and intent of what Congress enacted by its 1988 amendments to chapter 9 was to provide a mechanism whereby the pledged special revenues would continue to be paid uninterrupted to those to which/whom payment of the sewer system's indebtedness is secured by a lien on special revenues. The result is that 11 U.S.C. § 922(d) excludes continued payment of these "pledged special revenues" to the lienholder from being stayed under 11 U.S.C. § 362(a) or 11 U.S.C. § 922(a).

## IV. The Case, What Proceeding and Abstention

Less than twenty four hours after the initiation of the County's bankruptcy case, the Indenture Trustee and the Receiver filed similar motions containing astonishingly broad requests that this Court abstain from any and all actions that might in any way interfere with either the Receiver or the Receiver Order.[17] This is striking when one knows that from the filing of its

_____

from Net Revenues does the same.

This result is inevitable in all instances where there is no excess of special revenues above those subject to the lien of the secured creditor. This is the case under the Indenture as of this time and for what the evidence reveals will be well beyond the redemption dates. At best, all that might be able to be done is to even further extend the repayment periods beyond the already unrealistic redemption dates. This highlights some of why Congress intended that pledged special revenues continue to be able to be applied post-bankruptcy. S. Rep. at 11-13; H.R. Rep. at 4, 7.

[17]  At the start of the hearings in this matter, the Court considered the arguments offered by the Indenture Trustee and the Receiver in support of abstaining from or otherwise not retaining jurisdiction over the County's bankruptcy case that are founded on the Johnson Act, 28 U.S.C. § 1342, and the *Rooker-Feldman* doctrine, *see D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923). The Court also addressed their contentions premised on the Johnson Act and the *Rooker-Feldman* doctrine regarding the automatic stays of 11 U.S.C. §§ 362(a), 922(a). The positions presented are that the Johnson Act forbids a federal court from interfering with the rate orders of public utilities which would be required in the County's bankruptcy case and that the bankruptcy case is a collateral attack in federal court on a final order of the Alabama court that appointed the Receiver which violates the *Rooker-Feldman* doctrine.

This Court orally denied all parts of the motions involving the Johnson Act and the *Rooker-Feldman* doctrine. The denial of the Johnson Act based motions was the jurisdiction of a bankruptcy court is premised on 28 U.S.C. § 1334 which is not within what is required by the Johnson Act. A prerequisite to the Johnson Act's forbiddance is federal jurisdiction must be based solely on diversity of citizenship or "repugnance of the order to the Federal Constitution." 28 U.S.C. § 1342(1); *In re Cajun Elec. Power Co-op., Inc.*, 185 F.3d 446, 452 n.7 (5th Cir. 1999); *Int'l Bhd. of Elec. Workers, Local Union No. 1245 v. Pub. Serv. Comm'n of Nev.*, 614 F.2d 206, 211 (9th Cir. 1980). In the County's case, neither is involved. For this reason, the Johnson Act does not require abstaining from the exercise of jurisdiction over the County's bankruptcy case and similarly has no application to the existence or modification of the automatic stays. Supporting the Johnson Act not being an impediment to bankruptcy jurisdiction in this case is that 11 U.S.C. § 943(b)(6) expressly requires that any regulatory approval be obtained as part of the chapter 9 plan confirmation process and the arguments are at odds with the history of bankruptcy filings by entities

44

chapter 9 to now, the County has not asked this Court to take any action to either interfere with the Receiver or the Receiver Order.  Nor has anyone else.

All that has occurred relevant to the abstention sought is that the chapter 9 case was filed with the concomitant imposition of automatic stays of 11 U.S.C. §§ 362(a) & 922(a).  Significant to the abstention considerations is that stays of conduct are not the result of any actions taken by a bankruptcy court as part of the case or in a proceeding arising in, arising under, or related to a bankruptcy case.  Rather and as the descriptive terminology for them indicates, they are  imposed automatically upon the filing of a chapter 9 case.  Each is a Congressionally created stay of certain actions and inactions by non-debtors imposed under the terms of the bankruptcy statute simultaneous with the filing of a chapter 9 case. *See* 11 U.S.C. §§ 362(a) & 922(a). *See* 11 U.S.C. §§ 362(a) & 922(a). *In re Taylor*, 655 F.3d 274, 278 (3d Cir. 2011); *see also In re Atkins*, 176 B.R. 998, 1004 (Bankr. D. Minn. 1994) ("the automatic stay in bankruptcy comes into existence as a matter of law; it is self-effectuating").

One other fact is material.  The receivership is not one sought by Alabama to control the County's political or governmental functions.

<u>(a) Case Abstention</u>

<u>(i) No Political or Governmental Powers Involved for §§ 903, 904 Purposes</u>

The parties' argument in support of abstention from the County's bankruptcy case are by invocation of § 903 and § 904 of the Bankruptcy Code, 11 U.S.C. §§ 903, 904, along with the Tenth Amendment to the U.S. Constitution.  The argument is somewhat akin to the 11 U.S.C.

---

subject to state rate setting bodies. *See, e.g., Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007) (pertaining to Respondent's chapter 11 bankruptcy); *In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60 (Bankr. D.N.H. 1994) (pertaining to county solid waste disposal districts' Chapter 9 petition); *In re Cottonwood Water and Sanitation Dist.*, 138 B.R. 973 (Bankr. D. Colo. 1992) (pertaining to a "quasi-municipal" entity's Chapter 9 petition).

