IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JEFFERSON COUNTY, ALABAMA, | ) | Case No.: 11-05736-TBB |
| a political subdivision of the | ) | |
| State of Alabama, | ) | |
| | ) | |
| Debtor. | ) | Chapter 9 |
| | ) | |

_____

| | | |
|---|---|---|
| THE BANK OF NEW YORK MELLON, | ) | |
| AS INDENTURE TRUSTEE, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | AP No.: 12-0016-TBB |
| | ) | |
| JEFFERSON COUNTY, ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**Memorandum Opinion on Professional Fees and Expenses, the Indenture's Operating
Expenses, and 11 U.S.C. § 928(b)'s "Necessary Operating Expenses"**

## I.     Words, Phrases, And Meanings Be They Plain or Not

Some of what the law is about is words and their usage.  From the view of one version of
objectivity, language is objective in the sense that it allows people to agree across areas of
disagreement.[1]  For instance, resort to calling a word's or phrase's meaning plain when there is
no plain meaning is a method to reach agreement on the outcome of a legal dispute despite not
having a consensus on the underlying reasons for a ruling.  Saying something has a plain
meaning when it does not sometimes avoids a fight over the meaning of words that could
otherwise forestall reaching a decision.[2]  Unfortunately, the opposite frequently happens.  The
malleable and mutable meaning of words or imprecision in their use often causes disagreement

---

[1] Frederick Schauer, Meador Lecture on Objectivity at The University of Alabama School of Law (Jan. 23, 2013).

[2] Frederick Schauer, *Statutory Construction and the Coordinating Function of Plain Meaning*, 1990 Sup. Ct. Rev.
231 (1990); *see also* Frederick Schauer, *The Practice and Problems of Plain Meaning: A Response to Aleinikoff and
Shaw*, 45 Vand. L. Rev. 715 (1992).

1

for which invocation of the plain meaning principle does not facilitate achieving an agreed-upon outcome.[3]

The problem presented to this Court is similar to the latter sort. It is a dispute arising from the ability of parties to utilize the elasticity in the meaning of words and how they are used along with their placement in an agreement to support differing views of what was agreed to more than a decade ago.

More specifically, it arises from the language of the Trust Indenture between Jefferson County, Alabama ("the County") and AmSouth Bank of Alabama as trustee dated as of February 1, 1997 ("the Indenture"), the relevant portions of which for this opinion have been incorporated into eleven supplemental indentures (collectively, the Indenture and the eleven supplemental indentures are referred to as the "Indentures").[4] The Bank of New York Mellon (hereinafter

---

[3] One need only know in a common law context how legal precedent evolves and how lawyers are trained to evade it in order to appreciate the breadth of indeterminateness often caused by words. For instance, *stare decisis* is a principle used to apply a law developed and utilized in one factual framework to all supposedly similar contexts involving numerous, potentially infinite, variations of facts. That is unless one is able to distinguish a law's application from the initial holding. Visually, this process may be seen as taking one grain of sand in a jar representing the initial bundle of facts to which a legal principle is applied, a subset, and extending it to all other grains of sand in the jar, the global set, without consideration of the variety of differences between the bundle of facts exemplified by the other grains of sand. As later comparisons are made of other grains to the first one, some are taken out of the jar as being sufficiently dissimilar to allow alteration of a legal principle or to modify its application to the facts. This is the process of distinguishing precedent.

In its essence, what our jurisprudence allows is application of a law as used in one factual milieu to set the law's application for a variety of permutations that will entail an incorrect implementation for many fact variations until one obtains a determination that the law or its application should be modified in some fashion to better fit a sufficiently variant fact pattern. The reverse also occurs from this process. The distinguishing process permits one to urge sufficient dissimilarity to avoid the application of a law when there is no difference to the degree that would warrant altering it or its application. This is a problem inherent in all verbal analysis.

Essentially this precedent making process is both complementary and contrary to Schauer's concept of objectivity. To the extent that it allows agreement or resolution of a matter even if the application of the law is viewed by many, if not most, as technically incorrect in a given instance, it is complementary. Conversely and to the extent that it allows one to apply words differently in what are sufficiently similar contexts, it engenders disagreement. This indeterminateness of words and their broad brush application via precedent may be some of why guidance from the Supreme Court of the United States has lessened over the last decade or so. *See* Frederick Schauer, *Abandoning the Guidance Function: Morse v. Frederick*, 2007 Sup. Ct. Rev. 205 (2007).

Although the discussion in this footnote and the related text of this Opinion may appear to be an aside unrelated to this Court's ruling on this matter, it is not. As is presented later in Part V, and in particular Part V(D), of this opinion, the very process of extending a ruling made in one fact context to other factual variations is what some have done with this Court's earlier ruling in this adversary proceeding, which is an unintended consequence of the law's verbally based analysis and this judge's apparent lack of clarity on the scope of application of the earlier opinion in this adversary proceeding.

[4] The eleven supplemental indentures are the First Supplemental Indenture between Jefferson County, Alabama and AmSouth Bank of Alabama dated as of March 1, 1997; Second Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of March 1, 1999; Third Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of March 1, 2001; Fourth Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of February 1, 2002; Fifth Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of September 1, 2002; Sixth Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of October 1, 2002; Seventh Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of November 1, 2002; Eighth Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of

2

sometimes referred to as "the Trustee") has been substituted for AmSouth Bank of Alabama as the trustee under the Indenture.  The dispute this Court addresses is the extent to which professional fees actually incurred by the County during its municipal bankruptcy are payable out of revenues generated from the County's sewer system ("Sewer System").  A little background of earlier decisions of this Court involving the Indenture and 11 U.S.C. §§ 901, 902, 922, & 928 helps one understand the genesis of the disputes that remain in this adversary proceeding while setting forth definitions, other sections of the Indenture, and prior rulings that need to be taken into account as part of resolution of the issues addressed in this opinion.

## II. <u>The Antecedents A/K/A Case History and Definitions</u>

In prior proceedings, this Court has had to resolve disputes over (i) what revenues of the Sewer System are subject to a lien securing the County's repayment of warrants issued by it, (ii) one or more of the terms defined in the Indenture, and (iii) how the Sewer System's revenues are to be applied under the Indenture to obligations incurred by the County as part of the issuance of warrants financing the rehabilitation, upgrading, and expansion of the Sewer System.  The current outstanding balance of the warrants is approximately $3.2 billion.

The first opinion was in the context of various challenges made by the Trustee, an Alabama Court's receiver ("Receiver") for the Sewer System, the insurers of some of the County's payment obligations owed to warrant holders under the Indentures, certain liquidity banks, and others against the County that were filed within hours of the commencement of the County's chapter 9 bankruptcy.  Although there were numerous challenges by these parties, they may be grouped into several categories: those relating to (1) the status of the Receiver *vis-a-vis* the Sewer System after the County's bankruptcy filing, (2) whether and the extent to which the Sewer System constitutes property of the County as a municipal debtor, (3) modification of the automatic stays of 11 U.S.C. §§ 362(a), 922(a) along with their asserted inapplicability to the Sewer System and certain of its revenues, (4) statutory and case-based abstention regarding the Sewer System properties and the Receiver's status, and (5) the scope of the exception to the applicability of the § 362(a) and § 922(a) stays under 11 U.S.C. § 922(d)'s language specifying the continued, post-petition "application of pledged special revenues . . . to the payment of indebtedness secured by such revenues."  *See In re Jefferson Cnty., Ala.*, 474 B.R. 228, 235 (Bankr. N.D. Ala. 2012) ("the First Opinion").

As it impacts this discussion, one holding in the First Opinion is that "pledged special revenues" referenced in 11 U.S.C. § 922(d) encompass all revenues of the Sewer System that remain following payment of its operating expenses, as this term is defined in the Indenture, the Net Revenues Available for Debt Service ("Net Revenues"), that were in the possession of the Trustee, the Receiver, or the County as of the filing of the County's chapter 9 case and all Net Revenues of the Sewer System received after the filing of the County's case, not just those in the possession of the Trustee as of the petition date.  *In re Jefferson Cnty., Ala.,* 474 B.R. at 271.

<hr>

January 1, 2003; Ninth Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of April 1, 2003; Tenth Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of August 3, 2003; and Eleventh Supplemental Indenture between Jefferson County, Alabama and The Bank of New York dated as of May 1, 2004.

3

Due to the lack of sufficient evidence regarding the Sewer System's revenues and expenses, this Court declined to rule on the amount of the Net Revenues--the amount of monies flowing initially to satisfy debt service following payment of Sewer System operating expenses--and suggested that the parties attempt to agree on the dollar amount of System Revenues payable to the Trustee on behalf of the warrant holders and others. Such an agreement was not forthcoming.

Failing to agree on the amount of Net Revenues payable to the Trustee under the Indenture for the benefit of the warrant holders and others precipitated another piece of litigation and another opinion by this Court. *See The Bank of New York Mellon, et al. v. Jefferson Cnty., Ala. (In re Jefferson Cnty., Ala.)*, 482 B.R. 404 (Bankr. N.D. Ala. 2012) ("the Second Opinion"). The subject matter of the Second Opinion was whether under the Indenture estimated reserves for depreciation, amortization, future expenditures (in particular estimated legal and professional fees and costs relating to the County's chapter 9 case), and anticipated capital expenditures (collectively, "the Reserves") are within the Indenture's definition of Operating Expenses ("Operating Expenses") or could otherwise constitute an Indenture-permitted reduction in System Revenues to arrive at the amount of monies that are to be paid to warrant holders (hereinafter "Parity Security Holders") and for certain other purposes (hereinafter the warrant payments and those for certain other purposes are sometimes referred to as payments for/to the Parity Security Holders).

Additionally, the Second Opinion addressed whether the provisions of 11 U.S.C. § 928(b) allow subordination of the Indenture-granted lien on the Net Revenues to the Reserves should they not be part of Operating Expenses. Effectively, a determination that the Reserves are either within Operating Expenses under the Indenture or constitute "necessary operating expenses" under § 928(b) either (i) places into Operating Expenses monies that under the Indenture would otherwise be Net Revenues payable to Parity Security Holders and then to other purposes, or (ii) subordinates the lien on Net Revenues to allow some of what are Net Revenues to be used for the Reserves. Such a placement or subordination would result in a reduction in the monies otherwise available from Net Revenues and give the County more funds to use for Sewer System purposes. This is why the issue was and remains important to all of the parties involved in this case.

This Court held in the Second Opinion that the structure of the Indenture creates a flow of certain revenues received by the Sewer System, those defined as System Revenues under Indenture § 1.1. System Revenues are defined as

> . . .the revenues derived from the Sewer Tax and all revenues, receipts, income and other moneys hereafter received by or on behalf of the County from whatever source derived from operation of the [Sewer] System, including, without limitation, the fees, deposits and charges paid by users of the [Sewer] System and interest earnings on the Indenture Funds (other than the Rate Stabilization Fund) and any other funds held by the County or its agents that are attributable to or traceable from moneys derived from the operation of the [Sewer] System, <u>but excluding</u>, <u>however</u>, any federal or state grants to the County in respect of the [Sewer] System and any income derived from such grants.

4

Indenture § 1.1 (emphasis in original).

The System Revenues are permitted to be utilized during a specified period for payment of those items that are defined as Operating Expenses under Indenture §1.1. Indenture § 11.1. As with the determination of System Revenues during a given period, the amount of Operating Expenses is period-by-period. Generally, they are those for a given month. *Id.* Coupled with this is that Operating Expenses is defined in one subsection of the Indenture to exclude, among other items, depreciation, amortization, plus certain items which under generally accepted accounting principles are (i) chargeable to a fixed capital account or (ii) characterized as extraordinary items. *See* Indenture § 1.1.

Excluding certain tax revenues, what is left of the System Revenues for a given period following payment of Operating Expenses is subjected to a lien granted under § 2.1 of the Indenture. Section 2.1 contains the County's grant, bargain, sale, conveyance, assignment, transfer, and pledge to and with the Trustee of, among other things:

> The System Revenues (other than revenues, derived from the Sewer Tax and any other tax revenues that constitute System Revenues) that remain after the payment of Operating Expenses, subject, however, to the right of the County to receive and use any or all of such revenues that are deemed "surplus revenues" under Section 11.6 hereof after all prior and current obligations of the County hereunder have been satisfied from the System Revenues;

Indenture § 2.1(I).[5]

Those System Revenues that are impressed with a lien under Indenture § 2.1(I)'s terms are also Pledged Revenues as defined in § 1.1 of the Indenture. Pledged Revenues are "those of the System Revenues that are pledged, pursuant to Section 2.1 hereof, to secure the payment of the Parity Securities."[6] Indenture § 1.1. Similarly, the revenues remaining from the System Revenues for a given period following payment of Operating Expenses for that period are part of what is Net Revenues as defined in Indenture § 1.1. The only difference for a given period between Net Revenues and System Revenues left following payment of Operating Expenses is interest earned, if not otherwise included in System Revenues, during the given period on monies held in some of what are defined as Indenture Funds. The amount of such interest earned during a period is added to what is Net Revenues. Essentially and when there is such earned interest, it increases the amount of monies that are part of both System Revenues and Net Revenues above what would otherwise be the amount available for payment of principal and interest on the Parity Securities and, possibly, for other uses.[7]

---

[5] There are two other subparts of Indenture § 2.1 whereby additional lien grants are made to secure repayment of the County's obligations under the Indentures. Indenture § 2.1(II)-(III). For purposes of this portion of the discussion, these sub-portions need not be set forth.

[6] Under the Indenture "Parity Securities" means "Series 1997 Warrants, the Series 1997-C Warrants and any Additional Parity Securities at the time outstanding." Indenture § 1.1.

[7] No evidence has been presented that earned interest of this sort has been included as part of either System Revenues, Net Revenues, or Pledged Revenues while the County's chapter 9 case has been pending.

5

As part of the rulings in the First Opinion and the Second Opinion, this Court held that the Pledged Revenues are "pledged special revenues" as that term is used in 11 U.S.C. § 922(d). This determination has the effect of excluding their Indenture-called for application from the automatic stays of 11 U.S.C. §§ 362(a), 922(a). They are also "special revenues" as defined in 11 U.S.C. § 902(2) and as that term is used in 11 U.S.C. § 928(a) & (b). *In re Jefferson Cnty., Ala.*, 474 B.R. at 263, 274; *In re Jefferson Cnty., Ala.*, 482 B.R. at 428-429.[8]

Conceptually, simplistically, and without restating the exclusions set forth above and the full analysis in the Second Opinion, the contracted for flow of revenues is as follows. System Revenues taken in during a specific accounting period are utilized to pay the Operating Expenses for this period. What is left after reduction by the Operating Expenses is available for debt service and other purposes identified in the Indenture. At the end of each accounting period, that which is designed to occur is the flushing of all System Revenues out of the account into which they are required to be deposited, the Jefferson County Sewer System Revenue Account ("the Revenue Account").

Understanding how the revenues of the Sewer System are to flow from the Revenue Account is critical to knowing that this flow of revenues is designed to first provide for payment of what the parties to the Indenture determined were needed for the (1) "reasonable and necessary expenses of efficiently and economically administering and operating the [Sewer] System," (2) "expenses of maintaining the [Sewer] System in good repair and in good operating condition," and (3) "fees and charges of the Trustee," the Operating Expenses, and then to other purposes under a prioritized payment scheme. It is the provisions of the Indenture detailing the flow of monies under this prioritization that most clearly reveal why the Reserves are not contemplated or allowed under the Indenture's terms. As will become evident, the flow of monies is a pivotal factor in resolving which professional fees and related expenses incurred by the County during its chapter 9 case are within and outside Operating Expenses.

As set forth in the Second Opinion, the distributive scheme is detailed in Article XI of the Indenture:

> . . . A special account called the Jefferson County Sewer System Revenue Account (hereinafter the Revenue Account) has been established to receive all System Revenues and all amounts received by the County pursuant to certain swap agreements. On or before the last business day of each calendar month, the County is required to apply monies in the Revenue Account first to payment of all Operating Expenses "*that are then due and that were incurred during the then-current or in any then-preceding calendar month*." Indenture § 11.1.
>
> Of the monies in the Revenue Account, those that were received from the Sewer Tax are to be used first to pay the Operating Expenses. Following exhaustion of the Sewer Tax revenues, any remaining incurred and then due Operating

---

[8] Some of this Court's rulings set forth in the First Opinion and the Second Opinion are, via 28 U.S.C.§ 158(d), currently on direct appeal to the United States Court of Appeals for the Eleventh Circuit.

6

> Expenses from the current or any preceding month are to be paid from the residual funds in the Revenue Account. When the due, incurred, and unpaid Operating Expenses from the current and preceding months have been fully paid, any remaining monies in this account are to be paid in a specific priority.

*In re Jefferson Cnty., Ala.,* 482 B.R. at 417 (emphasis added). It is the "then due and that were incurred during the then-current or in any then-preceding calendar month" and similar wording in Article XI of the Indenture that are part of what prevents reserving monies from System Revenues for expenditures not yet due or not yet incurred, i.e. the Reserves.

Following the provision for payment of the Operating Expenses, the specified priority is that the monies in the Revenue Account are to be paid next into the Debt Service Fund when and to the extent set forth in section 11.2 of the Indenture and then into the Debt Service Reserve Fund, sometimes also called the Reserve Fund, at the times and amounts specified in section 11.3 of the Indenture. To the extent that monies remain in the Revenue Account after payment of the Operating Expenses, the amount required for the Debt Service Fund and that for the Debt Service Reserve Fund, they are to be paid in descending priority to four other funds. Indenture §§ 11.4-11.7. If insufficient funds are in the Revenue Account to pay all that is required for a superior-in-priority fund such as the Debt Service Fund, then no monies are paid into the inferior-in-priority fund or funds such as the Debt Service Reserve Fund. Indenture § 11.1.

Due to this mandated flow of monies out of the Revenue Account, one knows the agreed-upon structure is to first pay only the Operating Expenses with all residual monies in the Revenue Account immediately flowing into the Debt Service Account for principal and interest on obligations governed by and within the scope of the Indenture's terms and then, to the extent monies still remain, to other of the Indenture Funds. From a cash flow analysis, it places provision for payment of Operating Expenses first and then debt service second with all other purposes lower in priority. By agreeing to the "incurred and then due" restriction for what is included in Operating Expenses along with the Indenture's structured flow of revenues, the parties to the Indenture knowingly constructed a waterfall of revenues in a fashion that precludes reserves for the types of items the County argued it was entitled to withhold ahead of payment of debt service: those not incurred or not yet due. This agreement is further established by the exclusion set forth in the Indenture's definition of Operating Expenses for depreciation, amortization, items chargeable to a fixed capital account, and extraordinary items. In its essence, this cash flow and Operating Expense formulation is designed to reduce the Revenue Account balance to zero during each relevant period. *In re Jefferson Cnty., Ala.*, 482 B.R. at 421-422.

