**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **JEFFERSON COUNTY, ALABAMA,** | ) | **Case No. 11-05736-TBB** |
| **a political subdivision of the State of** | ) | |
| **Alabama,** | ) | **Chapter 9** |
| | ) | |
| Debtor. | ) | |

**CHAPTER 9 PLAN OF ADJUSTMENT FOR JEFFERSON COUNTY, ALABAMA**
<u>**(DATED July 29, 2013)**</u>

Pursuant to 11 U.S.C. § 941, Jefferson County, Alabama, files this plan of adjustment.

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

**Section 1.1.** **Definitions.**

As used in the Plan and the Plan's Exhibits, the following Defined Terms shall have the respective meanings specified below:

1. **"503(b)(9) Bar Date"** means June 4, 2012, which is the date established by the Bankruptcy Court as the deadline to file 503(b)(9) Claims.

2. **"503(b)(9) Claim"** means a Claim that is entitled to treatment as an administrative expense under Bankruptcy Code section 503(b)(9).

3. **"Accumulated Sewer Revenues"** means all revenues of the Sewer System that are deposited and retained by the Sewer Warrant Trustee in either the "Jefferson County Sewer System Revenue Account" or the "Jefferson County Sewer System Debt Service Fund" through the Effective Date, in each case without deducting any amounts that may be subject to deduction as "Operating Expenses" under the Sewer Warrant Indenture as a result of any ruling by the Bankruptcy Court regarding the pending dispute about actually incurred professional fees in Adversary Proceeding Number 12-00016-TBB.

4. **"Act 619"** means Act 619 of the Alabama Legislature, 1949 Ala. Acts 949, *et seq.* (Sept. 19, 1949).

5. **"Adjusted Sewer Warrant Principal Amount"** means the amount of principal considered to be outstanding on each of the Sewer Warrants as of January 31, 2013, based upon the records maintained by the Sewer Warrant Trustee, *less* all payments of principal of Sewer Warrants (including principal included within the Sewer Warrant Insurers Outlay Amount) to be made on the Effective Date from the Accumulated Sewer Revenues as set forth in Section 4.6(a) of the Plan. The aggregate Adjusted Sewer Warrant Principal Amount with respect to all Sewer Warrants as of the Effective Date is anticipated to be approximately $3.078 billion.

6. **"Administrative Claim"** means a Claim for administrative costs or expenses that is entitled to priority in payment under Bankruptcy Code sections 503(b), 507(a)(2), and 901.

7. **"Administrative Claims Bar Date"** means, unless otherwise ordered by the Bankruptcy Court, the date established by the Bankruptcy Court and set forth in the Confirmation Order as the last day to file proof of an Administrative Claim, which date shall be no more than ninety (90) calendar days after the Effective Date, after which date any Administrative Claim not timely Filed shall be forever barred, and the County shall have no obligation with respect thereto; *provided, however*, that no proof of an Administrative Claim shall be required to be filed if such Administrative Claim shall have been incurred (a) in accordance with an order of the Bankruptcy Court or (b) with the written consent of the County and in the ordinary course of the County's operations.

1

8. **"Alabama Constitution"** means the Constitution of Alabama of 1901, as amended from time to time thereafter.

9. **"Allowed"** or **"Allowed _____ Claim"** means:

(a) with respect to a Claim arising prior to the Petition Date (including a 503(b)(9) Claim):

    (i) either (A) a proof of Claim was timely Filed by the applicable Claims Bar Date, or (B) a proof of Claim is deemed timely Filed either as a result of such Claim being listed on the List of Creditors or by a Final Order; and

    (ii) either (A) the Claim is not a Contingent Claim, a Disputed Claim, an Unliquidated Claim, or a Disallowed Claim; or (B) the Claim is expressly allowed by a Final Order or under the Plan;

(b) with respect to a Claim arising on or after the Petition Date (excluding a 503(b)(9) Claim), a Claim that has been allowed pursuant to Section 2.2(a) of the Plan.

Unless otherwise specified in the Plan or by a Final Order of the Bankruptcy Court, an "Allowed Administrative Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest, penalties, or late charges on such Administrative Claim or Claim from and after the Petition Date. Moreover, any portion of a Claim that is satisfied, released, or waived during the Case is not an Allowed Claim. For the avoidance of doubt, any and all Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.

10. **"Ambac"** means Ambac Assurance Corporation.

11. **"Amended and Restated GO Warrant Indentures"** means the new trust indentures delivered in exchange for the GO Warrant Indenture pursuant to Bankruptcy Code section 1123(a)(5)(F), the form of which indentures will be included in the Plan Supplement and which will include the material terms specified in Section 1(c) of the GO Plan Support Agreement.

12. **"Amended List Bar Date"** means, with respect to a claimant affected by the County's amendment of the List of Creditors subsequent to the mailing and publication of the Bar Date Notice that reduces the undisputed, non-contingent, or liquidated amount or changes the nature or classification of such claimant's Claim, the later of (a) either (i) the General Bar Date or (ii) if such claimant is a governmental unit, the Governmental Unit Bar Date; and (b) thirty (30) calendar days after the date that such claimant is served with notice of the amendment to the List of Creditors altering the amount, nature, or classification of such claimant's Claim.

13. **"Approved Rate Structure"** means the structure of sewer rates and charges approved by the County Commission pursuant to Amendment 73 of the Alabama Constitution and Act 619 to be charged by the County to users of the Sewer System to support the repayment of the New Sewer Warrants so long as any portion of the New Sewer Warrants remain

outstanding, which structure is set forth as Exhibit C to the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

14.  **"Asserted Full Recourse Sewer Claims"** means any and all Claims based on or related to any Sewer Debt Claims that any Person asserts are general obligations of the County payable from the General Fund, including (a) the Sewer Warrant Trustee's Asserted Recourse Claim; (b) the unliquidated proofs of Claim for indemnity, fraud, fraud in the inducement, and the like Filed by FGIC; (c) the unliquidated proofs of Claim for indemnity Filed by Assured; (d) the unliquidated proofs of Claim for indemnity Filed by Syncora; and (e) the JPMorgan Asserted Recourse Indemnification Claims.

15.  **"Assured"** means Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc.

16.  **"Avoidance Actions"** means all causes of action, claims, remedies, or rights that may be brought by or on behalf of the County under any section contained within chapter 5 of the Bankruptcy Code, or under related state or federal statutes or common law, regardless whether such action has been commenced prior to the Effective Date.

17.  **"Avoidance Claim Bar Date"** means, with respect to any Person asserting Claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the first Business Day that is at least thirty (30) calendar days after entry of the order or judgment authorizing avoidance of the transfer.

18.  **"Ballot"** means the ballot forms distributed to each holder of an Impaired Claim that is entitled to vote to accept or reject the Plan, on which form the holder may cast its vote in respect of the Plan in accordance with the Plan and the Plan Procedures Order, and which must be actually received by the Ballot Tabulator on or before the Ballot Deadline in order to be counted.

19.  **"Ballot Deadline"** means the deadline established by the Bankruptcy Court in the Plan Procedures Order for the delivery of executed Ballots to the Ballot Tabulator.

20.  **"Ballot Record Date"** means the date established by the Bankruptcy Court in the Plan Procedures Order to determine which Creditors are entitled to vote on the Plan.

21.  **"Ballot Tabulator"** means the Claims Agent, or any other Person designated by the County to tabulate Ballots in accordance with the Plan Procedures Order.

22.  **"Bank Warrant Claims"** means any and all Series 2002-C-2 Through C-4 & C-6 Through C-7 Sewer Claims and Series 2003-B-2 Through B-7 Sewer Claims.  For the avoidance of doubt, (i) any Claims on account of Bank Warrants held by any of the Sewer Warrant Insurers are Sewer Warrant Insurers Claims, not Bank Warrant Claims; and (ii) Bank Warrant Claims do not include the Other Standby Sewer Warrant Claims.

23.  **"Bank Warrant Default Interest Claims"** means any Claims based on interest that is alleged to have accrued on any Bank Warrants on or before the Petition Date at a "default"

rate or as interest on interest, including under the Standby Sewer Warrant Purchase Agreements, and that remained unpaid on the Petition Date.

24. **"Bank Warrant Default Interest Settlement Payments"** means, collectively, (a) $1,164,307.11 to be paid to State Street as consideration for the settlement, release, and waiver under the Plan of asserted Bank Warrant Default Interest Claims of approximately $8.5 million; (b) $953,295.41 to be paid to Scotia Bank as consideration for the settlement, release, and waiver under the Plan of asserted Bank Warrant Default Interest Claims of approximately $7.2 million; and (c) $646,694.23 to be paid to BNY as consideration for the settlement, release, and waiver under the Plan of asserted Bank Warrant Default Interest Claims of approximately $4.3 million.

25. **"Bank Warrants"** means, collectively, the Series 2002-C-2 Through C-4 & C-6 Through C-7 Sewer Warrants and the Series 2003-B-2 Through B-7 Sewer Warrants.

26. **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as the same may be amended from time to time to the extent applicable to the Case.

27. **"Bankruptcy Court"** means the United States Bankruptcy Court for the Northern District of Alabama, Southern Division, or any other court that exercises competent jurisdiction over the Case.

28. **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure promulgated by the Supreme Court of the United States under 28 U.S.C. § 2075, as the same may be amended from time to time to the extent applicable to the Case.

29. **"Bar Date Notice"** means the *Notice of (A) Entry of Order for Relief and (B) Deadlines for Filing Proofs of Claim and Requests for Allowance of Section 503(b)(9) Administrative Expense Claims*, which sets forth certain dates, deadlines, and procedures relevant to filing proofs of Claims in the Case pursuant to the *Order (I) Setting Bar Dates and Procedures for Filing Proofs of Claim; (II) Setting the Bar Date and Procedures for Filing Requests for Allowance of Section 503(b)(9) Claims; and (III) Approving Form and Manner of Serving and Publishing the Notices of Bar Dates and the Entry of the Order for Relief*, as subsequently amended [Docket Nos. 889 & 933].

30. **"Bennett Action"** means that certain adversary proceeding styled as *Andrew Bennett, et al. v. Jefferson County, Alabama and The Bank of New York Mellon, as Indenture Trustee (In re Jefferson County, Alabama)*, Adv. Proc. No. 12-00120 (Bankr. N.D. Ala.).

31. **"Bessemer Indenture"** means that certain *Trust Indenture* dated as of August 1, 2006, between the PBA and the Bessemer Trustee.

32. **"Bessemer Insurer"** means Ambac.

33. **"Bessemer Lease"** means that certain *Lease Agreement* dated August 1, 2006, by and between the County and the PBA.

34.     **"Bessemer Lease Claims"** means, collectively, (a) any and all Claims arising from or in connection with the Bessemer Lease, including all Claims resulting from the rejection of the Bessemer Lease under Bankruptcy Code section 365; and (b) any and all Claims that could be asserted (directly or indirectly) by any Person under or in connection with the Bessemer Indenture and the Bessemer Policy, including by any reinsurer regarding the Bessemer Policy or by any holder of warrants issued under the Bessemer Indenture; *provided, however,* that for the avoidance of doubt, the "Bessemer Lease Claims" do not include any Claims arising under the New Bessemer Lease, under the Bessemer Stipulation, or under any Related Documents (as defined in the Bessemer Stipulation) on and after the Effective Date.

35.     **"Bessemer Policy"** means that certain *Financial Guaranty Insurance Policy* number 25645BE issued by Ambac on or around August 17, 2006, and insuring certain of the PBA's obligations under the Bessemer Indenture.

36.     **"Bessemer Stipulation"** means that certain *Stipulation and Agreement Regarding the Settlement and Resolution of Certain Disputes* dated as of November 27, 2012, by and among the County, the PBA, the Bessemer Trustee, and the Bessemer Insurer, which Bessemer Stipulation was approved by order of the Bankruptcy Court on December 20, 2012 [Docket No. 1537].

37.     **"Bessemer Trustee"** means First Commercial Bank, in its capacity as Indenture Trustee under the Bessemer Indenture.

38.     **"BLB"** means Bayerische Landesbank, New York Branch, formerly known as Bayerische Landesbank Girozentrale.

39.     **"BLB GO Claim"** means $52,937,479.17, which sum represents the amount of principal and prepetition non-default interest due and owing by the County on account of the Series 2001-B GO Warrants held by BLB.

40.     **"BNY"** means The Bank of New York Mellon in its capacity as a Sewer Liquidity Bank and not in any other capacity.

41.     **"Board of Education Lease Claims"** means any and all Claims arising from or in connection with the Board of Education Lease Warrants or the Board of Education Lease Indenture other than Board of Education Lease Policy Claims.

42.     **"Board of Education Lease Debts"** means, together, all Board of Education Lease Claims and all Board of Education Lease Policy Claims.

43.     **"Board of Education Lease Indenture"** means that certain *Mortgage and Trust Indenture* dated as of July 1, 2000, between the County and the Board of Education Lease Trustee.

44.     **"Board of Education Lease Insurer"** means Assured.

45.     **"Board of Education Lease Policy"** means that certain *Municipal Bond Insurance Policy* number 26420-N issued by Assured on or around July 25, 2000.

5

46. **"Board of Education Lease Policy Claims"** means any and all Claims arising from or in connection with the Board of Education Lease Policy, as well as any and all Claims of the Board of Education Lease Insurer or any Transferee of the Board of Education Lease Insurer arising from or in connection with the Board of Education Lease Indenture, including all Claims arising in connection with any Board of Education Lease Warrants held by the Board of Education Lease Insurer or by any Transferee of the Board of Education Lease Insurer as a result of the Board of Education Lease Insurer's satisfaction of any claims under the Board of Education Lease Policy, and including any related Reinsurance Claims.

47. **"Board of Education Lease Trustee"** means U.S. Bank National Association, in its capacity as Indenture Trustee under the Board of Education Lease Indenture and as successor to SouthTrust Bank.

48. **"Board of Education Lease Trustee Fee Claims"** means any and all Claims of the Board of Education Lease Trustee for compensation, disbursements, expenses, fees, or indemnification pursuant to the Board of Education Lease Indenture.

49. **"Board of Education Lease Warrants"** means those certain Limited Obligation School Warrants, Series 2000 issued in the original principal amount of $45,210,000 and insured by the Board of Education Lease Insurer.

50. **"Business Day"** means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

51. **"Case"** means the voluntary case commenced by the County under chapter 9 of the Bankruptcy Code and pending before the Bankruptcy Court.

52. **"Cash"** means cash and cash equivalents, including bank deposits, wire transfers, checks representing good funds, and legal tender of the United States of America or instrumentalities thereof.

53. **"Causes of Action"** means any and all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, rights of setoff, third-party claims, subordination claims (including equitable subordination claims and statutory subordination claims), subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims, damages, or judgments whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, foreseen or unforeseen, asserted or unasserted, existing or hereafter arising, in law, at equity, by statute, whether for tort, fraud, contract, or otherwise.

54. **"Claim"** means any "claim" as that word is defined by Bankruptcy Code section 101(5) against the County or against property of the County, whether or not asserted in the Case.

55. **"Claims Agent"** means Kurtzman Carson Consultants LLC, the County's court-appointed claims, noticing, and balloting agent pursuant to the *Order Appointing Kurtzman*

6

*Carson Consultants LLC as Claims, Noticing and Balloting Agent Pursuant to 28 U.S.C. § 156(c) and Rule 2002 of the Federal Rules of Bankruptcy Procedure* [Docket No. 291].

56. **"Claims Bar Date"** means, as applicable, the 503(b)(9) Bar Date, the Administrative Claim Bar Date, the Amended List Bar Date, the Avoidance Claim Bar Date, the General Bar Date, the Governmental Unit Bar Date, and the Rejection Bar Date.

57. **"Claims Objection Deadline"** means, unless extended by the Bankruptcy Court upon a motion Filed by the County, the date that is the later of (a) the first Business Day that is at least 180 calendar days after the Effective Date, and (b) the first Business Day that is at least 180 calendar days after the date on which a proof of Claim in respect of a Claim has been Filed. For the avoidance of doubt, the Claims Objection Deadline may be extended one or more times by the Bankruptcy Court.

58. **"Class"** means a group of Claims as designated in Section 2.3 of the Plan, or any subclass thereof.

59. **"Closing Agreement"** means an agreement between the County and the Internal Revenue Service which, in form and substance acceptable to the County and each of the Sewer Plan Support Parties other than LBSF, resolves the pending audit regarding certain of the Sewer Warrants and confirms the tax-free status of all the Sewer Warrants, with no taxes, costs, or other liabilities to the existing holders of the Sewer Warrants.

60. **"Commutation Election"** means the election or deemed election under the Plan of a holder of Sewer Warrants to unconditionally commute, waive, and forever release, discharge, and forgo (a) any and all Sewer Wrap Payment Rights; (b) any and all Bank Warrant Default Interest Claims (except with respect to the Bank Warrant Default Interest Settlement Payments); and (c) any and all other Claims or Causes of Action against the County, against any of the Sewer Released Parties, or against any of their respective Related Parties.

61. **"Confirmation Date"** means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court in the Case.

62. **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider confirmation of the Plan as required by Bankruptcy Code section 1128(a), as such hearing may be continued from time to time.

63. **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan under Bankruptcy Code section 943(b).

64. **"Consent Decree Claims"** means any and all Claims arising from or in connection with either of the Consent Decrees.

65. **"Consent Decrees"** means the EPA Consent Decree and the Hiring Practices Consent Decree.

66. **"Contingent Claim"** means a Claim that is listed on the List of Creditors as contingent.

67.     **"County"** means Jefferson County, Alabama, a political subdivision of the State of Alabama and the chapter 9 debtor in the Case.

68.     **"County Commission"** means the duly elected five member Jefferson County Commission, which serves as the governing body of the County pursuant to Alabama Code sections 11-1-5 and 11-3-11.

69.     **"Covered Tail Risk"** means Cash equal to each Sewer Warrant Insurer's Tail Risk to be paid or funded by the County on the Effective Date pursuant to the applicable Tail Risk Payment Agreement, the amount of which Cash shall not exceed $25 million in the aggregate.

70.     **"Creditor"** means a Person holding a Claim.

71.     **"Cure Payment"** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) that is necessary to cure any and all defaults under an executory contract or unexpired lease so that such contract or lease may be assumed, or assumed and assigned, pursuant to Bankruptcy Code section 1123(b)(2).

72.     **"Declaratory Judgment Action"** means that certain adversary proceeding commenced by the Sewer Warrant Trustee against the County, Syncora, and Assured on or about February 6, 2013, and styled as *The Bank of New York Mellon, as Indenture Trustee v. Jefferson County, Alabama, et al. (In re Jefferson County, Alabama)*, Adv. Proc. No. 13-00019 (Bankr. N.D. Ala.).

73.     **"Defined Term"** means any capitalized term that is defined in this Section 1.1 of the Plan.

74.     **"Depfa Plan Support Agreement"** means that certain *Plan Support Agreement* dated as of February 11, 2013, by and between the County and Depfa Bank PLC.

75.     **"Deposit Refund Claims"** means any and all Claims for the refund of any deposits paid to and held by the County, including deposits made with respect to applications for permits issued by the County and security deposits paid to the County with respect to the provision of services by the County.

76.     **"Disallowed Claim"** means a Claim that (a) is not listed on the List of Creditors, or is listed thereon as contingent, unliquidated, disputed, or in an amount equal to zero, and whose holder failed to timely File a proof of Claim by the applicable Claims Bar Date; or (b) has been disallowed pursuant to an order of the Bankruptcy Court.

77.     **"Disclosure Statement"** means that certain disclosure statement relating to the Plan, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to Bankruptcy Code section 1125, as it subsequently may be amended, modified, or supplemented by the County.

78.     **"Disputed Claim"** means a Claim:

8

(a) as to which a proof of Claim is Filed or is deemed Filed as a result of such Claim being listed on the List of Creditors; and

(b) as to which:

(i) an objection or request for estimation (A) has been timely Filed, and (B) has not been denied by a Final Order or withdrawn; or

(ii) is a Claim that is listed on the List of Creditors as disputed; or

(iii) is disputed in whole or in part under the Plan.

79. **"Distribution"** means any initial or subsequent issuance, payment, or transfer of consideration made under the Plan.

80. **"Distribution Record Date"** means (a) the first Business Day that is at least ten (10) calendar days after the Confirmation Date; or (b) such later date before the Effective Date as the County (i) reasonably determines, after consultation with the Sewer Plan Support Parties and the Sewer Warrant Trustee, is feasible in light of the anticipated date of the Effective Date and (ii) specifies in a notice Filed with the Bankruptcy Court.

81. **"DTC"** means The Depository Trust Company.

82. **"Effective Date"** means a Business Day selected by the County, after consultation with the Sewer Plan Support Parties, that is on or after the date on which the conditions set forth in Section 4.18(a) of the Plan have been satisfied or waived by the County and by any other necessary parties in accordance with Section 4.18(b) of the Plan.

83. **"Eligible Sewer Warrants"** means the Sewer Warrants held by the Supporting Sewer Warrantholders as of the date of execution of the Supporting Sewer Warrantholder Plan Support Agreement and set forth opposite each such Supporting Sewer Warrantholder's name on Schedule 1 thereto.

84. **"Eminent Domain Claims"** means any and all Claims for actual damages arising directly from the County's exercise of its power of eminent domain or condemnation.

85. **"Employee Compensation Claims"** means any and all Claims of Persons employed by the County or the State of Alabama as of the Petition Date that the County is required to compensate by agreement or applicable law, for all forms of compensation including unpaid wages, salaries, accrued vacation, compensation or "comp" time, pension contributions, health insurance premiums, and sick pay arising prior to the Petition Date and remaining outstanding on the Effective Date.

86. **"Employee Indemnification Claims"** means any and all Claims for legal representation or indemnification made by Persons currently or formerly employed by either the County or such boards, agencies, and commissions designated by the County Commission, with regard to civil claims for which such Persons may be legally obligated to pay where the incident or occurrence giving rise to such representation or claim was one arising out of and within the

9

line and scope of their employment, pursuant to the limitations and upon the conditions specified by the County Commission or applicable law.

87. **"EPA Consent Decree"** means that certain Consent Decree entered by the United States District Court for the Northern District of Alabama on December 9, 1996, in the litigation styled as *Kipp, et al. v. Jefferson County, Alabama*, Civil Action No. 93-G-2492-S (N.D. Ala.) and *United States v. Jefferson County, Alabama*, Civil Action No. 94-G-2947-S (N.D. Ala.).

88. **"Federal Court Receivership Action"** means *The Bank of New York Mellon, as Trustee v. Jefferson County, Alabama, et al.*, Case No. 2:08-cv-1703-RDP, pending in the United States District Court for the Northern District of Alabama, Southern Division.

89. **"FGIC"** means Financial Guaranty Insurance Company.

90. **"FGIC Assured-Insured Warrant Claims"** means any and all Claims arising from or in connection with the Series 2003-B-8 Sewer Warrants held by FGIC as an investment as of the date of the execution of the Sewer Plan Support Agreement among the County and the Sewer Warrant Insurers.

91. **"FGIC Rehabilitator"** means Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, solely in his capacity as the rehabilitator of FGIC in the matter styled as *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (N.Y. Sup. Ct.).

92. **"File"** or **"Filed"** means duly and properly filed with the Bankruptcy Court and reflected on the docket of the Bankruptcy Court in the Case, except with respect to proofs of claim that must be filed with the Claims Agent pursuant to the Bar Date Notice, in which case "File" or "Filed" means duly and properly filed with the Claims Agent and reflected on the official claims register maintained by the Claims Agent.

93. **"Final Order"** means an order or judgment of the Bankruptcy Court entered on the docket of the Bankruptcy Court in the Case:

(a) that has not been reversed, rescinded, stayed, modified, or amended;

(b) that is in full force and effect; and

(c) with respect to which (i) the time to appeal or to seek review, rehearing, remand, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; or (ii) any such appeal or petition has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a writ of certiorari was sought.

For the avoidance of doubt, no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Bankruptcy Code section 502(j), Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rules 9023 or 9024 may be filed with respect to such order.

10

94. **"Future Tax Proceeds"** means any future excess tax proceeds available for mandatory redemptions under the School Warrant Indenture.

95. **"General Bar Date"** means June 4, 2012, which is the date established by the Bankruptcy Court as the general deadline for Creditors to file proofs of Claims against the County.

96. **"General Fund"** means the County's general operating fund.

97. **"General Liability Claim"** means a Claim, arising in tort or otherwise, for damages arising from or relating to death, injury to a Person, damage to or loss of property, or any other injury that a Person may suffer to his, her, or its Person, reputation, character, feelings, or estate.

98. **"General Unsecured Claim"** means a Claim that is not an Administrative Claim, a Bessemer Lease Claim, a Board of Education Lease Debt Claim, a GO Debt Claim, an Other Unimpaired Claim, a Professional Fee Claim, a Secured Claim, a Special Revenues Claim, or a Subordinated Claim. General Unsecured Claims include the Asserted Full Recourse Sewer Claims, Rejection Damage Claims, and the Uninsured Portion of General Liability Claims.

99. **"General Unsecured Claims Pool"** means the sum of $5 million, which will be contributed from the General Fund to a segregated, interest-bearing account on the Effective Date, plus all interest paid by the depositary institution with respect to such sum through and including the GUC Payment Date.

100. **"GO Acknowledgment"** means the provisions set forth in Exhibit D to the Plan, which the County will include in the proposed form of Confirmation Order.

101. **"GO Banks"** means, together, BLB and JPMorgan Chase Bank, N.A.

102. **"GO Debt Claims"** means, collectively, all GO Policy Claims, all GO Swap Agreement Claims, and all GO Warrant Claims.

103. **"GO Events of Default"** means all defaults or breaches by the County of either of the GO Resolutions, including any failure of the County to pay amounts due and owing on any of the Series 2003-A GO Warrants or the Series 2004-A GO Warrants when due.

104. **"GO Insurance Policies"** means, together, (a) that certain *Financial Guaranty Insurance Policy* number 40587 issued by National on or around March 19, 2003; and (b) that certain *Financial Guaranty Insurance Policy* number 44671 issued by National on or around August 10, 2004.

105. **"GO Paying Agents"** means, together, (a) The Bank of New York Mellon Trust Company, N.A., in its capacity as paying agent with respect to the Series 2003-A GO Warrants; and (b) U.S. Bank National Association, in its capacity as successor paying agent with respect to the Series 2004-A GO Warrants.

106.    **"GO Plan Support Agreement"** means that certain *Plan Support Agreement* dated as of May 13, 2013, by and among the County, the GO Banks, and the GO Warrant Trustee.

107.    **"GO Plan Support Parties"** means, collectively, the GO Banks, the GO Warrant Trustee, and National.

108.    **"GO Policy Claims"** means any and all Claims arising from or in connection with the GO Insurance Policies, as well as any and all Claims of the GO Warrant Insurer or any Transferee of the GO Warrant Insurer arising from or in connection with the GO Resolutions, including all Claims arising in connection with any Series 2003-A GO Warrants or Series 2004-A GO Warrants held by the GO Warrant Insurer or by any Transferee of the GO Warrant Insurer as a result of the GO Warrant Insurer's satisfaction of any claim under any of the GO Insurance Policies, including the National Fees and Expenses Claims and the National Reimbursement Claims, and including any related Reinsurance Claims.

109.    **"GO Released Claims"** means any and all Claims, Causes of Action, and Avoidance Actions (including those arising under the Bankruptcy Code or nonbankruptcy law) based in whole or in part on any act, event, omission, transaction, or other occurrence taking place on or before the Effective Date, in connection with, relating to, or arising from: the County, the Case, the negotiation, formulation and preparation of the Plan and any related documents or the implementation of the transactions contemplated hereby or thereby, the GO Insurance Policies, the GO Resolutions, the GO Warrants, the GO Warrant Indenture, the Standby GO Warrant Purchase Agreement, or the GO Swap Agreement, but excluding (a) all obligations imposed by the Plan, the Amended and Restated GO Warrant Indentures, and the Replacement 2001-B GO Warrants; and (b) any Claim held by a GO Released Party or any of its Related Parties in a fiduciary, agency, or other representative capacity for third-party customers, clients, or accountholders, but only to the extent any such customers, clients, or accountholders are not also GO Released Parties.

110.    **"GO Released Parties"** means each of the County, the GO Banks, the GO Warrant Trustee, and National.

111.    **"GO Resolution 2003-A"** means that certain *Resolution and Order*, including any documents annexed thereto, adopted by the County Commission at a meeting held on March 6, 2003, and authorizing the issuance of the Series 2003-A GO Warrants.

112.    **"GO Resolution 2004-A"** means that certain *Resolution and Order Authorizing the Issuance of General Obligation Warrants, Series 2004-A*, including any documents annexed thereto, adopted by the County Commission at a meeting held on July 27, 2004, and authorizing the issuance of the Series 2004-A GO Warrants.

113.    **"GO Resolutions"** means, together, the GO Resolution 2003-A and the GO Resolution 2004-A.

114.    **"GO Swap Agreement"** means that certain *ISDA Master Agreement* dated as of March 23, 2001, between the County and JPMorgan Chase Bank, N.A., as amended, supplemented, or otherwise modified, including by the *Schedule* thereto dated as of March 23,

12

2001, and collectively with the *Confirmation* dated April 26, 2001 and any other schedules, annexes, or confirmations related thereto

115. **"GO Swap Agreement Claims"** means any and all Claims arising under the GO Swap Agreement, including with respect to all "Transactions" (as defined in the GO Swap Agreement) thereunder.

116. **"GO Warrant Claims"** means any and all Series 2001-B GO Claims, Series 2003-A GO Claims, and Series 2004-A GO Claims.

117. **"GO Warrant Indenture"** means that certain *Trust Indenture* dated as of July 1, 2001, between the County and the GO Warrant Trustee.

118. **"GO Warrant Insurer"** means National.

119. **"GO Warrant Trustee"** means Wells Fargo Bank, National Association, in its capacity as Indenture Trustee under the GO Warrant Indenture and as successor to The Bank of New York.

120. **"GO Warrant Trustee Fee Claims"** means any and all Claims of the GO Warrant Trustee for compensation, disbursements, expenses, fees, or indemnification pursuant to the GO Warrant Indenture.

121. **"GO Warrants"** means, collectively, the Series 2001-B GO Warrants, the Series 2003-A GO Warrants, and the Series 2004-A GO Warrants.

122. **"Governmental Unit Bar Date"** means August 31, 2012, which is the date established by the Bankruptcy Court as the deadline for governmental units to file proofs of Claims.

123. **"GUC Payment Date"** means the later of (a) the third (3rd) annual anniversary of the Effective Date, and (b) the date on which all objections that the County Files regarding any General Unsecured Claims on or before the Claims Objection Deadline have been settled or resolved by Final Orders.

124. **"Hiring Practices Consent Decree"** means that certain Consent Decree entered by the United States District Court for the Northern District of Alabama on December 29, 1982, in the litigation styled as *United States of America v. Jefferson County, et al.*, Civil Action No. 2:75-cv-00666-CLS (N.D. Ala.).