Parenthetically, the Indenture Trustee and the Receiver contend that as a result of the Receiver Order and for the Johnson Act purposes, the Receiver is the a state administrative agency or rate-making body of a state political subdivision within the meaning of 28 U.S.C. § 1342.  At this time, this issue has not and need not be addressed by the Court.

With respect to those portions of the motions relying on *Rooker-Feldman*, this Court denied the movants' requests based on *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).  Namely, the filing of a bankruptcy case is not a losing party in a state court case seeking review and rejection of a state court judgment in a federal court after the state court proceedings are ended.  *See, e.g., In re Gruntz,* 202 F.3d 1074, 1083 (9th Cir. 2000) (holding that the enforcement of an automatic stay is not improper appellate review of state court judgment); *In re Clarke,* 373 B.R. 769, 771 (Bankr. S.D. Fla. 2006) (holding the same as *Gruntz*); *see also Nicholson v. Shafe*, 558 F.3d 1266 (11th Cir. 2009). There is also a complex issue going beyond what the parties briefed regarding the finality of the state court's grant of partial summary judgment in the form of the Receiver Order.  For purposes of the denial of the *Rooker-Feldman* predicated motions, the lack of finality of the Receiver Order was not relied upon by the Court.  Should it not be a final order, *Rooker-Feldman* would, for an added reason, be irrelevant to these bankruptcy proceedings and the automatic stays.  *See also supra* at n.2.

Case 11-05736-CRJ9   Doc 536   Filed 01/13/12   Entered 01/13/12 10:04:54   Desc Main
Document   Page 45 of 57

§ 364(b)(4) police and regulatory powers assertions already discarded.  It goes as follows.  Since the Receiver is an officer of the Alabama receivership court having possession of the County's sewer system and authorized to operate it, either it is acting for the court in a sovereign capacity or the Alabama receivership court is acting in a sovereign capacity.  Given this sovereign status, the proposition is that § 903, § 904, and the Tenth Amendment restrict a bankruptcy court from doing anything that limits or impairs the Receiver's or the Alabama receivership court's exercise of control over the County's sewer system properties.

The § 904 portion of the argument is without support under any reading of the statute.  Section 904 is a restraint on this Court's ability to direct actions by a municipal debtor that are within the County's political or governmental powers, dealings with its property or revenues, or use or enjoyment of income producing properties.  11 U.S.C. § 904(1) - (3).  Since the Receiver and the Alabama receivership court are not the debtor, see  11 U.S.C. § 101(13), literal interpretation of § 904 does not sustain abstention from the County's bankruptcy case.

For another reason, the same may be said for 11 U.S.C. § 903.  Both §§ 903, 904 have been carried forward from the prior bankruptcy statute as part of what Congress did to overcome the Supreme Court's *Ashton v. Cameron County Water Improvement Dist.,* 298 U.S. 513 (1936), rationale for striking down the 1934 enacted municipal bankruptcy provisions contained in §§ 78-80 of the Bankruptcy Act.  Sections 903 and 904 are similar to the 1937 amendments adding  chapter 10 for municipal bankruptcy filings that was upheld in *United States v. Bekins*, 304 U.S. 27 (1938).  As with their *Bekins* version predecessors, both §§ 903, 904 are designed to recognize the sovereignty of states.  Section 903 is with respect to a state's sovereignty and § 904 is with regard to the sovereignty of subdivisions of a state.  Each applies to only those powers exercised by the state or a municipality that are within its sovereign powers which must be differentiated for bankruptcy purposes from a court's exercise of powers enforcing private rights.  What is at the heart of § 903 is state control over a municipality's "political or governmental powers."  11 U.S.C. § 903.

The difficulty for those asserting § 903, and for that matter § 904(1), in support of abstention from the County's bankruptcy case is both the Receiver and the Alabama receivership court are not exercising the requisite sovereignty.  The case law on receivers and receivership courts is consistent:  a receiver and the court appointing a receiver of the type John S. Young, Jr., LLC is do not hold the property in a sovereign capacity and are not exercising public rights with respect to the property held in *custodia legis*.  *See The Southern Cross*, 120 F.2d at 468; *Nakash*, 190 B.R. at 768-69; *Rohrig,* 12 N.W. 2d at 868; *Kluchuhn,* 461 A.2d at 21; *Goldberg*, 272 A.2d at 401; *see also supra* at III 4(b), (e), (f), 5(a)(i)-(iii) & n.13.

In other words, the Receiver and the Alabama receivership court are not exercising the "political or governmental powers of such municipality," here the County, referenced in § 903 or § 904(1).  As the *Kluckhuhn* court set forth, "the assertion [by the receiver or the receivership court] is of merely private rights on behalf of a limited group."  *Kluckhuhn*, 461 A.2d at 21 (internal quotation marks omitted).  It is the distinction between private or proprietary rights on

46

the one hand and public or governmental rights on the other that is the telling reason for why § 903 and § 904(1) do not support the arguments for abstention. The Receiver and Alabama receivership court's utilization of a receiver arose in a case seeking enforcement of private or proprietary rights, not in an action that addresses political or governmental powers.