Looked at differently, the structure of the flow of revenues under the Indenture is designed to pay those ordinary and typical expenses of the Sewer System necessary to keep its day-to-day operations ongoing while making certain that the maximum amount of monies following payment of the allowed operating expenses flows first to the payment of principal and interest on the warrants. In other words, it is constructed to keep the Sewer System operating while maximizing the flow of monies to the Parity Security Holders along with ensuring that (1) items for which no monies are required to be expended in a current period do not reduce the Net Revenues, (2) items for which expenditures should be spread over multiple time periods, not wholly in the current one, do not lower the Net Revenues by the full amount of the current

expenditure, and (3) certain atypical and/or out-of-the-ordinary expenses/expenditures do not create uncertainty and unexpected fluctuations in the flow of monies to the Parity Security Holders.

These exclusions from Operating Expenses are designed to give consistency and a relative degree of evenness to the flow of monies to the Parity Security Holders that are necessary to structure, among other things, the pricing of the warrants, including the interest rate(s), and the repayment period(s). Absent this structure, the risk of fluctuations in the flow of monies to pay debt service would be greater and result in an increase in the price, the interest rate, of the warrants given *ceteris paribus* conditions for other factors.[9]

Joined with these determinations in the Second Opinion, this Court also considered and rejected the County's argument that 11 U.S.C. § 928(b) allowed the County to withhold monies that would, per the Indenture, otherwise go into the Debt Service Fund, and potentially other of the Indenture Funds, even if the Indenture's terms did not allow such a withholding. The contention was that the reserves for amortization, depreciation, certain estimated future expenditures, including capital items, come within what § 928(b) classifies as "necessary operating expenses" allowing subordination of the Indenture created lien on Net Revenues.

This Court's § 928 ruling was partially premised on 11 U.S.C. § 928(b)'s subordination having only an interim application from, at the earliest, the commencement of a chapter 9 case until, at the latest, the confirmation of a plan of adjustment. The importance of this factor is not just the restricted time during which any 928(b) subordination is limited to, but also that any such subordination should be restrained in financial scope to the minimally "necessary operating expenses" concept of 11 U.S.C. § 928(b). *In re Jefferson Cnty., Ala.*, 482 B.R. at 437, 441.

Secondly, and over a period of about a decade and a half, all of the Operating Expenses paid via the Indenture's structure maintained the Sewer System at or above the degree of operational capability envisioned under 11 U.S.C. § 928(b)'s "necessary operating expenses" standard. Third, the Reserves were not, as structured by the County, for currently due and payable items. Rather, they were for estimates of prior, paid-for items (depreciation and amortization) and estimated future expenditures (premised in significant part on the County's view for estimated depreciation and amortization), and, thus, not necessary for the then-current period and potentially not necessary for any pre-confirmation of a plan period. *In re Jefferson Cnty., Ala.*, 482 B.R. at 412, 443. In point of fact, the timeframe for the depreciation, amortization, and future capital expenditures is one that greatly exceeds the interim subordination time for 11 U.S.C. § 928(b)'s application and is one for which insufficient evidence was presented that any such expenditures would be incurred and paid during the pre-confirmation period.

---

[9] More technically, increase in risk is manifested by a change in the equilibrium of the relevant supply and demand, which graphically is the altering of the intersection of the relevant supply and demand curves. This is due to risk being a non-price factor which causes a shift in, depending on the market, either the supply or demand curve in a fashion that increases price for greater risk and lowers price for decreased risk. As a result, for pricing purposes, it was in the County's best interest to structure the Operating Expenses in the fashion it did to decrease risk by giving more stability and certainty to Net Revenues.

8

Added to these factors has been the existence of tens of millions of dollars, potentially an amount of well over a hundred million dollars, available for the County's argued-for purposes for the Reserves' components of depreciation, amortization, and capital items. During this interim period ending with a hoped-for confirmation of a plan of adjustment and at the time of the Second Opinion, sufficient monies existed to cover the capital and capital-like items for which the County sought to reserve as "necessary operating expenses." In fact, one Sewer System account, that at the beginning of this case held around $ 50,000,000.00, has been used by the County for the capital items for which the argued-for Reserves were designed.[10] The balance in this account continues to be reduced by expenditures for items that are capitalized under accounting guidance and the Indenture.

In its quintessence and without setting forth more of the details of the Second Opinion, the interim applicability of § 928(b)'s subordination in a context where the Operating Expenses were continuously being paid, along with a fund in the tens of millions of dollars that has been available for the depreciation, amortization, and estimated future capital expenditure components of the Reserves obviated implementation of § 928(b)'s subordination of the lien on Net Revenues to the Reserves. The Second Opinion ruling was not one that precludes subordination under 11 U.S.C. § 928(b) in an appropriate context. Rather, it was one dealing with only the Reserves, items not requiring a current expenditure, where the appropriate context did not then exist in the County's chapter 9 case. The Second Opinion analysis was done in the fact setting of reserving monies for future uses, not those involving currently incurred and payable expenses and using estimates rather than known amounts.[11] This distinction has been glossed over by some of the parties and others.

Due to the insufficiency of evidence regarding disputed professional fees already incurred during the chapter 9 proceeding and as part of the Second Opinion, this Court declined to determine whether such incurred professional fees and related costs were either included within Operating Expenses or are "necessary operating expenses" under 11 U. S. C. § 928(b) for subordination purposes. Rather, the Court simply stated that the Trustee's position that all legal fees incurred during a chapter 9 proceeding are outside the scope of Operating Expenses was untenable. *In re Jefferson Cnty., Ala.*, 482 B.R. at 424.

The expected response was for further consideration by this Court of the disputed, incurred professional fees and related costs. This Court agreed to address this issue once supplemental information and materials were submitted. As part of this process, a Federal Rule

---

[10] As structured by the County, (1) the depreciation and amortization components of the Reserves are for the recovery of the cost of already acquired, in place capital items, and (2) another portion of the Reserves is to fund the cost of anticipated future capital expenditures. In essence, one is for the recovery of the cost of past capital expenditures and the other is for the cost of anticipated future capital expenditures. Thus, these facets of the Reserves are for the cost of past and future capital items even though their acquisition is temporally different from the current accounting one. As formulated by the County, none involve a current period monetary outflow.

[11] The estimates for the capital expenditures aspect included the County's proposed Reserves gives recognition to the fact that using traditional life spans for the Sewer System's capital assets to compute depreciation and amortization would result in the incongruous outcome that depreciation plus amortization plus Operating Expenses would consume all System Revenues, making Net Revenues a negative amount. As a consequence, the County used a shorter period for estimating its prospective capital needs, but one that is many years past a probable date for confirmation or not of a plan.

of Civil Procedure 54(b) determination was made regarding the rulings in the Second Opinion enabling the County to take an immediate appeal. This opinion deals with the residuum that was not part of the Second Opinion.

## II.    The Arcane, the Enigmatic, and an Accountant's Delight, But Not an Exemplar of Simplicity

### (A)  Categories of Incurred

The extent to which, if at all, the professional fees incurred by the County during its municipal bankruptcy case are either Operating Expenses under the Indenture's terms or "necessary operating expenses" for 11 U.S.C. § 928(b)'s subordination requires this Court to consider anew the arcane world of municipal finance.  In particular, the Indenture's terms must be viewed through the opaque lens of municipal finance usage.  Along with the contextual use of words in the Indenture, all parties have presented interpretative arguments founded on the enigmatic realm of governmental accounting and its related accounting guidance.[12]

Before fully detailing the why of the parties' legal postures, setting forth the agreed categories of professional fees incurred by the County and the positions taken on each facilitates the discussion of what makes up Operating Expenses.  The categories set forth in the Joint Submission Regarding Actually Incurred Professional Fees and Expenses ("the Joint Submission") are:

    1. Emergency Stay Relief Litigation.  This relates to defending against what the Receiver and the Trustee denominated as emergency stay relief motions filed on November 10, 2011.  The professional fees under this category are those incurred in connection with the issues addressed by this Court in the First Opinion.

    2. Net Revenue Litigation.  The professional fees of the County incurred for determination of whether the Reserves are within Operating Expenses under the Indenture and/or whether the Reserves are "necessary operating expenses" for which 11 U.S.C. § 928(b) authorizes subordination of the lien on special revenues for payment of such expenses.  This is the subject of the proceeding captioned *The Bank of New York Mellon, et al. v. Jefferson County, Alabama*, adversary proceeding no.12-00016 and the Second Opinion.

    3. Severed Sewer Adversary Litigation.  A portion of the claims and counterclaims originally plead in the adversary proceeding referenced in item 2 were severed and transferred into adversary proceeding no. 12-00067 captioned *The Bank of New York Mellon, et al. v. Jefferson County, Alabama*.  What remains of the severed claims and counterclaims, as amended, is essentially whether monies in certain accounts aggregating almost $100,000,000.00 are

---

[12] In particular is Statement No. 58 of the Governmental Accounting Standards Board which is applicable to governmental entities that have petitioned for relief under chapter 9 of the Bankruptcy Code, 11 U.S.C. §§ 901 *et seq.*, regardless of the entry of an order for relief. GASB 58, ¶¶ 1-2.

subject to the lien, security interest or pledge granted by the County to the Trustee under the Indenture and for what purposes these monies may be used by the County.

4. <u>Other Creditor-Initiated Sewer-Related Litigation (Bankruptcy Court)</u>. This category is for professional fees and expenses the County has or may incur in connection with any litigation that has been or may be commenced by Sewer System creditors in this Court along with any appeals from this Court's rulings. Included in this are stay relief motions by Financial Guaranty Insurance Company (FGIC) and Assured Guaranty, and Assured Guaranty's motion to set a plan filing deadline.

5. <u>Other Creditor-Initiated Sewer-Related Litigation (Non-Bankruptcy Court)</u>. Essentially, this grouping is for existing and future litigation brought by Sewer System creditors in courts other than this Court.

6. <u>FGIC State Insurance Proceedings</u>. Encompassed in this classification are professional fees and expenses incurred as the result of and in connection with FGIC's insurance insolvency proceedings.

7. <u>Third Party Litigation Regarding Validity of Sewer Debt</u>. Existing and any future litigation challenging the validity and enforcement of the Sewer System's indebtedness under the Indentures by those not parties to or successors in interest to parties to the Indentures are encompassed in this class. It includes those claims asserted by purported representatives of various classes of Sewer System users in adversary proceeding no. 12-00120, captioned *Andrew Bennett, et al. v. Jefferson County, Alabama, a nominal defendant, and The Bank of New York Mellon, et al.* (sometimes the *Bennett* Litigation).

8. <u>Third Party Litigation Regarding Validity Of Sewer Rates</u>. This subdivision is for professional fees and expenses of the County that have been or may be incurred in defending against contests over Sewer System rates. One such lawsuit has had some claims removed to federal court and others remain in an Alabama court proceeding. It is referred to as the *Wilson* litigation. Another is the *Bennett* Litigation.

9. <u>Settlement Negotiations and Communications With Sewer Creditors, Ratepayers, And Others</u>. The parties jointly describe this portion of professional fees and expenses incurred by the County as being those "incurred in negotiating with and responding to the various requests for information concerning the Sewer System by the Trustee, the Receiver, sewer creditors, and ratepayers.

10. <u>Rate-Setting</u>. As is evident, this category is for legal and other professional fees incurred by the County in relation to setting rates for Sewer System use by its customers.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document    Page 11 of 51

11. <u>Sewer Creditor Claim Analysis And Objections</u>.  This grouping is described as fees and expenses incurred in relation to proofs of claims filed against the County by Sewer System creditors exclusive of "ordinary course" tort or employee claims.

12. <u>Eligibility Litigation</u>.  This portion is a County-proposed allocation of seventy-five percent (75%) of professional fees and costs incurred ". . . in responding to challenges to the County's eligibility to be a chapter 9 debtor and the subsequent appeals."  The percentage is an approximation calculated by taking the amount of the Sewer System debt and dividing it by the total of the County's indebtedness.

13. <u>Plan Preparation and Prosecution</u>.  The County proposes an allotment of seventy-five (75%) of the professional fees and expenses arising from researching, drafting, and seeking confirmation of a chapter 9 plan.  This percentage was set by the same calculation as that used for category 12.

For all of the categories in the Joint Stipulation, the County argues that the professional fees and related expenses actually incurred by it ("the Professional Fees") are within the Indenture's definition of Operating Expenses.  On the other side, the Trustee asserts that none associated with classifications 1, 2, 3, 4, 6, 12, and 13 are Operating Expenses because they are either or both outside what accountants view as operating expenses, i.e., non-operating expenses or extraordinary items.  For categories 5, 7, 9, 10, and 11, the Trustee contends that portions are either extraordinary items or non-operating expenses under generally accepted accounting standards and, as a result, not Operating Expenses.  However, the Trustee concedes that part may also be within Operating Expenses, but insufficient information has been provided regarding the nature, extent, necessity, and reasonableness of the professional services rendered ("the Insufficiency Rationale") to enable it to determine if they are Operating Expenses.  For the part of professional fees in categories 5, 7, 9, 10, and 11 that may be Operating Expenses, the Trustee asserts that more information needs to be provided on a case-by-case, as incurred basis, not category-by-category before incurrence.

The remaining class is number 8.  For it, the Trustee does not, in the Joint Submission, expressly contend that the fees and expenses are either extraordinary items or non-operating expenses.  It only asserts the Insufficiency Rationale as requiring more information being supplied and that any determination for those within this classification should be made after being incurred and on a case-by-case basis, not category-by-category.  Because there is no evidence regarding the reasonableness and non-§ 928(b) necessity aspects of the Insufficiency Rationale, a caveat is warranted.  It is that this Court's rulings in this opinion are with respect to the inclusion or exclusion of the Joint Submission categories as part of Operating Expenses or not on only a category-by-category basis as each such category is specified in the Joint Submission.  So, all should bear in mind that the contract analysis, accounting guidance, and 11 U.S.C. § 928(b) discussion is based on the categories, not the specifics of the underlying items within each.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document        Page 12 of 51

## (B) Some of the Arcane: The Non-GAAP GAAP Definition

The definition in the Indenture essential to the positions espoused by all is that for Operating Expenses. The Trustee and the County argue that whether the Professional Fees are encompassed, or not, within Operating Expenses necessitates consideration of not just the words used, but also the accounting treatment referenced in the definition. Initially, one needs to know the Indenture's wording. It is:

> **"Operating Expenses"** means, for the applicable period or periods, **(a) the reasonable and necessary expenses of efficiently and economically administering and operating the [Sewer] System,** *including, without limitation, the costs of all items of labor, materials, supplies, equipment (other than equipment chargeable to fixed capital account), premiums on insurance policies and fidelity bonds maintained with respect to the [Sewer] System (including casualty, liability and any other types of insurance), fees for engineers, attorneys and accountants (except where such fees are chargeable to fixed capital account) and all other items,* except depreciation, amortization, interest and payments made pursuant to Qualified Swaps, **that by generally accepted accounting principles are properly chargeable to expenses of administration and operation and are not characterized as extraordinary items,** (b) the expenses of maintaining the [Sewer] System in good repair and in good operating condition, but not including items that by generally accepted accounting principles are properly chargeable to fixed capital account, and (c) the fees and charges of the Trustee. Payments or transfers of Sewer Revenues into the General Fund of the County shall constitute payments of Operating Expenses if and to the extent that the services or benefits for which such payments or transfers are made are such that payments to a Person other than the County for such services or benefits would constitute payments of Operating Expenses.

Indenture § 1.1.[13] With the exception of the words "Operating Expenses," the Court has italicized, underlined, or bolded portions of the definition. The bolding, underlining, and italicizing are in subpart (a) dealing with the reasonable and necessary expenses of efficiently and economically administering and operating the system. These segregate portions of the definition over which the County and the Trustee disagree. It also highlights what is partially a structural issue within the definition of Operating Expenses that has been raised by the parties.

As will become apparent, critical to each side is what the nature of "properly chargeable" and "extraordinary" items is and how the reference to them modifies earlier portions of this subpart of the definition. An assumption contained in the trial presentations by all parties is that accounting standards, principles, and guidance are determinative of what is either a "properly chargeable" or an "extraordinary" item for purposes of Operating Expenses. The Court has

---

[13] Although the entire definition for Operating Expenses is set forth, the only portion relating to the Professional Fees for which a contested meaning is asserted in this County-Trustee fight is subpart (a) for expenses of administration and operation of the Sewer System. In particular, subpart (b) is not argued as including some of the Professional Fees. As such, it is not discussed further whether the Professional Fees may be partially within this subpart.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document        Page 13 of 51

accepted the contention by all parties to the Indentures that accounting standards, principles, and guidance are to be used to flesh out Operating Expenses. However and as will be seen, this Court's view of how these accounting standards, principles, and guidance are utilizable is at odds with those of the parties. Part of the difference is fact-based and part is founded on the law.

The determination of what is the accepted accounting practice is one of fact. *See Doyon, Ltd. v. United States*, 42 Fed. Cl. 175, 185-86 (Fed. Cl. 1998), *rev'd on other grounds* 214 F.3d 1309 (Fed. Cir. 2000) ("Stated differently, GAAP does not constitute legal authority for the propriety of a given accounting method; rather, GAAP is merely a nondispositive statement of customary accounting practices. We are also mindful that the opinions of accounting experts, as with the opinions of experts in other fields of knowledge, are not conclusive and binding upon the court sitting as a trier of fact."). The application of the accounting treatment to a specific problem is one of contract interpretation which is an issue of law. *See Hercules v. U.S.*, 626 F.2d 832, 835 (Ct. Cl. 1980) ("[W]hat is accepted practice in the accounting profession is a factual inquiry. But the application of accounting rules to a finite problem raises an issue of contract interpretation, which is an issue of law."); *Lockheed Aircraft Corp. v. U.S.*, 375 F.2d 786, 790 (Ct. Cl. 1967) (same). Thus, the accounting treatment does not by itself determine Operating Expenses. It is merely one of the factors that goes into the interpretative equation should an ambiguity exist when it comes to what is encompassed by Operating Expenses.