125. **"Impaired"** means "impaired" within the definition of Bankruptcy Code section 1124.

126. **"Indenture Trustees"** means, collectively, the Board of Education Lease Trustee, the GO Warrant Trustee, the School Warrant Trustee, and the Sewer Warrant Trustee.

13

127. **"Insured Portion"** means that portion of an Allowed General Liability Claim that is covered by insurance by one or more policies providing coverage to or on behalf of the County or any of its employees, including any excess coverage policies.

128. **"JPMorgan Asserted Recourse Indemnification Claims"** means any and all Claims arising from or in connection with any of those certain *Warrant Purchase Agreements*, dated as of March 6, 2002, September 18, 2002, October 24, 2002, April 30, 2003, and August 5, 2003, in each case by and between the County and JPMS.

129. **"JPMorgan GO Claim"** means $52,185,812.50, which sum represents the amount of principal and prepetition non-default interest due and owing by the County on account of the Series 2001-B GO Warrants held by JPMorgan Chase Bank, N.A.

130. **"JPMorgan Parties"** means, collectively, JPMorgan Chase Bank, N.A., JPMS, and any of their respective affiliates holding Sewer Warrant Claims or Bank Warrant Claims, and for purposes of the definition of Sewer Released Parties, the term JPMorgan Parties shall also include Bear Stearns Capital Markets Inc.

131. **"JPMorgan Sewer Revenue Indemnification Claims"** means any and all Claims arising from or in connection with any of those certain *Remarketing and Interest Services Agreements*, dated as of February 1, 2002, May 1, 2003, and May 1, 2003, in each case by and between the County and JPMS.

132. **"JPMS"** means J.P. Morgan Securities LLC, formerly known as J.P. Morgan Securities Inc.

133. **"LBSF"** means Lehman Brothers Special Financing Inc.

134. **"LBSF Periodic Payment Claim"** means an asserted Claim of $1,002,754.42, which allegedly represents the net total periodic payments that had accrued and were due to LBSF at the time of the termination of the LBSF Swap Agreement, plus interest thereon through the Petition Date for a total asserted Claim of $1,656,230.21.

135. **"LBSF Swap Agreement"** means that certain *ISDA Master Agreement* dated as of October 23, 2002, between the County and LBSF, as subsequently amended via an amendment dated as of September 14, 2006, and together with all schedules, annexes, and confirmations related thereto.

136. **"Liquidity Agent Standby Sewer Warrant Claims"** means any and all Claims of JPMorgan Chase Bank, N.A. in its capacity as liquidity agent under the Standby Sewer Warrant Purchase Agreements, including any and all Claims for reimbursement or indemnification in such capacity.

137. **"List of Creditors"** means the list of Creditors Filed by the County in the Case pursuant to Bankruptcy Code section 924 and Bankruptcy Rule 1007(e), as it has been or subsequently may be modified or amended by the County [Docket Nos. 410 & 932].

138.    **"National"** means National Public Finance Guarantee Corporation, together with and as reinsurer of and administrator for MBIA Insurance Corporation.

139.    **"National Fees and Expenses Claims"** means any and all Claims on account of fees, expenses, or costs incurred by National prior to the Effective Date that arise from or are related to the Case, the Series 2003-A GO Warrants, the Series 2004-A GO Warrants, the GO Resolutions, or the GO Insurance Policies, including National's attorneys' and other professionals' fees and expenses.

140.    **"National Plan Support Agreement"** means that certain *Plan Support Agreement* dated as of June 27, 2013, by and between the County and National.

141.    **"National Reimbursement Claims"** means any and all Claims arising under the GO Insurance Policies or the GO Resolutions from or in connection with the County's failure to pay interest accruing on the Series 2003-A GO Warrants or on the Series 2004-A GO Warrants during the period from the Petition Date through the Effective Date.

142.    **"National Reimbursement Payments"** means the following amounts that are payable, subject to the County's prepayment rights under Section 2.3(r) of the Plan, on the following dates: (a) $2,854,321.62 payable on April 1, 2025; (b) $2,854,321.62 payable on April 1, 2026; and (c) $2,854,321.63 payable on April 1, 2027.

143.    **"New Bank Rate"** means the Prime Rate (as defined in the Standby School Warrant Purchase Agreement) plus 2.25%.

144.    **"New Bessemer Lease"** means that certain *Lease Agreement* dated as of January 1, 2013, which the County and the PBA entered into pursuant to the Bessemer Stipulation.

145.    **"New Sewer Warrant Indenture"** means the indenture under which the County will issue the New Sewer Warrants, the form of which indenture will be included in the Plan Supplement.

146.    **"New Sewer Warrants"** means the new sewer warrants issued by the County under the Plan, secured by the collateral specified in the New Sewer Warrant Indenture, and governed by the New Sewer Warrant Indenture, the form of which sewer warrants will be included in the Plan Supplement.

147.    **"Non-Commutation True-Up Amount"** means an aggregate amount equal to, with respect to each Sewer Warrant held by a Person that elects not to make or is deemed not to make the Commutation Election, the difference between (a) 80% of the Adjusted Sewer Warrant Principal Amount of such Sewer Warrant, and (b) 65% of the Adjusted Sewer Warrant Principal Amount of such Sewer Warrant.

148.    **"OPEB Plan"** means the single-employer, post-retirement welfare benefit plan sponsored by the County in accordance with the resolution of the County Commission first approved on September 25, 1990, and approved from time to time thereafter.

149.    **"OPEB Plan Claims"** means any and all Claims of the OPEB Plan.

15

150.    **"Other Secured Claims"** means any Secured Claims that are not otherwise expressly classified under the Plan.

151.    **"Other Specified Sewer Claims"** means any and all JPMorgan Sewer Revenue Indemnification Claims and the LBSF Periodic Payment Claim.

152.    **"Other Standby Sewer Warrant Claims"** means any and all Claims arising from or in connection with the Standby Sewer Warrant Purchase Agreements other than any Claims on account of principal, interest, or the Facility Fee (as defined in the Standby Sewer Warrant Purchase Agreements).  For the avoidance of doubt, the Other Standby Sewer Warrant Claims include the Liquidity Agent Standby Sewer Warrant Claims and any and all other Claims for reimbursement or indemnification, including with respect to any fees or expenses (including professional fees), of any party (other than the County) to the Standby Sewer Warrant Purchase Agreements.

153.    **"Other Unimpaired Claims"** means any and all Consent Decree Claims, Deposit Refund Claims, Eminent Domain Claims, Employee Compensation Claims, Employee Indemnification Claims, OPEB Plan Claims, Pass-Through Obligation Claims, Retirement System Claims, Tax Abatement Agreement Claims, and Workers Compensation Claims.

154.    **"Outstanding Amount"** means, with respect to any series or subseries of non-commuted Sewer Warrants, (a) if the applicable Sewer Warrant Insurer elects (irrespective of the terms of the applicable Sewer Wrap Policy) to make payments under Section 4.15(h) of the Plan on the Effective Date, the outstanding principal (after giving effect to all Distributions contemplated by the Plan) owing on such series or subseries of Sewer Warrants as of the Effective Date; or (b) if the applicable Sewer Warrant Insurer elects (irrespective of the terms of the applicable Sewer Wrap Policy) to make payments under Section 4.15(h) of the Plan on a date after the Effective Date, the sum of (i) the outstanding principal (after giving effect to all Distributions contemplated by the Plan and any principal payments theretofore made by the applicable Sewer Warrant Insurer on or after the Effective Date) owing on such series or subseries of Sewer Warrants as of the date on which the applicable Sewer Warrant Insurer elects to pay outstanding accelerated principal and interest, and (ii) all interest accrued and unpaid on such series or subseries of Sewer Warrants after the Effective Date through the date on which the applicable Sewer Warrant Insurer makes such election as to such series or subseries.

155.    **"Pass-Through Obligation Claims"** means any and all Claims of the Birmingham-Jefferson Civic Center Authority, the State of Alabama, cities, towns, school districts, school boards, and other municipalities for taxes and other funds due to them or to any applicable trustee on their behalf that the County, under applicable state law, has collected on their behalf and is obligated to remit to them or to any applicable trustee on their behalf.

156.    **"PBA"** means the Jefferson County Public Building Authority.

157.    **"Permanent Injunction"** has the meaning set forth in Section 6.2 of the Plan.

158.    **"Person"** means any person or organization created or recognized by law, including any association, company, cooperative, corporation, entity, estate, individual, joint

16

stock company, joint venture, limited liability company, partnership, trust, unincorporated organization, or government or any political subdivision thereof.

159. **"Petition Date"** means November 9, 2011.

160. **"Plan"** means this *Chapter 9 Plan of Adjustment for Jefferson County, Alabama (Dated June 30, 2013)*, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time by the County in accordance with the terms hereof and Bankruptcy Code section 942.

161. **"Plan Procedures Order"** means an order that is entered by the Bankruptcy Court and, among other things, establishes procedures and deadlines with respect to the solicitation and tabulation of votes to accept or reject the Plan.

162. **"Plan Supplement"** means a compilation of any document, form of document, schedule, or exhibit identified in the Plan or the Disclosure Statement for Filing with the Bankruptcy Court on or before the deadline specified in the Plan Procedures Order, including the Amended and Restated GO Warrant Indentures, the New Sewer Warrant Indenture, the Put Agreement, the Schedule of Assumed Agreements, the School Warrant Second Supplemental Indenture (if applicable), the Tail Risk Payment Agreements, the form of the New Sewer Warrants, and the form of the Replacement 2001-B GO Warrants.

163. **"Plan Support Agreements"** means, collectively, the Depfa Plan Support Agreement, the GO Plan Support Agreement, the National Plan Support Agreement, and the Sewer Plan Support Agreements, in each case collectively with all exhibits and schedules thereto.

164. **"Plan Support Parties"** means, collectively, Depfa Bank PLC, the GO Plan Support Parties, and the Sewer Plan Support Parties.

165. **"Preserved Claims"** means all Causes of Action of the County, including the Avoidance Actions and other Causes of Action identified on Exhibit A to the Plan, against the Persons identified thereon, but excluding all Causes of Action that are expressly waived, relinquished, released, compromised, or settled in the Plan, pursuant to the Confirmation Order, or pursuant to any other order of the Bankruptcy Court. The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Causes of Action as a Preserved Claim is not intended to and shall not limit the rights of the County to pursue any such Causes of Action. The County expressly reserves all Causes of Action, other than those Causes of Action that are expressly waived, relinquished, released, compromised, or settled in the Plan, pursuant to the Confirmation Order, or pursuant to any other order of the Bankruptcy Court, as Preserved Claims for later adjudication, and no preclusion doctrine (including the doctrines of *res judicata*, collateral estoppel, judicial estoppel, equitable estoppel, issue preclusion, claim preclusion, and laches) shall apply to such Causes of Action as Preserved Claims on or after the Effective Date.

166. **"Primary Standby Sewer Warrant Claims"** means any and all Claims arising from or in connection with the Standby Sewer Warrant Purchase Agreements on account of principal, interest, or the Facility Fee (as defined in the Standby Sewer Warrant Purchase Agreements).

17

167. **"Pro Rata"** means proportionately so that the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim to (b) the amount of that Allowed Claim, is the same as the ratio of (x) the amount of consideration available for Distribution on account of all Allowed Claims in the Class in which the particular Allowed Claim is included to (y) the amount of all Allowed Claims of that Class.

168. **"Professional Fee Claim"** means a Claim to be satisfied pursuant to Section 2.2(c) of the Plan with respect to amounts to be paid to a professional Person that has been duly retained by the County for services or expenses in the Case or incident to the Plan. For the avoidance of doubt, no Professional Fee Claim will be Allowed or paid by the County if the underlying professional's retention was by or on behalf of any Person other than the County or was otherwise not properly authorized by the County Commission.

169. **"Put Agreement"** means an agreement between the County and those Supporting Sewer Warrantholders undertaking a Put Obligation, the form of which agreement will be included in the Plan Supplement.

170. **"Put Consideration"** means an amount to be paid on the Effective Date under the Put Agreement to those Supporting Sewer Warrantholders undertaking a Put Obligation equal to 1.5% of the Adjusted Sewer Warrant Principal Amount of the Eligible Sewer Warrants held by each such Supporting Sewer Warrantholder.

171. **"Put Obligation"** means an undertaking by some or all of the Supporting Sewer Warrantholders to purchase a specified portion of the New Sewer Warrants on the terms and conditions set forth in the Put Agreement.

172. **"Rate Resolution"** means the resolution adopted by the County Commission to implement the Approved Rate Structure.

173. **"Receiver"** means John S. Young, Jr., LLC, the receiver appointed in the State Court Receivership Action, and any successor thereto or replacement thereof.

174. **"Receivership Actions"** means the Federal Court Receivership Action and the State Court Receivership Action.

175. **"Refinancing Proceeds"** means the net proceeds generated by the issuance of New Sewer Warrants after the payment of the Put Consideration.

176. **"Reinstated Sewer Warrant Interest Payments"** means all non-default rate interest (with respect to the Bank Warrants, including the Bank Warrants held by the Sewer Warrant Insurers, the Sewer Bank Rate) accrued and unpaid on account of any Sewer Warrants through and including the Effective Date, without providing for any interest on interest; *provided, however*, that any non-default rate interest paid by any of the Sewer Warrant Insurers during the period starting on February 1, 2013, and continuing through and including the Effective Date is not included within the "Reinstated Sewer Warrant Interest Payments," but instead is part of the "Sewer Warrant Insurers Outlay Amount."

18

177.    **"Reinstated Sewer Warrant Principal Payments"** means all principal amounts that have become due and payable and remain unpaid (by the County, any Sewer Warrant Insurer, or otherwise) on account of any of the Sewer Warrants during the period starting on February 1, 2013, and continuing through and including the Effective Date, without giving effect to any acceleration or any accelerated redemption schedule (including any accelerated redemption schedule applicable to any Bank Warrants). Any principal amounts that have become or will become due and owing on any of the Sewer Warrants during the period starting on February 1, 2013, and continuing through and including the Effective Date, and that have been paid or are paid by any of the Sewer Warrant Insurers are not included within the "Reinstated Sewer Warrant Principal Payments," but instead are part of the "Sewer Warrant Insurers Outlay Amount."

178.    **"Reinsurance Claim"** means, with respect to any particular bond or warrant insurance policy, any Claim that has been or could be asserted (directly or indirectly) by any Person that has acted or is acting as a "reinsurer" or in any similar capacity with respect to such insurance policy.

179.    **"Rejection Bar Date"** means, with respect to any Rejection Damage Claim, the latest of (a) the first Business Day that is at least thirty (30) calendar days after the later of either (i) the date on which a Rejection Order is entered by the Bankruptcy Court or (ii) the effective date of such Rejection Order; (b) either (i) the General Bar Date or (ii) if the claimant is a governmental unit, the Governmental Unit Bar Date; and (c) solely as to those Rejection Damage Claims arising from the rejection of an unexpired lease or an executory contract under the Plan, the first Business Day that is at least thirty (30) calendar days after the Effective Date.

180.    **"Rejection Damage Claim"** means a Claim arising under Bankruptcy Code section 365(g) from the rejection of an unexpired lease or an executory contract.

181.    **"Rejection Order"** means an order of the Bankruptcy Court entered prior to the Effective Date and authorizing the County's rejection of an unexpired lease or an executory contract.

182.    **"Related Parties"** means, collectively, (a) any affiliates of a Person, and (b) all of the respective accountants, affiliates, agents, assigns, attorneys, authorities, bankers, consultants, directors, employees, executors, financial advisors, heirs, investment bankers, managers, members, officers, officials, parent entities, partners, predecessors, principals, professional persons, representatives, shareholders, subsidiaries, and successors, whether past or present, of such Person and of such Person's affiliates; *provided, however*, that the County's Related Parties shall include the County Commission and its members, but shall not include any former County Commissioners or any former employees or officials of the County against which the County has any Preserved Claims.

183.    **"Remaining Accumulated Sewer Revenues"** means the amount of Accumulated Sewer Revenues, if any, remaining after providing for the payment of all Reinstated Sewer Warrant Principal Payments, all Reinstated Sewer Warrant Interest Payments, and all Sewer Warrant Insurers Outlay Amount as required by Section 4.6(a) of the Plan.

184.     **"Replacement 2001-B GO Warrants"** means replacement warrants to be issued in two series under the Plan, governed by the Amended and Restated GO Warrant Indentures, and named the "General Obligation Warrants, Series 2013-A" and the "General Obligation Warrants, Series 2013-B", the form of which warrants will be included in the Plan Supplement and which will include the material terms specified in Section 1(c) of the GO Plan Support Agreement.

185.     **"Retained Amount"** means the sum of $3,756,625.75 of Education Tax Revenues (as defined in the School Warrant Indenture) retained by the County during the pendency of the Case in the "Jefferson County Limited Obligation Warrant Revenue Account" established under the School Warrant Indenture.

186.     **"Retirement System"** means the General Retirement System for Employees of Jefferson County, Alabama, which was established by the Alabama Legislature pursuant to Act Number 497, Acts of Alabama 1965, page 717, and is the administrator of a single-employer, defined benefit pension plan covering substantially all employees of the County.

187.     **"Retirement System Claims"** means any and all Claims of the Retirement System.

188.     **"Schedule of Assumed Agreements"** means the schedule of executory contracts and unexpired leases that the County will assume on the Effective Date.  As part of the Plan Supplement, the County shall File its initial Schedule of Assumed Agreements and serve it on the parties to contracts and leases listed on that schedule.  Upon filing, such schedule shall become Exhibit B to the Plan (subject to any modifications made prior to the Effective Date).

189.     **"School Debt Claims"** means, collectively, all School Policy – General Claims, all School Surety Reimbursement Claims, all School Warrant Claims, all School Warrant Trustee Fee Claims, and all Subordinated School Claims.

190.     **"School Insurance Policies"** means, together, the School Policy – General and the School Surety.

191.     **"School Policy – General"** means that certain *Financial Guaranty Insurance Policy* number 23545BE issued by Ambac on or around February 2, 2005.

192.     **"School Policy – General Claims"** means any and all Claims arising from or in connection with the School Policy – General, as well as any and all Claims of the School Warrant Insurer or any Transferee of the School Warrant Insurer arising from or in connection with the School Warrant Indenture, including all Claims arising in connection with any Series 2005-A School Warrants or Series 2005-B School Warrants held by the School Warrant Insurer or by any Transferee of the School Warrant Insurer as a result of the School Warrant Insurer's satisfaction of any claims under the School Policy – General, and including any related Reinsurance Claims.

193.     **"School Surety"** means that certain *Surety Bond* number SB1982BE issued by Ambac on or around February 2, 2005.

Case 11-05736-CRJ9    Doc 1911    Filed 07/29/13    Entered 07/29/13 14:41:05    Desc
Main Document      Page 21 of 104

194.    **"School Surety Reimbursement Claims"** means any and all Claims arising from or in connection with (a) the School Surety or (b) that certain *Guaranty Agreement* dated as of February 2, 2005, by and between the County and Ambac, including all Claims arising in connection with any School Warrants held by the School Warrant Insurer or by any Transferee of the School Warrant Insurer as a result of the School Warrant Insurer's satisfaction of any claims under the School Surety, and including any related Reinsurance Claims.

195.    **"School Warrant Claims"** means any and all Series 2004-A School Claims, Series 2005-A School Claims, and Series 2005-B School Claims.

196.    **"School Warrant Event of Default"** shall have the meaning ascribed to the term "Event of Default" in, as applicable, the School Warrant Indenture or the Standby School Warrant Purchase Agreement, and **"School Warrant Events of Default"** shall mean more than one such "Event of Default."

197.    **"School Warrant Indenture"** means that certain *Trust Indenture* dated as of December 1, 2004, between the County and the School Warrant Trustee, as subsequently supplemented by that certain *First Supplemental Indenture* dated as of January 1, 2005.

198.    **"School Warrant Insurer"** means Ambac.

199.    **"School Warrant Second Supplemental Indenture"** means that certain supplement to the School Warrant Indenture to be executed as of the Effective Date of the Plan, which shall contain the amendments to the School Warrant Indenture effected by the Plan; *provided, however*, that such School Warrant Second Supplemental Indenture shall be executed only if the County and the School Warrant Trustee agree that such a supplemental indenture is necessary and appropriate and agree on the form and substance of such supplemental indenture prior to the deadline for filing the Plan Supplement.

200.    **"School Warrant Trustee"** means U.S. Bank National Association, in its capacity as successor Indenture Trustee under the School Warrant Indenture.

201.    **"School Warrant Trustee Fee Claims"** means any and all Claims of the School Warrant Trustee for compensation, disbursements, expenses, fees, or indemnification pursuant to the School Warrant Indenture.

202.    **"School Warrants"** means, collectively, the Series 2004-A School Warrants, the Series 2005-A School Warrants, and the Series 2005-B School Warrants.

203.    **"Scotia Bank"** means The Bank of Nova Scotia.

204.    **"Secured Claim"** means a Claim, including a Secured Tax Claim and Other Secured Claim, that is secured by a lien on property of the County, which lien is valid, perfected, and enforceable under applicable law and not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law.  A Claim is a Secured Claim only to the extent of the value of the claimholder's interest in the County's interest in the collateral or to the extent of the amount subject to setoff against a Claim held by the County, whichever is applicable, and as determined under Bankruptcy Code section 506(a); to the extent that the value of such interest is less than

21

the amount of the Claim which has the benefit of such security, in the case of a Claim that is not a Special Revenues Claim, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case, the Class of which Secured Claim is a part makes a valid and timely election in accordance with Bankruptcy Code section 1111(b) to have such Claim treated as a Secured Claim to the extent Allowed.

205. **"Secured Tax Claim"** means a governmental unit's Secured Claim for unpaid taxes.

206. **"Series 1997-A Sewer Claims"** means any and all Claims arising from or in connection with the Series 1997-A Sewer Warrants, other than any Series 1997-A Sewer Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction of any claim under any of the Sewer Insurance Policies.

207. **"Series 1997-A Sewer Warrants"** means those certain Sewer Revenue Refunding Warrants, Series 1997-A issued in the original principal amount of $211,040,000 and insured by FGIC.

208. **"Series 2001-A Sewer Claims"** means any and all Claims arising from or in connection with the Series 2001-A Sewer Warrants, other than any Series 2001-A Sewer Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction of any claim under any of the Sewer Insurance Policies.

209. **"Series 2001-A Sewer Warrants"** means those certain Sewer Revenue Capital Improvement Warrants, Series 2001-A issued in the original principal amount of $275,000,000 and insured by FGIC.

210. **"Series 2001-B GO Claims"** means any and all Claims arising from or in connection with the Series 2001-B GO Warrants or the GO Warrant Indenture, including all Standby GO Warrant Claims and all GO Warrant Trustee Fee Claims, but excluding the GO Swap Agreement Claims.

211. **"Series 2001-B GO Warrants"** means those certain General Obligation Warrants, Series 2001-B issued in the original principal amount of $120,000,000.

212. **"Series 2002-A Sewer Claims"** means any and all Claims arising from or in connection with the Series 2002-A Sewer Warrants together with any and all Claims arising from or in connection with that certain *Standby Warrant Purchase Agreement* dated as of February 1, 2002, among the County, the Sewer Warrant Trustee, and JPMorgan Chase Bank, N.A., other than any Series 2002-A Sewer Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction of any claim under any of the Sewer Insurance Policies.

213. **"Series 2002-A Sewer Warrants"** means those certain Sewer Revenue Capital Improvement Warrants, Series 2002-A issued in the original principal amount of $110,000,000 and insured by FGIC.

214.  **"Series 2002-C-1 & C-5 Sewer Claims"** means any and all Claims arising from or in connection with the Series 2002-C-1 Sewer Warrants or the Series 2002-C-5 Sewer Warrants, other than any Series 2002-C-1 Sewer Warrants or Series 2002-C-5 Sewer Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction of any claim under any of the Sewer Insurance Policies.

215.  **"Series 2002-C-1 Sewer Warrants"** means those certain Sewer Revenue Refunding Warrants, Series 2002-C designated as subseries C-1-A, C-1-B, C-1-C, and C-1-D, issued in the original principal amount of $298,800,000, and insured by Syncora.

216.  **"Series 2002-C-2 Through C-4 & C-6 Through C-7 Sewer Claims"** means any Claims arising from or in connection with the Series 2002-C-2 Through C-4 & C-6 Through C-7 Sewer Warrants, including any Primary Standby Sewer Warrant Claims asserted with respect to the Series 2002-C-2 Through C-4 & C-6 Through C-7 Sewer Warrants, other than any Series 2002-C-2 Through C-4 & C-6 Through C-7 Sewer Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction or commutation of any claim under or in connection with any of the Sewer Insurance Policies.

217.  **"Series 2002-C-2 Through C-4 & C-6 Through C-7 Sewer Warrants"** means those certain Sewer Revenue Refunding Warrants, Series 2002-C designated as subseries C-2, C-3, C-4, C-6, and C-7, issued in the original principal amount of $442,400,000, and previously insured by Syncora.

218.  **"Series 2002-C-5 Sewer Warrants"** means those certain Sewer Revenue Refunding Warrants, Series 2002-C designated as subseries C-5, issued in the original principal amount of $98,300,000, and insured by Syncora.

219.  **"Series 2003-A GO Claims"** means any and all Claims arising from or in connection with the Series 2003-A GO Warrants, other than any Series 2003-A GO Warrants held or acquired by the GO Warrant Insurer or by any Transferee of the GO Warrant Insurer as a result of the GO Warrant Insurer's satisfaction of any claim under any of the GO Insurance Policies.

220.  **"Series 2003-A GO Warrants"** means those certain General Obligation Capital Improvement and Refunding Warrants, Series 2003-A issued in the original principal amount of $94,000,000 and insured by National.

221.  **"Series 2003-A Sewer Claims"** means any and all Claims arising from or in connection with the Series 2003-A Sewer Warrant.

222.  **"Series 2003-A Sewer Warrant"** means that certain Sewer Revenue Refunding Warrant, Series 2003-A issued in the original principal amount of $41,820,000 and presently held by Alabama Water Pollution Control Authority.

223.  **"Series 2003-B-1 Sewer Claims"** means any and all Claims arising from or in connection with the Series 2003-B-1 Sewer Warrants, other than any Series 2003-B-1 Sewer

Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction of any claim under any of the Sewer Insurance Policies.

224.    **"Series 2003-B-1 Sewer Warrants"** means those certain Sewer Revenue Refunding Warrants, Series 2003-B designated as subseries B-1-A, B-1-B, B-1-C, B-1-D, and B-1-E, issued in the original principal amount of $735,800,000, and insured by FGIC.

225.    **"Series 2003-B-2 Through B-7 Sewer Claims"** means any and all Claims arising from or in connection with the Series 2003-B-2 Through B-7 Sewer Warrants, including any Primary Standby Sewer Warrant Claims asserted with respect to the Series 2003-B-2 Through B-7 Sewer Warrants, other than any Series 2003-B-2 Through B-7 Sewer Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction or commutation of any claim under or in connection with any of the Sewer Insurance Policies.

226.    **"Series 2003-B-2 Through B-7 Sewer Warrants"** means those certain Sewer Revenue Refunding Warrants, Series 2003-B designated as subseries B-2, B-3, B-4, B-5, B-6, and B-7, issued in the original principal amount of $300,000,000, and previously insured by Syncora.

227.    **"Series 2003-B-8 Sewer Claims"** means any and all Claims arising from or in connection with the Series 2003-B-8 Sewer Warrants, other than any Series 2003-B-8 Sewer Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction of any claim under any of the Sewer Insurance Policies.  For the avoidance of doubt, the Series 2003-B-8 Sewer Claims include the FGIC Assured-Insured Warrant Claims.

228.    **"Series 2003-B-8 Sewer Warrants"** means those certain Sewer Revenue Refunding Warrants, Series 2003-B designated as subseries B-8, issued in the original principal amount of $119,965,000, and insured by Assured.

229.    **"Series 2003-C-1 Through C-8 Sewer Claims"** means any and all Claims arising from or in connection with the Series 2003-C-1 Through C-8 Sewer Warrants, other than any Series 2003-C-1 Through C-8 Sewer Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction of any claim under any of the Sewer Insurance Policies.

230.    **"Series 2003-C-1 Through C-8 Sewer Warrants"** means those certain Sewer Revenue Refunding Warrants, Series 2003-C designated as subseries C-1, C-2, C-3, C-4, C-5, C-6, C-7, and C-8, issued in the original principal amount of $820,000,000, and insured by FGIC.

231.    **"Series 2003-C-9 Through C-10 Sewer Claims"** means any and all Claims arising from or in connection with the Series 2003-C-9 Through C-10 Sewer Warrants, other than any Series 2003-C-9 Through C-10 Sewer Warrants held or acquired by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction of any claim under any of the Sewer Insurance Policies.

232. **"Series 2003-C-9 Through C-10 Sewer Warrants"** means those certain Sewer Revenue Refunding Warrants, Series 2003-C designated as subseries C-9 and C-10, issued in the original principal amount of $232,025,000, and insured by Assured.

233. **"Series 2004-A GO Claims"** means any and all Claims arising from or in connection with the Series 2004-A GO Warrants, other than any Series 2004-A GO Warrants held or acquired by the GO Warrant Insurer or by any Transferee of the GO Warrant Insurer as a result of the GO Warrant Insurer's satisfaction of any claim under any of the GO Insurance Policies.

234. **"Series 2004-A GO Warrants"** means those certain General Obligation Warrants, Series 2004-A issued in the original principal amount of $51,020,000 and insured by National.

235. **"Series 2004-A School Claims"** means any and all Claims arising from or in connection with the Series 2004-A School Warrants, other than any Series 2004-A School Warrants held or acquired by the School Warrant Insurer or by any Transferee of the School Warrant Insurer as a result of the School Warrant Insurer's satisfaction of any claim under any of the School Insurance Policies.

236. **"Series 2004-A School Warrants"** means those certain Limited Obligation School Warrants, Series 2004-A issued in the original principal amount of $650,000,000.

237. **"Series 2005-A School Claims"** means any and all Claims arising from or in connection with the Series 2005-A School Warrants, other than any Series 2005-A School Warrants held or acquired by the School Warrant Insurer or by any Transferee of the School Warrant Insurer as a result of the School Warrant Insurer's satisfaction of any claim under any of the School Insurance Policies.

238. **"Series 2005-A School Warrants"** means those certain Limited Obligation School Warrants, Series 2005-A issued in the original principal amount of $200,000,000 and insured by Ambac.

239. **"Series 2005-B School Claims"** means any and all Claims arising from or in connection with the Series 2005-B School Warrants, including all Standby School Warrant Claims, other than any Series 2005-B School Warrants held or acquired by the School Warrant Insurer as a result of the School Warrant Insurer's satisfaction of any claim under any of the School Insurance Policies.

240. **"Series 2005-B School Warrants"** means those certain Limited Obligation School Warrants, Series 2005-B issued in the original principal amount of $200,000,000 and insured by Ambac.