The result of all that has happened is the appointment of the Receiver and the actions taken by it on behalf of the Alabama receivership court are for a private party, the Indenture Trustee on behalf of creditor warrant holders, seeking to enforce the contractual obligations of a debtor, the County, including payment of monies owed. This is no different than a case where the debtor is not a municipal entity. The fact that a municipal entity is the debtor does not change the status of the Receiver and the Alabama receivership court as not exercising control over the County with respect to its political or governmental powers.[18] All that is being done is that the Alabama court is exercising its powers, not the political or governmental powers of the County, to enforce the contractual rights of the Indenture Trustee and the warrant holders against property of the County. The use of the remedy of a receivership by a non-governmental creditor as part of a debt collection means is not the state controlling a municipality's political or governmental powers within the purview of either 11 U.S.C. § 903 or 11 U.S.C. § 904(1). It simply involves enforcing private rights on behalf of a non-governmental creditor.

### (ii) No Statutory Based Case Abstention and the Ramification

There is only one statute allowing a bankruptcy court to abstain from the entirety of a bankruptcy case. It is that set forth in 11 U.S.C. § 305 which is captioned "Abstention." It allows a bankruptcy court to either dismiss a bankruptcy case or suspend all proceedings in a case. 11 U.S.C. § 305(a). However, it is excluded from chapter 9. 11 U.S.C. §§ 103(f), 901(a). Understanding some of why this section is inapplicable to chapter 9 assists in knowing why abstention to a bankruptcy case may be inapposite.[19]

The legislative history for § 305 indicates Congress recognized the rule that courts given jurisdiction of a matter requires taking jurisdiction, yet contemplated there may be instances in bankruptcy cases when jurisdiction should be declined. H.R. Rep. at 290; S. Rep. at 34. This is

---

[18] This Court has not located and has not been cited to a reported Alabama court decision addressing a receivership court in a debtor-creditor dispute as exercising the sovereign powers contemplated as within the scope of the §§ 903, 904 limits on a bankruptcy court's authority. Despite this, Alabama's courts have consistently followed both federal case law and that of other jurisdictions on the status of a receiver and a receivership court when dealing with the John S. Young, Jr., LLC type of receiver. This indicates that Alabama's courts would not deviate from the authorities cited regarding the Receiver and the Alabama receivership court as not acting in a sovereign capacity.

[19] Although one may question whether the standards for dismissal or suspension under § 305(a) are truly abstention as contemplated in case law and 28 U.S.C. § 1334(c), its "interests of creditors and the debtor" is amorphous enough that in an appropriate instance it may include abstention as developed in case law and that encompassed by 28 U.S.C. § 1334(c).

47

in contrast to earlier pronouncements of federal courts that a bankruptcy court is without power to cede its exclusive jurisdiction over a bankruptcy case and property of its estate. *See, e.g.*, *Isaacs v. Hobbs Tie & Timber Co.*, 282 U.S. 734, 739 (1931); *In re 188 W. Randolph St. Bldg. Corp.*, 88 F.2d 257, 261 (7th Cir. 1937). Section 305 creates an exception to the rule that a federal court is required to exercise its bankruptcy jurisdiction. Although § 305 alters these holdings in certain instances where a municipal debtor is not involved, they remain the rule in a municipal bankruptcy case.

When it comes to a bankruptcy case and absent the § 305 basis for declining to retain jurisdiction, abstention from a bankruptcy case is not an option due to the exclusive nature of federal jurisdiction over bankruptcy cases. This is part of what underlies *Isaacs'* and its progeny's holdings. As another bankruptcy court has stated "[b]ecause this Court maintains exclusive jurisdiction to decide matters under Title 11, abstention from a debtor's case is simply not an option." *In re First Assured Warranty Corp.*, 383 B.R. 502, 529 (Bankr. D. Colo. 2007). In the context of a chapter 9 bankruptcy, this is even more so than in those in which § 305 alters the rule from *Isaacs*.

Over and above these reasons is that abstention premised on section 305(a) of the Bankruptcy Code may be viewed as having been made inapplicable to chapter 9 cases in part because two of the requirements of being a municipal debtor adjusting debts is that of the requisite consent of the state along with the municipality desiring to effectuate a plan of adjustment of debts. 11 U.S.C. §§ 109(c)(2) &(4). In their essence, these subparts of § 109(c), constitute a requirement that both the state and the municipality consent to a chapter 9 case. Appropriately given state and municipal consent eliminates the argument that such a bankruptcy case is an affront to state sovereignty and contrary to the Tenth Amendment to the Constitution. More succinctly, our federal form of government under the Constitution has not been disregarded. In point of fact, the consent requirement is in furtherance of federalism. *See Bekins*, 304 U.S. at 49-52; *Ashton*, 298 U.S. at 538-40 (Cardozo, J., dissenting). This furtherance tilts the balance against abstaining from exercising jurisdiction over a chapter 9 bankruptcy case. *See also In re Nashville White Truck, Inc.*, 731 F.2d 376, 378 (6th Cir. 1984) (ruling that the application of the § 362(a) automatic stay to states does not violate the Tenth Amendment).