### (C) Ambiguity or Ambiguities – One is Necessary, But Many Exist

#### *(1) The Non-GAAP*

Before delving into why classification as an extraordinary item is critical to the parties interpretations, comments regarding Operating Expenses and presentation of another Indenture definition, that for Net Revenues, are warranted because this Court's ascertaining what are expenses included as Operating Expenses must be made only if there is an ambiguity of the sort recognized by law. Whether an agreement is ambiguous is a question of law for the trial court. *Bell South Telecomms., Inc. v. ITC Deltacom Commc'ns, Inc. et* al., 62 F. Supp. 2d 1302, 1311 (M.D. Ala. 1999); *Terry Cove North v. Baldwin Cnty. Sewer Auth., Inc.*, 480 So.2d 1171, 1173 (Ala. 1985). When the agreement is reasonably susceptible to more than one meaning, an ambiguity exists. An instrument is unambiguous if only one reasonable meaning clearly emerges. *Ohio Cas. Ins. Co. v. Holcim (US)* Inc., 548 F.3d 1352, 1357 (11th Cir. 2008); *Blue Cross & Blue Shield of Alabama v. Beck*, 523 So.2d 121, 124 (Ala.Civ.App. 1988).

Although the definition of Operating Expenses makes reference to generally accepted accounting principles ("GAAP") for determination of Operating Expenses, its structure is such that what is within Operating Expenses for Indenture purposes is not necessarily identical to that which would be operating expenses under GAAP. This arises from the Indenture definition's exclusions which include depreciation and amortization. In other, proper circumstances, these exclusions are recognized as a portion of operating expenses under GAAP. *See, e.g.,* Jacqueline L. Reck, Suzanne L. Lowenshon & Earl R. Wilson, *Accounting for Governmental & Nonprofit Entities* 271-286 & Illustrations 7-7 & 7-8 (16th ed. 2013). This divergence between Operating Expenses under the Indenture and operating expenses under GAAP is demonstrated by an exhibit presented by one of the Trustee's experts which sets forth as an operating expense the Sewer System's depreciation recognized during the fiscal year that ended September 30, 2010.

14

Plaintiff's Exh. 94.[14] Indeed, this expert admitted that the definition of Operating Expenses is not the same as it is for GAAP reporting purposes due, in part, to the exclusion of depreciation and amortization. Testimony of Martin Ives, April 12, 2012, at 70-71.

### *(2) Net Revenues of Two Sorts?*

Further complicating the matter is another defined term: Net Revenues. Its definition highlights an inconsistency in the Indenture's formulation of just what are Operating Expenses. Net Revenues are defined for purposes of debt servicing as:

> for any period, the difference between (A) the sum of (i) the total amount of System Revenues accrued during such period, and (ii) the amount of interest earned during such period on moneys held in those of the Indenture Funds other than the Rate Stabilization Fund (to the extent that such interest is not taken into account pursuant to the preceding clause (i)) and (B) *the total amount of Operating Expenses incurred during such period (determined in accordance with generally accepted accounting principles)*.

Indenture § 1.1 (emphasis added).

Literally read, Operating Expenses as referred to in the Net Revenues definition is determined in accordance with GAAP without exclusions. However, this is not how Operating Expenses is determined via its definition in Indenture § 1.1. The difference is important because it is one aspect of the Indenture that creates an ambiguity in the portions governing whether the Professional Fees are part of Operating Expenses deductible from System Revenues before monies are allocated to payment of interest and principal owed on the Parity Securities.[15]

One calls for the exclusion of depreciation, amortization, and certain other items that under GAAP are operating expenses while the Net Revenues formulation has no such exclusions.

---

[14] A reason underlying the exclusion of depreciation and amortization along with items chargeable to a fixed capital account from Operating Expenses comes from the structural feature creating a specific flow or waterfall of monies. This permits monies that could otherwise be withheld for other purposes for which no current period expense is incurred and then due and payable to flow to the succeeding, lower categories for which payment is allowed. The Indenture's most immediate next category is that for interest and principal on the Parity Securities. Indenture, Art. XI. When it comes to depreciation and amortization, the waterfall concept is also, though to a lesser degree of importance in this matter, premised on the difference between financing the acquisition of capitalized items by use of municipal debt from that which occurs in the private sector along with how revenues, e.g., the Sewer System's rates, are obtained in a governmental context, generally based on operating costs plus debt service, as distinguished from the private sector for-profit entity, frequently set by including recovery for fixed and variable expenses, including operating and non-operating expenses, plus a return on investment.

[15] The difference between what are Operating Expenses under the Indenture's definitions of Net Revenues and that for Operating Expenses is not one argued by either side of this dispute. It is, though, one of importance supporting this Court's ability or not to locate the contractually agreed upon meaning of Operating Expenses. There is another divergence caused by Net Revenues' usage for Operating Expenses as being "incurred during such period" versus Indenture § 11.1's money flow to pay Operating Expenses "then due and incurred during the then-current or in any then-preceding calendar month." Both are defining the monies available for debt service, but not identically. Given this Court's treatment of the GAAP formulation variance, this difference is not further discussed.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document    Page 15 of 51

Since Operating Expenses is a crucial component in the mathematics for what of the System Revenues is available for payment of the Parity Security Holders, only one version for Operating Expenses is possible under the Indenture. The ambiguity is which is the proper version for ascertaining those expenditures within Operating Expenses' confines?

### (3) The Properly Chargeable and Extraordinary Modifier

Another ambiguity is inherent within the definition of Operating Expenses. More specifically, much is made by the contesting parties over what portion of the definition is modified by the subpart (a) phrase "that by generally accepted accounting principles are properly chargeable to expenses of administration and operation and are not characterized as extraordinary items. . ." (hereinafter sometimes the Properly Chargeable and Extraordinary Item Phrase). One side argues that it is a modifier to all of "the reasonable and necessary expenses of efficiently and economically administering and operating" the Sewer System. If this is the case, all of the Professional Fees (a) not treated by GAAP as chargeable as expenses of administration and operation of the Sewer System or (b) that are extraordinary items are potentially excluded from Operating Expenses.

The other side contends that the Properly Chargeable and Extraordinary Item Phrase's application is limited to only the "and all other items" portion of the descriptive, nonexclusive listing of items within expenses of administering and operating the Sewer System. If this is what was agreed to, the Professional Fees are potentially included within Operating Expenses. Should this interpretative difference arise from an ambiguity–not just due to a party's interpretation variance–it also supports this Court resorting to rules of interpretation for the meaning of Operating Expenses. *See Stewart v. KHD Deutz of Am., Corp.*, 980 F.2d 698, 704 (11th Cir. 1993) (when both parties have offered reasonable interpretations and each interpretation is plausible, that is sufficient to establish that the contract is ambiguous and extrinsic evidence should have been considered); *Orkin Exterminating Co. v. F.T.C.,* 849 F.2d 1354, 1360 (11th Cir. 1988) (parties alleging different constructions of an agreement does not necessarily demonstrate an ambiguity; *see generally In re Jefferson Cnty., Ala.*, 482 B.R. at 419.

As the Properly Chargeable and Extraordinary Item Phrase is set forth in subpart (a) of Operating Expenses, the structure of the definition creates a valid issue, an ambiguity, regarding what it modifies. Is it just a qualifier for some of the types of items listed as within Operating Expenses or does it modify all of what are the reasonable and necessary expenses of efficiently and economically administering and operating the Sewer System?

### (4) GAAP Without More, or Which GAAP?

Of equal significance are the Indenture's generalized references to GAAP which, without more, are sufficient to create just the form and degree of ambiguity required before a court may delve into the vagaries of contractual interpretation. *See, e.g., Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995) (noting that nineteen different GAAP sources exist, "any number of which present conflicting treatments of a particular accounting question"); *Thor Power Tool Co. v. Comm'r. Internal Rev.*, 439 U.S. 522, 544 (1979) (GAAP is not a "canonical set of rules" ensuring "identical accounting treatment of identical transactions." They allow a scope of

16

reasonable treatments with the ability of management to pick among alternatives.).[16] More precisely for this case, just what portions of GAAP were intended to be part of the Operating Expenses formulation? Are they only those that existed as of the Indenture's 1997 execution? Or does the formulation also include those that subsequently evolved in the realm of governmental accounting? Does it include cost accounting standards, statutory accounting principles, or others? Compounding the problem with having merely a generalized reference to GAAP in the definition is Operating Expenses is defined in § 1.1 of the Indenture in a way that alters what GAAP would include as operating expenses, the exclusions, while simultaneously incorporating GAAP into its definition. None of what the agreement is is readily apparent or known from a mere reading of the definition of Operating Expenses. Thus, another feature creating an ambiguity.[17]

      Whether more than one of (1) the application of GAAP for setting Operating Expenses while excluding some of what GAAP would call for, (2) the structural application of the Properly Chargeable and Extraordinary Item Phrase's limitation on what is part of Operating Expenses, (3) the § 1.1 departure from GAAP for determining Operating Expenses while concomitantly incorporating GAAP into Operating Expenses in Net Revenue's definition, or (4) the Indenture's generalized references to GAAP are ambiguities allowing court interpretation of the Indenture does not matter. All that is needed is for one to give rise to an ambiguity in meaning to the level required under the law to enable a fixing of meaning to that which the parties agreed. This is due to each of the four issues involving the meaning of Operating Expenses and what revenues are

---

[16] Perhaps demonstrating the danger created by a contractual reference to GAAP without more detailing is GAAP includes accounting treatments that are done on what is referred to as cost accounting and those that are done using non-cost accounting reporting. Other accounting treatments exist. The cost accounting that this Court is referring to is that which, somewhat to the extent of an economist's treatment of costs, includes opportunity cost. Conceptually, opportunity cost is the foregone return from an alternate use of one's properties or monies. Failure to include it in one's analysis of profitability of an undertaking may result in overstating the profit, not knowing that one has a loss, or understating a loss when compared to what non-cost accounting treatments under GAAP indicate. For a discussion of and graph for the difference between these two methods of presentation in the context of excluding expert accounting testimony/evidence regarding what was a case of deepening insolvency–though not called such, one may consult a prior opinion of this Court. *See In re Perry Cnty. Foods, Inc.*, 313 B.R. 875 (Bankr. N.D. Ala. 2004).

    The reason underlying the exclusion of accounting evidence in *Perry County* was that the non-cost accounting treatment showing continued losses proved nothing from an evidentiary perspective. This is because when one includes opportunity costs as part of the analysis, the continued incurrence of losses in what economists call the short run is what a business should do if all of one's variable costs and, hopefully, but not required, some of one's fixed costs are covered by revenues. Continuing to incur losses in the short run when revenues recoup all variable costs and some fixed costs lessens and, in some instances, may minimize losses.

    Such continued losses in the short run make an entity no worse off than if it had shut down. This is the opposite of what deepening insolvency theories of liability or damages are trying to demonstrate and why a lot of the financial information attempted to be utilized is, from an evidentiary reference point, frequently worthless for proving liability or damages. This deepening insolvency discussion is used to point out by example the problems created by generalized references to GAAP. In this Sewer System Indenture dispute, it is sufficient to point out that the mere reference to GAAP does not distinguish between various methods of reporting under GAAP which raises another issue for what is meant by its inclusion in the calculus for what is Operating Expenses utilized to calculate Net Revenues available for payment to the Parity Security Holders.

[17] What the agreement in the Indenture is has been even more complicated by the fact that the Sewer System's accounting is supposed to be on an accrual basis, that for the governmental fund portion of the County's activities on a modified accrual basis, and the Indenture's approach for Operating Expenses being done a basis not matching either method of accounting treatment.

17

available from System Revenues for payment of interest and principle owed on the Parity Security Holders, *see* Indenture §§ 1.1, 2.1, & 11.1-11.2, standing alone, being sufficient to render the definition of Operating Expenses ambiguous. *See Westport Ins. Corp. v. Tuskegee Newspapers, Inc.*, 402 F.3d 1161, 1164 (11th Cir. 2005) (citing *Ex parte Harris*, 837 So.2d 283, 290 (Ala. 2002) (a contract is ambiguous "when a term is reasonably susceptible to more than one interpretation."); *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (ambiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations.); *see also Stewart*, 980 F.2d at 704. Under Alabama's case law, this allows further examination to determine what is Operating Expenses. *See, e.g.*, *Extermitech, Inc. v. Glasscock, Inc.*, 951 So. 2d 689, 694 (Ala. 2006) (when term is susceptible to more than one reasonable interpretation, court may go beyond plain meaning to rules of construction to resolve ambiguity); *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000) (same).[18]

### (D) Pieces Of The Enigmatic Or Bordering on the Acataleptic

#### *(1) Standards, Governmental Entity Accounting, And Enterprise Funds*

#### *(a) Pronouncements, Statements, Opinions, And Accounting Literature—The Guidance*

Some of what the Trustee and the County rely on are a cause for part of the puzzle enveloping the treatment of Operating Expenses under the Indenture. This aspect of determining the meaning arises from the accounting pronouncements and their application to the facts and issues in this Operating Expenses dispute. The parties principally rely upon accounting standards Statement No. 9 of the Governmental Accounting Standards Board (GASB 9), Statement No. 34 of the Governmental Accounting Standards Board (GASB 34), Statement No. 58 of the Governmental Accounting Standards Board (GASB 58), Statement of Financial Accounting Standards No. 117 (FASB 117), American Institute of Certified Public Accountants (AICPA) Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" (SOP 90-7), and Accounting Principles Board Opinion No. 30 (APB 30). Each of the contesting parties posit application of one or more of this accounting guidance as fleshing out the skeleton of what is Operating Expenses.

GASB 9 deals with the reporting of cash flows for, among others, governmental entities that use proprietary fund accounting. It has been used by the Trustee's expert for the proper construction of a report for cash flows of the Sewer System. In significant ways, it has been superseded by GASB 34. As such, it adds little to the legal discussion and will not be further mentioned other than to point out that the treatment of cash flows for a governmental entity is divided into four classifications and that cash flows from operating activities "generally are the cash effects of transactions and other events that enter into the determination of operating income." GASB 9, ¶ 15-16 & n. 8.[19] FASB 117 is for not-for-profit organizations, not for

---

[18] The Indenture sets Alabama's laws as the applicable ones governing, among other factors, its interpretation. *See* Indenture § 18.10.

[19] The four classifications are operating activities, noncapital financing activities, capital and related financing activities, and investing activities. Showing the complexity of ascertaining what are Operating Expenses is GASB 9's language that operating activities generally "result from providing services and producing and delivering goods,

governmental entities. It is not essential to and does not aide the analysis of the expert citing to it. This is why it is mentioned infrequently by this Court.[20]

### *(b)  The Whole and the Subdivisions*

Before outlining the positions regarding the accounting treatments founded on the above listed GASB, APB, and SOP guidance for professional fees incurred in a chapter 9 bankruptcy case, one must pay attention to the context of their proposed application.  In this case, there are different aspects of governmental accounting involved.  One is an aggregation for the County as a whole.  The next is for major activities of the County which are subparts of the whole.  The activities of the County for governmental accounting purposes are divided into three types.  One is comprised of those that are the provision of the traditional sorts of governmental services such police, firefighting, public works, and parks and recreation.  A second is for the business-like activities undertaken by a state or local governmental entity that are largely sustained by user charges and fees, such as public utilities, hospitals, and the like.  The third sort encompasses those activities with respect to which the government acts as a fiduciary.  *See* GASB 34, ¶¶ 12-17 & 63-73; Reck, Lowenshon & Wilson at 24-25.

---

*and include all transactions and other events that are not defined as . . .*" one of the other three activities.  GASB 9, ¶ 16 (emphasis added).  Added to this is the text of its footnote 8 that operating income is not defined in authoritative governmental accounting literature and that nonauthoritative illustrations of the calculation of operating income, that is operating revenues less operating expenses, is provided elsewhere in the accounting literature.  GASB 9, ¶ 16 n. 8.

[20] GASB 34 was effective for the County for its first reporting period starting after June 15, 2001. GASB 34, ¶¶ 142-143.  GASB 58 became effective June 15, 2009.  GASB 58, ¶ 16.  GASB 34's and GASB 58's effective dates are after the Indenture's date of February 1, 1997.  The Eleventh and last Supplemental Indenture is dated May 1, 2004, and was executed June 22, 2004.  Thus, GASB 58 became effective after entry by the County and the Trustee, or a predecessor trustee, into all of the Indentures.  GASB 34's effective date was after that of the Indenture which contains the definition of Operating Expenses.  Superficially, the parties' reliance on  GASB 34 and GASB 58, along with those other accounting guidance pronouncements by GASB, FASB, and AICPA that became effective after the 1997 date of execution of the Indenture, would appear to be of limited, if any, value.  *See Bridge Capital Investors, II v. Susquehanna Radio Corp.*, 458 F.3d 1212, 1218 (11th Cir. 2006) (it is presumed that parties had law in force at time of agreement in mind when making contract).  The appearance, though, is deceptive.  This is due to the carryforward for enterprise funds of the guidance from prior FASB statements and interpretations, APB Opinions, and ARBs of the Committee on Accounting Procedures, along with other FASB and AICPA guidance literature such as SOP 90-7, unless those pronouncements conflict with, contradict, or have been superseded by GASB pronouncements.  *See* GASB 62, ¶¶ 506-509, 536; GASB 34, ¶¶ 93-95; GASB 20, ¶¶ 6-9 (GASB 20 was completely superseded by GASB 62 as it applies to the County on June 15, 2001, and portions were superseded earlier by GASB 34, ¶¶ 6, 66, 69, 93-95, & 138.).  The discussion set forth in the text of this opinion utilizes those aspects of guidance from GASB, along with FASB and AICPA pronouncements and related accounting literature incorporated into GASB, that (i) were in existence at the time of execution of the Indenture, and (ii) have remained consistent in reporting guidance from 1997 to today.

The relevant parts of the accounting guidance literature not altered by GASB pronouncements that has remained the same has been accomplished under the GASB regime in various ways.  Sometimes it has been directly incorporated by repetition into one or more later GASB pronouncements from earlier GASB, FASB or AICPA pronouncements or other literature.  In other instances, it is simply referred to by citation to earlier FASB or AICPA pronouncements or other such literature.  An example is APB 30, ¶¶ 19-24 giving guidance on extraordinary and special items.  Paragraphs 19 through 23 have been incorporated by reference and paraphrasing into GASB while paragraph 24's materiality has not.  GASB 62, ¶ 563; *see also,* GASB 58, ¶¶ 48, 50, & 51.

The business-like activities of a governmental unit are classified by accountants as proprietary funds for accounting purposes. The proprietary fund grouping is subdivided into two funds: internal service funds and enterprise funds. The enterprise fund category is the one relevant to this Court's discussion. It is a means to account for goods or services sold to the public by the government's business-like activities. This is the class into which the Sewer System is placed. Importantly, activities like those of the Sewer System that are major activities included within the enterprise fund classification are required to be separately set forth in financial statements for the governmental entity and not aggregated with other, non-major enterprise funds. GASB 34, ¶¶ 12-17 & 63-73; Reck, Lowenshon & Wilson at 256.[21] The County and the Trustee agree that the Sewer System is an enterprise fund and have not contested that its operations are to be broken out on the County's financial statements.