241. **"Sewer Bank Rate"** means the "Bank Rate" as that term is defined in the applicable Standby Sewer Warrant Purchase Agreement.

242. **"Sewer Debt Claims"** means, collectively, all Bank Warrant Claims, all Other Specified Sewer Claims, all Other Standby Sewer Warrant Claims, all Primary Standby Sewer

Warrant Claims, all Sewer Swap Agreement Claims, all Sewer Warrant Claims, all Sewer Warrant Insurers Claims, all Sewer Warrant Trustee Fee Claims, and all Subordinated Sewer Claims.

243. **"Sewer DSRF Policies"** means, collectively, (a) that certain *Municipal Bond Debt Service Reserve Fund Policy* number 01010226 issued by FGIC on or around March 22, 2001; (b) that certain *Municipal Bond Debt Service Reserve Fund Policy* number 02010252 issued by FGIC on or around March 6, 2002; (c) that certain *Debt Service Reserve Insurance Policy* number CA01568A issued by Syncora on or around December 30, 2004; and (d) that certain *Municipal Bond Debt Service Reserve Insurance Policy* number 201371-R issued by Assured on or around April 1, 2005.

244. **"Sewer DSRF Reimbursement Agreements"** means, collectively, (a) that certain *Debt Service Reserve Fund Policy Agreement* dated as of March 22, 2001, by and between the County and FGIC; (b) that certain *Debt Service Reserve Fund Policy Agreement* dated as of March 6, 2002, by and between the County and FGIC; (c) that certain *Financial Guaranty Agreement* dated as of December 30, 2004, by and between the County and Syncora; and (d) that certain *Insurance Agreement* dated as of April 1, 2005, by and between the County and Assured.

245. **"Sewer DSRF Reimbursement Claims"** means any and all Claims arising from or in connection with the Sewer DSRF Reimbursement Agreements or the Sewer DSRF Policies, including all Claims arising in connection with any Sewer Warrants held by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction of any claim under or in connection with any of the Sewer DSRF Policies, and including any related Reinsurance Claims.

246. **"Sewer Insurance Policies"** means, collectively, the Sewer DSRF Policies and the Sewer Wrap Policies.

247. **"Sewer Liquidity Banks"** means, collectively, BNY, Scotia Bank, and State Street, each in its capacity as a liquidity bank with respect to Sewer Warrants, the Bank Warrant Claims, the Primary Standby Sewer Warrant Claims, the Other Standby Sewer Warrant Claims, and the Bank Warrant Default Interest Claims, and not in any other capacity.

248. **"Sewer Plan Support Agreements"** means, collectively, (i) those certain *Plan Support Agreements* among the County and each of the JPMorgan Parties, the Sewer Warrant Insurers, and the Supporting Sewer Warrantholders, dated as of June 6, 2013; (ii) that certain *Plan Support Agreement* among the County and the Sewer Liquidity Banks dated as of June 27, 2013; and (iii) that certain *Plan Support Agreement* between the County and LBSF dated as of July 24, 2013, in each case as the same may have been amended, modified, or supplemented in accordance with their respective terms.

249. **"Sewer Plan Support Parties"** means, collectively, the JPMorgan Parties, LBSF, the Sewer Liquidity Banks, the Sewer Warrant Insurers, and the Supporting Sewer Warrantholders.

26

250.    **"Sewer Released Claims"** means any and all Claims, Causes of Action, and Avoidance Actions (including those arising under the Bankruptcy Code or nonbankruptcy law) based in whole or in part on any act, event, omission, transaction, or other occurrence taking place on or before the Effective Date, in connection with, relating to, or arising from: the County, the Case, the negotiation, formulation and preparation of the Plan and any related documents or the implementation of the transactions contemplated hereby or thereby, the Sewer Warrants, the Sewer Warrant Indenture, the Sewer Insurance Policies, the Sewer DSRF Reimbursement Agreements, the Standby Sewer Warrant Purchase Agreements, the Sewer Swap Agreements, the Syncora Settlement Agreement, the Asserted Full Recourse Sewer Claims, the Bank Warrant Default Interest Claims, the LBSF Periodic Payment Claim, the Sewer System, or any swap, financing, or other transaction relating to the Sewer System, including any and all Claims or Causes of Action challenging the validity or enforceability of the Sewer Warrants or the issuance thereof, payments of principal and interest made in respect of the Sewer Warrants, acceleration of the Sewer Warrants, the manner in which Sewer Warrant Trustee has applied revenues of the Sewer System to payment of Sewer Debt Claims both before and during the Case, including any Causes of Action related to the reapplication to principal of any interest payments made on the Sewer Warrants during the Case, issues raised by the Declaratory Judgment Action, or any Sewer System rates or charges established or collected by the County in connection with the issuance or the payment of debt service in respect of the Sewer Warrants, or seeking the return to the County of any payment made by the County in connection with the Sewer Warrants or any swap, financing, or other transaction relating to the Sewer System.  The Sewer Released Claims do not include (a) any obligations under or reserved by the Plan (including the payment of Covered Tail Risk, the Sewer Warrant Insurers Outlay Amount, and the Non-Commutation True-Up Amount), the New Sewer Warrant Indenture, the New Sewer Warrants, the Put Agreement, the Tail Risk Payment Agreements, and the Sewer Warrant Insurers Agreements; (b) any rights of the Sewer Warrant Insurers vis-à-vis each other to the extent not released in or reserved in any of the Sewer Warrant Insurers Agreements; (c) any Sewer Wrap Payment Rights of FGIC against Assured on account of any unpaid FGIC Assured-Insured Warrant Claims; (d) any rights of the Supporting Sewer Warrantholders vis-à-vis each other to the extent contained in agreements among themselves; (e) any Claim held by a Sewer Released Party or any of its Related Parties in a fiduciary, agency, or other representative capacity for third-party customers, clients, or accountholders, but only to the extent any such customers, clients, or accountholders are not also Sewer Released Parties (for the avoidance of doubt, this clause (e) shall not exclude from the scope of the Sewer Released Claims any Claims arising from (i) any "Covered Sewer Warrants" as defined in the Supporting Sewer Warrantholder Plan Support Agreement, (ii) the Sewer Warrants set forth on Schedule 1 to the Sewer Plan Support Agreement among the County and the JPMorgan Parties, (iii) the Sewer Warrants referenced in Section 3(a) of the Sewer Plan Support Agreement among the County and the Sewer Warrant Insurers, (iv) the Bank Warrants referenced in Section 3(a) of the Sewer Plan Support Agreement among the County and the Sewer Liquidity Banks; or (v) the "LBSF Claims" referenced in Section 3 of the Sewer Plan Support Agreement between the County and LBSF); and (f) any Sewer Wrap Payment Rights of a holder of Sewer Warrants that did not make or was deemed not to make the Commutation Election against the applicable Sewer Warrant Insurer.

251.    **"Sewer Released Parties"** means each of the County, the FGIC Rehabilitator, the Receiver, the Sewer Plan Support Parties, and the Sewer Warrant Trustee.

27

252.     **"Sewer Swap Agreement Claims"** means any and all Claims arising from or in connection with the Sewer Swap Agreements, including with respect to all "Transactions" (as defined in the Sewer Swap Agreements) thereunder, but excluding the LBSF Periodic Payment Claim.

253.     **"Sewer Swap Agreements"** means, collectively, (a) the LBSF Swap Agreement; (b) that certain *ISDA Master Agreement* dated as of October 18, 2002, between the County and Bank of America, N.A., as subsequently amended via an amendment dated as of July 14, 2003, together with all schedules, annexes, and confirmations related thereto; and (c) that certain *ISDA Master Agreement* dated as of May 1, 2004, between the County and Bear Stearns Capital Markets Inc., together with all schedules, annexes, and confirmations related thereto.

254.     **"Sewer System"** means the entire sanitary sewer system owned by the County.

255.     **"Sewer Warrant Claims"** means any and all Series 1997-A Sewer Claims, Series 2001-A Sewer Claims, Series 2002-A Sewer Claims, Series 2002-C-1 & C-5 Sewer Claims, Series 2003-A Sewer Claims, Series 2003-B-1 Sewer Claims, Series 2003-B-8 Sewer Claims, Series 2003-C-1 Through C-8 Sewer Claims, and Series 2003-C-9 Through C-10 Sewer Claims.  For the avoidance of doubt, (i) the FGIC Assured-Insured Warrant Claims are Sewer Warrant Claims; (ii) any Claims on account of Sewer Warrants held by any of the Sewer Warrant Insurers (other than the FGIC Assured-Insured Warrant Claims) are Sewer Warrant Insurers Claims; and (iii) the Bank Warrant Claims, the Other Standby Sewer Warrant Claims, and the Primary Standby Sewer Warrant Claims are not Sewer Warrant Claims.

256.     **"Sewer Warrant Indenture"** means that certain *Trust Indenture* dated as of February 1, 1997, between the County and the Sewer Warrant Trustee, as subsequently supplemented by eleven supplemental indentures dated as of March 1, 1997, March 1, 1999, March 1, 2001, February 1, 2002, September 1, 2002, October 1, 2002, November 1, 2002, January 1, 2003, April 1, 2003, August 1, 2003, and May 1, 2004.

257.     **"Sewer Warrant Indenture Funds"** means any funds or accounts that are established by or have any connection to the Sewer Warrant Indenture regardless of the pendency of any dispute concerning whether the Sewer Warrant Trustee has property rights in, or a lien on, such fund or account (including in Adversary Proceeding No. 12-00067).

258.     **"Sewer Warrant Insurers"** means, collectively, Assured, FGIC, and Syncora.

259.     **"Sewer Warrant Insurers Agreements"** means those certain written agreements of the Sewer Warrant Insurers (to which the County is not a party), each dated as of June 6, 2013, and concerning, among other things, the agreed allocation of certain of the consideration payable under Section 2.3(c) of the Plan and certain commutations and settlements between and among the Sewer Warrant Insurers in respect of the Sewer Warrant Insurers Claims.

260.     **"Sewer Warrant Insurers Claims"** means any and all Claims held by the Sewer Warrant Insurers, whatever the origin or nature, including all Sewer Wrap Policy Claims, all Sewer DSRF Reimbursement Claims, and all other Claims held by any Sewer Warrant Insurer arising from or in connection with the Sewer Warrants, the Sewer Warrant Indenture, or the Standby Sewer Warrant Purchase Agreements, but excluding the FGIC Assured-Insured Warrant

Claims and the Asserted Full Recourse Sewer Claims. For the avoidance of doubt, Sewer Warrant Insurers Claims include any and all Claims that could be asserted in respect of (a) the Series 2002-A Sewer Warrants in the principal amount of $101,465,000 owned by FGIC, or (b) the Series 2002-C-2 Through C-4 & C-6 Through C-7 Sewer Warrants and Series 2003-B-2 Through B-7 Sewer Warrants in the aggregate principal amount of $214,191,875.11 owned by Syncora.

261. **"Sewer Warrant Insurers Outlay Amount"** means a sum equal to the amount of any and all payments made by any of the Sewer Warrant Insurers to or for the benefit of holders of Sewer Warrants under any of the Sewer Insurance Policies on or after February 1, 2013, and through the Effective Date, plus interest on the principal portion of such payments, calculated at the underlying Sewer Warrant rate (e.g., 5.25% on the Series 2003-B-8 Sewer Warrants and two (2) times the one month LIBOR rate on the Series 2003-C-9 Through C-10 Sewer Warrants). For the avoidance of doubt, no additional interest will be paid on the portion of such payments related to interest accrued on any Sewer Warrant.

262. **"Sewer Warrant Trustee"** means The Bank of New York Mellon, in its capacity as Indenture Trustee under the Sewer Warrant Indenture and as successor to AmSouth Bank of Alabama.

263. **"Sewer Warrant Trustee Fee Claims"** means any and all Claims of the Sewer Warrant Trustee for compensation, disbursements, expenses, fees (including fees of its counsel and experts), or indemnification pursuant to the Sewer Warrant Indenture.

264. **"Sewer Warrant Trustee Residual Fee Estimate"** means (a) the anticipated aggregate amount of reasonable expenses and fees (including reasonable fees of its counsel) that will be incurred by the Sewer Warrant Trustee in connection with the completion of the actions that the Sewer Warrant Trustee is required to take pursuant to Sections 4.6(a), 4.6(b), 4.6(c), 4.7(b), 4.8(c), 4.11 (only with respect to last sentence thereof), 4.15(e)(iv)(A), and 4.15(e)(v) of the Plan (and only such actions), which anticipated amount shall be provided in writing to the County's counsel on or before the seventh (7th) calendar day after the Confirmation Date; plus (b) an amount not to exceed $100,000 in respect of any indemnification rights, which amount shall be returned to the County if not used by the tenth (10th) annual anniversary of the Effective Date. The Sewer Warrant Trustee Residual Fee Estimate shall not include (i) any anticipated amounts in respect of the Sewer Wrap Payment Rights Administration Expenses; or (ii) except as set forth above, any amounts or reserves in respect of indemnification rights.

265. **"Sewer Warrant Trustee's Asserted Recourse Claim"** means the proof of Claim filed by the Sewer Warrant Trustee "in an amount not less than $85,562,828.31."

266. **"Sewer Warrants"** means, collectively, the Series 1997-A Sewer Warrants, the Series 2001-A Sewer Warrants, the Series 2002-A Sewer Warrants, the Series 2002-C-1 Sewer Warrants, the Series 2002-C-2 Through C-4 & C-6 Through C-7 Sewer Warrants, the Series 2002-C-5 Sewer Warrants, the Series 2003-A Sewer Warrant, the Series 2003-B-1 Sewer Warrants, the Series 2003-B-2 Through B-7 Sewer Warrants, the Series 2003-B-8 Sewer Warrants, the Series 2003-C-1 Through C-8 Sewer Warrants, and the Series 2003-C-9 Through C-10 Sewer Warrants. For the avoidance of doubt, all Bank Warrants are also Sewer Warrants.

29

267. **"Sewer Wrap Payment Rights"** means any rights of a holder of Sewer Warrants against the applicable Sewer Warrant Insurer insuring such holder's Sewer Warrants to receive any payments under, in connection with, or on account of such Sewer Warrant Insurer's Sewer Wrap Policies, but only with respect to any Sewer Warrants as to which such holder did not make or was deemed not to make the Commutation Election against the applicable Sewer Warrant Insurer.

268. **"Sewer Wrap Payment Rights Administration Expenses"** means the reasonable expenses and fees of the Sewer Warrant Trustee, if any, associated with the pursuit and administration of any Sewer Wrap Payment Rights after the Effective Date, including making demands on the applicable Sewer Warrant Insurer, calculating any amounts due under the applicable Sewer Wrap Policies, and receiving or distributing any funds payable on account of any Sewer Wrap Payment Rights. The Sewer Warrant Trustee shall provide an estimate in writing of the Sewer Wrap Payment Rights Administration Expenses to counsel for the County and each of the Sewer Warrant Insurers on or before the seventh (7th) calendar day after the Confirmation Date.

269. **"Sewer Wrap Policies"** means, collectively, (a) that certain *Municipal Bond New Issue Insurance Policy* number 97010082 issued by FGIC on or around February 27, 1997, as it may be amended by FGIC's plan of rehabilitation; (b) that certain *Municipal Bond New Issue Insurance Policy* number 01010225 issued by FGIC on or around March 22, 2001, as it may be amended by FGIC's plan of rehabilitation; (c) that certain *Municipal Bond New Issue Insurance Policy* number 02010251 issued by FGIC on or around March 6, 2002, as it may be amended by FGIC's plan of rehabilitation; (d) that certain *Municipal Bond Insurance Policy* number CA00370A issued by Syncora on or around October 25, 2002; (e) that certain *Municipal Bond New Issue Insurance Policy* number 03010448 issued by FGIC on or around May 1, 2003, as it may be amended by FGIC's plan of rehabilitation; (f) that certain *Municipal Bond Insurance Policy* number 200777-N issued by Assured on or around May 1, 2003; (g) that certain *Municipal Bond Insurance Policy* number CA00522A issued by Syncora on or around May 1, 2003; (h) that certain *Municipal Bond New Issue Insurance Policy* number 03010824 issued by FGIC on or around August 7, 2003, as it may be amended by FGIC's plan of rehabilitation; and (i) that certain *Municipal Bond Insurance Policy* number 201371-N issued by Assured on or around August 7, 2003.

270. **"Sewer Wrap Policy Claims"** means any and all Claims arising from or in connection with the Sewer Wrap Policies, as well as any and all Claims of any of the Sewer Warrant Insurers or any Transferee of any of the Sewer Warrant Insurers arising from or in connection with the Sewer Warrant Indenture, including all Claims arising in connection with any Sewer Warrants held by any of the Sewer Warrant Insurers or by any Transferee of any of the Sewer Warrant Insurers as a result of a Sewer Warrant Insurer's satisfaction or commutation of any claims under or in connection with any of the Sewer Wrap Policies, and including any related Reinsurance Claims. For the avoidance of doubt, the Sewer Wrap Policy Claims do not include the Sewer DSRF Reimbursement Claims.

271. **"Special Revenues Claim"** means a Claim payable solely from "special revenues" (as defined in Bankruptcy Code section 902(2)) under applicable nonbankruptcy law, including all School Debt Claims and all Sewer Debt Claims.

272. **"Standby GO Warrant Claims"** means any and all Claims arising from or in connection with the Standby GO Warrant Purchase Agreement.

273. **"Standby GO Warrant Purchase Agreement"** means that certain *Standby Warrant Purchase Agreement* dated as of July 1, 2001, among the County, the GO Warrant Trustee, and the GO Banks, as subsequently amended by that certain *First Amendment to Standby Warrant Purchase Agreement* dated as of September 1, 2004.

274. **"Standby School Warrant Claims"** means any and all Claims of Depfa Bank PLC arising from or in connection with the Standby School Warrant Purchase Agreement.

275. **"Standby School Warrant Purchase Agreement"** means that certain *Standby Warrant Purchase Agreement* dated as of January 1, 2005, among the County, the School Warrant Trustee, and Depfa Bank PLC.

276. **"Standby Sewer Warrant Purchase Agreements"** means, collectively, (a) that certain *Standby Warrant Purchase Agreement* dated as of February 1, 2002, among the County, the Sewer Warrant Trustee, and JPMorgan Chase Bank, N.A.; (b) those certain *Standby Warrant Purchase Agreements* dated as of October 1, 2002, among the County, the Sewer Warrant Trustee, JPMorgan Chase Bank, N.A. (as liquidity agent), and each of JPMorgan Chase Bank, N.A., Bank of America, N.A., Scotia Bank, Société Générale, New York Branch, and Regions Bank; and (c) those certain *Standby Warrant Purchase Agreements* dated as of May 1, 2003, among the County, the Sewer Warrant Trustee, JPMorgan Chase Bank, N.A. (as liquidity agent), and each of Société Générale, New York Branch, BNY, State Street, and Lloyds TSB Bank plc.

277. **"State Court Receivership Action"** means *The Bank of New York Mellon, as Indenture Trustee v. Jefferson County, Alabama, et al.*, Civil Action No. CV-2009-02318, pending in the Circuit Court of Jefferson County, Alabama.

278. **"State Street"** means State Street Bank and Trust Company.

279. **"Subordinated Claim"** means a Claim that is determined pursuant to contract, the Plan, or the Confirmation Order to be subordinated in accordance with Bankruptcy Code section 510(b) or 510(c), including all Subordinated General Claims, Subordinated School Claims, and Subordinated Sewer Claims.

280. **"Subordinated General Claims"** means any and all Claims that represent general obligations of the County and are determined pursuant to contract, the Plan, or the Confirmation Order to be subordinated in accordance with Bankruptcy Code section 510(b) or 510(c). For the avoidance of doubt, all Claims in Class 5-A, Class 5-B, Class 5-C, Class 5-D, or Class 5-E that are Allowed under the Plan are not Subordinated General Claims or subject to subordination.

281. **"Subordinated School Claims"** means any and all School Debt Claims that are determined pursuant to contract, the Plan, or the Confirmation Order to be subordinated in accordance with Bankruptcy Code section 510(b) and 510(c). For the avoidance of doubt, all Claims in Class 2-A, Class 2-B, Class 2-C, Class 2-D, or Class 2-E that are Allowed under the Plan are not Subordinated School Claims or subject to subordination.

31

282. **"Subordinated Sewer Claims"** means any and all Sewer Debt Claims that are determined pursuant to contract, the Plan, or the Confirmation Order to be subordinated in accordance with Bankruptcy Code section 510(b) or 510(c). For the avoidance of doubt, all Claims in Class 1-A, Class 1-B, Class 1-C, or Class 1-D that are Allowed under the Plan are not Subordinated Sewer Claims or subject to subordination.

283. **"Supporting Sewer Warrantholder Directed Distribution"** has the meaning set forth in Section 4.9(b) of the Plan.

284. **"Supporting Sewer Warrantholder Plan Support Agreement"** means that certain *Plan Support Agreement* dated as of June 6, 2013, by and among County, JPMorgan Chase Bank, N.A., and the Supporting Sewer Warrantholders from time to time party thereto.

285. **"Supporting Sewer Warrantholders"** means each of those Persons that owns, or manages or advises accounts or funds that own, Sewer Warrants and that is or becomes a signatory to the Supporting Sewer Warrantholder Plan Support Agreement.

286. **"Syncora"** means Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc.

287. **"Syncora Settlement Agreement"** means that certain *Settlement Agreement* by and among JPMorgan Chase Bank, N.A., Bank of America, N.A., Scotia Bank, Société Générale, New York Branch, Regions Bank, BNY, State Street, Lloyds TSB Bank, plc, as liquidity banks under the Standby Sewer Warrant Purchase Agreements, and Syncora, dated as of April 7, 2010, collectively with any exhibits thereto and any ancillary documents associated therewith.

288. **"Tail-Coverage Escrow Accounts"** means individual escrow accounts established with respect to each of the Sewer Warrant Insurers that will be funded by the County on the Effective Date in an amount equal to the respective Covered Tail Risk for each of the Sewer Warrant Insurers, plus any interest or investment returns accruing thereon.

289. **"Tail-Coverage Protocols"** means the protocols to be set forth in the Tail Risk Payment Agreements regarding the process for disbursement of funds from each Sewer Warrant Insurer's Tail-Coverage Escrow Account to such Sewer Warrant Insurer to reimburse such Sewer Warrant Insurer for payments made by the applicable Sewer Warrant Insurer on account of its Tail Risk, which protocol will also include provisions for the reallocation of funds between and among Tail-Coverage Escrow Accounts and the return of any remaining funds in each Tail-Coverage Escrow Account to the County, in each case, if the subject Sewer Warrant Insurer no longer requires the remaining funds in its Tail-Coverage Escrow Account, including the interest or any investment return thereon, to pay its respective Tail Risk (a) over the entire term that any Tail Risk claims can be presented for payment to such Sewer Warrant Insurer (including any additional or subsequent cash payments that may be made by a Sewer Warrant Insurer on account of previously submitted Tail Risk claims that received prior payments) or (b) in each Sewer Warrant Insurer's sole discretion, on an accelerated basis.

290.　**"Tail Risk"** means the claim exposure of each of the Sewer Warrant Insurers under the applicable Sewer Wrap Policies that remains after the Effective Date (after giving effect to the County's payment of the Non-Commutation True-Up Amount to the Sewer Warrant Insurers, but without taking into account any reduction in FGIC's payment obligations pursuant to any plan of rehabilitation for FGIC) based on (a) the aggregate Adjusted Sewer Warrant Principal Amount of the Sewer Warrants held by holders that elected not to make or were deemed not to make the Commutation Election, *less* the Distributions made to such holders pursuant to Option 2 of Section 2.3(a) of the Plan; and (b) the aggregate Adjusted Sewer Warrant Principal Amount of the Sewer Warrants held by holders of Series 2003-C-9 Through C-10 Sewer Warrants insured by Assured that are deemed to make the Commutation Election but nonetheless object to such deemed commutation and thereafter timely file a notice of appeal of the Confirmation Order overruling such objection, *less* the Distributions made to such holders pursuant to Option 1 of Section 2.3(a) of the Plan.

291.　**"Tail Risk Payment Agreements"** means individual agreements between the County and each of the Sewer Warrant Insurers setting forth the Tail Risk with respect to such Sewer Warrant Insurer, providing the mechanisms for the payment in full of an amount equal to such Sewer Warrant Insurer's Covered Tail Risk, and incorporating the Tail-Coverage Escrow Accounts and Tail-Coverage Protocols, the forms of which agreements will be included in the Plan Supplement.

292.　**"Tax Abatement Agreement Claims"** means any and all Claims arising from or in connection with the Tax Abatement Agreements.

293.　**"Tax Abatement Agreements"** means any agreement pursuant to which any sales tax, use tax, recording tax, non-educational *ad valorem* tax, or other tax has been or currently is being abated under the Tax Incentive Reform Act of 1992, codified at Alabama Code section 40-9B-1, *et seq.*

294.　**"Transferee"** means any Person that, after the Petition Date, obtained or obtains any beneficial interest in all or any part of a particular Claim, whether by way of assignment, bequest, foreclosure, hypothecation, lien, mortgage, pledge, sale, or other method of "transfer" as that word is defined in Bankruptcy Code section 101(54).

295.　**"True-Up Amount"** means a sum equal to the aggregate amount of any interest paid on account of any Series 2005-B School Claims during the period between August 31, 2013, and the Effective Date at a rate higher than the New Bank Rate, as agreed by and acceptable to Depfa Bank PLC and the County.

296.　**"True-Up Amount Certificate"** means a certificate delivered to the School Warrant Trustee pursuant to Section 2.3(i) of the Plan confirming the amount of the True-Up Amount and directing the School Warrant Trustee to implement the provisions of the Plan reducing the principal balance of the Series 2005-B School Warrants by an amount equal to the True-Up Amount rounded down to the nearest authorized denomination of the Series 2005-B School Warrants.

33

297. **"Unclaimed Distribution"** means any Distribution other than an Undeliverable Distribution with respect to which the County tenders a distribution check and that distribution check is not cashed within forty-five (45) calendar days after its issuance date.

298. **"Undeliverable Distribution"** means any Distribution with respect to which the County tenders a distribution check and that distribution check is returned as undeliverable.

299. **"Uninsured Portion"** means the portion of an Allowed General Liability Claim that is not the Insured Portion.

300. **"Unliquidated Claim"** means a Claim that is listed on the List of Creditors as unliquidated.

301. **"Unused Covered Tail Risk Amount"** means an amount equal to the positive difference, if any, between $25 million and the aggregate Covered Tail Risk that the County is required to pay or fund on the Effective Date pursuant to the Plan and the Tail Risk Payment Agreements; *provided, however*, that the Unused Covered Tail Risk Amount shall in no event exceed the lesser of (a) $750,000 and (b) the estimated amount of the Sewer Wrap Payment Rights Administration Expenses to be provided by the Sewer Warrant Trustee to counsel for the County and each of the Sewer Warrant Insurers on or before the seventh (7th) calendar day after the Confirmation Date.

302. **"Wilson Action"** means, together, that certain adversary proceeding styled as *Charles E. Wilson, et al. v. JPMorgan Chase & Co., et al. (In re Jefferson County, Alabama)*, Adv. Proc. No. 11-00433 (Bankr. N.D. Ala.), and the counts remaining in that certain action styled as *Wilson v. Bank of America, et al.* Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-2008-901907.00.

303. **"Workers Compensation Claims"** means any and all Claims pursuant to Alabama workers compensation law of Persons who suffered an eligible injury while employed by the County or by the State of Alabama and for which Claims the County is liable for payment by agreement or applicable law.

**Section 1.2.**    **Interpretation; Rules of Construction; Computation of Time.**

    **(a)**    **Defined Terms.**  Any term used in the Plan or the Plan's Exhibits that is not a Defined Term, but that is used in the Bankruptcy Code or Bankruptcy Rules has the meaning assigned to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable, unless the context requires otherwise.

    **(b)**    **Rules of Interpretation and Construction.**

1. The definition given to any term or provision in the Plan or the Plan's Exhibits supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement, on any Ballot, or in any Plan Support Agreement.

2. Whenever appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.

3.       All references in the Plan and the Plan's Exhibits to any one of the feminine, masculine, or neuter genders shall be deemed to include references to all other such genders.

4.       Whenever the Plan or the Plan's Exhibits use the word "including," such reference shall be deemed to mean "including, without limitation,".

5.       Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms.

6.       Any reference to an existing document or instrument means the document or instrument as it has been, or may be, amended or supplemented prior to the Effective Date not in violation of any agreements applicable to such amendment or supplement (including the Plan Support Agreements as they may be applicable to any amendment or supplement of the Plan).

7.       Any reference to a specific Person includes any successors or assigns of such Person, and all rights, benefits, interests, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, trustee, liquidator, rehabilitator, conservator, successor, or assign of such Person.

8.       Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a portion of the Plan.

9.       Unless otherwise specified, all references to "Articles," "Exhibits," "Schedules," or "Sections" are references to articles, exhibits, schedules, and sections of or to the Plan.

10.       The words "herein," "hereof," "hereto," "hereunder," "herewith," and other words of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan.

11.       Captions and headings to articles and sections are inserted for convenience of reference only, do not constitute a portion of the Plan, and are not intended to affect in any manner the interpretation of the Plan.

12.       Whenever the Plan or the Plan's Exhibits provides that a document or thing must be "acceptable" or "satisfactory" to any Person, such requirement shall in each case be subject to a reasonableness qualifier.

13.       All other rules of construction set forth in Bankruptcy Code section 102 apply to the Plan and the Plan's Exhibits to the extent not inconsistent with this Section 1.2.

(c)       **Time Periods.**  In computing any period of time prescribed or allowed by the Plan or the Plan's Exhibits, the provisions of Bankruptcy Rule 9006(a) shall apply.