### (iii) Case Law Based Case Abstention

In light of some parties advocating the *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959), case developed abstention doctrines, the Court will briefly deal with their arguments even though there is a serious issue as to whether they apply to a bankruptcy case.[20] Not all of the issues and arguments regarding case

---

[20] One opinion coming the closest to saying that judicially created abstention doctrines do not apply is *Bricker v. Martin*, 348 B.R. 28, 32 (W.D. Pa. 2006) ("[T]he grounds for abstention in bankruptcy cases have been codified and [bankruptcy courts] are not strictly bound by these [judicially created abstention doctrines]." (quoting *Southwinds Assocs. v. Reedy (In re Southwinds Assocs.)*, 115 B.R. 857, 861 n.5 (W.D. Pa. 1990)). Others indicate

48

law based abstention are or need be addressed. Even assuming that one form may apply, application of the case law analysis does not support abstention from the County's case.

Federal courts use abstention as a means to adhere to the federal structure of the Constitution on which the United States is premised. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996). It furthers federalism by allowing federal courts to give the proper scope and necessary recognition to the role and authority of the states. *Quackenbush,* 517 U.S. at 733 (Kennedy, J., concurring). Deciding to abstain as it has been developed by case law entails balancing the independence of state action, sovereignty, against the federal interest of retaining jurisdiction by determining which interest is paramount. *Id.* at 733-34. Furthermore, abstention is viewed by federal courts as the exception that is not routinely invoked. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). In the bankruptcy realm, part of the balancing of state versus federal interests encompasses whether a state may and has consented to an act by the federal government regarding an action that otherwise is one reserved to the states under the Constitution as well as whether the federal government may and has agreed to allow a state to take an action otherwise reserved to it under the Constitution. *See Bekins*, 304 U.S. at 49-52; *Ashton*, 298 U.S. at 538-40 (Cardozo, J., dissenting). According due weight for state consent is but one aspect of what is essential in this balancing of interests for the County-Indenture Trustee-Receiver dispute.

The only relevant factors for case abstention recited to the Court are the existence of the Receiver, its improvements in the operation of the sewer system, and its enhancements in sewer system gross revenues. Counter balancing this to a great degree is the receivership is not for the entirety of the County, its properties, and its debts and other obligations. This leaves only part of the County's financial difficulties being dealt with in the state court should this Court abstain from the case.

Combined with the weight of state consent must be tacked on that from lack of §§ 903,

_____

that the case law developed abstention doctrines have been incorporated into 11 U.S.C. § 1334(c). *See, e.g.*, *Coker v. Pan Am. World Airways, Inc. (In re Pan Am. Corp.)*, 950 F.2d 839, 945 (2d Cir. 1991); *Eastport Assocs. v. City of L.A. (In re Eastport Assoc.)*, 935 F.2d 1071, 1079 n.7 (9th Cir. 1991); *In re Wright,* 231 B.R. 597 (Bankr. W.D. Tex. 1999). Although not expressly holding that judicially created abstention is either incorporated into or overridden by 28 U.S.C. § 1334(c), two courts have indicated that judge made abstention is not ordinarily applied in a bankruptcy case. *In re Midgard Corp.*, 204 B.R. 764, 774 (B.A.P. 10th Cir. 1997) (citing *Cathedral of Incarnation v. Garden City Co. (In re Cathedral of the Incarnation)*, 99 F.3d 66, 68-69 (2d Cir. 1996); *In re Gen. Carriers Corp.*, 258 B.R. 181, 191 (B.A.P. 9th Cir. 2001). One bankruptcy court has concluded that case law developed abstention doctrines do apply in bankruptcy cases and are not superceded by the bankruptcy statutory abstention provisions. *Swift v. Bellucci (In re Bellucci)*, 119 B.R. 763, 767 (Bankr. E.D. Cal. 1990). Virtually all of these courts' discussions are in the context of proceeding abstention of the permissive and mandatory types covered by 28 U.S.C. § 1334(c)(1) & (2). Given the debate on their availability to courts for proceedings in a bankruptcy case and when one recalls the exclusive nature of bankruptcy jurisdiction joined with the unavailability of 11 U.S.C. § 305(a) in a municipal bankruptcy case, it is questionable that these case based abstention doctrines retain viability for abstention from continued exercise of jurisdiction over a municipal bankruptcy case.

904 supporting abstention from a case along with the similar lack of support from the Tenth Amendment and the ramification of § 305(a) not applying in a municipal bankruptcy. These have been discussed in greater detail earlier and the discussion will not be repeated here. These weights when joined with another make the balance tilt lopsidedly to no abstention from a municipal bankruptcy case. The other is the proscription on impairing contracts under Art. 1, Section 10 of the Constitution. A financially prostrate municipal government has one viable option to resolve debts in a non-consensual manner. It is in a bankruptcy case. Outside of bankruptcy, non-consensual alteration of contracted debt is, at the very least, severely restricted, if not impossible. [21]

The Alabama courts cannot involuntarily impose on creditors receipt of less than each is due under whatever form of contract or agreement it, she, or he has with Jefferson County. In significant part, the possibility of non-consensual adjustments of debts made only available in a federal court is one more reason why abstention doctrines should rarely be utilized to justify a federal court's determination to not retain jurisdiction over a chapter 9 bankruptcy case.