Part of the point being made is that although the Sewer System's finances are included in the County's overall financial statements, they are supposed to be separated in a fashion from the remainder of the enterprise funds, if any others exist, and from the County's overall financial statements. This separation allows one to examine the operations of the major business-like activities of a governmental unit, here the Sewer System, which would be difficult, if not impossible, should all of the other enterprise fund activities be combined with one such as the Sewer System's or should the Sewer System's financial reporting be lumped in as part of an aggregation of the financial reporting for all of the County's activities.

The rest of the point is that when discussing the Professional Fees, some may be associated solely with the Sewer System segment of the enterprise fund. Others may be associated with more than one aspect of the enterprise fund or more than one of the three accounting classifications for the County's activities. To the extent they are related to more than one enterprise fund activity or more than just the enterprise fund category, it is necessary to allocate them between different aspects of the enterprise fund or between the different fund categories.

For instance, professional fees incurred in connection with a Sewer System employee's claim to worker's compensation for an injury sustained while working on the Sewer System would be associated only with the Sewer System and included within the accounting for this enterprise fund. By contrast, a class action suit involving the same injured Sewer System employee that challenges an alleged County-wide improper handling of worker compensation claims would potentially cross all of the governmental, business-like, and fiduciary activities of the County. In other words, all three of the fund categories may be impacted for accounting purposes. Keeping this distinction in mind is important due to some of the Professional Fees potentially crossing into more than one of the government fund, enterprise fund, and fiduciary fund accounting classifications and some being properly allocated solely to within the Sewer System as an enterprise fund.

---

[21] For accounting purposes, those governmental activities that are the traditional types of activities are sometimes described as a governmental fund and those that are done in a fiduciary-like context are categorized as a fiduciary fund. Each of these fund categories has subcategories. *See* Reck, Lowenshon & Wilson at 31-36.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document      Page 20 of 51

*(2) Jefferson County's Approach and a Problem*

Of the two sides taken on governmental accounting as it relates to the Professional Fees, the County's is the most straightforward because it primarily relies on one accounting pronouncement, GASB 58, which is captioned "Accounting and Financial Reporting for Chapter 9 Bankruptcies." GASB 58 "establishes accounting and financial reporting standards for all governments that have petitioned for relief under Chapter 9 of the U.S. Bankruptcy Code or have been granted relief under the provisions of Chapter 9 . . ." GASB 58, ¶ 2.

Essentially, the position espoused by the County is that three paragraphs, 12, 13, and 14, of GASB 58 disclose the accounting and financial reporting guidance for the Professional Fees while the County's municipal bankruptcy case is ongoing. These paragraphs read as follows:

**Reporting Gains and Losses**
12. Gains (or losses) resulting from remeasurement of liabilities or assets in bankruptcy should be reported as an extraordinary item. Additional guidance for governmental funds is provided in paragraph 14.

**Reporting Costs Associated with Bankruptcy Proceedings**
13. Professional fees and similar types of costs directly related to the bankruptcy proceedings should be reported as an expense or expenditure as incurred.

**Reporting in Governmental Funds**
14. If the new payment terms affect liabilities (and assets) reported in the governmental funds, those amounts should be adjusted. Adjustments to the reported amount of governmental fund liabilities (and assets), if any, should be reported as an extraordinary item.

GASB 58, ¶ 12 governs the treatment of gains or losses from remeasuring liabilities or assets of, among other funds, an enterprise fund such as the Sewer System. This provision requires that such a loss or gain be reported as an extraordinary item. GASB 58, ¶ 14 supplements GASB 58, ¶ 12 when new payment terms affect liabilities and assets in a governmental fund. Both of these paragraphs are implemented - that is the requisite recognition occurs - following the chapter 9 plan of adjustment's confirmation. GASB 58, ¶¶ 3-4 & 31. Noteworthy is that GASB 58, ¶¶ 12 & 14 do not set forth the timing of recognition of the extraordinary item. They only set forth how the impact of the remeasurement or new payment term is to be reported. As mentioned, the timing of the recognition for the reporting treatment specified in paragraphs 12 and 14 is set forth in GASB 58, ¶¶ 3-4 & 31.

Neither paragraph 12 or 14 of GASB 58 is directly involved in the accounting treatment of the Professional Fees, and, to the extent that either indirectly might be, no plan of adjustment for the County has been confirmed. Thus, their relevance in this Sewer System dispute is limited to understanding GASB 58's use by the contesting parties, not to their application to the Professional Fees. The interpretative aspect of these two paragraphs arises from how the County's expert, when compared to that of the Trustee's, views the purpose underlying GASB 58, ¶ 13.

Despite their inapplicability to the reporting for the Professional Fees, the County points out that only paragraphs 12 and 14 set forth an accounting treatment for a municipal debtor that calls for classifying an item as an extraordinary one and it is only in the context of remeasurement of assets or liabilities or the effect of a new payment term on liabilities or assets. Joined with this is reliance on paragraph 13 that the County reads to apply to all of the Professional Fees. The County posits the only standard that governs how the Professional Fees are to be reported is GASB 58, ¶ 13, which specifies they are to be dealt with as an expense or expenditure as incurred. As a result, the argument is that there is no need to go outside GASB 58 or to consider other accounting guidance to determine the accounting reporting treatment for the Professional Fees.

It is from this view of the accounting for the Professional Fees that the County justifies why they are within the Indenture's Operating Expenses. Essentially and regardless of which portion of Operating Expenses is modified by the Properly Chargeable and Extraordinary Item Phrase, GASB 58, ¶ 13, unlike ¶¶ 12 & 14, does not have the Professional Fees reported as extraordinary items. Thus, the County maintains they are within Operating Expenses because GASB 58, ¶ 13 does not expressly call for their reporting as an extraordinary item.

Although not necessarily altering the outcome sought by the County regarding some of the Professional Fees, the position espoused by the County's expert subsumes in his analysis a specific treatment for one word in GASB 58, ¶ 13: "directly." GASB 58, ¶ 13's scope is for professional fees and similar types of costs "*directly* related to the bankruptcy proceedings. . ." GASB 58, ¶ 13 (emphasis added). It does not purport to deal with all professional fees and similar types of costs that arise during a municipality's bankruptcy case. So and for the County's view of GASB 58's treatment of the Professional Fees to be completely accurate, all must be directly related to its bankruptcy case. The necessary degree of relatedness is explored more during the discussion of the Trustee's approach.

The County's asserted treatment also does not address that GASB 58, ¶ 13 uses the wording "expense or expenditure" while not specifying the type of expense or expenditure. To the extent that the "expense or expenditure" wording includes more than items that are operating expenses, the County's reliance on its interpretation of GASB 58, ¶ 13 does not fully sustain its offered interpretation of how all of the Professional Fees are to be treated.[22]

---

[22] Despite the operating expense characterization of the Professional Fees by the County's expert, his response to a carefully worded cross examination question reflects that not all professional fees and related costs are operating expenses simply due to their being incurred during a chapter 9 case. The question was "And if the impact of this accounting for bankruptcy affects the capital financing matters would you classify the related legal fees as non-operating items?" The relevant portions of the response are: "It's going to be a little bit of a long answer. Possibly. Now again, there's some guidance in the standards that would tend to imply that the legal fees associated with Chapter 9 bankruptcy are going to be non-operating as opposed to operating." The conclusion was that "[i]f you force me to classify those as one or the other at this point in time I would classify them as non-operating, yes." Testimony of Lowell Broom, April 12, 2012, at 224-25.

In addition to recognizing that not all professional fees incurred during a chapter 9 case are operating expenses, the cross examination question also evidences how the Trustee's position on the Professional Fees has been crafted. The question specified into which category the legal fees would be allocated by making them part of the "capital financing matters." Once in this category and with the possible exclusion of a portion allocated to a current accounting period, all such legal fees would not be part of operating expenses. The formulation of this

At variance with the County's proffered accounting treatment for chapter 9 related professional fees is that of the Trustee. Discussion of its position requires more inquiry into the realm of governmental accounting. This is due to reliance by the Trustee on guidance from accounting pronouncements beyond what is contained in GASB 58. The critical, particular other guidance is found in GASB 34, APB-30, and SOP 90-7.

The Trustee's expert's opinion on the accounting treatment of professional fees incurred during a chapter 9 case is that all are characterized as being non-operating expenses and are the result of an extraordinary event. Ives Tr. at 21-22, 34-52. Getting to this conclusion required consideration of paragraphs 12, 13, and 14 of GASB 58 which have already been set forth. The Trustee's reading of paragraph 13 is that it only deals with the timing of recognition of professional fees, which is that they are to be "reported . . . as incurred." GASB 58, ¶ 13. It is asserted that GASB 58, ¶ 13 does not indicate that the expense is to be either an operating or a non-operating one, let alone an extraordinary item.

His pronouncement continues that once one understands this view of what GASB 58, ¶ 13 is designed to do, one must look for guidance to other applicable accounting standards and principles to determine the proper expense or expenditure treatment for the Professional Fees. To arrive at his conclusion that in this case all of Professional Fees incurred by the County are extraordinary items, the Trustee's expert read a letter from one of the County's attorneys that sets forth the basis for why the County would be establishing the Reserves ("the Klee Letter"). The expert's reading of the Klee Letter is that the County's chapter 9 case is solely ". . . to restructure the financing – well restructure the financial outflows." Ives Tr. at 37.

Although by being given in the midst of accounting jargon, standards, and principles this statement may not appear to be important, this reading of the Klee Letter is a crucial factor on which the opinion of the Trustee's expert rests. This is because it caused the expert to categorize all of the Professional Fees as being the result of the restructuring of the "financing" and the "financing outflows" of the County. He viewed this as solely the effect of the chapter 9 case. This reading of the Klee Letter makes the Professional Fees a financing activity that is reported as a non-operating expense unless they also qualify as extraordinary items. Ives Tr. at 37-38. Then, he went on to explain why all of the Professional Fees were extraordinary items, again, relying on his interpretation of the Klee Letter. Ives Tr. at 38-47, 80-81.[23] This expert's

---

question just happens to be identical to how the Trustee's expert framed his opinion based on an assumption that all chapter 9 professional fees are the effects of the restructuring of financing activities. The import of this is discussed more fully in the text dealing with the Trustee's expert's testimony.

[23] One response during cross examination when asked whether a chapter 9 being recognized under GASB 58 as an extraordinary event made all expenses associated with the bankruptcy extraordinary items was, "Yes. Based on the statement that the effects of an extraordinary event are extraordinary items, assuming they are material and refer to materiality, then they would be classified as extraordinary items. Yes." Ives Tr. at 81. Although this was the expert's position, it has not been how all have been treated by the Trustee. The Trustee has routinely allowed payment of professional fees and expenses that are the normal, ordinary types associated with the operations of the Sewer System, including legal fees for matters such as claims by Sewer System employees for on-the-job injuries.

interpretation of the Klee Letter preordained his position on the accounting treatment for all categories of the Professional Fees, be they reported as financing activities or extraordinary items: they are not Operating Expenses.

To know what type of an expense the GASB 58, ¶ 13 professional fees are to be recognized as and that should they be extraordinary items they are to be reported as a separate classification from operating expenses, the Trustee's expert testified that one must look to the accounting standards governing whether an item is an extraordinary item. These include APB-30 and SOP 90-7, which are incorporated into the GASB pronouncements via GASB 58, ¶¶ 48, 50 and GASB 34, ¶ 55.[24]

The Trustee's expert is correct that GASB 58, ¶ 48 adopts the factors for determining what is an extraordinary item for reporting purposes from GASB 34, ¶ 55 and from APB 30, ¶¶ 20a, 20b. GASB 58, ¶ 48 references the GASB 34, ¶ 55 requirements for a transaction or event to be an extraordinary one: the event or transaction must be *both* unusual in nature and infrequent in occurrence. GASB 58, ¶ 48 also sets forth portions of APB 30, ¶¶ 20a & 20b that further describes what constitutes unusual in nature and infrequent in occurrence.[25] Immediately following the discussion of how one determines whether a transaction is to be treated as an extraordinary one, GASB 58, ¶ 48 states that "[t]he Board concluded that Chapter 9 bankruptcy meets those criteria." However, the entirety of the discussion of what is an extraordinary item in GASB 58, ¶ 48 is under the caption "Reporting Gains and Losses" which is for the remeasurement of liabilities or assets per GASB 58, ¶¶ 12 & 14.

The Trustee's expert is also right that GASB 58, ¶ 50 incorporates portions of SOP 90-7's discussion, more precisely, SOP 90-7.28's, of how professional fees and similar types of expenditures had been reported by entities that filed a chapter 11 bankruptcy case. Before SOP

Also, and as set forth earlier while detailing the categories of the Professional Fees in the Joint Submission, this is not the Trustee's position on all of the Professional Fees.

[24] *See also* Statement No. 62 of the Governmental Accounting Standards Board (GASB 62), ¶¶ 514, 528, 535-536, 538, 542-544, 546, 562-563, & 577 (detailing certain of the codifications into and exclusions from GASB of accounting and financial reporting guidance contained in pre-November 30, 1989 pronouncements by FASB and AICPA and setting forth that the GASB approach adopted was incorporation of the accounting and reporting requirements post-November 30, 1989, "essentially as they existed in the applicable pre-November 30, 1989, FASB and AICPA pronouncements, modifying the language as appropriate to recognize the effects of the governmental environment without affecting the substance of the provisions.").

[25] APB 30, ¶¶ 20(a)-(b) further explain "unusual nature" and "infrequency of occurrence." "Unusual nature" is an "underlying event or transaction [that] . . . possess[es] a high degree of abnormality and . . .[is] of a type clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the entity, taking into account the environment in which the entity operates." APB 30, ¶ 20(a). "Infrequency of occurrence" refers to an "underlying event or transaction [that] should be of a type that would not reasonably be expected to recur in the forseeable future, taking into account the environment in which the entity operates." *Id.* ¶ 20(b). Paragraphs 21 and 22 of APB 30 give further clarification to these two factors along with the indication that "[t]he environment in which an entity operates is a primary consideration in determining whether the underlying event or transaction is abnormal and significantly different from the ordinary and typical activities of the entity." *Id.* ¶ 21. The importance of the environment factor is that an event or transaction may be ordinary and typical in one business or setting, but extraordinary in another business or setting.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document    Page 24 of 51

90-7, recognition of reorganization related professional fees was sometimes deferred until a plan was confirmed and used to reduce a gain from debt discharge to the extent of the deferral, other times they were accrued upon the filing of the chapter 11 case, and in other instances they were expensed as incurred. It is also accurate that SOP 90-7 adopted the position for chapter 11 cases that such professional fees are to be expensed as incurred and that this approach was incorporated into GASB 58. GASB 58, ¶¶ 13, 50; *see also* Grant W. Newton, *Bankruptcy and Insolvency Accounting, Practice and Procedure* 460-61 (5th ed. 1994). This GASB 58 discussion is set forth under the heading "Reporting Costs Associated with Bankruptcy Proceedings" which is somewhat misleading until one pays attention to the contents of paragraph 50. GASB 58, ¶ 50 details the professional fees that are to be expensed as incurred are those "directly related to the bankruptcy proceedings . . ." This "directly related" requirement is, as with the County's expert, given less than the attention it should have been accorded by the Trustee's expert.

Also sidestepped to potentially a degree too far by the Trustee's expert is the last sentence of GASB 58, ¶ 50 setting forth the basis for the expense treatment. It states that "[t]hese costs do not provide an increase in service capacity and do not meet the definition of assets or deferred outflows in the GASB conceptual framework," which is a reference to some of the reasoning for the remeasurement treatment accorded in GASB 58, ¶¶ 12, 14. Contrastingly, there is no mention in GASB 58, ¶ 13 or ¶ 50 that the basis for the professional fee expensing is that they are extraordinary items. Additionally, GASB 34, ¶¶ 53-56 & 89 adopt APB 30's guidance on what is an extraordinary item and a special item, and perhaps more importantly to this Court's analysis, the separate reporting of both of them. However, the import of a parenthetical comment in GASB 34, ¶ 89 dealing with the reporting of extraordinary and special items was not addressed. The parenthetical says, "Because other financing sources and uses, rather than *gains* or *losses,* are reported for debt refundings in governmental funds, these transactions should not be reported as extraordinary items." GASB 34, ¶ 89. Whether these qualifiers affect the argued-for treatment of the Professional Fees under GASB 58, ¶ 13 has not been dealt with by the Trustee's, and for that matter, the County's expert.

Despite these underanalyzed, sidestepped, and unaddressed factors, the Trustee's argument goes forward applying the GASB 58, ¶ 48 extraordinary item discussion, that for gains and losses, to all of the Professional Fees on the postulate that GASB 58, ¶ 13 only deals with the timing of recognition of professional fees as being "as incurred." This "as incurred" foundation overlooks the "expense or expenditure" accounting treatment called for along with the "directly related to the bankruptcy proceeding" wording. As a result and similar to the County's expert, the Trustee's insistence on extraordinary item treatment for all of the Professional Fees misses the fact that GASB 58, ¶ 13 has no relevance or application to the accounting treatment for some of the Professional Fees: those not directly related to the bankruptcy case. GASB 34, ¶ 41; see also, GASB 34, ¶¶ 55-56, 86-89, & 100-02. Also, based on the expert's reading of the Klee Letter, he incorrectly assumes that all of the Professional Fees result from activities that are not operating activities, as this phrase is used in its accounting sense, of the Sewer System. They are assumed to be solely from financing activities.

More telling for why GASB 58, ¶ 13 does not deal with at least some of the expense treatment for the Professional Fees than that to which the Trustee's expert opines they are to be given is revealed by review of an appendix to SOP 90-7 along with some of the unmentioned portions of its text.[26]  Although developed and applicable in chapter 11 cases where bankruptcy of an entity is a special item, not one that is the effect of an extraordinary event, SOP 90-7 demonstrates that the accounting treatment of professional fees incurred during a bankruptcy case need not be something other than operating expenses under GAAP.  This is in accord with APB 30, which provides that:

> [j]udgment is required to segregate in the income statement the effects of events or transactions that are extraordinary items . . . *The Board concludes that an event or transaction should be presumed to be an ordinary and usual activity of the reporting entity, the effects of which should be included in income from operations, unless the evidence clearly supports its classification as an extraordinary item as defined in this Opinion.*

APB 30, ¶ 19 (emphasis added).