# ARTICLE II
## DESIGNATION OF CLASSES AND TREATMENT OF CLAIMS

**Section 2.1.** **Summary and Classification of Claims.**

This Section classifies Claims – except for Administrative Claims, which are not classified – for all purposes, including confirmation, Distributions, and voting. A Claim is classified in a particular Class only to the extent that the Claim falls within the Class description. To the extent that part of a Claim falls within a different Class description, that part of the Claim is classified in that different Class. The following table summarizes the Classes of Claims under the Plan:

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| None | Administrative Claims | Unimpaired | Not Entitled to Vote |
| Class 1-A | Sewer Warrant Claims | Impaired | Entitled to Vote |
| Class 1-B | Bank Warrant Claims and Primary Standby Sewer Warrant Claims | Impaired | Entitled to Vote |
| Class 1-C | Sewer Warrant Insurers Claims | Impaired | Entitled to Vote |
| Class 1-D | Other Specified Sewer Claims | Impaired | Entitled to Vote |
| Class 1-E | Sewer Swap Agreement Claims | Impaired | Not Entitled to Vote (deemed to reject) |
| Class 1-F | Other Standby Sewer Warrant Claims | Impaired | Not Entitled to Vote (deemed to reject) |
| Class 2-A | Series 2004-A School Claims | Impaired | Entitled to Vote |
| Class 2-B | Series 2005-A School Claims | Impaired | Entitled to Vote |
| Class 2-C | Series 2005-B School Claims and Standby School Warrant Claims | Impaired | Entitled to Vote |
| Class 2-D | School Policy – General Claims | Impaired | Entitled to Vote |
| Class 2-E | School Surety Reimbursement Claims | Impaired | Entitled to Vote |
| Class 3-A | Board of Education Lease Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 3-B | Board of Education Lease Policy Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |

36

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Class 4 | Other Secured Claims, including Secured Tax Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 5-A | Series 2001-B GO Claims and Standby GO Warrant Claims | Impaired | Entitled to Vote |
| Class 5-B | Series 2003-A GO Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 5-C | Series 2004-A GO Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 5-D | GO Policy Claims | Impaired | Entitled to Vote |
| Class 5-E | GO Swap Agreement Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Bessemer Lease Claims | Impaired | Entitled to Vote |
| Class 8 | Other Unimpaired Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 9 | Subordinated Claims | Impaired | Not Entitled to Vote (deemed to reject) |

**NOTWITHSTANDING ANY OTHER TERM OR PROVISION OF THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

The treatment in the Plan is in full, final, and complete satisfaction of the legal, contractual, and equitable rights (including any liens, encumbrances, charges, and interests) that each Person holding a Claim may have or assert against the County or its property. This treatment supersedes and replaces any agreements or rights that any holder of a Claim may otherwise have or assert against the County or its property. Other than the Reinstated Sewer Warrant Interest Payments and the Bank Warrant Default Interest Settlement Payments, all Distributions in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter to the remaining portion of such Allowed Claim, if any; *provided, however*, that the County's treatment of any Distributions for its tax purposes will not be binding on any Creditor as to the treatment of such Distributions for any regulatory, tax, or other purposes.

**Section 2.2.** <u>Allowance and Treatment of Administrative Claims.</u>

      **(a)**     <u>Allowance of Administrative Claims.</u>

          **(i)**     **Administrative Claims Generally.**

Unless otherwise expressly provided in the Plan or agreed by the County, Administrative Claims will be Allowed only if:

    (A)     On or before the Administrative Claims Bar Date, the Person holding such Administrative Claim both Files with the Bankruptcy Court and serves on the County a motion requesting allowance of the Administrative Claim; and

    (B)     The Bankruptcy Court enters a Final Order finding that such asserted Administrative Claim is an Allowed Claim.

The County or any other party in interest may File an objection to such motion within sixty (60) calendar days after the expiration of the Administrative Claims Bar Date, unless such time period for filing such objection is extended by the Bankruptcy Court. **THE FAILURE TO FILE A MOTION REQUESTING ALLOWANCE OF AN ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE, OR THE FAILURE TO SERVE SUCH MOTION TIMELY AND PROPERLY, SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISALLOWED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY DISTRIBUTED PURSUANT TO THE PLAN.**

          **(ii)**     **Cure Payments.**

Cure Payments shall be Allowed in accordance with the procedures set forth in Section 3.1(b).

          **(iii)**     **503(b)(9) Claims.**

Unless otherwise expressly provided in the Plan or agreed by the County, a 503(b)(9) Claim will be Allowed only if:

    (A)     The 503(b)(9) Claim is Filed by the 503(b)(9) Bar Date, or is deemed timely Filed; and

    (B)     If an objection to such 503(b)(9) Claim is Filed by a party in interest on or before the Claim Objection Deadline, the Bankruptcy Court enters a Final Order finding that such asserted 503(b)(9) Claim is an Allowed 503(b)(9) Claim.

**PURSUANT TO THE BAR DATE ORDER, ALL PERSONS HOLDING 503(b)(9) CLAIMS THAT DID NOT TIMELY FILE SUCH CLAIMS BY THE 503(b)(9) BAR**

**DATE ARE FOREVER BARRED. ESTOPPED, AND ENJOINED FROM ASSERTING THOSE CLAIMS AGAINST THE COUNTY OR ITS PROPERTY.**

        **(b)**      <u>**Treatment of Administrative Claims**</u>.

             **(i)**      **Administrative Claims Generally.**

Unless the Person holding an Allowed Administrative Claim agrees to different treatment, or already has been paid the full amount of such Allowed Administrative Claim, the County shall pay to that Person Cash in an amount equal to the Allowed amount of such Administrative Claim, without interest, on or before the later of (A) ten (10) Business Days after the Effective Date, and (B) ten (10) Business Days after the date on which any order determining such Claim is an Allowed Administrative Claim becomes a Final Order.

             **(ii)**      **Cure Payments.**

Cure Payments will be made to the non-debtor parties to the subject executory contracts or unexpired leases in accordance with Section 3.1.

             **(iii)**      **503(b)(9) Claims.**

Unless the Person holding an Allowed 503(b)(9) Claim agrees to different treatment, or already has been paid the full amount of such Allowed 503(b)(9) Claim, the County shall pay to that Person Cash in an amount equal to the Allowed amount of such 503(b)(9) Claim, without interest, on or before the later of (A) ten (10) Business Days after the Effective Date, and (B) ten (10) Business Days after the date on which any order determining such Claim to be an Allowed 503(b)(9) Claim becomes a Final Order.

        **(c)**      <u>**Professional Fees**</u>.

Pursuant to Bankruptcy Code section 943(b)(3), all amounts to be paid for services or expenses in the Case or incident to the Plan must be fully disclosed to the Bankruptcy Court and must be reasonable. There shall be paid to each holder of a Professional Fee Claim in full, final, and complete settlement, satisfaction, release, and discharge of such Claim, Cash in an amount equal to the portion of such Professional Fee Claim that the Bankruptcy Court determines is reasonable on or as soon as is reasonably practicable following the date on which the Bankruptcy Court enters an order determining reasonableness. The County, in the ordinary course of its business, and without the requirement for Bankruptcy Court approval, may pay for professional services rendered and expenses incurred following the Effective Date.

        **(d)**      <u>**Administrative Tax Claims**</u>.

Notwithstanding anything to the contrary in the Plan or in the Confirmation Order, a governmental unit shall not be required to file, make, or submit a request for payment (or any document, including a bill) of an expense described in Bankruptcy Code section 503(b)(1)(B) or (C) as a condition of its being an Allowed Administrative Claim, and the County shall pay in full all such Allowed Administrative Claims, including any interest related thereto, when due.

39

(e)      **No Other Priority Claims.**

The only category of priority Claim incorporated into a chapter 9 case through Bankruptcy Code section 901(a) are Administrative Claims allowable under Bankruptcy Code section 507(a)(2).  The treatment of Allowed Administrative Claims under the Plan is described in Section 2.2(b) above.  No other kinds of priority claims set forth in Bankruptcy Code section 507 are recognized or entitled to priority in chapter 9 or in this Case, but rather are treated in chapter 9 and in this Case and classified in the Plan as General Unsecured Claims.

**Section 2.3.      Classification and Treatment of Classified Claims.**

(a)      **Class 1-A (Sewer Warrant Claims).**

Class 1-A consists of all Sewer Warrant Claims.  Class 1-A is Impaired under the Plan.  Class 1-A Claims shall be Allowed on the Effective Date in an aggregate amount equal to (i) the Adjusted Sewer Warrant Principal Amount of all Sewer Warrants giving rise to Class 1-A Claims and (ii) the amount of any Reinstated Sewer Warrant Principal Payments and Reinstated Sewer Warrant Interest Payments payable under Section 4.6(a) with respect to any Sewer Warrants giving rise to Class 1-A Claims, which Allowed Claims shall not be subject to any Causes of Action, Avoidance Action, defense, counterclaim, subordination, or offset of any kind.

Except as set forth in Section 4.9(a) with respect to the Allowed Class 1-A Claims held by the JPMorgan Parties, each holder of an Allowed Class 1-A Claim shall receive a Distribution in one of the two amounts specified in Option 1 and Option 2 below.  Such a Distribution is higher than such holder's Pro Rata share of the Distributions made to holders of all Allowed Class 1-A Claims would otherwise be as a result of (i) the reallocation of Plan consideration from the JPMorgan Parties to holders of Allowed Class 1-A Claims as part of the global settlement of Sewer Released Claims against the JPMorgan Parties implemented pursuant to the Plan and (ii) the consideration provided by the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties pursuant to the Plan, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to the holders of Allowed Class 1-A Claims on account of such Claims.

The Distributions to be made to holders of Allowed Class 1-A Claims from or on behalf of the County consist of the following two components:

A.      Except as set forth in Section 4.9(a) with respect to the Allowed Class 1-A Claims held by the JPMorgan Parties, each holder of an Allowed Class 1-A Claim shall receive the right to choose between the following two Distribution options:

Option 1: if such holder makes or is deemed to make the Commutation Election, a Distribution on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to 80% of the Adjusted Sewer Warrant Principal Amount of such holder's Sewer Warrants in full, final, and complete

40

settlement, satisfaction, release, and exchange of all of such holder's Class 1-A Claims and of all of such holder's other Sewer Released Claims, both against the County and against any of the other Sewer Released Parties and their respective Related Parties (including against the Sewer Warrant Insurers and their respective Related Parties in respect of any of the Sewer Insurance Policies); or

Option 2: if such holder does not make or is deemed not to make the Commutation Election, (i) a Distribution on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to 65% of the Adjusted Sewer Warrant Principal Amount of such holder's Sewer Warrants in full, final, and complete settlement, satisfaction, release, and exchange of all of such holder's Class 1-A Claims; and (ii) the retention of Sewer Wrap Payment Rights, if any, against the applicable Sewer Warrant Insurer in respect of any Sewer Wrap Policies insuring such holder's Sewer Warrants, which Sewer Wrap Payment Rights shall not be waived or impaired.

B.      Regardless of the option selected, each holder of an Allowed Class 1-A Claim shall also receive on the Effective Date a Distribution of Cash on account of any applicable Reinstated Sewer Warrant Principal Payments and any applicable Reinstated Sewer Warrant Interest Payments in accordance with Section 4.6(a). No Distributions will be made under the Plan to any Person on account of (i) any interest in excess of the non-default rate on any Sewer Warrants after the Petition Date and (ii) any interest on interest on any Sewer Warrants after the Petition Date.

As described in Section 4.9(a), the sources of the incremental recovery to holders of Allowed Class 1-A Claims that make the Commutation Election as provided in this Section 2.3(a) result from (i) the agreement of the JPMorgan Parties to reallocate to such holders a substantial portion of the Pro Rata share of the Distribution that otherwise would have been distributed to the JPMorgan Parties on account of the Allowed Class 1-A Claims and Allowed Class 1-B Claims held by the JPMorgan Parties as part of the global settlement of Sewer Released Claims against the JPMorgan Parties implemented pursuant to the Plan; and (ii) the consideration provided as a result of the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims on account of such Claims.

Each of the JPMorgan Parties and each Supporting Sewer Warrantholder has agreed in the applicable Sewer Plan Support Agreement to make, and shall make, the Commutation Election with respect to all Sewer Warrants held by each of the JPMorgan Parties and each Supporting Sewer Warrantholder, subject to the exceptions contained in Section 3(e) of the Supporting Sewer Warrantholder Plan Support Agreement.

41

As part of the global settlement implemented under the Plan, on the Effective Date the holders of Class 1-A Claims will be deemed to have assigned any and all rights of recovery on account of the Sewer Warrant Trustee's Asserted Recourse Claim to the County, without any warranty, representation, or recourse whatsoever.

With the exception of the Sewer Warrant Trustee Fee Claims, which shall be satisfied, discharged, and released in accordance with Section 4.6(b), no additional or other Distributions will be made under the Plan to any Person on account of any Claims with respect to the professional fees or expenses of any holder of Sewer Debt Claims. Because the Sewer Warrant Trustee Fee Claims are paid separately under Section 4.6(b), the Distributions under this Section 2.3(a) shall not be reduced by any deduction on account of any Sewer Warrant Trustee Fee Claims.

     (b)     **Class 1-B (Bank Warrant Claims and Primary Standby Sewer Warrant Claims).**

Class 1-B consists of all Bank Warrant Claims and (to the extent not otherwise included) all Primary Standby Sewer Warrant Claims. Class 1-B is Impaired under the Plan. Class 1-B Claims shall be Allowed on the Effective Date in an aggregate amount equal to (i) the Adjusted Sewer Warrant Principal Amount of all Bank Warrants giving rise to Class 1-B Claims; (ii) the amount of any Reinstated Sewer Warrant Interest Payments payable under Section 4.6(a) with respect to any Bank Warrants giving rise to Class 1-B Claims; and (iii) the Bank Warrant Default Interest Settlement Payments, which Allowed Claims shall not be subject to any Causes of Action, Avoidance Action, defense, counterclaim, subordination, or offset of any kind.

Except as set forth in Section 4.9(a) with respect to the Allowed Class 1-B Claims held by the JPMorgan Parties, each holder of an Allowed Class 1-B Claim shall receive a Distribution in one of the two amounts specified in Option 1 and Option 2 below. Such a Distribution is higher than such holder's Pro Rata share of the Distributions made to holders of all Allowed Class 1-B Claims would otherwise be as a result of (i) the reallocation of Plan consideration from the JPMorgan Parties to holders of Allowed Class 1-B Claims as part of the global settlement of Sewer Released Claims against the JPMorgan Parties implemented pursuant to the Plan and (ii) the consideration provided by the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties pursuant to the Plan, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to the holders of Allowed Class 1-B Claims on account of such Claims.

The Distributions to be made to holders of Allowed Class 1-B Claims from or on behalf of the County consist of the following three components:

     A.     Except as set forth in Section 4.9(a) with respect to the Allowed Class 1-B Claims held by the JPMorgan Parties, each holder of an Allowed Class 1-B Claim shall receive the right to choose between the following two Distribution options:

42

Option 1: if such holder makes the Commutation Election, a Distribution on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to 80% of the Adjusted Sewer Warrant Principal Amount of such holder's Bank Warrants in full, final, and complete settlement, satisfaction, release, and exchange of all of such holder's Class 1-B Claims (including any Bank Warrant Default Interest Claims, provided that Bank Warrant Default Interest Settlements Payments, if applicable, shall be paid pursuant to component C. below) and of all of such holder's other Sewer Released Claims, both against the County and against any of the other Sewer Released Parties and their respective Related Parties; or

Option 2: if such holder does not make or is deemed not to make the Commutation Election, a Distribution (x) on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to 65% of the Adjusted Sewer Warrant Principal Amount of such holder's Bank Warrants and (y) on the first Business Day that is at least thirty (30) calendar days after the entry of a Final Order allowing such Claims, of Cash from a reserve account to be funded on the Effective Date from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to 65% of any Allowed Bank Warrant Default Interest Claims held by such holder in full, final, and complete settlement, satisfaction, release, and exchange of all of such holder's Class 1-B Claims.

B.      Regardless of the option selected, each holder of an Allowed Class 1-B Claim shall also receive on the Effective Date a Distribution of Cash on account of any applicable Reinstated Sewer Warrant Interest Payments in accordance with Section 4.6(a).  No Distributions will be made under the Plan to any Person on account of (i) any interest in excess of the Sewer Bank Rate on any Bank Warrants after the Petition Date and (ii) any interest on interest on any Bank Warrants after the Petition Date.

C.      In addition to the foregoing, each of the Sewer Liquidity Banks shall receive on the Effective Date a Distribution of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to such Sewer Liquidity Bank's respective specified portion of the Bank Warrant Default Interest Settlement Payments.  By their acceptance of or non-objection to confirmation of the Plan, each other holder of an Allowed Class 1-B Claim shall have consented and agreed, pursuant to Bankruptcy Code section 1123(a)(4), to the Sewer Liquidity Banks' receipt of the Bank Warrant Default Interest Settlement Payments.

As described in Section 4.9(a), the sources of the incremental recovery to holders of Allowed Class 1-B Claims that make the Commutation Election as provided in this Section 2.3(b) result from (i) the agreement of the JPMorgan Parties to reallocate to such holders a substantial portion of the Pro Rata share of the Distribution that otherwise would have been

43

distributed to the JPMorgan Parties on account of the Allowed Class 1-A and Allowed Class 1-B Claims held by the JPMorgan Parties as part of the global settlement of Sewer Released Claims against the JPMorgan Parties implemented pursuant to the Plan; and (ii) the consideration provided as a result of the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims on account of such Claims.

Each of the JPMorgan Parties, each Sewer Liquidity Bank, and each Supporting Sewer Warrantholder has agreed in the applicable Sewer Plan Support Agreement to make, and shall make, the Commutation Election and to waive any Bank Warrant Default Interest Claims held by such JPMorgan Party, Sewer Liquidity Bank, and Supporting Sewer Warrantholder, as applicable, with respect to all Bank Warrants held by each of the JPMorgan Parties, each Sewer Liquidity Bank, and each Supporting Sewer Warrantholder.

As part of the global settlement implemented under the Plan, on the Effective Date the holders of Class 1-B Claims will be deemed to have assigned any and all rights of recovery on account of the Sewer Warrant Trustee's Asserted Recourse Claim to the County, without any warranty, representation, or recourse whatsoever.

No additional or other Distributions will be made under the Plan to any Person on account of the Primary Standby Sewer Warrant Claims (to the extent not otherwise included within the Bank Warrant Claims).

With the exception of the Sewer Warrant Trustee Fee Claims, which shall be satisfied, discharged, and released in accordance with Section 4.6(b), no additional or other Distributions will be made under the Plan to any Person on account of any Claims with respect to the professional fees or expenses of any holder of Sewer Debt Claims. Because the Sewer Warrant Trustee Fee Claims are paid separately under Section 4.6(b), the Distributions under this Section 2.3(b) shall not be reduced by any deduction on account of any Sewer Warrant Trustee Fee Claims.

    **(c)**    **Class 1-C (Sewer Warrant Insurers Claims).**

Class 1-C consists of all Sewer Warrant Insurers Claims. Class 1-C is Impaired under the Plan. Class 1-C Claims shall be Allowed on the Effective Date in an aggregate amount, without duplication, equal to the sum of (i) the amount of the Sewer Warrant Insurers Claims, (ii) the amount of any Reinstated Sewer Warrant Principal Payments or Reinstated Sewer Warrant Interest Payments payable under Section 4.6(a) with respect to any Sewer Warrants held by the Sewer Warrant Insurers, and (iii) the Sewer Warrant Insurers Outlay Amount, which Allowed Claims shall not be subject to any Causes of Action, Avoidance Action, defense, counterclaim, subordination, or offset of any kind.

The holders of Allowed Class 1-C Claims shall receive from or on behalf of the County on the Effective Date, in full, final, and complete settlement, satisfaction, release, and exchange of each such holder's Class 1-C Claims:

(i)     an aggregate Distribution of $165,000,000 in Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof, which aggregate amount shall be distributed and allocated among the Sewer Warrant Insurers as set forth in the Sewer Warrant Insurers Agreements;

(ii)    a separate aggregate Distribution of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof, which aggregate amount shall be equal to the Non-Commutation True-Up Amount attributable to all Sewer Warrants insured by each Sewer Warrant Insurer under a Sewer Wrap Policy and held by Persons that elected not to make or were deemed not to make the Commutation Election;

(iii)   a payment in full from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to each Sewer Warrant Insurer's Covered Tail Risk, to be paid or funded pursuant to each of the Tail Risk Payment Agreements;

(iv)    Distributions of Cash on account of the Reinstated Sewer Warrant Principal Payments, the Reinstated Sewer Warrant Interest Payments, and the Sewer Warrant Insurers Outlay Amount, in each case if applicable and if any, in accordance with Section 4.6(a).

As part of the global settlement implemented under the Plan, the Sewer Warrant Insurers will be deemed to waive and release all Bank Warrant Default Interest Claims.

As part of the global settlement implemented under the Plan, on the Effective Date the holders of Class 1-C Claims will be deemed to have assigned any and all rights of recovery on account of the Sewer Warrant Trustee's Asserted Recourse Claim to the County, without any warranty, representation, or recourse whatsoever.

With the exception of the Sewer Warrant Trustee Fee Claims, which shall be satisfied, discharged, and released in accordance with Section 4.6(b), no additional or other Distributions will be made under the Plan to any Person on account of any Claims with respect to the professional fees or expenses of any holder of Sewer Debt Claims.  Because the Sewer Warrant Trustee Fee Claims are paid separately under Section 4.6(b), the Distributions under this Section 2.3(c) shall not be reduced by any deduction on account of any Sewer Warrant Trustee Fee Claims.

(d)     **Class 1-D (Other Specified Sewer Claims).**

Class 1-D consists of all JPMorgan Sewer Revenue Indemnification Claims and the LBSF Periodic Payment Claim.  Class 1-D is Impaired under the Plan.

All Claims in Class 1-D will be Allowed on the Effective Date.  In full, final, and complete settlement, satisfaction, release, and exchange of all Class 1-D Claims, and as part of the global settlement between the County and the Sewer Released Parties implemented pursuant

45

to the Plan, on the Effective Date the County shall pay (i) $10.00 to JPMS and (ii) $1,250,000.00 to LBSF, in each case from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof. By its acceptance of or non-objection to confirmation of the Plan, JPMS shall have consented and agreed, pursuant to Bankruptcy Code section 1123(a)(4), to receive less favorable treatment than LBSF on account of its Allowed Class 1-D Claim.

As part of the global settlement implemented under the Plan, on the Effective Date the holders of Class 1-D Claims will be deemed to have assigned any and all rights of recovery on account of the Sewer Warrant Trustee's Asserted Recourse Claim to the County, without any warranty, representation, or recourse whatsoever.

With the exception of the Sewer Warrant Trustee Fee Claims, which shall be satisfied, discharged, and released in accordance with Section 4.6(b), no additional or other Distributions will be made under the Plan to any Person on account of any Claims with respect to the professional fees or expenses of any holder of Sewer Debt Claims. Because the Sewer Warrant Trustee Fee Claims are paid separately under Section 4.6(b), the Distributions under this Section 2.3(d) shall not be reduced by any deduction on account of any Sewer Warrant Trustee Fee Claims.

### (e)    Class 1-E (Sewer Swap Agreement Claims).

Class 1-E consists of all Sewer Swap Agreement Claims. Class 1-E is Impaired under the Plan.

The holders of Sewer Swap Agreement Claims shall neither receive any Distributions nor retain any property under the Plan on account of such Claims. Because no Distributions will be made to holders of Class 1-E Claims nor will such holders retain any property on account of such Claims, Class 1-E is deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g), and therefore holders of Claims in Class 1-E are not entitled to vote to accept or reject the Plan on account of such Claims.

### (f)    Class 1-F (Other Standby Sewer Warrant Claims).

Class 1-F consists of all Other Standby Sewer Warrant Claims. Class 1-F is Impaired under the Plan.

The holders of Other Standby Sewer Warrant Claims shall neither receive any Distributions nor retain any property under the Plan on account of such Claims. Because no Distributions will be made to holders of Class 1-F Claims nor will such holders retain any property on account of such Claims, Class 1-F is deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g), and therefore holders of Claims in Class 1-F are not entitled to vote to accept or reject the Plan on account of such Claims.

### (g)    Class 2-A (Series 2004-A School Claims).

Class 2-A consists of all Series 2004-A School Claims. Class 2-A is Impaired under the Plan.

All Claims in Class 2-A will be Allowed on the Effective Date; *provided, however*, that for the avoidance of doubt, any Series 2004-A School Claims subject to subordination under Bankruptcy Code section 510(b) will not be Allowed and are separately classified as Subordinated Claims. Each holder of an Allowed Class 2-A Claim will on account of such holder's Class 2-A Claim retain all of such holder's rights and interests in its Series 2004-A School Warrants, which will be repaid on the terms and conditions set forth in the School Warrant Indenture as modified by the Plan. Pursuant to Bankruptcy Code section 1123(a)(5)(F), the School Warrant Indenture shall be modified on the Effective Date in the following respects:

(i)     Subject to the County having satisfied its payment obligations in respect of the Series 2004-A School Warrants through the Effective Date, all School Warrant Events of Default under the School Warrant Indenture that occurred prior to or that were continuing on the Effective Date generally with respect to all School Warrants or with respect to the Series 2004-A School Warrants shall be deemed waived and of no further force or effect, without any requirement that the County take any action to cure or otherwise eliminate any such School Warrant Events of Default. For the avoidance of doubt, and except as otherwise provided in clause (ii) immediately below, the fact that a School Warrant Event of Default existed at any time prior to, or at the time of, the Effective Date, shall not give rise to any argument or claim that any future occurrence or recurrence of such type of School Warrant Event of Default has been excused or waived (prospectively or otherwise) under the preceding sentence.

(ii)    None of the following events shall constitute School Warrant Events of Default under the School Warrant Indenture: (A) the pendency of a proceeding regarding the "Segregated Account" of Ambac in Wisconsin state court; (B) the pendency of a chapter 11 bankruptcy case regarding Ambac Financial Group Inc.; and (C) the subsequent filing of any bankruptcy case or proceeding under any other insolvency regime regarding either of Ambac or Ambac Financial Group Inc., including the appointment of any "orderly liquidation authority" under 12 U.S.C. §§ 5381-5394. For the avoidance of doubt, to the extent that School Warrant Events of Default may have occurred on or prior to the Effective Date due to the foregoing events, such School Warrant Events of Default shall be deemed waived and of no further force or effect.

(iii)   If and to the extent that Future Tax Proceeds are collected or held by the County after the Effective Date, the County shall comply with the mandatory redemption provisions of the School Warrant Indenture, but for so long as the Series 2005-B School Warrants are outstanding the County shall exercise any discretion and powers the County holds under the School Warrant Indenture to direct the School Warrant Trustee to redeem the Series 2005-B School Warrants, and not the Series 2005-A School Warrants or the Series 2004-A School Warrants, on the next applicable redemption date. In addition, notwithstanding any provision to the contrary in the School Warrant Indenture, including Section 2.1(f) of the First Supplemental Indenture, the County will not direct the School Warrant Trustee to credit any portion of the mandatory redemptions made after the Effective Date of the Series 2005-B School Warrants as against the principal amortization schedule

Case 11-05736-CRJ9    Doc 1911    Filed 07/29/13    Entered 07/29/13 14:41:05    Desc
Main Document        Page 48 of 104

set forth in the School Warrant Indenture (including the First Supplemental Indenture thereto) or otherwise.

To the extent necessary to give effect to the foregoing modifications, each holder of Allowed Class 2-A Claims shall be deemed to consent to the execution of the School Warrant Second Supplemental Indenture by the County and the School Warrant Trustee on the Effective Date.

On the Effective Date, or as soon thereafter as practicable, the County will release any hold on the Retained Amount, and the Retained Amount shall thereafter be available for distribution in accordance with the provisions of the School Warrant Indenture.  No compensation, damages, interest, or other amounts will be Allowed or otherwise payable to any holders of Class 2-A Claims on account of the County's retention of the Retained Amount.

Any unpaid portion of the School Warrant Trustee Fee Claims shall be paid in Cash on the Effective Date to the School Warrant Trustee out of funds in the "Jefferson County Limited Obligation School Warrant Revenue Account" established under the School Warrant Indenture. Nothing in the Plan is intended to or will affect the School Warrant Trustee's rights to compensation or its lien, priorities, or any other rights under the School Warrant Indenture.

Nothing in the Plan is intended to release or affect any rights or claims that holders of Series 2004-A School Warrants or the School Warrant Trustee may have against the School Warrant Insurer; *provided, however*, that in no event shall any such rights give rise to any Claims against the County or its property that are not satisfied and released by the treatment provided herein for Allowed Class 2-A Claims.

(h)     **Class 2-B (Series 2005-A School Claims).**

Class 2-B consists of all Series 2005-A School Claims.  Class 2-B is Impaired under the Plan.

All Claims in Class 2-B will be Allowed on the Effective Date; *provided, however*, that for the avoidance of doubt, any Series 2005-A School Claims subject to subordination under Bankruptcy Code section 510(b) will not be Allowed and are separately classified as Subordinated Claims.  Each holder of an Allowed Class 2-B Claim will on account of such holder's Class 2-B Claim retain all of such holder's rights and interests in its Series 2005-A School Warrants, which will be repaid on the terms and conditions set forth in the School Warrant Indenture as modified by the Plan.  Pursuant to Bankruptcy Code section 1123(a)(5)(F), the School Warrant Indenture shall be modified on the Effective Date in the following respects:

(i)     Subject to the County having satisfied its payment obligations in respect of the Series 2005-A School Warrants through the Effective Date, all School Warrant Events of Default under the School Warrant Indenture that occurred prior to or that were continuing on the Effective Date generally with respect to all School Warrants or with respect to the Series 2005-A School Warrants shall be deemed waived and of no further force or effect, without any requirement that the County take any action to cure or otherwise eliminate any such School Warrant Events of Default.  For the avoidance of doubt, and except as otherwise provided in clause

48

(ii) immediately below, the fact that a School Warrant Event of Default existed at any time prior to, or at the time of, the Effective Date, shall not give rise to any argument or claim that any future occurrence or recurrence of such type of School Warrant Event of Default has been excused or waived (prospectively or otherwise) under the preceding sentence.

(ii) None of the following events shall constitute School Warrant Events of Default under the School Warrant Indenture: (A) the pendency of a proceeding regarding the "Segregated Account" of Ambac in Wisconsin state court; (B) the pendency of a chapter 11 bankruptcy case regarding Ambac Financial Group Inc.; and (C) the subsequent filing of any bankruptcy case or proceeding under any other insolvency regime regarding either of Ambac or Ambac Financial Group Inc., including the appointment of any "orderly liquidation authority" under 12 U.S.C. §§ 5381-5394. For the avoidance of doubt, to the extent that School Warrant Events of Default may have occurred on or prior to the Effective Date due to the foregoing events, such School Warrant Events of Default shall be deemed waived and of no further force or effect.

(iii) If and to the extent that Future Tax Proceeds are collected or held by the County after the Effective Date, the County shall comply with the mandatory redemption provisions of the School Warrant Indenture, but for so long as the Series 2005-B School Warrants are outstanding the County shall exercise any discretion and powers the County holds under the School Warrant Indenture to direct the School Warrant Trustee to redeem the Series 2005-B School Warrants, and not the Series 2005-A School Warrants or the Series 2004-A School Warrants, on the next applicable redemption date. In addition, notwithstanding any provision to the contrary in the School Warrant Indenture, including Section 2.1(f) of the First Supplemental Indenture, the County will not direct the School Warrant Trustee to credit any portion of the mandatory redemptions made after the Effective Date of the Series 2005-B School Warrants as against the principal amortization schedule set forth in the School Warrant Indenture (including the First Supplemental Indenture thereto) or otherwise.

To the extent necessary to give effect to the foregoing modifications, each holder of Allowed Class 2-B Claims shall be deemed to consent to the execution of the School Warrant Second Supplemental Indenture by the County and the School Warrant Trustee on the Effective Date.