Given the protracted period over which the County, with assistance form the State of Alabama and others, has been unable to resolve its financial difficulties outside the bankruptcy arena, the scale is weighed even further against case law-based abstention from the County's case. Lastly this balancing process is further weighted against abstention by the realization that once a sovereign agrees to one of its subdivision's filing a bankruptcy case, all of the chapter 9 provisions will be applicable to a municipal subdivision's case. *County of Orange v. Merrill Lynch & Co.* (*In re County of Orange*), 191 B.R. 1005, 1021 (Bankr. C.D. Cal. 1996). This includes application of the automatic stays of § 362(a) and § 922(a) to the Receiver and the Indenture Trustee.

Even under case law developed abstention, the totality of the balancing process does not support abstention from the County's bankruptcy case. The outcome of the balancing is as it was for the other considerations regarding abstaining from a bankruptcy case. It is not applicable to the County's case.

(b) Abstention and Proceedings

The residual abstention issues have to do with whether abstention under 28 U.S.C. § 1334(c) and/or case law based abstention otherwise apply. Each needs to be considered in the context of abstaining from a proceeding arising in, arising under, or related to the case. At this point in the County's chapter 9 case, there is only one category of such proceedings before this Court having anything to do with the requests that this Court not interfere with either the

---

[21] There has been only one instance in this and the last century when the Supreme Court of the United States has sustained the alteration of a municipal bond contract outside a bankruptcy case. *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 (1942). In a later case, *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 27-28 (1977), *Faitoute* was distinguished and its precedent status, if any, is dubious. *Id.*

50

Receiver or the Receiver Order.  It is the motions for, among other things, abstention.

Under the permissive abstention provision of 28 U.S.C. § 1334(c)(1) (providing for the interest of justice, the interest of comity with state courts, or respect for state law), abstention is with respect to a "particular proceeding."  Likewise, the mandatory abstention subsection, 28 U.S.C. § 1334(c)(2) (providing that a state law claim or state law cause of action that is only related to a case under title 11 that may be timely adjudicated in a state court), is expressly limited to a "proceeding" in a bankruptcy case.  As used in 28 U.S.C. § 1334(c), a proceeding is anything that occurs within a bankruptcy case, not the case itself.  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 226 n.38 (3d Cir. 2004); *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1141 n.14 (6th Cir. 1991). The legislative history for the predecessor to § 1334, 28 U.S.C. § 1471, is instructive on what is a proceeding.  It is:

> [A]nything that occurs within a case . . . . Thus, proceeding here is used in its broadest sense, and would encompass what are now called contested matters, adversary proceedings, and plenary actions under the [then] current bankruptcy law.  It also includes any disputes related to the administrative matters in a bankruptcy case.

H.R. Rep. at 445.

Because what is referenced by a proceeding under both 28 U.S.C. § 1334 (c)(1) & (2) is not the case itself, the mandatory and permissive abstention subparts of § 1334 do not apply to the Indenture Trustee's and the Receiver's requests for abstention unless they desire the Court to abstain from hearing their motions.  The same is true for judicially developed abstention.  This stems from the only proceedings in the County's chapter 9 case involving either the Receiver or the Receiver Order are the respective motions of the Indenture Trustee and the Receiver as joined by their supporters.

Coupled with the absence of a proceeding of the sort necessary for abstention is 28 U.S.C. § 1334(d) which specifies that the permissive and mandatory abstention provisions of § 1334(c) do not apply to § 362(a) stays of action affecting property of a bankruptcy estate which via 11 U.S.C. § 902(1) has to include property of a municipal debtor.[22]  The outcome of this

---

[22]  Section 1334(d) references "the property of the estate in bankruptcy."  28 U.S.C. § 1334(d).  11 U.S.C. § 541 determines what is property of the estate in a non-municipal bankruptcy.  In a chapter 9, § 541 is excluded as the result of 11 U.S.C. §§ 103(f), 901(a).  Section 902(1) redefines property of the estate to be property of the debtor "when used in a section that is made applicable in a case under this chapter [9] by section 103[f] or 901 of this title [11]."  This redefinition is literally only for Title 11 purposes.  Property of the bankruptcy estate for Title 28's § 1334(d)'s preservation of the automatic stay of § 362(a) is not defined in Title 28.  Neither is it or property of the debtor defined in Title 28 for purposes of 11 U.S.C. § 1334(e)(1).  Case law has consistently treated property of the estate as determined under § 541 as being the same as property of the estate referenced in 28 U.S.C. § 1334(e)(1) and has set what is property of the debtor by reference to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*  Despite the absence of these definitions in Title 28, the point is title 28's § 1334 follows Title 11's fixing of these property

51

subsection is that permissive and mandatory abstention of § 1334(c) may not be used to avoid the automatic stays of § 362(a) that apply to the Indenture Trustee and the Receiver.

Should this Court abstain at this juncture of the chapter 9 case, the Court would be abstaining from consideration of the requests by the Indenture Trustee, the Receiver, and those of supporting others which include the real issues: the impact on the Receiver and the Receiver Order of the 28 U.S.C. § 1334(a) & (e) grant of exclusive jurisdiction of the Jefferson County case and of its property to this Court along with that of the automatic stays imposed under 11 U.S.C. §§ 362 & 922.