SOP 90-7.21 sets forth that entering a bankruptcy reorganization case does not ordinarily affect or change the application of otherwise applicable and accepted accounting principles following filing of a chapter 11 case.  SOP 90-7.22 specifies that for the periods including and following a bankruptcy filing, the financial statements should distinguish the transactions in the financial statements directly associated with the reorganization from the ongoing operations of the business.  Coupled with these is SOP 90-7.27, which discusses the content of a statement of operations of an entity in a chapter 11 case.  It provides that ". . . expenses (including professional fees) . . . resulting from the reorganization and restructuring of the business should be reported separately as reorganization items, except for those required to be reported as . . . extraordinary items in conformity with APB Opinion 30… .."

The identical treatment is accorded them in the statement of cash flows under SOP 90-7.31.  It sets forth that reorganization items, including professional fees, should be disclosed separately within the operating, investing, and financing activities categories of the statement of cash flows.  Stated differently, this demonstrates that professional fees incurred are potentially included within one or more divisions of the statement of operations and that within these divisions those directly related to reorganization matters in a bankruptcy case are to be disclosed separately to the extent that they are within any of these portions of the statement.  The example of a statement of operations and a statement of cash flows in Appendix A of SOP 90-7, SOP 90-

---

[26] SOP 90-7 became effective on November 19, 1990.  Therefore, GASB 62, ¶ 542's post-1997 guidance that generally the appendices of pre-November 30, 1989 FASB and AICPA pronouncements should not be incorporated into the GASB literature because they "are nonauthoritative and often lack applicability to the government environment" is not an issue for SOP 90-7 appendices *as used* by this Court.  This Court's utilization of a portion of the appendix to SOP 90-7 is not for the accounting treatment actually used, but for the concept of what is being accomplished, which is segregation of certain types of expenses from those resulting from an event that is usual in nature and frequent in occurrence.  Also, GASB 62 was not promulgated until well after the Indenture agreements.

7.67, is further support that this is the proper reporting treatment for an entity during its chapter 11 case.[27]

More succinctly put, these portions of SOP 90-7 demonstrate that with respect to what would be considered the ordinary and typical operating activities–to be distinguished from those directly related to a bankruptcy case–of a debtor in chapter 11, the accounting guidance applicable to reporting of, among other items, expenses is not altered to the extent and in the way the Trustee's expert posited.  *See, e.g.*, Newton at 458-63.  When these portions of SOP 90-7 are read in connection with GASB 58, ¶ 30, it is evident that GASB 58 does not support the Trustee's expert's treatment of all of the Professional Fees as extraordinary items.  The relevant portion of GASB 58, ¶ 30 provides that "much of the guidance in this Statement is based on existing accounting guidance, and new accounting guidance has been provided only where the Board believes that existing accounting guidance would not be appropriate for Chapter 9 bankruptcies."  This is consistent with GASB 62's setting forth of the history and the reincorporation of earlier accounting guidance of GASB 20, ¶ 6-7 for business-like activities, all FASB statements and interpretations and APB opinions issued on or before November 30, 1989, unless they conflict with or contradict GASB pronouncements and all FASB statements and interpretation issued after November 30, 1989, except those that conflict with or contradict GASB pronouncements.  GASB 62, ¶¶ 507-08.

Furthermore and at odds with an assumption forged into, yet not stated, the Trustee's expert's opinion, GASB 58, ¶ 13, standing alone, does not call for extraordinary item treatment for all of the professional fees associated with a chapter 9 case.  Thus, the GAAP-created conundrum.  Is the County's expert's reading of GASB 58 as calling for reporting all of the Professional Fees as operating expenses a permissible one, is the Trustee's expert's view that all are extraordinary items the more apt one, or are both incorrect to a degree?

### *(5) Separateness of a Degree*

Regardless of reading GASB 58, ¶ 13 in isolation from or with the aid of other accounting standards or principles, SOP 90-7 helps one know that what is contemplated by GASB 58 is a segregation of the reporting of those of the Professional Fees that are directly related to the County's chapter 9 bankruptcy from those that might otherwise be reported within (a) operating expenses on a statement of operations or (b) the operating, investing, noncapital financing, and capital and related financing categories of a statement of cash flows.  For purposes of analysis, what matters is the segregation, not whether they are extraordinary items or special items such as reorganization items.  Additionally, due recognition that GASB 58's guidance did not exist at the 1997 time period of the Indenture requires that one recognize that the "directly related" Professional Fees may not then have been contemplated to be the effects of an extraordinary event/transaction.  They may have been perceived by the parties as being treated like similar professional fees in a chapter 11 case:  reorganization items.  *See infra* footnote 28.

---

[27] The statement of operations in SOP 90-7.31 has three parts because it deals with a for-profit entity.  A statement of operations for a governmental entity has four.  This difference is immaterial to this Court's determinations.

Once more, the guidance from SOP 90-7 as it relates to separate disclosure is in SOP 90-7.22, .27, & .31. Subpart 22 speaks in terms of distinguishing the transactions and events directly associated with the bankruptcy reorganization from the ongoing operations of a business. Subpart 27 indicates that on a statement of operations the professional fee expenses directly resulting from reorganization and restructuring of a business are to be reported apart from those emanating from the ordinary and typical operations of a business. So too, for the statement of cash flows. Subpart 31 delineates a separate disclosure of those incurred in the reorganization process that are within the operating, investing, and financing categories.

Consistent with SOP 90-7's treatment, GASB 58 does not purport to alter the accounting treatment of all categories of, among others, expenses simply due to a governmental entity filing a chapter 9 bankruptcy. This is the clear import of GASB 58, ¶ 30's new accounting guidance being given only when existing guidance is rendered inappropriate by a chapter 9 filing along with the SOP 90-7 guidance having been determined as "also appropriate for Chapter 9 bankruptcies." GASB 58, ¶ 50. This is why when it comes to the Professional Fees, GASB 58, ¶ 13 is limited in application to those directly related to the bankruptcy case. It does not apply to those of the Sewer System incurred in its ordinary and typical operations that would take place whether there was a bankruptcy or not.

If nothing more, the separation of some of the reorganization/restructuring professional fees from other incurred professional fees is a recognition that they are engendered from something that is not the ordinary and typical course of operations of a business entity. This engendering aspect is the distinction of relevance that is drawn from the accounting pronouncements' guidance and the related literature cited to this Court that is factored into learning what is Operating Expenses. Knowing this transforms the enigma into knowledge demonstrating as incorrect the all versus nothing positions of the parties for whether the Professional Fees are Operating Expenses.[28]

### *(6) Engendering Leading to Apples to Apples*

The separation of financial effects of extraordinary items or special items that arise serves a specific purpose. The segregation concept enables one to examine and compare the performance of a business or business-like unit when things that are special items (e.g., the effects arise from an event or transaction that are either unusual in nature or infrequent in occurrence and under management's control, such as a chapter 11 reorganization or certain types of catastrophic events), GASB 34, ¶ 56; Newton at 458-459, or extraordinary items (e.g., the

---

[28] Part of this Court's analysis has been done knowing that GASB 58's conclusion that a chapter 9 case is an extraordinary event had not been promulgated until more than a decade following the Indenture. Although it is possible that in 1997 by "taking into account the environment in which the entity operates," *see* APB 30, ¶¶ 20(a)-(b), 21, one might have concluded that a municipal bankruptcy was an event making reporting of certain transactions as extraordinary items. However, no such evidence is before this Court. Also, it is possible that in 1997 the accounting guidance viewing a chapter 11 reorganization as a special item, not an extraordinary one, may have been followed for a debtor in a municipal bankruptcy case. What would have been the course for accounting reporting in 1997 has not been fleshed out by the parties to this matter by evidence or otherwise. This is another reason the rationale underlying extraordinary and special items is important and not whether the 1997 treatment contemplated under the Indenture was as an extraordinary item.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document        Page 28 of 51

effects from an event or transaction that are both unusual in nature and infrequent in occurrence such as a chapter 9 bankruptcy and some forms of catastrophic events), GASB 34, ¶ 55; GASB 58, ¶ 48, might, if not separated, mislead those examining financial reports.  The separate disclosure enables comparisons of the financial performance of an entity or subdivision in isolation from aberrations caused by extraordinary or special events or transactions.

For a business entity or its governmental counterpart, separating certain financial effects from those ordinary and typical allows one to know the its financial performance without the impact of such extraordinary or special events/transactions and to compare operating performance between reporting periods to learn if it was the same, better, or worse than what it had been in another reporting period when an unusual and/or infrequent event did not impact the financial results.  Simultaneously, it permits one to look at the influence of the special or extraordinary transaction/event on financial performance.  In non-accounting and non-legal terminology, this breaking out of items allows an apples-to-apples comparison of financial results.  Reck, Lowenshon & Wilson at 257-258.

It is also a recognition that items reported in these sorts of separated classes are not of the ordinary and typical types for revenues or expenses generated by business operations.  This separation of disclosure of expenses, revenues, and cash flows engendered directly by the bankruptcy proceedings as distinguished from those incurred, received, or occurring regardless of a entity's bankruptcy proceeding is the critical distinction.  Furthermore, it is the rationale on which rests the separate disclosure which assists in the interpretation of Operating Expenses.  It is not the precise accounting classification as extraordinary, special, reorganization, or similar items that is the helpful information.  This rationale is some of what this Court utilizes in finding the boundaries for what is included and excluded from Operating Expenses.

## IV.  The Finding Process: Rules First, Then Facts (Or Is it so Easy?)

### (A) More on the Law's Framework

To know what Operating Expenses includes requires a specific reference point.  Here, it has been selected by the parties.  It is the law of Alabama.  Indenture § 18.10.  Alabama's courts have set forth a framework to be followed once an ambiguity in meaning of an agreement is established by a court.  As a matter of Alabama law, a court is to apply rules of construction to attempt to resolve any ambiguity in a contract before resorting to factual issues to determine the meaning of an agreement. *Extermitech, Inc.*, 951 So.2d at 694; *Alfa Life Ins. Corp. v. Johnson*, 822 So.2d 400, 404-05 (Ala. 2001).

Simple as this format may sound, it is not so simple in implementation.  This is due to the almost limitless number of so-called rules of construction and recognition of the fact that for one rule of construction setting forth how one is to give meaning to an agreement there is often another calling for a different or the opposite approach to establish what was agreed.  For example, one is *ejusdem generis* which is counterpoised by *expressio unius est exclusio alterius*. Furthermore, some of these rules rely on facts for their implementation, which is at odds with the Alabama courts' use of rules of construction before looking at the facts.  The rule that looks to

the practical construction put on the language by the parties to an agreement is partially a fact-based inquiry.

Despite the intricacies of Alabama's interpretative framework, certain rules of construction, sometimes called by Alabama courts rules of interpretation, are applicable to know what was agreed to under the Indenture.  One is that an agreement is to be viewed as a whole.  *In re Jefferson County, Ala.*, 482 B.R. 404, 419-422 (Bankr. N.D. Ala. 2012); *Vankineni v. Santa Rosa Beach Dev. Corp. II*, 57 So.3d 760, 763 (Ala. 2010).  Added to this are those that call for a court to give effect to the intentions of the parties by, among other things, (1) taking into account the practical construction put on the language of the agreement by the parties, *see, e.g., Noell v. Am. Design, Inc. Profit Sharing Plan*, 764 F.2d 827, 832 (11th Cir. 1985) (quoting *City of Montgomery v. Maull*, 344 So.2d 492, 495 (Ala. 1977)); *Ohio Cas. Ins. Co. v. Holcim (US), Inc., et al.*, 744 F. Supp. 2d 1251, 1259 (S.D. Ala. 2010); *Extermitech*, 951 So.2d *at* 694; (2) giving words their ordinary meaning, *see, e.g., BellSouth Telecommunications, Inc. v. ITC Deltacom Communications, Inc., et al.*, 62 F. Supp. 2d 102, 1311 (M.D. Ala. 1999); *American Farm Bureau Fed'n v. Alabama Farmers Fed'n.*, 935 F. Supp. 1533, 1544 (M.D. Ala. 1996), *aff'd.*, 121 F.3d 723 (11th Cir. 1997); and (3) considering the surrounding circumstances, *see, e.g., Ohio Cas. Ins.,* at 1263*; McCollough v. Regions Bank*, 955 So.2d 405, 410 (Ala. 2006).

### (B) Once More, It's the Structure

For the Indenture, one rule of interpretation has overarching importance in determining Operating Expenses.  It involves viewing the Indenture as a whole and not trying to intuit the meaning of Operating Expenses by simply looking to its definition.  What is within Operating Expenses is best ascertained by looking to the overall structure of the Indenture for the flow of revenues.

As earlier discussed, it involves the flushing of the Revenue Account and how the flow of System Revenues creates a specific distribution of monies.  In particular is the "then due and that were incurred during the then-current or in any then-preceding calendar month" limitation on payment of Operating Expenses.  Indenture § 11.1.  It is some of what ensures that System Revenues in a given period are not kept from flowing to debt service by items that are either not due for payment in the current period or have not been incurred.  This effectively makes certain that noncash items such as depreciation and amortization along with reserving for future expenditures do not reduce monies that would otherwise be available to pay interest and principal on the warrants.  Not allowing fixed capital expenditures to be allotted to only one accounting period achieves the identical result and is a recognition that debt is the revenue source for many, if not most or all, capital expenditures under the Indenture's structure.[29]

Joined with this cash flow are the limitations on what are Operating Expenses set forth in its definition which have a similar purpose.  Included are the requirements that the expenses be reasonable and necessary and that they be for the efficient and economic administration and operation of the Sewer System.  Indenture § 1.1.  In part, they are designed to achieve the same

---

[29]  Since depreciation and amortization for these fixed capital expenditures is not a permitted reduction in System Revenues before fixing the amount of Net Revenues, these expenditures do not result in a reduction in Net Revenues in other accounting periods via depreciation or amortization.

cash flow goal underlying the exclusions for depreciation, amortization, and items chargeable to a fixed capital account.

Another restriction created for the identical purpose is the Properly Chargeable and Extraordinary Item Phrase. *See supra* at II and III(B) ("Operating Expenses" means "the reasonable and necessary expenses of efficiently and economically administering and operating the [Sewer] System . . . that by generally accepted accounting principles are properly chargeable to expenses of administration and operation and are not characterized as extraordinary items . . ."). The County's argument is the words "that by generally accepted accounting principles are properly chargeable to expenses of administration and operation and are not characterized as extraordinary items" only modify the "and all other items" portion of the listing of the types of things that are within expenses of administration and operation. The County's posture is that this phrase does not qualify the entire listing of items and, just as importantly, does not restrict the entire category of "reasonable and necessary expenses of efficiently and economically administering and operating the [Sewer] System . . ."

The Court does not agree with the County's interpretation. Subpart (a) of Operating Expenses sets forth those that are for administration and operation of the Sewer System. Interposed within subpart (a) is a non-exhaustive listing of examples describing the types of expenses that may fall within the administration and operation subcategory. Although describing some of what are expenses of administration and operation may have been inserted to assist in knowing what is Operating Expenses, its placement did more than assist. It muddled, too. Once this interposition is recognized for what it is and subject to the expressed exclusion of "depreciation, amortization and interest and payments made pursuant to Qualified Swaps," it becomes apparent that this portion of Operating Expenses' definition was intended to be those for "the reasonable and necessary expenses of efficiently and economically administering and operating the [Sewer] System . . . that by generally accepted accounting principles are properly chargeable to expenses of administration and operation and are not characterized as extraordinary items . . . ."

Even though the (b) subpart of Operating Expenses' definition is not at issue in this matter, its structure supports how the Properly Chargeable and Extraordinary Item Phrase qualifies all of what are the expenses of administration and operation of the Sewer System. A similar qualifier without an interposed phrase is contained in subpart (b): "but not including items that by generally accepted accounting principles are properly chargeable to [a] fixed capital account . . ." This phrase, just like that for subpart (a) of Operating Expenses, modifies the entire category of the sort of expenses contained within subpart (b). This reading of subpart (a) is consistent with viewing the Indenture as a whole when it comes to the structure for the flow of monies.

To read what is modified by the Properly Chargeable and Extraordinary Item Phrase otherwise undoes to an extent what the parties to the Indenture desired to accomplish when it comes to the waterfall of revenues which is ensuring a consistent and relatively stable flow of revenues to the Parity Security Holders. As indicated, part of this is accomplished by limiting Operating Expenses to those incurred plus being due and payable while excluding non-cash/expenditure items such as depreciation and amortization along with expenditures that are

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document    Page 31 of 51

more properly spread out over more than one accounting period such as those that are capitalized or their purchase is from borrowed funds, not System Revenues. Some of the rest involves the purpose for the Properly Chargeable and Extraordinary Item Phrase.

### (C) Underlying Rationale and Guidance: Girding of the Structure and No Receiver Exception

This is where the rationale underlying the accounting treatment for extraordinary items and special items comes into the interpretative amalgam. Breaking out their disclosure on a statement of revenues, expenses, and changes in fund net assets and from the activity categories in a statement of cash flows points out that extraordinary and special items are disruptions from the ordinary and typical sorts of items which, if not so separately set forth, could mislead the reader of a financial statement regarding the operations of an entity. Put differently, these extraordinary and special items are the result of events that are usual in nature and/or are infrequent in occurrence. They are, thus, the types of items that if not separated out cause the very kinds of disruptions for which the waterfall in revenues of the Indenture and the definition of Operating Expenses were designed to minimize, if not eliminate, from the distributive scheme to determine Net Revenues available to pay principal and interest to the Parity Security Holders.

More simply stated, the accounting rationale underpinning how extraordinary and special items should be reported assists in knowing the purpose for the Properly Chargeable and Extraordinary Item Phrase. It is to exclude from Operating Expenses those that upset the waterfall of revenues from the consistent and relatively stable flow designed. It does this by making certain that the effects of certain events or transactions that under accounting guidance are outside those that arise from the ordinary and typical are not part of Operating Expenses. The Properly Chargeable and Extraordinary Item Phrase has another function: excluding those that are not appropriately allotted to the operations and administration of the Sewer System. This second function is accomplished by the "Properly Chargeable" portion of the phrase.

This part of the phrase occupies a position of particular importance in this Indenture-based dispute because at the time of entering into the Indenture, GASB 58's guidance that a debtor's chapter 9 bankruptcy is an extraordinary event did not exist. Should the parties have contemplated that a chapter 9's financial effects would be treated just as the accounting guidance dealt with a debtor's chapter 11's filing as either a reorganization or special item, the "Extraordinary Item" segment of the phrase would not exclude any of the Professional Fees from Operating Expenses. However, the "Properly Chargeable" portion would and does by engrafting the separation of special/reorganization items from Operating Expenses.