On the Effective Date, or as soon thereafter as practicable, the County will release any hold on the Retained Amount, and the Retained Amount shall thereafter be available for distribution in accordance with the provisions of the School Warrant Indenture. No compensation, damages, interest, or other amounts will be Allowed or otherwise payable to any holders of Class 2-B Claims on account of the County's retention of the Retained Amount.

Any unpaid portion of the School Warrant Trustee Fee Claims shall be paid in Cash on the Effective Date to the School Warrant Trustee out of funds in the "Jefferson County Limited Obligation School Warrant Revenue Account" established under the School Warrant Indenture.

Nothing in the Plan is intended to or will affect the School Warrant Trustee's rights to compensation or its lien, priorities, or any other rights under the School Warrant Indenture.

Nothing in the Plan is intended to release or affect any rights or claims that holders of Series 2005-A School Warrants or the School Warrant Trustee may have against the School Warrant Insurer; *provided, however*, that in no event shall any such rights give rise to any Claims against the County or its property that are not satisfied and released by the treatment provided herein for Allowed Class 2-B Claims.

### (i) Class 2-C (Series 2005-B School Claims and Standby School Warrant Claims).

Class 2-C consists of all Series 2005-B School Claims and (to the extent not otherwise included) all Standby School Warrant Claims. Class 2-C is Impaired under the Plan.

All Claims in Class 2-C will be Allowed on the Effective Date. Each holder of an Allowed Class 2-C Claim will on account of such holder's Class 2-C Claim retain all of such holder's rights and interests in its Series 2005-B School Warrants, which will be repaid on the terms and conditions set forth in School Warrant Indenture and the Standby School Warrant Purchase Agreement, in each case as modified by the Plan. Pursuant to Bankruptcy Code section 1123(a)(5)(F), the School Warrant Indenture and the Standby School Warrant Purchase Agreement shall be modified on the Effective Date in the following respects:

(i)     Effective as of August 31, 2013, the "Bank Rate" shall be defined to mean the New Bank Rate.

(ii)    All School Warrant Events of Default under the School Warrant Indenture or the Standby School Warrant Purchase Agreement (including cross-defaults) that occurred prior to or that were continuing on February 11, 2013, shall be deemed waived and of no further force or effect, without any requirement that the County take any action to cure or otherwise eliminate any such School Warrant Events of Default. For the avoidance of doubt, and except as otherwise provided in clause (iii) immediately below, the fact that a School Warrant Event of Default existed at any time prior to, or at the time of, February 11, 2013, shall not give rise to any argument or claim that any future occurrence or recurrence of such type of School Warrant Event of Default has been excused or waived (prospectively or otherwise) under the preceding sentence.

(iii)   All School Warrant Events of Default that could result under the School Warrant Indenture or the Standby School Warrant Purchase Agreement (including cross-defaults) due to the occurrence of any of the following events during the period between February 11, 2013, and the Effective Date shall be deemed waived and of no further force or effect: (A) the pendency of the Case; (B) the pendency of a proceeding regarding the "Segregated Account" of Ambac in Wisconsin state court and the pendency of a chapter 11 bankruptcy case regarding Ambac Financial Group Inc.; and (C) the County's retention of the Retained Amount in the Jefferson County Limited Obligation Warrant Revenue Account during the

50

pendency of the Case notwithstanding any contrary provision of the School Warrant Indenture. In addition, all School Warrant Events of Default that could result under the School Warrant Indenture or the Standby School Warrant Purchase Agreement (including cross-defaults) due to the occurrence of any of the following events during the period after the Effective Date shall be deemed waived and of no further force or effect: (x) the pendency of a proceeding regarding the "Segregated Account" of Ambac in Wisconsin state court; and (y) the pendency of a chapter 11 bankruptcy case regarding Ambac Financial Group Inc.

(iv)    Provided that no School Warrant Events of Default (other than those waived pursuant to clauses (ii) and (iii) immediately above) occur under the School Warrant Indenture or the Standby School Warrant Purchase Agreement after February 11, 2013, each holder of a Class 2-C Claim shall irrevocably waive and release any claim or right to receive interest at a rate higher than the New Bank Rate for any period beginning on or after August 31, 2013, either from the County or from Ambac, including under the School Insurance Policies. For the avoidance of doubt, if any School Warrant Events of Default (other than those waived pursuant to the provisions described in clauses (ii) and (iii) immediately above) occur under the School Warrant Indenture or the Standby School Warrant Purchase Agreement after February 11, 2013, the holders of Class 2-C Claims will not be deemed to have waived any claims or rights against the County or Ambac for interest at the Base Rate plus 3.00% under the Standby School Warrant Purchase Agreement from and after the occurrence of such School Warrant Events of Default. The County will represent at the Confirmation Hearing that no School Warrant Events of Default (other than those waived pursuant to clauses (ii) and (iii) immediately above) have occurred under the School Warrant Indenture or the Standby School Warrant Purchase Agreement during the period between February 11, 2013, and the date on which the Confirmation Hearing begins and will request that the Bankruptcy Court include such a finding in the Confirmation Order.

(v)     At least five (5) Business Days prior to the first interest payment date after the Effective Date, the County shall provide the True-Up Certificate to the School Warrant Trustee and direct the School Warrant Trustee: (X) to reduce the aggregate outstanding principal balance of the Series 2005-B School Warrants by an amount equal to the True-Up Amount rounded down to the nearest authorized denomination of the Series 2005-B School Warrants, and (Y) to subtract the remainder of the True-Up Amount (after giving effect to the principal reduction referenced in clause (X) of this sentence) from the interest otherwise payable on such interest payment date on account of the Series 2005-B School Warrants. Holders of the Series 2005-B School Warrants shall take such actions as may be reasonably requested by the School Warrant Trustee to implement the principal reduction by the True-Up Amount as described herein.

(vi)    If and to the extent that Future Tax Proceeds are collected or held by the County after the Effective Date, the County shall comply with the mandatory redemption

51

provisions of the School Warrant Indenture, but for so long as the Series 2005-B School Warrants are outstanding the County shall exercise any discretion and powers the County holds under the School Warrant Indenture to direct the School Warrant Trustee to redeem the Series 2005-B School Warrants, and not the Series 2005-A School Warrants or the Series 2004-A School Warrants, on the next applicable redemption date. In addition, notwithstanding any provision to the contrary in the School Warrant Indenture, including Section 2.1(f) of the First Supplemental Indenture, the County will not direct the School Warrant Trustee to credit any portion of the mandatory redemptions made after the Effective Date of the Series 2005-B School Warrants as against the principal amortization schedule set forth in the School Warrant Indenture (including the First Supplemental Indenture thereto) or otherwise.

(vii)   If the County causes a remarketing of or restructuring of any of the outstanding Series 2005-B School Warrants under the School Warrant Indenture, such remarketing or restructuring shall be for no less than 100% of such outstanding Series 2005-B School Warrants and the Standby School Warrant Purchase Agreement shall be replaced or cancelled contemporaneously with the closing of such remarketing or restructuring, thereby relieving Depfa Bank PLC from its obligations to provide liquidity support with respect to the Series 2005-B School Warrants. For the avoidance of doubt, the preceding sentence is intended to prohibit the County from remarketing or restructuring a portion of the Series 2005-B Warrants and leaving the Standby School Warrant Purchase Agreement in place; further, the preceding sentence is intended to require the County to remarket or restructure the Series 2005-B School Warrants on an all or none basis

To the extent necessary to give effect to the foregoing modifications, each holder of Allowed Class 2-C Claims shall consent to the execution of the School Warrant Second Supplemental Indenture, in a form acceptable to Depfa Bank PLC, by the County and the School Warrant Trustee on the Effective Date.

On the Effective Date, or as soon thereafter as practicable, the County will release any hold on the Retained Amount, and the Retained Amount shall thereafter be available for distribution in accordance with the provisions of the School Warrant Indenture. No compensation, damages, interest, or other amounts will be Allowed or otherwise payable to any holders of Class 2-C Claims on account of the County's retention of the Retained Amount.

Any unpaid portion of the School Warrant Trustee Fee Claims shall be paid in Cash on the Effective Date to the School Warrant Trustee out of funds in the "Jefferson County Limited Obligation School Warrant Revenue Account" established under the School Warrant Indenture. Nothing in the Plan is intended to or will affect the School Warrant Trustee's rights to compensation or its lien, priorities, or any other rights under the School Warrant Indenture.

(j)      **Class 2-D (School Policy – General Claims).**

Class 2-D consists of all School Policy – General Claims. Class 2-D is Impaired under the Plan.

52

All Claims in Class 2-D will be Allowed on the Effective Date. Notwithstanding anything to the contrary in the School Policy – General, the School Warrant Indenture, or the Standby School Warrant Purchase Agreement, the holders of Class 2-D Claims (including, for the avoidance of doubt, the School Warrant Insurer) will consent to all modifications of the School Warrant Indenture and of the Standby School Warrant Purchase Agreement set forth in the treatment for Class 2-A Claims, Class 2-B Claims, and Class 2-C Claims.

All other legal, equitable, and contractual rights of holders of Allowed Class 2-D Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto.

### (k)      <u>Class 2-E (School Surety Reimbursement Claims)</u>.

Class 2-E consists of all School Surety Reimbursement Claims. Class 2-E is Impaired under the Plan.

All Claims in Class 2-E will be Allowed on the Effective Date. Notwithstanding anything to the contrary in (i) the School Surety; (ii) that certain *Guaranty Agreement* dated as of February 2, 2005, by and between the County and Ambac; (iii) the School Warrant Indenture; or (iv) the Standby School Warrant Purchase Agreement, the holders of Class 2-E Claims (including, for the avoidance of doubt, the School Warrant Insurer) will consent to all modifications of the School Warrant Indenture and of the Standby School Warrant Purchase Agreement set forth in the treatment for Class 2-A Claims, Class 2-B Claims, and Class 2-C Claims.

All other legal, equitable, and contractual rights of holders of Allowed Class 2-E Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto.

### (l)      <u>Class 3-A (Board of Education Lease Claims)</u>.

Class 3-A consists of all Board of Education Lease Claims. Class 3-A is not Impaired under the Plan.

All Claims in Class 3-A will be Allowed on the Effective Date. The legal, equitable, and contractual rights of holders of Allowed Class 3-A Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto. The holders of Board of Education Lease Warrants shall retain all of their limited payment rights and recourse against the collateral securing obligations under the Board of Education Lease Indenture. Consistent with the Board of Education Lease Indenture, the County has no general liability on account of the Board of Education Lease Claims, which fact will be unaltered by the Plan. To the extent required, the County shall (i) cure any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to the Allowed Class 3-A Claims, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist; (ii) reinstate the maturity of such Allowed Class 3-A Claims as the maturity existed under the Board of Education Lease Indenture before any default, without recognition of any default rate of interest or similar penalty or charge; and

53

(iii) otherwise leave unaltered the legal, equitable, and contractual rights with respect to such Allowed Class 3-A Claims. For the avoidance of doubt, the rights of the Board of Education Lease Trustee under the Board of Education Lease Indenture, including in respect of any unpaid Board of Education Lease Trustee Fee Claims, are unimpaired by the Plan.

(m) <u>Class 3-B (Board of Education Lease Policy Claims).</u>

Class 3-B consists of all Board of Education Lease Policy Claims. Class 3-B is not Impaired under the Plan.

All Claims in Class 3-B will be Allowed on the Effective Date. The legal, equitable, and contractual rights of holders of Allowed Class 3-B Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto. To the extent required, the County shall (i) cure any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to the Allowed Class 3-B Claims, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist; (ii) reinstate the maturity of such Allowed Class 3-B Claims as the maturity existed under the Board of Education Lease Indenture before any default, without recognition of any default rate of interest or similar penalty or charge; and (iii) otherwise leave unaltered the legal, equitable, and contractual rights with respect to such Allowed Class 3-B Claims.

(n) <u>Class 4 (Other Secured Claims, including Secured Tax Claims).</u>

Class 4 consists of all Other Secured Claims, including all Secured Tax Claims. Each Class 4 Claim shall constitute its own subclass. Class 4 is not Impaired under the Plan.

All Claims in Class 4 will be Allowed on the Effective Date. The legal, equitable, and contractual rights of holders of Allowed Class 4 Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto. Unless the holder of an Allowed Class 4 Claim in a particular Class 4 subclass agrees to other treatment, on or as soon as is reasonably practicable after the Effective Date, such holder shall receive, at the County's option: (i) Cash in the Allowed amount of such holder's Allowed Class 4 Claim; (ii) the return of the collateral securing such Allowed Class 4 Claim, without representation or warranty by or recourse against the County; or (iii) (A) the cure of any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to such holder's Allowed Class 4 Claim, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist; (B) the reinstatement of the maturity of such Allowed Class 4 Claim as the maturity existed before any default, without recognition of any default rate of interest or similar penalty or charge; and (C) its unaltered legal, equitable, and contractual rights with respect to such Allowed Class 4 Claim.

The Bankruptcy Court shall retain jurisdiction to determine the amount necessary to satisfy any Allowed Class 4 Claim for which treatment is elected under clause (i) or clause (iii) of the immediately foregoing paragraph. With respect to any Allowed Class 4 Claim for which

treatment is elected under clause (i), any holder of such Allowed Class 4 Claim shall release (and by the Confirmation Order shall be deemed to release) all liens against property of the County.

**(o)      Class 5-A (Series 2001-B GO Claims and Standby GO Warrant Claims).**

Class 5-A consists of all Series 2001-B GO Claims and (to the extent not otherwise included) all Standby GO Warrant Claims.  Class 5-A is Impaired under the Plan.

All Claims in Class 5-A will be Allowed on the Effective Date.  However, with the exception of Claims on account of principal and prepetition non-default interest in the aggregate amount of $105,123,291.67 (consisting of the BLB GO Claim and the JPMorgan GO Claim), the additional settlement payments set forth in this Section 2.3(o), and the reasonable fees and expenses of the GO Warrant Trustee, the GO Warrant Trustee and the GO Banks will waive and release all other asserted Claims in Class 5-A, including on account of default rate interest, the GO Banks' fees and expenses, and postpetition interest, which will receive no Distribution under the Plan.

On the Effective Date each holder of an Allowed Class 5-A Claim shall receive, in full, final, and complete settlement, satisfaction, release, and exchange of such holder's Series 2001-B GO Claims, the following: (1) Cash in the amount of $123,291.67, to be distributed as specified in Exhibit A to the GO Plan Support Agreement; and (2) a Pro Rata Distribution of Replacement 2001-B GO Warrants, which will be repaid on the terms set forth in the Amended and Restated GO Warrant Indentures.  In addition, the County shall pay the following amounts in Cash on the Effective Date as consideration for the settlement, waiver, and release of additional prepetition Claims under the Standby GO Warrant Purchase Agreement: (i) $500,000 payable to BLB and (ii) $250,000 payable to JPMorgan Chase Bank, N.A.

The form of Confirmation Order proposed by the County will include the GO Acknowledgement with respect to the Series 2001-B GO Warrants and the Replacement 2001-B GO Warrants.

In accordance with the GO Warrant Indenture, the County shall pay all reasonable fees and expenses of the GO Warrant Trustee, including the reasonable fees and expenses of its agents and counsel, in Cash on or as soon as practicable after the Effective Date, but in any event no more than two (2) Business Days after the Effective Date.  Nothing in the Plan is intended to or will affect the rights and priorities granted to the GO Warrant Trustee pursuant to Sections 12.3(b) and 13.7(b) of the GO Warrant Indenture.

**(p)      Class 5-B (Series 2003-A GO Claims).**

Class 5-B consists of all Series 2003-A GO Claims.  Class 5-B is not Impaired under the Plan.

All Claims in Class 5-B will be Allowed on the Effective Date; *provided, however*, that for the avoidance of doubt, any Series 2003-A GO Claims subject to subordination under Bankruptcy Code section 510(b) will not be Allowed and are separately classified as Subordinated Claims.  Each holder of an Allowed Class 5-B Claim shall retain, in full, final, and

complete settlement, satisfaction, release, and exchange of such holder's Class 5-B Claims, all of such holder's legal, equitable, and contractual rights and interests under the GO Resolution 2003-A and in its Series 2003-A GO Warrants, provided that any GO Events of Default that occurred prior to or that were continuing on the Effective Date shall be deemed waived and of no further force or effect, without any requirement that the County provide any compensation or take any action to cure or otherwise eliminate any such GO Events of Default.  Based on such treatment and National's payment during the Case of all regularly scheduled principal and interest due on the Series 2003-A GO Warrants, the Series 2003-A GO Claims shall be deemed unimpaired under the Plan and accordingly the holders of such Claims will not be solicited.

From and after the Effective Date and without limiting the effects of the waiver of all prior and continuing GO Events of Default under the Plan, the GO Resolution 2003-A and the GO Insurance Policies shall remain in effect, subject to all terms and conditions thereof, until the Series 2003-A GO Warrants are paid in full.  The County will pay in the ordinary course the reasonable fees and costs of the GO Paying Agents to the extent unpaid but required to be paid under the GO Resolutions.  To the extent the County fails to make a scheduled principal or interest payment on account of the Series 2003-A GO Warrants after the Effective Date, National may exercise all of its rights and remedies against the County as set forth in the GO Insurance Policies and the GO Resolutions and subject to all terms and conditions thereof.

The form of Confirmation Order proposed by the County will include the GO Acknowledgement with respect to the Series 2003-A GO Warrants.

(q)     **Class 5-C (Series 2004-A GO Claims).**

Class 5-C consists of all Series 2004-A GO Claims.  Class 5-C is not Impaired under the Plan.

All Claims in Class 5-C will be Allowed on the Effective Date; *provided, however*, that for the avoidance of doubt, any Series 2004-A GO Claims subject to subordination under Bankruptcy Code section 510(b) will not be Allowed and are separately classified as Subordinated Claims.  Each holder of an Allowed Class 5-C Claim shall retain, in full, final, and complete settlement, satisfaction, release, and exchange of such holder's Class 5-C Claims, all of such holder's legal, equitable, and contractual rights and interests under the GO Resolution 2004-A and in its Series 2004-A GO Warrants, provided that any GO Events of Default that occurred prior to or that were continuing on the Effective Date shall be deemed waived and of no further force or effect, without any requirement that the County provide any compensation or take any action to cure or otherwise eliminate any such GO Events of Default.  Based on such treatment and National's payment during the Case of all regularly scheduled principal and interest due on the Series 2004-A GO Warrants, the Series 2004-A GO Claims shall be deemed unimpaired under the Plan and accordingly the holders of such Claims will not be solicited.

From and after the Effective Date and without limiting the effects of the waiver of all prior and continuing GO Events of Default under the Plan, the GO Resolution 2004-A and the GO Insurance Policies shall remain in effect, subject to all terms and conditions thereof, until the Series 2004-A GO Warrants are paid in full.  The County will pay in the ordinary course the reasonable fees and costs of the GO Paying Agents to the extent unpaid but required to be paid

under the GO Resolutions.  To the extent the County fails to make a scheduled principal or interest payment on account of the Series 2004-A GO Warrants after the Effective Date, National may exercise all of its rights and remedies against the County as set forth in the GO Insurance Policies and the GO Resolutions and subject to all terms and conditions thereof.

The form of Confirmation Order proposed by the County will include the GO Acknowledgement with respect to the Series 2004-A GO Warrants.

(r)  **Class 5-D (GO Policy Claims).**

Class 5-D consists of all GO Policy Claims.  Class 5-D is Impaired under the Plan.

All Claims in Class 5-D will be Allowed on the Effective Date, and National shall receive the following payments, in full, final, and complete settlement, satisfaction, release, and exchange of all Class 5-D Claims:

(i)  the County will pay $503,046.53 to reimburse National for the accrued prepetition interest that National paid under the GO Insurance Policies in April 2012 on April 1, 2014;

(ii)  the County will pay $2,880,000 to reimburse National for the principal that National paid under the GO Insurance Policies in April 2012 on April 1, 2014;

(iii)  the County will pay $2,965,000 to reimburse National for the principal that National paid under the GO Insurance Policies in April 2013 on April 1, 2015;

(iv)  as a compromise and settlement of the National Fees and Expenses Claims, the County will pay National $1,500,000 in Cash on the Effective Date;

(v)  as a compromise and settlement of the National Reimbursement Claims, including National's contention that the National Reimbursement Claims constitute a right of reimbursement to which National is entitled in accordance with the Bankruptcy Code and applicable law, the County will pay National the National Reimbursement Payments; *provided, however*, that at any time on or after Effective Date, the County shall have the option to prepay the National Reimbursement Payments in whole or in part without premium or penalty, which prepayment option is exercisable by the County paying to National an aggregate amount equal to the nominal sum of the amount of the National Reimbursement Payments that the County elects to prepay discounted to present value as of the prepayment date using a discount rate of 4.90% back from the date of maturity to the prepayment date; and

(vi)  The County's obligations to National under the Plan (other than with respect to payment of the National Reimbursement Payments, which obligations will bear no interest) will bear interest from and after the Effective Date until satisfied at a fixed rate equal to the Wall Street Journal prime rate on the Effective Date plus 1.65% per annum.

From and after the Effective Date, the GO Insurance Policies and the GO Resolutions will remain in effect, subject to all terms and conditions thereof, until the Series 2003-A GO Warrants and the Series 2004-A GO Warrants are paid in full.  To the extent the County fails to make a scheduled principal or interest payment on account of the Series 2003-A GO Warrants or

the Series 2004-A GO Warrants after the Effective Date, National may exercise all of its rights and remedies against the County as set forth in the GO Insurance Policies and the GO Resolutions and subject to all terms and conditions thereof.

The form of Confirmation Order proposed by the County will include the GO Acknowledgement with respect to the GO Insurance Policies.

### (s)    Class 5-E (GO Swap Agreement Claims).

Class 5-E consists of all GO Swap Agreement Claims. Class 5-E is Impaired under the Plan.

All Claims in Class 5-E will be Allowed on the Effective Date in the aggregate amount of $7,893,762.30, plus interest accrued thereon at the applicable rate as set forth in the GO Swap Agreement. In full, final, and complete settlement, satisfaction, release, and exchange of all Class 5-E Claims, and as part of the global settlement between the County and the JPMorgan Parties implemented pursuant to the Plan, on the Effective Date the County shall pay JPMorgan Chase Bank, N.A. $10.00.

### (t)    Class 6 (General Unsecured Claims).

Class 6 consists of all General Unsecured Claims. Class 6 is Impaired under the Plan.

Holders of Allowed Class 6 Claims will receive a Pro Rata Distribution from the General Unsecured Claims Pool on the GUC Payment Date.

Notwithstanding the foregoing, on the Effective Date, (i) JPMS will waive and release any and all rights to receive any Distribution under the Plan on account of the JPMorgan Asserted Recourse Indemnification Claims; (ii) the Sewer Warrant Insurers will waive and release any all rights to receive any Distribution under the Plan on account of their respective Asserted Full Recourse Sewer Claims; and (iii) no Distribution will be made under the Plan on account of the Sewer Warrant Trustee's Asserted Recourse Claim. For the avoidance of doubt, no Asserted Full Recourse Sewer Claims shall be allowed under the Plan, and the County reserves all its rights to dispute any Asserted Full Recourse Sewer Claims that are not waived and released under the Plan (including with respect to the allowance, amount, and priority of any such Claims) after the Effective Date.

### (u)    Class 7 (Bessemer Lease Claims).

Class 7 consists of all Bessemer Lease Claims. Class 7 is Impaired under the Plan.

All Claims in Class 7 will be Allowed on the Effective Date. In full, final, and complete settlement, satisfaction, release, and exchange of the Bessemer Lease Claims, the County shall recognize and perform all of its obligations under the Bessemer Stipulation, including with respect to the New Bessemer Lease. The holders of Class 7 Claims will not receive any additional or other Distributions under the Plan beyond those that such holders receive as a result of the County's performance under the Bessemer Stipulation.

58

(v)     **Class 8 (Other Unimpaired Claims).**

Class 8 consists of all Consent Decree Claims, Deposit Refund Claims, Eminent Domain Claims, Employee Compensation Claims, Employee Indemnification Claims, OPEB Plan Claims, Pass-Through Obligation Claims, Retirement System Claims, Tax Abatement Agreement Claims, and Workers Compensation Claims.  Class 8 is not Impaired under the Plan.

Notwithstanding any other term or provision of the Plan, the legal, equitable, and contractual rights of the holders of Class 8 Claims are unaltered by the Plan, and the Plan leaves unaltered the legal, equitable, and contract rights of all Persons with respect to the Other Unimpaired Claims.  Without limitation, the County retains all Causes of Action, defenses, deductions, assessments, setoffs, recoupment, and other rights under applicable nonbankruptcy law with respect to any Other Unimpaired Claims.

(w)     **Class 9 (Subordinated Claims).**

Class 9 consists of all Subordinated Claims.  Class 9 is Impaired under the Plan.

The holders of Subordinated Claims shall neither receive any Distributions nor retain any property under the Plan on account of such Claims.  Because no Distributions will be made to holders of Class 9 Claims nor will such holders retain any property on account of such Claims, Class 9 is deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g), and therefore holders of Claims in Class 9 are not entitled to vote to accept or reject the Plan on account of such Claims.

**Section 2.4.     Impaired Classes to Vote.**

Except to the extent a Class of Claims is deemed to have rejected the Plan, each holder of a Claim in an Impaired Class as of the Ballot Record Date shall be entitled to vote to accept or reject the Plan as provided in the Plan Procedures Order, or in any other order or orders of the Bankruptcy Court.

**Section 2.5.     Classification Controversies.**

(a)     If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.

(b)     If the Bankruptcy Court finds that the classification of any Claim other than a Sewer Debt Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

(c)     If the Bankruptcy Court finds that the classification of any Sewer Debt Claim is improper, then, subject to Section 2.5(d), such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim shall be counted in the Class (which may or may not be a Class presently set forth in Section 2.3) in which the Bankruptcy Court determines such

59

Claim should have been classified, without the necessity of resoliciting any votes on the Plan, and the holder of such Claim shall receive the same treatment under the Plan as is presently set forth in the Class from which such Claim was reclassified.

(d)     If as a result of the reclassification of any Sewer Debt Claim pursuant to Section 2.5(c), or in connection with any amendment to the Plan or otherwise, the Plan is no longer an "Acceptable Plan" for purposes of any Sewer Plan Support Agreement, then notwithstanding Section 2.5(c), all Ballots cast as required by such Sewer Plan Support Agreement shall be deemed withdrawn, null, and void unless the voting party to the applicable Sewer Plan Support Agreement has reaffirmed its Ballot in writing. Nothing in this Section 2.5 shall limit the rights or remedies available to any Person under any applicable Plan Support Agreement.

**Section 2.6.    No Section 1111(b)(2) Elections.**

Pursuant to Bankruptcy Code section 927, the election under Bankruptcy Code section 1111(b)(2) is not available to holders of Special Revenues Claims under the Plan.

**Section 2.7.    Acceptance by Class of Claims.**

An Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan. Classes that are not Impaired under the Plan are presumed to have accepted the Plan.

**Section 2.8.    Cramdown.**

With respect to any Impaired Class of Claims that fails to accept the Plan, the County requests that the Bankruptcy Court confirm the Plan pursuant to Bankruptcy Code section 1129(b), subject to any applicable Plan Support Agreement.

## ARTICLE III
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Section 3.1.    Assumption of Certain Executory Contracts and Unexpired Leases.**

(a)     **Assumption of Agreements.**

On the Effective Date the County shall assume all executory contracts and unexpired leases that are listed on the Schedule of Assumed Agreements.

The County reserves the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date (i) to delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (ii) to add any executory contract or unexpired lease and provide for its assumption under the Plan. The County will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to those agreements affected by the amendment.

Unless otherwise specified on the Schedule of Assumed Agreements, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is also listed on the Schedule of Assumed Agreements.

The Confirmation Order will constitute a Bankruptcy Court order approving the assumption, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

(b)      **Cure Payments**.

Any amount that must be paid under Bankruptcy Code section 365(b)(1) to cure a default under and compensate the non-debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Schedule of Assumed Agreements.  Unless the parties mutually agree to a different date, such payment shall be made in Cash, within ten (10) Business Days following the later of: (i) the Effective Date and (ii) entry of a Final Order resolving any disputes regarding (A) the amount of any Cure Payment, (B) the ability of the County to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365 with respect to a contract or lease to be assumed, to the extent required, or (C) any other matter pertaining to assumption.

Pending the Bankruptcy Court's ruling on any such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the County unless otherwise agreed by the parties or ordered by the Bankruptcy Court.

(c)      **Objections to Assumption/Cure Payment Amounts**.

Any Person that is a party to an executory contract or unexpired lease that will be assumed under the Plan and that objects to such assumption (including the proposed Cure Payment) must File with the Bankruptcy Court and serve upon parties entitled to notice a written statement and supporting declaration stating the basis for its objection.  This statement and declaration must be Filed and served on the County on or before **October 21, 2013**.  Any Person that fails to timely File and serve such a statement and declaration shall be deemed to waive any and all objections to the proposed assumption (including the proposed Cure Payment) of its contract or lease.

In the absence of a timely objection by a Person that is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired lease, as well as a conclusive finding that the County has demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease, to the extent required.

        (d)      **Resolution of Claims Relating to Assumed Contracts and Leases**.

Payment of the Cure Payment established under the Plan, by the Confirmation Order, or by any other order of the Bankruptcy Court, with respect to an assumed executory contract or unexpired lease, shall be deemed to satisfy, in full, any prepetition or postpetition arrearage or other Claim (including any Claim asserted in a Filed proof of Claim or listed on the List of Creditors) with respect to such contract or lease (irrespective of whether the Cure Payment is less than the amount set forth in such proof of Claim or the List of Creditors).  Upon the tendering of the Cure Payment, any such Filed or scheduled Claim shall be disallowed with prejudice, without further order of the Bankruptcy Court or action by any Person.

**Section 3.2.**    **Rejection of Executory Contracts and Unexpired Leases.**

        (a)      **Rejected Agreements.**

On the Effective Date all executory contracts and unexpired leases that the County entered into on or before the Petition Date that (i) have not been previously assumed or rejected by the County and (ii) are not set forth on the Schedule of Assumed Agreements shall be rejected.  For the avoidance of doubt, executory contracts and unexpired leases that have been previously assumed or assumed and assigned pursuant to an order of the Bankruptcy Court shall not be affected by the Plan.  The Confirmation Order will constitute a Bankruptcy Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases to be rejected under the Plan.

        (b)      **Rejection Bar Date.**

Any Rejection Damage Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served on the County by the Rejection Bar Date.  Any such Claims that are not timely Filed and served will be forever barred and unenforceable against the County and its property, and Persons holding such Claims will not receive and be barred from receiving any Distributions on account of such untimely Claims.

**Section 3.3.**    **Postpetition Contracts and Leases.**

Except as expressly provided in the Plan or the Confirmation Order, all executory contracts and unexpired leases that the County has entered into after the Petition Date with due authorization of the County Commission will be assumed and retained by the County and will remain in full force and effect from and after the Effective Date.