Accordingly, abstention from the County's chapter 9 case and from proceedings within its case is not supported by statute or case law. Neither are they supported by what the Indenture Trustee, the Receiver, and those who have joined with them want and need to have resolved as early as possible in this case. Finally and given the unbounded scope of the requests for abstention in the absence of any real controversy over actions requested by either the County or taken by this Court regarding the Receiver and the Receiver Order, the requests are too nebulous to form a basis on which abstention may be determined to be applicable to any aspect of the County's bankruptcy. *See, e.g.*, *First Assured Warranty Corp.*, 383 B.R. at 528-29; *In re The Bible Speaks*, 65 B.R. 415, 431 (Bankr. D. Mass. 1986). It may be at some later time for a proceeding in the County's case abstention may be a preferred path or required course. So early in this case, it is premature, unwarranted, and would be counterproductive. The outcome is all of the abstention requests are denied.

## V. <u>Stay Modification or Not</u>

For modification of the automatic stays of § 362(a) and § 922(a), 11 U.S.C. §§ 362(a), 922(a), the subsection governing the basis for modification of one or both is § 362(d). 11 U.S.C. §§ 362(d), 922(b). In the County's bankruptcy, the relevant portions of § 362(d) for the stay modification requests of the Indenture Trustee, the Receiver, and those joining them are § 362(d)(1) & (2). Subpart (d)(1) is for cause which includes lack of adequate protection. 11 U.S.C. § 362(d)(1). Subpart (d)(2) requires a showing of no equity in the property against which the stay proscribes acts along with a showing that such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). Section 362(g) places the burden of proof on the lack of equity in property on the person or entity requesting stay relief and the burden of proof on all other issues on the County. 11 U.S.C. § 362(g)(1) & (2); *Timbers of Inwood Forest Assocs.*, 484 U.S. at 375-76; *Overhead Door Corp. v. Allstar Bldg. Prods. (In re Allstar Bldg. Prods.)*, 834 F.2d 898, 899 (11th Cir. 1987) (per curiam).

---

interests. *See, e.g.*, *In re RNI Wind Down Corp.*, 348 B.R. 286, 292 (Bankr. D. Del. 2006). The same methodology should be used for defining "property of the estate in bankruptcy" for § 1334(d) when it comes to a municipal bankruptcy. Under this procedure, the reference is back to the Bankruptcy Code just as is done for § 1334(e). In particular, § 902(1) redefines property of the estate in bankruptcy as property of the municipal debtor for § 1334(d) purposes similar to how the references to property of the estate in the applicable provisions of the Bankruptcy Code are redefined to be property of the debtor by 11 U.S.C. § 901(1).

52

In this case, the sewer system properties of the County have a lien against only the Net Revenues. There is no lien against the underlying realty or personalty generating the revenues. Conceptually, the only property for stay modification purposes that equity in property or the lack thereof has relevance to is the stream of revenues of the sewer system constituting the Net Revenues. *Timbers*, 484 U.S. at 374-76; *Albany Partners, Ltd. v. Westbrook (In re Westbrook)*, 749 F.2d 670, 673 (11th Cir. 1984). This Court could speculate on the existence or non-existence of equity in the stream of revenues, but that is not what is required. What is required is a determination based on evidentiary fact. *See Stewart v. Gurley*, 745 F.2d 1194, 1195-96 (9th Cir. 1984) (summarizing the methods to calculate "equity"). No valuation evidence for this stream of revenues has been presented except for the pre-bankruptcy inability of Net Revenues to fund the obligations secured under the Indenture. Conjoined with this is the automatic stays do not apply to the Net Revenues. For these reasons, lack of equity in the sewer system is not a basis on which stay modification may be founded in this case. This is consistent with the contract terms that set forth an express disavowal of any claim against any County property interests other than the Net Revenues. It also follows the *Butner* espoused property determination methodology where state laws set the perimeters of liens. *Butner*, 440 U.S. at 55-56.

What is left is 11 U.S.C. § 362(d)(1)'s "cause" basis for stay modification. Since the Net Revenues are to be paid to the Indenture Trustee and the warrant holders have no claims against any of the realty or personalty comprising the sewer system except the Net Revenues, the remaining "cause" contentions relate to the Alabama receivership case. All are to the effect that the stays be modified to allow the Alabama receivership case to go forward unimpeded by the County's bankruptcy case. Of necessity, this includes demands for allowing the Receiver to exclusively continue to operate and manage the County's sewer system properties, which encompasses raising usage rates for the sewer system customers.

As with other portions of the motions of the Indenture Trustee, the Receiver, and those joining with them, parts of their stay modification pleadings are predicated on legal and factual assumptions regarding the Receiver that are incorrect. More expressly, it is the supposition that on the filing of the County's bankruptcy case the property interests of the County constituting its sewer system remained subject to the jurisdiction and in the possession of the Alabama receivership court. As set forth above in III.4(a) - (f), they did not. The loss was not something resulting from any act of this Court. It was from the *in rem* jurisdictional grant of 28 U.S.C. § 1334(e)(1). This means those arguments presuming the properties constituting the County's sewer system are in the possession and control of the Receiver are also wrong. The *in rem* jurisdiction of the Alabama receivership court is over as is the Receiver's holding of such properties for the Alabama court. As a consequence, there is no modification of the automatic stay issue with regard to the Receiver's continued operation, management, and control of the County's sewer system properties. This is due to one of the further implications of *Taylor v. Sternberg,* 293 U.S. at 473, that the Receiver, if anything, holds these properties as a mere repository for this Court.