The County's and the Trustee's conduct is in accord with this interpretation. The evidence is that the ordinary and typical kinds of professional fees and related expenses have consistently been paid out of System Revenues, be they legal or others. These include defending worker's compensation and tort claims arising from Sewer System activities, collection of monies owed by Sewer System customers, drafting of contracts and related contract matters, performance of engineering and other technical tests and studies, and a host of other day-to-day legal and other professional expenses incurred by the Sewer System. To date, those day-to-day

32

operations and administration related professional fees and expenses that have been paid as Operating Expenses aggregate in many years to a sum in the multiple millions of dollars.

Excluding one argued exception, this reading of Operating Expenses is in accord with how the parties have for over a decade viewed its formulation. This so-called exclusion is relied on by the County to demonstrate that something different occurred in support of its reading of Operating Expenses.

During the period when the Receiver controlled and operated the Sewer System for an Alabama court (the Receivership Court), some of the County's incurred professional fees that related to the Sewer System were paid out of System Revenues in a fashion that reduced Net Revenues. These professional fees, mostly legal, were paid during a period when the Receiver was attempting to obtain a settlement among the various parties involving a reduction in the outstanding balance owed to the Parity Security Holders, refinancing the Parity Security indebtedness at the hoped for reduced balance, and borrowing additional hundreds of millions of dollars for the Sewer System's future needs. Other than during this time, there has been no evidence presented to this Court that professional fees and expenses excluded as those of the sort that disrupt or distort the Indenture's waterfall of monies, i.e., special or extraordinary items, have ever been included within Operating Expenses.

Furthermore, the professional fees and related expenses of the County paid during this period stopped and those that reflected they related to or were associated with the planning, filing, and implementation of the County's chapter 9 case were denied payment by the Receiver. Lastly and as already discussed, even some of the County's professional fees and expenses paid by the Receiver would have been included within Operating Expenses under accounting guidance. Therefore, what was paid are those that dealt with the possible resolution of litigation outside the context of a bankruptcy and those that dealt with the restructuring of debts outside of bankruptcy. This makes GASB 58's guidance inapplicable to the treatment of these professional fees and expenses. GASB 58, ¶¶ 1-2. Because it occurred outside of a chapter 9 bankruptcy, this payment of some such fees and expenses is not evidence of how those directly related to a chapter 9 have been treated, nor does it demonstrate their proper reporting following the filing of a chapter 9 case.

Whatever the Receiver's reasons for paying these professional fees and related expenses, the Receiver is not a party to the Indenture. Added to this is that under the terms of the order appointing the Receiver, the Receivership Court would have had to and did authorize the payment of these fees and expenses. This distinction shows that the payment of the County's professional fees and expenses during this period of time is not evidence of how the Trustee and the County performed under the Indenture or how Operating Expenses were to be set. Rather, they are how the Receivership Court decided to use System Revenues, not the parties to the Indenture.[30] These payments are not evidence of how the parties operated under the Indenture or

---

[30] Whether these Receiver payments to the County are part of Operating Expenses under the third subpart of the Indenture's definition is an issue that need not be addressed other than to mention that this issue exists. It arises from the Trustee's fees and charges being part of Operating Expenses under subpart (c) of § 1.1 in conjunction with the remedies on default provisions of Indenture § 13.2 that entitles the Trustee to have a receiver appointed for the Sewer System following what are specified as events of default.

of a practical construction put on Operating Expenses' wording. If nothing else, the surrounding circumstances regarding the Receiver's and the Receivership Court's actions are outside those utilizable to determine the meaning of Operating Expenses. *See* Restatement (Second) of Contracts § 202 (1981) (course of performance is given weight only "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other"). Neither the Receiver, nor the Receivership Court are parties to the Indenture.

A summary is that the overarching guidance of looking at the Indenture as a whole when joined with the proper construction of how the Properly Chargeable and Extraordinary Item Phrase modifies what are the subpart (a) expenses within Operating Expenses along with the County's and Trustee's practical construction shown by what professional fees and related expenses have been included within Operating Expenses, be they facts that are necessary for use of a rule of construction or facts beyond what are needed for a rule of construction, demonstrate that those of the Professional Fees that are directly related to the chapter 9 case are not part of Operating Expenses. This is because they are not the ordinary and typical types of expenses that do not disrupt the consistent and relatively stable flow of System Revenues called for under the Indenture's structure. This construction retains what it was that the parties sought to achieve for the waterfall of monies under the Indenture and how they viewed Operating Expenses for over a decade. The other outcome flowing from this analysis is that the fixing of Operating Expenses for calculating Net Revenues is by use of Operating Expenses as it is defined in § 1.1 of the Indenture without Net Revenue's § 1.1 definition's reference to "determined in accordance with generally accepted accounting principles."

Therefore, under the Indenture's terms and whether certain of the Professional Fees are deemed special/reorganization or extraordinary items, those of the thirteen categories of the Professional Fees that are directly related to the County's chapter 9 case are not within Operating Expenses and those that are not directly related are to be reported as otherwise required under the Indenture and the accounting guidance for an enterprise fund not in a chapter 9 bankruptcy. This means some of the Professional Fees not directly related to the chapter 9 may be within Operating Expenses.[31]

---

[31] The County has multiple arguments for why the Professional Fees are Operating Expenses. In light of this Court's determination regarding Operating Expenses' formulation, some are dealt with only in this footnote or in a prior opinion in Jefferson County's chapter 9. One previously rejected by this Court has three parts that rely on Alabama's Constitution's debt limitation along with its case law on what obligations are subject to the debt ceiling and an extrapolation of Alabama case law dealing with general revenue pledges, not special ones, for why the Indenture's definition of Operating Expenses encompasses the Professional Fees. *See In re Jefferson County,* 482 B.R. at 424-425. One needs to pay attention to the fact that this Court's rejection of this argument was with respect to the Reserves, not actually incurred professional fees and related expenses.

Another is premised on the Supreme Court of the United States' rejection of the *Fobian* holding by the U.S. Court of Appeals for the Ninth Circuit that did not allow recovery of attorney fees of a creditor for litigating issues peculiar to bankruptcy law even though provided for by contract. In this County-Trustee fight, the issue is not the *Fobian* rule's disregard for underlying state law and an incorrect application of bankruptcy law. Rather, it is the extent to which the Indenture allows or is required to provide for payment of the Professional Fees under Alabama law. Thus, analysis of what the scope of the contracted-for professional fees under Alabama's laws is consistent with the *Travelers* analysis of what is required in a bankruptcy case. *See Travelers Cas. & Sur. Co. of AM. V. PG & E,* 549 U.S. 443, 451-56 (2007).

A third argument is that under GASB 9 and GASB 34 the Professional Fees are appropriately within Operating Expenses. This contention has been addressed in the text of this opinion regarding the expert testimony on

**(D)  Directly Related Opposed to Not Directly – Divination or Determination?**

One of the problems with GASB 58, ¶ 13's expensing as incurred treatment of professional fees directly related to a chapter 9 case is determining which fees are "directly related."  GASB 58 does not give much accounting guidance on this subject.  A little more is given in SOP 90-7 in the context of a reorganization in a chapter 11 case.  In particular, SOP 90-7 contains a reference that professional fees and similar expenditures directly related to a chapter 11 generally do not result in assets or liabilities.  This is why SOP 90-7's guidance is that they should be expensed as incurred as reorganization items.  *See* SOP 90-7.28.  This indicates that at least some professional fees that result in assets or liabilities are not "directly related" under GASB 58, ¶ 13.

There are other considerations.  Insolvency accounting texts identify classifications into which professional services provided in a chapter 11 may be placed.  One such treatise recognizes that at least five sorts may be present.  They are (1) services required solely because the petition is filed, (2) costs associated with discontinued operations, (3) costs associated with

the accounting guidance relied upon by the contesting parties. As indicated, some may properly by within Operating Expenses and some are not.

One more of the County's contentions relies on a comparison of the Indenture's "reasonable and necessary" condition for being within Operating Expenses to the standard found in 11 U.S.C. § 330(a) for "reasonable compensation for actual, necessary services" and "actual, necessary expenses" of a trustee, a consumer privacy ombudsman appointed under 11 U.S.C. § 332; an examiner, an ombudsman appointed under 11 U.S.C. § 333; or a professional appointed under 11 U.S.C. § 327 or 11 U.S.C. § 1103. The provisions of 11 U.S.C. § 330 are not applicable to chapter 9 even though 11 U.S.C. § 333 for appointment of a patient care ombudsman and 11 U.S.C. § 1103 for appointment of an accountant, attorney or other agent are incorporated into chapter 9.  *See* 11 U.S.C. § 901(a). Thus, the inapplicability of section 330(a) voids the comparison proposed along with the fact that in a chapter 9 case there is no trustee, examiner, or professional person appointed under 11 U.S.C. § 327, or an ombudsman appointed under 11 U.S.C. § 332. *Id.* For a patient care ombudsman appointed under 11 U.S.C. § 333, whether and how such a representative is to be paid out of a municipal debtor's or someone else's property absent the agreement of the debtor or the someone else is problematic. The same is true for committee members appointed under 11 U.S.C. § 1103 along with any attorney, accountant, or agent appointed under 11 U.S.C. §1103. So too, is the standard, if any, other that the municipality's agreement to pay from its property or some other person or entity so agreeing. Lastly, the comparison is of a statutory standard to a contract's provision. One is a legislatively set standard which is being compared to one agreed to by parties to a contract. No evidence has been presented that the parties ever considered 11 U.S.C. §330(a)'s reasonableness in the making of what is Operating Expenses. These distinctions make the statutory one not directly applicable to the agreed one for purposes of knowing what the parties meant as Operating Expenses. *See Percoff v. Solomon*, 67 So. 2d 31, 40-41 (Ala. 1953) ("We have observed that the general rule in the law of contracts is that when the parties reduce their agreements and obligations to writing, the writing, in the absence of mistake or fraud, is the sole expositor of the transaction and intention of the parties.").

A fifth is that what is reasonable and necessary for the efficient and economical operation and administration of the Sewer System is an "incident" to Alabama's constitutional delegation giving the County full power and authority to manage, operate, control and administer the Sewer System.  *See* Ala. Const. Amend. 73. This grant of power to manage, operate, control, and administer the Sewer System is not dispositive of instances where the County exercises its delegation by agreeing in a contract to the specific treatment of costs and expenses of operating its Sewer System as it did in the Indenture.  Nothing in this provision purports to limit or prohibit what the County agreed to in the Indenture regarding the Professional Fees.  *See* Ala. Const. Amend. 73.

The remaining two arguments are the parties' historic treatment of professional fees based on course of performance before and shortly after the commencement of the County's municipal bankruptcy case and that the Professional Fees are not extraordinary items. These have been dealt with in the text of this opinion and will not be repeated here.

reorganization of the ongoing business, (4) normal legal and accounting services, and (5) costs associated with a temporary management team of workout specialists. Newton at 460.

These categories are just as applicable to an enterprise fund like the Sewer System involved in a chapter 9 case as they are to an entity in a chapter 11 case. The class for discontinued operations and that for a temporary management team are not at issue in this matter. Those for the normal legal, accounting, and similar professional fees have been dealt with and are not the subject of the dispute between the County and the Trustee.

The remaining two classes are involved. The category for services required solely because the petition is filed includes the bankruptcy petition, the schedules and statement of financial affairs, special reports filed with the bankruptcy court, such as operating statements in a chapter 11 case, and comparing proofs of claims with a debtor's records. The professional fees in this grouping are all "directly related" to the reorganization. Somewhat differently and based on SOP 90-7's "directly related" standard, this treatise explains that even for the class of costs associated with the reorganization of an ongoing business there are costs related to identifying the underlying causes for the financial difficulties and the need to develop a plan to correct them that would have been incurred in the absence of a bankruptcy case. The difference is that these professional fees are greater if earlier, pre-bankruptcy action was not taken. *Id.*

This is a recognition that a portion of the professional fees associated with the reorganization are not necessarily "directly related" to a bankruptcy case. As Newton explains,

> As can be seen, the expenditures for professional fees are related to both ongoing operations and chapter 11 proceedings. No doubt a significant amount of the costs related to chapter 11, such as evaluations of alternatives, should have been incurred even if a chapter 11 petition was not filed. According to SOP 90-7, only those fees directly related to the chapter 11 proceeding are reorganization items and should be expensed.

Newton at 460-461. The identical is true for a governmental entity. What is required is a judgment by management on what income and what expenses relate to ongoing operations versus those that are solely the effect of the reorganization. As set forth during a discussion regarding reorganization items' treatment in a statement of operations:

> Note that the reader of the statement of operations is able to determine the amount of income generated from continuing operations without the impact of the reorganization being reflected in these totals. *Although some judgment on the part of management is involved to determine the part of income that relates to ongoing operations, a reasonable estimate of the segregation will be much more beneficial to the reader than including all items in this category . . .*

Newton at 459 (emphasis added). The judgment by management being referred to is the portion of income and expenses, including professional fees, that are "directly related" to the chapter 11 case that are to be separately set forth from those included within the normal operations of the

Case 11-05736-CRJ9   Doc 1813   Filed 06/28/13   Entered 06/28/13 10:29:55   Desc
Main Document      Page 36 of 51

business. No reason or evidence has been presented for why such a judgment and analysis is not proper in a chapter 9 adjustment of debts case.

Although this discussion has been in the SOP 90-7 chapter 11 reorganization context, it is relevant to a governmental entity like the County and to an enterprise fund such as the Sewer System because of GASB 58's language that "the guidance in SOP 90-7 [for reporting costs associated with bankruptcy proceedings] also is appropriate for Chapter 9 bankruptcies." GASB 58, ¶ 50. Thus, SOP 90-7's "directly related" criterion for professional fees has, via GASB 58, been built into that for a governmental entity's business-like activities once a chapter 9 is filed.

Given this incorporation of SOP 90-7's "directly related" factors, the Professional Fees that are solely the effect of a chapter 9 case are "directly related." For these GASB 58, ¶ 13's expense treatment applies. Those that are from the normal operating and administrative activities – those that are ordinary and typical – that would occur regardless of a chapter 9 case are not "directly related." For these, GASB 58, ¶ 13's expense guidance does not apply. Rather, the accounting guidance that would otherwise apply to them for a governmental entity, including an enterprise fund, not in a chapter 9 guides their treatment. For those of the Professional Fees that are associated with the reorganization of the ongoing business, a judgment by management needs to be made allocating a portion as "directly related" to the chapter 9 and a portion as not being "directly related." In other words, part of this group will be subject to the treatment called for by GASB 58, ¶ 13 and the rest will not be subject to it. The rest are reported as called for by the accounting guidance applicable to a governmental entity and/or its enterprise fund that is not a debtor in a chapter 9 case. Further and given the portion of APB 30 that is incorporated into GASB guidance – that "an event or transaction should be presumed to be an ordinary and usual activity of the reporting entity," APB 30, ¶ 19 – there is a presumption that the Professional Fees not within GASB 58, ¶ 13's reach and not properly allocated to investing, capital funding, or non-capital funding activities are incurred from operating activities of the County. *See also* GASB 9, ¶ 16 & n. 14 *supra*. That is, they would most likely be operating expenses under GAAP and Operating Expenses under the Indenture.

Due to the Joint Submission's generalizations for the thirteen categories of the Professional Fees, this Court is only able to give a determination by category, not for the specifics of what is included in each, for the accounting guidance's use in this interpretative dispute. The Professional Fees within categories 1 (emergency stay relief litigation), 12 (eligibility of the County as a chapter 9 debtor), and 11 (sewer system claims analysis and objections), are governed by GASB 58, ¶ 13's treatment. They are matters unique to the County's chapter 9 case. Those in categories 5 (other creditor initiated sewer related, non-bankruptcy litigation), 6 (FGIC insurance insolvency proceedings), 7 (third party litigation regarding validity of sewer system debt), 8 (third party litigation regarding sewer system rates), and 10 (rate setting for the sewer system) are not governed by GASB 58, ¶ 13. Stated differently, the otherwise applicable accounting guidance governs how these items are reported. These items deal with matters involving the ordinary and typical activities of the Sewer System. The remaining items, those in 2 (the net revenue litigation), 3 (severed sewer system adversary proceeding litigation), 4 (other creditor initiated sewer system related litigation), 9 (settlement negotiations and communications with sewer creditors, ratepayers, and others), and 13 (plan preparation and prosecution) require an allocation of the Professional Fees. Part should be

reported under GASB 58, ¶ 13's guidance and part reported consistent with the governmental accounting guidance applicable for an entity not in chapter 9.

This Court's determination is subject to a further qualification. To the extent that matters such as a stay relief motion or some other activity that is considered solely the effect of the chapter 9 case arise in the context of a matter that is in a Joint Submission category that is not subject to GASB 58, ¶ 13's guidance or for which an allocation is made for GASB 58, ¶ 13's treatment, the amount for these subitems should be treated as subject to GASB 58, ¶ 13. For instance, Joint Submission item 4 for Other Creditor-Initiated Sewer-Related Litigation (Non-Bankruptcy Court) also references stay relief motions. Although this classification is one involving for the division of the Professional Fees between those subject to GASB 58, ¶ 13's guidance and those not, the stay relief motion-related professional fees within this category are fully subject to GASB 58, ¶ 13's guidance. Not knowing the specifics for what Professional Fees are within each category, this Court is not able to further refine the determination of GASB 58, ¶ 13's applicability or not.

In addition to the qualification, it is necessary to recall that accounting reporting for the County as a whole involves one or more of the governmental fund, proprietary fund, and fiduciary fund classifications. Some of the Joint Submission categories of the Professional Fees may be properly allocated among one or more of these funds. For instance, those for items 9 (Settlement Negotiations and Communications With Sewer Creditors, Ratepayers, And Others) and 13 (Plan Preparation and Prosecution) encompass facets of professional work that implicate more than one of the funds and, to the extent they exist, other funds within the proprietary fund category. As such and using accounting terminology, a judgment is required by management to separate those of the Professional Fees that should appropriately be reported in more than one fund classification and, for within the proprietary fund class, in more than one fund within this classification. To the extent that the Professional Fees are properly apportioned to funds other than the enterprise fund which is the Sewer System, they are not part of Operating Expenses.

### (E) Contract-Based Upshot or the Operating Expense Earmarking

This Court's analysis of the Indenture's objective for what costs and expenses of operating and administering the Sewer System are encompassed within as Operating Expenses has considered the Indenture's structure for cash flows, including exclusions, the practical interpretation placed on Operating Expenses by the County and Trustee, the circumstances surrounding its usage and implementation, and accounting guidance. With respect to the accounting guidance, this Court has taken into account that important GASB pronouncements, including GASB 34 and GASB 58, were not in effect until well after the parties entered into the Indenture.