**ARTICLE IV**
**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**Section 4.1.**    **Consent Under Bankruptcy Code Section 904.**

Pursuant to and for purposes of Bankruptcy Code section 904, the County consents to entry of the Confirmation Order on the terms and conditions set forth herein and to entry of any

further orders as necessary or required to implement the provisions of the Plan or any and all related transactions.

**Section 4.2.**     **Continued Governance of the County and the Sewer System.**

From and after the Effective Date, the County Commission shall continue to govern the County and shall continue to administer, control, manage, and operate the property and enterprises of the County (including the Sewer System) in accordance with the Plan, the County's constituent documents, any applicable indentures or other governing contracts, the Alabama Constitution, applicable statutes of the State of Alabama, the EPA Consent Decree, the Personnel Board Consent Decree, and other applicable laws.

**Section 4.3.**     **Application of the Approved Rate Structure.**

From and after the Effective Date, the Confirmation Order shall constitute a conclusive finding and determination that the Approved Rate Structure complies with the requirements of Bankruptcy Code sections 943(b)(6) and 1129(a)(6) and applicable state law, and is appropriate, reasonable, non-discriminatory, and legally binding on and specifically enforceable against the County in accordance with the Plan and under all applicable state and federal laws.  From and after the Effective Date, the County Commission shall adopt and maintain the Approved Rate Structure in accordance with the Rate Resolution and as necessary for the County to satisfy the obligations arising under the New Sewer Warrants and the New Sewer Warrant Indenture (and to otherwise comply with all applicable state and federal laws regarding the maintenance and operation of the Sewer System), including increases in sewer rates to the extent necessary to allow the timely satisfaction of the County's obligations under the New Sewer Warrants and the New Sewer Warrant Indenture (and to otherwise comply with all applicable state and federal laws regarding the maintenance and operation of the Sewer System).

**Section 4.4.**     **Retention of Assets Generally.**

Except as otherwise expressly provided in the Plan, all assets and properties of the County shall be retained by the County on the Effective Date, free and clear of all Claims, liens, encumbrances, charges, and interests.  From and after the Effective Date, the County may conduct its affairs and use, acquire, and dispose of any assets or property without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

**Section 4.5.**     **Certain Transactions on the Effective Date.**

(a)     On the Effective Date the County shall issue the New Sewer Warrants under the New Sewer Warrant Indenture.  The gross proceeds generated by the issuance of the New Sewer Warrants shall first be utilized to pay the Put Consideration.

(b)     On the Effective Date the County shall issue and deliver the Replacement 2001-B GO Warrants under the Amended and Restated GO Warrant Indentures, along with the initial

payments required on the Effective Date pursuant to the Replacement 2001-B GO Warrants and Section 2.3(o).

(c)     On or before the Effective Date, the County shall enter into the Tail Risk Payment Agreements with each Sewer Warrant Insurer and on the Effective Date pay or fund in full an amount equal to each Sewer Warrant Insurer's respective Covered Tail Risk.

(d)     Only if the County and the School Warrant Trustee agree that such a supplemental indenture is necessary and appropriate and agree on the form and substance of such supplemental indenture prior to the deadline for filing the Plan Supplement, on the Effective Date the County shall execute the School Warrant Second Supplemental Indenture.

**Section 4.6.     <u>Disposition of the Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, and Refinancing Proceeds</u>.**

(a)     As a proposed settlement incorporated into the Plan pursuant to Bankruptcy Rule 9019 of any and all Causes of Action and matters raised in or that could have been raised in the Declaratory Judgment Action, and any Causes of Action related to the reapplication to principal of any interest payments made on the Sewer Warrants during the Case or any Causes of Action related to the reallocation of any payments made on the Sewer Warrants both before and during the Case among the holders of various series and subseries of Sewer Warrants, (i) on the Effective Date, Cash in amounts equal to the Reinstated Sewer Warrant Principal Payments (without giving effect to any acceleration or any accelerated redemption schedule), the Reinstated Sewer Warrant Interest Payments, and the Sewer Warrant Insurers Outlay Amount shall be distributed by the Sewer Warrant Trustee to the applicable parties from the Accumulated Sewer Revenues, including with respect to the Sewer Warrants held by the Sewer Plan Support Parties; (ii) for purposes of Distributions under the Plan, no payments made during the Case (other than amounts used to repay Sewer Warrants at maturity or to redeem Sewer Warrants prior to maturity, including, as applicable, making regularly scheduled principal payments on the Sewer Warrants and the Reinstated Sewer Warrant Principal Payments) shall be applied or recharacterized to reduce principal; and (iii) no Distributions shall be made on account of postpetition interest accrued on any Sewer Warrants in excess of pre-default rates or, with respect to Bank Warrants, the Sewer Bank Rate.

(b)     On the Effective Date the Sewer Warrant Trustee shall apply any Sewer Warrant Indenture Funds in the Sewer Warrant Trustee's possession to satisfy the Sewer Warrant Trustee Fee Claims to the extent unpaid but permitted to be paid under the Sewer Warrant Indenture and to reserve an amount equal to the Sewer Warrant Trustee Residual Fee Estimate. Any such application and reserve by the Sewer Warrant Trustee shall fully, finally, and completely satisfy, discharge, and release all Sewer Warrant Trustee Fee Claims. If and only if there is an Unused Covered Tail Risk Amount, the Sewer Warrant Trustee shall apply any Sewer Warrant Indenture Funds in the Sewer Warrant Trustee's possession to establish a reserve for Sewer Wrap Payment Rights Administration Expenses to the extent and in the amount of the Unused Covered Tail Risk Amount, which the Sewer Warrant Trustee may thereafter invest in an interest-bearing account and utilize to satisfy Sewer Wrap Payment Rights Administration Expenses as such expenses become due. The County shall have no obligation to pay, fund (including from Accumulated Sewer Revenues, Sewer Warrant Indenture Funds, or Refinancing Proceeds), or

64

otherwise provide for any Sewer Wrap Payment Rights Administration Expenses beyond the Unused Covered Tail Risk Amount and such interest as may be obtained through the Sewer Warrant Trustee's investment of the reserve established with the Unused Covered Tail Risk Amount. Notwithstanding anything to the contrary in this Section 4.6(b), if the Unused Covered Tail Risk Amount is less than the Sewer Wrap Payment Rights Administration Expenses and if any applicable Sewer Warrant Insurers will not provide a source of payment for the Sewer Wrap Payment Rights Administration Expenses in excess of the Unused Covered Tail Risk Amount on terms acceptable to the Sewer Warrant Trustee, then the Sewer Warrant Trustee shall have no obligation or responsibility to perform any action that would give rise to Sewer Wrap Payment Rights Administration Expenses.

(c)     On the Effective Date, the Sewer Warrant Trustee or the County, as the case may be, shall apply the following funds in the following order for purposes of making the Distributions provided under the Plan for holders of Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D:

(1)     first, all Sewer Warrant Indenture Funds remaining after giving effect to the application permitted or required by Section 4.6(b),

(2)     second, all Remaining Accumulated Sewer Revenues, and

(3)     third, Refinancing Proceeds.

(d)     On the Effective Date, all Refinancing Proceeds remaining after giving effect to the usage permitted or required by Section 4.6(c) shall be applied in accordance with the New Sewer Warrant Indenture.

**Section 4.7.     Commutation Election Protocols and Effect on the Sewer Insurance Policies.**

**(a)     Presumptions Regarding the Commutation Election.**

All holders of Claims in Class 1-A and Class 1-B that (i) do not return any Ballot by the Ballot Deadline, (ii) return a Ballot by the Ballot Deadline but do not make any election with respect to the Commutation Election, or (iii) return a Ballot by the Ballot Deadline and indicate both an election to make and an election not to make the Commutation Election, will be conclusively deemed to have made the Commutation Election; *provided, however*, that (x) any holders of the Series 2003-B-8 Sewer Warrants that either do not return a Ballot, do not indicate an election on any Ballot that is returned by the Ballot Deadline, or return a Ballot by the Ballot Deadline and indicate both an election to make and an election not to make the Commutation Election will be conclusively deemed not to have made the Commutation Election, and (y) any holders of the Series 2003-C-9 Through C-10 Sewer Warrants that are deemed to make the Commutation Election will be sent a notice pursuant to the Plan Procedures Order under which such holders will have an opportunity to rescind the deemed Commutation Election and, upon such rescission, shall be deemed not to have made the Commutation Election for all purposes under the Plan and shall have their Series 2003-C-9 Through C-10 Sewer Claims be treated in accordance with Option 2 of Section 2.3(a).

65

As a result of the satisfaction and discharge of all Sewer Debt Claims and the cancellation of the Sewer Warrants and the Sewer Warrant Indenture under the Plan, on the Effective Date (i) the Sewer DSRF Policies and the Sewer DSRF Reimbursement Agreements will be cancelled and of no further force or effect; (ii) the Sewer Warrant Trustee will close the "Jefferson County Sewer System Debt Service Reserve Fund" under the Sewer Warrant Indenture and return any surety bonds or other documentation evidencing the Sewer DSRF Policies to the applicable Sewer Warrant Insurer; and (iii) the Sewer Wrap Policies will be cancelled and of no further force or effect except with respect to any Sewer Wrap Payment Rights, and such Sewer Wrap Policies (in the case of FGIC, as modified by any plan of rehabilitation) shall remain in full force and effect with respect to such Sewer Wrap Payment Rights.

**Section 4.8.     Compromise and Settlement of All Sewer Debt-Related Issues.**

(a)     Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, in consideration of the settlement and release of all Sewer Released Claims and the treatment and consideration provided under the Plan for Allowed Class 1-A, Class 1-B, Class 1-C, and Class 1-D Claims, the Plan incorporates and is expressly conditioned upon the approval and effectiveness of a comprehensive compromise and settlement by and among the County and the Sewer Plan Support Parties of numerous issues and disputes related to the Sewer System, the Sewer Released Claims, and the allowance and treatment of the Sewer Debt Claims.  As of the Effective Date, the Plan accordingly represents a full, final, and complete compromise, settlement, release, and resolution of, among other matters, disputes and pending or potential litigation (including any appeals) regarding the following: (i) the allowability, amount, priority, and treatment of the Sewer Debt Claims; (ii) the validity or enforceability of the Sewer Warrants; (iii) the valuation of the Sewer System and of the stream of net sewer revenues pledged under the Sewer Warrant Indenture; (iv) the appropriate rates that have been or can be charged to users of the Sewer System; (v) any Causes of Action or Avoidance Actions that the County has asserted or could potentially assert against the JPMorgan Parties or against other of the Sewer Plan Support Parties, including any subordination claims (including equitable subordination claims and statutory subordination claims) relating to any Sewer Debt Claims held by any of the Sewer Plan Support Parties; (vi) the Sewer Released Claims that (A) some of the Sewer Plan Support Parties have asserted or (B) the Sewer Plan Support Parties could potentially assert against other Sewer Plan Support Parties, including, in each case, any subordination claims (including equitable subordination claims and statutory subordination claims) relating to any Sewer Debt Claims held by any of the Sewer Plan Support Parties; (vii) how the Sewer Warrant Trustee has applied revenues of the Sewer System to payment of certain Sewer Debt Claims both before and during the Case, including any Causes of Action related to the reapplication to principal of any interest payments made on the Sewer Warrants during the Case or reallocation of any payments made on the Sewer Warrants both before and during the Case among the holders of various series and subseries of Sewer Warrants; (viii) the various issues raised by the Declaratory Judgment Action; (ix) the scope and extent of any liens or other property rights under the Sewer Warrant Indenture; (x) whether, and the extent to which, the County may recover from Sewer System revenues amounts actually incurred or previously paid by the County on account of professional fees prior to and during the Case; (xi)

66

the allowance and amount of any Bank Warrant Default Interest Claims; (xii) the priority of the LBSF Periodic Payment Claim, the various issues raised by the LBSF Periodic Payment Claim, and the Sewer Warrant Trustee's treatment of and obligations with respect to that Claim; (xiii) the various issues raised by the Receivership Actions; and (xiv) other historical and potential issues associated with the Sewer System and its financing.

(b)      This comprehensive compromise and settlement will be binding on the County, on all Persons who have asserted or could assert any potential Causes of Action or Avoidance Actions for or on behalf of the County in any fashion, including derivatively or directly, and on all Creditors concerning the Sewer Released Claims compromised and settled under the Plan (including as described in Section 4.8(a)) in any pending or potential litigation (including any appeals) before any court or agency.  This comprehensive compromise and settlement is a critical component of the Plan and is designed to provide a resolution of disputed Sewer Released Claims inextricably bound with the Plan.  As such, the approval and consummation of the Plan will conclusively bind all Creditors and other parties in interest, and the releases and settlements effected under the Plan will be operative as of the Effective Date and subject to enforcement by the Bankruptcy Court from and after the Effective Date, including pursuant to the injunctive provisions of Sections 6.2 and 6.3.

(c)      In order to give effect to this comprehensive compromise and settlement, (i) any adversary proceedings or contested matters involving Sewer Released Claims shall be dismissed effective as of the Effective Date; and (ii) in connection with the occurrence of the Effective Date, each of the County, the Sewer Plan Support Parties, and the Sewer Warrant Trustee (as applicable) shall file in other appropriate courts stipulations of dismissal among the applicable parties or motions to dismiss any pending litigation (including any appeals) commenced by the County, any of the Sewer Plan Support Parties, or the Sewer Warrant Trustee against the County or any of the Sewer Plan Support Parties with prejudice, with such dismissals to be effective on and contingent upon the occurrence of the Effective Date.

**Section 4.9.      <u>JPMorgan Reallocation of Distributions and Consideration Provided by the Sewer Warrant Insurers</u>.**

(a)      The Sewer Warrant Claims and Bank Warrant Claims held by the JPMorgan Parties shall be Allowed on the Effective Date in an aggregate amount equal to (i) the Adjusted Sewer Warrant Principal Amount of all Sewer Warrants held by the JPMorgan Parties and (ii) the amount of any Reinstated Sewer Warrant Principal Payments or Reinstated Sewer Warrant Interest Payments payable under Section 4.6(a) with respect to such Sewer Warrants, and shall be classified in Class 1-A and Class 1-B, respectively.  Notwithstanding the general treatment afforded to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, as part of the global settlement among the County, the JPMorgan Parties, and the other Sewer Plan Support Parties to be implemented pursuant to the Plan pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, and in consideration of the settlement and release of all Sewer Released Claims against the JPMorgan Parties as provided herein, the JPMorgan Parties have agreed, subject to the terms and conditions set forth herein, to make the Commutation Election with respect to all Sewer Warrants held by the JPMorgan Parties (but without receiving the higher recovery being made available to all other holders of Sewer Warrants that make or are deemed to make the Commutation Election) and to reallocate to

67

the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims a substantial portion of the JPMorgan Parties' Pro Rata share of the Distribution made to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, thereby increasing the recovery received by all other holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims on account of such Claims and reducing the amount of Sewer System indebtedness following the County's emergence from chapter 9.  As a result of such reallocation by the JPMorgan Parties and the contributions by the Sewer Warrant Insurers detailed below, each holder of an Allowed Class 1-A Claim or an Allowed Class 1-B Claim (other than the JPMorgan Parties) will receive, in full settlement, satisfaction, release, and exchange of such holder's Claims, a Distribution of Cash from Refinancing Proceeds and other sources of Cash in one of the two amounts specified in Option 1 and Option 2 of Sections 2.3(a) and 2.3(b).  Such Distribution is higher than such holders' Pro Rata share of the Distribution made to all holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims as a result of (i) the reallocation of Plan consideration from the JPMorgan Parties to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims; and (ii) the consideration provided by the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties pursuant to the Plan, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims on account of such Claims.  The sources of the incremental recovery to those holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims that make the Commutation Election will be from (i) the reallocation of Plan consideration that otherwise would have been distributed to the JPMorgan Parties; and (ii) consideration provided by the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties pursuant to the Plan, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims that make the Commutation Election on account of such Claims.  The source of the Non-Commutation True-Up Amount and the Covered Tail Risk to be paid to the Sewer Warrant Insurers pursuant to Section 2.3(c) shall also be from the reallocation of Plan consideration that otherwise would have been distributed to the JPMorgan Parties.

(b)  Based upon the agreements of the Supporting Sewer Warrantholders set forth in Section 5 of the Supporting Sewer Warrantholder Plan Support Agreement, which agreement was reached in order to facilitate the various settlements to be implemented pursuant to the Plan and the occurrence of the Effective Date, the JPMorgan Parties have agreed, subject to the terms and conditions set forth herein and in the Supporting Sewer Warrantholder Plan Support Agreement, to reallocate and distribute to each Supporting Sewer Warrantholder a portion of the JPMorgan Parties' Cash recovery under the Plan after giving effect to the reallocations described in Section 4.9(a) above in an amount (such amount so reallocated and distributed, the "Supporting Sewer Warrantholder Directed Distribution") equal to (i) the principal amount of Eligible Sewer Warrants held by such Supporting Sewer Warrantholder as of the Distribution Record Date, multiplied by (ii) 3.46%; *provided*, *however*, that the total amount of Eligible

68

Sewer Warrants shall not exceed the total set forth on Schedule 1 of the Supporting Sewer Warrantholder Plan Support Agreement on the date of execution thereof, and the aggregate amount of the Supporting Sewer Warrantholder Directed Distribution shall not exceed the product of the total set forth on Schedule 1 of the Supporting Sewer Warrantholder Plan Support Agreement multiplied by 3.46%. Subject to the terms and conditions set forth herein and in the Supporting Sewer Warrantholder Plan Support Agreement, on or before the Effective Date, the JPMorgan Parties shall provide irrevocable directions to the County and the Sewer Warrant Trustee to reallocate and Distribute to each Supporting Sewer Warrantholder, instead of to the JPMorgan Parties, such Supporting Sewer Warrantholder's Pro Rata share of the Supporting Sewer Warrantholder Directed Distribution.

(c)     Accordingly, after giving effect to the reallocations described in Section 4.9(a) and the Supporting Sewer Warrantholder Directed Distribution, the JPMorgan Parties shall receive, on the Effective Date, Cash in the amount of approximately 31% (approximately $375 million) of the Adjusted Sewer Warrant Principal Amount of Sewer Warrants held by the JPMorgan Parties (approximately $1.218 billion) plus a Distribution of Cash on account of any applicable Reinstated Sewer Warrant Interest Payments in accordance with Section 4.6(a) in full, final, and complete settlement, satisfaction, release, and discharge of all Sewer Debt Claims and Sewer Released Claims held by the JPMorgan Parties. After giving effect to the concessions by the JPMorgan Parties and the Sewer Warrant Insurers described above and the settlements and releases to be implemented pursuant to the Plan, the Sewer Debt Claims held by the JPMorgan Parties and the Sewer Warrant Insurers shall not be subject to any Causes of Action, Avoidance Action, defense, counterclaim, subordination, or offset of any kind.

**Section 4.10.  <u>Cancellation of Warrants and Other Documents</u>.**

(a)     On the Effective Date, except to the extent otherwise expressly provided in the Plan, all agreements, certificates, indentures, instruments, notes, resolutions, warrants, and other documents evidencing indebtedness of the County, and all liens, mortgages, pledges, grants, trusts, and other interests relating thereto, shall be automatically cancelled, and all obligations of the County thereunder or in any way related thereto shall be discharged. Without limitation and in addition to the provisions of Section 4.7(b), on the Effective Date (i) the Sewer Warrants will be discharged and cancelled, provided that such discharge and cancellation shall not modify, prejudice, or give rise to any defenses in favor of any applicable Sewer Warrant Insurer with respect to any Sewer Wrap Payment Rights; (ii) the Sewer Warrant Indenture will be cancelled and of no further force or effect other than for purposes of allowing the Sewer Warrant Trustee to calculate and make Distributions in accordance with the Plan, to seek and obtain dismissals of the Receivership Actions and other applicable pending litigation, and, if applicable, to pursue and administer the Sewer Wrap Payment Rights after the Effective Date (which, for the avoidance of doubt, will impose no cost or expense on the County beyond any Unused Covered Tail Risk Amount); (iii) the Sewer Swap Agreements will be cancelled and of no further force or effect; (iv) the Standby Sewer Warrant Purchase Agreements will be cancelled and of no further force or effect; (v) the Standby GO Warrant Purchase Agreement will be cancelled and of no further force or effect; (vi) the GO Warrant Indenture will be superseded in all respects by the Amended and Restated GO Warrant Indentures; (vii) the Series 2001-B GO Warrants will be cancelled and superseded in all respects by the Replacement 2001-B GO Warrants; and (viii) the GO Swap Agreement will be cancelled and of no further force or effect. From and after the

69

Effective Date, all Plan Support Agreements will be terminated and superseded in all respects by the Plan, except with respect to any provisions that specifically survive termination of the Plan Support Agreements in accordance with their respective terms.

(b)     For the avoidance of doubt, the Plan will not cancel or otherwise alter any of the following documents or instruments except to the extent otherwise expressly provided in the Plan: (i) the Board of Education Lease Indenture, (ii) the Board of Education Lease Policy, (iii) the Board of Education Lease Warrants, (iv) the GO Insurance Policies, (v) the GO Resolutions, (vi) the New Bessemer Lease, (vii) the School Insurance Policies, (viii) the School Warrant Indenture, (ix) the School Warrants, (x) the Series 2003-A GO Warrants, (xi) the Series 2004-A GO Warrants, and (xii) the Standby School Warrant Purchase Agreement.

**Section 4.11.   Termination of Receiver and Dismissal of Receivership Actions.**

As a result of the satisfaction and discharge of all Sewer Debt Claims, as well as the cancellation of the Sewer Warrants, the Sewer Warrant Indenture, and the Sewer Insurance Policies (as applicable) under the Plan, from and after the Effective Date, the Receiver's status as receiver of the Sewer System will be terminated and of no further force or effect.  On or as soon as reasonably practicable after the Effective Date, the Sewer Warrant Trustee shall pay all of the Receiver's unpaid reasonable fees (including fees of its counsel and experts) and expenses from the Sewer Warrant Indenture Funds and shall dismiss (or obtain any court orders as are necessary to dismiss) each of the Receivership Actions in their entirety and with prejudice.

**Section 4.12.   Vesting of Preserved Claims.**

All Preserved Claims shall be preserved and shall vest in the County on the Effective Date, but only to the extent not expressly released pursuant to the Plan, the Confirmation Order, or any other order of the Bankruptcy Court.  From and after the Effective Date, the County shall retain its exclusive right, power, and duty to administer the collection, prosecution, enforcement, settlement, or abandonment of the Preserved Claims in the County's sole and absolute discretion.

**Section 4.13.   Exemption from Securities Law.**

(a)     The issuance of the Replacement 2001-B GO Warrants and the New Sewer Warrants are exempt from registration under the Securities Act of 1933, as amended (the "1933 Act"), and all rules and regulations promulgated thereunder.  In general, securities issued by the County, such as general obligation warrants and sewer revenue warrants, are exempt from registration under section 3(a)(2) of the 1933 Act.  Obligations issued by the County likewise are exempt from registration under current Alabama securities law.  These exemptions from registration apply to the New Sewer Warrants and the Replacement 2001-B GO Warrants.

(b)     The New Sewer Warrants will be publically offered.  Therefore, the County intends to rely on generally applicable securities law exemptions for the offering and sale of the New Sewer Warrants, provided that the County does not expect to offer the New Sewer Warrants in states in which registration of County securities may be required by applicable state securities law, unless first registered or otherwise qualified for sale in such jurisdiction.  The Replacement 2001-B GO Warrants will not be publically offered but instead will be issued to the GO Banks pursuant to the Plan.  The Replacement 2001-B GO Warrants and the New Sewer Warrants

issued in exchange for Sewer Warrants under the Put Agreement will also be exempt from registration under federal or state securities law to the maximum extent provided under Bankruptcy Code section 1145.

(c)       Like the exemption from registration provided to the County under section 3(a)(2) of the 1933 Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by government entities.  The New Sewer Warrant Indenture and the Amended and Restated GO Warrant Indentures are each exempt from qualification under section 304(a)(4) of the Trust Indenture Act of 1939.

(d)       Nothing in the Plan is intended to preclude the Securities and Exchange Commission from performing its statutory duties regarding any Person in any forum with proper jurisdiction.

**Section 4.14.   Objections to Claims.**

(a)       **County's Exclusive Right to Object.**

The County shall have the right to object to the allowance of Claims as to which liability, amount, priority, classification, or status as secured or unsecured is disputed in whole or in part (except to the extent such Claims have been previously Allowed or are Allowed as set forth in the Plan).  Except as otherwise provided herein, the County's rights to object to, oppose, and defend against all Claims on any basis are fully preserved.  Unless otherwise ordered by the Bankruptcy Court, the County shall file and serve any such objections on or before the Claims Objection Deadline.  After the Effective Date, the County shall have the sole right and authority to control and effectuate the Claims reconciliation process, including to File, settle, compromise, withdraw, or litigate to judgment objections to Claims.

(b)       **Distributions Following Allowance.**

At such time as a Contingent Claim, a Disputed Claim, or an Unliquidated Claim becomes an Allowed Claim, in whole or in part, including pursuant to the Plan, the County or its agent shall distribute to the holder thereof the Distributions, if any, to which such holder is then entitled under the Plan.  Such Distributions, if any, shall be made as soon as practicable after the date on which the order or judgment allowing such Claim becomes a Final Order (or such other date on which the Claim becomes an Allowed Claim, including pursuant to the Plan).  Unless otherwise specifically provided in the Plan or allowed by a Final Order of the Bankruptcy Court, no interest shall be paid on Contingent Claims, Disputed Claims, or Unliquidated Claims that later become Allowed Claims.

**Section 4.15.   Distributions Under the Plan.**

Unless otherwise provided in the Plan, the following procedures apply to Distributions.

(a)       **Responsibility for Making Distributions.**

The County or its designated agents, including the Indenture Trustees and the GO Paying Agents under Section 4.15(e)(iv), shall be responsible for distributing all Distributions made to

71

them for the benefit of the holders of the respective underlying warrants as required under the Plan and, unless otherwise specified in the Plan, pursuant to the applicable operative documents. To the extent applicable, the County or its designated agents shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit with respect to such Distributions, and all Distributions shall be subject to such withholding and reporting requirements.

      **(b)**    **No *De Minimis* Distributions.**

      Notwithstanding anything to the contrary in the Plan, with the exception of Distributions on account of Class 1-D Claims and Class 5-E Claims, no Cash payment of less than fifty dollars ($50.00) will be made to any Person; *provided, however*, that solely with respect to Distributions from the General Unsecured Claims Pool, if the right to payment of a holder of Allowed Class 6 Claims does not exceed fifty dollars ($50.00) on the GUC Payment Date, then such holder will receive a Cash payment in an amount equal to such holder's entitlement. No consideration will be provided in lieu of the *de minimis* Distributions that are not made pursuant to this Section 4.15(b), and the County shall be authorized and empowered to retain such *de minimis* amounts for its own benefit.

      **(c)**    **No Distributions With Respect to Certain Claims.**

      Notwithstanding anything to the contrary in the Plan, no Distributions or other consideration of any kind shall be made on account of any Contingent Claim, Disputed Claim, or Unliquidated Claim unless and until such Claim becomes an Allowed Claim, or is deemed to be such for purposes of distribution, and then only to the extent that such Claim becomes, or is deemed to be for distribution purposes, an Allowed Claim.

      **(d)**    **Distributions to Holders as of the Distribution Record Date.**

      **(i)**    **General Principles.**

      At the close of business on the Distribution Record Date, the claims register shall be closed, and there shall be no further changes in the record holder of any Claim. The County or any other Person responsible for making Distributions shall have no obligation to recognize any transfer of any Claim occurring or purportedly occurring after the Distribution Record Date, and shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the claims register as of the close of business on the Distribution Record Date.

      **(ii)**    **Specific Exceptions.**

      The general principles set forth in Section 4.15(d)(i) will not apply to Claims arising from the Board of Education Lease Warrants, the School Warrants, the Series 2003-A GO Warrants (other than any GO Policy Claims), or the Series 2004-A GO Warrants (other than any GO Policy Claims). Subject in all cases to the treatment provided under the Plan, nothing in the Plan will limit the rights of a holder of the Board of Education Lease Warrants, the School Warrants, the Series 2003-A GO Warrants, or the Series 2004-A GO Warrants to assign, sell, pledge, hypothecate, or otherwise transfer its warrants to the extent permitted by such warrants, any

other applicable operative agreements, and applicable nonbankruptcy law. Subject to the terms of the applicable operative agreements and any requirements under applicable nonbankruptcy law, the County and any applicable Indenture Trustee or GO Paying Agent shall recognize and give effect to assignments, sales, pledges, hypothecations, or other transfers of the Board of Education Lease Warrants, the School Warrants, the Series 2003-A GO Warrants, or the Series 2004-A GO Warrants regardless whether such assignments, sales, pledges, hypothecations, or other transfers were made or settled before, on, or after the Distribution Record Date.

**(e)**   **Delivery of Distributions; Undeliverable/Unclaimed Distributions.**

**(i)**   **Delivery of Distributions in General.**

The County or its designated agents shall make Distributions to each holder of an Allowed Claim as follows: (A) by mail at the address set forth on the proof of Claim Filed by such holder in respect of such Allowed Claim, unless such holder has provided written notice of address change to the County; (B) by mail at the address set forth in any written notice of address change delivered to the County after the date of any related proof of Claim; (C) by mail at the address reflected in the List of Creditors if no proof of Claim is filed and the County has not received a written notice of a change of address; or (D) through the facilities of DTC for the benefit of the holders of Allowed Sewer Debt Claims. Notwithstanding the foregoing, the County shall make Distributions on account of Allowed Class 1-C Claims directly to holders of Class 1-C Claims pursuant to directions provided to the County by the Sewer Warrant Insurers, and the County and Sewer Warrant Insurers shall provide such information as is necessary in order to prevent the Sewer Warrant Trustee or DTC from making any additional or other Distributions on account of any Allowed Class 1-C Claims.

**(ii)**   **Undeliverable and Unclaimed Distributions.**

If the County tenders an Undeliverable Distribution, the issuing entity may cancel the distribution check and need not re-attempt delivery, unless the County timely receives notification of the holder's new address before the deadlines described below. If the County tenders an Unclaimed Distribution, the issuer may cancel the distribution check, and need not attempt redelivery, except as otherwise provided herein.

The County shall reserve the funds with respect to all Undeliverable Distributions and Unclaimed Distributions for one (1) year following the Effective Date. If the County does not receive prior to that date a written request from the holder of the applicable Allowed Claim asserting entitlement to an Undeliverable Distribution or Unclaimed Distribution and providing a current address, then the County shall be authorized and empowered to retain such funds for its own benefit.

Any holder of an Allowed Claim that does not assert in writing its entitlement to an Undeliverable Distribution or Unclaimed Distribution, by the applicable dates set forth in the foregoing paragraphs, no longer shall have any interest in or be entitled to such undelivered or unclaimed Distribution and shall be barred forever from receiving any Distributions under the Plan, or from asserting a Claim against the County or its property, and the right to such undeliverable or unclaimed Distribution will be discharged.