53

So and from an *in rem* focus, the only way the Receiver could be allowed to do what it previously did is for this Court to surrender its exclusive *in rem* jurisdiction over the County's sewer system properties. The further fallout is that virtually all of the reasons for which the receivership was desired by the Indenture Trustee cannot now be obtained in a state receivership case. Again, that is unless this Court is willing and able to relinquish jurisdiction over the debtor's sewer system properties. Since these properties are worth billions of dollars and the indebtedness secured by the sewer system's revenues is of even greater magnitude, such a transfer of properties from the exclusive jurisdiction of this Court is, at the very least, problematic for the viability of the County's debt adjustment in chapter 9.

Stay modification would remove a very large part of the County's properties from the bankruptcy case. Concomitantly, the sewer system debt resolution would become much more complex with two courts, one the Alabama court and the other this Court, attempting to resolve County indebtedness in different forums and under different governing laws. The difference of potentially the greatest significance is an ability in a bankruptcy case that is not present in an Alabama court: non-consensual impairment of the claims of the warrant holders. *U.S. Trust Co.*, 431 U.S. at 27-28. When one realizes that such a transfer limits, complicates, and places at risk the ability of the County to adjust its debts in one setting, it defeats one of the primary benefits of having a bankruptcy case. *See Isaacs*, 282 U.S. at 737-39; *Gonzales v. Parks*, 830 F.2d 1033, 1034-37 (9th Cir. 1987).

Furthermore and given the size of the sewer system related debts and the value of its properties compared to the totality of the County's properties, relinquishing this Court's jurisdiction over the sewer system properties would be the practical equivalent of declining jurisdiction over the case. Comparably, such a relinquishment of jurisdiction over the sewer system properties would be the same as abstaining from the case. This has already been rejected.

Also where the surrender of property subject to this Court's jurisdiction is the equivalent of ceding case jurisdiction and, as has been discussed in the abstention sections of this opinion, this Court may, and should, not cede its jurisdiction over these properties or the administration of them. *See Isaacs,* 282 U.S. at 739; *U.S. Fid. & Guar. Co. v. M.J. Bray*, 225 U.S. 205, 218 (1912); *188 West Randolph Street Bldg.*, 88 F.2d at 261 (examining the effect of bankruptcy of a state receiver and setting forth that "[s]uch jurisdiction having attached, control of the administration of the estate cannot be surrendered even by the court itself. . . [T]he jurisdiction of the court of bankruptcy after [filing of the petition] is exclusive and supersedes that of a court of equity in possession of the *res* of the debtor. The court of bankruptcy cannot surrender its jurisdiction or its duties.").

 As for the probable complications that would be created, many created have never been dealt with in the reported bankruptcy decisions. Two examples suffice for now. Practically speaking, one is the scope of the debts involved with the sewer system and of the debtor's property interests should they be taken out of the bankruptcy case potentially subverts administration of the County's case. Second and even in the mundane realm of stay

54

modification, which is relatively well fleshed out in other types of bankruptcies, variations on how it implicates other aspects of a municipal bankruptcy case are unresolved. For instance, in a chapter 9 case there is no property of the estate because 11 U.S.C. § 541 is not one of the available bankruptcy law sections. *See* 11 U.S.C. §§ 103(f), 901(a). In other reorganization portions of the bankruptcy laws, there is both property of a debtor and property of a debtor's bankruptcy estate. *See, e.g.*, 11 U.S.C. §§ 522(b), 541, 1115, 1207 & 1306. In chapter 7 or 11 cases involving an entity, stay modification removes property from being administered in the bankruptcy case. *See In re Cook*, 384 B.R. 282, 296 (Bankr. N.D. Ala. 2008) (explaining that bankruptcy gathers issues into "one tribunal for administration" through the stay). In a chapter 9, stay modification does not remove property interests from administration as part of a bankruptcy estate because there is none. Yet, the property remains property of a municipal debtor even after modifying the automatic stay. Whether and what the ramifications, if any, of this difference may be in a chapter 9 has not been fully explored in reported case law and is but one issue that would have to be considered along with other unique complications present in a chapter 9 case. By not ceding jurisdiction over the sewer system properties, many complications and complexities are avoidable.

Moving forward to the factual underpinnings for the cause urged as a reason for modification of the automatic stays, all of the movants recite criminal and fraudulent conduct involving the sewer system by former county commissioners and certain former employees of the County; the failure of the County to raise sewer rates for a number of years; management inefficiencies that included more employees of the sewer system than were necessary; improper maintenance, repair, and capital improvement practices; lack of sufficient knowledge to properly run the sewer system; and use of sewer system monies for purposes for which they are not permitted to be expended. The moving parties have provided evidence tending to show that the Receiver has corrected or eliminated many of these factors.