The Court has also noted that at the time the Indenture was executed, the Governmental Accounting Standards Board had not determined that the filing of a chapter 9 case by a governmental entity was an extraordinary event. Prior to the enactment of GASB 58, using the guidance from APB 30 and SOP 90-7, one may not have determined that a chapter 9 filing was an extraordinary event. At the date of the Indenture, the guidance for an entity in a chapter 11 may have been viewed as appropriate for a debtor in a chapter 9 case. As detailed above, that

guidance states that professional fees directly related to the bankruptcy are special items, not extraordinary ones. Accordingly, this Court analyzed the rationale underlying the accounting guidance for each type of case in determining the relevant accounting guidance.

As it turns out, the directly related effects of both are required to be separately reported from the ordinary and typical operating expenses and, to the extent assigned to a category other than operating activities, similarly reported separately in such other classifications. GASB 34, ¶¶ 55-56, 89, 100-102. *But see* GASB 34, ¶ 102 n. 42. The upshot for the Indenture's usage is that it would not matter under this Court's view of how the Indenture was intended to operate that the portion of the Professional Fees directly related to the County's chapter 9 case were contemplated in 1997 to be treated as they had been set via SOP 90-7 for a chapter 11 reorganization as a special item or, instead, as an extraordinary item. Either way, those Professional Fees directly related to the chapter 9 are the very types of items which are pulled out from any lumping with costs and expenses otherwise constituting operating expenses, including the Operating Expenses at issue here.

From an accounting reporting viewpoint, this reveals the financial results without their being masked by special or extraordinary items along with seeing the financial repercussion of them on an entity's operating income, expenses, and cash flows by their being separately shown. From the perspective of the Indenture's plan, it maintains the reliable and relatively stable cash flow to debt service by excluding from Operating Expenses those items that are within the Properly Chargeable and Extraordinary Item Phrase. Those excluded by this phrase from Operating Expenses are items properly chargeable to other of the funds utilized for governmental accounting reporting, those properly chargeable to other categories than expenses of operation and administration of the Sewer System, and those that are the effects of events or transactions either determined as unusual in nature and/or infrequent in occurrence under Governmental Accounting Standards Board's guidance.

Under GASB 58, those of the Professional Fees attributed to the Sewer System and that are within the "directly related" guidance for GASB 58, ¶ 13 should be segregated from other operating and administration expenses. As a result, they are just the sort of items designed by the Indenture's drafters that are excluded from Operating Expenses be they special items, extraordinary items, or some other accounting reporting grouping that is not an operating or administration expense. In this case, it is those in Joint Submission categories 1, 11, and 12.

For those in Joint Submission categories 2, 3, 4, 9, and 13 that are determined to be within the enterprise fund that is the Sewer System, the amount accorded as directly related to the chapter 9 are not within Operating Expenses and the sum attributed as not directly related are Operating Expenses to the extent that the otherwise applicable–the non-GASB 58 guidance– would indicate they are within the operating and administration expenses of the Sewer System. This Operating Expenses inclusion is also subject to the reasonable and necessary for efficient and economical requirement of the Indenture's composition for Operating Expenses.

The last are those in the Joint Submission categories 5, 6, 7, 8, and 10. These are not within GASB 58, ¶ 13's reach. This means that they may be within Operating Expenses if, under accounting guidance for a non-chapter 9 governmental entity, they would otherwise be reported

as an expense of operations or administration not separately broken out, such as a special or extraordinary item. Furthermore, the evidence before this Court does not support their separate disclosure. As with those in the prior paragraph, these, too, are subject to the reasonable and necessary for efficient and economical requirement built into Operating Expenses.

Although this Court does not have evidence on the dollar amounts for any of the categories of the Joint Submission and the specifics describing the dollar amounts associated with what the professionals did, one observation is worthwhile. Given the pervasive nature of the litigation and disagreements among and between parties regarding the Sewer System and the concomitant costs driven by this litigation and disagreements, the scope of what is necessary in its non § 928(b) use by the Trustee is quite broad. Similarly, what is reasonable has an equal or greater degree of breadth.

Although this ruling on the range of what is Operating Expenses is, to say the least, technical, it may be simplistically summed up as some of the Professional Fees are Operating Expenses and some are not. Despite the technical and specialized nature of the analysis, this Court's determinations are not divinations. They, also, are not the end of the matter. What needs to be considered next is applicable bankruptcy law and whether it alters the outcome with respect to those of the Professional Fees that are not part of Operating Expenses.[32]

### V. The Revisitation and Does It Matter That Some of the Professional Fees Are Not Indenture "Operating Expenses"?

### (A) Only the Net Revenues

In the Second Opinion, this Court addressed whether 11 U.S.C. § 928(b) permitted subordination of the lien on the Sewer System's Net Revenues to the Reserves and nothing more. The Professional Fees were expressly excluded from this Court's considerations regarding 11 U.S.C. §§ 922(d) and 928. A critical difference between what was considered there and the Professional Fees is that the Reserves did not involve current expenditures of monies and the depreciation, amortization, and estimated future capital expenditure components were comprised of either past expenditures or potential future ones for which no payment would be required for a significant portion, if not at all, during the interim period between the County's chapter 9 filing and potential confirmation of a plan of adjustment. Added to this is the fact that a fund established under the Indentures holding tens of millions of dollars has been used to pay for actual capital items during the post-petition period of this case. In contrast, the Professional Fees are expenditures incurred by the County for which no source of payment by the Sewer System exists other than from System Revenues. The County-Trustee fight which is the subject of this ruling also evidences that the County, even if it could, is not voluntarily agreeing to use non-

---

[32] The reason that only the part of Professional Fees not encompassed within Operating Expenses is looked at for bankruptcy law's modification of their treatment under the Indenture is that these are the only System Revenues that are subject to the lien granted in Indenture § 2.1[I]. As a result, the subordination provision of 11 U.S.C. § 928(b) that is applicable to a lien on special revenues applies only to those of the System Revenues that flow to Net Revenues due to their exclusion from Operating Expenses.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document    Page 40 of 51

Sewer System revenues to pay the Sewer System's generated Professional Fees.[33]  Before addressing the import of these differences, more of what was determined in this Court's prior opinions in the Jefferson County chapter 9 case assists in the analysis of how the Professional Fees are treated in this opinion.

Some of what needs to be revisited is the perimeter of 11 U.S.C. § 928's application.  As part of the rulings in the Second Opinion, one determination was that all of the System Revenues are "special revenues" under the definition set forth in 11 U.S.C. § 902(2).  *In re Jefferson Cnty.*, 482 B.R. at 428.  Also, not all of the System Revenues are pledged special revenues for 11 U.S.C. § 922(d)'s avoidance of the automatic stays of 11 U.S.C. §§ 362(a) and 922(a).  The part of System Revenues that may be paid to the Parity Security Holders consistent with the Indenture's distributive scheme while avoiding the automatic stays are those on which a consensual lien was granted under the Indenture.  These are the Net Revenues which are also Pledged Revenues and "pledged special revenues" for 11 U.S.C. § 922(d)'s stay restrictions.  *In re Jefferson Cnty.*, 482 B.R. at 427-29.

Restatement of one point made in the Second Opinion is necessary to understand how this Court's ruling in this opinion varies from some of what was set forth in the Second Opinion.  It is a warning on the limit of what was being considered for purposes of 11 U.S.C. § 922(d)'s application to System Revenues:

> One cautionary note is required.  This referenced restriction of the automatic stays is when the lien status is viewed solely from the Indenture's treatment for what are Pledged Revenues.  Even though all of the System Revenues are special revenues, Pledged Revenues is the only portion of System Revenues that, *when considered only by how they are treated under the Indenture*, constitutes "pledged special revenues."

*In re Jefferson Cnty.*, 482 B.R. at 429 (emphasis added).

The point being made in the Second Opinion was that the determination of the portion of System Revenues that are "pledged special revenues" for § 922(d)'s avoidance of application of the automatic stays of 11 U.S.C. §§ 362(a) and 922(a) was done in the context of the Indenture's terms.  Under the Indenture, all that was pledged in its lien creating sense and all that was pledged "to payment of indebtedness secured by such revenues" under § 922(d)'s usage are the Pledged Revenues.  *Cf.* Indenture §§ 1.1, 2.1 *with* 11 U.S.C. § 922(d).  The impact of the Indenture's provisions is that the only "pledged special revenues" for 11 U.S.C. § 922(d)'s application are those against which a lien has been accorded by the contract.  Whether other

---

[33] Some of the parties have suggested that the County could and should use other, non-Sewer System revenues to pay the Professional Fees.  However, Alabama law precludes such a means for their payment in the context of special revenue financing.  *See, e.g.*, *Chism v. Jefferson Cnty.*, 954 So. 2d 1058, 1080 (Ala. 2006); *Taxpayers & Citizens of Shelby Cnty. v. Acker*, 641 So. 2d 259, 260-62 (Ala. 1994); *see also  In re Jefferson Cnty.*, 482 B.R. at 425.

"special revenues" in its § 902(2) meaning were also "pledged special revenues" in its § 922(d) usage was and is not at issue.[34]

This determination results in the consensual lien on Net Revenues created via Indenture § 2.1 being protected by 11 U.S.C. § 928(a) from an argument that 11 U.S.C. § 552(a) undoes it for the post-bankruptcy period. This is done by language to the effect that "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from a security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a); *see also In re Jefferson Cnty.*, 482 B.R. at 430-31.[35]

These Bankruptcy Code sections are why the Net Revenues are the only "pledged special revenues" for § 922(d) purposes and only those of the System Revenues for which § 928(a) preserves the Indenture accorded lien from a 11 U.S.C. § 552(a)-premised challenge to its existence. They are also why Net Revenues are the only portion of System Revenues that are potentially subjected to 11 U.S.C. § 928(b)'s subordination to "necessary operating expenses" of the Sewer System. Section 928(b) provides that with respect to the lien on special revenues of

---

[34] Part of the difficulty with 11 U.S.C. § 922(d)'s reference to application of "pledged special revenues" is whether "pledged" is used in the sense of a lien or in its non-lien meaning of dedicated to payment of obligations of a system or project. The § 922(d) qualifier that the automatic stays do not stay application of "payment of indebtedness secured by such revenues" makes this subsection apply only to those special revenues against which a lien of a particular type has been obtained. Understanding this allows one to know that the "pledged" wording in § 922(d) is immaterial *under the facts of this Jefferson County case* because the special revenues against which a lien has been granted under the Indenture have also been pledged under its usage as meaning subject to a lien and also in its non-lien, dedicated to payment sense. Whether it is possible to have a consensual lien on special revenues of a project or system that is not also pledged in the dedicated to payment sense of its meaning is not before this Court in this matter.

This application in this case is supported by 922(d)'s requirement that the application of pledged special revenues be "in a manner consistent with section 92[8] of this title. . ." Section 928(a) preserves from an 11 U.S.C. § 552(a) attack during the post-petition period pre-petition liens obtained against special revenues "acquired" post-petition where the lien has been obtained pre-bankruptcy from a grant in a security agreement. 11 U.S.C. § 928(a). Standing in isolation from §§ 922(d) and 928(b), § 928(a) does not restrict its lien protection from 11 U.S.C. § 552(a)'s potential application to only liens that are also pledged in the dedicated to payment sense. Literally, it is for all such pre-bankruptcy obtained liens against special revenues created under the terms of a security agreement. Furthermore, 928(b)'s subordination of such a lien on special revenues to "necessary operating expenses" is with respect to "any such lien on special revenues" which is a reference to the lien preserved by 11 U.S.C. § 928(a). 11 U.S.C. § 928(b). This means that the "pledged special revenues" for which 11 U.S.C. § 922(d)'s automatic stay avoidance is applicable includes pledged special revenues against which the appropriate type of consensual lien has been obtained.

Application of post-bankruptcy-acquired pledged special revenues to debt repayment that are subject to a consensual, pre-petition lien obtained under the terms of a security agreement is not stayed due to § 922(d). *In re Jefferson Cnty.*, 482 B.R. at 429. So and for what "pledged" means as it is used in 11 U.S.C. § 922(d), it is of no moment for resolution of *this case* even if it refers to a non-lien, dedication to payment sort of "pledged." Furthermore and without the requisite sort of lien for both 11 U.S.C. § 922(d) stay avoidance and 11 U.S.C. § 928(b) subordination purposes, the types of disputes between the Trustee and the County presented in this adversary proceeding would not arise.

[35] Title 11 U.S.C. § 928(a)'s lien preservation applies to appropriately liened special revenues "acquired by the debtor after commencement of the case . . . ." Thus, § 928(b) subordination of "any such lien on special revenues" to "necessary operating expenses" applies to only special revenues acquired by the debtor post-petition, not those "acquired" pre-petition. There is no contention that any special revenues acquired pre-petition are involved in the Professional Fees dispute. Understanding this limit on § 928(b)'s subordination is also part of why 11 U.S.C. § 922(d)'s limitation on the § 922(a) and § 362(a) stays applies to appropriately liened special revenues acquired post-petition by a municipal debtor.

42

the sort within § 928(a)'s orbit, "such lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system . . . ." 11 U.S.C. § 928(b). More simply put for purposes of this discussion, those monies constituting Net Revenues are the only ones for which § 928(b) may have application because no lien is created under Indenture § 2.1 against the portion of the System Revenues that are utilized to pay Operating Expenses. The lien is only imposed on what remains following payment of the Operating Expenses.

This is why this section of this opinion deals solely with that portion of the Professional Fees that this Court has earlier determined were subject to GASB 58, ¶ 13's guidance as being (1) "directly related" to the County's chapter 9 case, (2) properly allocated to the Sewer System, and (3) not part of Operating Expenses. These are the Professional Fees that are treated under the Indenture and accounting guidance as items that are pulled out of operating expenses as being either the effects of an unusual in nature and/or infrequently occurring event or transaction, i.e., extraordinary items or special items, or are otherwise properly allocated under the Indenture's utilization of accounting guidance to a category that is not for operation and administration of the Sewer System, that is, those that are not Operating Expenses.

### (B) Gross Plus Some Net Pledges

While addressing the Reserves in the Second Opinion, this Court disagreed with the Trustee's contention that 11 U.S.C. § 928(b)'s subordination of the lien on special revenues was applicable to only those against all special revenues of a system or project which is frequently referenced as a gross revenue pledge or gross pledge. *In re Jefferson Cnty.*, 482 B.R. at 440-43. The plain language of the statute does not reference either a gross revenue pledge or a net revenue pledge. Rather, § 928(b) speaks in terms of "any such lien" which references the § 928(a) post-bankruptcy validation of pre-bankruptcy liens on special revenues obtained via a security agreement. In § 928(a), there is no mention of anything that restricts its application to a gross revenue lien. In fact, the purpose underlying this subsection's post-petition preservation of the lien against special revenues is for all qualifying liens regardless of whether they are gross or net revenue pledges. *See* Municipal Bankruptcy Amendments of 1988, H.R. Rep. No. 100-1011, at 7-8 (1988). Otherwise, creative drafting of liens could undo Congress' underlying purposes for 11 U.S.C. § 928(b)'s payment of expenses standard.

Moreover and despite the citation to a portion of the *Report of the National Bankruptcy Conference on Proposed Municipal Bankruptcy Amendments* ("NBC Report") that was not, like virtually all of the rest of it, quoted verbatim in the reports of the two committees of Congress regarding the 1988 amendments, *see In re Jefferson Cnty.*, 482 B.R. at 437, even the unmentioned portion of the NBC Report does not unequivocally demonstrate that these portions of chapter 9 are limited for subordination purposes to gross revenue pledges. *Id.* at 435-36. Rather, the concern is with respect to pledges of revenues that do not allow for payment of all of what are "necessary operating expenses" under its 11 U.S.C. § 928(b) formulation before debt repayment. *In re Jefferson Cnty.*, 482 B.R. at 437.

When it comes to liens, the words of the statute are clearly not limited as being for only a lien on all special revenues of a system or project. *See* 11 U.S.C. § 928(a) & (b). This is

43

precisely the circumstance when courts should not read words into a statute.  *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461-62 (2002); *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001).[36]

## (C) Guideposts

Having rejected the Trustee's argued-for limitation of the subordination provision of 11 U.S.C. § 928(b) to only gross revenue pledges, this Court set forth the (1) purpose underlying the subordination and (2) criteria for determining whether items are within "necessary operating expenses." *Id.* at 437-39.  The legislative history provides as follows:

> . . . *payment* of operating expenses – those necessary to keep the project or system going – must be protected so that the project or system can be maintained in good condition to generate the reve[n]ue to repay bondholders (and, importantly, to provide residents of the municipality with the service the project or system is meant to deliver).

H.R. Rep. No. 100-1011, at 8 (emphasis added).  In addition to payment, what is encompassed are those expenses necessary to keep the system or project operating in good condition.  It is referenced as a minimum standard that does not come into play unless the contracted-for one fails to meet this § 928(b) requisite.  Also embodied in the minimum concept is that not all expenditures are automatically necessary such as those that may be appropriately delayed or put off beyond the interim period during which § 928(b)'s subordination comes into play. Additionally, the expenses are to be directly related to the system or project. *In re Jefferson Cnty.*, 482 B.R. at 437.

In outline form, these are factors to be considered to plumb what is within "necessary operating expenses" for § 928(b)'s purposes:  (1) expended to keep the system or project operating in good repair and generating the special revenues, not those for improvements and enhancements, (2) directly related to the project or system, (3) encompassing some, but not all operating expenses, which arises from the minimum standard expressed by Congress, and (4) being paid, which is different from those that may be incurred and paid in a later time period. H.R. Rep. No. 100-1011, at 8; Municipal Bankruptcy Amendments, S. Rep. No. 100-506, at 23 (1988); *In re Jefferson Cnty.*, 482 B.R. at 437-40.

When it comes to the minimum standard, a pre-bankruptcy agreement that allows payment of all of the sorts of expenses contemplated within § 928(b)'s "necessary operating expenses" ahead of debt would not subject the consensual lien to subordination.   Also in this non-subordination category would be those that permit payment of not just those expenses that are part of § 928(b)'s "necessary," but those that provide for payment of more than those that are "necessary" under its § 928(b) usage.  This is because agreements on application of special

---

[36] Although 11 U.S.C. § 928(b)'s wording is clear regarding the liens encompassed within its subordination reach – those preserved under § 928(a), this Court has previously determined that § 928(b)'s "necessary operating expenses" is unclear.  *In re Jefferson Cnty.*, 482 B.R. at 431.

revenues that meet or exceed the § 928(b) minimum subsume within the agreed application all of what are the "necessary operating expenses" under 11 U.S.C. § 928(b).