73

For the avoidance of doubt, the foregoing provisions regarding Undeliverable Distributions or Unclaimed Distributions will not apply to Distributions made on account of Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D.

Nothing contained in the Plan shall require the County or its designated agents to attempt to locate any holder of an Allowed Claim.

### (iii)  Estimation of Certain Claims for Distribution Purposes.

The County may move for a Bankruptcy Court order estimating any Contingent Claim, Disputed Claim, or Unliquidated Claim. The estimated amount of any Claim so determined by the Bankruptcy Court shall constitute the maximum recovery that the holder thereof may recover after the ultimate liquidation of its Claim, irrespective of the actual amount that is ultimately Allowed.

### (iv)  Certain Distributions to be Made to the Indenture Trustees or the GO Paying Agents.

### (A)  Sewer Warrant Trustee.

All Distributions to be made to or for the benefit of individual holders of Sewer Warrant Claims, Bank Warrant Claims, and Primary Standby Sewer Warrant Claims shall be made by the County in aggregate, lump-sum payments to the Sewer Warrant Trustee, and will in turn be distributed by the Sewer Warrant Trustee in accordance with the Plan and the applicable operative agreements and without any deduction or reduction on account of any unpaid expenses, fees, indemnities, or other amounts (all of which will be deemed satisfied pursuant to Section 4.6(b)).

### (B)  GO Warrant Trustee.

All Distributions to be made to or for the benefit of individual holders of Series 2001-B GO Claims and Standby GO Warrant Claims shall be made by the County in aggregate, lump-sum payments to the GO Warrant Trustee, and will in turn be distributed by the GO Warrant Trustee in accordance with the Plan and the applicable operative agreements and without any deduction or reduction on account of any unpaid expenses, fees, indemnities, or other amounts.

### (C)  Other Indenture Trustees and Paying Agents.

With respect to all preexisting warrants that will remain outstanding under the Plan (i.e., the Board of Education Lease Warrants, the School Warrants, the Series 2003-A GO Warrants, and the Series 2004-A GO Warrants), the County will make post-Effective Date payments on account of such warrants to the applicable Indenture Trustee or GO Paying Agent, which Indenture Trustee or Paying Agent shall thereafter distribute such payments to holders of such warrants in accordance with the applicable operative agreements.

74

### (v)     Surrender of Instruments.

On the Effective Date, each holder of a certificated instrument, warrant, or note that (A) gives rise to any Sewer Debt Claims or (B) arises from or in connection with the Series 2001-B GO Warrants, the GO Warrant Indenture, the Standby GO Warrant Purchase Agreement, or the GO Swap Agreement shall be deemed to have surrendered such instrument, warrant, or note to the appropriate indenture trustee, paying agent, or designee, and as a result of such deemed surrender, such instrument, warrant, or note shall be cancelled without the need for any action by such holder.  On the Effective Date, each holder of a global certificated instrument, warrant, or note that is held pursuant to the book-entry system operated by DTC and that (X) gives rise to any Sewer Debt Claims or (Y) arises from or in connection with the Series 2001-B GO Warrants, the GO Warrant Indenture, the Standby GO Warrant Purchase Agreement, or the GO Swap Agreement shall be deemed to have surrendered such instrument, warrant, or note to the appropriate indenture trustee, paying agent, or designee in accordance with the Rules and Operational Arrangements of DTC, and as a result of such deemed surrender, such instrument, warrant, or note shall be cancelled without the need for any action by such holder.  Upon issuance and delivery of the New Sewer Warrants and completion of Distributions required under the Plan, the Sewer Warrant Trustee shall cancel all outstanding Sewer Warrants on the records of DTC and destroy all associated original physical certificates, provided that such cancellation and destruction shall not modify, prejudice, or give rise to any defenses in favor of any applicable Sewer Warrant Insurer with respect to any Sewer Wrap Payment Rights.  Upon issuance and delivery of the Replacement 2001-B GO Warrants, the GO Warrant Trustee shall cancel all outstanding Series 2001-B GO Warrants on the records of DTC and destroy all associated original physical certificates.

### (f)     Full, Final, and Complete Settlement and Satisfaction.

The Distributions and other treatment provided under the Plan for each holder of an Allowed Claim shall be in full, final, and complete settlement, satisfaction, discharge, and release of such holder's Claims against the County, against the County's property, or any Claims released under the Plan.

### (g)     Limitations on Distributions Payable to Persons Liable to County.

No Distribution will be made on account of any Claim of any Person against which the County has any affirmative Causes of Action (excluding all GO Released Claims and all Sewer Released Claims), and such Person's Claim shall be deemed to be a Disallowed Claim pursuant to the Plan, unless and until such time as all Causes of Action (excluding all GO Released Claims and all Sewer Released Claims) against that Person have been settled or resolved by a Final Order and such Person has paid the entire amount for which such Person is liable to the County.

### (h)     Deemed Acceleration of the Sewer Warrants.

For all purposes, including Distributions under the Plan, all series and subseries of the Sewer Warrants shall be deemed accelerated, as of the Effective Date, after payment of the Reinstated Sewer Warrant Principal Payments, the Reinstated Sewer Warrant Interest Payments,

75

and the Sewer Warrant Insurers Outlay Amount, which acceleration shall occur immediately and before any other Distribution of consideration on the Effective Date; *provided, however*, that such acceleration will not be deemed to release any of the Sewer Wrap Policies with respect to Sewer Wrap Payment Rights except as a result of any Sewer Warrant Insurer's payment of the Outstanding Amount on the applicable series or subseries of non-commuted Sewer Warrants as set forth in the last sentence of this paragraph. With respect to any series or subseries of Sewer Warrants as to which the Commutation Election is not made or deemed not to have been made, and solely to the extent that any Sewer Warrant Insurer voluntarily elects (irrespective of the terms of the applicable Sewer Wrap Policy), in its sole and absolute discretion, to pay the Outstanding Amount on such series or subseries of Sewer Warrants, the Sewer Warrant Trustee shall be deemed as of the Effective Date or, if later, as of the date on which the applicable Sewer Warrant Insurer makes such election as to such series or subseries of Sewer Warrants, to have submitted a draw request under each applicable Sewer Wrap Policy in respect of the Outstanding Amount on such non-commuted series or subseries of Sewer Warrants, and each such Sewer Warrant Insurer shall be entitled (irrespective of the terms of the applicable Sewer Wrap Policy), in its sole and absolute discretion, to treat the Outstanding Amount as "Due for Payment" (as such term is defined in the applicable Sewer Wrap Policy and for purposes of such Sewer Wrap Policy) as of the Effective Date or as of such later date on which the applicable Sewer Warrant Insurer elects to pay such Outstanding Amount. Payment, as provided in the applicable Sewer Wrap Policy, of the Outstanding Amount on any series or subseries of non-commuted Sewer Warrants shall be deemed to fully discharge the applicable Sewer Warrant Insurer's obligations under the applicable Sewer Wrap Policy and to fully release all Sewer Wrap Payment Rights with respect to such Sewer Warrants.

**Section 4.16.  Setoff, Recoupment, and Other Rights.**

Notwithstanding anything to the contrary contained in the Plan and except as otherwise agreed by the County, the County may, but shall not be required to, setoff against or recoup from any Claim and the Distributions to be made in respect of such Claim (other than with respect to Claims previously Allowed or Allowed as set forth in the Plan) any Causes of Action of any nature whatsoever that the County may have against the claimant and that is not a GO Released Claim or a Sewer Released Claim. If the County elects to so setoff or recoup, the Allowed amount of the subject Claim shall be limited to the net amount after giving effect to the County's setoff or recoupment; *provided, however*, that the claimant will be provided with written notice of the proposed setoff or recoupment at least ten (10) Business Days prior thereto, and, if the claimant files a written objection to such proposed setoff or recoupment, the County shall not proceed with the setoff or recoupment absent the withdrawal of the claimant's objection or the entry of an order overruling the objection, but the County may in all events withhold any Distributions on account of such Claim pending resolution of the claimant's objection; *provided further, however*, that neither the failure to setoff against or recoup from any Claim nor the allowance of any Claim shall constitute a waiver or release by the County of any Causes of Action the County may have against the subject claimant.

**Section 4.17.  Motion Under Bankruptcy Code Section 364.**

The Plan constitutes a motion by the County seeking the Bankruptcy Court's approval of the incurrence of all indebtedness and extensions of credit necessary to implement the Plan

pursuant to Bankruptcy Code section 364, including the offering of New Sewer Warrants under the Plan, the incurrence of any underwriting or other transaction fees to be paid at closing, and payment of the Put Consideration. Confirmation of the Plan shall constitute a conclusive determination that the protections of Bankruptcy Code section 364(e) will apply to all such indebtedness or extensions of credit to the maximum extent permitted by law. Confirmation of the Plan shall also constitute a conclusive determination that all such indebtedness or extensions of credit were extended and incurred in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

**Section 4.18. <u>The Effective Date</u>.**

The Plan shall not become binding unless and until the Effective Date occurs. The Effective Date will be a Business Day selected by the County, after consultation with the Sewer Plan Support Parties, that is on or after the date on which all of the following conditions have been satisfied as set forth below, or waived as set forth in Section 4.18(b). Unless waived pursuant to Section 4.18(b), the Effective Date of the Plan shall not occur until each of the following conditions precedent has occurred or will occur simultaneously with the Effective Date of the Plan.

        **(a)**        <u>Conditions to the Effective Date</u>.

       (i)     The Confirmation Order shall (A) be entered and in full force and effect in form and substance acceptable to (1) the County, (2) the Sewer Plan Support Parties to the extent the relevant provisions of the Confirmation Order (or provisions excluded from the proposed Confirmation Order) would affect the rights of the applicable Sewer Plan Support Party, and (3) the GO Plan Support Parties to the extent the relevant provisions of the Confirmation Order (or provisions excluded from the proposed Confirmation Order) would affect the rights of the applicable GO Plan Support Party; and (B) not be subject to any stay;

       (ii)    The County shall have entered into the Closing Agreement; *provided, however*, that if any settlement payment is required to be made to the Internal Revenue Service, such payment shall be payable exclusively from Accumulated Sewer Revenues or gross Sewer System revenues received by the County; *provided further, however*, that any such settlement payment shall not reduce the aggregate consideration to be paid to holders of Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D, or any other payments described herein to be paid to the Sewer Plan Support Parties;

       (iii)   The aggregate Tail Risk and the aggregate Covered Tail Risk shall each not exceed $25.0 million;

       (iv)   No Sewer Warrant Insurer will be subject to any Tail Risk on or after the Effective Date in an amount in excess of its Covered Tail Risk;

       (v)    The issuance of the New Sewer Warrants has closed (or will close simultaneously with the occurrence of the Effective Date), and the aggregate Refinancing Proceeds and other Cash consideration required to make the payments to (A) holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims shall be available and shall have been paid under the Plan to the Sewer Warrant Trustee for Distribution in accordance with the Plan on the Effective Date; and

(B) holders of Allowed Class 1-C Claims (including the Sewer Warrant Insurers Outlay Amount) shall be available and shall have been paid under the Plan to the applicable Sewer Warrant Insurer in accordance with the Plan and the Sewer Warrant Insurers Agreements on the Effective Date;

(vi)     The Sewer Plan Support Agreements, the Sewer Warrant Insurers Agreements, and the Tail Risk Payment Agreements shall be in full force and effect and any and all payments required under (A) the Sewer Warrant Insurers Agreements shall have been made to the applicable Sewer Warrant Insurer (or are paid simultaneously with the other payments to the Sewer Warrant Insurers required under the Plan); and (B) the Tail Risk Payment Agreements and the Plan shall have been paid or placed into escrow, as the case may be, in accordance with such Tail Risk Payment Agreements;

(vii)     All of the settlements, releases, and injunctions contemplated by the Plan (including the settlement and release under the Plan of the Causes of Action asserted in the Bennett Action and the Wilson Action) shall have been approved pursuant to the Confirmation Order, and any pending litigation (including any appeals) commenced by the County or any of the Sewer Plan Support Parties against any of the Sewer Plan Support Parties shall have been (or simultaneously with the occurrence of the Effective Date will be) dismissed with prejudice;

(viii)     The Effective Date shall have occurred on or before December 31, 2013;

(ix)     The Plan (as confirmed by the Confirmation Order), the Plan Supplement, and all other documents, instruments, agreements, writings, and undertakings required under the Plan (A) shall be in form and substance satisfactory to the County (and, to the extent required by any applicable Plan Support Agreement or the Plan, approved by the applicable Plan Support Party or Parties); (B) shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby; and (C) and, to the extent required by any applicable Plan Support Agreement or the Plan, shall be (or simultaneously with the occurrence of the Effective Date will be) effective;

(x)     The Supporting Sewer Warrantholder Directed Distribution and the Put Consideration shall have been approved pursuant to the Confirmation Order and paid to the Supporting Sewer Warrantholders; and

(xi)     The County, the Sewer Liquidity Banks, the Sewer Warrant Insurers, the Supporting Sewer Warrantholders, and the JPMorgan Parties shall have each acknowledged in writing (which writing may take the form of an email exchange among their respective counsel) that all conditions to the Effective Date have been satisfied or waived (or will be satisfied or waived simultaneously with the occurrence of the Effective Date).

### (b)     <u>**Waiver of Conditions.**</u>

The requirement that the conditions to the occurrence of the Effective Date be satisfied may be waived in whole or in part by mutual written agreement by (i) the County and each Sewer Plan Support Party (or, in the case of the Supporting Sewer Warrantholders, the "Majority Eligible Warrantholders" as defined in the Supporting Sewer Warrantholder Plan Support Agreement if such waiver may be effected by the Majority Eligible Warrantholders under the

Supporting Sewer Warrantholder Plan Support Agreement) that is affected by the subject condition; or (ii) the County and each GO Plan Support Party that is affected by the subject condition, solely with respect to conditions (i), (vii), and (ix). Any such waiver may be effected at any time, without advance notice, leave, or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

(c) <strong><u>Effect of Failure of Conditions.</u></strong>

In the event that the conditions to the occurrence of the Effective Date have not been timely satisfied or waived pursuant to Section 4.18(b), and upon notification Filed by the County with the Bankruptcy Court, (i) the Confirmation Order shall be vacated; (ii) no Distributions shall be made; (iii) the County and all Creditors shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; (iv) the County, the Plan Support Parties, the Sewer Warrant Trustee, and the School Warrant Trustee will be restored to their rights as if the Plan, the Plan Support Agreements, any Plan Term Sheets referenced therein, and the Sewer Warrant Insurers Agreements were never entered into, and all claims and defenses of the County, the Plan Support Parties, the Sewer Warrant Trustee, and the School Warrant Trustee shall be fully reserved; (v) any and all Ballots with respect to the Plan delivered by each of the Plan Support Parties shall be immediately withdrawn, and such Ballots shall be null and void for all purposes and shall not be considered or otherwise used in any manner; and (vi) all of the County's obligations with respect to Claims shall remain unchanged and nothing contained in the Plan shall constitute a waiver or release of any Causes of Action by or against the County or any other Person or to prejudice in any manner the rights, claims, or defenses of the County or any other Person in any further proceedings involving the County. Nothing in the foregoing sentence shall alter or limit any Person's rights under any Plan Support Agreement.

(d) <strong><u>Notice of the Effective Date.</u></strong>

Promptly after the occurrence of the Effective Date, the County or its agents shall mail or cause to be mailed to all Creditors a notice that informs such Creditors of (i) entry of the Confirmation Order and the resulting confirmation of the Plan; (ii) the occurrence of the Effective Date; (iii) the assumption and rejection of executory contracts and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Damage Claims; (iv) the deadline established under the Plan for the filing of Administrative Claims; and (v) such other matters as the County finds appropriate.

<strong>ARTICLE V<br/>OTHER PLAN PROVISIONS</strong>

**Section 5.1.** <strong><u>Exculpation of GO Released Parties, Sewer Released Parties, and the School Warrant Trustee Regarding the Bankruptcy and Plan Process.</u></strong>

To the maximum extent permitted by law, neither the GO Released Parties, nor the Sewer Released Parties, nor the School Warrant Trustee, nor any of their respective Related Parties shall have or incur any liability to any Person, including any holders of GO Warrants, Sewer Warrants, or School Warrants, for any act or omission occurring on or before the Effective Date

79

in connection with, related to, or arising out of the Case, the Plan Support Agreements, the formulation, preparation, dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlements contained herein, the Disclosure Statement, or any contract, instrument, release, or other agreement or document provided or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided, however*, that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any such act or omission occurring on or prior to the Effective Date to the extent that such act or omission is determined in a Final Order to have constituted willful misconduct or fraud. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute willful misconduct or fraud unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the GO Released Parties, the Sewer Released Parties, the School Warrant Trustee, and their respective Related Parties shall be entitled to rely on the advice of their respective counsel with respect to their duties and responsibilities in connection with the Case and the Plan.

**Section 5.2.    Revocation of the Plan; No Admissions.**

Subject to each of the Sewer Plan Support Agreements, the County reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or if the Effective Date does not occur, the Plan (and the Confirmation Order, if entered) will be null and void and inadmissible as evidence in any proceeding, and nothing contained in the Plan, the Disclosure Statement, or the Confirmation Order (if entered) will (a) be an admission by the County, any of the Plan Support Parties, the Sewer Warrant Trustee, or the School Warrant Trustee with respect to any matter set forth therein, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against the County or its property, or of any Causes of Action; or (c) prejudice in any manner the rights of any Person in any further proceedings. Nothing in this Section 5.2 shall limit the rights or remedies available to any Person under any applicable Plan Support Agreement. In addition, nothing in the Plan, the comprehensive compromise and settlement described in Section 4.8(a), or any other compromises and settlements implemented under the Plan shall be deemed to be an admission or evidence of wrongdoing or, except with respect to obligations created under or pursuant to the Plan, liability on the part of any GO Released Party, any Sewer Released Party, or any of their respective Related Parties.

**Section 5.3.    Modification of the Plan.**

Subject to the restrictions set forth in Bankruptcy Code section 942 and in each of the Sewer Plan Support Agreements, the County reserves the right to alter, amend, or modify the Plan at any time before the Confirmation Date.

**Section 5.4.    Severability of Plan Provisions.**

If, before the Confirmation Date, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with

80

the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. All rights of each Plan Support Party under the applicable Plan Support Agreement are fully reserved if any such holding, alteration, or interpretation means that the Plan is no longer an "Acceptable Plan" for purposes of the applicable Plan Support Agreement. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section 5.4, is valid and enforceable under its terms.

**Section 5.5.    Inconsistencies.**

To the extent of any inconsistencies between the Plan, on the one hand, and the Disclosure Statement, any Plan Support Agreement, or any Ballot, on the other hand, the terms and provisions contained in the Plan shall govern.

**Section 5.6.    Governing Law.**

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and the Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided in, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, instruments, and documents executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Alabama without giving effect to the principles of conflict of laws thereof.

**Section 5.7.    Transactions on Business Days.**

If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

**Section 5.8.    Good Faith.**

Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Plan Procedures Order, the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the County, all the Plan Support Parties, the Sewer Warrant Trustee, the School Warrant Trustee, the FGIC Rehabilitator, and all their respective Related Parties have acted in good faith in connection therewith.

**Section 5.9.    Effectuating Documents and Further Transactions.**

Each of the officials and employees of the County is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents

and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and provisions of the Plan.

**Section 5.10.  <u>Validation of the New Sewer Warrants</u>.**

Pursuant to Bankruptcy Code sections 944(a), 944(b)(3), 105(a), and 1123(b)(6), from and after the Effective Date, confirmation of the Plan shall be a binding judicial determination that the New Sewer Warrants, the New Sewer Warrant Indenture, the Rate Resolution, and the covenants made by the County for the benefit of the holders thereof (including the revenue and rate covenants in the New Sewer Warrant Indenture) will constitute valid, binding, legal, and enforceable obligations of the County under Alabama law and that the provisions made to pay or secure payment of such obligations are valid, binding, legal, and enforceable security interests or liens on or pledges of revenues, which validation will be set forth in the Confirmation Order substantially as follows:

> The New Sewer Warrants were authorized and will be issued as of the Effective Date as a means of implementing the Plan and providing for the satisfaction of Sewer Debt Claims in accordance with the Bankruptcy Code.

> The County has the authority under the constitution and laws of the State of Alabama and the Plan to adopt the Rate Resolution, to execute, deliver and perform its obligations under the New Sewer Warrant Indenture, and to issue, execute, and deliver the New Sewer Warrants pursuant to the Plan.

> All actions and things required under the provisions of applicable law to be had and done in this proceeding preliminary to the entry of this Confirmation Order have been had and done in the manner provided by law.  This Confirmation Order will be forever conclusive against, among others, the County and all taxpayers and citizens of the County.

> The indebtedness evidenced and ordered paid by the New Sewer Warrants shall be a limited obligation of the County, payable solely from the System Revenues derived from the operation of the Sewer System.  The general faith and credit of the County shall not be pledged to the payment of the principal of or the interest or premium (if any) on the New Sewer Warrants, and the New Sewer Warrants shall not be general obligations of the County.

> The New Sewer Warrants shall not constitute a debt or indebtedness of the County under the provisions of Section 224 of the Constitution of the State of Alabama, as amended, because the principal of and interest on the New Sewer Warrants will be payable solely from the System Revenues derived from the operation of the Sewer System, and will not be a charge on the general credit of the County.

> The Bankruptcy Court does hereby validate and confirm all proceedings had and taken in connection with the following (i) the Plan; (ii) all covenants, agreements, provisions, and obligations of the County set forth in the Plan; (iii) the Rate Resolution; (iv) all covenants, agreements, provisions, and obligations of the

82

County set forth in the New Sewer Warrant Indenture; and (v) the New Sewer Warrants and the provisions made to pay and secure payment of such obligations. When the New Sewer Warrants have been executed and delivered in accordance with the Plan, then the New Sewer Warrants and the pledges, covenants, agreements, and obligations set forth therein and in the New Sewer Warrant Indenture shall stand validated and confirmed.

At the time of the delivery of the New Sewer Warrants, the County is hereby directed to cause to be stamped or written on each of the New Sewer Warrants a legend substantially as follows:

> "VALIDATED AND CONFIRMED BY JUDGMENT AND CONFIRMATION ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ALABAMA, ENTERED ON THE ___ DAY OF _____, 2013."

This validation under the Plan will be full, final, complete, binding, and conclusive as to the County and all Persons, including all Persons that could assert or purport to assert any rights by or on behalf of the County. Accordingly, the validity and enforceability of the Rate Resolution, the New Sewer Warrants, the New Sewer Warrant Indenture, and the covenants made by the County for the benefit of the holders thereof (including the revenue and rate covenants in the New Sewer Warrant Indenture) shall not be subject to any collateral attack or other challenge by any Person in any court or other forum from and after the Effective Date.

**Section 5.11.** <u>**Validation of the Approved Rate Structure.**</u>

Pursuant to Bankruptcy Code sections 944(a), 944(b)(3), 105(a), and 1123(b)(6), from and after the Effective Date, the Confirmation Order shall be a binding judicial determination that (i) the Approved Rate Structure is a valid provision made to pay or secure payment of the New Sewer Warrants and is appropriate, reasonable, non-discriminatory, and legally binding on and specifically enforceable against the County, in accordance with the Plan and under applicable law; and (ii) the County Commission shall adopt and maintain the Approved Rate Structure in accordance with the Rate Resolution and as necessary for the County to satisfy the obligations arising under the New Sewer Warrants and the New Sewer Warrant Indenture (and to otherwise comply with all applicable state and federal laws regarding the maintenance and operation of the Sewer System), including increases in sewer rates to the extent necessary to allow the timely satisfaction of the County's obligations under the New Sewer Warrants and the New Sewer Warrant Indenture (and to otherwise comply with all applicable state and federal laws regarding the maintenance and operation of the Sewer System). Without limitation, from and after the Effective Date, (a) the Confirmation Order shall constitute a consent decree binding upon, specifically enforceable against, and a basis for mandamus against the County, the County Commission, and all other Persons in accordance with the Plan; (b) the validity and enforceability of the Approved Rate Structure and the Rate Resolution shall not be subject to any collateral attack or other challenge by any Person in any court or other forum from and after the Effective Date; and (c) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the Approved Rate Structure and the Rate Resolution, to require the County to otherwise comply with the New Sewer Warrants and the New Sewer Warrant Indenture, and to hear and adjudicate

any action or proceeding enforcing, challenging, or collaterally attacking the Approved Rate Structure or the Rate Resolution.

**Section 5.12.  <u>Validation of Allowance of Sewer Debt Claims</u>.**

Confirmation of the Plan shall be a binding judicial determination that the allowance on the Effective Date of Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D is appropriate and binding on, specifically enforceable against, and a basis for mandamus against the County, the County Commission, and all other Persons in accordance with the Plan, because, among other things, the allowance of such Claims, along with treatment of those Allowed Claims under the Plan, is a necessary predicate to the issuance of the New Sewer Warrants.  This validation under the Plan will be full, final, complete, binding, and conclusive as to the County and all Persons, including all Persons that could assert or purport to assert any rights by or on behalf of the County.  Accordingly, the validity and enforceability of the allowance of the Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D along with the treatment of those Allowed Claims under the Plan, shall (i) moot any pending Causes of Action challenging the validity or enforceability of the Sewer Warrants or the issuance thereof, payments of principal and interest made in respect of the Sewer Warrants, or any Sewer System rates or charges established or collected by the County in connection with the issuance or the payment of debt service in respect of the Sewer Warrants, or seeking the return to the County of any payment made by the County in connection with the Sewer Warrants or any financing or other transaction regarding the Sewer System; and (ii) not be subject to any collateral attack or other challenge by any Person in any court or other forum from and after the Effective Date.

**Section 5.13.  <u>Notices</u>.**

Any notices to or requests of the County by parties in interest under or in connection with the Plan shall be in writing and served either by (a) certified mail, return receipt requested, postage prepaid; (b) hand delivery; or (c) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when actually received by the following parties:

> Jefferson County, Alabama
> Attn: County Manager
> Room 251, Jefferson County Courthouse
> 716 Richard Arrington Jr. Boulevard North
> Birmingham, Alabama 35203
>
> -and-
>
> Jefferson County, Alabama
> Attn: County Attorney
> Room 280, Jefferson County Courthouse
> 716 Richard Arrington Jr. Boulevard North
> Birmingham, Alabama 35203
>
> -and-

84

Bradley Arant Boult Cummings LLP
Attn: J. Patrick Darby, Esq.
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Re: Jefferson County

-and-

Klee, Tuchin, Bogdanoff & Stern LLP
Attn: Kenneth N. Klee, Esq.
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Re: Jefferson County

**Section 5.14.   <u>Sewer Warrant Trustee Residual Fee Estimate</u>.**

The County will have the right to challenge the amount of the Sewer Warrant Trustee Residual Fee Estimate by filing an action in the Bankruptcy Court within five (5) calendar days after receipt of the Sewer Warrant Trustee Residual Fee Estimate, provided that prior to filing such an action, the County will make good faith efforts to resolve any dispute with the Sewer Warrant Trustee.  Any challenge by the County to the amount of the Sewer Warrant Trustee Residual Fee Estimate will be resolved by the Bankruptcy Court on an expedited basis before the Effective Date.

**ARTICLE VI**
**<u>EFFECTS OF CONFIRMATION OF THE PLAN</u>**

**Section 6.1.   <u>Binding Effect</u>.**

Upon the Effective Date and pursuant to Bankruptcy Code section 944(a), the Plan, the Distributions and transactions contemplated by the Plan, and the compromises and settlements contained in the Plan shall be binding upon the County, all Creditors, all special tax payers (as such term is defined in Bankruptcy Code section 902(3)), all customers and rate payers of the Sewer System, all parties in interest, and all other Persons.  Confirmation of the Plan binds each holder of a Claim to all the terms and conditions of the Plan, whether or not such holder's Claim is Allowed, whether or not such holder holds a Claim that is in a Class that is Impaired under the Plan, and whether or not such holder has accepted the Plan.  The County reserves all rights to seek appropriate relief against any Person under Bankruptcy Code section 1142(b) to the extent necessary for the consummation of the Plan.

85

**Section 6.2.**    **Discharge and Injunctions.**

The rights afforded in the Plan and the treatment of all Claims by the Plan shall be in exchange for and in complete settlement, satisfaction, discharge, and release of, and injunction against, all Claims of any nature whatsoever arising prior to the Effective Date against the County or its property, including any interest accrued on such Claims from and after the Petition Date.

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, (a) the County and its property are discharged and released to the fullest extent permitted by Bankruptcy Code section 944(b) from all Claims and rights that arose before the Effective Date, including all debts, obligations, demands, and liabilities, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), regardless whether (i) a proof of Claim based on such debt is Filed or deemed Filed, (ii) a Claim based on such debt is allowed pursuant to Bankruptcy Code section 502, or (iii) the holder of a Claim based on such debt has or has not accepted the Plan; (b) any judgment underlying a Claim discharged hereunder is void; and (c) all Persons are precluded from asserting against the County or its property, whether directly or on behalf of the County, any Claims or rights based on any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold, or may hold a Claim that is based on any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, that otherwise arose or accrued prior to the Effective Date, or that otherwise is discharged pursuant to the Plan, are permanently and completely enjoined from taking any of the following actions on account of any such discharged Claim (the "Permanent Injunction"): (a) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind against or affecting the County, its property, its obligations, or any of its Related Parties that is inconsistent with the Plan or the Confirmation Order; (b) attaching, collecting, enforcing, levying, or otherwise recovering in any manner any award, decree, judgment, or order against or affecting the County, its property, its obligations, or any of its Related Parties other than as expressly permitted under the Plan; (c) creating, perfecting, or otherwise enforcing in any manner any lien or encumbrance of any kind against or affecting property of the County, other than as expressly permitted under the Plan; (d) asserting any right of recoupment, setoff, or subrogation of any kind against any obligation due to the County with respect to any such discharged Claim, except as otherwise permitted by Bankruptcy Code section 553; (e) acting or proceeding in any manner, in any place whatsoever, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the discharge provisions of Bankruptcy Code section 944; and (f) taking any actions to interfere with the implementation or consummation of the Plan.  The County and any other Person injured by any willful violation of the Permanent Injunction shall recover actual damages, including costs, expenses, and attorneys' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

Except as otherwise provided in the Plan, all injunctions or stays in effect in the Case under Bankruptcy Code sections 105, 362(a), or 922(a), or otherwise, on the Confirmation Date shall remain in full force and effect through and including the Effective Date.

Section 6.3.    Releases and Injunctions.

(a)    Sewer Releases and Injunctions.

Under the Plan and as of the Effective Date, each Sewer Released Party, on behalf of itself, and to the maximum extent permitted by law, on behalf of each of its Related Parties, in exchange for and upon receipt of the treatment and consideration set forth in the Plan for the Sewer Released Parties, including the compromises and settlements among the Sewer Released Parties implemented pursuant to the Plan, forever waives and releases all other Sewer Released Parties and their respective Related Parties from any and all Sewer Released Claims.