There is no doubt that the Receiver has done a far better job overseeing the running of the County's sewer system than the former commissioners. Lost revenues have been recaptured. Excess employees have been eliminated. Up to date accounting records have been prepared. If not eliminated, inappropriate expenditures have been reduced. Better maintenance, repair, and capital improvement practices have been developed along with ongoing, continuous education programs for sewer system employees. Through its majority owner, John S. Young, Jr., the Receiver has ready access to a person with an extensive background in and knowledge of utility management and operations. He has also served as a top executive of a major utility. Mr. Young's capabilities and experience are better than those of the current county commissioners and the County's employees when it comes to management and operation of a utility such as the County's sewer system.

There are countervailing factors. Primary among them is the attenuation in time of what was done by former county commissioners, former county employees, and former persons and entities in the private sector. All predate September 22, 2010, when the Receiver was appointed. Coupled with this is evidence that most of the easy fixes, or as the Receiver called them, the low

hanging fruit, have been accomplished and need only be continued into the future. In terms of utility, here not to be confused with a utility, this means that the incremental or marginal costs will be greater in order to achieve incremental or marginal reductions in expenses. For some of this marginal work, the costs of marginal improvement may exceed their value, meaning they would not be done even by the Receiver. With the likely exception of a sewer rate increase, the same marginal cost versus marginal benefit analysis applies to revenue enhancements. What the Court has not been provided with is an incremental cost benefit analysis for these sorts of items that would indicate that the Receiver will obtain a better outcome than would the County running its sewer system. This factor has added significance given the evidence that many of the complained of failures and inept practices of the former commissioners and former county employees have been dealt with by the Receiver.

One of the focal points of the requests for stay modification is the failure of the County to increase rates for a number of years. For a period prior to the Receiver's appointment, it is undisputed that the County did not. However, the wished-for inference that the new county commissioners - - all of whom were elected after the appointment of the Receiver - - will not raise sewer usage rates for the sewer system's customers is not proven.

Should the County have wanted to increase rates from September 22, 2010, forward, it could not have done so. The Alabama court's appointment of the Receiver precluded such actions by the County. On top of this is the manifested agreement by the new county commissioners to take the politically dangerous step of agreeing to significant rate increases of over eight percent per year for three years and up to 3.25% per year for the fourth year onward for what is an unlimited number of years capped only at the point when debt service requirements are met. This is part of what is in the term sheet approved by the current county commissioners. It demonstrates their willingness to increase rates along with the necessity of such increases.

Akin to the rate increase inference not being demonstrated is the wanted inference that all of what was done and not done by the former county commissioners and county employees will continue under the present Jefferson County Commission and the County's current employees. The movants' evidence in this area is not just time attenuated. The County has undertaken various initiatives that are unpopular with the employees, the citizenry, and others. These include layoffs of hundreds of County employees with the potential for many more under consideration; reduction in working hours for remaining hourly employees; suspension of hiring in many, if not all, job classifications; capital expenditure reductions; maintenance and repair cost savings; and the closing of various County facilities. Additionally, and for the first time, it has a county manager and assistants to help it in the County's operations.

One action taken by the County most resisted by echelons of state executive and legislative leaders, along with much of the business community, is the filing of the bankruptcy case. One may agree or disagree on whether the County was correct, but what it shows is that these county commissioners are serious about resolution of the sewer system related indebtedness and the other obligations of the County as they determine what is in the best interests of the

County. This is a fundamental change from former county commissioners, some of whom were not similarly focused. The current commissioners are not of the same ilk as the former ones and the proffered inference that they are is neither warranted nor demonstrated.

Part of the problem with the stay modification motions is that they were brought too soon in the County's case given the changed landscape of who is running it and what has been happening in the County. This Court is under no illusion that the County's commissioners or its employees have the expertise of the Receiver's majority owner. Just as the Receiver has hired expertise, the County is also able to hire such expertise which could conceivably include the Receiver in a different capacity. At this time, all of these factors mitigate against modification of the automatic stay for the causes on which the Indenture Trustee, the Receiver, and those joining them premise their requests. More simply, there is not now sufficient cause to alter the automatic stays.

A precautionary point needs to be made. Subsequent stay modification requests are available to parties should the County not take the necessary actions to maintain the improvements wrought during the Receiver's tenure and go forward to address the various other matters that need further action, including appropriate revenue enhancements, be it by a rate increase or by some other manner. Should the County fail to do what it needs to in the context of its bankruptcy case, this Court will consider future, warranted, and properly supported requests for stay modification. At this time, though, the requests for stay modification are denied.

## VI. Conclusion

Based on the foregoing, the motions for abstention are denied. The motions for stay relief are also denied. Simultaneous with and automatically on the filing of the County's chapter 9 case, the real and personal properties constituting its sewer system were no longer in the possession or custody of the Alabama receivership court. Instead, exclusive jurisdiction over these properties resides with this Court. Lastly, the Net Revenues, the amount of which is subject to further determination of this Court, are not subject to the automatic stays of 11 U.S.C. § 362(a) or 11 U.S.C. § 922(a). A separate order incorporating the Court's decision will be entered contemporaneously with this Memorandum Opinion.

Dated:     January 6, 2012

Thomas B. Bennett
United States Bankruptcy Judge

57