Conversely, those agreements that do not provide for payment of all of what § 928(b) includes would subject the type of lien encompassed within § 928(a) to subordination for payment of such excluded expenses. Clearly, a gross revenue lien is subject to subordination for payment of the requisite operating expenses called for by § 928(b) should they not otherwise be paid. On the other side of the spectrum where a net revenue lien provides for payment of all of what are § 928(b)'s "necessary operating expenses" or more, the lien contracted for as part of such a net revenue pledge is not subject to subordination. Along with gross revenue liens, it is those other net revenue liens that fall between these two points on the spectrum for which § 928(b) allows subordination.[37]

### (D) Capital and the Second Opinion

Before consideration of whether those of the Professional Fees that are not Operating Expenses may be "necessary operating expenses" under § 928(b), another supplementary discussion of what this Court determined in the Second Opinion is mandated. It regards capital items and this Court's determination that "in this County-Trustee fight, expenditures for items that are capitalized are not included within the scope of 'necessary operating expenses.'" 482 B.R. at 439. This portion of the Second Opinion is why the beginning discussion in the "Words, Phrases, And Meanings Be they Plain Or Not" section and, in particular, that set forth in footnote three are lead-ins to the analysis of the Indenture's and 11 U.S.C. § 928(b)'s treatment of the items comprising the Professional Fees.

Due in large part to this Court's wording and the structure of the argument presented in support of the exclusion of capital items from "necessary operating expenses" some have read it to apply to more than the set of facts before the Court. In footnote three terms, it has been read to apply to all fact variations involving capital items, be they non-expenditure estimates or those for which an expenditure has been made or is required during the period of § 928(b)'s applicability. In other words, it has been extrapolated to the global set of facts and application of law to them. *See supra* n.3.

This Court's capital item decision was with respect to a fact context dealing with the Reserves, not for current expenditures. More specifically, the ruling was made in the fact background of *estimates* of depreciation, amortization, future capital items, and professional fees for which no current expenditure was being made and none might be made in the interim period during which 11 U.S.C. § 928(b) allows subordination. It was a resolution that did not allow §

---

[37] Some have argued that 11 U.S.C. § 928(b)'s "necessary operating expenses" minimum should be read as expenses that are in addition to the ones for which payment is allowed ahead of debt under the terms of the contracted-for liens. This "in addition to" formulation is not at variance from that set forth by this Court because those expenses within "necessary operating expenses" for which payment is not provided under the terms of the agreement or other applicable law would subject the lien to subordination to the extent they are contractually excluded from payment ahead of debt. Conversely and under the "in addition to" suggested formulation, the only "in addition to" items would be those not contractually allowed to be paid ahead of debt, not those permitted to be paid before debt unless the "in addition to" formulation allows double payment. The difference is one of semantics, not one that alters the outcome when it comes to 11 U.S.C. § 928(b)'s subordination.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document    Page 45 of 51

928(b) subordination of an amount that could exceed $100 million for estimated expenditures for which evidence was lacking on the extent, if at all, that capital expenditures encompassed within the Reserves would occur in the pre-confirmation time frame. In fact, some of the evidence is that expenditures for the capital item portion of the Reserves would occur *after* confirmation, if it happens, of the County's plan of adjustment of its debts.

Furthermore and to the extent that this Court's wording may be read to indicate that the exclusion of capital items from "necessary operating expenses" is more than for the Reserves, both this Court's wording and any implication from such wording that the ruling goes beyond the Reserves are incorrect. This is a "problem inherent in all verbal analysis" alluded to in footnote three from which this judge's writings and analysis are not immune. To make the point clearer, the Second Opinion only excludes estimated capital items that were part of the Reserves from the definition of "necessary operating expenses" under 11 U.S.C. § 928(b). It does not say and should not be read as saying more than that.

In addition, this supplementation has been done to also avoid any inference from the Second Opinion that "operating expenses" as used in 11 U.S.C. § 928(b) has the same composition as operating expenses determined in accordance with accounting principles and guidance. Review of the definitions for "operate" and "expense" demonstrates that each is not so restricted. An "expense" is defined as "something expended to secure a benefit or bring about a result; a financial burden or outlay; an item of business outlay chargeable against revenue for a specific period." Merriam-Webster's Collegiate Dictionary, *available at* http://www.merriam-webster.com/dictionary/expense. There are no accounting-like qualifications of the type dealt with *supra* in resolving what are Operating Expenses. In similar fashion, "operate" is defined as "bring about, effect; to cause to function." Merriam-Webster's Collegiate Dictionary, *available at* http://www.merriam-webster.com/dictionary/operate.

Nor does the chapter 9 statutory context of these words indicate any restriction to only those expenditures that accountants would classify as operating expenses. Added to this is the legislative history which reveals that for actual expenditures, not reserves that are estimates of future expenditures, that which is contemplated is payment of those items required to maintain a system or project at the level called for by the statute to provide the service or product while also generating sufficient revenues to meet the system's or project's requirements including debt service. There is no mention of such expenditures being determined by reference to how accountants distinguish operating expenses from other types. *See* H.R. Rep. No. 100-1011, at 8; S. Rep. No. 100-506, at 23. Accordingly and for purposes of the Professional Fees excluded from Operating Expenses under the Indenture, the accounting principles and guidance reasons for exclusion of items that in accounting jargon are classified as or allocated to a capital expenditure are not *a fortiori* a basis for their exclusion from 11 U.S.C. § 928(b)'s configuration of "necessary operating expenses." More simply put, and when it comes to actual expenditures, not estimated ones such as the Reserves, that an expenditure is capitalized under applicable accounting guidance and principles does not mean that it is inexorably excluded from being a "necessary operating expense" for 11 U.S.C. § 928(b) subordination purposes.

At this time, actual expenditures from System Revenues for items that are capitalized under the Indenture are not at issue in this adversary proceeding. Thus, this Court need not and

46

does not resolve further the extent, if at all, such actual expenditures may permit subordination of debt repayment via 11 U.S.C. § 928(b). Before this Court for this opinion, the only actual expenditures that have been presented for potential subordination of the lien granted for the Parity Security Holders against System Revenues are some of those within the Professional Fees. The rest of this section deals with this portion of the Professional Fees and whether their payment is permitted via 11 U.S.C. § 928(b) to be ahead of what would otherwise occur, which is payments of principal and interest on the warrants. To make this determination, this Court analyzes the Professional Fees that are outside Operating Expenses using the factors set forth above.

### (E) The Necessary

The Joint Submission categories and explanations for them demonstrate that the subject matter of each is "directly related" to the Sewer System for § 928(b) purposes. This is not all that shows the requisite relatedness. The earlier analysis of GASB 58, ¶ 13's guidance for the Professional Fees and how it and other accounting guidance view the treatment of professional fees and costs arising during the course of a municipal debtor's chapter 9 case involved two filters for the exclusion of some of the Professional Fees from Operating Expenses.

One is GASB 58, ¶ 13's "directly related" requirement. The other is the allocation of such fees and costs between and among the various fund categories--governmental, proprietary including enterprise funds, and fiduciary--and within the enterprise fund classification into which the Sewer System falls. To be subject to the potential for subordination of debt payment to them, the part of the Professional Fees that are within this non-Operating Expenses grouping has meant that they are directly related to the County's bankruptcy which includes the Sewer System's activities as categorized in the Joint Submission. This is the result of GASB 58, ¶ 13's "directly related to the bankruptcy proceedings."

Although the GASB 58, ¶ 13 "directly related to bankruptcy" is not the same "directly related" as that for § 928(b), the GASB 58 formulation builds into it the requirement that the professional fees and costs be those incurred by the Sewer System when one pays attention to the separation of disclosure of the financial results of the major enterprise fund that is the Sewer System from the financial disclosures of the County as a whole and from other major fund activities of the County. As a result, this filter for the accounting treatment also demonstrates the requisite degree of directness called for under § 928(b)'s subordination.

Along with the GASB 58, ¶ 13 "directly related" filter is that from the called-for allocation of those professional fees and related costs that require apportionment between the Sewer System and the other of the County's proprietary, fiduciary, and governmental fund activities. Those directly related to the chapter 9 and the allotment filters coupled with the Joint Submission categorizations demonstrate in this case that the Professional Fees excluded from Operating Expenses are for § 928(b)'s purposes directly related to the project or system, here the Sewer System.

The Professional Fees have been incurred. There is no dispute that they have also been paid. Thus, they are unlike the Reserves when it comes to 11 U.S.C. § 928(b)'s imposition.

The exclusion of some expenses from "necessary operating expenses" contemplates that the expenditure be for those that are required to keep the Sewer System in good, not perfect, condition enabling it to supply service to its customers and to generate revenues to repay the warrant holders. As set forth in the Second Opinion, this generally does not include improvements or enhancements or items that may be delayed or deferred without impairing the provision of sewer services or generation of sufficient revenues to meet the Sewer System's requirements. *In re Jefferson Cnty.*, 482 B.R. at 437. This is founded on both the minimum built into § 928(b)'s "necessary" along with a reasonableness aspect. What is minimal (and not included within Operating Expenses' formulation in the Indenture) and reasonable should reside within the sound business judgment of the debtor, here the County, and the other parties to the Indenture. Unless, as this Court cautioned in the Second Opinion, it is clear that an unreasonable exercise of such judgment has occurred or it is a certainty that the § 928(b) standard has not been met. *In re Jefferson Cnty.*, 482 B.R. at 442.

Perhaps best demonstrating the extent to which the Indentures permit payment of those items that are encompassed within 11 U.S.C. § 928(b)'s "necessary operating expenses" standard is that, to date, the only subordination the County has sought has been for the Reserves and Professional Fees. The Reserves have been dealt with and found in the Second Opinion as being outside § 928(b)'s reach. The Professional Fees are another and different matter.

Under this Court's prior analysis two caveats to the business judgment rule of the parties were specified for what sorts of expenditures are necessary to maintain the system or project in the condition required to keep it operating to achieve the purposes for which 11 U.S.C. § 928(b) subordination is permitted. Only either an unreasonable exercise of business judgment or the certainty that § 928(b)'s standard for subordination is not met need be present. For the part of the Professional Fees excluded from Operating Expenses, this Court need initially consider whether these are the sort of expenditures encompassed by § 928(b)'s "necessary."

Forcefully demonstrating their "necessary" nature for § 928(b) is that a major reason for and focus of the County's chapter 9 has been and remains the restructuring of the Sewer System's Indentures' special revenue financing obligations. When this is joined with Alabama's law that calls for encapsulation of the costs and expenses within a special revenue financed system or project such as the Sewer System, and that other county revenues not be used for such purposes, *see, e.g.*, *Chism v. Jefferson Cnty.*, 954 So. 2d 1058, 1080 (Ala. 2006); *Taxpayers & Citizens of Shelby Cnty. v. Acker*, 641 So. 2d 259, 260-62 (Ala. 1994), the "necessary" aspect becomes more evident. This feature of Alabama law essentially focuses on making the Sewer System self-supporting as if it were a separate entity from the County. Added to this should be the realization that to exclude professional fees and costs of a chapter 9 from what § 928(b) designates as "necessary operating expenses" for a project or system that either is a separate entity or is required as the Sewer System is under Alabama's laws to be so treated results in expenditures needed to keep the Sewer System operating not being paid in accordance with Alabama law. To exclude those Professional Fees that are incurred to, hopefully, save a special revenue financed-system or project from economic collapse would relegate the system or project to fail not just financially but also operationally, which is precisely what Congress wanted to avoid by enactment of § 928(b). H.R. Rep. No. 100-1011, at 8; S. Rep. No. 100-506, at 22-23.

As another court has noted, "[i]n proceedings under Chapter 11, legal services are never a frill or an extra; they are fundamental to the efficient development of a reorganization plan. Indeed, legal services are no less vital to a reorganization than are charges for inventory and utility service." *In re City Mattress, Inc.*, 174 B.R. 23, 26 (Bankr. W.D.N.Y. 1994). Furthermore, "[l]egal services are the very lifeblood of a debtor in reorganization." *Id.* The same is the case for the Professional Fees in this chapter 9. Those of the Professional Fees excluded from the definition of Operating Expenses in the Indenture are "necessary" under § 928(b) and have been excluded from payment under the terms of the Indenture. Thus, it is a certainty that for those of the Professional Fees not part of the Operating Expenses, § 928(b)'s standard has not been met.

Having resolved the "necessary" issue, a return to the categories of the Joint Submission is needed. Those categories in the Joint Submission that are completely excluded from Operating Expenses are 1 for Emergency Stay Relief Litigation, 11 for Sewer Creditor Claim Analysis and Objection, and 12 for Eligibility Litigation. From the perspective of a chapter 9 case where approximately three-fourths of the debt of the County is for the Sewer System and the County has defaulted with respect to it, it is inescapable that professional fees and related costs allotted to the Sewer System that are incurred for qualifying and remaining in a chapter 9 case are necessary for § 928(b)'s purposes. Once more, this is especially true when one recognizes that a fundamental reason for the County's case is to readjust its Sewer System related indebtedness. Joined with this is the fact that the necessity for these professional fees and related costs has been driven in substantial part by actions by the Trustee and those joining with it to aggressively contest the County's chapter 9 filing, for a determination that the Sewer System was not within the reach of this bankruptcy court's jurisdiction, and for a ruling that this court should not exercise its jurisdiction over the Sewer System as a result of a prior Alabama court receivership. The Professional Fees incurred in connection with these aspects of the County's chapter 9 case along with those that encompass the claims allowance process have been and remain essential to the prosecution and defense of a bankruptcy case, an important purpose of which is restructuring its Sewer System related warrant indebtedness. Absent their payment, the likelihood of a successful restructuring in chapter 9 of the Sewer System's Indenture-based obligations is on the asymptotic portion of the curve of success that is imperceptibly shy of zero. Not ensuring their payment also defeats what Congress sought and manifested in 11 U.S.C. § 928(b).

The same is true for the non-Operating Expenses portions of items 2, the Net Revenue Litigation, 3, the Severed Sewer Adversary Proceeding, 4, the Other Creditor-Initiated Sewer-Related Litigation (Bankruptcy Court), 9, Settlement Negotiations and Communications with Sewer Creditors, Ratepayers, and Others, and 13, Plan Preparation and Prosecution. As set forth supra at Part IV(D)-(E), each of these categories require an allocation of the professional fees and related costs between what are within Operating Expenses and those that are within GASB 58, ¶ 13's directly related to the bankruptcy proceedings which are excluded from Operating Expenses. Among other things, the portion of each of these classifications excluded from Operating Expenses entail what revenues and monies of the Sewer System are available for its operations and payment of the Parity Security Holders. They are also intimately and necessarily involved in resolution of the Sewer System aspects of the County's chapter 9 case. Significant portions of each of these classifications are the direct result of activities by the Trustee and others joining with the Trustee's efforts to elude bankruptcy court jurisdiction over the Sewer System,

49

to exit the Sewer System from such jurisdiction, and to protect System Revenues from alteration of the distributive scheme of the Indenture.  Thus and when viewed from the County's Sewer System perspective, they, too, are necessary to the operations and functioning of the Sewer System under 11 U.S.C. § 928(b)'s "necessary operating expenses."

At this juncture in this Court's rulings, those of the Professional Fees that are within Joint Submission categories 5, Other Creditor-Initiated Sewer-Related Litigation (Non-Bankruptcy Court), 6, FGIC State Insurance Proceedings, 7, Third Party Litigation Regarding Validity of Sewer Debt, 8, Third Party Litigation Regarding Validity Of Sewer Rates, and 10, Rate-Setting, have been determined to be part of Operating Expenses.  They are, therefore, not part of the Professional Fees for which payments to the Parity Security Holders are subject to subordination under 11 U.S.C. § 928(b).[38]

## VI.  Some Plus More Equals All --The Summary

The outcome of this Professional Fees dispute is that some in the Joint Submission categories are included as Operating Expenses under the Indenture's terms.  The remaining portion, those that are not Indenture defined Operating Expenses, are within those categories of expenditures that are "necessary operating expenses" for purposes of 11 U.S.C. § 928(b)'s alteration of the contracted-for flow of monies and allowance of their payment ahead of application of the pledged special revenues, here the Net Revenues, to payment of the Parity Security Holders.  In other words, the lien on the post-petition acquired Net Revenues that is preserved during the period following the County's chapter 9 filing by 11 U.S.C. § 928(a) is subjected by 11 U.S.C. § 928(b) to payment of this part of the categories of the Professional Fees as "necessary operating expenses" of the Sewer System.  The summary is that for the Joint Submission categories as either Operating Expenses under the Indenture or as "necessary operating expenses" for § 928(b) subordination purposes, all of the Joint Submission categories of Professional Fees are permitted to be paid ahead of interest and principal to the Parity Security Holders.

This determination leaves only the reasonableness and non-§ 928(b) necessity portions of the Insufficiency Rationale asserted by the Trustee as the remaining potential basis for the Professional Fees to not be paid out of System Revenues for which evidence is lacking.  Absent the specific facts regarding such unreasonableness in dollar amount or the non-§ 928(b) necessary objection by the Trustee, these contentions by the Trustee are not capable of resolution at this time and as part of this adversary proceeding.  As a result, they are to be dismissed without prejudice and, hopefully, need not be addressed by this Court on another day in another proceeding.

---

[38] Should any portion of the Professional Fees in this grouping for reasons outside those dealt with in this opinion be excluded from Operating Expenses, the rationale on which the portions of the other two groupings excluded from Operating Expenses have been determined to be within "necessary operating expenses" under § 928(b) would apply to those so otherwise excluded from Operating Expenses.

Case 11-05736-CRJ9    Doc 1813    Filed 06/28/13    Entered 06/28/13 10:29:55    Desc
Main Document      Page 50 of 51

A separate order incorporating the findings of fact and conclusions of law is to be entered. The order will designate by Joint Submission category how each is to be treated under the Indenture and, for those excluded from Operating Expenses, their disposition under 11 U.S.C. § 928(b).[39]

Dated June 27, 2013

Thomas B. Bennett
Chief United States Bankruptcy Judge

---

[39] This Court is aware that it could have decided the Professional Fees disputes between the County and the Trustee via only 11 U.S.C. § 928. However, there are significant, existing and prospective unaddressed contract – Indenture – issues that needed to be resolved, which, in this Court's view, mitigated against not determining the Indenture's and its incorporated accounting treatments for not just the Professional Fees, but other sorts of expenses/expenditures that could be the subject of some of the same contract-based arguments used by the parties with respect to the Professional Fees. In particular, it is the Indenture's waterfall of funds and its rationale that should forestall at least some similar, future fights over Operating Expenses and Net Revenues.