Under the Plan and as of the Effective Date, all Persons who voted to accept the Plan or who made or are deemed to have made the Commutation Election will be conclusively deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released and discharged on their own behalf, and on behalf of any Person claiming through them, all Sewer Released Parties and their respective Related Parties from any and all Sewer Released Claims.

From and after the Effective Date, the County, any Person seeking to exercise the rights of the County (including in respect of the County's Causes of Action purportedly asserted in the Bennett Action and the Wilson Action), all Persons holding any Sewer Released Claims that are waived and released pursuant to this Section 6.3(a), and all Persons acting or purporting to act on behalf of any Persons holding any Sewer Released Claims that are waived and released pursuant to this Section 6.3(a), are permanently and completely enjoined from commencing or continuing any action, directly or indirectly and in any manner, to assert, pursue, litigate, or otherwise seek any recovery on or on account of such Sewer Released Claims.

From and after the Effective Date, the Sewer Warrant Trustee, any holders of Sewer Warrants, or any other Person are permanently and completely enjoined from pursuing any right of payment under (i) any of the Sewer DSRF Policies, which will be cancelled and of no further force or effect pursuant to Section 4.7; or (ii) any of the Sewer Wrap Policies with respect to any Sewer Warrant holder that made or was deemed to have made the Commutation Election, which Sewer Wrap Policies will be cancelled and of no further force or effect pursuant to Section 4.7; *provided, however*, that such injunction shall not enjoin any holders of Sewer Warrants that did not make or were deemed not to make the Commutation Election, or, if applicable, the Sewer Warrant Trustee on their behalf, from pursuing any Sewer Wrap Payment Rights.

87

(b)     **GO Releases and Injunctions.**

**Under the Plan and as of the Effective Date, each GO Released Party, on behalf of itself, and to the maximum extent permitted by law, on behalf of each of its Related Parties, in exchange for and upon receipt of the treatment and consideration set forth in the Plan for the GO Released Parties, including the compromises and settlements among the GO Released Parties implemented pursuant to the Plan, forever waives and releases all other GO Released Parties and their respective Related Parties from any and all GO Released Claims.**

**Under the Plan and as of the Effective Date, all Persons who voted to accept the Plan will be conclusively deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released and discharged on their own behalf, and on behalf of any Person claiming through them, all GO Released Parties and their respective Related Parties from any and all GO Released Claims.**

**From and after the Effective Date, the County, any Person seeking to exercise the rights of the County, all Persons holding any GO Released Claims that are waived and released pursuant to this Section 6.3(b), and all Persons acting or purporting to act on behalf of any Persons holding any GO Released Claims that are waived and released pursuant to this Section 6.3(b), are permanently and completely enjoined from commencing or continuing any action, directly or indirectly and in any manner, to assert, pursue, litigate, or otherwise seek any recovery on or on account of such GO Released Claims.**

(c)     **Necessity and Approval of Releases and Injunctions.**

**The releases and injunctions set forth in this Section 6.3 are integral and critical parts of the Plan and the settlements implemented pursuant to the Plan, the approval of such releases pursuant to the Confirmation Order is a condition to the occurrence of the Effective Date, and all Sewer Released Parties and all GO Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, Causes of Action, and other rights under the Plan.**

**Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases and injunctions set forth in this Section 6.3, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases and injunctions are: (1) in exchange for the good and valuable consideration provided by the Sewer Released Parties, the GO Released Parties, and their respective Related Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the County and all Creditors; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a**

**bar to any of the releasing parties as set forth herein asserting any Claims or Causes of Action released pursuant to such release.**

**Section 6.4.**    **Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Case after the Effective Date to the fullest extent provided by law, including the jurisdiction to:

(a)    Except as otherwise Allowed pursuant to the Plan or in the Confirmation Order, Allow, classify, determine, disallow, establish the priority or secured or unsecured status of, estimate, limit, liquidate, or subordinate any Claim, in whole or in part;

(b)    Resolve any motions pending on the Effective Date to assume, assume and assign, or reject any executory contract or unexpired lease to which the County is a party or with respect to which the County may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(c)    Resolve any and all other applications, motions, adversary proceedings, and other contested or litigated matters involving the County that may be pending on the Effective Date or that may be instituted thereafter in accordance with the terms of the Plan;

(d)    Ensure that all Distributions are accomplished pursuant to the provisions of the Plan;

(e)    Enter such orders as may be necessary or appropriate to implement or consummate the Plan and all contracts, instruments, releases, and other agreements or documents entered into in connection with or related to the Plan;

(f)    Resolve any and all controversies, suits, or issues that may arise in connection with the implementation, consummation, interpretation, or enforcement of the Plan or the Confirmation Order, or any Person's rights, obligations, or interests under the Plan or the Confirmation Order;

(g)    Remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, the Plan, the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(h)    Adjudicate any Preserved Claims;

(i)    Implement and enforce the Commutation Election, and implement and enforce all settlements, releases, exculpations, and injunctions associated with the Plan;

(j)    Issue injunctions, enter and implement other orders, or take any other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan or the Confirmation Order;

89

(k)     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason modified, reversed, revoked, stayed, or vacated;

(l)     Adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any actions taken by any Person pursuant to or in furtherance of the Plan, including implementation or enforcement of the Approved Rate Structure and issuance of the New Sewer Warrants under the New Sewer Warrant Indenture, and enter any necessary or appropriate orders or relief (including mandamus) in connection with such adjudication;

(m)     Hear and determine any actions brought against the County, the GO Released Parties, the Sewer Released Parties, or any of their respective Related Parties in connection with all compromises and settlements, exculpations and releases, the Plan, or the Case;

(n)     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan; and

(o)     Enter an order closing the Case pursuant to Bankruptcy Code section 945(b).

If the Bankruptcy Court abstains from exercising jurisdiction, declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter, then this Section 6.4 shall have no effect upon and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

[remainder of page intentionally left blank]

## ARTICLE VII
## RECOMMENDATION AND CONCLUSION

The County believes that confirmation and implementation of the Plan are the best alternative under the circumstances and urges all its Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

DATED AS OF:  July 29, 2013

**JEFFERSON COUNTY, ALABAMA**

By:  W.D. Carrington
Its:  County Commission President

Filed by:

/s/ J. Patrick Darby
**BRADLEY ARANT BOULT CUMMINGS LLP**
J. Patrick Darby
Jay R. Bender
Jennifer H. Henderson
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 521-8000
Facsimile:  (205) 521-8500
Email: pdarby@babc.com, jbender@babc.com,
    jhenderson@babc.com

*-and-*

**KLEE, TUCHIN, BOGDANOFF & STERN LLP**
Kenneth N. Klee (*pro hac vice*)
Lee R. Bogdanoff (*pro hac vice*)
David M. Stern (*pro hac vice*)
Robert J. Pfister (*pro hac vice*)
Whitman L. Holt (*pro hac vice*)
1999 Avenue of the Stars, Thirty-Ninth Floor
Los Angeles, California 90067
Telephone:  (310) 407-4000
Facsimile:  (310) 407-9090
Email:  kklee@ktbslaw.com, lbogdanoff@ktbslaw.com,
    dstern@ktbslaw.com, rpfister@ktbslaw.com,
    wholt@ktbslaw.com

*Counsel for Jefferson County, Alabama*

Case 11-05736-CRJ9    Doc 1911    Filed 07/29/13    Entered 07/29/13 14:41:05    Desc
Main Document    Page 92 of 104

# Exhibit A

## Preserved Claims

1. All Causes of Action and Avoidance Actions against British Petroleum arising out of the fire, explosions, and oil leak that occurred on the Deepwater Horizon, whether or not asserted in connection with the consolidated cases collectively styled *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010, MDL No. 2179, pending in the United States District Court for the Eastern District of Louisiana.

2. All Causes of Action and Avoidance Actions against Bank of America, Bank of Tokyo - Mitsubishi UFJ, Barclays Bank plc, Citibank NA, Credit Suisse, Deutsche Bank AG, HSBC, Lloyds TSB Bank plc, Rabobank, Royal Bank of Canada, The Norinchukin Bank, The Royal Bank of Scotland Group, UBS AG, BNP Paribas, Credit Agricole Corporate Investment Bank, Sumitomo Mitsui Banking Corporation, and Société Générale regarding manipulation of the London Interbank Offered Rate and effect on the County's variable-rate obligations, including obligations under interest rate swap agreements.

3. All Causes of Action and Avoidance Actions against Jack Swann; Harry Chandler; Ronald Wilson; Clarence Barber; Larry Creel; Sohan Singh; Ed Key; U.S. Infrastructure; Civil Engineering Design Services; Pat Dougherty; Dougherty Engineering; Bobby Rast; Danny Rast; Rast Construction; William Dawson; Dawson Engineering; Grady Pugh, Jr; Roland Pugh; Roland Pugh Construction; and Eddie Yessick arising out of these parties' conduct in connection with bribery, corruption, or the construction of the Sewer System. The County's Causes of Action include claims for unpaid fines or restitution.

4. All Causes of Action and Avoidance Actions against Wachovia Bank, N.A. ("Wachovia") and Wells Fargo Bank, N.A. ("Wells Fargo") arising from Wachovia's violation of state and federal antitrust laws in connection with the marketing, sale, and placement of municipal bond derivatives, whether or not included in the settlement between Wachovia, Wells Fargo, and the Attorneys General of twenty six states and whether or not asserted in the case styled *In re Municipal Derivatives Antitrust Litigation* (or other related actions) filed in the United States District Court for the Southern District of New York.

5. All Causes of Action and Avoidance Actions against UBS AG arising from USB AG's violations of state and federal antitrust and other laws by UBS and others in connection with the marketing, sale, and placement of municipal bond derivatives, whether or not included in the settlement between UBS AG and the Attorneys General of twenty six states and whether or not asserted in the case styled *In re Municipal Derivatives Antitrust Litigation* (or other related actions) filed in the United States District Court for the Southern District of New York.

6. All Causes of Action and Avoidance Actions against Jefferson Clinic, P.C. related to services provided to Cooper Green Mercy Hospital and payments made to Jefferson Clinic P.C. with respect to such services.

7. All Causes of Action and Avoidance Actions against any contractors, vendors, and former employees related to services provided to Cooper Green Mercy Hospital, including claims for refunds of payments made pursuant to void contracts.

8. All Causes of Action and Avoidance Actions against Health Assurance, LLC for refunds of premiums paid on or behalf of the County.

9. All Causes of Action and Avoidance Actions against Greater McAdory Athletic Association related to advances from the County earmarked for specific use.

10. All Causes of Action and Avoidance Actions against Hendon Engineering in connection with design and construction defects at the Five Mile Waste Water Treatment Plant.

11. All Causes of Action and Avoidance Actions for payment of any taxes, including sales taxes, use taxes, ad valorem taxes, occupational taxes, privilege taxes, or any other kind of tax; whether or not such taxes are currently the subject of any litigation.

12. All Causes of Action and Avoidance Actions related to services provided by the County to third parties, including municipalities and related municipal boards, authorities and other entities, sewer customers, and hospital and clinic patients.

13. All Causes of Action and Avoidance Actions relating to reimbursements from the State of Alabama and the federal government, including the Federal Emergency Management Agency, for County expenditures following the tornadoes of April 2011.

14. All Causes of Action and Avoidance Actions related to deposits, bonds, or other forms of security posted in connection with construction projects or other contracts as to which the counterparty failed to timely or satisfactorily perform.

15. All Causes of Action and Avoidance Actions related to subrogation rights against third parties arising from property and worker's compensation claims.

16. All Causes of Action and Avoidance Actions against any holder of Sewer Warrants that is not a Sewer Released Party or a Related Party of such Sewer Released Party.

17. All Causes of Action, Avoidance Actions, defenses, deductions, assessments, setoffs, recoupment, and other rights under applicable nonbankruptcy law with respect to any Creditor or any Person that are not otherwise released under or pursuant to the Plan.

# **<u>Exhibit B</u>**

**Schedule of Assumed Agreements**

[Initial Schedule of Assumed Agreements will be included in the Plan Supplement]

# Exhibit C

## Approved Rate Structure

Rates and charges for sewer service are embodied in the *Jefferson County Sewer Use Charge Ordinance*, adopted November 6, 2012 (as amended from time to time, the "Charge Ordinance"), the current version of which is appended to and incorporated into this Approved Rate Structure. The Charge Ordinance sets out pertinent defined terms and describes in detail the policies and procedures by which bills are calculated. This Approved Rate Structure details how further changes in rates and charges contemplated by the Plan will be implemented.

### User Charges

Under the Charge Ordinance, each user pays: (i) a monthly base charge that varies depending on meter size; and (ii) volumetric charges (measured on a per-CCF basis) that vary depending on whether the user is classified as residential or non-residential, and (for residential users) that vary based on the level of the user's consumption. In addition, the Charge Ordinance specifies certain industrial waste surcharges and the fees for discharging hauled wastewater (septage and domestic wastewater, as well as grease trap waste) into the system. Finally, the Charge Ordinance sets out certain miscellaneous fees and charges, including fees for inspections, permits, returned checks, and the like. These fees and charges are collectively referred to as the "User Charges," and they are set out immediately below.

Effective March 1, 2013, the User Charges are as follows:

| Category | Amount |
|---|---|
| Monthly Base Charge (5/8" Meter) | $10.00 |
| Monthly Base Charge (3/4" Meter) | $11.00 |
| Monthly Base Charge (1" Meter) | $14.00 |
| Monthly Base Charge (1.5" Meter) | $18.00 |
| Monthly Base Charge (2" Meter) | $29.00 |
| Monthly Base Charge (3" Meter) | $110.00 |
| Monthly Base Charge (4" Meter) | $140.00 |
| Monthly Base Charge (6" Meter) | $210.00 |
| Monthly Base Charge (8" Meter) | $290.00 |
| Monthly Base Charge (10" Meter) | $370.00 |
| Non-Residential Block Volumetric Charge | $7.60 per CCF |

95

| Category | Amount |
|---|---|
| Residential Block Volumetric Charge (first three CCF) | $4.50 per CCF |
| Residential Block Volumetric Charge (next three CCF) | $7.00 per CCF |
| Residential Block Volumetric Charge (additional CCF) | $8.00 per CCF |
| Surcharge for BOD (300 mg/l strength) | $0.8284 per pound |
| Surcharge for COD (750 mg/l strength) | $0.4142 per pound |
| Surcharge for TSS (300 mg/l strength) | $0.2734 per pound |
| Surcharge for FOG (50 mg/l strength) | $0.1715 per pound |
| Surcharge for TP (4 mg/l strength) | $3.2650 per pound |
| Septage and Domestic Wastewater | $60.00 per 1,000 gallons |
| Grease Trap Waste | $75.00 per 1,000 gallons |
| Private Meter Application Processing Fee | $12.00 per application |
| Sewer Impact Fees for New Connections to the System | $225.00 per fixture |
| Connection Fee for Properties Currently on Septic | $100.00 |
| Impact Fee Refund Charge (1 – 10 Fixtures) | $20.00 |
| Impact Fee Refund Charge (11 – 50 Fixtures) | $30.00 |
| Impact Fee Refund Charge (More than 50 Fixtures) | $50.00 |
| Connection Permit (Pre-Installation) | $50.00 |
| Connection Permit (Post-Installation) | $550.00 |
| Repair Permit (Pre-Installation) | $50.00 |
| Repair Permit (Post-Installation) | $550.00 |
| Tap Permit | $150.00 |
| Disconnection Permit | $25.00 |

| Category | Amount |
|---|---|
| Grease Trap Annual Inspection Fee (1 – 5 Units) | $300.00 |
| Grease Trap Annual Inspection Fee (6 – 10 Units) | $500.00 |
| Grease Trap Annual Inspection Fee (Additional Units) | $200.00 per 5 additional units |
| Grease Trap Non-Compliance Fee | $400.00 |
| Grease Trap Re-Inspection Fee | $400.00 |
| Grease Trap Exemption Fee | $300.00 |
| Lien Recording Fee | $16.00 |
| Lien Satisfaction Fee | $16.00 |
| Return Check Fee | $30.00 |
| Pay Off Amount | $4.00 per sheet |

The County Commission may add, delete, or modify these categories of User Charges by adopting an Adjusting Resolution (defined below), provided that any modification of the categories of User Charges shall be either revenue-neutral or revenue-enhancing as shown by a Revenue Certification (defined below).

***Method of Imposing Rate Modifications for User Charges***

Pursuant to the Plan and in connection with the issuance of the New Sewer Warrants under the New Sewer Warrant Indenture, a resolution duly adopted by the County Commission during October 2013 (the "October 2013 Resolution") in compliance with Amendment 73 and Act 619 shall, upon approval, enact the revised User Charges set out in the next section (entitled "November 1, 2013 Increase"), effective November 1, 2013.

Pursuant to the October 2013 Resolution, the County shall each year thereafter increase the overall User Charges by certain required percentages (the "Required Percentage Increases," as more specifically defined below). Pursuant to the October 2013 Resolution, the County shall, unless it otherwise so elects as herein permitted, make the Required Percentage Increases by uniformly increasing the fees and charges in each of the categories of User Charges by the requisite percentage (rounded to the nearest cent except for those fees and charges expressed above in hundredths of a cent increments, which shall be rounded to the nearest hundredth of a cent). This method of making the Required Percentage Increases is the "Uniform Method."

Alternatively, the County may, but is not required to, elect to make the Required Percentage Increases non-uniformly (the "Non-Uniform Method") by increasing, decreasing, or leaving unchanged certain of the fees and charges in each of the categories of User Charges in such manner as the County shall determine in its reasonable discretion. If the County uses the Non-Uniform Method to make a

97

Required Percentage Increase, the County shall certify to the indenture trustee for the New Sewer Warrants, in accordance with the terms of the New Sewer Warrant Indenture, that the revenues projected to be generated in the fiscal year for which the Required Percentage Increase is applicable will be greater than or equal to the revenues that would be projected to be generated in that same fiscal year if the Uniform Method had instead been used to make the Required Percentage Rate Increase (a "Revenue Certification"). The New Sewer Warrant Indenture may further condition the use of a Non-Uniform Method and the terms of the Revenue Certification.

***November 1, 2013 Increase***

The October 2013 Resolution shall, upon approval, enact the following User Charges, effective November 1, 2013. (Categories with changed amounts from the User Charges in effect as of March 1, 2013 are italicized; the remaining categories are unchanged.)

| Category | Amount |
|---|---|
| ***Monthly Base Charge (5/8" Meter)*** | ***$15.00*** |
| ***Monthly Base Charge (3/4" Meter)*** | ***$16.50*** |
| ***Monthly Base Charge (1" Meter)*** | ***$21.00*** |
| ***Monthly Base Charge (1.5" Meter)*** | ***$27.00*** |
| ***Monthly Base Charge (2" Meter)*** | ***$43.50*** |
| ***Monthly Base Charge (3" Meter)*** | ***$165.00*** |
| ***Monthly Base Charge (4" Meter)*** | ***$210.00*** |
| ***Monthly Base Charge (6" Meter)*** | ***$315.00*** |
| ***Monthly Base Charge (8" Meter)*** | ***$435.00*** |
| ***Monthly Base Charge (10" Meter)*** | ***$555.00*** |
| ***Non-Residential Block Volumetric Charge*** | ***$7.87 per CCF*** |
| Residential Block Volumetric Charge (first three CCF) | $4.50 per CCF |
| Residential Block Volumetric Charge (next three CCF) | $7.00 per CCF |
| Residential Block Volumetric Charge (additional CCF) | $8.00 per CCF |
| Surcharge for BOD (300 mg/l strength) | $0.8284 per pound |
| Surcharge for COD (750 mg/l strength) | $0.4142 per pound |

98

| Category | Amount |
|---|---|
| Surcharge for TSS (300 mg/l strength) | $0.2734 per pound |
| Surcharge for FOG (50 mg/l strength) | $0.1715 per pound |
| Surcharge for TP (4 mg/l strength) | $3.2650 per pound |
| Septage and Domestic Wastewater | $60.00 per 1,000 gallons |
| Grease Trap Waste | $75.00 per 1,000 gallons |
| Private Meter Application Processing Fee | $12.00 per application |
| Sewer Impact Fees for New Connections to the System | $225.00 per fixture |
| Connection Fee for Properties Currently on Septic | $100.00 |
| Impact Fee Refund Charge (1 – 10 Fixtures) | $20.00 |
| Impact Fee Refund Charge (11 – 50 Fixtures) | $30.00 |
| Impact Fee Refund Charge (More than 50 Fixtures) | $50.00 |
| Connection Permit (Pre-Installation) | $50.00 |
| Connection Permit (Post-Installation) | $550.00 |
| Repair Permit (Pre-Installation) | $50.00 |
| Repair Permit (Post-Installation) | $550.00 |
| Tap Permit | $150.00 |
| Disconnection Permit | $25.00 |
| Grease Trap Annual Inspection Fee (1 – 5 Units) | $300.00 |
| Grease Trap Annual Inspection Fee (6 – 10 Units) | $500.00 |
| Grease Trap Annual Inspection Fee (Additional Units) | $200.00 per 5 additional units |
| Grease Trap Non-Compliance Fee | $400.00 |
| Grease Trap Re-Inspection Fee | $400.00 |

| Category | Amount |
|---|---|
| Grease Trap Exemption Fee | $300.00 |
| Lien Recording Fee | $16.00 |
| Lien Satisfaction Fee | $16.00 |
| Return Check Fee | $30.00 |
| Pay Off Amount | $4.00 per sheet |

### *Required Percentage Increases*

In addition to enacting the User Charges effective November 1, 2013, the October 2013 Resolution shall, upon approval, specify the precise First Required Percentage Increase (as defined below), Second Required Percentage Increase (as defined below), Third Required Percentage Increase (as defined below), Fourth Required Percentage Increase (as defined below), and the Residual Annual Required Percentage (as defined below) (together, the "Required Percentage Increases").

#### *First Required Percentage Increase*

Subject to the entirety of this Approved Rate Structure, and only if the Effective Date has occurred by January 1, 2014, the User Charges in effect as of November 1, 2013, shall, pursuant to the October 2013 Resolution, be increased by the "First Required Percentage Increase." The First Required Percentage Increase shall be given effect no later than November 1, 2014, and shall be enacted via the October 2013 Resolution. The User Charges thereby established will remain in effect unless and until modified in accordance with the October 2013 Resolution, but in no event may such User Charges be lowered prior to October 1, 2015.

The First Required Percentage Increase shall equal 7.89%, unless adjusted upward or downward by an Adjusting Resolution (as defined below) on the terms and conditions set out in the New Sewer Warrant Indenture, including the rate and revenue covenants therein. The First Required Percentage Increase shall be made using the Uniform Method unless the County otherwise elects.

#### *Second Required Percentage Increase*

Subject to the entirety of this Approved Rate Structure, and only if the Effective Date has occurred by January 1, 2014, the User Charges in effect as of September 30, 2015 shall, pursuant to the October 2013 Resolution, be increased by the "Second Required Percentage Increase." The Second Required Percentage Increase shall be provided in the October 2013 Resolution, subject to the occurrence of the Effective Date, and given effect no later than October 1, 2015. The User Charges thereby established will remain in effect through and including September 30, 2016.

The Second Required Percentage Increase shall equal 7.89%, unless adjusted upward or downward by an Adjusting Resolution (as defined below) on the terms and conditions set out in the New Sewer Warrant Indenture, including the rate and revenue covenants therein. The Second Required Percentage Increase shall be made using the Uniform Method unless the County otherwise elects.

100

*Third Required Percentage Increase*

Subject to the entirety of this Approved Rate Structure, and only if the Effective Date has occurred by January 1, 2014, the User Charges in effect as of September 30, 2016, shall, pursuant to the October 2013 Resolution, be increased by the "Third Required Percentage Increase." The Third Required Percentage Increase shall be provided in the October 2013 Resolution, subject to the occurrence of the Effective Date, and given effect no later than October 1, 2016. The User Charges thereby established will remain in effect through and including September 30, 2017.

The Third Required Percentage Increase shall equal 7.89%, unless adjusted upward or downward by an Adjusting Resolution on the terms and conditions set out in the New Sewer Warrant Indenture, including the rate and revenue covenants therein. The Third Required Percentage Increase shall be made using the Uniform Method unless the County otherwise elects.

*Fourth Required Percentage Increase*

Subject to the entirety of this Approved Rate Structure, and only if the Effective Date has occurred by January 1, 2014, the User Charges in effect as of September 30, 2017, shall, pursuant to the October 2013 Resolution, be increased by the "Fourth Required Percentage Increase." The Fourth Required Percentage Increase shall be provided in the October 2013 Resolution, subject to the occurrence of the Effective Date, and given effect no later than October 1, 2017. The User Charges thereby established will remain in effect through and including September 30, 2018.

The Fourth Required Percentage Increase shall equal 7.89%, unless adjusted upward or downward by an Adjusting Resolution on the terms and conditions set out in the New Sewer Warrant Indenture, including the rate and revenue covenants therein. The Fourth Required Percentage Increase shall be made using the Uniform Method unless the County otherwise elects.

*Residual Annual Required Percentage Increases*

Subject to the entirety of this Approved Rate Structure, and only if the Effective Date has occurred by January 1, 2014, for each fiscal year starting with the fiscal year beginning October 1, 2018 and continuing through the remaining term of the New Sewer Warrants, the User Charges in effect as of September 30 of the immediately preceding fiscal year shall, pursuant to the October 2013 Resolution, be increased by the "Residual Annual Required Percentage Increase." The Residual Annual Required Percentage Increase shall be provided in the October 2013 Resolution (subject to the occurrence of the Effective Date), and given effect no later than October 1 of each fiscal year starting with the fiscal year beginning October 1, 2018. The User Charges thereby established will remain in effect through and including the following September 30.

The Residual Annual Required Percentage Increase shall equal 3.49% for each remaining fiscal year that the New Sewer Warrants remain outstanding, unless adjusted upward or downward by an Adjusting Resolution on the terms and conditions set out in the New Sewer Indenture, including the rate and revenue covenants therein. The Residual Annual Required Percentage Increase shall be made using the Uniform Method unless the County otherwise elects.

**Adjusting Resolutions**

Beginning with the First Required Percentage Increase, the costs of operating the Sewer System and servicing the New Sewer Warrants may permit or require User Charges to decrease or increase other than as specified in the October 2013 Resolution. Moreover, the County Commission may elect to

implement some or all of the Required Percentage Increases using the Non-Uniform Method, which will require precise calculations that must be made closer in time to the scheduled adjustments of User Charges.

Accordingly, to preserve the County Commission's flexibility and to ensure that User Charges are neither too high nor too low, the County Commission may from time to time enact a resolution (an "Adjusting Resolution") that may do any or all of the following: (i) modify the Required Percentage Increase for the next fiscal year only; (ii) provide for the implementation of the Required Percentage Increase via the Non-Uniform Method for the next fiscal year only; and (iii) modify the existing categories of User Charges.

An Adjusting Resolution must: (i) be duly enacted in the fiscal year immediately preceding the first fiscal year for which the Adjusting Resolution will take effect; (ii) be enacted at least 30 days prior to the start of the fiscal year for which the Adjusting Resolution will take effect; and (iii) fully comply with the New Sewer Warrant Indenture, including the rate and revenue covenants therein.

Any Adjusting Resolution that provides for the implementation of a Required Percentage Increase by the Non-Uniform Method must: (i) set out which User Charges will be increased, which (if any) will be decreased, and which will be left unchanged; and (ii) be accompanied by a Revenue Certification.

Any Adjusting Resolution that adds, deletes, or modifies any categories of User Charges shall be accompanied by a Revenue Certification.

Notwithstanding anything to the contrary in this Approved Rate Structure, the County Commission may increase User Charges at any time.

**[Insert Charge Ordinance as Appendix]**

Case 11-05736-CRJ9     Doc 1911     Filed 07/29/13     Entered 07/29/13 14:41:05     Desc
Main Document     Page 103 of 104

# Exhibit D

## GO Acknowledgement

(i)      The indebtedness evidenced and ordered to be paid on account of the GO Warrants and the GO Insurance Policies constitutes, and with respect to the Replacement 2001-B GO Warrants will constitute, a general obligation of the County in support of which the County irrevocably pledged its full faith and credit.  This pledge is a commitment to pay and a commitment of the County's revenue generating powers to produce the funds necessary to pay the principal of and interest on the GO Warrants, and the Replacement 2001-B GO Warrants once issued, as they become due and to reimburse National on account of the GO Insurance Policies.

(ii)      Revenues legally available to the County for payment of debt service on the GO Warrants and to reimburse National on account of the GO Insurance Policies include, and with respect to the Replacement 2001-B GO Warrants will include, ad valorem taxes, sales and business license taxes, and other general fund revenues.

(iii)      Pursuant to Section 215 of the Alabama Constitution, as amended by Amendment No. 208, and Sections 11-3-11(a)(2), 11-14-11, and 11-14-16 of the Alabama Code (collectively, "Section 215"), the County may levy and collect a 5.1 mill special ad valorem tax (the "Special Tax"), not to exceed one-fourth of one percent per annum, for the purpose of paying any debt or liability against the County due and payable during the year and created for the erection, repairing, furnishing, or maintenance of public buildings, bridges, or roads, and any remaining proceeds of the Special Tax in excess of amounts payable on bonds, warrants, or other securities issued by the County for such limited purposes may be spent for general county purposes.  Section 215 provides that the County may use proceeds of the Special Tax for general county purposes only after all amounts due and payable in any given fiscal year on bonds, warrants, or other securities issued by the County for the erection, repairing, furnishing, or maintenance of public buildings, bridges, or roads (collectively, "Special Tax Obligations") are paid in full, and such proceeds shall be applied first to Special Tax Obligations.

(iv)      The Special Tax is separate and distinct from the County's 5.6 mill general ad valorem tax, the proceeds of which are used for general county purposes and to support the operation of the County's basic governmental functions, including management, personnel, accounting, taxation, purchasing, data processing, law enforcement, the judiciary, and land utilization.

(v)      The GO Warrants and the obligations to reimburse National on account of the GO Insurance Policies constitute, and the Replacement 2001-B GO Warrants will constitute, a debt or liability against the County created for the erection, repairing, furnishing, or maintenance of public buildings, bridges, or roads within the scope and meaning of Section 215.  As such, all amounts payable on account of or in connection with the GO Warrants, and the Replacement 2001-B GO Warrants once issued, and to reimburse National on account of the GO Insurance Policies in any given fiscal year must be paid by the County from the proceeds of the Special Tax prior to the County using any such proceeds in such fiscal year for general county purposes, including but not limited to current governmental expenses or any expenditures related to the County's sewer system.

(vi)      By virtue of the application of Section 215 with respect to the proceeds of the Special Tax, any and all claims arising from or in connection with the GO Warrants, the GO Warrant Indenture, the GO Insurance Policies, and the Standby GO Warrant Purchase Agreement are properly classified separately under the Plan and properly treated in the fashion provided by the Plan.

103