**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **JEFFERSON COUNTY, ALABAMA,** | ) | **Case No. 11-05736-TBB** |
| **a political subdivision of the State of** | ) | |
| **Alabama,** | ) | **Chapter 9** |
| | ) | |
| Debtor. | ) | |

**DISCLOSURE STATEMENT REGARDING**
**CHAPTER 9 PLAN OF ADJUSTMENT FOR JEFFERSON COUNTY, ALABAMA**
**(DATED JULY 29, 2013)**

# TABLE OF CONTENTS

TABLE OF EXHIBITS .................................................................................................. xviii

SUMMARY INFORMATION ......................................................................................... xix

I. INTRODUCTION .........................................................................................................1

II. GENERAL DISCLAIMERS AND INFORMATION ...................................................5

III. OVERVIEW OF THE COUNTY, INCLUDING ITS ASSETS AND LIABILITIES .............6

    A.     Historical Information About the County ..............................................6

         1.     History ..........................................................................................6

         2.     Population ....................................................................................6

         3.     Cities and Towns Within the County .........................................7

         4.     Economic Information .................................................................8

              a.     Employment ....................................................................8

              b.     Industries and Employers ...............................................9

              c.     Housing and Construction Activity ...............................11

              d.     Transportation ...............................................................12

              e.     Schools and Education ...................................................13

              f.     Financial Reporting .......................................................14

         5.     Governance ...............................................................................14

              a.     County Commission ......................................................14

              b.     Other Elected Officials ..................................................16

              c.     County Management ......................................................18

              d.     County Employees .........................................................20

         6.     County Component Units ...........................................................21

              a.     Jefferson County Economic and Industrial Development Authority ........................................................................21

              b.     The PBA .........................................................................21

i

7.    Services ...................................................................................................21

8.    Insurance and Risk Management ................................................................22

9.    The County's Retirement System ..............................................................23

10.   Other Post-Employment Benefits ...............................................................24

11.   Lack of "Home Rule" and the County's Limited Ability to Raise
      Revenues ....................................................................................................24

      a.    Section 44 of Article IV of the Alabama Constitution .................25

      b.    Section 104 of Article IV of the Alabama Constitution ...............25

      c.    Article XI of the Alabama Constitution.........................................25

      d.    Legislative Earmarking of County Revenues ...............................26

B.    The County's Sewer System ...................................................................................26

      1.    The Sewer System's History.......................................................................26

      2.    The EPA Consent Decree ...........................................................................29

      3.    Cost Overruns, Financing Costs, and Corruption ......................................30

      4.    Defaults on the Sewer System's Debt Obligations ....................................30

      5.    Current Status of Sewer System .................................................................31

C.    Historical Information About the Occupational Tax ...............................................31

      1.    Origin of the Occupational Tax ..................................................................31

      2.    Attacks on the Occupational Tax in the Alabama Legislature ..................32

      3.    Invalidation of the Occupational Tax in the Edwards Lawsuit...................32

      4.    Legislative Remedy in Response to the Edwards Lawsuit ........................33

      5.    Attack on Legislative Remedy in the Weissman Lawsuit .........................35

      6.    Lack of Legislative Remedy to Address the Weissman Lawsuit ..............35

D.    Summary of the County's Prepetition Indebtedness................................................36

      1.    Sewer Warrants...........................................................................................36

            a.    Series 1997-A Sewer Warrants.....................................................36

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document        Page 3 of 251

| | | | |
|---|---|---|---|
| | b. | Series 2001-A Sewer Warrants | 37 |
| | c. | Series 2002-A Sewer Warrants | 38 |
| | d. | Series 2002-C Sewer Warrants | 38 |
| | e. | Series 2003-A Sewer Warrant | 40 |
| | f. | Series 2003-B Sewer Warrants | 40 |
| | g. | Series 2003-C Sewer Warrants | 42 |
| | h. | Sewer Debt Service Reserve Fund Substitution | 42 |
| | i. | The Rate Covenant | 43 |
| | j. | Sewer Warrant Indenture Funds | 43 |
| 2. | | School Warrants | 47 |
| | a. | Series 2004-A School Warrants | 47 |
| | b. | Series 2005-A School Warrants and Series 2005-B School Warrants | 48 |
| 3. | | Board of Education Lease Warrants | 48 |
| 4. | | General Obligation Warrants | 49 |
| | a. | Series 2001-B GO Warrants | 50 |
| | b. | Series 2003-A GO Warrants | 51 |
| | c. | Series 2004-A GO Warrants | 51 |
| 5. | | Bessemer Lease Warrants | 52 |
| 6. | | Multi-Family Warrants | 53 |
| 7. | | Swap Agreements | 54 |
| | a. | Series 2002-A Sewer Swap | 54 |
| | b. | Series 2002-C Sewer Swaps | 55 |
| | c. | Series 2003-B Sewer Swap | 56 |
| | d. | Series 2003-C Sewer Swaps | 56 |
| | e. | Series 2001-B GO Swap | 57 |

iii

|  |  | f. | 2001 Swaptions | 57 |
|  |  | g. | 2004 Swaps | 58 |
|  | 8. | Economic Development Agreements and Tax Abatement Agreements | 59 |

E. Summary of Prepetition Litigation Involving the County .....................................60

1. *Wilson v. Bank of America, et al.*; Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-2008-901907.00, and United States Bankruptcy Court for the Northern District of Alabama (Birmingham), Adversary Proceeding No. 11-0433-TBB (together, the "Wilson Action") .................................................................60

2. *Bank of New York Mellon as Trustee v. Jefferson County, et al.*; United States District Court for the Northern District of Alabama, Southern Division, Case No. 2:08-cv-1703-RDP (the "Federal Court Receivership Action") ...................................................................61

3. *Bank of New York Mellon as Trustee v. Jefferson County, et al.*; Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-09-2318 (the "State Court Receivership Action," and together with the Federal Court Receivership Action, the "Receivership Actions") .........................................................61

4. *Syncora Guarantee v. Jefferson County, Alabama, et al.*, Supreme Court of New York, County of New York, Case No. 601100/10 (the "Syncora Lawsuit") ...........................................................62

5. *Assured Guaranty Municipal Corp v. JPMorgan Chase Bank, N.A., et al.*, Supreme Court of the State of New York, County of New York, Case No. 650642/10 (the "Assured Lawsuit") ...........................62

6. *Jefferson County, Alabama v. JPMorgan Chase Bank, N.A., et al.*, Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-2009-903641.00 (the "JPMorgan Lawsuit") ...................63

7. *Edwards v. Jefferson County, Alabama*; Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-07-900873 ........63

8. *Weissman v. Jefferson County, Alabama*; Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-09-904022.00 ...64

9. *In the Matter of J.P. Morgan Securities, Inc., Respondent;* Securities and Exchange Commission, Administrative Proceeding, File No. 3-13673 ...................................................................64

iv

10. *United States v. Jefferson County, et al.*; United States District Court for the Northern District of Alabama, Southern Division, Case No. 2:75-cv-00666-CLS ...............................................................65

F.    Summary of the County's Assets.......................................................66

    1.    Exemption of the County's Assets from Execution or Levy ....................66

    2.    Capital Assets.......................................................66

    3.    Statement of Net Assets .......................................................66

        a.    Deposits and Investments .......................................................68

        b.    Receivables .......................................................68

        c.    Inventories.......................................................69

        d.    Prepaid Items .......................................................69

        e.    Restricted Assets .......................................................69

        f.    Capital Assets.......................................................69

    4.    County Tax Revenues .......................................................70

    5.    Operating Revenues from the County's Business-Type Activities ..........71

    6.    Claims and Causes of Action Against Third Parties.................................71

G.    Summary of the County's Revenues.......................................................72

    1.    Enterprise or Proprietary Fund Revenues .................................................72

    2.    Governmental Fund Revenues .......................................................72

    3.    Sources of Revenues .......................................................73

    4.    Collection and Remittance of Taxes and Fees Due the State and Other Municipalities .......................................................79

    5.    *Ad Valorem* Taxes on Real and Personal Property .....................................80

        a.    Classification and Limitations on *Ad Valorem* Tax Rates .............80

        b.    Assessment Ratio Adjustments.......................................................81

        c.    Rate Adjustments .......................................................81

d.    Maximum Tax Limitation ................................................................82

e.    Additional Exemptions ................................................................82

f.    Homestead Exemption ................................................................82

g.    *Ad Valorem* Tax Rates in the County ............................................82

h.    *Ad Valorem* Tax Assessment and Collection ..............................83

i.    Earmarking of *Ad Valorem* Tax Collections ................................83

j.    Historical *Ad Valorem* Tax Levies and Collections ......................83

H.    The Indigent Care Fund and Cooper Green Mercy Hospital ................................84

    1.    The County's Indigent Care Fund ..............................................84

    2.    Cooper Green ................................................................85

I.    Significant Events Leading to Commencement of the Chapter 9 Case ................86

    1.    Loss of Occupational Tax ..........................................................86

    2.    Prepetition Cost Cutting Measures ............................................88

    3.    The April 27, 2011 Tornadoes and the County's Clean-Up Costs ...........88

    4.    The Financial Problems of the Sewer System Result in Substantial Claims Against the County's General Fund ................................89

    5.    Sewer System Debt Crisis ..........................................................89

        a.    EPA Consent Decree ................................................................89

        b.    The Sewer System's Debt Structure ..............................................90

        c.    Triggering Events Related to Sewer System Crisis ......................90

        d.    Litigation and Appointment of Receiver ......................................91

        e.    Negotiations Regarding the Restructuring of the Sewer Warrants ................................................................91

    6.    Accelerated Obligations Under General Obligation Warrants ................91

    7.    The Decision to File for Chapter 9 ............................................92

IV. OVERVIEW OF THE CHAPTER 9 CASE ................................................................92

Case 11-05736-TBB9   Doc 1977   Filed 08/08/13   Entered 08/08/13 11:52:51   Desc
Main Document    Page 7 of 251

A.       Receiver-Stay Litigation ...........................................................................93

B.       Eligibility Litigation...............................................................................93

C.       Net Revenues Litigation .........................................................................94

D.       Severed Sewer Adversary Proceeding ....................................................97

E.       The Rate-Related Stay Relief Motions ...................................................98

F.       Adversary Proceeding Commenced by the Sewer Warrant Trustee Against
         the County, Syncora, and Assured ..........................................................99

G.       Litigation with the City of Birmingham and the Mayor regarding Cooper
         Green.......................................................................................................100

H.       Other Adversary Proceedings ...............................................................101

         1.       Wilson Adversary Proceeding ....................................................101

         2.       Bennett Action ...........................................................................102

         3.       Moore Oil Adversary Proceeding ...............................................103

         4.       LBSF Adversary Proceeding .......................................................103

         5.       Dr. Farah Adversary Proceeding.................................................104

         6.       Johnson Adversary Proceeding....................................................104

I.       Creditors' Claims..................................................................................105

         1.       The List of Creditors and the Bar Dates ....................................105

         2.       Claims Filed By the Institutional Nominees ...............................106

         3.       503(b)(9) Claims ........................................................................106

         4.       Professional Fees .......................................................................106

         5.       Other Administrative Expense Claims.........................................107

         6.       General Unsecured Claims ..........................................................107

         7.       Other Unimpaired Claims ...........................................................108

         8.       Claim Objections .......................................................................109

         9.       Trade Claims and Avoidance Actions .........................................109

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document      Page 8 of 251

J.     Other Automatic Stay Disputes .......................................................................110

K.    Rejection Motions ...........................................................................................111

       1.    Satellite Courthouse Leases ...................................................111

       2.    Bessemer Courthouse Lease ..................................................111

L.     Creditors' Committee.....................................................................................112

M.   The New Sewer Rate Structure.......................................................................113

N.    Adoption of the Fiscal Year 2012-2013 Budget .............................................114

       1.    The County Budget Process.....................................................114

       2.    The Fiscal Year 2012-2013 Budget ........................................115

O.    The Adoption of a New Indigent Care Model for the County: Cooper
       Green Mercy Health Services .........................................................................116

P.     Sales of County Properties..............................................................................116

       1.    Sale of the Nursing Home and Cooper Green Geriatric / Psychiatric
           Beds........................................................................................116

       2.    Sales of Non-Essential Properties...........................................116

Q.    Efforts to Obtain General Fund Legislation....................................................117

       1.    Postpetition Efforts to Obtain General Fund Relief.................117

       2.    Future Prospects for General Fund Relief ...............................118

R.     The County's Negotiation and Approval of the Plan Support Agreements........118

V. SETTLEMENTS UNDER THE PLAN.................................................................................120

A.    The Comprehensive Sewer-Related and Other Compromises and
       Settlements Under the Plan..............................................................................120

       1.    The Disputes Resolved by the Sewer Plan Support Agreements ............120

       2.    Other Settlements....................................................................125

           a.    The Depfa Plan Support Agreement ...........................125

           b.    The GO Plan Support Agreement ................................125

| | | c. | The National Plan Support Agreement ........................................126 |
| | | d. | The Bessemer Stipulation ..........................................................127 |
| | 3. | The County Will Ask the Bankruptcy Court to Approve the Comprehensive Compromises and Settlements Under the Plan..............127 |

VI. THE SEWER FINANCING PLAN....................................................................128

VII. SUMMARY OF THE PLAN ...........................................................................131

    A.    Classification and Treatment of Claims Under the Plan......................................131

        1.    Unclassified Claims ...................................................................................132

            a.    Allowance of Administrative Claims...........................................132

            b.    Treatment of Administrative Claims ...........................................133

            c.    Professional Fees .......................................................................133

            d.    Administrative Tax Claims .........................................................134

            e.    No Other Priority Claims ...........................................................134

        2.    Classified Claims ......................................................................................134

            a.    Class 1-A (Sewer Warrant Claims)..............................................134

            b.    Class 1-B (Bank Warrant Claims and Primary Standby Sewer Warrant Claims)..................................................................136

            c.    Class 1-C (Sewer Warrant Insurers Claims)................................139

            d.    Class 1-D (Other Specified Sewer Claims) .................................140

            e.    Class 1-E (Sewer Swap Agreement Claims) ...............................141

            f.    Class 1-F (Other Standby Sewer Warrant Claims)......................141

            g.    Class 2-A (Series 2004-A School Claims)...................................141

            h.    Class 2-B (Series 2005-A School Claims)...................................143

            i.    Class 2-C (Series 2005-B School Claims and Standby School Warrant Claims)..............................................................144

            j.    Class 2-D (School Policy – General Claims)................................147

ix

k.     Class 2-E (School Surety Reimbursement Claims) ....................147

l.     Class 3-A (Board of Education Lease Claims) ...........................147

m.    Class 3-B (Board of Education Lease Policy Claims) ................148

n.     Class 4 (Other Secured Claims, including Secured Tax Claims) ....................................................................................148

o.     Class 5-A (Series 2001-B GO Claims and Standby GO Warrant Claims) ..................................................................149

p.     Class 5-B (Series 2003-A GO Claims) ......................................150

q.     Class 5-C (Series 2004-A GO Claims) ......................................150

r.     Class 5-D (GO Policy Claims) ....................................................151

s.     Class 5-E (GO Swap Agreement Claims) ..................................152

t.     Class 6 (General Unsecured Claims) ..........................................152

u.     Class 7 (Bessemer Lease Claims) ...............................................153

v.     Class 8 (Other Unimpaired Claims) ...........................................153

w.    Class 9 (Subordinated Claims) ...................................................153

B.    Treatment of Executory Contracts and Unexpired Leases .................153

    1.    Assumption of Certain Executory Contracts and Unexpired Leases.......153

        a.     Assumption of Agreements.........................................................153

        b.     Cure Payments ...........................................................................154

        c.     Objections to Assumption/Cure Payment Amounts ...................154

        d.     Resolution of Claims Relating to Assumed Contracts and Leases.......................................................................................155

    2.    Rejection of Executory Contracts and Unexpired Leases.......................155

        a.     Rejected Agreements ..................................................................155

        b.     Rejection Bar Date .....................................................................155

    3.    Postpetition Contracts and Leases ..........................................................155

x

C.      Means of Execution and Implementation of the Plan ........................................ 155

        1.      Consent Under Bankruptcy Code Section 904. ....................................... 155

        2.      Continued Governance of the County and the Sewer System ................ 156

        3.      Application of the Approved Rate Structure ........................................... 156

        4.      Retention of Assets Generally ............................................................... 156

        5.      Certain Transactions on the Effective Date ........................................... 156

        6.      Disposition of the Accumulated Sewer Revenues, the Sewer Warrant
                Indenture Funds, and Refinancing Proceeds .......................................... 157

        7.      Commutation Election Protocols and Effect on the Sewer Insurance
                Policies .................................................................................................. 158

                a.      Presumptions Regarding the Commutation Election .................. 158

                b.      Plan's Effect on the Sewer Insurance Policies ........................... 159

        8.      Compromise and Settlement of All Sewer Debt-Related Issues ............ 159

        9.      JPMorgan Reallocation of Distributions and Consideration Provided
                by the Sewer Warrant Insurers ............................................................... 160

        10.     Cancellation of Warrants and Other Documents .................................... 162

        11.     Termination of Receiver and Dismissal of Receivership Actions .......... 163

        12.     Vesting of Preserved Claims .................................................................. 163

        13.     Exemption From Securities Law ............................................................ 163

        14.     Objections to Claims ............................................................................. 164

                a.      County's Exclusive Right to Object ........................................... 164

                b.      Distributions Following Allowance ............................................ 164

        15.     Distributions Under the Plan .................................................................. 164

                a.      Responsibility for Making Distributions ................................... 164

                b.      No *De Minimis* Distributions ..................................................... 166

                c.      No Distributions With Respect to Certain Claims ...................... 166

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
                Main Document        Page 12 of 251

        d.      Distributions to Holders as of the Distribution Record Date.......166

        e.      Delivery of Distributions; Undeliverable/Unclaimed Distributions....................................................................................167

        f.      Full, Final, and Complete Settlement and Satisfaction...............169

        g.      Limitations on Distributions Payable to Persons Liable to County..........................................................................................169

        h.      Deemed Acceleration of the Sewer Warrants.............................169

    16.     Setoff, Recoupment, and Other Rights ...................................................170

    17.     Motion Under Bankruptcy Code Section 364..........................................170

    18.     The Effective Date ..................................................................................171

        a.      Conditions to the Effective Date.................................................171

        b.      Waiver of Conditions..................................................................172

        c.      Effect of Failure of Conditions ..................................................173

        d.      Notice of the Effective Date .......................................................173

D.     Exculpation of GO Released Parties, Sewer Released Parties, and the School Warrant Trustee Regarding the Bankruptcy and Plan Process...............174

E.     Validations Under the Plan .................................................................................174

    1.      Validation of the New Sewer Warrants ..................................................174

    2.      Validation of the Approved Rate Structure .............................................176

    3.      Validation of Allowance of Sewer Debt Claims......................................176

F.     Effects of Confirmation of the Plan ...................................................................177

    1.      Binding Effect.........................................................................................177

    2.      Discharge and Injunctions.......................................................................177

    3.      Releases and Injunctions.........................................................................178

        a.      Sewer Releases and Injunctions.................................................178

        b.      GO Releases and Injunctions.....................................................179

Case 11-05736-TBB9   Doc 1977   Filed 08/08/13   Entered 08/08/13 11:52:51   Desc
Main Document    Page 13 of 251

|  | c. | Necessity and Approval of Releases and Injunctions. | 180 |

|  | 4. | Retention of Jurisdiction | 180 |

| G. | Other Plan Provisions | | 182 |

|  | 1. | Revocation of the Plan; No Admissions | 182 |

|  | 2. | Modification of the Plan | 182 |

|  | 3. | Severability of Plan Provisions | 182 |

|  | 4. | Inconsistencies | 183 |

|  | 5. | Governing Law | 183 |

|  | 6. | Transactions on Business Days | 183 |

|  | 7. | Good Faith | 183 |

|  | 8. | Effectuating Documents and Further Transactions | 183 |

|  | 9. | Sewer Warrant Trustee Residual Fee Estimate | 183 |

VIII. CERTAIN TAX CONSEQUENCES OF THE PLAN ........................................184

A. Federal Income Tax Aspects of Plan .................................184

    1. Future Legislation Could Affect Tax-Exempt Obligations ....................184

    2. Sewer Warrants .................................185

        a. Negotiation of a Closing Agreement with the IRS ....................185

        b. Payments Received During the Pendency of the County's Bankruptcy Case .................................185

        c. Refunding of Sewer Warrants.................................186

        d. Payments to Non-Commuting Holders of Sewer Warrants .........186

    3. Holders of the Series 2001-B GO Warrants ...........................187

        a. Exchange of Series 2001-B GO Warrant....................187

        b. Tax Status of Replacement 2001-B GO Warrants ....................187

    4. Holders of the Other Outstanding County Warrants...............187

IX. CERTAIN CONSEQUENCES UNDER THE FEDERAL SECURITIES LAW ................188

xiii

A. Registration of Securities ................................................................................... 188

B. Market Disclosure .............................................................................................. 189

    1. Initial Offering ............................................................................................ 189

    2. Continuing Disclosure ................................................................................ 189

X. FINANCIAL INFORMATION AND PROJECTIONS ....................................... 190

A. Audited Financial Statements ............................................................................ 190

B. Financial Projections ......................................................................................... 190

XI. RISKS AND OTHER FACTORS TO CONSIDER ............................................ 191

A. Bankruptcy Considerations ............................................................................... 191

    1. Parties in Interest May Object to the County's Classification of Claims ................................................................................................... 191

    2. Failure to Obtain Confirmation of the Plan ............................................... 191

    3. Non-Consensual Confirmation ................................................................... 192

    4. The County May Object to the Amount or Classification of Claims ...... 192

    5. The Effective Date Might Not Occur .......................................................... 192

    6. The County May Withdraw or Modify the Plan ........................................ 193

B. Risks Relating to Making or Declining to Make the Commutation Election ...... 193

C. Risks Associated with the County ..................................................................... 196

    1. Risks Applicable to the County Generally ................................................ 196

        a. Control by the Alabama Legislature .............................................. 196

        b. County Credit May be Viewed Negatively By Market .............. 196

        c. Lack of Population Growth ............................................................ 196

        d. Risks with Respect to Tax Exemption for Interest Payments on County Obligations ................................................................. 197

    2. General Fund Risks ..................................................................................... 197

        a. Inability to Increase Tax Rates .................................................... 197

xiv

| | | | |
|---|---|---|---|
| | b. | Additional Earmarking of Existing Revenue Sources | 198 |
| | c. | Fluctuations in *Ad Valorem* Tax Collections | 198 |
| 3. | | Risks Relating to the New Sewer Warrants | 198 |
| | a. | The New Sewer Warrants are Limited Obligations | 198 |
| | b. | The Interim Rate Structure and Its Impact on Sewer Revenues | 199 |
| | c. | The EPA Consent Decree and Other Compliance Obligations | 199 |
| | d. | Additional Regulatory Requirements | 199 |
| | e. | Additional Sewer Indebtedness | 200 |
| 4. | | Risks Relating to the School Warrants | 200 |
| | a. | School Warrants are Limited Obligations | 200 |
| | b. | Online Commerce and Other Factors Contributing to Erosion of Tax Base | 200 |
| 5. | | Risks Relating to the New Bessemer Lease | 201 |
| | a. | Right of County Not to Renew the New Bessemer Lease | 201 |
| | b. | Other Risk Factors Discussed in the Official Statement relating to the Bessemer Lease Warrants Issued by the PBA | 201 |
| D. | | Additional Factors to Be Considered | 202 |
| 1. | | The County Has No Duty to Update | 202 |
| 2. | | No Representations Outside This Disclosure Statement Are Authorized | 202 |
| 3. | | Claims Could Be More Than Projected | 202 |
| XII. VOTING AND ELECTION PROCEDURES | | | 203 |
| A. | | Solicitation of Votes with Respect to the Plan | 203 |
| 1. | | The County Will Solicit Votes From Holders of Claims in Classes 1-A, 1-B, 1-C, 1-D, 2-A, 2-B, 2-C, 2-D, 2-E, 5-A, 5-D, 5-E, 6, and 7 | 203 |

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 16 of 251

|  | 2. | Classes 3-A, 3-B,  4, 5-B, 5-C, and 8 Will Be Deemed to Accept the Plan, While Classes 1-E, 1-F, and 9 Will Be Deemed to Reject the Plan | 204 |

|  | 3. | Voting Rights with Respect to Contingent Claims and Unliquidated Claims | 204 |

|  | 4. | Voting Rights with Respect to Disputed Claims | 204 |

|  | 5. | Solicitation, Balloting, Tabulation, Notices, and Confirmation Procedures | 205 |

|  | 6. | Ballot Record Date | 205 |

|  | 7. | Ballots | 205 |

|  | 8. | Ballot Deadline | 206 |

| B. | | The Commutation Election | 207 |

|  | 1. | What Is the Commutation Election? | 208 |

|  | 2. | What Are the Procedures Whereby One Can Make or Will Be Deemed to Have Made the Commutation Election or, If Applicable, Can Rescind a Deemed Commutation Election? | 210 |

|  |  | a. Commutation Election Procedures | 210 |

|  |  | b. Rescission of Deemed Election Procedures | 212 |

|  | 3. | What Is the County's Position on the Commutation Election? | 213 |

| C. | | Requests for Additional Information | 216 |

XIII. ALTERNATIVES TO THE PLAN ... 216

| A. | Alternative Plan of Adjustment | 216 |

| B. | Dismissal of the County's Case | 217 |

XIV. CONFIRMATION OF THE PLAN ... 218

| A. | Necessary Votes | 218 |

| B. | The "Best Interests" Test | 218 |

| C. | Feasibility | 220 |

| D. | Compliance with Other Applicable Provisions of the Bankruptcy Code | 220 |

xvi

E.  Cramdown....................................................................................................221

F.  Confirmation Hearing and Process for Objections to Confirmation ...................224

XV. RECOMMENDATION AND CONCLUSION....................................................225

xvii

## TABLE OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 1 | *Chapter 9 Plan of Adjustment for Jefferson County, Alabama Dated July 29, 2013* [with exhibits] |
| 2 | Jefferson County Commission Audited Financial Statements – September 30, 2011 |
| 3 | Department of Examiners of Public Accounts of the State of Alabama report dated June 8, 2012 |
| 4 | County's Fiscal Year 2012-2013 Budget |
| 5 | Depfa Plan Support Agreement |
| 6 | GO Plan Support Agreement |
| 7 | Sewer Plan Support Agreements |
| 8 | National Plan Support Agreement |
| 9 | Amended Financing Plan |
| 10 | Financial Projections for General Fund |
| 11 | Financial Projections for Education Tax |
| 12 | Description of Wilson Action Provided by the Wilson Action Plaintiffs |
| 13 | Description of Bennett Action Provided by the Bennett Action Plaintiffs |

xviii

| | |
|---|---|
| Debtor: | Jefferson County, Alabama |

**Recommendation:** **For the reasons more fully set forth below, the County believes that the prompt confirmation and implementation of the Plan are superior to any potentially feasible alternative. Accordingly, the County recommends that you vote in favor of the Plan.[2]**

**The County also recommends that holders of Allowed Class 1-A Claims (Sewer Warrant Claims) and Class 1-B Claims (Bank Warrant Claims and Primary Standby Sewer Warrant Claims) make the Commutation Election on their Ballots; provided, however, with respect to those Class 1-A Claims in the approximate outstanding principal amount of $62 million that are on account of Series 2003-B-8 Sewer Warrants, the County makes no recommendation to such holders regarding the Commutation Election, but requests that such holders also evaluate thoroughly the information contained herein (including, without limitation, Sections XI.B and XII.B of this Disclosure Statement) and decide whether to make the Commutation Election.**

**Vote Required to Accept the Plan:** Acceptance of the Plan requires the affirmative vote of two-thirds in amount and a majority in number of the Allowed Claims actually voted in each Class of Impaired Claims entitled to vote. Only Persons holding Claims in Classes 1-A, 1-B, 1-C, 1-D, 2-A, 2-B, 2-C, 2-D, 2-E, 5-A, 5-D, 5-E, 6, and 7 are Impaired, will receive Distributions, and therefore are entitled to vote on the Plan. If any of these Classes rejects the Plan, however, the Bankruptcy Court nevertheless may confirm the Plan if the "cramdown" requirements of Bankruptcy Code section 1129(b) are satisfied with respect to such rejecting Class.

The holders of all Allowed Class 1-B Claims, all Allowed Class 1-C Claims, and all Allowed Class 1-D Claims have committed to vote in favor of confirmation of the Plan, subject to the terms of their Plan Support Agreements. Holders of Allowed Class 1-A Claims representing over 75% of the dollar amount of Allowed Class 1-A Claims have also committed to vote in favor of confirmation of the Plan, subject to the terms of their Plan Support Agreements.

**Commutation Election:** The Commutation Election available to holders of Allowed Class 1-A Claims (Sewer Warrant Claims) and Class 1-B Claims (Bank Warrant Claims and Primary Standby Sewer Warrant Claims) is set forth in Sections 2.3(a) and 2.3(b) of the Plan and described in Section XII.B

---

[1] All capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to those Defined Terms in Section 1.1 of the *Chapter 9 Plan of Adjustment for Jefferson County, Alabama (Dated July 29, 2013)*, a true and correct copy of which is attached hereto as **Exhibit 1** (as more particularly defined therein, the "Plan").

[2] Refer to Article XII below entitled "Voting and Election Procedures" for additional information about the voting and election process with respect to the Plan.

below.  If you hold an Allowed Class 1-A or Class 1-B Claim, your decision regarding the Commutation Election will affect your Distribution under the Plan and certain releases thereunder.  Under some circumstances, holders of Allowed Class 1-A and Class 1-B Claims will be *deemed to make the Commutation Election*. Holders of Allowed Class 1-A Claims who make or are deemed to make the Commutation Election will receive a materially larger Distribution of Cash under the Plan (80% of one's Adjusted Sewer Warrant Principal Amount) than holders who do not make the Commutation Election (65% of one's Adjusted Sewer Warrant Principal Amount), but will release certain additional rights, including claims that could be asserted against the Sewer Warrant Insurers under the applicable Sewer Insurance Policies.

The holders of all Allowed Class 1-B Claims (Bank Warrant Claims and Primary Standby Sewer Warrant Claims) have committed to make the Commutation Election, subject to the terms of their Plan Support Agreements.  Holders of Allowed Class 1-A Claims (Sewer Warrant Claims) representing over 75% of the dollar amount of Allowed Class 1-A Claims have also committed to make the Commutation Election, subject to the terms of their Plan Support Agreements.

|                                          |                                                                                                                                                                                                                                                                                                                                                                                                                     |
|------------------------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| **Releases and Injunctions under the Plan:** | **Section 6.3(a) of the Plan provides that if you vote to accept the Plan or make or are deemed to make the Commutation Election, you will be conclusively deemed to have irrevocably and unconditionally waived and released as of the Effective Date of the Plan all Sewer Released Parties (including, among others, the JPMorgan Parties, the Sewer Liquidity Banks, the Sewer Warrant Insurers, the Sewer Warrant Trustee, and the Supporting Sewer Warrantholders) and their respective Related Parties from any and all Sewer Released Claims.** |
|                                          | **Section 6.3(b) of the Plan provides that if you vote to accept the Plan, you will be conclusively deemed to have irrevocably and unconditionally waived and released as of the Effective Date of the Plan, all GO Released Parties (including, among others, the GO Banks, the GO Warrant Trustee, and National) and their respective Related Parties from any and all GO Released Claims.** |
|                                          | **The releases and injunctions under the Plan are more particularly described in Section VII.F.3 of this Disclosure Statement.** |
| **Voting Information:** | If you are entitled to vote, you should have received a Ballot with this Disclosure Statement.  After completing and signing your Ballot, you should return it in accordance with the instructions provided on your Ballot.  The instructions for returning Ballots are also described in Article XII below. |
| **Ballot Deadline:** | For your Ballot to be counted, the Ballot Tabulator must receive the Ballot not later than 5:00 p.m. prevailing Central time on October 7, 2013. |
|                                          | If you must return your Ballot to your bank, broker, agent, or nominee, |

you must return your Ballot to such bank, broker, agent, or nominee by the deadline (if any) set by them so that such bank, broker, agent, or nominee may process your Ballot and return it to the Ballot Tabulator by the Ballot Deadline. If your Ballot is not returned, or if you are required to return your Ballot to your bank, broker, agent, or nominee and your Ballot is not received by such bank, broker, agent, or nominee by the deadline (if any) set by them, or if your Ballot is otherwise received by the Ballot Tabulator after the Ballot Deadline, your Ballot will not be counted and, if you are a holder of a Class 1-A Claim or a Class 1-B Claim, depending upon which series or subseries of Sewer Warrants you hold, you may be deemed to have made the Commutation Election in accordance with the terms of the Plan.

| | |
|---|---|
| **Confirmation Hearing:** | The Confirmation Hearing will be held on November 12, 2013, at 9:00 a.m. prevailing Central time. The Confirmation Hearing may be continued from time to time without further notice. |
| **Treatment of Claims:** | The treatment that Creditors will receive if the Bankruptcy Court confirms the Plan is set forth in the Plan and is summarized in Section VII.A of this Disclosure Statement. |
| **The Effective Date:** | The Effective Date of the Plan will be a Business Day selected by the County, after consultation with the Sewer Plan Support Parties, provided, among other conditions set forth in Section 4.18 of the Plan, that the Effective Date shall be no later than December 31, 2013. |
| **Questions:** | Information about the Plan solicitation procedures, as well as copies of the Plan, Disclosure Statement, Disclosure Statement Order, the approved forms of Ballots, the Plan Procedures Motion, and the Plan Procedures Order, are available at www.jeffersoncountyrestructuring.com. Copies of the Plan, Disclosure Statement, Disclosure Statement Order, the approved forms of Ballots, the Plan Procedures Motion, and the Plan Procedures Order are available upon request by contacting the County's Claims and Noticing Agent and Ballot Tabulator, Kurtzman Carson Consultants LLC, either by email at JeffersonCountyInfo@kccllc.com, or by telephone at (866) 967-0677, or by mail at Jefferson County Ballot Processing, c/o Kurtzman Carson Consultants LLC, (Attention: Jefferson County Ballot Processing), 2335 Alaska Avenue, El Segundo, CA 90245. Copies of the Plan, the Disclosure Statement, the Disclosure Statement Order, the Plan Procedures Motion, and the Plan Procedures Order are also available for review and download at the Bankruptcy Court's website, www.alnb.uscourts.gov. Alternatively, these documents may be accessed through the Bankruptcy Court's "PACER" website, https://ecf.alnb.uscourts.gov. A PACER password and login are needed to access documents on the Court's "PACER" website. A PACER password can be obtained at http://www.pacer.gov. |

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document      Page 22 of 251

| IMPORTANT NOTICE: | **THE PLAN, THIS DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, AND THE BALLOTS CONTAIN IMPORTANT INFORMATION THAT IS NOT INCLUDED IN THIS SUMMARY. THAT INFORMATION COULD MATERIALLY AFFECT YOUR RIGHTS. YOU SHOULD THEREFORE READ THE PLAN, THIS DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, AND THE BALLOTS IN THEIR ENTIRETY.** |
|---|---|

**THE PLAN, ONCE CONFIRMED AND EFFECTIVE, IS THE LEGALLY BINDING DOCUMENT REGARDING THE TREATMENT OF CLAIMS AND THE TERMS AND CONDITIONS OF THE COUNTY'S ADJUSTMENT OF ITS INDEBTEDNESS. ACCORDINGLY, TO THE EXTENT THAT THERE IS ANY INCONSISTENCY BETWEEN THE PROVISIONS AND DEFINITIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND THOSE CONTAINED IN THE PLAN, THE TERMS AND DEFINITIONS OF THE PLAN ARE CONTROLLING AND WILL GOVERN.**

**YOU SHOULD CONSULT WITH YOUR LEGAL AND FINANCIAL ADVISORS BEFORE VOTING ON THE PLAN AND BEFORE MAKING OR NOT MAKING A COMMUTATION ELECTION.**

xxii

## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| None | Administrative Claims | Unimpaired | Not Entitled to Vote |
| Class 1-A | Sewer Warrant Claims | Impaired | Entitled to Vote |
| Class 1-B | Bank Warrant Claims and Primary Standby Sewer Warrant Claims | Impaired | Entitled to Vote |
| Class 1-C | Sewer Warrant Insurers Claims | Impaired | Entitled to Vote |
| Class 1-D | Other Specified Sewer Claims | Impaired | Entitled to Vote |
| Class 1-E | Sewer Swap Agreement Claims | Impaired | Not Entitled to Vote (deemed to reject) |
| Class 1-F | Other Standby Sewer Warrant Claims | Impaired | Not Entitled to Vote (deemed to reject) |
| Class 2-A | Series 2004-A School Claims | Impaired | Entitled to Vote |
| Class 2-B | Series 2005-A School Claims | Impaired | Entitled to Vote |
| Class 2-C | Series 2005-B School Claims and Standby School Warrant Claims | Impaired | Entitled to Vote |
| Class 2-D | School Policy – General Claims | Impaired | Entitled to Vote |
| Class 2-E | School Surety Reimbursement Claims | Impaired | Entitled to Vote |
| Class 3-A | Board of Education Lease Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 3-B | Board of Education Lease Policy Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 4 | Other Secured Claims, including Secured Tax Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 5-A | Series 2001-B GO Claims and Standby GO Warrant Claims | Impaired | Entitled to Vote |
| Class 5-B | Series 2003-A GO Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |

xxiii

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Class 5-C | Series 2004-A GO Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 5-D | GO Policy Claims | Impaired | Entitled to Vote |
| Class 5-E | GO Swap Agreement Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Bessemer Lease Claims | Impaired | Entitled to Vote |
| Class 8 | Other Unimpaired Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 9 | Subordinated Claims | Impaired | Not Entitled to Vote (deemed to reject) |

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 25 of 251

# I.
# INTRODUCTION

Jefferson County, Alabama (the "<u>County</u>") filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on November 9, 2011 (the "<u>Petition Date</u>"), thereby commencing the above-captioned bankruptcy case (the "<u>Case</u>"). The Case is pending before the Honorable Thomas B. Bennett, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Northern District of Alabama, Southern Division (the "<u>Bankruptcy Court</u>") as case number 11-05736-TBB. The Bankruptcy Court entered an order for relief in the Case on March 4, 2012.[3] The County is a municipal debtor operating under chapter 9 of the Bankruptcy Code, which incorporates only some of the Bankruptcy Code provisions that are applicable in bankruptcy cases pending under other chapters of the Bankruptcy Code. *See* 11 U.S.C. § 901(a).

Pursuant to Bankruptcy Code section 941, the County has filed and is the proponent of the *Chapter 9 Plan of Adjustment for Jefferson County, Alabama (Dated July 29, 2013)*, a copy of which is attached to this Disclosure Statement as <u>Exhibit 1</u>. **The document you are reading is the Disclosure Statement for the accompanying Plan.** The Plan sets forth the manner in which all Claims will be treated if the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs. This Disclosure Statement describes the Plan, the County's current and future operations, the proposed adjustment of the County's indebtedness, risk factors associated with confirmation of the Plan, and other related matters.

For a complete understanding of the Plan, you should read this Disclosure Statement, the Plan, and the exhibits to these documents (collectively, the "<u>Exhibits</u>") in their entirety.

This Disclosure Statement sets forth the assumptions underlying the Plan, describes the process that the Bankruptcy Court will follow when determining whether to confirm the Plan, and describes how the Plan will be implemented if the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs. Bankruptcy Code section 1125 requires that a disclosure statement contain "adequate information" concerning a bankruptcy plan. *See* 11 U.S.C. § 1125(a). After a hearing held on August 6, 2013, the Bankruptcy Court entered an order approving the form of this document as containing adequate information to enable Creditors entitled to vote on the Plan to make an informed judgment when deciding whether to vote to accept or to reject the Plan (the "<u>Disclosure Statement Order</u>"). The Bankruptcy Court's approval of the adequacy of this Disclosure Statement, however, does not constitute a determination by the Bankruptcy Court with respect to the fairness or the merits of the Plan or the accuracy or completeness of the information contained in the Plan or Disclosure Statement. **THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. THEREFORE, THE PLAN'S TERMS**

---

[3] As detailed in Section IV.B below, various parties challenged the County's eligibility to be a chapter 9 debtor under Bankruptcy Code section 109(c) and Alabama Code section 11-81-3. After briefing and a hearing, the Bankruptcy Court overruled those objections and entered the order for relief. *See In re Jefferson County*, 469 B.R. 92 (Bankr. N.D. Ala. 2012).

1

**ARE NOT YET BINDING ON ANYONE. IF THE COURT LATER CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, THEN THE PLAN WILL BE BINDING ON THE COUNTY AND ON ALL PARTIES IN INTEREST IN THIS CASE, INCLUDING ALL CREDITORS OF THE COUNTY IRRESPECTIVE OF WHETHER SUCH CREDITORS VOTED IN FAVOR OF THE PLAN OR NOT.**

The Plan is the product of more than 18 months of effort to restore the County's General Fund to operational balance, to address and resolve years of litigation involving the Sewer System and its indebtedness, and to enable the County to successfully emerge from the Case.

The Plan is structured around a series of significant inter-related, multi-party compromises and settlements among the County and various Creditors, most notably the Sewer Plan Support Parties holding over $2.5 billion of Sewer Debt Claims. Through the Plan, the County will achieve more than $1.3 billion of Sewer Debt Claim concessions (the largest of which will be made by the JPMorgan Parties), which concessions will substantially reduce the amount of the County's Sewer System-related indebtedness (approximately $3.2 billion of principal and interest as of the County's chapter 9 filing) to approximately $1.9 billion. Concomitantly, as part of these compromises the County has committed to increases in sewer rates pursuant to the Approved Rate Structure designed to facilitate the County's issuance of New Sewer Warrants in an amount sufficient to make approximately $1.835 billion of Distributions to the holders of Allowed Class 1-A, Class 1-B, Class 1-C, and Class 1-D Claims pursuant to the Plan and to ensure that the Sewer System will generate adequate funds to service indebtedness, maintain operations, meet capital needs for the foreseeable future, and preserve and improve services. Issuance of the New Sewer Warrants does not require state legislation and will not involve any swap transactions, auction rate securities, or other financial transactions that the County believes contributed to its financial difficulties and the filing of the Case.

As part of the global settlement of myriad, complex disputes among the County, the JPMorgan Parties, the Sewer Warrant Insurers, and the other Sewer Plan Support Parties to be implemented pursuant to the Plan, and in consideration of the settlement and release of all Sewer Released Claims against the JPMorgan Parties and their Related Parties, the JPMorgan Parties will consent to the reallocation to other holders of Sewer Warrants of a substantial portion of the Plan consideration that would otherwise be distributed on a Pro Rata basis to the JPMorgan Parties and, thereby, will increase the recovery received by all other holders of Sewer Warrants and reduce the amount of sewer indebtedness following the County's emergence from chapter 9.

The Plan includes a Commutation Election mechanism whereby holders of Sewer Warrants may elect or be deemed to elect to commute, waive, and forever release certain claims and rights, including all claims that could be asserted against the Sewer Warrant Insurers under the applicable Sewer Insurance Policies, and any and all Sewer Released Claims against the Sewer Released Parties and their respective Related Parties. In consideration for making the Commutation Election, holders of Sewer Warrants will receive a materially higher Cash recovery under the Plan. As more particularly described in Section 4.9 of the Plan, the sources of the higher recovery to Creditors that make or are deemed to make the Commutation Election will be from (i) the reallocation of Plan consideration that otherwise would have been distributed to the JPMorgan Parties; and (ii) consideration provided by the Sewer Warrant Insurers (x) settling and releasing any and all of their

2

Sewer Released Claims against the County and the JPMorgan Parties pursuant to the Plan, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of reallocated consideration from the JPMorgan Parties to be made available to the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims that make the Commutation Election on account of such Claims.

The Plan provides for various releases and injunctions that are key elements of the compromises and settlements contained in the Plan, all of which releases and injunctions shall become effective as of the Effective Date of the Plan. Under the Plan, each Sewer Released Party (including, among others, the County, the JPMorgan Parties, the Sewer Liquidity Banks, the Sewer Warrant Insurers, and the Supporting Sewer Warrantholders) shall waive and release all other Sewer Released Parties and their respective Related Parties from any and all Sewer Released Claims. Additionally, all Persons who vote to accept the Plan or make or are deemed to make the Commutation Election will be conclusively deemed to release all Sewer Released Parties and their respective Related Parties from any and all Sewer Released Claims. The Plan further provides that all Persons who vote to accept the Plan will be conclusively deemed to release all GO Released Parties (consisting of the County, the GO Banks, the GO Warrant Trustee, and National) and their respective Related Parties from any and all GO Released Claims. The Plan also contains a settlement and release of any and all claims and matters raised in the Declaratory Judgment Action, and any claims and matters related to the reapplication to principal of any interest payments made on the Sewer Warrants during the Case or reallocation of any payments made on the Sewer Warrants both before and during the Case among the holders or various series and subseries of Sewer Warrants. The Plan provides that, upon the Effective Date of the Plan, all Persons bound by the releases set forth in Section 6.3 of the Plan shall be enjoined from pursuing any recovery on account of any Sewer Released Claims and GO Released Claims released under the Plan.

In addition to the foregoing releases, the Plan provides that Distributions provided for in the Plan to the County's Creditors shall be in full, final, and complete settlement, satisfaction, discharge, and release of such Creditors' Claims against the County, against the County's property, and any Claims released under the Plan.

Each of the compromises and settlements to be implemented pursuant to the Plan and described herein and in the Plan are inextricably linked, and each individual compromise and settlement is dependent upon the approval and implementation of every other compromise and settlement.

The Plan contains several provisions related to the validation and approval of the New Sewer Warrants that are crucial to the success of the financing transaction described in the Plan. If the County cannot successfully issue the New Sewer Warrants on the terms contemplated by the Plan, then the Plan will not be consummated and the County will need to pursue other alternatives to emerge from bankruptcy. The County believes that any such alternatives will be less favorable to the County, its Creditors, its citizens, and other parties-in-interest than under the Plan.

3

The Plan also implements a series of settlements concerning the County's other significant liabilities, including obligations relating to the Bessemer Lease Claims, the School Debt Claims, and the GO Warrant Claims.

Other than with respect to Causes of Action that are expressly released or compromised under the Plan or with respect to Claims that are Allowed under the Plan, various potential claims and Causes of Action (including Avoidance Actions) may be pursued by and for the County's benefit and are being preserved under the Plan. You should not vote to accept or to reject the Plan with the expectation that the County may or may not pursue any action, regardless of whether that action was commenced prepetition or whether that action pertains to preferences, fraudulent transfers, or other claims and Causes of Action. Unless explicitly set forth in the Plan, the County's rights to commence any action will not be released. Furthermore, unless such rights are released or otherwise resolved in the Plan, the County reserves all rights to object to any Claim (other than Claims that are Allowed under the Plan) or defend itself against any counterclaim asserted by any entity in connection with a claim or Cause of Action.

The County believes that the significant compromises and settlements made by the Sewer Plan Support Parties, the GO Plan Support Parties, and other Creditors under the Plan are fair, equitable, and reasonable. Such compromises and settlements are an integral part of the Plan, and they provide value and certainty for the County and all Creditors by eliminating significant litigation risk and expenses, and providing a framework for the County to emerge from chapter 9 expeditiously. As discussed below, the County has been and remains involved in a multitude of litigation in numerous courts against numerous parties. This litigation costs the County millions of dollars each year to pursue. The Plan resolves this litigation on fair terms to the County and all of its Creditors. Accordingly, the County believes that the Plan provides the greatest and earliest possible recoveries to Creditors under the circumstances and that acceptance and confirmation of the Plan is in the best interests of all Creditors, the County, and the County's inhabitants. The County further believes that any alternative to the Plan would result in unnecessary delay, uncertainty, litigation, and expense, the net effect of which would result in recoveries to Creditors less than the Distributions to be made to Creditors under the Plan. There is no better alternative to Creditors than the Plan.

**Accordingly, the County recommends and urges all Creditors who hold Impaired Claims entitled to vote on the Plan to vote to accept the Plan by checking the box marked "Accept" on their Ballots. The County also recommends that holders of Allowed Class 1-A Claims (Sewer Warrant Claims) and Class 1-B Claims (Bank Warrant Claims and Primary Standby Sewer Warrant Claims) make the Commutation Election on their Ballots; provided, however, with respect to those Class 1-A Claims in the approximate outstanding principal amount of $62 million that are on account of Series 2003-B-8 Sewer Warrants, the County makes no recommendation to such holders regarding the Commutation Election, but requests that such holders also evaluate thoroughly the information contained herein (including, without limitation, Sections XI.B and XII.B of this Disclosure Statement) and decide whether to make the Commutation Election. The County urges all Creditors, after marking on their Ballots their votes and, if applicable, their decisions regarding the Commutation Elections, to return those Ballots as directed on their respective Ballots.**

4

# II.
## GENERAL DISCLAIMERS AND INFORMATION

Please carefully read this document and all the Exhibits to this document. These documents explain who may object to confirmation of the Plan, who is entitled to vote to accept or to reject the Plan, who is entitled to make the Commutation Election under the Plan, the implications of making or not making such Commutation Election, and the treatment that Creditors can expect to receive if the Bankruptcy Court confirms the Plan and the Effective Date occurs. The Disclosure Statement also describes the history of the County, the County's liabilities and assets, the contributing factors that the County believes precipitated the Case, certain events in the Case, the effect of Plan confirmation, and some of the things the Bankruptcy Court may consider when deciding whether to confirm the Plan. The Disclosure Statement also addresses the Plan's feasibility and how Creditors' treatment under the Plan compares to potential alternatives. The statements and information contained in the Plan and Disclosure Statement, however, do not constitute financial or legal advice. You should therefore consult your own advisors if you have questions about the impact of the Plan on your Claims or rights.

The financial information used to prepare the Plan and Disclosure Statement was prepared by the County from information in its books and records and is the sole responsibility of the County. The County's professionals have prepared the Plan and Disclosure Statement at the direction of, and with the review, input, and assistance of, the County Commission and the County's employees. The County's professionals have not independently verified this information. No other party in interest, including the Plan Support Parties or their professionals, has any responsibility for the content of this Disclosure Statement, and such other parties may hold different views than the County with respect to the matters discussed in the Disclosure Statement.

The statements and information concerning the County in this document constitute the only statements and information that the Bankruptcy Court has approved for the purpose of soliciting votes to accept or to reject the Plan. Therefore, no statements or information inconsistent with anything contained in this Disclosure Statement are authorized unless otherwise ordered by the Bankruptcy Court.

You may not rely on the Plan and Disclosure Statement for any purpose other than to determine whether to vote to accept or to reject the Plan and whether to make the Commutation Election. Nothing contained in the Plan or Disclosure Statement constitutes an admission of any fact or liability by any Person or may be deemed to constitute evidence of the tax or other legal effects that the adjustment of indebtedness set forth in the Plan may have on entities holding Claims.

Unless another time is expressly specified in this Disclosure Statement, all statements contained in this Disclosure Statement are made as of July 29, 2013. Under no circumstances will the delivery of this Disclosure Statement or the exchange of any rights made in connection with the Plan create an implication or representation that there has been no subsequent change in the information included in this Disclosure Statement. The County assumes no duty to update or supplement any of the information contained in this Disclosure Statement, and the County currently does not intend to undertake any such update or supplement.

5

**CAUTIONARY STATEMENT:** Some statements in this Disclosure Statement may constitute forward-looking statements within the meaning of the Securities Act of 1933, as amended from time to time (the "1933 Act"), and the Securities Exchange Act of 1934, as amended from time to time (the "1934 Act"). Such statements are based upon information available when the statements were made and are subject to risks and uncertainties that could cause actual results materially to differ from those expressed in the statements. Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved the Disclosure Statement, the Plan, or any Exhibits to either document.

The Exhibits that are listed after the Table of Contents are attached to the Disclosure Statement. These Exhibits are incorporated into the Disclosure Statement and will be deemed to be included in this Disclosure Statement when they are Filed.

## III.
## OVERVIEW OF THE COUNTY, INCLUDING ITS ASSETS AND LIABILITIES

### A.      Historical Information About the County

#### 1.      History

The County is a political subdivision of the State of Alabama that was created by the legislative branch of the state government of Alabama (the "Alabama Legislature") on December 13, 1819. The County is located in the north-central portion of the State of Alabama, on the southern extension of the Appalachians, in the center of the iron, coal, and limestone belt of the South. The County is approximately 1,111 square miles in size.

The City of Birmingham has served as the county seat since 1873, and the County continues to maintain its primary offices and courthouse in Birmingham.

Pursuant to acts passed in the early 1900s, the Alabama Legislature assigned certain obligations to the County with regard to the maintenance of an additional courthouse and other County offices in a region of the County commonly known as the "Bessemer Cutoff." That term references the City of Bessemer, the largest city in the Bessemer Cutoff which, as of 2010, had a population of approximately 28,000 people.

#### 2.      Population

The County is the most populous county in the State of Alabama. According to the U.S. Census Bureau, the County's population was estimated in 2011 at 658,931, an increase of 0.1% from the previous year. According to the U.S. Census Bureau, 54.7% of the County's population is white and 42.3% of the population is black.

The County is the center of the seven-county Birmingham-Hoover Metropolitan Statistical Area (the "Birmingham-Hoover MSA"), which covers approximately 5,332 square miles. The Birmingham-Hoover MSA had an estimated population of 1,132,264 as of July 1, 2011, and was the 50th most populated area among the 366 Metropolitan Statistical Areas in the United States, according to figures from the U.S. Census Bureau.

6

As reflected in the table below, during the period from 2000 to 2012, the population of the County decreased by approximately 0.31%, compared to population increases of 8.02% for the Birmingham-Hoover MSA, 7.60 for the State, and 11.5% for the United States, during the same time frame.

| Year | Jefferson County | Birmingham-Hoover MSA | State of Alabama | United States |
|------|------------------|------------------------|-------------------|----------------|
| 2000 | 662,047 | 1,052,238 | 4,477,100 | 281,424,600 |
| 2001 | 660,197 | 1,060,486 | 4,647,634 | 284,968,955 |
| 2002 | 657,518 | 1,065,283 | 4,480,089 | 287,625,193 |
| 2003 | 657,513 | 1,072,279 | 4,503,491 | 290,107,933 |
| 2004 | 656,023 | 1,080,135 | 4,530,729 | 292,805,298 |
| 2005 | 654,919 | 1,088,218 | 4,569,805 | 295,516,599 |
| 2006 | 655,893 | 1,100,019 | 4,628,981 | 298,379,912 |
| 2007 | 655,163 | 1,107,256 | 4,672,840 | 301,231,207 |
| 2008 | 656,510 | 1,117,101 | 4,718,206 | 304,093,966 |
| 2009 | 658,441 | 1,125,271 | 4,757,938 | 306,771,529 |
| 2010 | 658,466 | 1,128,047 | 4,779,736 | 308,745,538 |
| 2011 | 658,386 | 1,132,264 | 4,802,740 | 311,591,917 |
| 2012 | 660,009 | 1,136,650 | 4,822,023 | 313,914,040 |

Source: Population Division, U.S. Census Bureau and Center for Business and Economic Research.

As reflected in the table below, the County is projected to have growth rates lower than the Birmingham-Hoover MSA, the State, and national levels between 2012 and 2050. The County's growth rate is projected at 0.04%, while the Birmingham-Hoover MSA's, the State's, and the United States' projected population growth rates are 20.4%, 19.8%, and 27.4%, respectively.

| Year | Jefferson County | Birmingham-Hoover MSA | State of Alabama | United States |
|------|------------------|------------------------|-------------------|----------------|
| 2012 | 660,009 | 1,136,650 | 4,822,023 | 313,914,040 |
| 2020 | 662,040 | 1,206,843 | 5,101,172 | 333,896,000 |
| 2030 | 663,525 | 1,271,790 | 5,365,245 | 358,471,000 |
| 2040 | 661,881 | 1,319,205 | 5,567,024 | 380,016,000 |
| 2050 | 660,241 | 1,368,388 | 5,776,392 | 399,803,000 |

Source: U.S. Census Bureau and Center for Business and Economic Research, The University of Alabama.

### 3. Cities and Towns Within the County

Birmingham, with an estimated population of 212,038 in 2012, is the largest city in the County and in the State of Alabama. From 2010 to 2012, Birmingham's population decreased by 0.1%. Birmingham's population is approximately 73% black, 22% white, 4% Hispanic or Latino (including whites and non-whites), and 1% Asian.

7

The City of Hoover, the sixth largest city in the State of Alabama, is primarily located within the County, with approximately 72.5% of its citizens residing within the County and the remainder living in Shelby County. Hoover had an estimated population of 83,412 in 2012. From 2010 to 2012, Hoover's population rate increased by 2.8%. Hoover's population is approximately 75% white, 15% black, 6% Hispanic or Latino (including whites and non-whites), and 5% Asian.

Other cities and towns located within the County (either wholly or in part) include Adamsville, Adger, Argo, Bessemer, Brighton, Brookside, Cardiff, Center Point, Chalkville, Clay, Ensley, Fairfield, Fultondale, Gardendale, Graysville, Homewood, Hueytown, Huffman, Irondale, Kimberly, Leeds, Lipscomb, Maytown, McCalla, Midfield, Morris, Mountain Brook, Mulga, North Johns, Pinson, Pleasant Grove, Sylvan Springs, Tarrant, Trafford, Trussville, Vestavia Hills, Warrior, Wenonah, and West Jefferson. The County is also home to numerous communities, many of which are unincorporated.

### 4. Economic Information

#### a. Employment

According to the Alabama Department of Industrial Relations, the County's civilian labor force totaled 301,631 as of January 2013. Of those persons, 279,640 were employed, and 21,991 were unemployed, reflecting an unemployment rate for the County of 7.3%.

The following table summarizes the labor force, employment, and unemployment figures for the period from 2003 through 2012 for the County, the Birmingham-Hoover MSA, and the State.

**Annual Average Labor Force Estimates[*]**
**Jefferson County**

| Employment Status | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|
| Civilian Labor Force | 318,771 | 317,073 | 315,476 | 317,635 | 315,210 | 309,814 | 304,500 | 305,452 | 306,677 | 305,558 |
| Employment | 302,832 | 302,119 | 303,569 | 306,692 | 304,780 | 294,989 | 275,016 | 276,779 | 279,911 | 284,866 |
| Unemployment | 15,939 | 14,954 | 11,907 | 10,943 | 10,430 | 14,825 | 29,484 | 28,673 | 26,766 | 20,692 |
| Rate | 5.0 | 4.7 | 3.8 | 3.4 | 3.3 | 4.8 | 9.7 | 9.4 | 8.7 | 6.8 |

**Annual Average Labor Force Estimates[*]**
**Birmingham-Hoover MSA**

| Employment Status | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|
| Civilian Labor Force | 522,615 | 524,631 | 527,688 | 537,190 | 535,660 | 530,222 | 522,392 | 528,139 | 530,139 | 530,609 |
| Employment | 498,163 | 501,658 | 509,277 | 519,245 | 506,582 | 474,221 | 481,100 | 480,902 | 486,344 | 496,639 |
| Unemployment | 24,452 | 22,973 | 18,411 | 17,174 | 16,415 | 23,640 | 48,171 | 47,237 | 43,795 | 33,970 |
| Rate | 4.7 | 4.4 | 3.5 | 3.2 | 3.1 | 4.5 | 9.2 | 8.9 | 8.3 | 6.4 |

**Annual Average Labor Force Estimates[*]**
**State of Alabama**

| Employment Status | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|
| Civilian Labor Force | 2,104,209 | 2,113,781 | 2,133,177 | 2,173,817 | 2,178,480 | 2,163,252 | 2,144,592 | 2,179,163 | 2,190,519 | 2,156,301 |
| Employment | 1,989,784 | 2,007,153 | 2,051,893 | 2,098,462 | 2,104,157 | 2,054,849 | 1,931,814 | 1,972,387 | 1,993,977 | 1,999,182 |
| Unemployment | 114,425 | 106,628 | 81,284 | 75,355 | 74,323 | 108,403 | 212,778 | 206,776 | 196,542 | 157,119 |
| Rate | 5.4 | 5.0 | 3.8 | 3.5 | 3.4 | 5.0 | 9.9 | 9.5 | 9.0 | 7.3 |

[*]    Estimates prepared by the Alabama Department of Labor, Bureau of Labor Statistics.

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 33 of 251

The U.S. Census Bureau reports that, during the period from 2007 through 2011, the median household income in the County was $45,750, which is higher than the Alabama median household income of $42,934, but lower than the U.S. median household income of $52,762 during such period. During that same period, 16.2% of persons in the County lived below the poverty level, compared to 17.6% of Alabama residents and 14.3% of U.S. residents.

### b.    Industries and Employers

According to the Alabama Department of Industrial Relations, the County's workforce is employed within the following occupational categories: (i) healthcare and social assistance (16.0%); (ii) retail trade (12.3%); (iii) educational services (8.3%); (iv) accommodation and food services (7.5%); (v) manufacturing (7.3%); (vi) finance and insurance (6.8%); (vii) professional, scientific, and technical services (5.9%); (viii) wholesale trade (5.8%); (ix) administrative and support and waste management and remediation services (5.6%); (x) construction (4.5%); (xi) public administration (4.4%); (xii) other services, except public administration (3.2%); (xiii) transportation and warehousing (2.9%); (xiv) information (2.4%); (xv) management of companies and enterprises (2.2%); (xvi) utilities (2.0%); (xvii) real estate, rental, and leasing (1.5%); (xviii) arts, entertainment, and recreation (1.1%); and (xix) agriculture, forestry, fishing and hunting, and mining (0.4%).

The largest private employers in the Birmingham-Hoover MSA include the following companies:

9

| Company | Employment | Product |
| --- | --- | --- |
| University of Alabama at Birmingham (incl. UAHSF) | 21,550 | Education and Healthcare Services |
| Regions Financial Corporation | 6,000 | Financial Services (Banking) |
| AT&T | 5,750 | Information |
| St. Vincent's Health System | 4,703 | Education and Healthcare Services |
| Baptist Health System, Inc. | 4,000 | Healthcare and Management Services |
| Children's Health System/ Children's of Alabama | 3,652 | Healthcare and Management Services |
| Southern Nuclear Operating Company | 3,200 | Utilities |
| Alabama Power Company | 3,000 | Utilities |
| Blue Cross-Blue Shield of Alabama | 3,000 | Financial Services (Insurance) |
| BBVA Compass | 2,804 | Financial Services (Banking) |
| Brookwood Medical Center | 2,600 | Healthcare and Management Services |
| Southern Company Generation | 2,500 | Utilities |
| American Cast Iron Pipe Company | 2,400 | Metal Fabrication |
| U.S. Steel-Fairfield Works | 2,400 | Metal Fabrication |
| Marshall Durbin Food Corporation | 2,000 | Food Processing |
| Trinity Medical Center | 1,879 | Healthcare and management Services |
| EBSCO Industries, Inc. | 1,800 | Diverse Products / Subscription |
| U.S. Social Security Administration | 1,800 | U.S. government, benefits |

Source:  Birmingham Business Alliance.

Numerous governmental entities, including the United States Government, the State of Alabama, the Jefferson County Board of Education, the County, and the City of Birmingham, also are major employers within the County.

10

### c.    Housing and Construction Activity

The following table contains information about housing units and households in the County, the Birmingham-Hoover MSA, and the state:

### Area Housing Units

| | Housing Units | | | Percent Change | |
|---|---|---|---|---|---|
| | 1990 | 2000 | 2010 | 1990-2000 | 2000-2010 |
| Jefferson County | 273,097 | 288,162 | 300,552 | 5.5 | 4.3 |
| Birmingham-Hoover MSA | 348,470 | 395,295 | 500,025 | 13.6 | 26.5 |

Source: U.S. Census Bureau, American Fact Finder.

### Characteristics of Housing Units, 2010

| | Total Housing Units | Occupied | | |
|---|---|---|---|---|
| | | Total | Owner | Renter |
| Alabama | 2,171,853 | 1,883,791 | 1,312,589 | 571,202 |
| Jefferson County | 300,552 | 263,568 | 171,158 | 92,410 |
| Birmingham-Hoover MSA | 500,025 | 441,924 | 312,004 | 129,920 |

Source: U.S. Census Bureau, American Fact Finder.

### Characteristics of Households by Type, 2010

| | Total Households | Family Households | Non-Family Households | Mobile Home or Trailer |
|---|---|---|---|---|
| Alabama | 1,883,791 | 1,276,440 | 607,351 | 310,721 |
| Jefferson County | 263,568 | 170,207 | 93,361 | 10,807 |
| Birmingham-Hoover MSA | 441,924 | 300,060 | 141,864 | 48,785 |

Source: U.S. Census Bureau, American Fact Finder.

### Average Value of Owner-Occupied Housing Units, 2010

| | |
|---|---|
| Alabama ............................................................................................................. | $111,900 |
| Jefferson County ............................................................................................... | 132,700 |
| Birmingham-Hoover MSA ................................................................................ | 143,000 |

Source: U.S. Census Bureau, American Fact Finder.

11

The following table presents information about residential and non-residential construction activity in the Birmingham-Hoover MSA over the past five years:

**Birmingham-Hoover MSA**
**Construction Activity**

| Year | Residential | Non-Residential | Total |
|------|-------------|-----------------|-------|
| 2008 | $611,267,000 | $ 889,578,000 | $1,500,845,000 |
| 2009 | 451,241,000 | 1,077,701,000 | 1,528,942,000 |
| 2010 | 497,674,000 | 507,418,000 | 1,005,092,000 |
| 2011[*] | 483,619,000 | 816,678,000 | 1,300,297,000 |
| 2012[**] | 686,123,000 | 669,359,000 | 1,355,482,000 |

[*]3rd Quarter 2011
[**]Projected
Source: McGraw-Hill Construction.

### d.    Transportation

The County has access to excellent road, rail, air, and waterway transportation.  The County is the nexus for three interstate highways: I-65 between Huntsville-Decatur to the north and Montgomery to the south; and I-59 from Gadsden in the northeast and I-20 from Anniston in the east, which interstates merge in the County as I-59/20 serving Tuscaloosa to the southwest.  Also, a new interstate highway – I-22 – is currently under construction which, when completed, will connect the County and Memphis, Tennessee.  The projected completion date for I-22 is in October 2014.

Rail freight service is provided by three major railroads: Norfolk Southern Railway; CSX Transportation; and Burlington Northern and Santa Fe Railway Corporation.  AmTrak provides passenger service to the County through the Crescent, a daily passenger train running from New Orleans to New York.  Over 100 truck lines maintain terminals in the area.

The County is home to Birmingham-Shuttlesworth International Airport, the largest airport in the State.  The airport offers 110 daily flights to 39 airports in 36 cities throughout the United States.  Commercial airline service is provided by five major carriers (American, Delta, Southwest, United, and USAir).  The airport currently ranks in the country's top 75 airports in terms of passengers served annually.  In 2012, the airport served over 2.8 million passengers.

Barge transportation is available through private dock facilities at Port Birmingham in the western part of the County.  These facilities are part of the Warrior-Tombigbee waterway system which provides access to the Port of Mobile in south Alabama.  The area is linked with the Tennessee-Tombigbee waterway system, which connects the County with 16,000 miles of barge routes stretching from the Great Lakes to the Gulf of Mexico.

12

### e. Schools and Education

#### i. Elementary and Secondary

The Jefferson County School System consists of 52 schools with a combined enrollment of approximately 35,843 students. The City of Birmingham has 49 schools in its system and approximately 25,798 students. The 11 other public school systems in the County encompass 63 schools and more than 41,357 students. In addition, the Birmingham-Hoover MSA has 96 private and denominational schools with grades ranging from kindergarten through high school.

#### ii. Colleges and Universities

The County is home to five colleges and universities, two business schools, and five junior colleges and trade schools. These schools have a combined enrollment of over 47,194.

The largest institution is the University of Alabama at Birmingham (UAB), which includes undergraduate and graduate programs and the UAB Medical Center. UAB is the third largest educational institution in the State, with a total enrollment of approximately 17,999. The UAB Medical Center consists of the Schools of Medicine, Dentistry, Nursing, Optometry, and Public Health, and the School of Community and Allied Health.

**Institution of Higher Education**
**Jefferson County**

| Name | Type | Approximate Student Enrollment Fall 2012 |
|------|------|------------------------------------------|
| **Four Year Institutions** | | |
| Birmingham-Southern College | Private | 1,305 |
| Miles College | Private | 1,800 |
| Samford University | Private | 4,758 |
| Southeastern Bible College | Private | 175 |
| University of Alabama at Birmingham | State Supported | 17,999 |
| **Two Year Institutions** | | |
| Herzing College of Business and Technology | Private | 411 |
| ITT Technical Institute | Private | 733 |
| Jefferson State Junior College | State Supported | 9,961 |
| Lawson State Community College | State Supported | 4,788 |
| Virginia College | Private | 5,264 |

13

### f. Financial Reporting

The County's fiscal year begins each October 1. The most recent audited financial statements of the County are for the fiscal year ending September 30, 2011, and are attached hereto as **Exhibit 2** (the "2011 Audited Financial Statements"). The 2011 Audited Financial Statements were audited by the outside accounting firm of Warren Averett, LLC.

The Department of Examiners of Public Accounts of the State of Alabama filed a report dated June 8, 2012 regarding its examination of the County for the period from October 1, 2008 through November 9, 2010, a copy of which report is attached hereto as **Exhibit 3**. This report presents a review of the County's compliance with applicable laws and regulations of the State of Alabama in accordance with the requirements of the Department of Examiners of Public Accounts under the authority of Alabama Code section 41-5-14.

### 5. Governance

### a. County Commission

Pursuant to Alabama Code Title 11, Act No. 97-147 and the case of *Michael Taylor et al. v. Jefferson County Commission et al.*, CV 84-C-1730-S, in the United States District Court for the Northern District of Alabama, the County is governed by a five (5) member County Commission (each member, a "Commissioner", who is elected concurrently with the other members of the County Commission). Each Commissioner serves and is elected from one of five geographical districts. Each Commissioner serves as the chair of one of the County Commission's standing committees, which are identified as (1) Health Services and General Services, (2) Community Services and Roads and Transportation, (3) Finance and Information Technology, (4) Courts, Emergency Management, Land Planning and Development Services and (5) Administrative Services. All five Commissioners sit on each of the five standing committees. The standing committees exist to evaluate proposed items of County Commission business and to advance or decline to advance such items to the agenda for a County Commission meeting. Committees and their members have no operational responsibilities of the County—those responsibilities being expressly delegated to the County Manager under applicable state law.

Commissioner Carrington chairs the Committee of Administrative Services, which is comprised of the Environmental Services Department, the Human Resources Department and the County Attorney's Office. Commissioner Bowman serves as Chair of the Committee of Health Services and General Services which is comprised of the General Services Department, Cooper Green Mercy Health Services and the County Coroner's Office. Commissioner Brown chairs the Committee of Community Services and Roads and Transportation, which is comprised of the Roads and Transportation Department, the Office of Senior Citizens Services and Community, Economic, and Workforce Development. The Chair of the Committee of Finance and Information Technology is Commissioner Stephens, and this committee is comprised of the departments of Finance, Revenue, Budget Management and Information Technology. Commissioner Knight chairs the Committee of Courts, Emergency Management and Land Planning and Development Services which is comprised of the County's Family and Juvenile Courts, the Emergency Management Agency, the Board of Registrars and Land Planning and Development Services.

14

The five current Commissioners are:

- <u>David Carrington</u>:  Commissioner Carrington was elected in 2010 to his first term on the County Commission where he represents District 5 of the County. Commissioner Carrington graduated with honors from the University of Houston with an undergraduate degree in mathematics and a Master's of Business Administration. Prior to being elected to the County Commission, he was a member for six years on the City Council of Vestavia Hills, a suburb of Birmingham, and served for four years as the City Council president.  He has a wide and varied business background and is currently the president of Racing USA, Inc.  He lives in Vestavia Hills, Alabama.

  Commissioner Carrington currently serves as the President of the County Commission.

- <u>Sandra Little Brown</u>:  Commissioner Brown was elected in November 2010 to her first term on the County Commission where she represents District 2.  Her public service background includes having served as an elected member of the Birmingham City Council for four years. While on the City Council she chaired the Birmingham Parks and Recreation & Cultural Arts Committees where she served as Park Board Commissioner and chaired the Birmingham Regional Arts Commission. Commissioner Brown is also an entrepreneur with over 20 years in sales.  She is the owner of JJs T-shirts and Team World.  She resides in Birmingham, Alabama.

  Commissioner Brown is President Pro Tempore of the County Commission.

- <u>George Bowman</u>:  Major General Bowman first served on the County Commission when he was appointed in 2007 by the Governor of Alabama to fill the remaining, one-year unexpired term of a resigning commissioner. He returned to the County Commission in mid-2010 when he won a special election to replace the resigning District 1 Commissioner.  In November 2010, he was re-elected to that position in the regular election. Major General Bowman holds a Master's in Public Administration from Shippensburg University in Pennsylvania. He also served a distinguished career in the United States Army and the Army Reserve, earning numerous decorations and awards during his service. Commissioner Bowman also worked for Liberty National Life Insurance Company at its home office in Birmingham.  He resides in Center Point, Alabama.

- <u>James "Jimmie" Stephens</u>:  Commissioner Stephens was elected in November 2010 to his first term on the County Commission where he represents District 3. Commissioner Stephens attended Samford University, where he obtained both a Bachelor of Science in Business Administration and a Masters of Business Administration. He previously served as a city councilor on the Bessemer City Council and is past chairman of the Bessemer Board of Zoning Adjustments, the Bessemer Airport Authority, the Bessemer Commercial Development Authority. In addition, he is a former high school educator, where he taught business education

15

courses. Commissioner Stephens has extensive business experience, primarily in the wholesale and retail fields. He lives in Bessemer, Alabama.

- <u>Joe Knight</u>: Commissioner Knight was elected in November 2010 to his first term as County Commissioner for District 4. Commissioner Knight has practiced as an attorney for the past twenty-three years and is the principal in T. Joe Knight, LLC, located in Birmingham. He is a member of the Alabama State Bar and Birmingham Bar Association. Prior to becoming an attorney, Commissioner Knight was Certified Registered Nurse Anesthetist (CRNA), a Nurse Clinician at UAB Hospital and Registered Nurse specializing in trauma. Commissioner Knight is General Counsel for the Alabama Association of Nurse Anesthetists. He is a member of the Alabama Association of Nurse Anesthetists and the American Association of Nurse Anesthetists. He lives in Trussville, Alabama.

The Commissioners elect one of their members to serve as President of the County Commission at the beginning of each four-year County Commission term. The President's duties include serving a presiding officer at all County Commission meetings, executing all contracts and other agreements which require approval of the County Commission and executing all checks and/or warrants on the County Commission accounts.

### b. Other Elected Officials

#### i. Sheriff

The Sheriff of Jefferson County is an elected official who serves as the chief law enforcement officer of the County. The Sheriff maintains full law enforcement jurisdiction throughout the County, with particular regard for providing service to the unincorporated areas of the County. These enforcement duties include handling criminal investigations and traffic accident investigations. The Sheriff also is responsible for the service of legal process for County courts, the conduct of public elections, and the operation and maintenance of the County jails.

The Sheriff is regarded as a State official under Alabama law. *See Marsh v. Butler Co., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001). However, Alabama law requires that the County fund the operations of the Sheriff's office. *See* Ala. Code §§ 11-8-3(c) (providing that a county's annual budget shall include reasonable expenditures for the operation of the sheriff, among other things) and 36-22-18 (providing that the "county commission shall . . . furnish the sheriff with the necessary quarters, books, stationery, office equipment, supplies, postage and other conveniences and equipment, including automobiles and necessary repairs, maintenance and all expenses incidental thereto, as are reasonably needed for the proper and efficient conduct of the affairs of the sheriff's office").

Mike Hale is the current Sheriff of Jefferson County, having served in that position since 1998. In 2010, he was re-elected to a four-year term.

16

### ii. County Treasurer

The County Treasurer is an elected position whose office is responsible for receiving and keeping the money of the County and disbursing the same as provided for by state law.

Mike Miles is the current County Treasurer, having won election for a four-year term in 2012. Mr. Miles succeeds Jennifer Parsons Champion, who served as County Treasurer as of the Petition Date. Sherry McClain is the current Deputy County Treasurer of the "Bessemer Cutoff" division, having won election in 2012. She succeeded Doris Britton.

### iii. Tax Assessor

The Jefferson County Tax Assessor is responsible for processing tax returns on real and personal property, discovering and assessing taxable property, recording the ownership of property, and maintaining the County's tax roll.

Gaynell Hendricks is the current County Tax Assessor. She was elected to her first four-year term in 2008, and was re-elected in 2012. Andrew Bennett is the current Assistant Tax Assessor, serving the "Bessemer Cutoff" division of the County.

### iv. Tax Collector

The County Tax Collector is an elected officer who is responsible for the collection of real property and other taxes assessed by the County. J.T. Smallwood currently serves as County Tax Collector, holding that position since first elected in 2002. Grover Dunn is the current Assistant Tax Collector, serving the "Bessemer Cutoff" division of the County.

### v. Probate Court Judges

The County Probate Judges are responsible for a variety of tasks, including issuing marriage licenses, recording real estate documents and other public records, probating wills and administering estates, issuing letters of guardianship and conservatorship, hearing adoptions and name change matters, hearing adult mental health involuntary commitment cases, processing applications for notaries public, and serving as the chief election official for the County.

The Honorable Alan King and the Honorable Sherri Friday both currently serve as Probate Judges.

### vi. District Attorney

The District Attorney is a publicly elected official who represents the State in the prosecution of criminal offenses within the County. Brandon Falls is the District Attorney, having most recently won election in 2010 to a six-year term. Arthur Green, Jr. currently serves as the Deputy District Attorney for the "Bessemer Cutoff" division, having won re-election also to a six-year term in 2010.

17

### c. County Management

#### i. County Manager / Chief Executive Officer

In August 2009, the Alabama Legislature passed Act 2009-662 and Act 2009-812, pursuant to which the Alabama Legislature directed the County Commission to hire a county manager to serve as the County's chief executive officer on or before April 1, 2011. The legislation provided that the votes of four of the five Commissioners would be necessary to select a county manager. The legislation further mandated that the County engage a qualified national search firm to recruit candidates at any time the county manager position was vacant.

Shortly after the current County Commission took office, it engaged a qualified national search firm to find qualified candidates to fill the county manager position. In Act 2011-69, the Alabama Legislature significantly revised the county manager law and extended the deadline for the County to appoint a county manager until June 1, 2011 (or October 1, 2011 if the initial search failed to produce a county manager). The initial national search identified three finalists from a pool of over 50 applicants; however, two of the finalists withdrew from consideration, and the third finalist did not garner the requisite support of the County Commission.

The County Commission resumed its search for a county manager. In addition to seeking applicants from across the country, the County Commission also focused efforts on identifying local candidates who were both qualified for and interested in the position.

On September 27, 2011, the County Commission unanimously selected Tony Petelos to serve as the County's first County Manager. Mr. Petelos came to the position with extensive public service and management experience. From 2004 to 2011, Mr. Petelos had served as the Mayor of the City of Hoover, the County's second largest city and the sixth largest city in Alabama. Before that, he served in the Alabama House of Representative from 1986 through 1997, where he also served as chair of the House's Jefferson County Delegation from 1990 to 1996. In 1997, Mr. Petelos was appointed by Governor Fob James as Commissioner of the Alabama Department of Human Resources after the department entered a federal consent decree. He was subsequently re-appointed by Governor Don Siegelman.

As County Manager, Mr. Petelos has assumed day-to-day management authority for the County's operations, a responsibility that previously had been borne by the Commissioners themselves, on top of their legislative functions. Centralizing the executive functions of the County in the County Manager's office has resulted in substantial efficiencies and improvements in the County's operations. Mr. Petelos oversees the implementation of authorized projects and programs, assures appropriate coordination of departmental operations, analyzes and implements organizational changes to improve the efficient and economical operation of County government, and recommends policies and adopts procedures for the orderly conduct of the County's administrative affairs. Mr. Petelos's office also is charged with the County's budget planning and oversight process, which entails reviewing and evaluating budget estimates of all County departments, submitting an annual budget to the County Commission for its review and approval, reviewing County revenues and expenditures throughout the year to insure budgetary control and to keep the County Commission advised of the financial condition and needs of the County, implementing necessary and prudent

18

fiscal controls, and providing recommendations as to supplemental appropriations and budget transfers which require County Commission approval. Mr. Petelos (or Deputy County Manager Walter Jackson) attends all County Commission meetings where he, as County Manager, may discuss any matter before the County Commission, although he has no vote on County Commission matters.

The County Manager is the appointing authority for all County employees with the exception of the County Attorneys and their merit system staff, elected County officials and their appointed staff. Aside from the limited exceptions stated above, the County Manager has the authority to select, appoint, evaluate, terminate and retain department heads and county employees.

### ii.        Chief Financial Officer

In July 2012, the County Commission approved the hire of George Tablack as the County's Chief Financial Officer. Prior to joining the County, Mr. Tablack served as budget director and county administrator for Mahoning County in Ohio. He holds a Bachelor of Science in accounting from Ohio State University and is a Certified Public Accountant (CPA).

As Chief Financial Officer, Mr. Tablack reports directly to the County Manager. The Chief Financial Officer has primary executive responsibility for the County's finance, revenue, purchasing, information technology and budget management offices.

### iii.       County Attorney

Carol Sue Nelson serves as County Attorney for Jefferson County. The County Commission approved her appointment in May 2013, and she assumed the role of County Attorney effective June 3, 2013. Prior to joining the County, Ms. Nelson was a shareholder at the Birmingham-based law firm of Maynard Cooper & Gale, where she concentrated her practice in the fields of labor and employment law. Ms. Nelson graduated *magna cum laude* from the Cumberland School of Law, and earned her undergraduate degree from Auburn University.

As County Attorney, Ms. Nelson reports directly to the County Commission. She supervises a staff of three in-house attorneys and oversees the work of numerous outside law firms retained from time to time by the County, including the instant Case. The County Attorney's office is responsible for representing and advising the County, its elected officials and department heads. The elected officials include the County Commission, the County Manager, the Deputy County Manager, the Chief Financial Officer, the Tax Collector and Tax Assessor, the Probate Judge, the Election Commission (comprised of the Sheriff, Clerk of Court and Probate Judge) and the Treasurer. The operating departments include the Finance Department, Revenue Department, Roads and Transportation Department, Environmental Services Department, Land Development Department, the Board of Equalization, the Cooper Green Mercy Health Services, the Coroner, the General Services Department, the Family Court, the Juvenile Detention facility, the Human Resources Department, the Budget Management Department, the Board of Registrars, the Inspection Services Department, the Community and Economic Development Department, the Department of Information Technology, the General Retirement System for Employees of Jefferson County, Alabama and the Jefferson County Emergency Management Agency. The County Attorney's office

represents these persons in a variety of matters, including the defense of claims, negotiation of contracts, compliance, and a variety of litigation matters.

Ms. Nelson has served as County Attorney since June 2013. She succeeds Jeffrey M. Sewell, who was County Attorney as of the Petition Date.

### iv.    Environmental Services Director

David Denard is the Director of the County's Environmental Services Department.  In this capacity, Mr. Denard manages the day-to-day operations of the Sewer System and is primarily responsible for long-range planning for the Department.  He is also responsible for the management of approximately 390 County employees who work within the Environmental Services Department. Mr. Denard has been employed with the County since 1999, serving as Director of the Environmental Services Department since 2007.  Mr. Denard reports directly to the County Manager.

### d.    County Employees

The number of permanent filled employee positions with the County has decreased by more than 30% over the past five years. In 2008, the County had 3,837 employees. In 2009 and 2010, the numbers were 3,548 and 3,544, respectively.  In 2011, the County's employment ranks dropped to 3,160. As of December 31, 2012, the number had dropped further to 2,590.

The Personnel Board of Jefferson County (the "Personnel Board") possesses substantial administrative responsibility over the County's employment practices. The Personnel Board is a human resources organization established by the Alabama Legislature in 1935 to administer the civil service, or merit, system for the County and other certain municipalities within the County. The Personnel Board is responsible for establishing and administering rules and regulations to assure compliance with Act 248, H.580, adopted by the Alabama Legislature in 1945 (as amended, the "Enabling Act"), and to ensure that the County's civil service employees are treated in accordance with the Enabling Act's provisions. To that end, the Personnel Board classifies positions throughout the County, tests potential candidates for employment, establishes hiring registers, develops and administers pay schedules, coordinates the adjudication of grievances, and maintains employee history records. The County's participation in the Personnel Board system is not optional, but is mandated by the Enabling Act.

The Personnel Board operates under the auspices of a three-member panel. This three-member panel is appointed by a Citizens' Supervisory Commission comprised of 17 civic leaders from throughout the County. The composition of the Citizens' Supervisory Commission is defined in the Enabling Act. Each panel member serves a staggered six-year term. A personnel director reports directly to the three-member panel and is responsible for the day-to-day operations of the Personnel Board.

The Personnel Board's expenses throughout its fiscal year are paid by the County, as required by the Alabama Legislature pursuant to the Enabling Act. At the end of each fiscal year, the County submits to the Personnel Board the total sum the County has expended on Personnel Board

20

operations. Once these expenses have been approved, the County and the other municipalities that participate within the Personnel Board system are billed for their respective shares of such annual expenses. For fiscal year 2011, the percentage of the Personnel Board's expenses allocated to the County was 34.9% of the total amount billed.

In addition to the administrative oversight by the Personnel Board, the Commission is subject to the Hiring Practices Consent Decree and other applicable laws which govern any employment action taken by the County.

### 6. County Component Units

In the County's financial audits, two separate legal entities are identified as component units of the County. They are The Jefferson County Economic and Industrial Development Authority (the "Development Authority") and The Jefferson County Public Building Authority (the "PBA"). As component units, the financial position and results of the Development Authority and the PBA are generally reflected in the County's financial statements as non-major enterprise funds with any significant activity with other County funds being eliminated.

#### a. Jefferson County Economic and Industrial Development Authority

The Development Authority is a public corporation formed in 1995 to engage in the solicitation and promotion of industry, industrial development and other concerns, as well as to convince enterprises to locate within the County, retain, expand, and improve their operations. The Development Authority offers a variety of assistance to businesses seeking to locate or expand within the County, including site and facility selection, project financing and incentive packages, and work force recruitment, screening and training.

#### b. The PBA

The PBA is a public corporation incorporated in 1998 under the laws of the State of Alabama. The general purpose of the PBA is to provide public facilities for use by the County and its agencies. All powers of the PBA are vested in a board of directors, consisting of three members elected by the County Commission for staggered terms. No officer of the State of Alabama, the County, or any incorporated municipality is eligible to serve on the PBA's board of directors. Each member of such board must be a duly qualified resident of the County and serves without compensation.

In September 2012, the County appointed the following individuals to the PBA's board of directors: Jimmy Koikos (term ending September 30, 2014), Katrina Whitely (term ending September 30, 2016), and Don Holmes (term ending September 30, 2018).

### 7. Services

The County provides an extensive range of services to its residents, including law enforcement, jails, land development and zoning, economic and community development, indigent health care, senior citizen support services, voter and election services, family courts, probate courts,

21

roads and transportation, coroner and medical examiner services, emergency management, tax assessment and collection, and a host of other public service and assistance programs.

As a result of significant decreases in the County's unrestricted revenues due largely to its loss of its Occupational Tax (as defined below), the County has enacted substantial reductions over the past several years in the depth and scope of services it provides. The loss of the Occupational Tax is discussed in greater detail in Section III.C below.

One of the primary services provided by the County is the administration, operation, and maintenance of the Sewer System. The Sewer System is discussed in greater detail in Section III.B below.

### 8. Insurance and Risk Management

The County is exposed to various risks of loss related to torts; theft of, damage to, and destruction of assets; errors and omissions; injuries to employees; and natural disasters. The County Commission maintains a risk management program in order to minimize its exposures to loss. Risk financing for these various exposures is accomplished through the following methods:

a. <u>General and Auto Liability</u>: Self-insured with an established department to finance losses.

b. <u>Workers' Compensation</u>: Self-insured with a retention of $550,000, with excess coverage for statutory amounts above the retention covered by commercial insurance.

c. <u>Property Insurance</u>: Commercial insurance coverage purchased in the maximum amount of $1 billion per occurrence, except a separate annual aggregate of $50 million for flood and earthquake damages and including certain sublimits: (i) the County Commission has participated in an Owner Controlled Insurance Program with respect to property in the course of construction, builder's risks and installation or erection, but that program has been discontinued and has only one claim outstanding before it is closed; (ii) $50 million per occurrence as included in the $500 million loss limit subject to the policy terms and conditions; (iii) $5 million with respect to extra expense; and (iv) $500,000 with respect to transit.

d. <u>Hospital and Nursing Home Medical Malpractice and General Liability</u>: Certain medical professional employees purchase individual insurance protection applicable to their County employment. The County generally reimburses premiums for medical malpractice-professional liability insurance coverage for those County medical professional employees in amounts up to a stated amount per year. The County also has purchased professional and general liability insurance itself with coverage consisting of $1 million per occurrence and $3 million in the aggregate.

22

e.    <u>Health Insurance</u>: Self-insured with excess coverage through a commercial insurance provider. The County purchases specific reinsurance coverage with an unlimited benefit for each covered person, subject to a $250,000 deductible per covered person. Employees may obtain health care services through participation in the County's group health insurance plan. Risk management administers health insurance and negotiates with private providers to provide health, life, accidental death and dismemberment, vision and dental insurances for its employees and dependents. The County pays approximately 75% of health insurance and 100% of basic life and accidental death and dismemberment coverage. Employees pay 100% of vision and dental insurance costs and other voluntary insurance plan costs. The County's risk financing activities associated with the County group health insurance, such as the risks of loss related to medical and prescription drug claims, are administered through third parties on a paid-claims basis.

Additional information regarding the County's self-insured activities, as of the fiscal year ended September 30, 2011, is provided in the County's 2011 Audited Financial Statements.

## 9.    The County's Retirement System

The County contributes to the General Retirement System for Employees of Jefferson County, Alabama (the "<u>Retirement System</u>"). The Retirement System is the administrator of a single-employer, defined benefit pension plan (the "<u>Pension Plan</u>") covering substantially all employees of the County. The Retirement System was established by the Alabama Legislature pursuant to Act Number 497, Acts of Alabama 1965, page 717, and provides guidelines for benefits to retired and disabled employees of the County. The Retirement System is a distinct legal entity from the County, and neither the Retirement System nor its assets are the subject of this Case. Employees of the County are required by statute to contribute six percent of their gross salary to the Retirement System. The County is required to contribute amounts equal to participant contributions. The Pension Plan also receives from the County a percentage of the proceeds from the County's sale of pistol permits.

For the fiscal year ended September 30, 2011, the County's annual pension contribution was $9,015,000. For the previous fiscal year, the County's annual pension contribution totaled $9,220,000. These amounts reflect both the County's required and actual contribution for those respective years. These required contributions were determined using the "entry age normal" method. The "entry age normal" method projects the benefit costs of each individual from entry age into a pension plan to assumed exit age from the plan, and allocates these benefit costs on a level basis over the earnings or service of such individual. The actuarial assumptions as of October 1, 2011, the latest actuarial valuation date relating to the Pension Plan, were (a) a 7.0 percent investment rate of return on present and future assets and (b) projected salary increases of 4.25 to 7.25 percent. Both of these assumptions include an inflation component of 3.25 percent.

The actuarial value of assets was determined using techniques that smooth the effects of short-term volatility in the market value of investments over a five-year period. The funding excess

23

is being amortized as a level percentage of projected payroll in an open basis. The remaining amortization period as of October 1, 2011 was fourteen years.

Additional information regarding the County's contribution obligations to the Pension Plan and funding progress with respect to the Pension Plan, as of the fiscal year ending September 30, 2011, is provided in the 2011 Audited Financial Statements.

### 10. Other Post-Employment Benefits

In addition to the pension benefits described above, the County Commission sponsors a single-employer postretirement welfare benefit plan (the "OPEB Plan") in accordance with a resolution first approved by the County Commission on September 25, 1990, and approved annually thereafter. The OPEB Plan provides for medical insurance coverage to eligible retirees and their dependents. The benefits provided under the OPEB Plan are typically financed on a pay-as-you-go basis. The OPEB Plan's eligibility requirements, coverages, and benefit types, as of the fiscal year ending September 30, 2011, are described in the County's 2011 Audited Financial Statements.

In June 2004, the Governmental Accounting Standards Board ("GASB") issued Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other than Pensions*. GASB Statement No. 45 establishes standards for the measurement, recognition, and disclosure of OPEB expenses and related liabilities and is effective for the County for the year ended September 30, 2008. Under this Statement, all state and local governmental entities that provide other postemployment benefits are required to report the cost of these benefits on their financial statements. The County Commission first adopted the requirements of GASB Statement No. 45 in 2011 and implemented it prospectively.

As of September 30, 2011, the most recent actuarial valuation date for the County's OPEB Plan, the OPEB Plan had 542 retired participants. The OPEB Plan had a total 3,089 active participants and 37 vested terminated participants. The County subsidizes a portion of the retirees' health care insurance premiums based on the total years of County service and age at retirement. As of September 30, 2011, the County's subsidy for each covered retired employee ranged from $392 to $1,080 per month, and total insurance premiums range from $450 to $1,080 per month.

Additional information about the OPEB Plan and the actuarial valuation thereof, as of the fiscal year ending September 30, 2011, is available in the County's 2011 Audited Financial Statements.

### 11. Lack of "Home Rule" and the County's Limited Ability to Raise Revenues

The County, as an instrumentality of the State of Alabama, has only such taxing authority and other governmental powers as are specifically granted to it, either under provisions of Alabama's Constitution or by legislative act.

The Alabama Constitution limits the County's ability to increase revenues beyond those sources of revenue described in Section III.G below. The Alabama Constitution contains no local government article and does not provide for "home rule" for counties in Alabama. This limitation on

24

county governmental powers, coupled with the traditional "Dillon's Rule" followed in Alabama that negates almost any implicit powers that might otherwise be fairly suggested by a county's governmental responsibilities, severely restricts the ability of the County to levy taxes or otherwise raise revenue for the benefit of its general operating fund (the "General Fund"). Specific constitutional provisions restricting the County's authority are described below.

### a. Section 44 of Article IV of the Alabama Constitution

Section 44 of Article IV of the Alabama Constitution states that the "legislative power of this state shall be vested in a legislature, which shall consist of a senate and a house of representatives." Because counties are instrumentalities of the State and have only such power as delegated to them by the State, county governments in Alabama have no general authority to act.

### b. Section 104 of Article IV of the Alabama Constitution

Section 104 of Article IV of the Alabama Constitution prohibits the Alabama Legislature from passing local bills regarding numerous specific subject areas. As a result, a statewide vote is required to permit the Alabama Legislature to pass many bills related to local issues. Among other things, section 104 provides that:

> The legislature shall not pass a special, private, or local law in any of the following cases: . . .
>
> (15) Regulating either the assessment or collection of taxes, except in connection with the readjustment, renewal, or extension of existing municipal indebtedness created prior to the ratification of the Constitution of eighteen hundred and seventy-five;
> …
> (17) Authorizing any county, city, town, village, district, or other political subdivision of a county, to issue bonds or other securities unless the issuance of said bonds or other securities shall have been authorized before the enactment of such local or special law, by a vote of the duly qualified electors of such county, city, town, village, district, or other political subdivision of a county, at an election held for such purpose, in the manner that may be prescribed by law; provided, the legislature may, without such election, pass special laws to refund bonds issued before the date of the ratification of this Constitution;
> . . .
> (28) Remitting fines, penalties, or forfeitures . . . .

### c. Article XI of the Alabama Constitution

Article XI of the Alabama Constitution governs taxation and finance. Section 15 of article XI of the Alabama Constitution limits the authority of the Alabama Legislature to authorize counties to levy property taxes in excess of specified rates. Those tax rate caps were established in 1901 and, despite amendments thereto over the years, remain low. In addition, section 217 of article XI places

25

other significant restrictions on a county's decision-making authority regarding the assessment and collection of *ad valorem* taxes on taxable property within such county.

### d. Legislative Earmarking of County Revenues

The lack of home rule and the attendant concentration of power in the Alabama Legislature frequently result in the "earmarking" of County revenue sources the Alabama Legislature approves. These earmarks are not necessarily aligned with the funding needs of the County. As a result, much of the revenue collected by the County cannot be used by the County in its discretion. For examples of legislative earmarking of County tax revenues, *see* Section III.G below.

## B. The County's Sewer System

The County's Sewer System serves nearly half a million people and has more than 144,000 active accounts. The Sewer System consists of more than 3,100 miles of sanitary sewer lines, approximately 174 pump stations, approximately 80,000 manholes, and nine wastewater treatment plants. The Sewer System treats, on average, roughly 100 million gallons of wastewater per day, but has the permitted capacity to treat approximately 200 million gallons daily, allowing for significant growth in the customer base.

### 1. The Sewer System's History

The oldest components of the Sewer System date back to the late 19th century. Beginning in 1901, the County began creating an ordered system of sanitary sewers that continued to grow with the County's population. However, the Sewer System infrastructure lagged behind the sanitary needs of the County. The patchwork of rapidly-growing municipalities developed their own network of sewer pipes outside of the County's control. Without central control of the collection system, it could not be assured that the various municipalities would take the steps necessary to prevent storm- and ground-water infiltration in the Sewer System. Moreover, some municipalities required hookups; some did not.

By 1931, County officials recognized that the Sewer System lacked sufficient treatment capacity to handle the County's needs. Using both federal grant money and borrowed funds, the County upgraded its treatment plants extensively over the next 15 years. Additionally, during the Great Depression, several projects by the Works Progress Administration brought needed extensions to the County's collection system. Despite these important improvements, the Sewer System's central problem – dispersed control of the collection system among several autonomous municipalities – continued. Compounding this problem, growth in the County surpassed the capacity of the existing pipes. Many brick and terracotta sewer lines had degraded and were crumbling. The Sewer System may have been big enough to handle the needs of the County, but the sewers were in poor condition. Expansion to keep pace with a growing and geographically-dispersed population took precedence over maintaining the existing system.

Recognizing the need for continued investment, the County sought the capacity to borrow money to finance sewer improvements. In 1948, voters approved Amendment 73 to the Alabama Constitution, which granted the County the power to borrow money for sewer improvements and to

26

charge for sewer service. The County requested the advice of Alvord, Burdick & Howson, a Chicago-based engineering firm, and received a report identifying $22.5 million in recommended projects. An appointed citizens advisory committee reduced the scope of projects from $22.5 million to $10 million, and the County borrowed this $10 million through bonds issued under Amendment 73. To cover cost overruns and extra projects, the County issued an additional $2.5 million in sewer warrants and used roughly $324,000 in excess sewer revenues. The County completed the last of these projects in 1958.

To pay debt service on the new bonds and warrants, the County began charging customers for use of the sewers in 1951. The initial sewer rate was one-half of the charge for sewer service. Billing and collections proved difficult. The Birmingham and Bessemer Water Works refused to collect sewer charges, so the County had to use raw usage information and create its own billing and collections departments. The process produced confusion, disputes with customers, and high levels of overhead. In 1961, the Alabama Legislature passed a bill requiring water systems to bill and collect for sewer providers, so the County was able to outsource those functions.

The sewer projects of the 1940s and 1950s were effective in achieving the desired improvements, but continued growth and degradation to other portions of the Sewer System's infrastructure presented new challenges. The Sewer System lacked secondary treatment capacity and continued to be hampered by the lack of centralized control over the collection system.

The County continued making capital investments in the Sewer System through the 1960s. It opened a new Shades Valley treatment plant in 1961 and completed a major collector sewer project in Valley Creek in 1965. After issuing another $10 million in sewer bonds, the County constructed a treatment plant on the Cahaba River and trunk lines on the Cahaba River and Little Shades Creek. To control access to the Sewer System, the County obtained legislation allowing it to require residents of unincorporated portions of the County to petition for sewer access. The County would then perform a survey of the work required to provide sewer service to the new area, hold a public hearing, and make a decision. If the County decided to provide access, it would assess the cost of the expansion against the properties served by the expansion over ten years.

All of these improvements were insufficient to handle the County's growth. In 1967, the Alabama Water Improvement Commission ("AWIC") notified the County that the County needed to spend $30 million to upgrade five treatment plants. Financing was not available, so the County sought to upgrade only three of the plants and route the sewage from the other two to the newly-completed Cahaba River plant. On March 12, 1971, AWIC issued a moratorium forbidding the County from allowing any new connections to the Sewer System until the projects identified in 1967 were completed.

To finance the work, the County, operating under the mistaken assumption that raising sewer rates required approval from the Alabama Legislature, had legislation introduced that would have raised sewer rates from roughly $0.09 per hundred cubic feet ("CCF") to $0.15 per CCF. The County also sought federal and state funds. The federal government offered $13 million to the County in the form of matching funds, but the County was unable to raise its portion of the capital without assistance from the Alabama Legislature.

27

In August 1971, the Alabama Supreme Court ruled that the County could raise its sewer rates without approval from the Alabama Legislature. No sooner had the County obtained this power than President Nixon's wage-price freeze forbade the County from exercising it. The Internal Revenue Service (the "IRS") explicitly told the County that no rate increase would be permitted. The County sought relief because it was stuck in a difficult circumstance: on the one hand, regulations issued by the Environmental Protection Agency (the "EPA") required the County to make massive upgrades to the Sewer System, while on the other hand, the IRS denied the County the means to finance those improvements.

The IRS relented, and the County implemented a rate increase on January 11, 1972. The next month, the County approved a $20 million bond issuance. However, litigation about the reasonableness of the rate increase delayed the issuance of the bonds because the validity of their funding source – the higher sewer rates – was in question until the litigation favorably concluded. Without bond proceeds, the County could not begin construction. Eventually, under heavy pressure from businesses and residential customers, the County reduced the planned rate increase from $0.33 per CCF to $0.20 per CCF, with a maximum quarterly bill of $7.50.

In 1973, the federal Clean Water Act came into effect. The Clean Water Act fundamentally changed not only the nature of sewer regulation, but also the strictness of the regulation. Whereas wastewater treatment had been primarily a matter of state and local regulation, the creation of the EPA and the passage of the Clean Water Act centralized regulation in the federal government. These new federal regulations also required secondary treatment of sewage – a major new requirement.

The County had previously provided only primary treatment to wastewater. Primary treatment typically involves allowing a portion of the wastewater solids to settle in a large tank. Solids settle to the bottom of the tank while oils and greases rise to the top. Secondary treatment further removes biodegradable waste products that remain suspended in the wastewater even after primary treatment. Although there are several methods to perform secondary treatments, and several steps in each method, all forms of secondary treatment are more complex, capital-intensive, and expensive than primary treatment alone. Along with the new requirements imposed by the EPA came federal funding to implement the requirements. As the County rapidly spent $50 million to upgrade its treatment plants to perform secondary treatment, federal grants covered roughly $24.5 million of the cost, with another $1.8 million contributed by the State of Alabama.

The County acted decisively to complete this series of massive capital projects in just five years, but it also expended all of this capital without addressing the capacity and collection problems that plagued the Sewer System. These continuing problems, fed by rapid growth of suburbs, led to continued pollution problems, which in turn prompted AWIC to impose a connection moratorium in 1975, followed by two voluntary moratoria in 1975 and 1976.

Recognizing the need for continued improvements and investments in the Sewer System, the County raised rates again in 1977 and imposed industrial surcharges and impact fees on new construction. It also promulgated a $109 million, 10-year capital improvement plan based on raising rates, new borrowing, and federal grants. This plan soon lagged behind schedule. The County was a year late in issuing its first $10 million in bonds. At the same time, federal aid mostly disappeared.

28

Instead of providing $53 million in construction grants, the federal government announced that it would provide no more than $10 million.

In 1980, the County Commission responded to these cutbacks by raising rates to $0.49 per CCF with a 15% watering credit. The County Commission also raised impact fees. These actions were insufficient to fund the needed improvements, but nevertheless were subjected to a lawsuit that the County had exceeded its authority. The Alabama Supreme Court ruled in the County's favor, and the County raised rates again.

After increasing sewer rates more than 600% between 1970 and 1980, the County realized that financing the Sewer System's needed improvements would require tripling rates again by 1989. It commissioned a blue-ribbon report to set a schedule for investments and rates. The first such rate increase was implemented in 1984, which raised rates to an average of $0.88 per CCF. Another, smaller increase followed in 1985. As the County's rates increased, so did its sewer debt.

## 2.    The EPA Consent Decree

Notwithstanding these rate hikes and increased borrowings, the County fell behind the schedule in the blue-ribbon report. To catch up, the County implemented multi-year rate increases in 1991, taking rates to $1.15 per CCF in 1992, $1.35 per CCF in 1993, $1.44 per CCF in 1994, $1.58 per CCF in 1995, and $1.73 per CCF in 1996.

During the 1990s, the Alabama Department of Environmental Management ("ADEM") imposed much stricter pollution standards. Specifically, ADEM required the County to measure its pollutant discharge not by the quantities discharged, but rather by the concentration of pollutants that resulted from the discharge. This methodology hinged on the volume of water of the streams into which the Sewer System discharged, and the volume in those streams would vary seasonally. ADEM required the County to use the most "conservative" volume, i.e., lowest flow volume, to calculate pollutant concentrations. To meet these strict requirements, the County had to implement more stringent treatment methods. ADEM also imposed new limitations on sewer bypasses. A bypass results when more sewage comes into a treatment plant or collection system than the system can convey or plant can treat. Bypasses are usually caused by rain water that infiltrates the collection system of a sewer, so the normal method of preventing bypasses is to repair the pipes and mains that constitute the collection system or store excess flows for later treatment. According to a plan commissioned by the County, making the required improvements to the collection system and treatment plants would cost $416.8 million. ADEM required the County to perform this plan and to make annual reports about the County's progress.

Shortly thereafter, three citizens filed suit against the County in federal court alleging violations of the Clean Water Act. The EPA filed a separate action the next year, and the suits were consolidated. The court found the County to be in violation of its discharge permits and required the parties to negotiate a plan to fix the Sewer System's problems.

The result of this negotiation process was the EPA Consent Decree, which was formally entered on December 9, 1996. The EPA Consent Decree required the County to eliminate all sewer overflows and bypasses. To fix the long-standing problem of poorly-performing municipal

29

collection systems, the County assumed responsibility for the municipal collection systems – more than 2,100 miles of sewer pipe – without compensation from the municipalities. These municipal collection systems were consolidated under the County's control as part of the Sewer System. The County also repaired or replaced roughly 730 miles of sewer mains, and made significant upgrades to the capacities of its treatment plants.

### 3.    Cost Overruns, Financing Costs, and Corruption

Although initial estimates of construction costs for the EPA Consent Decree work ranged from around $0.3 billion to $1.2 billion, the work ultimately cost more than $3.05 billion. The County borrowed this money by issuing several series of Sewer Warrants, beginning with over $600 million in 1997. The County borrowed another $953 million in 1999 and $1.4 billion in 2001-2002. Furthermore, in connection with these borrowings, the County entered into several refinancing transactions that caused the County's debt structure to become highly variable and required the use of financial guaranty insurance to make the County's debt marketable and less costly. For a detailed discussion of the Sewer Warrants and related indebtedness, *see* Section III.D.1 below.

Corruption played a significant role in both Sewer System construction projects and Sewer System financing. On the construction side, several County officials – including former County Commissioners Chris McNair and Gary White – were convicted for having accepted bribes while in office from contractors in exchange for steering County business to them. Former Commissioner McNair was sentenced to five years in prison, while former Commissioner White received a ten-year sentence. All told, twenty individuals and organizations were found guilty for their corrupt practices: two former County Commissioners, five other County employees, nine individual contractors, and four organizations.

Corruption also infected the County's financing activities. Two former County Commissioners solicited and accepted bribes in exchange for providing lucrative roles in County transactions to financing institutions. For example, in 2009, former Commission President Larry Langford was convicted for his participation in the bribery scheme; he is currently serving a fifteen-year prison term.

The County increased sewer rates to service its new debts. In 1997, rates rose to $1.78 per CCF. By 2002, rates had roughly doubled to $3.53 per CCF. From there, rates continued climbing: $4.90 per CCF in 2003, $5.39 per CCF in 2004, $5.93 per CCF in 2005, $6.35 per CCF in 2006, $6.87 per CCF in 2007, and $7.40 per CCF in 2008. From 1997 to 2008, rates increased 416 percent.

After 2008, the County did not raise sewer rates until March 2013.

### 4.    Defaults on the Sewer System's Debt Obligations

In late 2007 and early 2008, as an unprecedented financial crisis spread to all aspects of the global economy, the County's ability to pay debt service on the Sewer Warrants worsened. In 2008, the underlying credit ratings of the County's Sewer Warrants were downgraded, as were the credit ratings of two of the Sewer Warrant Insurers, Financial Guaranty Insurance Company ("FGIC") and

Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc. ("Syncora"). Many holders of the County's variable rate demand Sewer Warrants tendered their warrants for immediate payment, causing the maturity date of a substantial amount of the County's Sewer Warrants to be reduced from forty years to four years. Auctions for the County's auction-rate Sewer Warrants failed for lack of bidders, requiring the County to pay higher interest rates. The County was called upon to either fund the Sewer Warrant Indenture's debt service reserve fund (the "Sewer DSR Fund") with cash or replace the debt service reserve policies with an acceptable surety bond, insurance policy or letter of credit, but the County did not do so. In 2008, the County failed to comply with a rate covenant in the Sewer Warrant Indenture and defaulted in payment of the Sewer Warrants and, as a result, the Sewer Warrant Insurers were required to (and did) pay accelerated principal redemptions on the variable rate demand warrants, as well as regularly scheduled interest on Sewer Warrants that the County failed to pay. Thus, although the Sewer System remained operationally sound, the finances of the Sewer System deteriorated even further.

In September 2008, the Sewer Warrant Trustee, along with FGIC and Syncora, filed suit against the County seeking to appoint a receiver over the Sewer System. Although noting that a receiver for the Sewer System was warranted, the federal court ultimately decided that it did not have jurisdiction to appoint a receiver with rate making authority. The Sewer Warrant Trustee then filed a similar action in the Jefferson County Circuit Court (the "State Court"). In September 2010, the State Court held that the County was in default of its obligations under the Sewer Warrant Indenture and appointed John S. Young, Jr. LLC as receiver over the Sewer System (the "Receiver").

### 5. Current Status of Sewer System

Today the Sewer System is generally in good operational condition and fair to good physical condition. The Sewer System still experiences overflows, but five of the County's nine basins have been released from the EPA Consent Decree, including most recently the Leeds basin in April 2012. The Sewer System's treatment plants are operating effectively and are complying with their various permits. The collection system, however, remains in need of continued rehabilitation and replacement. Moreover, portions of the major plant improvements made in the 1990s and early 2000s are beginning to near the end of their useful lives. Complying with new regulations, such as the new phosphorous discharge limits, will require large capital investments.

## C. Historical Information About the Occupational Tax

### 1. Origin of the Occupational Tax

Given the limitations on the County's ability to raise revenue caused by its lack of "home rule" and the numerous earmarks placed by the Alabama Legislature on the County's revenue sources, the County often struggled to fund the basic services for its citizens. In 1967, the Alabama Legislature passed an act (the "1967 Act") authorizing the County to collect an occupational tax on earnings of workers employed in the County (the "Occupational Tax"), as well as a business license fee. The 1967 Act did not contain earmarks, and the County had relied on the Occupational Tax as its primary source of unrestricted General Fund revenues for decades. Between 2000 and 2009, the

Occupational Tax provided roughly $600 million to the County and provided over 40% of the funding for the County's general administration and for the Sheriff.

## 2. Attacks on the Occupational Tax in the Alabama Legislature

The Occupational Tax has been the subject of nearly continuous litigation from 1987 through the present. Considerable litigation focused on the constitutionality of the Occupational Tax. To date, the Occupational Tax has been challenged in court no less than 17 times. For decades, the Occupational Tax survived all legal challenges, including two trips to the Supreme Court of the United States.

The Occupational Tax ultimately was unable to survive subsequent attacks by the Alabama Legislature. In 1999, the Alabama Legislature passed Act 99-669 (the "1999 Act"), which repealed the 1967 Act but permitted the County to approve a new version of the Occupational Tax. The catch was that the new version of the Occupational Tax was rife with earmarks. The County refused to undermine its own operations through approval of the new version with its earmarks. In March 2000, the Circuit Court of Jefferson County declared in a lawsuit brought by the Jefferson County Employees' Association (the "JCEA Case") that the 1999 Act did not receive enough favorable votes in the Alabama Legislature to become law. The trial court declared the 1999 Act to be unconstitutional and void. No appeal followed the trial court's decision in the JCEA Case.

In 2000, the Alabama Legislature attempted again to repeal the 1967 Act with Act 2000-215 (the "2000 Act"). The 2000 Act purported to, among other things, repeal the 1967 Act; impose a new occupational tax with no exemptions; and earmark nearly one-third of the money collected under the new occupational tax to one state agency and nearly one hundred non-state agencies. In subsequent litigation, the Alabama Supreme Court affirmed the trial court's ruling that the 2000 Act was void because it violated section 106 of the Alabama Constitution.

In May 2005, the Alabama Supreme Court, in an unrelated case (the "BJCCA Case"), ruled that the judicial branch of state government lacks jurisdiction to interpret and enforce provisions of the state constitution that apply to the legislative branch of state government. The Court in the BJCCA Case further held that the courts of Alabama lack jurisdiction to determine whether a bill received the requisite number of favorable votes to become law.

## 3. Invalidation of the Occupational Tax in the Edwards Lawsuit

In 2007, certain taxpayers filed *Edwards v. Jefferson County*, Case No. CV-07-900873 (the "Edwards Lawsuit"), attacking the Occupational Tax based on the ruling in the BJCCA Case. In the Edwards Lawsuit, the plaintiffs sought to apply the precedent set in the BJCCA Case retroactively to the Alabama Legislature's approval of the 1999 Act. The trial court ruled that: (a) based on the Alabama Supreme Court's opinion in BJCCA Case, the trial court in the JCEA Case lacked jurisdiction to invalidate the 1999 Act; (b) the 1999 Act was valid; (c) the 1967 Act had been repealed by the 1999 Act; and (d) the County had been collecting the Occupational Tax without express statutory authority since the effective date of the 1999 Act.

32

The trial court in the Edwards Lawsuit stayed its judgment to afford the Alabama Legislature an opportunity to reinstate the Occupational Tax. The trial court also permitted the County to collect the Occupational Tax, but required the County to place the collected taxes into an escrow account. The Alabama Legislature did not pass legislation to revive the Occupational Tax during the regular session, and the stay expired.

The County appealed the court's decision in the Edwards Lawsuit while simultaneously implementing rigorous spending cuts to maintain a balanced budget as required by state law. The County laid off more than 1,000 workers, severely limiting its ability to continue to offer core and essential governmental functions.

### 4. Legislative Remedy in Response to the Edwards Lawsuit

The determination by the trial court in the Edwards Lawsuit on January 2, 2009, ultimately confirmed by the Alabama Supreme Court later that year, meant that the County could no longer (after expiration of the stays the trial court issued in the case) lawfully levy its occupational and business license taxes under the 1967 Act, which act had survived numerous prior judicial challenges to its validity since the time of the initial levy. Seeking to protect these major sources of General Fund revenue even prior to the ultimate resolution of the Edwards Lawsuit, the County undertook to secure legislative relief from the Alabama Legislature at its Regular Session held in the spring of 2009, backing the introduction and advocating passage of bills intended to revive the County's power to levy and collect the Occupational Tax and its business license taxes, through either "repeal of the repeal" undertaken by the Alabama Legislature in 1999 or through a fresh authorization of the County's power to levy those taxes.[4]

The County's efforts to accomplish these goals and thereby revive its authority to levy occupational and business license taxes were complicated and ultimately frustrated in the 2009 Regular Session when legislators could not agree upon the form and substance of the legislation needed to reauthorize the occupational and business license taxes or to provide other revenues for the General Fund. This lack of agreement was amplified by attempts of individual legislators to amend the several bills under consideration that would have authorized new occupational and business license taxes for the County so as to alter the applicability, extent, or duration of any new taxing authorization, to limit the rates or the tax bases of any new taxes, and to provide for new or additional exemptions therefrom, to specify the use of the proceeds from the taxes to be authorized for particular objects of expenditure other than the County's General Fund, to place conditions on the levy of any new taxes intended to benefit the General Fund considered by the County to be onerous or unhelpful (such as requiring the continued maintenance of particular specified County services without reference to costs), to include a provision for the "sunset" of the tax authorization after a relatively short specified period of time, and to make either the initial authorization, or the continuance of the levies of the authorized taxes beyond a certain date, subject to popular

---

[4] Among the bills introduced was House Bill 811, 2009 Regular Session, which (had it become law) would essentially have revived the 1967 Act by repealing the 1999 Act and re-enacting the text of the 1967 Act, with some adjustments in respect of persons subject to the tax. Several other bills having a similar effect were also introduced in the Regular Session, but only House Bill 811 made any progress in the legislative process.

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 58 of 251

referendum by the voters of the County. During the 2009 Regular Session, the County opposed most of these various proposed conditions and provisions primarily because they would have either significantly delayed receipt of any new tax revenues benefitting the General Fund, severely limited the amounts expected to be derived from the taxes, or were regarded by the County's advisors and attorneys as unlikely to survive legal challenge. Upon final adjournment of the 2009 Regular Session, the County had nothing to show for its efforts to revive the 1967 Act's authorization to levy occupational and business license taxes.

In light of this emergency, then-Governor Bob Riley called a Special Session of the Alabama Legislature to enact a new statute authorizing future collection of the Occupational Tax and ratifying, validating, and confirming the collection of Occupational Tax after the effective date of the 1999 Act. The Alabama Legislature enacted Act 2009-811 (the "2009 Act"), which, among other things, repealed the 1999 Act, revived the 1967 Act, and provided separate and additional authority to the County to levy the Occupational Tax and business license fees both retroactively and prospectively. Although the 2009 Act contained several provisions that the County considered undesirable and unhelpful in terms of accomplishing a lasting and effective solution to remedying the financial inadequacy of the County's General Fund to meet County needs (for instance, the new Occupational Tax was required to be levied beginning in 2010 at a rate not in excess of a rate 10% lower than that at which the old Occupational Tax had been levied, the new business license taxes were required to be computed differently from the pre-existing taxes rendering the revenue effect of those taxes uncertain, and the new Occupational Tax was required to be phased out conditionally beginning as soon as 2012, unless the results of a referendum to be held in the County during June 2012 were to the contrary), the County nevertheless in good faith took the formal actions necessary to utilize its new legislative authorization to levy by appropriate ordinances the Occupational Tax and the new business license taxes in the expectation that collections from these new taxes would provide the County with some financial breathing room and at least a partial replenishment of the General Fund. Although the new levies would not, owing to changes in the rates or method of computing thereof, be expected to restore the County's General Fund to the financial position it enjoyed prior to the Alabama Legislature's destruction of the County's power to levy the former occupational and business license taxes, nevertheless the authorization contained in the 2009 Act was viewed by the County as of significant help, and tax revenues from the newly authorized taxes began to flow for the benefit of the General Fund.

In August 2009, the Alabama Supreme Court affirmed the trial court's decision in the Edwards Lawsuit. The Alabama Supreme Court recognized, however, that by virtue of the 2009 Act, the County had a valid claim to the amounts taxed from the time of the trial court's ruling to the effective date of the 2009 Act. During that time, the County deposited approximately $37.7 million in escrow. The Alabama Supreme Court held that the County could not retrieve such funds from the escrow fund.

To avoid the difficulties associated with collecting the Occupational Tax a second time, the County and the named plaintiffs in the Edwards Lawsuit reached and obtained court approval of a settlement of the plaintiffs' claims. Under the terms of that settlement, $30 million of escrowed funds would be made available to refund to taxpayers and to pay the attorneys' fees of class counsel. Additionally, $1.10 million of escrowed funds would be made available to pay the costs of providing notice to the class. The remaining escrowed amounts were to be returned to the County.

34

### 5.    Attack on Legislative Remedy in the Weissman Lawsuit

Shortly after the County levied a new tax under the 2009 Act, the 2009 Act was challenged in a class action lawsuit brought by certain taxpayers against the County (the "Weissman Lawsuit"). In the Weissman Lawsuit, Judge Charles Price ruled that the Alabama Legislature failed to comply with the publication requirement of section 106 of the Alabama Constitution when enacting the 2009 Act. Judge Price concluded that the 2009 Act was unconstitutional and void. Judge Price's judgment became final on December 1, 2010, but it did not require that the County refund the Occupational Tax collected between the effective date of the 2009 Act (August 14, 2009) and the date of final judgment (December 1, 2010).

Both the County and the plaintiffs appealed Judge Price's ruling to the Alabama Supreme Court. The County challenged Judge Price's ruling that the 2009 Act was unconstitutional and void. The plaintiffs challenged Judge Price's determination that his ruling would not be given retroactive effect. The County continued to collect the Occupational Tax pending the appeal, with such collections being deposited into an escrow fund.

The Alabama Supreme Court bifurcated the issues on appeal. On March 16, 2011, the Alabama Supreme Court upheld Judge Price's ruling that the 2009 Act was unconstitutional and void. Consequently, all escrowed funds were released to the plaintiffs. As of the Petition Date, the Alabama Supreme Court had not ruled on whether the County was obligated to refund approximately $100 million in Occupational Tax collected pursuant to the 2009 Act from its effective date (August 14, 2009) through the date of Judge Price's order (December 1, 2010). The amount of those Claims exceeded the County's cash reserves in its General Fund as of the Petition Date.[5]

### 6.    Lack of Legislative Remedy to Address the Weissman Lawsuit

In light of the rulings in the Weissman Lawsuit, the County instituted further efforts, this time at the Alabama Legislature's 2011 Regular Session, to obtain the enactment of replacement legislation that would alleviate the financial pressures associated with the loss of the Occupational Tax. The first option was to pass "limited home rule" legislation that would grant the County limited authority to raise tax revenue without specific legislative approval. The second option was to pass "un-earmarking" legislation to remove certain restrictions on the County's use of tax revenues.

While making this push for legislation, the County simultaneously made drastic cuts in its expenditures in an attempt to balance its budget as mandated by state law. The spending cuts affected nearly every department and resulted in sweeping reductions in basic services. Initially, the County took steps to reduce expenditures without laying off employees. The County closed its four satellite courthouse locations and consolidated services at the Birmingham courthouse. These and other steps have reduced spending by over $75 million since the current County Commission took office.

---

[5] As referenced below in Section III.E.8, the Alabama Supreme Court ruled postpetition that the County does not have to refund the approximate $100 million of collected Occupational Taxes.

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 60 of 251

The "home rule" legislation enjoyed the support of a majority of the County's legislative delegation and was approved in the House of Representatives. However, under state legislative procedures related to bills impacting local issues,[6] a Senate vote on the legislation was blocked, effectively killing the "home rule" bill. Likewise, the "un-earmarking" legislation faced opposition from legislators intent on preserving revenues for certain County operating funds and enterprise funds. The Regular Session concluded without a legislative fix for the loss of Occupational Tax revenues.

## D.    Summary of the County's Prepetition Indebtedness

The following subsections discuss each of the major types of indebtedness issued by the County prior to the filing of the Case.

### 1.    Sewer Warrants

The Sewer Warrants were issued under chapter 28 of title 11 of the Alabama Code sections 11-28-1, *et seq*., which authorizes the County to issue warrants for the purpose of paying the costs of public facilities, including sanitary sewer systems and all necessary and desirable appurtenances with respect thereto, and to pledge in favor thereof the revenues from any revenue-producing properties owned or operated by the County, including the Sewer System. The Sewer Warrants are limited obligations of the County payable solely out of, and secured by a pledge and assignment of, the System Revenues (as such term is defined below) (other than tax revenues) from the Sewer System remaining after payment of Operating Expenses (as such term is defined in the Sewer Warrant Indenture), and the moneys deposited into the Sewer DSR Fund and the Debt Service Fund (as defined below) and other moneys that came into the possession or control of the Sewer Warrant Trustee as additional security. As of the Petition Date, the aggregate principal amount of Sewer Warrants outstanding was $3,135,977,500.

### a.    Series 1997-A Sewer Warrants

The Series 1997-A Sewer Warrants were issued as fixed rate warrants in the aggregate principal amount of $211,040,000 on February 27, 1997, pursuant to a Trust Indenture dated as of February 1, 1997 (as amended and supplemented from time to time, the "Sewer Warrant Indenture"), between the County and AmSouth Bank of Alabama, as indenture trustee (together with The Bank of New York Mellon, as successor indenture trustee, the "Sewer Warrant Trustee"). Interest on the Series 1997-A Sewer Warrants is payable on February 1 and August 1 of each year with the final maturity on February 1, 2027.

The Sewer Warrant Indenture provides for the Sewer DSR Fund, a debt service reserve fund which is a special trust fund that must be maintained at a prescribed amount (the "Sewer DSR Fund

---

[6] By convention and practice, although not by legislative rule or constitutional requirement, legislation pertaining to only one county, and general legislation that has as a practical matter at the time of consideration only a local impact, are almost invariably voted on in the Alabama Legislature only by members of the affected county's local legislative delegation; while all members of the legislative body may vote on the bill, most choose to refrain from doing so, meaning that a majority of the local delegation may effectively block most local bills.

Requirement") determined by a formula defined in the Sewer Warrant Indenture. Upon the issuance of each additional series of Sewer Warrants under the Sewer Warrant Indenture (other than the Series 2003-A Sewer Warrants described below), a new Sewer DSR Fund Requirement was calculated and, if necessary, the County was required to deposit cash, an insurance policy, a surety bond, or a letter of credit in the Sewer DSR Fund to fulfill the Sewer DSR Fund Requirement. In addition, the Sewer Warrant Indenture established a rate stabilization fund (the "Rate Stabilization Fund"), which is a special trust fund intended to supplement the net revenues of the Sewer System when necessary.

The proceeds of the Series 1997-A Sewer Warrants were used to (i) refund a portion of the County's then-outstanding Sewer System indebtedness, including warrants previously issued in 1992, 1993, and 1995; (ii) pay the premium for a municipal bond insurance policy provided by FGIC; (iii) fund the Sewer DSR Fund to the Sewer DSR Fund Requirement; (iv) fund a deposit to the Rate Stabilization Fund; and (v) pay the costs of issuance of the Series 1997-A Sewer Warrants.

Pursuant to Municipal Bond New Insurance Policy number 97010082, FGIC guaranteed the payment of scheduled principal and interest on the Series 1997-A Sewer Warrants.

On the Petition Date, the outstanding principal amount of the Series 1997-A Sewer Warrants was $57,030,000. As of the Petition Date, the County had paid all scheduled principal and interest payments on the Series 1997-A Sewer Warrants to the Sewer Warrant Trustee when due.

**b.      Series 2001-A Sewer Warrants**

The Series 2001-A Sewer Warrants were issued as fixed rate warrants in the aggregate principal amount of $275,000,000 on March 22, 2001, pursuant to a supplement to the Sewer Warrant Indenture dated as of March 1, 2001. Interest on the Series 2001-A Sewer Warrants is payable on February 1 and August 1 of each year with the final maturity on February 1, 2041.

The proceeds of the Series 2001-A Sewer Warrants were used to (i) pay a portion of the cost to upgrade the Sewer System in accordance with the EPA Consent Decree, (ii) fund other improvements to the Sewer System as part of the County's capital improvement program, (iii) pay the premium for a municipal bond insurance policy provided by FGIC, (iv) pay the premium for a debt service reserve fund policy provided by FGIC, and (v) pay the costs of issuance of the Series 2001-A Sewer Warrants.

Pursuant to Municipal Bond New Insurance Policy number 01010225, FGIC guaranteed the payment of scheduled principal and interest on the Series 2001-A Sewer Warrants. In addition, the County purchased Municipal Bond Debt Service Reserve Fund Policy number 01010226 in the maximum amount of $14,318,478 from FGIC to fulfill the Sewer DSR Fund Requirement.

On the Petition Date, the outstanding principal amount of the Series 2001-A Sewer Warrants was $11,010,000. As of the Petition Date, the County had paid all scheduled principal and interest payments on the Series 2001-A Sewer Warrants to the Sewer Warrant Trustee when due.

37

### c.   Series 2002-A Sewer Warrants

The Series 2002-A Sewer Warrants were issued as variable rate demand warrants in the aggregate principal amount of $110,000,000 on March 6, 2002, pursuant to a supplement to the Sewer Warrant Indenture dated as of February 1, 2002.  Interest on the Series 2002-A Sewer Warrants is payable on the first business day of each month with the final maturity on February 1, 2042.

The proceeds of the Series 2002-A Sewer Warrants were used to (i) pay a portion of the cost to upgrade the Sewer System in accordance with the EPA Consent Decree, (ii) fund other improvements to the Sewer System as part of the County's capital improvement program, (iii) pay the premium for a municipal bond insurance policy provided by FGIC, (iv) pay the premium for a debt service reserve fund policy provided by FGIC, and (v) pay the costs of issuance of the Series 2002-A Sewer Warrants.

Pursuant to Municipal Bond New Insurance Policy number 02010251, FGIC guaranteed the payment of scheduled principal and interest on the Series 2002-A Sewer Warrants.  In addition, the County purchased Municipal Bond Debt Service Reserve Fund Policy number 02010251 in the maximum amount of $5,566,000 from FGIC to fulfill the Sewer DSR Fund Requirement.

Liquidity support for the Series 2002-A Sewer Warrants was provided by a Standby Sewer Warrant Purchase Agreement among the County, the Sewer Warrant Trustee and JPMorgan Chase Bank, N.A. ("JPMorgan Chase") dated as of February 1, 2002.  In 2008, the principal amount of the Series 2002-A Sewer Warrants then outstanding was tendered by investors and purchased by JPMorgan Chase, and such Series 2002-A Sewer Warrants became "Bank Warrants" pursuant to the Standby Sewer Warrant Purchase Agreement (the "Series 2002-A Sewer Bank Warrants").  The Standby Sewer Warrant Purchase Agreement required the County to redeem the Series 2002-A Sewer Bank Warrants in twelve equal quarterly installments.  JPMorgan Chase subsequently exercised its right under the Standby Sewer Warrant Purchase Agreement to further accelerate principal payments on the Series 2002-A Sewer Bank Warrants so that the remaining principal amount was due in four quarterly installments.  The County defaulted on its obligation to redeem the Series 2002-A Bank Warrants on the accelerated timeframe, whereupon FGIC purchased the Series 2002-A Sewer Bank Warrants in an aggregate principal amount of $101,465,000 pursuant to claims on Municipal Bond New Insurance Policy number 02010251.  The defaults with respect to the Series 2002-A Sewer Bank Warrants caused interest to accrue thereon at higher default rates of interest.

As of the Petition Date, the Series 2002-A Sewer Warrants were outstanding in the aggregate principal amount of $101,465,000.  FGIC held on the Petition Date and continues to hold all Series 2002-A Sewer Warrants.

### d.   Series 2002-C Sewer Warrants

The Series 2002-C Sewer Warrants were issued in the aggregate principal amount of $839,500,000 on October 25, 2002, pursuant to a supplement to the Sewer Warrant Indenture dated as of October 1, 2002.  The County issued $298,800,000 aggregate principal amount of the Series 2002-C Sewer Warrants as auction rate warrants and $540,700,000 aggregate principal amount of

38

the Series 2002-C Sewer Warrants as variable rate demand warrants. On August 1, 2003, the County converted $98,300,000 aggregate principal amount of the variable rate demand warrants to auction rate warrants. Interest on the Series 2002-C Sewer Warrants in a variable rate demand mode is payable on the first business day of each month with the final maturity on February 1, 2040. Interest on the Series 2002-C Sewer Warrants in an auction rate mode is payable on the business day immediately succeeding each respective auction period with the final maturity on February 1, 2040.

The proceeds of the Series 2002-C Sewer Warrants were used to (i) advance refund all or a portion of select maturities of the County's then-outstanding Sewer System indebtedness, including warrants previously issued in 1997, 1999, and 2001; (ii) pay the premium for a municipal bond insurance policy provided by Syncora; and (iii) pay the costs of issuance of the Series 2002-C Sewer Warrants.

Pursuant to Municipal Bond Insurance Policy number CA00370A, Syncora guaranteed the payment of regularly scheduled principal and interest on certain of the Series 2002-C Sewer Warrants.

Liquidity support for the Series 2002-C Sewer Warrants issued as variable rate demand warrants was provided by Standby Warrant Purchase Agreements among the County, the Sewer Warrant Trustee, JPMorgan Chase (as Liquidity Agent) and each of JPMorgan Chase, Bank of America, N.A. ("Bank of America"), The Bank of Nova Scotia, Bayerisch Hypo-und Verinsbank AG, New York Branch, Societe Generale, New York Branch, and Regions Bank, each dated as of October 1, 2002 (collectively, "Series 2002-C Standby Sewer Warrant Purchase Agreements"). In 2008, all outstanding Series 2002-C Sewer Warrants issued as variable rate demand warrants were tendered by investors and purchased by the Series 2002-C Standby Sewer Warrant Purchase Agreement providers and such Series 2002-C Sewer Warrants became "Bank Warrants" pursuant to the Series 2002-C Standby Sewer Warrant Purchase Agreements (the "Series 2002-C Sewer Bank Warrants"). The Series 2002-C Standby Sewer Warrant Purchase Agreements required the County to redeem the Series 2002-C Sewer Bank Warrants in sixteen equal quarterly installments. The County defaulted on its obligation to redeem the Series 2002-C Sewer Bank Warrants on the accelerated timeframe, whereupon Syncora purchased Series 2002-C Sewer Bank Warrants in an aggregate principal amount of $109,196,250 pursuant to claims on Municipal Bond Insurance Policy number CA00370A. Syncora and the Series 2002-C Standby Sewer Warrant Purchase Agreement providers subsequently entered into the Syncora Settlement Agreement, under which Syncora commuted its obligations under Municipal Bond Insurance Policy number CA00370A in exchange for certain payments to such providers and the purchase from the Series 2002-C Standby Sewer Warrant Purchase Agreement providers of certain Series 2002-C Sewer Bank Warrants, in each case as set forth in such Settlement Agreement. The defaults with respect to the Series 2002-C Sewer Bank Warrants caused interest to accrue thereon at higher default rates of interest.

As of the Petition Date, the Series 2002-C Sewer Warrants in a variable rate demand mode were outstanding in the aggregate principal amount of $409,637,500 and the Series 2002-C Sewer Warrants in an auction rate mode were outstanding in the aggregate principal amount of $397,100,000, for a total aggregate principal amount of $806,737,500 for all outstanding Series 2002-C Sewer Warrants. Syncora only insures payment of regularly scheduled principal and interest on those Series 2002-C Sewer Warrants in an auction rate mode.

39

### e.    Series 2003-A Sewer Warrant

The Series 2003-A Sewer Warrant was issued as a fixed rate warrant in the aggregate principal amount of $41,820,000 on January 8, 2003, pursuant to a supplement to the Sewer Warrant Indenture dated as of January 1, 2003.

The Series 2003-A Sewer Warrant was issued to the Alabama Water Pollution Control Authority (the "AWPCA") pursuant to a Special Authority Loan Conditions Agreement dated as of January 1, 2003, among the County, the AWPCA, and ADEM, whereby the AWPCA agreed to loan the County a portion of the proceeds from its Revolving Fund Loan Refunding Bonds, Series 2003-B in exchange for loan payments secured by the net revenues of the Sewer System. The County issued its Series 2003-A Sewer Warrant to the AWPCA to evidence its repayment obligations with respect to the loan. Interest on the Series 2003-A Sewer Warrant is payable on February 15 and August 15 of each year with the final maturity on February 15, 2015.

The proceeds of the Series 2003-A Sewer Warrant were used to redeem a portion of the County's then-outstanding Sewer System indebtedness, specifically warrants previously issued in 1997. The Revolving Fund Loan Refunding Bonds, Series 2003-B, which are not obligations of the County, are insured by Financial Guaranty Insurance Policy number 20438BE provided by Ambac Assurance Corporation ("Ambac"). Principal and interest payments due from the County under the Series 2003-A Sewer Warrant are not insured.

As of the Petition Date, the outstanding principal amount of the Series 2003-A Sewer Warrant was $15,280,000 and the County had paid all scheduled principal and interest payments on the Series 2003-A Sewer Warrant to the Sewer Warrant Trustee when due.

### f.    Series 2003-B Sewer Warrants

The Series 2003-B Sewer Warrants were issued in the aggregate principal amount of $1,155,765,000 on May 1, 2003, pursuant to a supplement to the Sewer Warrant Indenture dated as of April 1, 2003. The County issued $735,800,000 aggregate principal amount of the Series 2003-B Sewer Warrants as auction rate warrants (the "Series 2003-B-1 Sewer Warrants"), $300,000,000 aggregate principal amount of the Series 2003-B Sewer Warrants as variable rate demand warrants (the "Series 2003-B-2 Through B-7 Sewer Warrants"), and $119,965,000 aggregate principal amount of the Series 2003-B Sewer Warrants as fixed rate warrants (the "Series 2003-B-8 Sewer Warrants"). Interest on the Series 2003-B-1 Sewer Warrants is payable on the business day immediately succeeding each respective auction period with the final maturity on February 1, 2042. Interest on the Series 2003-B-2 Through B-7 Sewer Warrants is payable on the first business day of each month with the final maturity on February 1, 2042. Interest on the Series 2003-B-8 Sewer Warrants is payable on February 1 and August 1 of each year with the final maturity on February 1, 2016.

The proceeds of the Series 2003-B Sewer Warrants were used to (i) advance refund all or a portion of select maturities of the County's then-outstanding Sewer System indebtedness, including warrants previously issued in 1997, 1999, 2001, and 2002; (ii) refund a portion of the interest on Sewer Warrants remaining outstanding subsequent to the advance refunding accomplished by the

40

issuance of the Series 2003-B Sewer Warrants; (iii) pay the premiums for municipal bond insurance policies provided by Syncora, FGIC, and Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc. ("Assured"); and (iv) pay the costs of issuance of the Series 2003-B Sewer Warrants.

Pursuant to Municipal Bond New Issue Insurance Policy number 03010448, FGIC guaranteed scheduled payments of the principal and interest on the Series 2003-B-1 Sewer Warrants. Pursuant to Municipal Bond Insurance Policy number CA00522A, Syncora guaranteed the regularly scheduled principal and interest on the Series 2003-B-2 Through B-7 Warrants. Pursuant to Municipal Bond Insurance Policy number 200777-N, Assured guaranteed the regularly scheduled principal and interest on the Series 2003-B-8 Sewer Warrants.

Liquidity support for the Series 2003-B-2 Through B-7 Sewer Warrants was provided by Standby Warrant Purchase Agreements among the County, the Sewer Warrant Trustee, JPMorgan Chase (as Liquidity Agent) and each of Societe Generale, New York Branch, The Bank of New York, State Street Bank and Trust Company, and Lloyds TSB Bank plc, each dated as of May 1, 2003 (collectively, "Series 2003-B-2 Through B-7 Standby Sewer Warrant Purchase Agreements" and, together with the Series 2002-C Standby Sewer Warrant Purchase Agreements, the "Standby Sewer Warrant Purchase Agreements"). In 2008, all outstanding Series 2003-B-2 Through B-7 Sewer Warrants were tendered by investors and purchased by the Series 2003-B-2 Through B-7 Standby Sewer Warrant Purchase Agreement providers and such Series 2003-B-2 Through B-7 Sewer Warrants became "Bank Warrants" pursuant to the Series 2003-B-2 Through B-7 Standby Sewer Warrant Purchase Agreements (the "Series 2003-B-2 Through B-7 Sewer Bank Warrants"). The Series 2003-B-2 Through B-7 Standby Sewer Warrant Purchase Agreements required the County to redeem the Series 2003-B-2 Through B-7 Sewer Bank Warrants in sixteen equal quarterly installments. The County defaulted on its obligation to redeem the Series 2003-B-2 Through B-7 Sewer Bank Warrants on the accelerated timeframe, whereupon Syncora purchased the Series 2003-B-2 Through B-7 Sewer Bank Warrants in an aggregate principal amount of $74,995,000 pursuant to claims on Municipal Bond Insurance Policy number CA00522A. Syncora and the Series 2003-B-2 Through B-7 Standby Sewer Warrant Purchase Agreement providers subsequently entered into the Syncora Settlement Agreement, under which Syncora commuted its obligations under Municipal Bond Insurance Policy number CA00522A in exchange for certain payments to such providers and the purchase from the Series 2003-B Standby Sewer Warrant Purchase Agreement providers of certain Series 2003-B Sewer Bank Warrants, in each case as set forth in such Settlement Agreement. The defaults with respect to the Series 2002-B-2 Through B-7 Sewer Bank Warrants caused interest to accrue thereon at higher default rates of interest.

As of the Petition Date, the Series 2003-B-1 Sewer Warrants were outstanding in the aggregate principal amount of $723,725,000, the Series 2003-B-2 Through B-7 Sewer Warrants were outstanding in the aggregate principal amount of $281,260,000, and the Series 2003-B-8 Sewer Warrants were outstanding in the aggregate principal amount of $95,845,000. The total aggregate principal amount of all outstanding Series 2003-B Sewer Warrants as of the Petition Date was $1,100,830,000.

41

### g. Series 2003-C Sewer Warrants

The Series 2003-C Sewer Warrants were issued as auction rate warrants in the aggregate principal amount of $1,052,025,000 on August 7, 2003, pursuant to a supplement to the Sewer Warrant Indenture dated as of August 1, 2003. Interest on the Series 2003-C Sewer Warrants is payable on the business day immediately succeeding each respective auction period with the final maturity on February 1, 2042.

The proceeds of the Series 2003-C Sewer Warrants were used to (i) advance refund all or a portion of select maturities of the County's then-outstanding Sewer System indebtedness, including warrants previously issued in 1997, 1999, 2001, and 2002; (ii) pay the premiums for municipal bond insurance policies provided by FGIC and Assured; and (iii) pay the costs of issuance of the Series 2003-C Sewer Warrants.

Payment of regularly scheduled principal and interest on the Series 2003-C Sewer Warrants issued in the aggregate principal amount of $820,000,000 (the "Series 2003-C-1 Through C-8 Sewer Warrants") is guaranteed by Municipal Bond New Issue Insurance Policy number 03010824 issued by FGIC. The remaining Series 2003-C Sewer Warrants issued in the aggregate principal amount of $232,025,000 (the "Series 2003-C-9 Through C-10 Sewer Warrants") are insured by Municipal Bond Insurance Policy number 201371-N issued by Assured. As of the Petition Date, the Series 2003-C-1 Through C-8 Sewer Warrants were outstanding in the aggregate principal amount of $820,000,000, and the Series 2003-C-9 Through C-10 Sewer Warrants were outstanding in the aggregate principal amount of $223,625,000.

The total aggregate principal amount of all outstanding Series 2003-C Sewer Warrants as of the Petition Date was $1,043,625,000.

### h. Sewer Debt Service Reserve Fund Substitution

Subsequent to the issuance of the Sewer Warrants, the Sewer DSR Fund was funded to the Sewer DSR Fund Requirement and contained cash, securities, and two FGIC Municipal Bond Debt Service Reserve Fund Policies numbered 01010226 and 02010251 (the "FGIC DSRF Policies") related to the Series 2001-A Sewer Warrants and the Series 2002-A Sewer Warrants, respectively. On December 30, 2004, the County purchased Debt Service Reserve Insurance Policy number CA01568A, which provides coverage up to the maximum amount of $164,863,746.40 from Syncora (the "Syncora DSRF Policy"). On April 1, 2005, the County purchased Municipal Bond Debt Service Reserve Insurance Policy number 201371-R, which provides coverage up to the maximum amount of $26,421,902 from Assured (the "Assured DSRF Policy", and collectively with the FGIC DSRF Policies and the Syncora DSRF Policy, the "Sewer DSRF Policies"). Pursuant to a Deposit Agreement between the County and the Sewer Warrant Trustee dated as of April 1, 2005, cash and investments with an aggregate value of $181,415,268.19 were withdrawn from the Sewer DSR Fund and substituted with the Syncora DSRF Policy and the Assured DSRF Policy.

In connection with the purchase of the Sewer DSRF Policies, the County entered into four agreements (two with FGIC and one with each of Syncora and Assured) obligating the County to reimburse the applicable Sewer Warrant Insurer for draws made on the applicable Sewer DSRF

42

Policies and reasonable expenses related to the Sewer DSRF Policies (collectively, the "Sewer DSRF Reimbursement Agreements").

Between September 30, 2008 and December 3, 2008, draws were made on the Sewer DSR Fund by the Sewer Warrant Trustee to make regularly scheduled interest payments on certain of the Sewer Warrants. As a result, the Sewer DSRF Policies were drawn upon in the approximate aggregate amount of $35.088 million. As of the Petition Date, the County had not reimbursed any amounts that were due under the Sewer DSRF Reimbursement Agreements as a result of those draws or interest or expenses that have accrued as a result of the draws.

### i. The Rate Covenant

As non-recourse obligations, the Sewer Warrants are not backed by the full faith and credit of the County, and the holders of the Sewer Warrants have no legal right to the County's General Fund or to the County's other assets for repayment. Under the Sewer Warrant Indenture and applicable Alabama statutory and constitutional law, including Alabama Code section 11-28-3, the primary collateral for the Sewer Warrants is the "Net Revenues" of the Sewer System. Pursuant to the Sewer Warrant Indenture, the "Net Revenues" are the gross revenues produced by the Sewer System ("System Revenues") *less* the Operating Expenses of the Sewer System.

Section 12.5 of the Sewer Warrant Indenture contains, among other things, a covenant (the "Rate Covenant") that requires the County to fix, revise, and maintain sewer rates sufficient to cover, to the extent permitted by law, all payments of principal, interest, and premium due under the Sewer Warrants.

### j. Sewer Warrant Indenture Funds

The following section provides descriptions of funds and accounts established by the County either under the Sewer Warrant Indenture or in connection with the Sewer System (the "Sewer Warrant Indenture Funds").

### i. Revenue Account

The Sewer Warrant Indenture requires that all System Revenues be deposited as received in the "Revenue Account" established under the Sewer Warrant Indenture (the "Revenue Account"). The County is permitted to select any commercial bank as the custodian of the Revenue Account. Once deposited in the Revenue Account, the Sewer Warrant Indenture requires System Revenues to be applied first to the payment of Operating Expenses of the Sewer System. System Revenues remaining after the deduction of Operating Expenses (i.e., the "Net Revenues") are directed to the other funds established by the Sewer Warrant Indenture, including funds dedicated for the payment of debt service on the Sewer Warrants and for the payment of the costs of Sewer System improvements. The County's books and records reflect that, as of the Petition Date, the balance in the Revenue Account was $7,172,210 and that, as of July 12, 2013, the balance was $7,218,574.50.

43

### ii. Debt Service Fund

The Debt Service Fund is a special trust fund established under the Sewer Warrant Indenture for which the Sewer Warrant Trustee is the depository, custodian and disbursing agent. Moneys on deposit in the Debt Service Fund are used to pay debt service on the Sewer Warrants as well as any other obligations related to the Sewer Warrants that have been secured by a pledge of the Pledged Revenues (defined herein below) on parity with the pledge securing the Sewer Warrants. The Sewer Warrant Indenture requires the County to apply the Net Revenues in the Revenue Account to the Debt Service Fund in such amounts sufficient to satisfy the debt service provisions of the Sewer Warrant Indenture. The County's books and records reflect that, as of the Petition Date, the balance in the Debt Service Fund was $39,877,937 and that, as of July 12, 2013, the balance was $92,163,005.57.

### iii. Sewer DSR Fund

The Sewer DSR Fund is defined in Section III.D.1.a above. As of the Petition Date and the date of this Disclosure Statement, the Sewer DSR Fund had a zero cash balance.

### iv. Subordinate Debt Fund

The Subordinate Debt Fund is the "Subordinate Debt Fund" under the Sewer Warrant Indenture. It was established as a special trust fund under a supplement to the Sewer Warrant Indenture dated as of September 1, 2002, and was to be held by any bank chosen by the County. The County was permitted (but not required) to make certain semiannual payments from Net Revenues into the Subordinate Debt Fund after all required deposits to the Debt Service Fund and the Sewer DSR Fund were made. Moneys in the Subordinate Debt Fund could be used to pay amounts owed on any obligations secured by a subordinate pledge of the Net Revenues. No such obligations were issued; accordingly the Subordinate Debt Fund was never funded.

### v. Rate Stabilization Fund

The Rate Stabilization Fund is defined in Section III.D.1.a above. As of the Petition Date and the date of this Disclosure Statement, the Rate Stabilization Fund had a zero balance.

### vi. Depreciation Fund

The Depreciation Fund is a special trust fund established under the Sewer Warrant Indenture and can be held by any bank chosen by the County. The moneys held in the Depreciation Fund may be used by the County to pay the costs of improvements to the Sewer System or to purchase or redeem Sewer Warrants. The Sewer Warrant Indenture provides that once all payments required to be made from the Revenue Account into the Debt Service Fund, the Sewer DSR Fund, the Subordinate Debt Fund, and the Rate Stabilization Fund have been made, then the Net Revenues remaining are to be deposited semiannually in $5,000,000 increments into the Depreciation Fund until the fund balance equals the accumulated depreciation referable to the Sewer System. If Net Revenues available in the Revenue Account are not sufficient to permit a deposit of the required sum into the Depreciation Fund, such shortfall does not increase the required amount of any subsequent

44

deposit into the Depreciation Fund. The County's books and records reflect that, as of the Petition Date, the balance in the Depreciation Fund was $52,549,266 and that, as of July 12, 2013, the balance was $37,120,202.62.

### vii.    2002-D Construction Fund

The 2002-D Construction Fund is a special trust fund established under a supplement to the Sewer Warrant Indenture dated as of November 1, 2002. The Sewer Warrant Trustee is the depository, custodian and disbursing agent for the 2002-D Construction Fund. The 2002-D Construction Fund was funded from the proceeds of the County's Series 2002-D Sewer Warrants issued as fixed rate warrants in the aggregate principal amount of $475,000,000 on November 8, 2002. Moneys on deposit in the 2002-D Construction Fund may be used to pay (A) expenses of the Sewer Warrant Trustee in connection with the 2002-D Construction Fund; (B) costs of acquiring, construction and installing improvements to the Sewer System, including land acquired for such improvements; or (C) expenses related to the items described in the foregoing clauses (A) and (B). The County's books and records reflect that, as of the Petition Date, the balance in the 2002-D Construction Fund was $45,569,230 and that, as of July 12, 2013, the balance was $46,097,313.25.

### viii.    2005 Construction Fund

The Sewer DSR Fund was created to provide a back-up source of funds for payment of principal and interest on the Sewer Warrants in the event of a deficiency in Net Revenues. The Sewer Warrant Indenture provides that the Sewer DSR Fund must be funded in an amount at least equal to the Sewer DSR Fund Requirement and permits the County to satisfy the Sewer DSR Fund Requirement either in the form of cash or by deposit of a surety bond, insurance policy or letter of credit. Prior to April, 2005, the Sewer DSR Fund Requirement had been satisfied by cash or surety bonds deposited at the time of issuance of various series of Sewer Warrants. On April 1, 2005, the County delivered to the Sewer Warrant Trustee the Syncora DSRF Policy and the Assured DSRF Policy in the aggregate face amount of $191,285,648.40. On the same date, the County and the Sewer Warrant Trustee entered into a Deposit Agreement (the "Deposit Agreement") pursuant to which the County directed the Sewer Warrant Trustee to withdraw $181,415,268.19 in cash and investments from the Sewer DSR Fund and to deposit such amount in the newly established 2005 Construction Fund.

The Sewer Warrant Trustee was designated as the depository, custodian and disbursing agent for the 2005 Construction Fund and was authorized to disburse funds upon requisitions submitted by the County to pay (A) expenses of the Sewer Warrant Trustee; (B) costs of acquiring, construction and installing improvements to the Sewer System, including land acquired for such improvements; or (C) expenses related to the items described in the foregoing clauses (A) and (B). By an Amendment to the Deposit Agreement dated January 1, 2007, the County and the Sewer Warrant Trustee agreed to several changes, including an addition to the Deposit Agreement permitting funds withdrawn from the 2005 Construction Fund to be deposited into any other account or fund established by the County pursuant to the Sewer Warrant Indenture or otherwise established by the County with respect to the Sewer System or obligations of the County pertaining thereto. The County's books and records reflect that, as of the Petition Date, the balance in the 2005 Construction Fund was $29,335,679 and that, as of July 12, 2013, the balance was $29,663,158.97.

45

### ix. Released Escrow Funds

The Series 2002-C Sewer Warrants, Series 2003-B Sewer Warrants, and Series 2003-C Sewer Warrants (together, the "Refunding Sewer Warrants") were issued to refund certain previously issued Sewer Warrants (the "Refunded Sewer Warrants") and thereby take advantage of lower interest rates. Because the Refunded Sewer Warrants were not subject to call and redemption at the time of issuance of the Refunding Sewer Warrants, the proceeds of the Refunding Sewer Warrants were deposited into irrevocable escrow accounts held by the Sewer Warrant Trustee for the payment of all principal of and interest on the Refunded Warrants. In each case, the escrow was established by an agreement between the County and the Sewer Warrant Trustee (collectively, the "Escrow Trust Agreements"). Each escrow was invested in U.S. Government securities that, taking into account their interest earnings and maturities, were calculated to produce funds sufficient to pay the Refunded Warrants when due.

As permitted by the Escrow Trust Agreements, the County subsequently elected to restructure the escrows by selling the original securities held in the escrow accounts and replacing them with higher yielding federal securities. The result of such transactions was to produce cash in excess of the amount necessary to fund the escrows at their required levels. To document the restructurings, the County and the Sewer Warrant Trustee entered into three separate agreements (the "Escrow Restructuring Agreements") setting out the terms and conditions of the restructuring transactions and providing for the release of the excess cash to the County. In each case, the County has contended that excess cash was transmitted to the County and deposited in one of three newly established escrow funds (the "Released Escrow Funds") to be used as the County should determine. The Sewer Warrant Trustee has disputed the County's contention and has asserted that the Released Escrow Funds were security for the Sewer Warrants. The County's books and records reflect that, as of the Petition Date, the balance of the Released Escrow Funds was $57,006,375 and that, as of July 12, 2013, the balance was $24,352,963.32.

### x. Supplemental Transactions Fund

The Supplemental Transactions Fund is a special fund established under a supplement to the Sewer Warrant Indenture dated as of May 1, 2004. The Supplemental Transactions Fund consists of cash and cash-equivalent investments derived from the 2004 Swaps (as such term is defined in Section III.D.7.g below). The County received upfront premiums from the counterparties to the 2004 Swaps in the aggregate amount of $25,488,000. These upfront premiums were deposited into the Supplemental Transactions Fund, where they remain to this day – in full, plus interest. Moneys in the Supplemental Transactions Fund may be disbursed only at the direction of the County, and in the meantime are invested pursuant to the County's instructions. The County has contended that, pursuant to the authorizing supplement to the Sewer Warrant Indenture, the Supplemental Transactions Fund could only be used to pay the costs of improvements to the Sewer System. The Sewer Warrant Trustee disputed the County's contention and asserted that this fund was security for the Sewer Warrants. The County's books and records reflect that, as of the Petition Date, the balance in the Supplemental Transactions Fund was $29,741,042 and that, as of July 12, 2013, the balance was $29,787,985.21.

46

### 2. School Warrants

The School Warrants were issued under chapter 28 of title 11 of the Alabama Code sections 11-28-1, *et seq.*, which authorizes the County to issue warrants for the purpose of paying the costs of public facilities, including school buildings, and to pledge in favor thereof the proceeds of any occupational, privilege, license, or excise tax that the County is authorized to levy at the time of the issuance of such warrants.

The School Warrants are limited obligations of the County payable solely from, and secured by a pledge and assignment of, the gross proceeds of an excise tax and a privilege and license tax (the "Education Tax") levied by the County and amounts held in designated funds created under the School Warrant Indenture (as defined below). The Education Tax generally parallels the statewide sales and use tax levied by the State of Alabama and the general rate is 1%. As of the Petition Date, the aggregate principal amount of School Warrants outstanding was $814,075,000.

### a. Series 2004-A School Warrants

The Series 2004-A School Warrants were issued as fixed rate warrants in the aggregate principal amount of $650,000,000 on December 29, 2004, pursuant to a Trust Indenture dated as of December 1, 2004 (the "School Warrant Indenture"), between the County and SouthTrust Bank as indenture trustee (together with U.S. Bank National Association, as successor indenture trustee, the "School Warrant Trustee"). Interest on the Series 2004-A School Warrants is payable on January 1 and July 1 of each year with the final maturity on January 1, 2025.

The School Warrant Indenture provides for a debt service reserve fund (the "School DSR Fund"), which is a special trust fund that must be maintained at a prescribed amount (the "School DSR Fund Requirement") determined by a formula defined in the School Warrant Indenture. Upon the issuance of each additional series of School Warrants under the School Warrant Indenture, a new School DSR Fund Requirement is calculated and, if necessary, the County must deposit cash, an insurance policy, a surety bond, or a letter of credit in the School DSR Fund to fulfill the School DSR Fund Requirement.

The proceeds of the Series 2004-A School Warrants were used to (i) make grants to eleven local school boards operating in the County in order to finance a variety of capital improvement projects and for the retirement of certain outstanding indebtedness of such school boards, (ii) fund the School DSR Fund to the School DSR Fund Requirement, and (iii) pay the costs of issuance of the Series 2004-A School Warrants.

As of the Petition Date, the outstanding principal amount of the Series 2004-A School Warrant was $534,400,000, and the County had paid all scheduled principal and interest payments on the Series 2004-A School Warrants to the School Warrant Trustee when due.

During the Case, the County has continued to make all scheduled principal and interest payments on these warrants when due.

47

### b. Series 2005-A School Warrants and Series 2005-B School Warrants

The Series 2005-A School Warrants were issued as auction rate warrants in the aggregate principal amount of $200,000,000. The Series 2005-B School Warrants were issued as variable rate demand warrants in the aggregate principal amount of $200,000,000. Both the Series 2005-A School Warrants and the Series 2005-B School Warrants were issued pursuant to a supplement to the School Warrant Indenture dated as of January 1, 2005. Interest on the Series 2005-A School Warrants is payable on the business day immediately succeeding each respective auction period with the final maturity on January 1, 2027. Interest on the Series 2005-B School Warrants is payable on the first business day of each month with the final maturity on January 1, 2027.

The proceeds of both the Series 2005-A School Warrants and the Series 2005-B School Warrants were used to (i) make grants to eleven local school boards operating in the County in order to finance a variety of capital improvement projects of such school boards, (ii) pay the premium for a surety bond provided by Ambac, (iii) pay the premium for a municipal bond insurance policy provided by Ambac, and (iv) pay the costs of issuance of the Series 2005-A School Warrants and the Series 2005-B School Warrants.

The Series 2005-A School Warrants and the Series 2005-B School Warrants are insured by Financial Guaranty Insurance Policy number 23545BE issued by Ambac. In addition, the County purchased Surety Bond number SB1982BE in the maximum amount of $29,438,296.81 from Ambac to fulfill the School DSR Fund Requirement.

Liquidity support for the Series 2005-B School Warrants was provided by a Standby Warrant Purchase Agreement among the County, the School Warrant Trustee and DEPFA Bank plc ("Depfa") dated as of January 1, 2005 (the "Standby School Warrant Purchase Agreement"). In 2008, the principal amount of the Series 2005-B School Warrants then outstanding was tendered by investors and purchased by Depfa and such Series 2005-B School Warrants became "Bank Warrants" pursuant to the Standby School Warrant Purchase Agreement.

As of the Petition Date, the Series 2005-A School Warrants were outstanding in the aggregate principal amount of $105,500,000 and the Series 2005-B School Warrants were outstanding in the aggregate principal amount of $174,175,000. The total aggregate principal amount of all outstanding Series 2005-A School Warrants and Series 2005-B School Warrants as of the Petition Date was $279,675,000, and the County had paid all scheduled principal and interest payments on such warrants to the School Warrant Trustee when due.

During the Case, the County has continued to make all scheduled principal and interest payments on the School Warrants when due.

### 3. Board of Education Lease Warrants

The Board of Education Lease Warrants were issued by the County under chapter 28 of title 11 of the Alabama Code sections 11-28-1, *et seq.*, which authorizes the County to issue warrants for the purpose of paying the costs of public facilities, including school buildings, and to pledge in favor

48

thereof the revenues from any revenue-producing properties owned or operated by the County, including school buildings.

The Board of Education Lease Warrants were issued as fixed rate warrants in the aggregate principal amount of $45,210,000 on July 25, 2000, pursuant to a *Mortgage and Trust Indenture* dated as of July 1, 2000 (the "Board of Education Lease Indenture"), between the County and SouthTrust Bank, as indenture trustee (together with U.S. Bank National Association, as successor indenture trustee, the "Board of Education Lease Trustee"). Interest on the Board of Education Lease Warrants is payable on February 15 and August 15 of each year with the final maturity on February 15, 2020. The Board of Education Lease Indenture provides for a debt service reserve fund (the "Board of Education Lease DSR Fund"), which is a special trust fund that must be maintained at a prescribed amount (the "Board of Education Lease DSR Fund Requirement") determined by a formula defined in the Board of Education Lease Indenture.

The proceeds of the Board of Education Lease Warrants were used to (i) purchase certain public school facilities (the "Board of Education Leased Property") of the Board of Education of Jefferson County (the "Board of Education"), an agency of the State of Alabama; (ii) fund the Board of Education Lease DSR Fund to the Board of Education Lease DSR Fund Requirement; (iii) pay the premium for a municipal bond insurance policy provided by Assured; and (iv) pay the costs of issuance of the Board of Education Lease Warrants.

The Board of Education Lease Warrants are limited obligations of the County payable solely from, and secured by a pledge of, the rentals and other receipts derived from the leasing of the Board of Education Leased Property. Pursuant to a Lease Agreement between the County and the Board of Education dated as of July 1, 2000 (the "Board of Education Lease Agreement"), the Board of Education is obligated to pay rentals to the Board of Education Lease Trustee (for the account of the County) on such dates and in such amounts sufficient to provide for the payment of debt service on the Board of Education Lease Warrants. Under the Board of Education Lease Agreement, the Board of Education has pledged the proceeds it receives from *ad valorem* taxes to secure its obligation to make rental payments to the Board of Education Lease Trustee (for the account of the County).

The Board of Education Lease Warrants are insured by Municipal Bond Insurance Policy number 26420-N issued by Assured.

As of the Petition Date, the outstanding principal amount of the Board of Education Lease Warrants was $26,255,000 and the Board of Education (for the account of the County) had paid all scheduled principal and interest payments on the Board of Education Lease Warrants to the Board of Education Lease Trustee when due.

### 4. General Obligation Warrants

The County's general obligation warrants (as more particularly described below, the "GO Warrants") were issued under chapter 28 of title 11 of the Alabama Code sections 11-28-1, *et seq.* and are general obligations of the County, for the payment of which the full faith and credit of the County is irrevocably pledged.

49

Revenues available to the County for payment of debt service on the GO Warrants include *ad valorem* taxes, sales and business license taxes, and other general fund revenues. None of such legally available revenues are, however, specially pledged for payment of debt service on the GO Warrants.

Pursuant to section 215 of the Alabama Constitution, as amended by Amendment No. 208, and sections 11-3-11(a)(2), 11-14-11, and 11-14-16 of the Alabama Code (collectively, "Section 215"), the County may levy and collect a 5.1 mill special *ad valorem* tax (the "Special Tax"), not to exceed one-fourth of one percent per annum, for the purpose of paying any debt or liability against the County due and payable during the year and created for the erection, repairing, furnishing, or maintenance of public buildings, bridges, or roads, and any remaining proceeds of the Special Tax in excess of amounts payable on bonds, warrants, or other securities issued by the County for such limited purposes may be spent for general county purposes. Section 215 provides that the County may use proceeds of the Special Tax for general county purposes only after all amounts due and payable in any given fiscal year on bonds, warrants, or other securities issued by the County for the erection, repairing, furnishing, or maintenance of public buildings, bridges, or roads (collectively, "Special Tax Obligations") are paid in full, and such proceeds shall be applied first to Special Tax Obligations.

The GO Warrants constitute debts or liabilities against the County created for the erection, repair, furnishing, or maintenance of public buildings, bridges, or roads within the scope and meaning of Section 215. As such, all amounts payable on account of or in connection with the GO Warrants in any given fiscal year must be paid by the County from the proceeds of the Special Tax prior to the County using any such proceeds in such fiscal year for general county purposes, including but not limited to General Fund expenses or any expenditures related to the Sewer System.

As of the Petition Date, the aggregate principal amount of GO Warrants outstanding was $200,520,000.

### a.      Series 2001-B GO Warrants

The Series 2001-B GO Warrants were issued as variable rate demand warrants in the aggregate principal amount of $120,000,000 on July 19, 2001, pursuant to a Trust Indenture dated as of July 1, 2001 (the "GO Warrant Indenture"), between the County and The Bank of New York, as indenture trustee (together with Wells Fargo Bank, National Association, as successor indenture trustee, the "GO Warrant Trustee"). Interest on the Series 2001-B GO Warrants was payable on the first business day of each month with the final maturity on April 1, 2021.

The proceeds of the Series 2001-B GO Warrants were used to (i) refund a portion of the County's then-outstanding general obligation indebtedness, including warrants previously issued in 1996 and 1999 for the erection, repair, furnishing, or maintenance of public buildings, bridges or roads within the scope and meaning of Section 215; and (ii) pay the costs of issuance of the Series 2001-B GO Warrants.

Liquidity support for the Series 2001-B GO Warrants was provided by a Standby Warrant Purchase Agreement among the County, the GO Warrant Trustee, JPMorgan Chase, and Bayerische

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 75 of 251

Landesbank Girozentrale, New York Branch, dated as of July 1, 2001 (as subsequently amended by that certain First Amendment to Standby Warrant Purchase Agreement dated as of September 1, 2004, the "Standby GO Warrant Purchase Agreement").  In 2008, virtually all outstanding Series 2001-B GO Warrants were tendered by investors and purchased by the Standby GO Warrant Purchase Agreement providers and such Series 2001-B GO Warrants became "Bank Warrants" pursuant to the Standby GO Warrant Purchase Agreement (the "Series 2001-B GO Bank Warrants"). The Standby GO Warrant Purchase Agreement required the County to redeem the Series 2001-B GO Bank Warrants in six equal semi-annual installments.  The County defaulted on its obligation to redeem the Series 2001-B GO Bank Warrants on the accelerated timeframe.

As of the Petition Date, the outstanding principal amount of the Series 2001-B GO Warrants was $105,000,000.

### b.    Series 2003-A GO Warrants

The Series 2003-A GO Warrants were issued as fixed rate warrants in the aggregate principal amount of $94,000,000 on March 19, 2003, pursuant to a resolution of the County Commission dated March 6, 2003 (the "GO Resolution 2003-A").  Interest on the Series 2003-A GO Warrants is payable on April 1 and October 1 of each year with the final maturity on April 1, 2023.

The proceeds of the Series 2003-A Warrants were used to (i) refund a portion of the County's then-outstanding general obligation indebtedness, including warrants previously issued in 1993; (ii) finance the  acquisition and construction of new streets and roads, landfill operations, acquisition of new equipment for use in the operation of County government, and resurfacing and repair of existing streets and roads; (iii) pay the premium for a municipal bond insurance policy provided by National Public Finance Guarantee Corporation, formerly known as MBIA Insurance Corporation ("MBIA"); and (iv) pay the costs of issuance of the Series 2003-A GO Warrants.

The Series 2003-A GO Warrants are insured by Financial Guaranty Insurance Policy number 40587 issued by MBIA.

There is no formal indenture trustee with respect to the Series 2003-A GO Warrants.  The Bank of New York Mellon Trust Company, N.A. serves as paying agent with respect to the Series 2003-A GO Warrants.

On the Petition Date, the outstanding principal amount of the Series 2003-A GO Warrants was $46,185,000.  As of the Petition Date, the County had paid all scheduled principal and interest payments on the Series 2003-A GO Warrants when due.  Following the filing of the Case, the County Commission resolved to cease making payments on the Series 2003-A GO Warrants, and all principal and interest payments scheduled to come due during the duration of the Case have been paid by National pursuant to the GO Insurance Policies.

### c.    Series 2004-A GO Warrants

The Series 2004-A GO Warrants were issued as fixed rate warrants in the aggregate principal amount of $51,020,000 on August 10, 2004, pursuant to a resolution of the County Commission

51

dated July 27, 2004 (the "GO Resolution 2004-A").  Interest on the Series 2004-A GO Warrants is payable on April 1 and October 1 of each year with the final maturity on April 1, 2024.

The proceeds of the Series 2004-A Warrants were used to (i) finance the cost of various capital improvements, (ii) pay the premium for a municipal bond insurance policy provided by MBIA, and (iii) pay the costs of issuance of the Series 2004-A GO Warrants.

The Series 2004-A GO Warrants are insured by Financial Guaranty Insurance Policy number 44671 issued by MBIA.

There is no formal indenture trustee with respect to the Series 2004-A GO Warrants.  U.S. Bank National Association serves as successor paying agent with respect to the Series 2004-A GO Warrants.

On the Petition Date, the outstanding principal amount of the Series 2004-A GO Warrants was $49,335,000.  As of the Petition Date, the County had paid all scheduled principal and interest payments on the Series 2004-A GO Warrants when due.  Following the filing of the Case, the County Commission resolved to cease making payments on the Series 2004-A GO Warrants, and all principal and interest payments scheduled to come due during the duration of the Case have been paid by National pursuant to the GO Insurance Policies.  With respect to the Series 2003-A GO Warrants and the Series 2004-A GO Warrants, National is anticipated to pay during the Case (assuming the Effective Date occurs prior to April 1, 2014), (a) $5,845,000.00 on account of principal maturing on the Series 2003-A GO Warrants and the Series 2004-A GO Warrants during the Case; (b) $503,046.38 on account of interest accruing on the Series 2003-A GO Warrants and the Series 2004-A GO Warrants during the period between October 1, 2011 and the Petition Date; and (c) $8,562,964.87 on account of interest accruing on the Series 2003-A GO Warrants and the Series 2004-A GO Warrants during the period after the Petition Date.

5.     **Bessemer Lease Warrants**

The Bessemer Lease Warrants were issued by the PBA under chapter 15 of title 11  of the Alabama Code sections 11-15-1, *et seq.*, which authorized the PBA to issue revenue warrants for the purpose of financing a building or buildings designed for use and occupancy as a County courthouse or jail or for the supplying of offices and related facilities for officers and departments of the County and any agencies for which the County may lawfully furnish office facilities or any one or more thereof, together with any lands deemed by the PBA to be desirable in connection therewith.

The Bessemer Lease Warrants were issued as fixed rate warrants in the aggregate principal amount of $86,745,000 on August 17, 2006, pursuant to a Trust Indenture dated as of August 1, 2006 (the "Bessemer Indenture"), between the County and First Commercial Bank, as indenture trustee (the "Bessemer Trustee").  Interest on the Bessemer Lease Warrants is payable on April 1 and October 1 of each year with the final maturity on April 1, 2026.

The Bessemer Indenture provides for a debt service reserve fund (the "Bessemer DSR Fund"), which is a special trust fund that must be maintained at a prescribed amount (the "Bessemer DSR Fund Requirement") determined by a formula defined in the Bessemer Indenture.

52

The proceeds of the Bessemer Lease Warrants were to be used to (i) provide for the payment of the cost of various capital improvements including a new County courthouse building in Bessemer, Alabama, the renovation of the existing courthouse, renovations to the existing County jail in Bessemer, and the acquisition and construction of an E911 Communications Center; (ii) fund the Bessemer DSR Fund to the Bessemer DSR Fund Requirement; (iii) pay the premium for a municipal bond insurance policy provided by Ambac; and (iv) pay the costs of issuance of the Bessemer Lease Warrants. In the Bessemer Indenture, the PBA reserved the right to use the proceeds of the Bessemer Lease Warrants for any other legally permissible purpose.

The E911 Communications Center was not constructed as planned and therefore the PBA is still in possession of the Bessemer Lease Warrants proceeds allocated to that facility. The Bessemer Lease Warrants are limited obligations of the PBA, payable solely out of revenues derived from the facilities with respect to which they were issued. The Bessemer Lease Warrants are also secured by a non-foreclosable mortgage lien on such facilities.

Pursuant to a Lease Agreement between the County and the PBA dated as of August 1, 2006 (the "Bessemer Lease"), the County is obligated to pay rentals to the Bessemer Trustee (for the account of the PBA) on such dates and in such amounts sufficient to provide for the payment of debt service on the Bessemer Lease Warrants. Such rental payments serve as consideration for the County's lease from the PBA of a courthouse and jail facility in Bessemer (the "Bessemer Leased Facilities"). The Bessemer Lease was renewable for successive one-year terms continuing to and including September 30, 2026. However, if the County elected not to renew the Bessemer Lease at the end of any fiscal year as therein provided, the PBA would have no funds with which to pay the principal of and interest on the Bessemer Lease Warrants.

The Bessemer Lease Warrants are insured by Financial Guaranty Insurance Policy number 25645BE issued by Ambac.

As of the Petition Date, the outstanding principal amount of the Bessemer Lease Warrants was $82,500,000, and the County (for the account of the PBA) had paid all scheduled principal and interest payments on the Bessemer Lease Warrants to the Bessemer Trustee when due.

**6.     Multi-Family Warrants**

The Multi-Family Warrants were issued as fixed rate warrants in the aggregate principal amount of $4,405,000 on September 25, 1997, pursuant to a Trust Indenture dated as of September 1, 2007 (the "Multi-Family Indenture"), between the County and Regions Bank, as indenture trustee. The Multi-Family Warrants were issued for the purpose of purchasing a mortgage loan used to finance the acquisition and construction of two separate multi-family residential developments for occupancy by persons of low and moderate income and to pay related development costs. The Multi-Family Warrants were limited obligations of the County, with debt service to be paid primarily from payments made by the developer.

As of the Petition Date, the outstanding principal amount of the Multi-Family Warrants was $1,105,000. Since the Petition Date, the Multi-Family Warrants have been fully redeemed through

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document        Page 78 of 251

the optional redemption provisions under the Multi-Family Indenture. There are no Multi-Family Warrants still outstanding.

### 7. Swap Agreements

The County entered into numerous interest rate swap agreements with multiple counterparties from 2001 to 2004 (collectively, as more particularly described below, the "Swap Agreements"). Each of the Swap Agreements was entered into pursuant to separate International Swaps and Derivatives Association, Inc. Master Agreements ("ISDA Master Agreements") between the County and each of the Swap Agreement counterparties. The terms and conditions of each Swap Agreement were confirmed by a letter agreement (a "Confirmation"), which supplemented, formed a part of, and was subject to the separate ISDA Master Agreement between the County and each of the Swap Agreement counterparties.

Each of the ISDA Master Agreements contained termination provisions pursuant to which the counterparties were authorized to terminate the Swap Agreements upon the occurrence of events of default or termination events as defined in the ISDA Master Agreements. Each of the Swap Agreement counterparties exercised the termination provisions contained in their respective ISDA Master Agreements to terminate the Swap Agreements with the County.

### a. Series 2002-A Sewer Swap

The County entered into the Series 2002-A Sewer Swap with JPMorgan Chase pursuant to a Confirmation dated September 18, 2001. The Series 2002-A Sewer Swap was "super-integrated" with the Series 2002-A Sewer Warrants for purposes of section 1.148-4(h)(4) of the Treasury Regulations promulgated under the Internal Revenue Code (the "Treasury Regs") and had a notional amount of $110,000,000, which was amortized to match the principal reduction on the Series 2002-A Sewer Warrants.

The effective date of the Series 2002-A Sewer Swap was February 15, 2002, and the termination date was February 1, 2042, which coincided with the maturity date of the related Series 2002-A Sewer Warrants. The terms of the Series 2002-A Sewer Swap required the County to pay a fixed rate of 5.060% and receive a floating rate equal to the Securities Industry and Financial Markets Association Municipal Swap Index rate (the "SIFMA Index") (formerly known as the BMA Municipal Swap Index), thereby synthetically fixing the variable rate of the Series 2002-A Sewer Warrants under the theory that the floating rate received by the County would offset the variable rate paid on the Series 2002-A Sewer Warrants, leaving only a fixed swap payment for the net interest payment related to the Series 2002-A Sewer Warrants.

The Series 2002-A Sewer Swap was terminated by JPMorgan Chase on March 2, 2009, with a calculated termination payment amount (including interest and deferred amounts) of $37,856,816 payable to JPMorgan Chase. As referenced in a settlement that JPMS entered into with the SEC in November of 2009 (the "JPMorgan SEC Settlement"), JPMorgan Chase terminated all obligations of the County to make termination payments associated with the Series 2002-A Sewer Swap. The JPMorgan SEC Settlement is discussed in more detail in Section III.E.9 below.

54

###### b. Series 2002-C Sewer Swaps

The County entered into three separate Series 2002-C Sewer Swaps with JPMorgan Chase (the "Series 2002-C JPM Sewer Swap"), Bank of America (the "Series 2002-C BofA Sewer Swap"), and Lehman Brothers Special Financing Inc. (the "Series 2002-C LB Sewer Swap") pursuant to three Confirmations dated October 23, 2002. The Series 2002-C BofA Sewer Swap Confirmation was later revised on November 1, 2002. The Series 2002-C Sewer Swaps were "integrated" with the Series 2002-C Sewer Warrants for purposes of section 1.148-4(h)(2) of the Treasury Regs.

The effective date of the Series 2002-C Sewer Swaps was October 25, 2002, and the termination date was February 1, 2040, which coincided with the maturity date of the related Series 2002-C Sewer Warrants. The terms of the Series 2002-C Sewer Swaps required the County to pay a fixed rate of 3.92% and receive a floating rate equal to 67% of the one month London Interbank Offered Rate ("LIBOR"), thereby synthetically fixing the variable rate of the Series 2002-C Sewer Warrants under the theory that the floating rate received by the County would offset the variable rate paid on the Series 2002-C Sewer Warrants, leaving only a fixed swap payment for the net interest payment related to the Series 2002-C Sewer Warrants. The Series 2002-C JPM Sewer Swap had a notional amount of $539,446,000, the Series 2002-C BofA Sewer Swap had a notional amount of $110,000,000, and the Series 2002-C LB Sewer Swap had a notional amount of $190,054,000. The notional amounts of the Series 2002-C Sewer Swaps were amortized to match the principal reduction on the Series 2002-C Sewer Warrants.

The Series 2002-C JPM Sewer Swap was terminated by JPMorgan Chase on March 2, 2009 with a calculated termination payment amount (including interest and deferred amounts) of $153,756,229 payable to JPMorgan Chase. As referenced in the JPMorgan SEC Settlement, JPMorgan Chase terminated all obligations of the County to make termination payments associated with the Series 2002-C JPM Sewer Swap.

The Series 2002-C BofA Sewer Swap was terminated by Bank of America on July 15, 2008, with a calculated termination payment amount (including interest and deferred amounts) of $11,866,081 payable to Bank of America. In December 2010, Bank of America entered into an out of court settlement agreement with attorneys general from Alabama and numerous other states (the "BofA Attorney General Settlement"). Pursuant to the BofA Attorney General Settlement, Bank of America forfeited the termination fee associated with the Series 2002-C BofA Sewer Swap. The BofA Attorney General Settlement resolved allegations against Bank of America for engaging in anticompetitive conduct or unfair trade practices in the marketing, sale, and placement of any municipal bond derivatives, or in the offer to market, sell, or place any municipal bond derivatives.

The Series 2002-C LB Sewer Swap was terminated by Lehman Brothers Special Financing, Inc. ("LBSF") on December 15, 2008, with a calculated termination payment amount (including interest and deferred amounts) of $68,568,285 payable to LBSF. As of the Petition Date, the Series 2002-C LB Sewer Swap termination payment remained outstanding. In addition, the County allegedly owed LBSF $1,002,754.42 on account of net total periodic payments that had accrued and were due at the time of the termination of the Series 2002-C LB Sewer Swap (such amount, together with interest allegedly accruing thereon, the "LBSF Periodic Payment Claim"). The Plan classifies any Claims arising from the Series 2002-C LB Sewer Swap, other than the LBSF Periodic Payment

55

Claim, in Class 1-E among the Sewer Swap Agreement Claims; the LBSF Periodic Payment Claim is classified in Class 1-D among the Other Specified Sewer Claims.

LBSF has filed an adversary proceeding in the Case regarding the Series 2002-C LB Sewer Swap and the priority of the LBSF Periodic Payment Claim. That adversary proceeding is discussed in Section IV.H.4 below.

### c.        Series 2003-B Sewer Swap

The County entered into the Series 2003-B Sewer Swap with JPMorgan Chase pursuant to a Confirmation dated March 28, 2003. The Series 2003-B Sewer Swap was "integrated" with the Series 2003-B Sewer Warrants for purposes of section 1.148-4(h)(2) of the Treasury Regs and had a notional amount of $1,035,800,000, which was amortized to match the principal reduction on the Series 2003-B Sewer Warrants.

The effective date of the Series 2003-B Sewer Swap was May 1, 2003, and the termination date was February 1, 2042, which coincided with the maturity date of the related Series 2003-B Sewer Warrants. The terms of the Series 2003-B Sewer Swap required the County to pay a fixed rate of 3.678% and, from May 2, 2004, receive a floating rate equal to 67% of one month LIBOR, thereby synthetically fixing the variable rate of the Series 2003-B Sewer Warrants under the theory that the floating rate received by the County would offset the variable rate paid on the Series 2003-B Sewer Warrants, leaving only a fixed swap payment for the net interest payment related to the Series 2003-B Sewer Warrants.

The Series 2003-B Sewer Swap was terminated by JPMorgan Chase on March 2, 2009, with a calculated termination payment amount (including interest and deferred amounts) of $255,717,158 payable to JPMorgan Chase. As referenced in the JPMorgan SEC Settlement, JPMorgan Chase terminated all obligations of the County to make termination payments associated with the Series 2003-B Sewer Swap.

### d.        Series 2003-C Sewer Swaps

The County entered into two separate Series 2003-C Sewer Swaps with JPMorgan Chase (the "Series 2003-C JPM Sewer Swap") and Bank of America (the "Series 2003-C BofA Sewer Swap") pursuant to two Confirmations dated July 14, 2003 and July 15, 2003, respectively. The Series 2003-C Sewer Swaps were "integrated" with the Series 2003-C Sewer Warrants for purposes of section 1.148-4(h)(2) of the Treasury Regs.

The effective date of the Series 2003-C Sewer Swaps was August 7, 2003 and the termination date was February 1, 2042, which coincided with the maturity date of the related Series 2003-C Sewer Warrants. The terms of the Series 2003-C Sewer Swaps required the County to pay a fixed rate of 3.596% and, from February 1, 2005, receive a floating rate equal to 67% of one month LIBOR, thereby synthetically fixing the variable rate of the Series 2003-C Sewer Warrants under the theory that the floating rate received by the County would offset the variable rate paid on the Series 2003-C Sewer Warrants, leaving only a fixed swap payment for the net interest payment related to the Series 2003-C Sewer Warrants. The Series 2003-C JPM Sewer Swap had a notional amount of

56

$789,018,750, and the Series 2003-C BofA Sewer Swap had a notional amount of $263,006,250. The notional amounts of the Series 2003-C Sewer Swaps were amortized to match the principal reduction on the Series 2003-C Sewer Warrants.

The Series 2003-C JPM Sewer Swap was terminated by JPMorgan Chase on March 2, 2009, with a calculated termination payment amount (including interest and deferred amounts) of $194,223,915 payable to JPMorgan Chase. As referenced in the JPMorgan SEC Settlement, JPMorgan Chase terminated all obligations of the County to make termination payments associated with the Series 2003-C JPM Sewer Swap.

The Series 2003-C BofA Sewer Swap was terminated by Bank of America on July 15, 2008, with a calculated termination payment amount (including interest and deferred amounts) of $16,762,880 payable to Bank of America. Bank of America forfeited the termination fee associated with the Series 2003-C BofA Sewer Swap under the BofA Attorney General Settlement.

### e.　　Series 2001-B GO Swap

The County entered into the Series 2001-B GO Swap with JPMorgan Chase pursuant to a Confirmation dated April 26, 2001. The Series 2001-B GO Swap was associated with the Series 2001-B GO Warrants and had a notional amount of $120,000,000. The Series 2001-B GO Swap was not, however, "integrated" with the Series 2001-B GO Warrants for purposes of section 1.148-4(h)(2) of the Treasury Regs. The provisions of the Series 2001-B GO Swap allowed JPMorgan Chase to cancel the swap on or after April 1, 2008.

The effective date of the Series 2001-B GO Swap was April 19, 2001, and the termination date was April 1, 2011. The terms of the Series 2001-B GO Swap required the County to pay a fixed rate of 4.295% and receive a floating rate equal to the SIFMA Index.

The Series 2001-B GO Swap was terminated by JPMorgan Chase on September 4, 2008, with a calculated termination payment amount (including interest and deferred amounts) of $7,893,762 payable to JPMorgan Chase. As of the Petition Date, the Series 2001-B GO Swap termination payment remained outstanding, and JPMorgan Chase asserts that such termination payment and the obligations in respect of the 2001-B GO Warrants are equal priority Claims against the County. The County has reserved all of its rights in respect of the allowance, priority, and treatment of the Series 2001-B-GO Swap Claims, but believes that the Plan provides for the fair and equitable satisfaction of such Claims in accordance with the GO Plan Support Agreement. Pursuant to the compromises and settlements between the County and the JPMorgan Parties implemented under the Plan, JPMorgan Chase will receive on the Effective Date the sum of ten dollars ($10.00) on account of and in full, final, and complete settlement, satisfaction, release, and exchange of all Series 2001-B GO Swap Claims.

### f.　　2001 Swaptions

The County entered into two separate 2001 Swaptions with JPMorgan Chase pursuant to two Confirmations dated January 10, 2001. The 2001 Swaptions included provisions that allowed them to be cancelled and restarted by JPMorgan Chase.

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 82 of 251

The first 2001 Swaption had a notional amount of $200,000,000 and an effective date of February 1, 2001 (the "First 2001 Swaption"). The second 2001 Swaption had a notional amount of $175,000,000 and an effective date of February 1, 2002 (the "Second 2001 Swaption"). Both of the 2001 Swaptions had a termination date of January 1, 2016. The terms of the First 2001 Swaption required the County to pay a floating rate equal to the SIFMA Index and receive a fixed rate of 5.069%. The terms of the Second 2001 Swaption required the County to pay a floating rate equal to the SIFMA Index and receive a fixed rate of 5.2251%.

Both the 2001 Swaptions were terminated by JPMorgan Chase on September 4, 2008. The First 2001 Swaption had a calculated termination payment amount of $3,500,000 payable to JPMorgan Chase. The Second 2001 Swaption had a calculated termination payment amount of $2,750,000 payable to JPMorgan Chase. As referenced in the JPMorgan SEC Settlement, JPMorgan Chase terminated all obligations of the County to make termination payments associated with the 2001 Swaptions.

### g. 2004 Swaps

The County entered into four separate 2004 Swaps pursuant to four Confirmations dated June 10, 2004, whereby the County paid a floating rate and received a floating rate from Bear Stearns Capital Markets Inc. ("Bear Stearns") and Bank of America. In addition, the County entered into a supplement to the Sewer Warrant Indenture dated as of May 1, 2004 in relation to the 2004 Swaps.

The purpose of the 2004 Swaps was to better match payments on the Series 2002-A Sewer Warrants, the Series 2002-C Sewer Warrants, the Series 2003-B Sewer Warrants, and the Series 2003-C Sewer Warrants as compared to the original swaps that were "integrated" with those outstanding series of Warrants. When the 2004 Swaps were executed, the County received aggregate up-front payments of $25,488,000 from Bear Stearns and Bank of America. The first Bear Stearns 2004 Swap had a notional amount of $110,000,000, an effective date of June 24, 2004, and a termination date of February 1, 2042 to match the maturity date of the Series 2002-A Sewer Warrants (the "First 2004 Bear Stearns Swap"). The second Bear Stearns 2004 Swap had a notional amount of $824,700,000, an effective date of February 1, 2011, and a termination date of February 1, 2040 to match the maturity date of the Series 2002-C Sewer Warrants (the "Second 2004 Bear Stearns Swap"). The third Bear Stearns 2004 Swap had a notional amount of $633,078,000, an effective date of August 1, 2012, and a termination date of February 1, 2042 (the "Third 2004 Bear Stearns Swap" and, collectively with the First 2004 Bear Stearns Swap and the Second 2004 Bear Stearns Swap, the "2004 Bear Stearns Swaps"). The Bank of America 2004 Swap had a notional amount of $379,847,000, an effective date of August 1, 2012, and a termination date of February 1, 2042 (the "2004 BofA Swap"). The Third 2004 Bear Stearns Swap and the 2004 BofA Swap were structured to match the maturity date of the Series 2003-B Sewer Warrants. The terms of the First 2004 Bear Stearns Swap required the County to pay a floating rate equal to the SIFMA Index and receive a floating rate equal to 56% of one month LIBOR plus a spread of 0.49 basis points. The terms of the Second 2004 Bear Stearns Swap, the Third 2004 Bear Stearns Swap, and the 2004 BofA Swap required the County to pay a floating rate equal to the 67% of one month LIBOR and receive a floating rate equal to 56% of one month LIBOR plus a spread of 0.49 basis points.

58

The 2004 Bear Stearns Swaps were terminated by Bear Stearns on March 3, 2009. The First 2004 Bear Stearns Swap had a calculated termination payment amount (including interest and deferred amounts) of $25,834,956 payable to Bear Stearns. The Second 2004 Bear Stearns Swap had a calculated termination payment amount of $6,249,915 payable to the County. The Third 2004 Bear Stearns Swap had a calculated termination payment amount of $10,524,145 payable to the County. The 2004 Bear Stearns Swaps net termination payment amount is $9,060,896 payable to Bear Stearns. As of the Petition Date, the 2004 Bear Stearns Swaps termination payment remained outstanding. The Plan classifies any Claims arising from the 2004 Bear Stearns Swaps in Class 1-E among the Sewer Swap Agreement Claims.

The 2004 BofA Swap was terminated by Bank of America on July 15, 2008, with a calculated termination payment amount of $2,560,000 payable to Bank of America. Bank of America forfeited the termination fee associated with the 2004 BofA Swap under the BofA Attorney General Settlement.

### 8.  Economic Development Agreements and Tax Abatement Agreements

The County historically has placed significant importance on the aggressive recruitment of businesses to build or expand commercial ventures within the County. The County's business recruiting efforts usually take the form of agreements (generally, the "Economic Development Agreements") whereby the County agrees to tax rebates, tax abatements, expense reimbursements, or other incentives associated with specific economic development projects. New business development was intended to stimulate job growth for the County's citizens and increase tax revenues so the County could fund its obligations under the Economic Development Agreements while also creating new jobs for the County's citizens.

With respect to Economic Development Agreements involving tax rebates, the County agreed to reimburse the counterparty a fixed amount of non-earmarked sales and use taxes or occupational taxes paid by the counterparty in connection with the project. The County typically would rebate the counterparty's prior tax payments on a quarterly basis for a period of time until the agreed-upon rebate amount was paid.

With respect to Economic Development Agreements involving expense reimbursements, the County agreed to reimburse the counterparty a fixed amount over time, based on the counterparty's construction of expansion-related infrastructure beneficial to the County, such as roads, drainage, sewer lines, and related infrastructure. Under these reimbursement agreements, the County typically would reimburse the counterparty on an annual basis for a period of time until the agreed-upon reimbursement was paid.

The County entered into the Economic Development Agreements involving tax abatements pursuant to the Tax Incentive Reform Act of 1992 ("TIRA"), which is codified at Alabama Code sections 40-9B-1, *et seq.*  Under these agreements (as more particularly described in the Plan, the "Tax Abatement Agreements"), the County has agreed to refrain from collecting certain non-educational *ad valorem* taxes, and sales and use taxes associated with construction and acquisition costs, or mortgage recording taxes (or some combination thereof) related to economic development projects within the County. The Tax Abatement Agreements typically provide for an abatement of

Case 11-05736-TBB9   Doc 1977   Filed 08/08/13   Entered 08/08/13 11:52:51   Desc
Main Document      Page 84 of 251

non-educational *ad valorem* taxes for a period of 10 years, which is the maximum period allowed under TIRA.

Notably, TIRA permits the governing bodies of cities and public industrial authorities to grant abatements of County taxes without County consent, thereby affecting the County's revenue. The County is not a party to these agreements. Rather, the County merely receives a copy of the agreement and adjusts its tax rolls accordingly. The abatements granted by other entities within the County, which adversely impact the County's tax revenues, number in the hundreds.

## E.     Summary of Prepetition Litigation Involving the County

Prior to the filing of the Case, the County was party to various pending litigation matters. Several of these matters have been removed to, or otherwise moved to, the Bankruptcy Court as adversary proceedings and contested matters. Other matters remain pending in other courts, where they are subject to the automatic stays imposed under Bankruptcy Code sections 362(a) and 922(a).

### 1.     *Wilson v. Bank of America, et al.*; Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-2008-901907.00, and United States Bankruptcy Court for the Northern District of Alabama (Birmingham), Adversary Proceeding No. 11-0433-TBB (together, the "Wilson Action")

In the Wilson Action, the plaintiffs, representatives of a putative class of sewer ratepayers, allege that the County's sewer rates are unconstitutionally high, that the Sewer Warrant Indenture pursuant to which the County issued the Sewer Warrants is invalid, and that the chapter of the Alabama Code that authorized the issuance of the Sewer Warrants is invalid. Plaintiffs sued several banks and individuals in addition to the County. The County, along with numerous other parties, moved to dismiss the action. The state trial court subsequently denied all motions to dismiss. Several defendants petitioned the Alabama Supreme Court for writs of mandamus to have the trial court's denial of the motions to dismiss overturned. Due to the County's bankruptcy and the automatic stay of Bankruptcy Code section 362, the Alabama Supreme Court has not yet ruled on those petitions.

Shortly after the Petition Date, FGIC removed one count of the Wilson Action to the United States District Court for the Northern District of Alabama (the "District Court"). It was referred to the Bankruptcy Court shortly thereafter, where the removed count was assigned Adversary Proceeding Number 11-00433-TBB (the "Wilson Adversary Proceeding"). After a duly-noticed hearing, the Bankruptcy Court entered an order decreeing that the automatic stay of Bankruptcy Code section 362(a) applies to the Wilson Adversary Proceeding and that the plaintiffs' efforts to engage in discovery were prohibited by the automatic stay.

The matter remains pending with one count in Bankruptcy Court and one count in State Court. The count in State Court is stayed by virtue of the automatic stays under Bankruptcy Code sections 362(a) and 922(a). The Wilson Adversary Proceeding is discussed further in Section IV.H.1 below.

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document     Page 85 of 251

The plaintiffs in the Wilson Action disagree with the County's description of the Wilson Action provided above and elsewhere in the Disclosure Statement. Attached as <u>Exhibit 12</u> and incorporated by reference is the Wilson Action plaintiffs' description of their claims. The County disagrees with the characterizations in <u>Exhibit 12</u>. The parties reserve all rights, claims and defenses.

2. ***Bank of New York Mellon as Trustee v. Jefferson County, et al.*; United States District Court for the Northern District of Alabama, Southern Division, Case No. 2:08-cv-1703-RDP (the "<u>Federal Court Receivership Action</u>")**

In 2008, the Sewer Warrant Trustee, FGIC, and Syncora filed this action in District Court seeking the appointment of a receiver over the Sewer System. Although the District Court found that the appointment of a receiver was warranted, the District Court abstained from exercising jurisdiction over the Federal Court Receivership Action. This case was stayed prior to the County's bankruptcy filing and has been administratively closed.

3. ***Bank of New York Mellon as Trustee v. Jefferson County, et al.*; Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-09-2318 (the "<u>State Court Receivership Action</u>," and together with the Federal Court Receivership Action, the "<u>Receivership Actions</u>")**

After the District Court abstained in the Federal Court Receivership Action, the Sewer Warrant Trustee filed the State Court Receivership Action in the State Court to seek the appointment of a receiver for the Sewer System. The State Court granted the Sewer Warrant Trustee's motion for partial summary judgment. In an order effective as of September 22, 2010 (the "<u>Receiver Order</u>"), the State Court, relying upon Alabama Code section 6-6-620 and section 13.2 of the Sewer Warrant Indenture (titled "Remedies on Default"), appointed the Receiver to operate the Sewer System.

As part of the Receiver Order, the State Court also entered a money judgment against the County in the amount of $515,942,500.11, with recourse for that money judgment limited to the net revenues from the operation of the Sewer System.

Several additional parties sought to intervene in the State Court Receivership Action since the Receiver Order was entered. The potential intervening parties include the Attorney General of the State of Alabama (the "<u>Attorney General</u>"), the plaintiffs from the Wilson Action, a group of Alabama state legislators, and another group that includes legislators, Birmingham city officials, and citizens (many of whom are also plaintiffs in the Bennett Action discussed in Section IV.H.2 below). No intervenors sought to assert new claims against the County. The State Court granted the Attorney General's motion to intervene but denied the motions of the other potential intervenors.

After the County filed its chapter 9 Case, the Sewer Warrant Trustee, the Receiver, and other parties filed motions requesting that the Bankruptcy Court find that the automatic stays did not apply to the State Court Receivership Action or that the automatic stays should be lifted. This litigation is discussed in more detail in Section IV.A below.

61

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document      Page 86 of 251

4. ***Syncora Guarantee v. Jefferson County, Alabama, et al.*, Supreme Court of New York, County of New York, Case No. 601100/10 (the "<u>Syncora Lawsuit</u>")**

In the Syncora Lawsuit, Syncora alleged that the County, JPMorgan Chase, and JPMS engaged in fraud and aided and abetted fraud in connection with Syncora's issuance of bond guarantees for certain of the Sewer Warrants. JPMorgan Chase and JPMS have denied the allegations and any liability to Syncora in connection with Syncora's issuance of such bond guarantees. The New York state court denied JPMorgan Chase's and JPMS's motion to dismiss the claims asserted against them in the Syncora Lawsuit.

The County asserted counterclaims against Syncora in the Syncora Lawsuit for Syncora's alleged failure to maintain its credit rating. Upon a motion to dismiss by Syncora, the New York state court dismissed those claims holding that Syncora had no obligation to maintain its credit rating. JPMorgan Chase and JPMS cross-claimed against the County for contribution and indemnification, alleging that the County had a contractual and common law obligation to indemnify any liability of JPMorgan Chase and JPMS to Syncora in the Syncora Lawsuit. The County's motion to dismiss the indemnification and contribution claim was denied by the New York state court.

The Syncora Lawsuit is currently stayed pending the resolution of the County's chapter 9 proceeding. As discussed in Section V.A below, pursuant to the settlements and compromises implemented pursuant to the Plan, the JPMorgan Parties and their Related Parties will be released from any and all claims and causes of action asserted in the Syncora Lawsuit, the Syncora Lawsuit will be dismissed with prejudice, and JPMorgan Chase and JPMS will release or otherwise receive no recovery on account of their indemnification and contribution claims against the County in connection with the Syncora Lawsuit.

5. ***Assured Guaranty Municipal Corp v. JPMorgan Chase Bank, N.A., et al.*, Supreme Court of the State of New York, County of New York, Case No. 650642/10 (the "<u>Assured Lawsuit</u>")**

In the Assured Lawsuit, Assured alleged that JPMorgan Chase and JPMS engaged in fraud and aided and abetted fraud in connection with Assured's issuance of bond guarantees for certain of the Sewer Warrants. JPMorgan Chase and JPMS have denied the allegations and any liability to Assured in connection with Assured's issuance of such bond guarantees. The New York state court denied JPMorgan Chase's and JPMS's motion to dismiss the claims asserted against them in the Assured Lawsuit. JPMorgan Chase and JPMS filed a third-party complaint against the County for contribution and indemnification alleging that the County had a contractual and common law obligation to indemnify any liability of JPMorgan Chase and JPMS to Assured in the Assured Lawsuit. The County's motion to dismiss the indemnification and contribution claims was denied by the New York state court.

The Assured Lawsuit is currently stayed pending the resolution of the County's chapter 9 Case. As discussed in Section V.A below, pursuant to the settlements and compromises implemented pursuant to the Plan, the JPMorgan Parties and their Related Parties will be released from any and all claims and causes of action asserted in the Assured Lawsuit, the Assured Lawsuit

62

will be dismissed with prejudice, and JPMorgan Chase and JPMS will release or otherwise receive no recovery on account of their indemnification and contribution claims against the County in connection with the Assured Lawsuit.

6.    ***Jefferson County, Alabama v. JPMorgan Chase Bank, N.A., et al.*, Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-2009-903641.00 (the "JPMorgan Lawsuit")**

The County brought suit against JPMS; JPMorgan Chase; Blount Parrish & Company; Charles LeCroy; Douglas MacFaddin; Larry Langford; William Blount; and Albert LaPierre asserting claims for fraud, suppression, unjust enrichment, and conspiracy. The JPMorgan Lawsuit was filed on November 13, 2009. The County seeks damages in excess of a billion dollars, and JPMS and JPMorgan Chase have denied the allegations and any liability to the County and have counterclaimed for indemnification. Prior to the County's filing its Plan, the lawsuit had been scheduled to go to trial in October 2013.

The JPMorgan Lawsuit is stayed by consent of the parties pending the confirmation and consummation of the Plan. As discussed in Section V.A below, pursuant to the settlements and compromises implemented pursuant to the Plan, the JPMorgan Parties and their Related Parties will be released from any and all claims and causes of action asserted in the JPMorgan Lawsuit, the JPMorgan Lawsuit will be dismissed with prejudice as to all defendants, and JPMorgan Chase and JPMS will release or otherwise receive no recovery on account of their indemnification claims against the County in connection with the JPMorgan Lawsuit.

7.    ***Edwards v. Jefferson County, Alabama*; Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-07-900873**

The plaintiffs in the Edwards Lawsuit successfully obtained, on behalf of a class, a declaration that the County's occupational, license, and privilege taxes were invalid and an injunction against the further collection of those taxes. The Alabama Supreme Court affirmed this ruling. As a result, the County was ordered to refund previously collected taxes in the amount of approximately $37,800,000. To that end, the County Commission escrowed occupational tax collections from January 12, 2009 to August 13, 2009.

While the case was on its first appeal, the Alabama Legislature reauthorized the County Commission to collect occupational, license, and privilege taxes. In a subsequent appeal, the Alabama Supreme Court recognized that, under the new legislation, the County Commission could levy and collect the new tax for the period covered by the escrow, but that the County Commission could not simply transfer to itself the amounts that had been escrowed.

After this second appeal, the County Commission mediated with plaintiffs' counsel and reached a settlement framework applicable to the escrowed tax collections (the "Edwards Preliminary Settlement Amount"). On May 19, 2011, the trial court ordered that $31,416,169 be refunded to taxpayers, less any attorneys' fees that may be awarded by the court. The trial court on that same day gave preliminary approval to the settlement that had been struck between the named class representatives and the County Commission. By order dated August 9, 2011, the trial court

gave final approval to the settlement. Based on the final approval, approximately $6,400,000 was returned to the County.

Members of the settlement subclass appealed the trial court's final approval of the settlement to the Alabama Supreme Court. The Bankruptcy Court granted the County's motion to lift the automatic stays to allow the appeal to proceed. On appeal, the Alabama Supreme Court ruled in the County's favor and upheld the settlement. The Edwards litigation is now concluded.

8. *Weissman v. Jefferson County, Alabama*; Circuit Court of Jefferson County, Alabama, Birmingham Division, Case No. CV-09-904022.00

The plaintiffs in this case sought repayment of all occupational, license, and privilege taxes levied by the County pursuant to authorizing legislation passed on August 14, 2009. The taxes levied between August 1 and December 31 of 2009 amounted to approximately $31 million. On December 1, 2010, the trial court granted summary judgment for the plaintiffs and found that the notice that preceded the passage of the authorizing legislation was inadequate. The trial court enjoined the County from collecting the occupational, license, and privilege taxes, but did not order the County to refund amounts already collected. Prior to the Petition Date, the Supreme Court of Alabama affirmed the trial court's ruling that the statute was unconstitutional, but had not decided the question whether the County must refund any taxes collected prior to December 1, 2010.

After the Bankruptcy Court granted the County's request that the automatic stays be lifted as to this case to allow the appeal to proceed, the Supreme Court of Alabama ruled that the County was not required to refund taxes it collected prior to December 1, 2010. Had the Alabama Supreme Court ruled to the contrary, the County's liability for refunding such taxes could have totaled approximately $100 million. The Weissman litigation is now concluded.

9. *In the Matter of J.P. Morgan Securities, Inc., Respondent;* Securities and Exchange Commission, Administrative Proceeding, File No. 3-13673

The County has received aggregate payments of $75,033,692.30 in connection with or pursuant to undertakings referenced in the JPMorgan SEC Settlement. On November 4, 2009, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order (the "SEC Order"). This proceeding is now concluded.

In connection with the JPMorgan SEC Settlement, in view of JPMS's undertaking to pay $50,000,000 "to and for the benefit of Jefferson County, Alabama" and to terminate any and all obligations of the County to make any payments to JPMorgan Chase under the Series 2002-A Sewer Swap, the Series 2002-C JPM Sewer Swap, the Series 2003-B Sewer Swap, the Series 2003-C JPM Sewer Swap, and the 2001 Swaptions, the SEC, among other things, ordered JPMS to pay disgorgement of $1.00 and a civil money penalty in the amount of $25,000,000 to the SEC, which JPMS thereafter paid. JPMS did not admit nor deny the findings contained in the SEC Order. Pursuant to the "Fair Fund" provisions of the Sarbanes-Oxley Act of 2002, the County was an eligible recipient of the civil money penalty and the disgorgement paid by JPMS to the SEC and, on

64

August 18, 2010, the SEC issued a Proposed Plan of Distribution, which provided for distribution of these funds to the County. In determining that the County was the eligible recipient of such funds, the SEC's Division of Risk, Strategy and Financial Innovation concluded that (i) there was no evidence or information that the interest rates warrantholders received were affected by the improper payment scheme alleged in the SEC Order, and (ii) the harm sustained by original warrantholders was largely the result of the failures of the markets for variable rate demand warrants and auction rate warrants, and there was no evidence to indicate that these failures were caused by the improper payment scheme alleged in the SEC Order. On October 7, 2010, the SEC issued an order approving the payment of the $25,000,001 to the County, and the funds in the amount of $25,000,001, plus $33,691 in interest thereon, were disbursed to the County on February 1, 2011.

Both the Sewer Warrant Trustee and the Receiver gave notice prepetition to the County Commission under Alabama Code section 6-5-20 of a claim to the proceeds of the $50,000,000 payment to the County by JPMS. The Receiver also presented a claim for the Fair Fund proceeds in the amount of $25,033,692. The County disputed those claims and has not turned over to the Sewer Warrant Trustee or the Receiver any of the funds received from JPMS in connection with or pursuant to undertakings referenced in the JPMorgan SEC Settlement.

Following the filing of the case, the Sewer Warrant Trustee filed a proof of claim asserting that the County was obligated to turn over to the Sewer Warrant Trustee any of the funds received from JPMS in connection with or pursuant to undertakings referenced in the JPMorgan SEC Settlement. The County disputes this claim. As discussed in Section V.A below, pursuant to the settlements and compromises implemented pursuant to the Plan, this proof of claim filed by the Sewer Warrant Trustee is among the Sewer Released Claims that will be compromised and released upon the Effective Date of the Plan.

### 10. *United States v. Jefferson County, et al.*; United States District Court for the Northern District of Alabama, Southern Division, Case No. 2:75-cv-00666-CLS

Various private plaintiffs and the United States filed suit against the County's Personnel Board and other defendants, including the County and the City of Birmingham, to remedy alleged wrongs in the hiring and promotion of African-American and female applicants and employees. After considerable negotiations, litigation, and appeals, the County entered into a consent decree on December 29, 1982 (the "Hiring Practices Consent Decree"). This decree, along with other consent decrees executed by other parties, remained the subject of further litigation and negotiations, including, in 2002, the District Court appointing a receiver for the Personnel Board.

At present, the active portion of the litigation began on October 3, 2007, when two groups of plaintiffs claimed that the County had failed to comply with the Hiring Practices Consent Decree's requirements to ensure equal employment for blacks and women and to remedy the effects of prior discrimination. The plaintiffs also allege that the County failed to comply with other specific consent decree requirements. The plaintiffs sought to hold the County in contempt and sought to modify the Hiring Practices Consent Decree to mandate particular practices that the plaintiffs would like to see implemented.

65

The District Court set disputed issues for trial in March 2009. Trial initially began on March 30, 2009. Prior to the Petition Date, the trial was continued for reasons unrelated to the litigation. On January 27, 2012, the District Court found that the automatic stays in the County's Case did not apply to the portions of the litigation concerning the County. The trial resumed on December 3, 2012. The contempt trial concluded on December 11, 2012, and the parties await a ruling from the federal district court. Until such time as the court issues its ruling on the contempt motion, the County is under a hiring freeze precluding it from hiring without express permission from the other parties and the District Court.

**F.      Summary of the County's Assets**

**1.      Exemption of the County's Assets from Execution or Levy**

Under Alabama law, the County's real and personal property holdings are exempt from the reach of the County's creditors. Alabama Code section 6-10-10 provides that "[a]ll property, real or personal, belonging to the several counties or municipal corporations in this state and used for county or municipal purposes shall be exempt from levy and sale under any process or judgment whatsoever."

**2.      Capital Assets**

The County owns all manner of capital assets, including buildings, roads, bridges, sewer pipes, treatment plants, undeveloped real estate, and a variety of service vehicles. Most of these assets are used daily in the ordinary course performance of the County's public functions. These assets are not easily liquidated or subject to liquidation at all.

The County's assets are valued in its books and records at depreciated historical cost. These book values do not represent the cash value that could be realized by the County were it to seek to sell or otherwise liquidate these assets.

**3.      Statement of Net Assets**

The County's 2011 Audited Financial Statements contain a "Statement of Net Assets" for the County. The Statement of Net Assets differentiates between assets relating to governmental activities and assets relating to business-type activities. The County's governmental activities are those primary governmental functions, which are generally financed through taxes, intergovernmental revenues, and other nonexchange transactions. Business-type activities are financed in whole or in part by fees charged to external parties and, in the County's case, as of the Petition Date, included the County's operation of the Sewer System, the County's landfill systems, the County-owned healthcare facility Cooper Green Mercy Hospital ("<u>Cooper Green</u>")[7], and the County-owned nursing home in Ketona, Alabama (the "<u>Nursing Home</u>").[8]

---

[7] Since the Petition Date, the County has adopted a new model for providing health care to indigent patients. As explained in greater detail below in Section IV.O, the County is now providing diagnostic care, urgent care, specialty care, and primary care to indigent patients under the auspices of Cooper Green Mercy Health Services. For ease of

*(FOOTNOTE CONTINUED)*

66

The 2011 Audited Financial Statements reflect, as of September 30, 2011, total current and non-current assets relating to the County's governmental activities totaling $820.4 million and assets relating to business-type activities totaling $3.203 billion. More specifically, the 2011 Audited Financial Statements report the County's assets as follows:

**JEFFERSON COUNTY COMMISSION**
**STATEMENT OF NET ASSETS**

30-Sep-11

**(IN THOUSANDS)**

| ASSETS | Governmental Activities | Cooper Green Hospital Fund | Sanitary Operations Fund | Nonmajor Enterprise Fund | Total |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| Cash and investments | $99,323 | $2,576 | $8,707 | $4,415 | $115,021 |
| Patient accounts receivable, net | - | 6,543 | - | 945 | 7,488 |
| Estimated third-party payor settlements | - | 402 | - | - | 402 |
| Accounts receivable, net | 5,940 | - | 18,619 | 169 | 24,728 |
| Loans receivable, net | 2,212 | - | - | - | 2,212 |
| Taxes receivable, net | 132,465 | - | 5,096 | - | 137,561 |
| Other receivables | - | 2,438 | - | - | 2,438 |
| Due from (to) other governments | 8,357 | - | 1,540 | -1,300 | 8,597 |
| Inventories | - | 1,298 | - | 5 | 1,303 |
| Prepaid expenses | - | 739 | - | - | 739 |
| Deferred charges – issuance costs | 11,970 | - | 46,591 | 3 | 58,564 |
| Restricted assets – current | 164,513 | - | 202,942 | - | 367,455 |
| **Total Current Assets** | 424,780 | 13,996 | 283,495 | 4,237 | 726,508 |

reference, the term "Cooper Green" shall refer to the County's former operation of Cooper Green Mercy Hospital and its current operation of Cooper Green Mercy Clinic and Cooper Green Mercy Health Services.

[8] Since the Petition Date, the County has sold its interests in the Nursing Home. For a description of that sale, see section IV.P below.

67

**Noncurrent Assets**

| | | | | | |
|---|---|---|---|---|---|
| Deferred charges – issuance costs | - | - | - | 1 | 1 |
| Advances due from (to) other funds | 42,745 | - | -10,628 | -32,117 | - |
| Loans receivable, net | 21,570 | | | | 21,570 |
| Restricted assets | 4,107 | 1,759 | 56 | 3,881 | 9,803 |
| Assets internally designated for capital improvements or redemption of warrants | - | - | 52,549 | - | 52,549 |
| | | | | | - |
| Capital assets: | | | | | |
|    Depreciable assets, net | 287,866 | 35,781 | 2,763,883 | 32,342 | 3,119,872 |
|    Nondepreciable assets | 39,376 | 1,090 | 31,672 | 20,681 | 92,819 |
| | 395,664 | 38,630 | 2,837,532 | 24,788 | 3,296,614 |
| | $820,444 | $52,626 | $3,121,027 | $29,025 | $4,023,122 |

Among the categories of personal and real property of the County identified in the 2011 Audited Financial Statements are the following:

### a. Deposits and Investments

The County's deposits include cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date of acquisition. Under Alabama Code section 11-8-11, the County Commission is authorized to invest in interest-bearing securities issued by the United States government which are guaranteed as to principal and which are redeemable upon application. Investments are reported at fair value, based on quoted market prices, except for money market investments and repurchase agreements, which are reported at amortized cost. The County Commission reports all money market investments (*i.e.*, U.S. Treasury bills and bankers' acceptances having a remaining maturity at time of purchase of one year or less) at amortized cost. Investments held in escrow for retainage on construction contracts and as surety for purchase commitments are stated at fair value.

### b. Receivables

All trade, property tax, loans, and patient receivables are shown net of an allowance for uncollectible amounts. Allowances for doubtful accounts are estimated based on historical write-off percentages. Doubtful accounts are written off against the allowance after adequate collection effort is exhausted and recorded as recoveries of bad debts if subsequently collected.

As reported in the County's 2011 Audited Financial Statements, sales tax receivables consist of taxes that have been paid by consumers in the month of September of the immediately preceding fiscal year. These taxes are normally remitted to the County Commission within the next sixty days.

Patient receivables relating to the County's business-type activities, including the operation of Cooper Green and the Nursing Home, are receivables due from patients, insurance companies, and third-party reimbursement contractual agencies. Patient receivables are recorded less an

68

allowance for uncollectible accounts, charity accounts, and other uncertainties. Certain third-party insured accounts (*e.g.*, Blue Cross, Medicare, and Medicaid) are based on contractual agreements, which generally result in collecting less than the established rates. Final determinations of payments under these agreements are subject to review by appropriate authorities. Doubtful accounts are written off against the allowance as deemed uncollectible and recorded as recoveries of bad debts if subsequently collected.

### c. Inventories

Inventories are valued at cost, which approximates realizable value, using the first-in, first-out (or "FIFO") method. Inventories of governmental funds are recorded as expenditures when consumed.

### d. Prepaid Items

Certain payments to vendors reflect costs applicable to future accounting periods and are recorded as prepaid items for both government activities and business-type activities.

### e. Restricted Assets

Certain funds set aside for the repayment of certain GO Warrants and Sewer Warrants were classified as restricted assets because they are maintained in separate bank accounts, and their use is limited by the applicable warrant documents or by applicable law. Also, various amounts were classified as restricted because they may be limited by warrant documents for the construction of various ongoing projects or improvements. Restricted assets available to satisfy liabilities classified as current were classified as current assets.

### f. Capital Assets

The County's capital assets include land, equipment, and infrastructure assets (*e.g.*, roads, bridges, water and sewer systems, and similar items). Capital assets are reported in the applicable governmental activities and business-type activities. Because of their public nature and use, the County's capital assets generally are not readily subject to liquidation or sale.

In its financial records, the County's capital assets are valued at cost when historical records are available, and at an estimated historical cost when no historical records exist. Donated fixed assets are valued at their estimated fair market value on the date received. Additions, improvements, and other capital outlays that significantly extend the useful life of an asset are capitalized. Other costs incurred for repairs and maintenance are expensed as incurred. Major outlays of capital assets and improvements are capitalized as projects are constructed.

Depreciation on all assets is provided on the straight-line basis over the asset's estimated useful life. Capitalization thresholds (*i.e.*, the dollar values above which asset acquisitions are added to the capital asset accounts) and estimated useful lives of the County's reported capital assets are as follows:

69

| Item | Capitalization Threshold | Estimated Useful Life |
|---|---|---|
| Buildings | $100,000 | 40 years |
| Equipment and furniture | $5,000 | 5-10 years |
| Roads | $250,000 | 15 years |
| Bridges | $250,000 | 40 years |
| Collection sewer system assets | $250,000 | 25-40 years |
| Treatment plant sewer system assets | $250,000 | 40 years |
| Landfills and improvements | $100,000 | 25 years |

The County Commission capitalizes interest cost incurred on funds used to construct property, equipment, and infrastructure assets. Interest capitalization ceases when the construction project is substantially complete. The capitalized interest is recorded as part of the asset to which it relates and is amortized over that asset's estimated useful life. Interest is not capitalized, however, for construction projects of governmental funds.

Capital assets are reviewed for impairment in accordance with the methodology prescribed in GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*. Asset impairment, as defined by this standard, constitutes a significant unexpected decline in the service utility of a capital asset and is not a function of the recoverability of the carrying amount of the asset. Service utility is the usable capacity of the asset that was expected to be used at the time of acquisition and is not related to the level of actual utilization, but the capacity for utilization. Indicators that the service utility of an asset has significantly declined include (i) evidence of physical damage, (ii) changes in legal or environmental circumstances, (iii) technological development or evidence of obsolescence, (iv) a change in the manner or expected duration of use of the asset, and (v) construction stoppage.

### 4. County Tax Revenues

As discussed in Section III.G below, the County levies and collects a variety of taxes for the benefit of its general governmental operations and the General Fund. The proceeds of some of those taxes have been pledged to secure certain obligations of the County. For example, the County has pledged the proceeds of the Education Tax described in Section III.G.3 below as security for the payment of the School Warrants. In addition, the Alabama Legislature has earmarked the County's tax revenues, thereby restricting the purposes for which those revenues may be used and, in many instances, requiring the payment of such revenues to other municipal authorities.

For fiscal year 2011, the County's net general revenues from taxes, both with respect to governmental activities and business-type activities, were as follows:

70

| Net General Revenues from Taxes (in thousands) | |
|---|---|
| Property taxes | $108,226 |
| Sales tax | $163,912 |
| Other taxes | $29,288 |
| Licenses and permits | $17,830 |
| Unrestricted investment earnings | $4,159 |
| Miscellaneous | $52,172 |
| Total General Revenues | $375,587 |

## 5. Operating Revenues from the County's Business-Type Activities

The County generates revenues from the operation of its business-type activities, including the Sewer System, the County's landfill system, and the Development Authority. Those operating revenues include charges for services, tax revenues, and intergovernmental transfers. For fiscal year 2011, the County's operating revenues from its business-type activities were as follows:

**JEFFERSON COUNTY COMMISSION**

**Operating Revenues of Proprietary Funds**

**30-Sep-11**

**(IN THOUSANDS)**

| | Cooper Green Hospital Fund | Sanitary Operations Fund | Landfill Operations Fund | Jefferson Rehabilitation and Health Center Fund | Jefferson County Economic and Industrial Development Authority | Total |
|---|---|---|---|---|---|---|
| **Operating Revenues** | | | | | | |
| Taxes | $0 | $4,702 | $0 | $0 | $0 | $4,702 |
| Intergovernmental | $0 | $103 | $0 | $0 | $0 | $103 |
| Charges for Services, Net | $29,845 | $154,302 | $0 | $9,865 | $0 | $194,012 |
| Other operating revenue | $9,658 | $4,109 | $1,266 | $209 | $637 | $15,879 |
| | $39,503 | $163,216 | $1,266 | $10,074 | $637 | $214,696 |

In certain instances, the County has pledged some or all of these operating revenues to secure certain County debts. Most notably, the Sewer Warrants are secured by a pledge of Net System Revenues. In other instances, the operating revenues are earmarked for a specific use. For example, pursuant to a Local Act enacted by the Alabama Legislature which affects only the County, any funds generated by Cooper Green are required to be retained by Cooper Green in its own general fund and to be expended solely by it.

## 6. Claims and Causes of Action Against Third Parties

In addition to the foregoing assets and revenue sources, the County also holds claims and causes of action against various parties, including without limitation the Preserved Claims.

71

### G. Summary of the County's Revenues

When analyzing the County's sources of revenues, it is appropriate to distinguish between revenues attributable to the County's enterprise or proprietary funds, on the one hand, and the County's governmental funds, on the other hand.

#### 1. Enterprise or Proprietary Fund Revenues

Enterprise funds are used to report the activities of the County for which fees are charged by the County to external users for goods or services. The County's major enterprise or proprietary funds are (a) the Cooper Green Hospital Fund, which is used to account for the revenues generated by the operation of Cooper Green from patient charges and reimbursements from third parties, including Medicare and Medicaid; and (b) the Sanitary Operations Fund, which is used to account for the revenues generated by the Sewer System through user charges, impact fees, and designated property and *ad valorem* taxes.

Non-major enterprise funds of the County include (x) the Landfill Operations Fund, which accounts for the revenues generated from the operation of the County's landfill systems primarily through user charges and lease payments from a third-party lessee; and (y) the Jefferson County Rehabilitation and Health Center Fund, which fund is used to account for the revenues generated by the operation by the County of the Nursing Home (which the County has sold since the Petition Date) from patient charges and reimbursements from third parties, principally Medicaid.

The statement of revenues, expenses, and changes in fund net assets for the aforementioned proprietary funds for the fiscal year ending September 30, 2011 may be found in the 2011 Audited Financial Statements attached hereto as **Exhibit 2**.

#### 2. Governmental Fund Revenues

The County's governmental funds reflect revenues generated by governmental services, primarily derived from taxes, licenses and permits, intergovernmental revenues from state and federal governments, and other nonexchange transactions. The County's major governmental funds include the following:

- General Fund: This fund is the primary operating fund of the County Commission. It is used to account for financial resources except those required to be accounted for in another fund. The General Fund is funded primarily from collections of property taxes, sales taxes, and revenues collected by the State of Alabama and shared with the County Commission.

- Limited Obligation School Fund: This fund is used to account for the education sales tax collected for the payment of principal and interest on the School Warrants.

72

- Indigent Care Fund:  This fund is used to account for the beverage and sales taxes collected by the County that have been earmarked by the Alabama Legislature for providing indigent care to County residents.

- Bridge and Public Building Fund:  This fund is used to account for the special County property taxes that have been earmarked by the Alabama Legislature for building and maintaining public buildings, roads, and bridges within the County.

- Debt Service Fund:  This fund is used to account for the accumulation of resources for and the payment of debt service on the GO Warrants.

Other non-major governmental funds of the County are:

- Community Development Fund:  This fund is used to account for the expenditure of federal block grant funds received by the County.

- Capital Improvements Fund:  This fund accounts for the financial resources used in the improvement of major capital facilities of the County.

- Emergency Management Fund:  This fund is used to account for the expenditure of funds received for disaster assistance programs.

- Road Construction Fund: This fund accounts for the financial resources expended in the construction of roads.

- Home Grant Funds:  This fund accounts for the expenditure of funds received to create affordable housing for low-income households.

- Public Building Authority Fund:  This fund is used to account for the operation of the PBA.

The statement of revenues, expenditures, and changes in fund revenues for the aforementioned governmental funds for the fiscal year ending September 30, 2011 is set forth in the 2011 Audited Financial Statements attached hereto as **Exhibit 2**.

3.      **Sources of Revenues**

The County's revenues from taxes, licenses, and permits utilized by the County's governmental funds are derived primarily from the following sources:

- Sales Tax Group (Sales, Consumer Use, and Sellers Use).  The County imposes a 1.0% tax on sales or goods sold within the County, or purchased from outside the County for use within the County.  With respect to automotive vehicles and equipment, mining, manufacturing, processing, and farm equipment, the sales tax is .375%.  Sales of motorboats, both inboard

73

and outboard (where the motor is not easily removable), are also subject to a .375% tax.

After payment of collection costs, the net proceeds of the sales and use tax are distributed in accordance with an earmarked formula mandated by Legislative Act 1973-659, as follows:

a.      collections on the first one-half of the proceeds are allocated as follows:

> (1)      an administrative cost of one and one-half percent (1.5%) of the total collected is first paid to the General Treasury of the County;

> (2)      9% of the balance goes to the Jefferson County Board of Health; and

> (3)      the balance of collections remaining goes to the Indigent Care Fund.

b.      collections on the second one-half of the proceeds from the sales tax are allocated as follows:

> (1)      the first $100,000 of monthly collections is paid to the Birmingham-Jefferson Civic Center Authority, a public corporation that owns and operates a civic center complex within the County (the "Civic Center Authority");

> (2)      22% goes to the Jefferson County Board of Health;

> (3)      9% of any remaining balance goes to the Jefferson County Board of Health; and

> (4)      any remaining balance goes to the General Treasury of the County.

- Education Tax. There is an additional 1.0% tax imposed on sales or goods sold within the County or purchased outside the County for use within the County. The special automotive, manufacturing, mining and farming rates of 0.357% apply to the Education Tax. The proceeds of this tax are earmarked exclusively for educational purposes. Alabama law provides that the proceeds from such taxes, less collection costs, "shall be used exclusively for public school purposes." Currently, all collections, after commission, are used solely for the payment of the School Warrants.

- Additional 3.0% Sales Tax on Beer and Alcohol (Excluding Wine). With respect to sales of beer and alcohol (excluding wine) by restaurants, there is

an additional 3.0% sales tax that is levied, the proceeds of which are distributed in full to the Civic Center Authority.

- <u>Lodgings Tax</u>. A 7.0% tax exists on the rental of hotel rooms, motel rooms, and other transient lodging within the County. The 7.0% lodging tax is divided into two components:

  a.  a 3.0% tax, the proceeds of which are paid solely to the Civic Center Authority; and

  b.  a 4.0% tax, the proceeds of which are distributed as follows:

      (1)  the first 25% goes to the Greater Birmingham Convention and Visitors Bureau;

      (2)  of the remaining 75% balance,

           i.   1% is paid to the County for a collection, administrative, and enforcement commission;

           ii.  1/3 (one-third) of the balance, after commission, goes to the Civic Center Authority; and

           iii. 2/3 (two-thirds) of the balance, after commission, goes to the Greater Birmingham Convention and Visitors Bureau.

- <u>Beer Tax</u>. Beer wholesalers are required to collect and pay tax on their sales of beer to retailers in the County. The proceeds of this tax are then distributed as follows:

<u>Fund A</u>

  a.  4/9 (four-ninths) of the beer tax is paid into a fund, the proceeds of which are distributed as follows:

      (1)  2% is retained by the County as a commission and paid to the General Treasury;

      (2)  the remaining 98% is distributed as follows:

           i. 1/4 (one-fourth) is paid to the County Board of Education;

           ii.  3/8 (three-eighths) is paid to the General Treasury of the County; and

75

   iii. 3/8 (three-eighths) is distributed among various municipalities within the County based upon their respective populations, according to the most recent federal census.

Fund B

 b. 2/9 (two-ninths) of the beer tax is paid into another fund, the proceeds of which are distributed among municipalities within the County based on the ratio of beer sales within each municipality to the total beer sales in the County.

Fund C

 c. the remaining 1/3 (one-third) of the beer tax is distributed as follows:

   (1) 50% of such annual amount, or $2,000,000, whichever is greater, is paid annually to the Birmingham Jefferson County Transit Authority; and

   (2) the remaining balance is divided between the County and the incorporated municipalities within the County based upon their respective population, as shown by the most recent federal census. Five percent (5.0%) of the County's share shall be paid to the fire districts in the unincorporated areas of the County.

- <u>Wine Tax</u>. Wine wholesalers are required to collect a tax from total sales to wine retailers in the County, and pay the tax to the County. All of the proceeds from this tax are paid to the County Treasurer. No commission is provided for administration of the wine tax.

- <u>Alcoholic Beverages Tax</u>. This tax is collected from restaurants, lounges, package stores, private clubs and any other retailer of alcoholic beverages at a rate of 6.0% of sale of alcoholic beverages (excluding beer and wine). The County receives 2.0% of such tax receipts as its collection, enforcement, and administrative commission, with the remaining 98% being paid into the County's Indigent Care Fund.

- <u>Tobacco Tax</u>. The County imposes a tax on the sales of cigarettes and smoking tobacco within the County, but not on cigars, cheroots, snuff or chewing tobacco. For cigarettes, the tax rate is four cents for 20 count packs and five cents for 25 count packs or fractions thereof. For loose, canned or bagged smoking tobacco, the rate is one cent for up to one and one-eighth ounces, three cents for over one and one-eighth ounces up to two ounces, five cents for over two ounces up to three ounces, seven cents for over three

76

ounces up to four ounces, and seven cents for over four ounces plus two cents for each additional ounce or fractional part thereof over four ounces. Tax proceeds are distributed as follows:

a. with respect to the first half,

  (1) 3.0% is retained by the County as an administrative commission; and

  (2) of the remaining balance,

    i. 75% is paid to municipalities based upon their population, according to the most recent federal census; and

    ii. 25% is paid to the General Treasury of the County; and

b. with respect to the second half

  (1) 1.0% is retained by the County as an administrative commission; and

  (2) the 99.0% remaining amount is paid to the Civic Center Authority.

- <u>State Gasoline Taxes .04, .05., and 07</u>. These taxes are collected by the State of Alabama and paid to the County on a monthly basis. Tax proceeds are distributed by the County as follows:

a. with respect to the first $6.0 million of tax,

  (1) 13% is paid to the General Treasury of the County; and

  (2) 87% is distributed among the incorporated municipalities within the County and the County's General Treasury. Each municipality's share is based on the ratio of each municipality's population relative to the County's total population. The County's share is based on the County's unincorporated portion relative to the County's total population;

b. with respect to tax revenues above $6.0 million and up to $6.5 million, 100% of such revenues is paid to the General Treasury of the County;

77

c. with respect to all tax revenues over $6.5 million,

   (1)  13% is paid to the County's General Treasury; and

   (2)  87% is distributed among the incorporated municipalities within the County and the County's General Treasury. Each municipality's share is based on the ratio of each municipality's population relative to the County's total population. The County's share is based on the County's unincorporated portion relative to the County's total population.

- <u>County Gasoline Tax</u>. This tax is collected from wholesale gasoline and diesel distributors at the rate of one cent (1¢) per gallon, and paid to the County by each wholesale distributor. Two percent (2%) is retained by the County as an administrative commission. The proceeds of this tax are distributed by the County to each municipality based on the total gallons of gasoline and diesel delivered into each municipality. The County's share of the tax is based on the total gallons of gasoline and diesel delivered into the unincorporated portions of the County.

- <u>State Business Licenses</u>. Collections for state business privilege license taxes are allocated according to different formulas provided for by Alabama Code sections 40-12-1 *et seq*. Proceeds from business license taxes are allocated to the State of Alabama, the County, municipalities within the County, and various professions, professional examiners, boards, and societies.

- <u>International Registration Prorations, Petroleum Inspection Fees, State Auto Licenses, and Additional State Motor Vehicle Fees</u>. These taxes are all earmarked for payment to the Jefferson County General Road Fund.

- <u>Property Taxes</u>. Property taxes on real estate (residential buildings, commercial buildings, industrial buildings, farm land, timber land and land for other uses) and personal property (business machines and equipment) are assessed by the County Tax Assessor and collected by the Tax Collector's office. The County's share of the property taxes collected is remitted by the Tax Collector's office to the County Treasurer's office.

- <u>Occupational Tax</u>. The County's Occupational Tax represented over a third of funding for the County's General Fund until invalidated by prepetition court opinions. The invalidation of the Occupational Tax is discussed in greater detail in Section III.I.1 below.

78

### 4. Collection and Remittance of Taxes and Fees Due the State and Other Municipalities

The County, through its Revenue Department and the Tax Collector's office, administers and enforces several federal, state, county, and municipal statutes, ordinances, and regulations. This responsibility includes collecting *ad valorem* real and personal property taxes, motor vehicle sales and use taxes, boat sales and use taxes, manufactured home taxes, tobacco taxes, wine and beer taxes, state and county gas and diesel taxes, motor vehicle registration fees, hunting/fishing license fees, privilege (business) licenses, education sales taxes, television franchise fees, stormwater fees, and municipal real estate license fees, as well as other taxes and fees.

The County collects certain of these taxes and fees on behalf of the County, the State of Alabama, other municipalities, school districts, quasi-governmental organizations, and fire districts within the County. For example, although cities and towns may levy taxes upon property, Alabama Code section 11-51-43 mandates that, in certain circumstances, the "tax collector of the counties in which such municipalities are situated shall collect all property taxes for such municipalities at the same time, and in the same manner, and under the same laws, that state and county taxes are collected." Accordingly, the County routinely collects property taxes that are due and owing to over 60 other taxing authorities, including municipalities, boards of education, and the State of Alabama.

Similarly, the County is obligated to collect motor vehicle sales and use taxes that are due to the County, the State of Alabama, and other municipalities. *See* Ala. Code §§ 40-23-100 to -111. The County is entitled to a fee for its services in collecting the State's portion of the motor vehicle tax and, after payment of such fee, is obligated to and does remit the balance to the State. *See* Ala. Code § 40-23-108.

The County also levies certain privilege, license, and excise taxes pursuant to the authority of Alabama Code section 40-12-4. Alabama law provides that the proceeds from such taxes, less the County's collection costs, "shall be used exclusively for public school purposes." Because there are multiple boards of education within the County, the County distributes among those various boards the net proceeds of these taxes remaining after payment of collection costs and debt service, with those net proceeds to be used solely for public school purposes, but excluding teachers', administrators', and supporting staff's wages.

The County likewise serves as a disbursing agent with respect to other taxes, receiving the portions of those taxes due not only to the County, but also to the municipalities within the County, and then remitting to such municipalities their respective shares.

The County also maintains agreements with several of its municipalities to create tax increment financing (or TIF) districts to promote economic development in the area. Pursuant to these TIF agreements, the County has agreed to remit to such municipalities the *ad valorem* taxes that would be otherwise due the County with respect to the redeveloped or improved properties within the TIF district.

In addition to TIF agreements, the County has participated over several years in tax abatements initiated by municipalities and industrial development boards. Although *ad valorem* tax

79

abatements generally last up to ten (10) years, non-educational construction-related taxes (general sales and use) are abated until the completion of the buildings and installation of machinery, furniture, fixtures, and equipment. Abatements include not only new construction, but also additions or improvements to existing structures.

Although abatements initially result in the County losing revenue, the projects, in the long-term, usually provide additional jobs within the County, and generally result in purchase of homes by the new employees, or at least provide rental income to owners of apartments and houses. This produces additional *ad valorem* taxes and increased sales taxes, as well as other consumer-related taxes; *e.g*., tobacco tax, television franchise fees, and the like.

During the course of the Case, pursuant to its authority under chapter 9 of the Bankruptcy Code and its obligations under Alabama law, the County has continued to remit, on the due dates prescribed by legislative acts and local ordinances, all of the taxes, fees, and other amounts that the County has collected on behalf of the State of Alabama, municipalities, boards of education, authorities, organizations, or any entity otherwise duly owed such amounts. The Claims of the State of Alabama, cities, towns, boards of education, authorities, organizations, and other municipalities for taxes and other funds due them that the County, under applicable state law, has collected on their behalf and is obligated to remit to them are "Pass-Through Obligation Claims" classified as Class 8 "Other Unimpaired Claims" under the Plan.

### 5. *Ad Valorem* Taxes on Real and Personal Property

The levy and collection of *ad valorem* taxes in Alabama are subject to the provisions of the Alabama Constitution. The Alabama Constitution, among other things, fixes the percentage of market value at which property can be assessed for taxation, limits the rates of county taxation that can be levied against property, and provides a maximum value for the aggregate *ad valorem* taxes that can be levied by all taxing authorities on any property in any tax year.

The amount of any specific *ad valorem* tax in Alabama is computed by multiplying the tax rate times the assessed value of the taxable property. The assessed value of taxable property is a specified percentage (known as the "assessment ratio") of its fair and reasonable market value or, in certain circumstances, its current use value. *Ad valorem* tax rates generally are stated in terms of mills (one-thousandth of a dollar) per dollar of assessed value. For any given *ad valorem* tax, each mill in the rate of taxation represents a tax on property equal to one-tenth of one percent of the assessed value of such property.

### a. Classification and Limitations on *Ad Valorem* Tax Rates

Amendment No. 373 to the Alabama Constitution (the "Property Tax Amendment") requires all taxable property to be divided into the four classes shown below and valued for taxation according to the assessment ratios respectively shown applicable thereto:

| | | |
|---|---|---|
| Class I | All property owned by utilities and used in the business of such utilities | 30% |

80

| Class II  | All property not otherwise classified | 20% |
| Class III | All agricultural, forest and single-family, owner-occupied residential property and historic buildings and sites | 10% |
| Class IV  | Private passenger automobiles and pickup trucks owned and operated by an individual for personal or private use | 15% |

The Property Tax Amendment provides that the owner of Class III property may elect to have such property appraised at its "current use value" instead of its "fair and reasonable market value." The legislative act implementing the Property Tax Amendment defines "current use value" as the value of such property based on the use being made of it on October 1 of the preceding year, without taking into consideration "the prospective value such property might have if it were put to some other possible use."

### b.    Assessment Ratio Adjustments

The Property Tax Amendment provides that with respect to local (as distinguished from State) *ad valorem* taxes, the governing body of any county, municipality, or other local taxing authority may, subject to certain criteria established by legislative act, adjust (by increasing or decreasing) the ratio of assessed value of any class of taxable property to its fair and reasonable market value or its current use value (as the case may be), but only if: (i) the governing body of such county, municipality, or other taxing authority holds a public hearing on the proposed adjustment before authorizing the adjustment; (ii) the Alabama Legislature adopts an act approving the adjustment; and (iii) a majority of the electors of such county, municipality, or other taxing authority subsequently approve the adjustment in a special election. Any adjustment of assessment ratios is subject to the further requirements that the assessment ratio applicable to each class of taxable property must be uniform within the jurisdiction of each local taxing authority and that no class may be assessed at more than thirty-five percent (35%) or less than five percent (5%) of its fair and reasonable market value or current use value (as the case may be). By virtue of the Property Tax Amendment, the Alabama Legislature has no power over the adjustment of assessment ratios pertaining to local taxes except to approve or disapprove an adjustment proposed by a local taxing authority. The County Commission has not sought to make any adjustment of the assessment ratio applicable to any class of taxable property in the County.

### c.    Rate Adjustments

The Property Tax Amendment authorizes any county, municipality, or other local taxing authority to decrease any *ad valorem* tax rate at any time, provided that such decrease will not jeopardize the payment of any bonded indebtedness secured by such tax. The Property Tax Amendment provides that a county, municipality, or other local taxing authority may at any time increase the rate at which any *ad valorem* tax is levied above the limit otherwise provided in the Alabama Constitution, but only if: (i) the governing body of such county, municipality, or other taxing authority holds a public hearing on the proposed increase before authorizing the increase; (ii) the Alabama Legislature adopts an act approving the increase; and (iii) a majority of the electors of

81

such county, municipality, or other taxing authority subsequently approve the increase in a special election.

### d. Maximum Tax Limitation

The Property Tax Amendment contains a provision that limits the total amount of *ad valorem* taxes (including all state, county, municipal, and other taxes) that may be imposed on any property in any one tax year to an amount not exceeding a specified percentage of the fair and reasonable market value of such property. The percentages applicable to the various classes of property are as follows:

| | |
|---|---|
| Class I | 2.0% |
| Class II | 1.5% |
| Class III | 1.0% |
| Class IV | 1.25% |

If the total amount of tax otherwise payable with respect to any property would exceed the applicable maximum tax limit, then the millage rate of each separate tax to which such property is subject must be reduced in the same proportion that the millage levied by or for the benefit of each taxing authority bears to the total millage levied by or for the benefit of all taxing authorities. This provision of the Property Tax Amendment has had the operative effect of requiring, since October 1, 1979, a reduction in the aggregate *ad valorem* tax rate on property located in certain municipalities in the County.

### e. Additional Exemptions

The Property Tax Amendment exempts from all *ad valorem* taxes household and kitchen furniture, farm tractors, and farming implements when used exclusively in connection with agricultural property, as well as stocks of goods, wares, and merchandise. These categories of property generally were not exempt from *ad valorem* taxation prior to adoption of the Property Tax Amendment.

### f. Homestead Exemption

Act No. 82-789 of the Alabama Legislature provides for an increase in the State *ad valorem* tax homestead exemption and authorizes the County Commission to: (a) increase the currently applicable $2,000 homestead exemption against County taxes to an amount not greater than $4,000 of assessed value; and (b) extend such homestead exemption to school district taxes. The County Commission has not taken any action to effectuate such an increase in the amount of the homestead exemption currently available against County *ad valorem* taxes, or to extend such exemption to school district taxes, for the current tax year or for any future tax year.

### g. *Ad Valorem* Tax Rates in the County

Excluding taxes levied by incorporated municipalities within the County (which vary from district to district), the total rates levied on property located within the County generally range from 46.6 mills to 50.1 mills per dollar of assessed value.

Case 11-05736-TBB9   Doc 1977   Filed 08/08/13   Entered 08/08/13 11:52:51   Desc
Main Document     Page 107 of 251

### h. *Ad Valorem* Tax Assessment and Collection

*Ad valorem* taxes on taxable properties within the County, except motor vehicles and public utility and railroad properties, are assessed by the County Tax Assessor and collected by the County Tax Collector. *Ad valorem* taxes on motor vehicles in the County are assessed and collected by the County Revenue Director, and *ad valorem* taxes on public utility and railroad properties are assessed by the State Department of Revenue and collected by the State and by the County Tax Collector. *Ad valorem* taxes are due and payable on the October 1 following the October 1 as of which they are assessed, and they become delinquent on the following December 31. The County Tax Assessor reassesses property on an annual basis.

### i. Earmarking of *Ad Valorem* Tax Collections

Of the *ad valorem* taxes collected by the County on its own behalf, approximately 50% are allocated to funds other than the General Fund. For each dollar the County collects in *ad valorem* taxes on its behalf, approximately 45% is allocated to roads and bridges and approximately 5% is allocated to Sewer System improvements, leaving only roughly 50% of each dollar of *ad valorem* taxes collected by the County for use by the County without restriction.

### j. Historical *Ad Valorem* Tax Levies and Collections

Following is a table showing the *ad valorem* tax levies and collections for the County for the period from 2008 to 2012.

HISTORICAL AD VALOREM TAX COLLECTIONS

| Tax Year Ended September 30 [1] | Total Net Tax Levy | Current Tax Collections | Percent of Levy Collected | Delinquent Tax Collections | Total Tax Collections | Percent of Total Tax Collection to Tax Levy |
|---|---|---|---|---|---|---|
| 2008 | 545,472,944 | 540,392,751 | 99.07% | 2,377,973 | 542,770,724 | 99.50% |
| 2009 | 580,123,421 | 559,724,507 | 96.48% | 4,470,839 | 564,195,346 | 97.25% |
| 2010 | 571,239,380 | 556,700,119 | 97.45% | 4,686,256 | 561,386,375 | 98.28% |
| 2011 | 563,149,729 | 539,061,625 | 95.72% | 6,669,403 | 545,731,028 | 96.91% |
| 2012 | 553,608,072 | 540,707,822 | 97.67% | 5,961,035 | 546,668,857 | 98.75% |

Footnotes:
(1) Taxes collected in each fiscal year represent the taxes levied in the prior fiscal year, as taxes are collected in arrears.

Source: Jefferson County Tax Collector.

83

**H.    The Indigent Care Fund and Cooper Green Mercy Hospital**

**1.    The County's Indigent Care Fund**

For nearly 50 years, the County has provided healthcare for indigent County residents.  In 1965, the Alabama Legislature passed Act Number 387 of the Acts of Alabama ("Act No. 387"), providing for the establishment of a fund to help finance the cost of delivering healthcare to the County's poorer citizens.  Act No. 387 applied to Alabama counties with populations over 500,000 – such as the County – and required each such county to impose a sales and use tax to establish an "Indigent Care Fund" for that county.  Section 14 of Act No. 387 was its operative provision and stated as follows:

> There is hereby established for the county the County Indigent Care Fund herein called 'the Indigent Care Fund'.  The Indigent Care Fund shall be used by the county for any or all of the following purposes: to acquire . . . a county hospital . . .; to operate, equip and maintain the same for the medical care and treatment of indigent persons of the county suffering from illness, injury, disability or infirmity, including out-patients; and the furnishings of drugs and medicine to such indigent persons . . .; also the operation of an emergency clinic.  In addition, the county shall be authorized to furnish a part of the cost of the medical care for those of the county able to pay for only part of their own medical care.

> The county shall be authorized to provide such treatment, care, drugs and medicines at a county hospital, out-patient clinic and/or emergency clinic or other hospitals located in the county under a contract between the county and any general hospital approved by the Joint Commission on Accreditation of Hospitals in the county.

> The county shall be authorized to collect for the benefit of the 'Indigent Care Fund' such sums as the county is able to collect from 'part-pay' patients and from any other source or fund, public or private . . . .

> The county each year shall earmark and set aside in a separate fund not less than twenty-five percent (25%) of the county indigent care fund to be used for capital improvements.  This requirement shall cease and no longer be binding upon the county after a county hospital has been constructed and fully equipped.

In 1967 the Alabama Legislature passed Act Number 405 of the Acts of Alabama ("Act No. 405"), which largely repealed and replaced Act No. 387 (though not section 14 of Act 387 quoted above).  The primary effect of Act No. 405 was to reallocate the proceeds of the sales tax previously authorized under Act No. 387.  Under the new Act No. 405, the first one-half of such sales tax was to be distributed as follows: (a) 1.5% of the total proceeds collected would be paid to the County to compensate it for its collection, enforcement and administration costs, and (b) the balance of such one-half share would be paid to the Indigent Care Fund.

Six years later, the Alabama Legislature again passed legislation to reallocate the sales tax that funded the County's Indigent Care Fund.  Under Act No. 659 of the Acts of Alabama ("Act No.

84

659" and, together with Act No. 387 and Act No. 405, the "Indigent Care Fund Acts"), the Alabama Legislature decreased the portion of the authorized sales tax that would be paid to the Indigent Care Fund. Act No. 659 provided that the first one-half of such sales tax would be allocated generally as follows: (x) 1.5% of the total proceeds collected would be paid to the County to compensate it for its collection, enforcement, and administration costs; (y) 9.0% of such one-half share would be paid to the County's Board of Health; and (z) the balance of such one-half share would be paid to the Indigent Care Fund.

The sales tax allocation formula adopted in 1973 remains largely in place today. In addition, the Indigent Care Fund receives 100% of the net proceeds from the County's alcoholic beverages tax. Together, contributions to the Indigent Care Fund from the County's sales tax and alcoholic beverages tax totaled $43.77 million in fiscal year 2011.

Since the Petition Date, the County has adopted a new model for the delivery of indigent health care which is more particularly discussed in Section IV.O below.

### 2. Cooper Green

The Indigent Care Fund Acts did not mandate the County's establishment and maintenance of a County-owned hospital to provide indigent care. In fact, the Indigent Care Fund Acts authorized the County Commission, in the alternative to a public hospital, to appropriate funds from the County's Indigent Care Fund to one or more accredited private hospitals to care for the County's citizens.

From 1965 through 1972, indigent care was provided by the County through private hospitals. In 1972, the County opened its own public hospital, Mercy Hospital, to provide indigent care. The hospital was accredited in 1973. In 1975 it was renamed Cooper Green Mercy Hospital. Since 1983, Cooper Green has operated as a department of the County.

As of the Petition Date, the County operated the Cooper Green hospital at its primary facility in south Birmingham. In that respect, the County was unusual, as it was the only one of the seven largest counties in Alabama (*i.e.*, Jefferson, Mobile, Madison, Montgomery, Shelby, Tuscaloosa, and Baldwin) that operated its own inpatient hospital. The hospital historically offered an expansive range of healthcare services. On an outpatient basis, it offered primary care and specialty services, such as general surgery, urology, orthopedics, ENT, ophthalmology, obstetrics and gynecology, cardiology, pulmonary, nephrology, and hematology/oncology services. Cooper Green also offered inpatient services, emergency room care, rehabilitation services, diagnostic services, and social services. Services that were not provided directly at the Cooper Green hospital facility, such as cardiac catheterization or bypass surgery, were often coordinated through the nearby University of Alabama-Birmingham hospitals. Cooper Green also operated two separate outpatient, primary care centers within the County known as the Jefferson MetroCare Health Center and the South Town Clinic.

In addition to the funding it received from the Indigent Care Fund, the Cooper Green hospital facility and outpatient care centers earned revenue from the services they provided, receiving payment for services from Medicare, Medicaid, and private insurers such as Blue Cross. These

85

facilities also charged some uninsured patients for their care, with the decision regarding whether and in what amount to charge fees based on family size and income. Under Act Number 2009-790 of the Acts of Alabama, a Local Act affecting only the County, any funds generated by the Cooper Green facilities were required to be retained by Cooper Green in its own general fund and to be expended solely by it. Cooper Green was required to account for all its operating revenues to the County Commission as part of the County's budget process set forth in Alabama Code section 11-8-3(d)(1).

Cooper Green has received additional funding for grants, special projects, and other operating expenses from the Cooper Green Hospital Foundation (the "Foundation"). In June 1973, the County Commission passed a resolution approving the creation of the Foundation, which has the stated purpose of assisting and strengthening Cooper Green in its service as a health center and a medical research and educational facility for the community. The Foundation has operated as a charitable non-profit corporation since its incorporation, donating millions of dollars to Cooper Green over the past forty years. In 1985, the County Commission passed a resolution naming the County Commission as the successor to the board of directors and executive committee of the Foundation, with the County Commission to continue the objects and purposes of the Foundation.

The cost of operating Cooper Green historically exceeded the funding Cooper Green received from the Indigent Care Fund, the operating revenues, and donations from the Foundation. In fiscal year 2010, Cooper Green received $12.7 million from the County's General Fund reserves to cover its operating shortfalls. In fiscal year 2011, an additional $10.6 million was transferred from the General Fund to Cooper Green.

I.     **Significant Events Leading to Commencement of the Chapter 9 Case**

The County's chapter 9 filing was precipitated by the combined effects of several different events, which are discussed in turn below.

1.     **Loss of Occupational Tax**

Between 2000 and 2009, the Occupational Tax provided roughly $600 million to the County and provided over 40% of the funding for the County's general administration and the Sheriff's department. For fiscal year 2010, unrestricted revenues in the County's General Fund (the "Unrestricted General Fund Revenues") totaled approximately $207.2 million. Approximately $50 million of the 2010 Unrestricted General Fund Revenues were related to one-time non-recurring revenue events. For fiscal year 2010, revenues from the Occupational Tax and business license fees totaled approximately $75.7 million, accounting again for roughly 48% of recurring Unrestricted General Fund Revenues.

By contrast, for fiscal year 2011 – the year in which the County lost the Occupational Tax – Unrestricted General Fund Revenues totaled approximately $152.47 million, with approximately $46.9 million of that amount attributable to non-recurring revenue events. The County collected only $15.3 million in Occupational Taxes from the beginning of the 2011 fiscal year through December 1, 2010 – the date that a judgment invalidating the Occupational Tax became final.

86

For fiscal years 2012 and 2013, the County collected no Occupational Taxes.

Following the court rulings in the Weissman Lawsuit, the County made a concerted effort to persuade the Alabama Legislature to pass legislation during its regular 2011 session to remedy the County's revenue problems caused by the loss of the Occupational Tax. The first option was to pass "limited home rule" legislation that would grant the County limited authority to raise tax revenue without specific state legislative approval. The second option was to pass "un-earmarking" legislation that removed certain restrictions on the County's use of tax revenues, which would have improved the County's ability to adapt to changing economic circumstances by allowing the County to allocate funds where needed.

The "home rule" legislation was approved in the Alabama House of Representatives and enjoyed the support of a majority of the County's delegation in the Alabama Senate. However, under state legislative procedures related to bills affecting local issues, one State Senator blocked a vote on the legislation in the Alabama Senate, effectively killing the "home rule" bill. Likewise, the "un-earmarking" legislation faced opposition from state legislators intent on preserving earmarks for certain County functions. As a result, the regular 2011 legislative session concluded without a legislative fix for the loss of Occupational Tax revenues.

The County had exhausted all of its Constitutional and legislatively-authorized taxing powers. For instance, the County's ability to increase *ad valorem* property taxes for the benefit of the General Fund is constrained by Section 215 of the Alabama Constitution, which limits the rate of property tax for county general fund purposes to 5.1 mills per dollar of assessed value of taxable property, subject to adjustment only (a) with approval by act of the Alabama Legislature and by the County's voters under procedures set forth in Amendment No. 373 to the Alabama Constitution, or (b) through the ratification of Constitutional amendments proposed by the Alabama Legislature and applicable only to the County authorizing new or increased rates of *ad valorem* taxation. Although actions previously taken by the County as permitted under Amendment No. 373 currently authorize the levy in the County of *ad valorem* property taxes for the benefit of the General Fund at the total rate of 5.6 mills per dollar of assessed property value (and for other earmarked non-General Fund purposes at the rate of 7.9 mills per dollar of assessed value), the County currently possesses no unutilized Constitutional or voter-authorized authority to levy *ad valorem* taxes in addition to, or to increase the rates of any of, the property taxes now being levied by the County, whether for the benefit of the General Fund or otherwise.

In respect of other types of County-levied taxes, such as the Occupational Tax formerly levied by the County and the business license taxes, transient occupancy taxes, sales, use, and other excise taxes currently levied by the County, the County is restricted in its ability to levy and to raise the rates of those taxes by the terms and conditions of the specific legislative acts providing authorizations therefore, some of which acts are applicable to all counties in the State of Alabama pursuant to general laws enacted by the Alabama Legislature and others of which are made applicable specifically to the County through the enactment by the Alabama Legislature of "local laws" relating only to the County.

For a discussion of postpetition efforts to cause the Alabama Legislature to restore the Occupational Tax, *see* Section IV.Q.1 below.

## 2. Prepetition Cost Cutting Measures

Independent of its efforts to persuade the Alabama Legislature to pass legislation to help the County with its revenue problems, the newly-elected members of the County Commission made drastic cuts in the County's expenditures in an attempt to compensate for the loss of the Occupational Tax. The prepetition spending cuts affected nearly every County department and resulted in sweeping reductions in basic services. In the first few months of 2011, the County Commission reviewed the budget approved by the previous County Commission to look for ways to reduce expenditures without laying off employees. The County Commission identified and promptly implemented measures to reduce the County's expenditures by over $30 million on an annualized basis, trimming $22.3 million in budgeted expenses from the general operating fund, $4.2 million from the capital projects fund, and $3.9 million from the budget for the County-operated hospital Cooper Green.

Even after these cuts were made, the County still faced a significant operating deficit due to the loss of the Occupational Tax revenues. The County Commission again took action. In June 2011, the County placed approximately 500 employees on leave without pay and eliminated approximately 160 remaining vacant positions, trimming over $11 million from the County's annual general fund budget. The County Commission also made cuts to various contracts with outside vendors and suppliers, resulting in additional annualized savings of approximately $1.0 million.

During the year prior to the Petition Date, the County implemented numerous cost-cutting measures, including: (a) all Sheriff's department employees were placed on a reduced workweek; (b) curtailment of generally all of the Sheriff's law enforcement actions, including responding to traffic accidents; (c) cessation of most street paving and all roadside mowing; (d) significant reductions in maintenance on all County buildings; (e) substantial reductions in security services at County courthouses, resulting in stop-gap funding for security at criminal, domestic relations, and family courts; (f) closure of the County's four satellite courthouse locations and consolidation of services at the Birmingham courthouse; (g) termination of all non-essential County contracts; (h) strict monitoring and restriction of overtime; (i) strict monitoring and restriction of discretionary expenditures; (j) strict implementation of a hiring freeze with exceptions made only when critical need was demonstrated; and (k) formation of an internal investment committee to replace external investment advisory services.

## 3. The April 27, 2011 Tornadoes and the County's Clean-Up Costs

On April 27, 2011, communities throughout the County were devastated when numerous tornadoes tore through the region. More than 20 people were killed by these tornadoes.

The County Commission authorized the usage of up to $25.0 million of the County's remaining operating reserves to finance storm clean-up. As of the Petition Date, the County had drawn $20.0 million from its operating reserve to fund those efforts, of which approximately $7.3 million had been reimbursed by the Federal Emergency Management Agency. The unexpected and substantial costs of the storm cleanup further strained the County's prepetition cash position.

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 113 of 251

### 4. The Financial Problems of the Sewer System Result in Substantial Claims Against the County's General Fund

The County's Sewer Warrants are non-recourse debts for which the County's General Fund has no repayment obligation. Nevertheless, the financial problems associated with the Sewer System impacted the County's General Fund, causing claims against the General Fund to be asserted or accelerated prepetition. These claims include the following:

• $105.0 million of the County's outstanding Series 2001-B GO Warrants, which warrants were otherwise due to mature in 2021, became subject to an accelerated repayment schedule requiring repayment in full by March 15, 2011. The County's liability for the accelerated Series 2001-B GO Warrants significantly exceeded the balance of the County's General Fund reserves as of the Petition Date. *See* Section III.D.4.a above for further discussion of the Series 2001-B GO Warrants;

• The demand made upon the County's General Fund by the Receiver for the payment of over $75 million received by the County from JPMS in connection with or pursuant to undertakings referenced in the JPMorgan SEC Settlement. *See* Section III.E.9 above for further discussion;

• The assertion of claims and counterclaims against the County by certain Sewer Warrant Insurers and holders of Sewer Warrants, alleging that the County's alleged improper conduct with respect to the Sewer Warrants was chargeable against the County's General Fund. *See* Sections III.E.4, III.E.5, and III.E.6 above for further discussion; and

• Claims for substantial legal fees incurred by the County defending claims relating to the Sewer Warrants and the Sewer System.

### 5. Sewer System Debt Crisis

#### a. EPA Consent Decree

The County's financial distress related to its Sewer System can be traced back to the entry of the EPA Consent Decree in 1996. As explained in more detail in Section III.B.2 above, the EPA Consent Decree imposed stringent requirements on the County, both with respect to the scope of the work to be done and the timetable for performing such tasks. Although initial projections of the cost of implementation ranged between $250 million and $1.2 billion, the ultimate cost was far higher. Under the EPA Consent Decree, the County assumed responsibility for a consolidated Sewer System serving twenty-one municipalities, whose sewer lines generally were in worse condition than the parties to the EPA Consent Decree anticipated. Contracting inefficiencies, certain engineering decisions, and the corruption of certain public officials contributed to the increased cost of the Sewer System. As a result of these and other factors, the overall debt associated with the improvements to the Sewer System and related financing exceeded $3.1 billion in principal as of the Petition Date.

89

### b.    The Sewer System's Debt Structure

Of the series of Sewer Warrants issued in 2002 and 2003 that are currently outstanding, nearly 95% were issued either as variable rate demand warrants or auction rate warrants. The County's variable rate demand warrants set forth the timing and terms and conditions upon which the rate of interest would adjust. For some of the County's variable rate demand warrants, the rate of interest was to adjust daily. For others, the rate of interest was to adjust weekly. The County's auction rate warrants provide that such warrants were to be sold by "Dutch auction" on a set schedule (generally every week or every five weeks), with the auction process to determine the interest rate for the warrants until the next auction. If an auction failed, the holders of the warrants would become entitled to a penalty rate of interest that compensates the holders for their inability to sell.

As more particularly described in Section III.D.1 above, because of the risk of fluctuations in interest rates, the variable rate demand Sewer Warrants and auction rate Sewer Warrants often were credit-enhanced by standby warrant purchase agreements, bond insurance, or both. Pursuant to the Standby Sewer Warrant Purchase Agreements, certain financial institutions agreed to purchase such variable rate demand warrants from the original warrantholders under certain conditions. Additionally, the Sewer Warrant Insurers issued the Sewer Wrap Policies insuring the payment of regularly scheduled principal and interest due on Sewer Warrants. The County entered into Sewer Swap Agreements to create a "synthetic" fixed interest rate with respect to the variable rate and auction rate Sewer Warrants. For a period, payments to the County from the counterparties to the Sewer Swap Agreements were sufficient to cover the interest rates as reset under the variable rate demand Sewer Warrants and auction rate Sewer Warrants, achieving the desired "synthetic" fixed interest rate the County sought. Later, that did not prove to be the case.

### c.    Triggering Events Related to Sewer System Crisis

Until February 2008, the County paid all principal and interest on the Sewer Warrants as and when due. However, as discussed in Section III.B.4 above, a series of unexpected events in the financial markets caused the County's obligations under the Sewer Warrants to mature on an expedited basis and to increase markedly.

In addition to the events described in Section III.B.4 above, the Sewer Swap Agreements associated with the Sewer Warrants did not perform as expected. The variable rates paid to the County by the swap providers under the Sewer Swap Agreements were intended to move in tandem with, and roughly match, the variable interest rates payable by the County on the Sewer Warrants. However, as a result of failed bond auctions and ratings downgrades in early 2008, the applicable interest rates on the variable rate and auction rate Sewer Warrants increased dramatically. At the same time, the LIBOR and SIFMA Index fell. As a consequence of this divergence in interest rates, the Sewer Swap Agreements had the opposite of their intended effect. Moreover, as a result of the downgrade of the County's underlying rating on the Sewer Warrants and the failure of the County to execute and deliver collateral agreements or to obtain an insurance policy, one or more termination events occurred under each of the Sewer Swap Agreements.

90

All Sewer Swap Agreements were terminated prepetition, triggering Sewer Swap Agreement Claims for termination fees asserted to be in excess of $100 million in the aggregate.

### d.    Litigation and Appointment of Receiver

#### i.    The State Court Receivership Action

As discussed above in Section III.E.3, the State Court appointed the Receiver in the State Court Receivership Action by entry of the Receiver Order on September 22, 2010.

On June 14, 2011, the Receiver published its First Interim Report on Finances, Operations, and Rates of the Jefferson County Sewer System. In that report, the Receiver announced its intention to increase System Revenues by 25%, through the levying of a monthly service charge on all Sewer System customers, increases of the Sewer System's volumetric rates, and increasing certain surcharges.

On July 8, 2011, the State Court entered a further order directing the County to provide the Receiver signature authority over all existing bank accounts relating to the Sewer System and any other Cash Equivalent Assets (as that term is defined in the Receiver Order) of the Sewer System.

Following the Receiver's proposed rate increases, the Attorney General filed a motion to intervene in the State Court Receivership Action. On July 25, 2011, the State Court granted the Attorney General's motion.

#### ii.    Ratepayer Litigation

Prior to the Petition Date, a putative class of ratepayers commenced the Wilson Action, suing the County for, among other things, a declaration that the County's volumetric sewer rates were unreasonably and unlawfully high, and that the Sewer Warrant Indenture was void. The plaintiffs in the Wilson Action sought opposite relief from that pursued by the Sewer Warrant Trustee in its prepetition lawsuits, arguing for the reduction, rather than the increase, of existing sewer rates. For more information about the Wilson Action, *see* Sections III.E.1 and IV.H.1 of this Disclosure Statement.

### e.    Negotiations Regarding the Restructuring of the Sewer Warrants

Starting in February 2008 and continuing through the Petition Date, the County negotiated with the Sewer Warrant Trustee, holders of the majority of the Sewer Warrants, and the Sewer Warrant Insurers (collectively, the "Sewer Warrant Creditors"). At various times, Governors Bob Riley and Robert Bentley, Attorney General Luther Strange, the Receiver, and others participated in these negotiations. For a variety of different reasons, however, these prepetition negotiations between the County and the Sewer Warrant Creditors did not result in a consummated settlement.

### 6.    Accelerated Obligations Under General Obligation Warrants

Although the Sewer Warrants are non-recourse obligations, the problems with those warrants nevertheless had an adverse financial effect on the County's General Fund obligations. Within two

91

months of the onset of the financial crisis associated with the Sewer Warrants, the County's Series 2001-B GO Warrants were tendered to the County's liquidity providers for purchase pursuant to the Standby GO Warrant Purchase Agreement as a result of credit downgrades of the County.  Pursuant to the Standby GO Warrant Purchase Agreement, JPMorgan Chase and Bayerische Landesbank (formerly known as Bayerische Landesbank Girozentrale) (together, the "Series 2001-B GO Warrant Liquidity Providers") purchased prepetition approximately $119.25 million in tendered Series 2001-B GO Warrants.  Pursuant to the Standby GO Warrant Purchase Agreement, the County was thereafter required to redeem the tendered Series 2001-B GO Warrants in six equal semiannual installments in the amount of $19.79 million each, beginning on September 15, 2008 and continuing through March 15, 2011.

On September 15, 2008, the County, in an attempt to limit draws on its General Fund, entered into a forbearance agreement with the Series 2001-B GO Warrant Liquidity Providers.  The forbearance agreement was extended again on September 30, 2008 and October 7, 2008.  In connection with an October 31, 2008 extension of the forbearance agreement, the County made a partial principal payment of $10.0 million with respect to the Series 2001-B GO Warrants.  In connection with a January 15, 2009 extension of the forbearance agreement, the County made a partial principal payment of $5.0 million with respect to the Series 2001-B GO Warrants.  The County and the Series 2001-B GO Warrant Liquidity Providers extended the forbearance agreement on March 12, 2009, and the forbearance agreement expired on June 20, 2009 with no further extensions.

Under the accelerated repayment schedule set forth in the Standby GO Warrant Purchase Agreement, the outstanding principal balance owing under the Series 2001-B GO Warrants totaled approximately $105 million as of the Petition Date.  The County did not have sufficient cash to pay the debt then due under the Series 2001-B GO Warrants while also maintaining basic services to its citizens.

### 7.     The Decision to File for Chapter 9

The County struggled on multiple fronts for over three and a half years to avoid filing for chapter 9.  Notwithstanding those efforts, the County eventually concluded that its non-bankruptcy efforts would not resolve the County's myriad financial problems.

Accordingly, the County Commission met on November 9, 2011 to consider its options.  By a majority vote, the County Commission authorized the County to file its chapter 9 petition as a means to continue providing essential services to the County's residents and to seek adjustment of the County's debts before the Bankruptcy Court.

## IV.
## OVERVIEW OF THE CHAPTER 9 CASE

As previously discussed, the County filed a voluntary petition under chapter 9 of the Bankruptcy Code on the Petition Date, thereby commencing the Case.  The following sections describe significant events that have occurred in the Case or in related litigations.

92

## A.    Receiver-Stay Litigation

On the second day of the Case, the Receiver and the Sewer Warrant Trustee filed emergency motions seeking expedited determinations that, among other things, (1) the automatic bankruptcy stays did not apply to the Receiver's continued operation and administration of the Sewer System for various reasons or (2) "cause" existed to grant relief from the automatic stays to allow the Receiver to continue to operate and administer the Sewer System (together, the "Receiver-Stay Motions"). Various other parties, including certain of the Sewer Warrant Insurers, the Standby Sewer Warrant Purchase Agreement providers, and other parties in interest, filed joinders or statements in support of the Receiver-Stay Motions.

The County opposed the Receiver-Stay Motions.  After an evidentiary hearing, the Bankruptcy Court ruled that "[w]ith one exception, the automatic stays of 11 U.S.C. § 362(a) and 11 U.S.C. § 922(a) prevent the Indenture Trustee and the Receiver from taking further actions in the [State Court Receivership Action] and with respect to the County's sewer system properties."  The exception related to Bankruptcy Code section 922(d), which the Bankruptcy Court held requires the County to pay over to the Sewer Warrant Trustee postpetition net System Revenues for payment on the Sewer Warrants.  Additionally, the Bankruptcy Court concluded that "cause" had not been shown for relief from stay.

After notices of appeal were filed by various parties (including the County), the Bankruptcy Court certified its ruling for direct appeal to the United States Court of Appeals for the Eleventh Circuit, which thereafter agreed to hear the appeals.

The parties completed their respective briefing before the Eleventh Circuit (on both the creditors' appeal and the County's cross-appeal).  The consolidated appeals were set for oral argument during the week of July 22, 2013.  On June 10, 2013, in accordance with the Sewer Plan Support Agreements, the County and the parties that were Sewer Plan Support Parties, requested that the Court of Appeals postpone the oral argument and hold the appeal in abeyance.  By order entered June 19, 2013, the Court of Appeals entered an order granting the parties' request to postpone oral argument and to hold the appeal in abeyance until January 15, 2014.

## B.    Eligibility Litigation

Bankruptcy Code section 109(c) sets forth five elements that must be met for an entity to be eligible as a debtor under chapter 9 of the Bankruptcy Code.  More specifically, such entity is eligible if and only if such entity: (1) is a municipality; (2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under State law, or by a governmental officer or organization empowered by state law to authorize such entity to be a debtor under chapter 9; (3) is insolvent; (4) desires to effect a plan to adjust such debts; and (5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a chapter 9 plan; (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a chapter 9 plan; (C) is unable to negotiate with creditors because such negotiation is impracticable; or (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under Bankruptcy Code section 547.

93

On the Petition Date, the County filed a memorandum setting forth various historical information and the bases for the County's conclusion that it is qualified to be a chapter 9 debtor under Bankruptcy Code section 109(c). Various parties objected to the County's eligibility to file for chapter 9, including the Receiver, the Sewer Warrant Trustee, certain of the Sewer Warrant Insurers, the Standby Sewer Warrant Purchase Agreement providers, and other parties in interest. With one minor exception, the exclusive foundation for all of the objections was that the County was not authorized to file chapter 9 under Alabama Code section 11-81-3, and therefore could not satisfy the condition set forth in Bankruptcy Code section 109(c)(2).

On March 4, 2012, the Bankruptcy Court issued its Memorandum Opinion on Eligibility of Jefferson County, Alabama Under 11 U.S.C. § 109(c), reported as *In re Jefferson County*, 469 B.R. 92 (Bankr. N.D. Ala. 2012) (the "Eligibility Opinion"). In the Eligibility Opinion, the Bankruptcy Court held that the County had demonstrated that it met all of the requirements of Bankruptcy Code section 109(c) and was therefore eligible to proceed as a municipal debtor in a chapter 9 bankruptcy case. The Bankruptcy Court's March 4, 2012 Order on Eligibility of Jefferson County, Alabama as a Debtor under 11 U.S.C. § 109(c)(1)-(5) also provided that it constituted an order for relief under Bankruptcy Code section 921(d) and all other relevant provisions of the Bankruptcy Code.

Various of the objecting parties filed notices of appeal of the Eligibility Opinion and associated order to the District Court. The objecting parties also filed motions for leave to appeal, which the District Court granted. The District Court subsequently stayed the appeals for thirty (30) days pending a decision by the Supreme Court of Alabama in the pending case *City of Prichard v. Balzer*, No. 1100950. On April 20, 2012, the Supreme Court of Alabama released its decision in the *City of Prichard* case, holding that "[i]t is clear that the legislature intended to authorize *every* county, city, town, and municipal authority organized pursuant to Article 9, Chapter 47 of Title 11, Ala. Code 1975, to file for federal bankruptcy protection" and that Alabama Code section 11-81-3 "does not require that an Alabama municipality have indebtedness in the form of refunding bonds or funding bonds as a condition to eligibility to proceed under Chapter 9 of" the Bankruptcy Code. *City of Prichard v. Balzer*, 95 So. 3d 1, 6 (Ala. 2012).

In the wake of the *Prichard* opinion, the objecting appellants filed motions to dismiss their appeals of the Eligibility Opinion and associated order, which motions the District Court granted. As a result of the dismissal of these appeals, the Eligibility Opinion and associated order have become final rulings of the Bankruptcy Court.

## C.     Net Revenues Litigation

Although the Bankruptcy Court's opinion regarding the Receiver-Stay Motions held that the County must continue to pay over net System Revenues to the Sewer Warrant Trustee for continued payment on the Sewer Warrants, the opinion did not address the extent to which amounts could be deducted from net System Revenues, either as "Operating Expenses" under the Sewer Warrant Indenture or as "necessary operating expenses" under Bankruptcy Code section 928(b).

Various issues regarding the amounts that could be deducted from net System Revenues were litigated in the context of *Bank of New York Mellon v. Jefferson County (In re Jefferson County)*, Adversary Proceeding No. 12-00016-TBB (the "Net Revenues Adversary Proceeding"). The Net

94

Revenues Adversary Proceeding was commenced when the Sewer Warrant Trustee filed an adversary complaint against the County, which was subsequently amended to add certain of the Standby Sewer Warrant Purchase Agreement providers and the Sewer Warrant Insurers as plaintiffs. In addition, FGIC filed a complaint in intervention against the County, and the County filed counterclaims.

The Bankruptcy Court severed three counts of the plaintiffs' complaint and the County's counterclaims into a separate adversary proceeding (see discussion of the "Severed Sewer Adversary Proceeding" below). After a trial on the plaintiffs' remaining counts,, the Bankruptcy Court issued its *Memorandum Opinion On Net Revenues And Applicability of 11 U.S.C. § 928(b)*, reported as *Bank of New York Mellon v. Jefferson County (In re Jefferson County)*, 474 B.R. 725 (Bankr. N.D. Ala. 2012) (the "Net Revenues Opinion"). In the Net Revenues Opinion, the Bankruptcy Court analyzed whether certain expenditures were payable prior to debt service, either as Operating Expenses under the Sewer Warrant Indenture or pursuant to Bankruptcy Code section 928(b); the opinion concludes with the following summary of the Bankruptcy Court's ruling:

> Operating Expenses as determined under the Indenture do not include (1) a reserve for depreciation, amortization, or future expenditures, or (2) an estimate for professional fees and expenses. At the end of each monthly period, as is determined under the Indenture, the monies remaining in the Revenue Account following payment of the Operating Expenses that were (1) incurred in the then current month or any prior month and (2) due and payable in the then current month or a prior month are to be remitted in the priority and manner as set forth in Article XI of the Indenture without withholding of any monies for depreciation, amortization, reserves, or estimated expenditures that are the subject of this litigation. Additionally, 11 U.S.C. § 928(b) is inapplicable to the pledge of revenues under the Indenture and the distributive scheme in Article XI of the Indenture.

The Net Revenues Opinion did not address the County's entitlement to deduct from System Revenues sewer-related professional fees and expenses actually incurred in connection with the Case. The Bankruptcy Court subsequently entered an order (1) determining to decide by separate order the issue of actually-incurred professional fees and expenses based on the testimony from the evidentiary hearing and the post-hearing briefs submitted by the parties; (2) finding that there was "no just reason for delay … in the entry of a final appealable judgment in [the Net Revenues Adversary Proceeding]"; and (3) entering partial final judgment in favor of the plaintiffs in the Net Revenues Adversary Proceeding.

The County appealed the Net Revenues Ruling, and the matter was once again certified to and accepted by the Eleventh Circuit as a direct appeal, pending as docket No. 13-10348-BB. On June 20, 2013, the County, FGIC, JPMorgan Chase, Syncora, Assured, The Bank of New York Mellon, as liquidity bank, and State Street Bank and Trust Company moved to stay the appeal. On June 21, 2013 the Eleventh Circuit granted the parties' motion and stayed further proceedings (including the filing of the County's appellate reply brief) until January 15, 2014.

On June 12, 2013, in accordance with the Sewer Plan Support Agreements, the County filed a motion to stay all proceedings in the Net Revenues Adversary Proceeding, with certain limited

95

exceptions concerning the issuance and appeal of the Court's ruling on the attorneys' fee issue. On June 28, 2013, the Bankruptcy Court entered an order granting the County's motion (the "Net Revenues Adversary Proceeding Stay Order").

The Bankruptcy Court issued its *Memorandum Opinion on Professional Fees and Expenses, the Indenture's Operating Expenses, and 11 U.S.C. § 928(b)'s "Necessary Operating Expenses"* on June 27, 2013, and its amended *Memorandum Opinion on Professional Fees and Expenses, the Indenture's Operating Expenses, and 11 U.S.C. § 928(b)'s "Necessary Operating Expenses"* on July 3, 2013 (the "Fee Opinion"). In the Fee Opinion, the Bankruptcy Court clarified certain aspects of the Net Revenues Opinion in the process of analyzing the County's entitlement to deduct from System Revenues sewer-related professional fees and expenses actually incurred in connection with the Case. The Bankruptcy Court ultimately concluded "that for the Joint Submission categories [of professional fees] as either Operating Expenses under the Indenture or as 'necessary operating expenses' for § 928(b) subordination purposes, all of the Joint Submission categories of Professional Fees are permitted to be paid ahead of interest and principal to the [holders of the Sewer Warrants]." The Fee Opinion did not resolve certain objections that had been pursued by the Sewer Warrant Trustee, including that insufficient information had been provided about the amount and nature of the County's professional fees to allow for an evaluation of whether such fees were reasonable; instead, the Bankruptcy Court noted that "these contentions by the [Sewer Warrant] Trustee are not capable of resolution at this time and as part of this adversary proceeding," and accordingly dismissed such objections without prejudice (in the process observing that they "hopefully, need not be addressed by this Court on another day in another proceeding"). On July 11, 2013, consistent with the terms of the Net Revenues Adversary Proceeding Stay Order and the Sewer Plan Support Agreements, the Sewer Warrant Trustee and other parties in interest filed with the Bankruptcy Court a consolidated notice of appeal of the Fee Opinion. In response, on July 12, 2013, the Clerk of the Bankruptcy Court entered a notice of deficient filing, stating that "[n]o order has been entered and the Notice of Appeal is premature." On that same day, the Clerk of the Bankruptcy Court also made an entry on the docket that stated: "matters docketed in error as no order has been entered and the Notice of Appeal was premature. (RE: related document(s) [198] Service of Notice of Appeal by Court, [199] Notice to Parties Regarding Designations)." The parties have agreed not to take any further action on the potential appeal unless: (i) such action is consistent with the terms of the Net Revenues Adversary Proceeding Stay Order and the Sewer Plan Support Agreements, (ii) the party believes action is necessitated by further action by either the Bankruptcy Court or the District Court (including the entry of an order with respect to the Fee Opinion), or (iii) the party believes action is necessary to preserve the appeal. Notwithstanding the Fee Opinion, the Sewer Plan Support Agreements and the Plan provide that the Accumulated Sewer Revenues will be distributed under the Plan without deducting any amounts that may be subject to deduction as "Operating Expenses" under the Sewer Warrant Indenture as a result of the ruling by the Bankruptcy Court in the Net Revenues Adversary Proceeding.

By order dated June 28, 2013, the Bankruptcy Court stayed all proceedings in the Net Revenues Adversary Proceeding, with the aforementioned limited exceptions, until the earlier of (1) the Effective Date of the Plan, or the effective date of some other chapter 9 plan of adjustment that incorporates the provisions of and is otherwise materially consistent with the Sewer Plan Support Agreements, and (2) the date of termination of any Sewer Plan Support Agreement.

### D.    Severed Sewer Adversary Proceeding

As referenced above, the Bankruptcy Court severed three of the plaintiffs' counts, as well as the County's counterclaims, from the Net Revenues Adversary Proceeding and into a separate adversary proceeding. That severed adversary proceeding remains pending before the Bankruptcy Court as *Bank of New York Mellon v. Jefferson County (In re Jefferson County)*, Adversary Proceeding No. 12-00067-TBB (the "Severed Sewer Adversary Proceeding"). The portions of the Severed Sewer Adversary Proceeding consisting of claims made by the plaintiffs against the County were stayed pending disposition of the Net Revenues Appeal.

At issue in the Severed Sewer Adversary Proceeding are three counterclaims (the "Fund Ownership Counterclaims") seeking declaratory relief pursuant to 28 U.S.C. §§ 1334(e)(1) & 2201(a) with respect to the following funds: (1) the Released Escrow Funds; (2) the 2005 Construction Fund; and (3) Supplemental Transactions Fund. More specifically, the County sought a determination from the Bankruptcy Court that it owns each of these funds free and clear of any lien, pledge or other property interest.

The County filed a *Motion For Summary Judgment On The County's Counterclaim*, arguing that none of the funds at issue in the Fund Ownership Counterclaims were the subject of any of the granting clauses in the Sewer Warrant Indenture. The County also argued that the Released Escrow Funds and the Supplemental Transactions Fund were not delivered to or deposited with the Sewer Warrant Trustee, and that the 2005 Construction Fund was not delivered to or deposited with the Sewer Warrant Trustee "as additional security" (Sewer Warrant Indenture § 2.1(III)), but rather was to be returned to the County when the County exercised its right to replace the Sewer Reserve Fund with the Syncora DSRF Policy and the Assured DSRF Policy. The County further argued that section 13.3 of the Sewer Warrant Indenture did not expand the granting clauses in section 2.1, and that the Receiver Order did not create any interest in property beyond those created by the Sewer Warrant Indenture.

In response, the plaintiffs/counterclaim defendants in the Severed Sewer Adversary Proceeding filed a cross-motion for summary judgment. The plaintiffs argued that the Sewer Warrant Trustee had a lien on the disputed funds under sections 2.1 and 14.7 of the Sewer Warrant Indenture, and that there was a statutory lien on the funds pursuant to Chapter 28, Title 11 of the Alabama Code, and that regardless of any lien, the funds were restricted. In addition, the plaintiffs argued that the Receiver Order found that the Sewer Warrant Trustee had a first-priority lien on all "Funds of the [Sewer] System" in its possession, and that the County was barred by *res judicata* from challenging that finding.

The Bankruptcy Court heard oral argument on the parties' cross motions for summary judgment. No ruling has been issued. On June 12, 2013, in accordance with the Sewer Plan Support Agreements, the County filed a motion to stay all proceedings in the Severed Sewer Adversary Proceeding, including any ruling on the parties' cross motions for summary judgment. By order dated June 28, 2013, the Bankruptcy Court stayed all proceedings in the Severed Sewer Adversary Proceeding until the earlier of (1) the Effective Date of the Plan, or the effective date of some other chapter 9 plan of adjustment that incorporates the provisions of and is otherwise materially

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 122 of 251

consistent with the Sewer Plan Support Agreements, and (2) the date of termination of any Sewer Plan Support Agreement.

**E.     The Rate-Related Stay Relief Motions**

In March 2012, FGIC filed a Motion to Lift or Condition the Automatic Stay.  FGIC sought either (1) relief from the stay to allow the Receiver to set new sewer rates or (2) an order conditioning the continuance of the automatic stay on the County's raising sewer rates by July 1, 2012.  The County objected to FGIC's motion.  After a hearing thereon, the Court entered an interim order requiring the County to file status reports "concerning the sewer ratemaking process" every 45 days.  FGIC's motion was continued.

The County filed status reports in compliance with the Court's order, setting out the County's ratemaking progress.  Among other things, during the summer of 2012, the County held three public hearings and, on November 6, 2012, the County Commission adopted a sewer rate structure proposed by the County's utility system consultant Eric Rothstein, a principal of the Galardi Rothstein Group ("Mr. Rothstein").

On November 5, 2012, the Sewer Warrant Trustee filed a motion seeking relief from the automatic stays to pursue litigation for the purpose of increasing the County's sewer rates.  FGIC requested further hearings on its pending motion for relief from stay.  Soon thereafter, holders of a substantial amount of the Sewer Warrants (the "Ad Hoc Sewer Warrantholders") and Assured each filed motions for relief from stay articulating different bases for such relief.  These stay-relief motions are referred to collectively as the "Rate-Related Stay Relief Motions."

The Rate-Related Stay Relief Motions alleged that the County's sewer rates did not comply with the Sewer Warrant Indenture, Alabama law, or the County's obligations under the Bankruptcy Code.  The County filed a Preliminary Opposition to the Rate Relief Motions, asserting that the County Commission's rates were presumptively valid under applicable law and that the County's newly-adopted rates complied with the County's obligations under both Alabama and bankruptcy law.

An evidentiary hearing on the Rate-Related Stay Relief Motions was held during the first half of 2013.  The Bankruptcy Court has not ruled on the Rate-Related Stay Relief Motions.

On June 12, 2013, in accordance with the Sewer Plan Support Agreements, the County filed a motion to stay all proceedings on the Rate-Related Stay Relief Motions, including any ruling on the Rate-Related Stay Relief Motions.  By order dated June 28, 2013, the Bankruptcy Court stayed all proceedings on the Rate-Related Stay Relief Motions until the earlier of (1) the Effective Date of the Plan, or the effective date of some other chapter 9 plan of adjustment that incorporates the provisions of and is otherwise materially consistent with the Sewer Plan Support Agreements, and (2) the date of termination of any Sewer Plan Support Agreement.

**F.      Adversary Proceeding Commenced by the Sewer Warrant Trustee Against the County, Syncora, and Assured**

Without forbearances from certain holders of the Bank Warrants to permit regularly scheduled principal payments to be made on other series of Sewer Warrants, the Sewer Warrant Trustee filed a complaint for declaratory relief in the Bankruptcy Court, naming the County, Syncora and Assured as defendants.[9]  The action is styled *The Bank of New York Mellon, as Indenture Trustee v. Jefferson County, Alabama, et al.*, Adversary Proceeding Number 13-00019-TBB (the "Declaratory Judgment Action").  In the complaint, the Sewer Warrant Trustee requests declaratory relief regarding the Sewer Warrant Trustee's rights and duties under the Sewer Warrant Indenture and statutory and constitutional law.  Among other relief, the Sewer Warrant Trustee (1) seeks authorization to accelerate, in its discretion, some of the Sewer Warrants, without accelerating certain Sewer Warrants insured by Assured and FGIC; (2) requests instructions regarding the application of funds received by the Sewer Warrant Trustee after acceleration of some, but not all, Sewer Warrants; (3) asks the Bankruptcy Court to consider whether, if an insurer is unable to perform its obligations under a Sewer DSRF Policy, the Sewer Warrant Trustee may make multiple draws on the Sewer DSRF Policies before drawing on the Sewer Wrap Policies; (4) seeks a declaration that reimbursement of amounts paid by the Sewer Warrant Insurers on account of draws on the Sewer DSRF Policies are subordinate to the payment of the Sewer Warrants; and (5) requests a declaration that obligations to honor draws under the Sewer Insurance Policies continue after all or certain of the Sewer Warrants have been accelerated.  The Sewer Warrant Trustee later dismissed, without prejudice, its claim for declaratory relief with respect to whether reimbursements of amounts paid by Sewer Warrant Insurers on account of draws upon the Sewer DSRF Policies are subordinate to the payment of Sewer Warrants.

The County timely answered the complaint in the Declaratory Judgment Action.  The County's answer includes the following assertions: (a) section 13.2(a) of the Sewer Warrant Indenture provides that the Sewer Warrant Trustee shall accelerate all Sewer Warrants upon the occurrence of a payment default under section 13.1(a), notwithstanding anything in the supplements to the Sewer Warrant Indenture or in the Sewer Warrants to the contrary; (b) any order or judgment in the adversary proceeding should be without prejudice to the County's rights regarding the proper characterization, allocation, or application of any funds disbursed by the Sewer Warrant Trustee, or otherwise received by any Sewer Warrant holder, after the first occurrence of an Event of Default under section 13.1(a) of the Sewer Warrant Indenture; (c) the County reserves all rights with respect to whether certain Sewer Warrant Insurer consent provisions contained in supplements to the Sewer Warrant Indenture may be exercised in a manner that overrides the mandatory acceleration provision of section 13.2(a) of the Sewer Warrant Indenture; (d) the entire indebtedness of the County to all the holders of Sewer Warrant was accelerated by the filing of the County's bankruptcy petition; (e) any order or judgment in the adversary proceeding should be without prejudice to the County's rights regarding the proper characterization, allocation, or application of any funds disbursed by the Sewer Warrant Trustee, or otherwise received by any Sewer Warrant holder, postpetition; (f) any and all reimbursements to Sewer Warrant Insurers for fees, expenses, claims and draws upon the

---

[9] The Sewer Warrant Trustee did not name FGIC as a defendant, presumably due to the pendency of the FGIC Rehabilitation Proceeding (as defined below).

Sewer DSRF Policies are contractually and statutorily subordinate to the payment of debt service on the Sewer Warrants; and (g) the Sewer Warrant Insurers' respective obligations to honor draws upon the Sewer DSRF Policies and the Sewer Wrap Policies continue after any or all of the Sewer Warrants have been accelerated.

In lieu of answering the Sewer Warrant Trustee's complaint, Assured moved to dismiss the Declaratory Judgment Action for lack for subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure and for failure to state a claim under Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure. Syncora also moved to dismiss the Declaratory Judgment Action, asserting that FGIC was a necessary and indispensable party to the Declaratory Judgment Action and that the Bankruptcy Court should dismiss the adversary proceeding if the FGIC Rehabilitation Proceeding (as such term is defined below) precluded FGIC's joinder in the action.

On June 28, 2013, the Bankruptcy Court entered an order in the Declaratory Judgment Action (the "Declaratory Judgment Action Order"). The Declaratory Judgment Action Order provides that: (1) the Declaratory Judgment Action is stayed; (2) the County will continue to pay to the Sewer Warrant Trustee on a monthly basis net revenues of the Sewer System (without deducting any additional amounts that may be subject to deduction as "Operating Expenses" under the Sewer Warrant Indenture as a result of any ruling by the Bankruptcy Court regarding pending disputes about actually incurred professional fees in the Net Revenues Adversary Proceeding); (3) the Sewer Warrant Trustee will not present any claims or seek to draw on any Sewer Wrap Policies or Sewer DSRF Policies; and (4) the Sewer Warrant Trustee shall not distribute sewer revenues to the holders of Sewer Warrants on account of obligations becoming due on or after February 1, 2013. The Declaratory Judgment Action Order states that the relief granted therein shall remain effective until the earlier of (1) the Effective Date of the Plan, or the effective date of some other chapter 9 plan of adjustment that incorporates the provisions of and is otherwise materially consistent with the Sewer Plan Support Agreements, and (2) the date of termination of any Sewer Plan Support Agreement.

## G. Litigation with the City of Birmingham and the Mayor regarding Cooper Green.

Cooper Green has been the subject of litigation between the County and the City of Birmingham (the "City") during the course of the chapter 9 Case. The City and Mayor William A. Bell, Sr. (the "Mayor") filed a complaint in State Court against the County Commission, seeking a declaratory judgment that the County Commission should be barred from closing Cooper Green. In response, the County filed an emergency motion to enforce the automatic stays, requesting entry of an order compelling the City and the Mayor to comply with the automatic stays of Bankruptcy Code sections 362(a) and 922(a).

The City and Mayor filed a Notice of Dismissal of their State Court lawsuit, without prejudice. After dismissing their lawsuit in State Court, the City and the Mayor then filed a motion with the Bankruptcy Court requesting relief from the automatic stays to file another complaint in State Court challenging the County Commission's decision to close the emergency room at Cooper Green. The City and Mayor also filed a complaint with the Bankruptcy Court, naming the County Commission and three County Commissioners as defendants in the complaint. The factual allegations and requested relief in the second complaint were almost identical to those in the original

100

complaint filed in State Court. The County filed a motion to dismiss the City's and the Mayor's complaint in the Bankruptcy Court.

The Bankruptcy Court entered an order and memorandum opinion, denying the City's and the Mayor's motion for relief. The Bankruptcy Court ruled that the automatic stays applied to the City's and the Mayor's proposed State Court action, and there was no cause for relief from the automatic stays. *See In re Jefferson County*, 484 B.R. 427 (Bankr. N.D. Ala. 2012). Among other things, the Bankruptcy Court ruled that the state law relied upon by the City and the Mayor, Alabama Code sections 22-21-290 to 22-21-297, does not require that the County operate a hospital. Based upon the same reasoning as the denial of stay relief, the Bankruptcy Court dismissed the City's and the Mayor's complaint against the County and the County Commissioners. The Bankruptcy Court's rulings on these issues have become final.

## H.    Other Adversary Proceedings

In addition to the Net Revenues Adversary Proceeding, the Severed Sewer Adversary Proceeding, and the Declaratory Judgment Action, there are other adversary proceedings that have been filed in connection with the Case, which are discussed in turn below.

### 1.    Wilson Adversary Proceeding

As discussed in Section III.E.1 above, FGIC removed one count of the Wilson Action to federal court, which had the effect of creating the Wilson Adversary Proceeding. The Bankruptcy Court has entered an order that the automatic stay of 11 U.S.C. § 362(a) applies to the Wilson Adversary Proceeding, thereby prohibiting the plaintiffs from engaging in discovery or otherwise pursuing the Wilson Adversary Proceeding without seeking relief from the automatic stay. Neither the Bankruptcy Court nor the parties have taken any subsequent action in the Wilson Adversary Proceeding.

The County maintains that the claims asserted in the Wilson Action and the Wilson Adversary Proceeding, to the extent they have any validity at all, are claims that rightfully belong to and can be brought and settled only by the County. The claims asserted in the Wilson Action and the Wilson Adversary Proceeding effectively seek to either have monies returned to the County or obtain declarations concerning the County's liabilities or lack thereof. The County – and not the plaintiffs in the Wilson Action and the Wilson Adversary Proceeding – has standing to pursue these claims. The County contends that the settlements, compromises, and validations contained in the Plan, including the validation and allowance of the Sewer Debt Claims, the amount of the New Sewer Warrants issued, and the validation of the Approved Rate Structure, will render the Wilson Adversary Proceeding and the remaining count in the Wilson Action pending in the State Court moot or otherwise resolved as of the Effective Date, and the County intends to have the Wilson Adversary Proceeding and the remaining count of the Wilson Action pending in the State Court dismissed in connection with confirmation of the Plan.

The plaintiffs in the Wilson Action disagree with the County's description of the Wilson Action provided above and elsewhere in the Disclosure Statement. Attached as Exhibit 12 and incorporated by reference is the Wilson Action plaintiffs' description of their claims. The County

disagrees with the characterizations in Exhibit 12. The parties reserve all rights, claims and defenses.

## 2. Bennett Action

On behalf of a putative class of individual and corporate sewer ratepayers of Jefferson County, fifteen named plaintiffs filed suit against the County and fourteen other defendants. The action was filed in the Bankruptcy Court and is styled *Bennett, et al. v. Jefferson County, Alabama, et al.*, Adversary Proceeding No. 12-00120 (the "Bennett Action").

The opening complaint in the Bennett Action[10] sought injunctive and declaratory relief, in addition to damages, on behalf of several putative classes of sewer customers. The County, named in the opening complaint only as a "nominal defendant," moved for a more definite statement of the claim and moved to strike the class allegations. Other defendants filed motions to dismiss detailing various shortcomings in the opening complaint. The plaintiffs voluntarily dismissed, with prejudice, six of the nine counts of their complaint. With respect to the remaining counts, the Bankruptcy Court entered orders granting the County's motion for a more definite statement and the County's motion to strike the class allegations, deeming moot the other defendants' various motions to dismiss, and giving plaintiffs time to file an amended complaint.

Plaintiffs filed their Second Amended Complaint For a Declaratory Judgment and Injunctive Relief on the Bankruptcy Court's deadline. This complaint named as defendants only the County and the Sewer Warrant Trustee. This complaint sought relief similar to that requested in the Wilson Adversary Proceeding, namely the entry of a declaratory judgment that certain series of Sewer Warrants were invalid because they violated the pre-issuance requirements of the Sewer Warrant Indenture and contravened the Alabama and United States Constitutions. Both the County and the Sewer Warrant Trustee responded to the Second Amended Complaint with motions to dismiss.

In its reply to the plaintiffs' brief, the County requested that the Bankruptcy Court stay the adversary proceeding pending confirmation of the County's Plan, on the grounds that confirmation likely will resolve or moot the adversary proceeding. The Bankruptcy Court granted the County's request and stayed the Bennett Action. The plaintiffs filed a motion for reconsideration of the Bankruptcy Court's order staying the adversary proceeding, which the Bankruptcy Court denied.

The County maintains that the claims asserted in the Bennett Action, to the extent they have any validity at all, are claims that rightfully belong to and can be brought and settled only by the County. The claims asserted in the Bennett Action effectively seek to either have monies returned to the County or obtain declarations concerning the County's liabilities or lack thereof. The County – and not the plaintiffs in the Bennett Action – has standing to pursue these claims. The County

---

[10] The opening complaint in the Bennett Action was the second attempt by the plaintiffs to state viable claims. In July 2012, the same plaintiffs had attempted to intervene in the Net Revenues Adversary Proceeding, filing a putative complaint and a motion to certify a class. The Bankruptcy Court denied permission to intervene in the Net Revenues Adversary Proceeding but granted leave to file a new complaint that became the Bennett Action.

contends that the settlements, compromises, and validations contained in the Plan, including the validation and allowance of the Sewer Debt Claims, the amount of the New Sewer Warrants issued, and the validation of the Approved Rate Structure, will render the Bennett Action moot or otherwise resolved as of the Effective Date, and the County intends to have the Bennett Action dismissed in connection with confirmation of the Plan.

The plaintiffs in the Bennett Action disagree with the County's description of the Bennett Action provided above and elsewhere in the Disclosure Statement. Attached as Exhibit 13 and incorporated by reference is the Bennett Action plaintiffs' description of their claims. The County disagrees with the characterizations in Exhibit 13. The parties reserve all rights, claims and defenses.

### 3. Moore Oil Adversary Proceeding

Moore Oil Co., Inc. ("Moore Oil") filed a complaint in the Bankruptcy Court against Jennifer Champion, as Treasurer of the County (the "Treasurer"), thereby commencing Adversary Proceeding No. 12-00060-TBB (the "Moore Oil Adversary Proceeding"). In its complaint, Moore Oil alleged that the Treasurer breached a constructive trust by failing to remit to Moore Oil excess bid proceeds from a tax sale and thereby caused damages to Moore Oil. The County moved to dismiss the Moore Oil Adversary Proceeding on the basis that the claims asserted therein were prepetition causes of action that should be handled through the bankruptcy claims administration procedures, not as a separate adversary proceeding. The Bankruptcy Court agreed and dismissed the Moore Oil Adversary Proceeding.

### 4. LBSF Adversary Proceeding

LBSF filed a complaint in the Bankruptcy Court against the Sewer Warrant Trustee and the County, thereby commencing Adversary Proceeding No. 12-00149-TBB (the "LBSF Adversary Proceeding"). In its complaint, LBSF requests that the Bankruptcy Court enter a judgment declaring the LBSF Periodic Payment Claim, in the alleged principal sum of $1,002,754.42 (exclusive of interest), stands in *pari passu* and in parity with debt service on the Sewer Warrants, and that the Sewer Warrant Trustee is obligated to make provision for payment to LBSF of that entire principal sum, plus interest.

LBSF, the Sewer Warrant Trustee, and the County entered into a joint stipulation providing that the County shall not be required to answer or further respond to the LBSF complaint, but shall be bound by any ruling in the LBSF Adversary Proceeding on the issue of whether the Sewer Warrant Trustee is required to treat "the periodic payment component of the Lehman debt," as described in the LBSF complaint, in parity with debt service on the Sewer Warrants. The County otherwise reserved all rights, claims, and defenses, including, without limitation, with respect to the allowance or treatment, in a plan or otherwise, of all Claims of LBSF against the County. The Sewer Warrant Trustee has filed its answer to the LBSF complaint, and the County understands that discovery is underway.

The County entered into a Sewer Plan Support Agreement with LBSF on July 23, 2013. That Sewer Plan Support Agreement provides for the settlement and resolution of the disputes in the

103

LBSF Adversary Proceeding under and pursuant to the Plan. More specifically, as contemplated by the referenced Sewer Plan Support Agreement, the Plan classifies any Claims arising from the Series 2002-C LB Sewer Swap, other than the LBSF Periodic Payment Claim, in Class 1-E among the Sewer Swap Agreement Claims; the LBSF Periodic Payment Claim is classified in Class 1-D among the Other Specified Sewer Claims. As part of the treatment of Allowed Class 1-D Claims, LBSF will receive a Cash recovery of $1,250,000.00 on the Effective Date in full, final, and complete settlement, satisfaction, release, and exchange of the LBSF Periodic Payment Claim and, consistent with the settlement of all Sewer Released Claims, the LBSF Adversary Proceeding will be resolved and dismissed with prejudice in connection with the Effective Date. As contemplated by the Sewer Plan Support Agreement, the County and LBSF intend to request that the Bankruptcy Court stay all proceedings in the LBSF Adversary Proceeding until the earlier of (a) the Effective Date of the Plan, or the effective date of some other chapter 9 plan of adjustment that incorporates the provisions of and is otherwise materially consistent with the Sewer Plan Support Agreement with LBSF, and (b) the date of termination of the Sewer Plan Support Agreement between the County and LBSF. The Sewer Warrant Trustee supports the requested stay.

### 5. Dr. Farah Adversary Proceeding

Dr. Ahmed Farah ("Dr. Farah") filed a complaint in the Bankruptcy Court against the County Commission and Tony Petelos, in his official capacity as County Manager (the "County Manager"), thereby commencing Adversary Proceeding No. 13-00002-TBB (the "Dr. Farah Adversary Proceeding"). In his complaint, Dr. Farah alleges that the County Commission and County Manager breached a Professional Services Agreement with Dr. Farah and were unjustly enriched by Dr. Farah's services at Cooper Green. The County Commission filed an answer and asserted counterclaims for breach of contract, indemnification, and a declaratory judgment that the Professional Services Agreement is unenforceable. The County Manager moved to dismiss Dr. Farah's complaint for failure to state a claim upon which relief may be granted. The Bankruptcy Court dismissed Dr. Farah's complaint against the County Manager. The County Commission approved a settlement of this matter, subject to execution of a release. The parties have consummated the settlement, and the Bankruptcy Court has entered an order dismissing the Dr. Farah Adversary Proceeding with prejudice.

### 6. Johnson Adversary Proceeding

Merrianne Johnson ("Johnson") filed a complaint against the County Commission in the United States District Court for the Middle District of Alabama (the "Middle District"). Johnson's complaint alleges employment discrimination in violation of Title VII of the Civil Rights Act. The County Commission filed a notice of bankruptcy in the lawsuit in January 2013, and the Middle District transferred Johnson's complaint to the District Court. The District Court referred Johnson's complaint to the Bankruptcy Court, thereby initiating Adversary Proceeding No. 13-00040-TBB (the "Johnson Adversary Proceeding"). The Bankruptcy Court stayed the Johnson Adversary Proceeding pending further order. Neither the Bankruptcy Court nor the parties have taken any subsequent action in the Johnson Adversary Proceeding.

104

## I.     Creditors' Claims

### 1.     The List of Creditors and the Bar Dates

On December 12, 2011, the County filed its original List of Creditors as required by Bankruptcy Code section 924. On April 23, 2012, the County amended its List of Creditors to add additional creditors. Pursuant to the List of Creditors, as amended, the County scheduled Claims as of the Petition Date totaling $4,616,790,649.30. This figure includes disputed and undisputed, contingent and non-contingent, and liquidated and unliquidated Claims. Of this amount, secured claims accounted for approximately $4,112,668,974, and unsecured claims accounted for approximately $504,121,675.

Following the entry by the Bankruptcy Court of the order for relief in the Case, the County moved the Bankruptcy Court to set the General Bar Date, the 503(b)(9) Bar Date, the Governmental Unit Bar Date, the Amended List Bar Date, and the Rejection Bar Date. By order dated April 6, 2012, the Bankruptcy Court set the following deadlines: June 4, 2012 as the General Bar Date; June 4, 2012 as the 503(b)(9) Bar Date; and August 31, 2012 as the Governmental Unit Bar Date (as amended, the "Bar Date Order"). Similarly, the Bankruptcy Court set the Amended List Bar Date and Rejection Bar Date by reference to any amendment to the County's List of Creditors and any Rejection Orders, respectively.

With the assistance of its claims and servicing agent, Kurtzman Carson Consultants LLC (the "Claims Agent"), the County caused the Bar Date Notice to be mailed to all parties on the List of Creditors. In addition, at the County's request, the Bankruptcy Court ordered The Depository Trust Corporation ("DTC") to provide the County with a listing of the names and address of institutional brokers and other customers that held, directly or indirectly, any of the County's GO Warrants, the School Warrants, the Sewer Warrants, and other debt instruments (the "Institutional Nominees"). DTC complied with this requirement and provided the County with the contact information for the Institutional Nominees. The County, again with the Claims Agent's assistance, served the Bar Date Notice on approximately 12,000 Institutional Nominees identified by DTC. In total, the Bar Date Notice was served by mail on over eighteen thousand (18,000) potential claimants. The County also published the Bar Date Notice in The Bond Buyer and The Birmingham News, the largest newspaper within the County.

As of the date of this Disclosure Statement, over 1,360 proofs of claim have been Filed, asserting Claims totaling in excess of $4.8 billion. Over 140 proofs of claim have been voluntarily withdrawn, representing over $500,000 in claims. Of the remaining proofs of claim, approximately 300 were Filed as unliquidated or in an unknown amount. The County believes that many of the Filed proofs of claim are overstated, are duplicative of other proofs of claims, or are not allowable under applicable law. For example, with respect to prepetition unsecured trade Claims, the County's List of Creditors listed trade claims totaling $3,683,281.24. Of that amount, the County disputed over $1.9 million of those Claims. During the course of its Case, the County has exercised its authority under Bankruptcy Code sections 903 and 904 to pay lawful trade Claims in the ordinary course of its operations to the extent those Claims were due to be Allowed. Accordingly, the County believes that it has paid substantially all of those prepetition unsecured trade Claims that are or were due to be Allowed and will amend its List of Creditors accordingly.

105

**THE COUNTY RESERVES ANY AND ALL RIGHTS, EXCEPT AS EXPRESSLY SETTLED, RELEASED, OR RESOLVED IN THE PLAN OR THE CONFIRMATION ORDER, TO OBJECT TO, DEFEND AGAINST, AND REQUEST DISALLOWANCE, REDUCTION, SUBORDINATION OR RECHARACTERIZATION OF ANY CLAIM ASSERTED AGAINST THE COUNTY OR ITS PROPERTY. THE COUNTY ANTICIPATES THAT SOME CLAIM OBJECTIONS WILL BE FILED AFTER CONFIRMATION OF THE PLAN.**

### 2. Claims Filed By the Institutional Nominees

A significant number of Institutional Nominees or purported individual holders filed proofs of claim to recover principal and interest allegedly due on their respective warrants. The County intends to object to all claims filed by Institutional Nominees or other individual holders for principal and interest on warrants as duplicative of those proofs of claim filed by the respective indenture trustees.

A very small minority of Institutional Nominees with respect to the County's warrants filed claims to recover purported losses on their investment, which allegedly occurred upon disposition of the County's warrants. All claims for damages arising from the purchase or sale of the County's warrants are subject to subordination pursuant to Bankruptcy Code section 510(b) and will receive the treatment provided for Class 9 (Subordinated Claims) under the Plan.

### 3. 503(b)(9) Claims

Bankruptcy Code section 503(b)(9) provides that the allowable "administrative expenses" in a bankruptcy case include "the value of any goods received by the debtor within 20 days before the date of commencement of a case under [the Bankruptcy Code] in which the goods have been sold to the debtor in the ordinary course of such debtor's business." Approximately 160 purported 503(b)(9) Claims have been filed against the County. The vast majority of 503(b)(9) Claims were filed by beneficial holders of the County's various outstanding warrants and are not for goods provided to the County within the twenty (20) days prior to the Petition Date. Other 503(b)(9) Claims were filed by certain of the County's trade creditors who have been or will be paid by the County in the ordinary course of its ongoing operations. Consequently, the County intends to object to most of the filed 503(b)(9) Claims and anticipates that the total 503(b)(9) Claims to be paid pursuant to the Plan will be less than $10,000.

### 4. Professional Fees

Pursuant to Bankruptcy Code section 943(b)(3), all amounts to be paid for services or expenses in the Case or incident to the Plan must be fully disclosed to the Bankruptcy Court and must be reasonable. There shall be paid to each holder of a Professional Fee Claim against the County in full, final, and complete settlement, satisfaction, release, and discharge of such Claim, Cash in an amount equal to the portion of such Professional Fee Claim that the Bankruptcy Court determines is reasonable on or as soon as is reasonably practicable following the date on which the Bankruptcy Court enters an order determining reasonableness. The County, in the ordinary course

106

of its business, and without the requirement for Bankruptcy Court approval, may pay for professional services rendered and expenses incurred following the Effective Date.

The County has paid the fees and expenses of its bankruptcy counsel, bond counsel, general outside counsel, and other professionals on a regular basis during the Case. Such fees are not subject to the Bankruptcy Court's review or approval, as Bankruptcy Code sections 327-331 do not apply in chapter 9 cases. In addition, the County does not believe that Bankruptcy Code section 943(b)(3) requires that any fees and expenses *previously paid* be subject to review or challenge based on reasonableness grounds. *Compare* 11 U.S.C. § 943(b)(2) (providing that "all amounts ***to be paid*** by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable" (emphasis added)), *with* 11 U.S.C. § 1129(a)(4) (providing that "[a]ny payment ***made or to be made*** by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable" (emphasis added)). Accordingly, the County intends to submit an estimate prior to the Confirmation Hearing of all amounts anticipated to be paid after the Confirmation Date and before the Effective Date for services or expenses in the Case or incident to the Plan and request that the Bankruptcy Court find that all such amounts are reasonable in connection with the confirmation of the Plan.

### 5.    Other Administrative Expense Claims

The Plan provides for an Administrative Claims Bar Date which shall be no more than ninety (90) calendar days after the Effective Date. Until the Administrative Claims Bar Date has passed, the County cannot provide a meaningful analysis of the Administrative Claims that will be filed or that will be paid pursuant to the Plan.

Many Persons that have already filed proofs of claim against the County asserted purported administrative expense or priority claims pursuant to various subsections of Bankruptcy Code section 507(a). However, section 507(a)(2) is the only applicable section of the Bankruptcy Code that provides for priority claims in chapter 9 cases. The County intends to object to all alleged priority Claims that are not entitled to priority under section 507(a)(2). To the extent such Claims are Allowed Claims and are not otherwise separately classified and treated in the Plan, such Claims will be treated as General Unsecured Claims under the Plan.

### 6.    General Unsecured Claims

Allowed General Unsecured Claims are classified in Class 6 under the Plan. The Plan defines a General Unsecured Claim as a Claim that is not an Administrative Claim, a Bessemer Lease Claim, a Board of Education Lease Debt Claim, a GO Debt Claim, an Other Unimpaired Claim, a Professional Fee Claim, a Secured Claim, a Special Revenues Claim, or a Subordinated Claim. Among the Claims specifically included in Class 6 under the Plan, to the extent they may be Allowed, are (a) the Asserted Full Recourse Sewer Claims, (b) Rejection Damage Claims, and (c) the Uninsured Portion of General Liability Claims.

107

The County believes that the total amount of General Unsecured Claims that are due to be Allowed is much smaller than the amount of unsecured Claims listed by the County in its List of Creditors that was Filed months ago in the Case or asserted in proofs of claims Filed in the Case. As discussed in Section IV.I.1 above, the County has paid postpetition many of the unsecured trade Claims that it had scheduled in its List of Creditors, substantially reducing the amount of Claims that would otherwise have been treated as Class 6 Claims under the Plan. In addition, although the Asserted Full Recourse Sewer Claims are classified among Class 6 General Unsecured Claims, the Plan provides that JPMS will waive and release any and all rights to receive any Distribution under the Plan on account of the JPMorgan Asserted Recourse Indemnification Claims upon the Effective Date of the Plan and that the Sewer Warrant Insurers similarly will waive and release any and all rights to receive any Distribution under the Plan on account of their Asserted Full Recourse Claims of the Sewer Warrant Insurers. The Plan further provides that no Distribution will be made on account of the Sewer Warrant Trustee's Asserted Recourse Claim.

With respect to Rejection Damage Claims, the landlords to the Satellite Courthouse leases have Filed proofs of claims for over $1.6 million in rejection damages. These are the only Rejection Damage Claims that have been asserted to date. The County believes that such Claims are or may be subject to reduction in accordance with Bankruptcy Code section 502(b)(6) and other defenses. The County is continuing its review of its executory contracts and unexpired leases and may reject additional contracts and unexpired leases in accordance with the provisions of the Bankruptcy Code and the Plan.

General Liability Claims, including personal injury Claims, civil rights Claims and other tort Claims, were asserted against the County. The County maintains general liability insurance which may provide coverage with respect to certain of these Claims. The County disputes liability for these Claims. To the extent such Claims are Allowed but insurance is not sufficient to pay such Claims in full, the claimants would hold General Unsecured Claims against the County.

The plaintiffs in the Bennett Action have filed a proof of Claim for $1,630,000,000. The plaintiffs in the Wilson Action have also filed a proof of claim in an unliquidated amount pursuant to which they assert the same claims asserted in the Wilson Action. The County disputes both of these Claims and believes that each of them is due to be disallowed in its entirety.

### 7.     Other Unimpaired Claims

Other Unimpaired Claims are classified in Class 8 of the Plan. These claims include any and all Consent Decree Claims, Deposit Refund Claims, Eminent Domain Claims, Employee Compensation Claims, OPEB Plan Claims, Pass-Through Obligation Claims, Retirement System Claims, Tax Abatement Agreement Claims, and Workers Compensation Claims. The Plan provides that, notwithstanding any other term or provision of the Plan, the legal, equitable, and contractual rights of the holders of Class 8 Claims are unaltered by the Plan, and the Plan leaves unaltered the legal, equitable, and contract rights of all Persons with respect to the Other Unimpaired Claims. Without limitation, pursuant to the Plan, the County retains all Causes of Action, defenses, deductions, assessments, setoffs, recoupment, and other rights under applicable nonbankruptcy law with respect to any Other Unimpaired Claims.

108

### 8. Claim Objections

Except as otherwise provided in Section 2.2(a) and 2.2(b) of the Plan (regarding allowance and payment of Administrative Claims), Section 4.14 of the Plan provides that objections to Claims shall be Filed and served upon the holders of the affected Claims no later than the Claims Objection Deadline: the date that is the later of (a) the first Business Day that is at least 180 days after the Effective Date, unless extended by the Bankruptcy Court, and (b) the first Business Day that is at least 180 days after the date on which a proof of claim in respect of a Claim against the Debtor has been Filed, unless extended by the Bankruptcy Court.

Other than with respect to Claims that are Allowed under the Plan or by order of the Bankruptcy Court, Creditors should assume that the County may File an objection to any proof of claim that differs in amount or priority from the amount or priority of Claim as listed on the List of Creditors, or if such Claim is listed as disputed, contingent, or unliquidated. <u>Therefore, in voting on the Plan, other than with respect to Claims that are treated as Allowed Claims under the Plan, no Creditor may rely on the absence of an objection to its proof of claim as any indication that the County will not object to the amount, priority, security, or allowability of any Claim that may be held by such Creditor. Moreover, other than with respect to Claims that are treated as Allowed Claims under the Plan, the GO Released Claims, and the Sewer Released Claims, the County reserves all rights with respect to all objections to Claims and counterclaims it may have with respect to any Claims and, except as specifically set forth in the Plan or the Confirmation Order, reserve its rights to prosecute all Preserved Claims or other rights (including rights to affirmative recoveries, rights to subordinate Claims, rights of setoff and recoupment, as well as any other rights that may exist currently or in the future).</u>

### 9. Trade Claims and Avoidance Actions

The County has determined not to pursue Avoidance Actions with respect to payments to certain trade creditors made within the 90 days before the Petition Date. Specifically, the County has determined not to pursue Avoidance Actions to recover payments made within 90 days of the Petition Date in respect of trade debt duly authorized by the County Commission or otherwise validly incurred by the County. Bankruptcy Code sections 547 and 550 provide that a debtor may avoid and recover certain payments of property of the debtor to or for the benefit of a creditor, on account of antecedent debt, that are made while the debtor is insolvent and within 90 days of the bankruptcy filing. To avoid a transfer, the debtor must also prove that the payment enabled the defendant-creditor to receive more than it would have received if the payment had not been made and the creditor received payment under chapter 7 of the Bankruptcy Code. Although section 901 of the Bankruptcy Code incorporates sections 547 and 550 into chapter 9, application of Bankruptcy Code section 547(b) in chapter 9 is problematic. Without limitation, chapter 7 is not an option for a municipal debtor, even hypothetically, and proving that a payment enabled a creditor to receive more than it would have received in a chapter 7 liquidation would be difficult. Moreover, Bankruptcy Code section 547(c) provides an affirmative defense to creditors who received payment in the ordinary course of business on debts incurred by the debtor in the ordinary course of business. Prior to the Petition Date, the County generally remained current on its normal trade obligations, and the County generally incurred and paid trade claims in the ordinary course of business. Accordingly, on information and belief, trade creditors would assert the ordinary course of business defense to

109

actions by the County to recover payments made to trade creditors within 90 days of the Petition Date. Although the County reserves all rights, claims, and defenses, the costs and risks associated with litigating such actions materially would reduce the value of any recoveries to other Creditors under the Plan. In addition, pursuant to a resolution approved by the County Commission on November 9, 2011, and as authorized by Bankruptcy Code section 904, the County has honored prepetition and postpetition continuing obligations to trade vendors that have provided and continue to provide goods and services to the County in the ordinary course of business and according to the credit terms agreed by such vendors and the County. Pursuing avoidance actions against trade vendors paid immediately prior to the Petition Date would be inconsistent with the County's policy to remain current on its trade debt as set forth in the County Commission's resolution. Remaining current on trade debt on the terms set forth in the resolution is necessary for the County to maintain essential services, preserve the efficiency of County operations, and to manage the cost of trade credit. Accordingly, pursuing avoidance actions against trade vendors would not provide a net benefit to the County. The County reserves all rights to recover payments made on account of any debt that was neither duly authorized by the County Commission nor otherwise validly incurred by the County.

## J. Other Automatic Stay Disputes

During the course of the Case, several parties have filed motions requesting relief from the automatic stays of Bankruptcy Code sections 362(a) and 922(a) to proceed with lawsuits and appeals pending in other courts in order to liquidate General Unsecured Claims. The County has stipulated to the granting of such relief with respect to several of these proceedings, including the appeals pending as of the Petition Date before the Supreme Court of Alabama regarding the Edwards Claims and the Weissman Claims. Additionally, the County consented to modification of the automatic stays to allow a pending appeal by the Fraternal Order of Police, Lodge No. 64, to continue in the Supreme Court of Alabama and also to allow the Personnel Board to provide procedural due process for disciplinary and other employment-related matters for County employees.

The Bankruptcy Court has considered other motions for relief filed by creditors or other parties in interest. First, Patricia Working, Rick Erdemir, Floyd McGinnis, Albert L. Jordan, and the law firm of Wallace Jordan Ratliff & Brandt, LLC (collectively, the "Working Parties") filed a motion for relief seeking to continue a State Court proceeding against the County Sheriff, the County Probate Judge, and the County Circuit Clerk, in which they sought to compel mediation of their claims for attorneys' fees against the defendants. The Bankruptcy Court granted limited relief but precluded the Working Parties from collecting any judgment from funds that were budgeted by the County. The Working Parties appealed, arguing they should not be limited to collecting solely from funds not budgeted by the County. The District Court dismissed the appeal for lack of justiciable dispute. *See Working v. Jefferson County (In re Jefferson County)*, No. 12-J-787-S, 2012 U.S. Dist. LEXIS 60220 (N.D. Ala. Apr. 30, 2012).

In February 2012, Assured filed a motion seeking a determination that the automatic stays did not apply to the Assured Lawsuit pending against JPMS and JPMorgan Chase in New York State Supreme Court, or, alternatively, seeking relief from those automatic stays to proceed with that action against JPMS and JPMorgan Chase. The County, JPMS, and JPMorgan Chase objected to this motion, and the Bankruptcy Court conducted a hearing on Assured's requested relief. On April

15, 2013, the Bankruptcy Court entered an order denying Assured's motion for relief. *See In re Jefferson County*, 491 B.R. 277 (Bankr. N.D. Ala. 2013).

Maralyn Mosley filed a motion for relief seeking to, among other things, enforce an alleged settlement agreement that segregated certain County funds for the benefit of Cooper Green, the County's indigent hospital. The County objected to Ms. Mosley's motion. The Bankruptcy Court sustained the County's objection and denied Ms. Mosley's motion. Ms. Mosley appealed the Bankruptcy Court's ruling to the District Court. The District Court affirmed the Bankruptcy Court's order, finding that any prepetition obligations the County had to fund Cooper Green were subject to adjustment in the Case and therefore denying relief to enforce the alleged settlement agreement. *See Mosley v. Jefferson County (In re Jefferson County)*, No. 12-J-2203-S, 2012 U.S. Dist. LEXIS 121961 (N.D. Ala. Aug. 28, 2012). Ms. Mosley did not appeal the District Court's order.

## K.  Rejection Motions

Bankruptcy Code section 365(a), which is incorporated into chapter 9, allows the County to file motions to assume or reject executory contracts and unexpired non-residential real property leases to which the County is a party. Thus far, the County has filed several rejection motions in the Case.

### 1.  Satellite Courthouse Leases

Prior to the Petition Date, the County operated satellite courthouses at locations on Main Street in Gardendale, on Forestdale Boulevard in Birmingham, and on Green Springs Highway in Homewood (collectively, the "Satellite Courthouses"). The County leased each of the properties upon which it operated these Satellite Courthouses. Prior to the Petition Date, the County Commission decided to close each of these locations in order to conserve County resources.

On November 30, 2011, the County moved to reject all of the leases for the Satellite Courthouses. Each of the affected landlords objected to the County's rejection motion. The Bankruptcy Court overruled their objections and approved the County's rejection of the Satellite Courthouse leases.

### 2.  Bessemer Courthouse Lease

As of the Petition Date, the County's rent obligations under the Bessemer Lease exceeded over $8 million per year on an annualized basis. After evaluating its options, the County concluded that, given its cash flow constraints, it could no longer continue to maintain its obligations under the Bessemer Lease as it was structured. The County engaged in good faith settlement discussions with the Bessemer Trustee and the Bessemer Insurer regarding, among other things, possible modifications to the Bessemer Lease and the rent schedule thereunder.

The County's negotiations with the Bessemer Insurer and the Bessemer Trustee did not result in a settlement before the end of August 2012. With the September 27, 2012 rejection deadline of Bankruptcy Code section 365(d)(4)(A) looming, the County moved to reject the Bessemer Lease on August 22, 2012.

111

The Bessemer Insurer, the Bessemer Trustee, and the City of Bessemer each objected to the County's rejection motion. The County continued to pursue negotiations with these parties regarding a possible restructuring of the Bessemer Lease. To facilitate these negotiations, the County again sought and obtained Bankruptcy Court approval for the Bessemer Trustee to use monies in the Bessemer DSR Fund to make the October 1, 2012, scheduled debt service payments on the Bessemer Lease Warrants. The County also obtained the Bankruptcy Court's approval of the consensual termination of a "forward agreement" regarding the funds held in the Bessemer DSR Fund, which resulted in a termination payment in the amount of $831,142.00, which amount was transferred into the Bessemer DSR Fund.

The County's negotiations proved successful. On November 27, 2012, the County filed a motion to approve its settlement and stipulation regarding the Bessemer Lease (the "Bessemer Stipulation Motion"). The Bessemer Stipulation Motion sought approval of a stipulation entered into by and among the County, the PBA, the Bessemer Trustee, and the Bessemer Insurer (the "Bessemer Stipulation"). The Bessemer Stipulation contemplated, among other things, the execution of the New Bessemer Lease, which would extend the term of the Bessemer Lease from 2026 to 2037 and substantially reduce the annual rent payments due from the County.

National Public Finance Guarantee Corporation ("National") filed an objection to the Bessemer Stipulation Motion. The County, the Bessemer Trustee, and the Bessemer Insurer filed replies in further support of the Bessemer Stipulation Motion. On December 20, 2012, the Court held a hearing on the Bessemer Stipulation Motion and entered an order granting the Bessemer Stipulation Motion and approving the Bessemer Stipulation. Subsequently, the County and the Authority entered into the New Bessemer Lease.

## L.     Creditors' Committee

On May 9, 2012, the Bankruptcy Administrator for the Northern District of Alabama (the "BA")[11] filed a notice with the Bankruptcy Court recommending the appointment of a three-member, official committee of unsecured creditors (the "BA Notice"). The County filed a response to the BA's recommendation, in which it advised the Bankruptcy Court that two of the proposed committee members either had been paid or soon would be paid in full on their prepetition claims. The County further advocated that the lone remaining member of the BA's proposed committee – a holder of certain GO Warrants – was adequately represented in the Case by its own counsel and by the GO Warrant Trustee. The County suggested to the Bankruptcy Court that, under these circumstances, appointment of an unsecured creditors committee was not warranted.

After a hearing on the BA Notice and the County's response thereto, the Bankruptcy Court ordered the BA to solicit additional unsecured creditors to determine if there was further interest in

---

[11] The Bankruptcy Administrator's office in the Northern District of Alabama oversees the administration of bankruptcy cases within the jurisdiction, and monitors the transactions and conduct of parties in bankruptcy. Congress established the United States Bankruptcy Administrator Program (USBA) in 1986. The USBA program is separate and distinct from the United States Trustee program operated by the Department of Justice.

112

serving on a committee. The BA did so, with only two additional parties expressing any interest and willingness to serve on such a committee.

On July 12, 2012, another hearing was held with regard to the appointment of an official unsecured creditors' committee. The Bankruptcy Court heard the arguments of counsel for the County, counsel for the proposed committee, and the BA. The BA advised the Bankruptcy Court that his office did not believe that appointment of a creditors' committee would be warranted or beneficial in the Case. Accordingly, the Bankruptcy Court ruled that the BA Notice was moot. Consequently, no official committee of unsecured creditors was appointed in the Case, and no other official committees have been proposed.

## M.    The New Sewer Rate Structure

Under Amendment 73 to the Alabama Constitution and Act 619, the County Commission is responsible for managing, operating, controlling, and administering the Sewer System. In 2012, the County Commission scheduled a series of public hearings to solicit information that could assist the Commission and the public in understanding the ratemaking process for the Sewer System, and at which members of the community and parties in interest in the Case would have the chance to share their input and concerns. These public hearings were held on June 12, 2012, July 24, 2012, and August 20, 2012. In each case, the County provided notice of the hearing in local newspapers and on the Bankruptcy Court's docket. In addition, the County also filed periodic status reports summarizing the events at each hearing, and made transcripts, presentations, and other materials from the hearings available free of charge on a website created by the County – www.jeffcosewerhearings.org – at which members of the public could submit comments for consideration by the County Commission.

Following this series of public hearings, and on the advice of the County's utility system consultant Mr. Rothstein, the Administrative Services Committee of the County Commission voted to place a *Resolution of the Jefferson County Commission* (the "November Resolution") on the agenda for the November 6, 2012, regular meeting of the full Commission. The November Resolution provided for, among other things: (1) the repeal of the *Jefferson County Sewer Use/Pretreatment Ordinance* adopted May 11, 1982, including all amendments thereto; (2) the repeal of the *Grease Control Program Ordinance* adopted October 3, 2006, including all amendments thereto; (3) the repeal of *Resolution No. Feb-12-1997-Bess-1*, adopted February 12, 1997; (4) the adoption of a new *Jefferson County Sewer Use Administrative Ordinance, Ordinance No. 1808*; and (5) the adoption of a new *Jefferson County Sewer Use Charge Ordinance, Ordinance No. 1809*.

The November Resolution and accompanying ordinances provided for the implementation of an interim sewer rate structure and accompanying rates and charges (the "Interim Rate Structure"). The Interim Rate Structure was modeled on Mr. Rothstein's recommendations and provided for, among other things: (1) fundamentally changing the sewer rate structure from charges based almost entirely on volumetric usage to one that relies on a combination fixed charge and an inclining block structure of residential volumetric rates; (2) setting a monthly base charge for all accounts; (3) increasing the charges for septage and grease disposal; and (4) increasing certain industrial waste surcharges. Specifically, the sewer rates and charges featured in the Interim Rate Structure included,

113

*inter alia*, a $10 fixed charge for all accounts with standard 5/8" meters (scaled upward for other meter sizes), a marginal residential volumetric rate of $4.50 per CCF for all users' first three CCF, a marginal residential volumetric rate of $7 per CCF for all users' next three CCF, a marginal residential volumetric rate of $8 per CCF for all additional usage, a non-residential volumetric rate of $7.60 per CCF, a septic hauling charge of $60 per thousand gallons for septage and $75 per thousand gallons for grease, and approximately doubling the industrial waste surcharges. A 15% discount for water not returned to the Sewer System was retained for residential customers.

At the final County Commission hearing on the November Resolution, a representative of the Attorney General read a letter expressing the Attorney General's position regarding the November Resolution. The County Commission then voted to adopt the November Resolution on November 6, 2012, and the Interim Rate Structure went into effect on March 1, 2013.

As discussed in Section IV.E above, in response to the adoption of the Interim Rate Structure, the Sewer Warrant Trustee, FGIC, the Ad Hoc Sewer Warrantholders, and Assured filed the Rate-Related Stay Relief Motions. Their motions requested, among other things, relief from the automatic stay to enforce rights under Sewer Warrant Indenture in state court for the purpose of setting sewer rates or to compel the County to raise its sewer rates higher through mandamus or other procedure. An objection from the County, along with subsequent trial briefs from the various parties, was filed, and the Bankruptcy Court heard the presentation of the case-in-chief and oral argument regarding the Rate-Related Stay Relief Motions in the first quarter of 2013. On June 12, 2013, in accordance with the Sewer Plan Support Agreements, the County filed a motion to stay all proceedings on the Rate-Related Stay Relief Motions. By order dated June 28, 2013, the Bankruptcy Court stayed all proceedings on the Rate-Related Stay Relief Motions until the earlier of (1) the Effective Date of the Plan, or the effective date of an alternative chapter 9 plan of adjustment that incorporates the provisions of and is otherwise materially consistent with the Sewer Plan Support Agreements, and (2) the date of termination of any Sewer Plan Support Agreement.

The County Commission intends to keep the overall rate structure created by the November Resolution – with its fixed charges, inclining block residential volumetric rates, and other components – in effect. The specific amounts of the various fees and charges that generate System Revenues, however, will be adjusted by further action of the County Commission to satisfy the County's obligations under the Plan and the Approved Rate Structure. The process by which the County Commission will make such adjustments is described in detail in Exhibit C to the Plan. Among other things, the County Commission anticipates holding additional rate hearings contemplated by Amendment 73 and Act 619 in October 2013. After such rate hearings are concluded, the County Commission will meet in October 2013 to vote on the approval of such adjustments. Any resulting rate and base charge adjustments approved by the County Commission would be made effective November 1, 2013.

## N.    Adoption of the Fiscal Year 2012-2013 Budget

### 1.    The County Budget Process

The County operates pursuant to an annual budget (the "Budget"), which aggregates the budgets of each of the many operating funds maintained by the County. The Budget projects the

receipts, disbursements, and transfers from all sources for the forthcoming fiscal year. Each fiscal year runs from October 1 through September 30.

Pursuant to Alabama Code section 11-8-3, the County Commission, at a meeting in September of each calendar year, must prepare and adopt a Budget for the fiscal year commencing on October 1 of such calendar year. State law requires that the Budget be a balanced budget. Section 11-8-3(b) specifically requires that the "appropriations made in [a county commission's] budget shall not exceed the estimated total revenue of the county available for appropriations." The Budget must, at a minimum, include any revenue required to be included in the Budget under the provisions of Alabama law, as well as reasonable expenditures for the operation of the offices of the Judge of Probate, the County's tax officials, the Sheriff, the County Treasurer, the County jail, the County courthouse, and other offices as required by law.

Once the County has approved its Budget, no obligation incurred by any County official or office over and above the amounts approved and appropriated by the County Commission shall be a valid obligation of the County unless the obligation is approved by an affirmative vote of a majority of the members of the County Commission.

The County's approved Budgets for recent years are available on the County's website at http://jeffconline.jccal.org/bmo/main/PastBudgetDocs.html.

## 2. The Fiscal Year 2012-2013 Budget

On September 26, 2012, the County Commission approved a budget for the fiscal year beginning on October 1, 2012 (the "Fiscal Year 2012-2013 Budget"). A true and correct copy of the Fiscal Year 2012-2013 Budget is attached hereto as **Exhibit 4**. The Fiscal Year 2012-2013 Budget is a balanced budget that conforms to all the requirements of Alabama Code section 11-8-3. The Fiscal Year 2012-2013 Budget contemplates a total operating and capital budget for all County operations of $570.2 million, of which approximately $205 million constitutes General Fund expenditures.[12] The Fiscal Year 2012-2013 Budget balances the County's enterprise funds, which include the Cooper Green Hospital Fund and the Sanitary Operations Fund, which relates to the Sewer System.

The Fiscal Year 2012-2013 Budget reflects a significant decrease in projected spending compared to previous years. In contrast, the Budget for the fiscal year beginning on October 1, 2011, provided for $217.8 million in General Fund expenditures and $638.5 million for the overall operating and capital budget. The Budget for the fiscal year beginning on October 1, 2010 provided for $312.4 million in General Fund expenses and $817.4 million in total operating and capital expenses.

---

[12] The 2012-2013 Budget includes $15 million in projected professional expenses relating to the County's chapter 9 Case. Prior budgets did not contain any similar allocations.

115

**O.     The Adoption of a New Indigent Care Model for the County: Cooper Green Mercy Health Services**

During 2012, the County Commission evaluated a new model for the delivery of indigent healthcare. Several factors prompted this evaluation, including Cooper Green's chronic operating shortfalls and the tremendous strain placed on the County's General Fund reserves by its loss of its Occupational Tax revenues. The County Commission's research revealed that the County is spending significantly more on indigent healthcare than any other county in Alabama, and more than many other large counties across the nation. For example, in 2012, the County concluded that it was making average expenditures of $543.64 on healthcare for each of its residents living in poverty, while Mobile County (the next largest county in the State) was making average expenditures of $189.49 per resident living in poverty and the counties in the metropolitan Atlanta, Georgia region were making average expenditures of $304.98 per resident living in poverty.

In September 2012, the County Commission passed a resolution to stop providing inpatient care and close the emergency room at Cooper Green. All inpatient and emergency room operations ceased during December 2012. The resolution also adopted a new "hub and spokes" model for delivering indigent healthcare within the County under the auspices of Cooper Green Mercy Health Services. Under this model, which is now being implemented, the former hospital facility will serve as the hub for providing diagnostic care, urgent care, specialty care, and primary care to indigent patients. The new model emphasizes primary care services, with Cooper Green maintaining additional outreach clinics throughout the County to provide primary care treatment. The County through Cooper Green Mercy Health Services continues to provide urgent care seven days a week to patients needing immediate care but not suffering from life-threatening issues; patients with life-threatening conditions are routed to emergency rooms at local private hospitals. The changes have resulted in substantial reductions in force and cost savings at Cooper Green. A timetable for completing the transition to the "hub and spokes" model is currently under development.

**P.     Sales of County Properties**

**1.     Sale of the Nursing Home and Cooper Green Geriatric / Psychiatric Beds**

Since the Petition Date, the County has sold all of its interests in the Nursing Home. Earlier this year, the County, pursuant to two separate transactions, sold the real estate on which the Nursing Home was located for approximately $2.95 million and the 238 licensed beds at the facility for approximately $8.3 million.

The County also recently sold a number of geriatric/psychiatric bed licenses formerly used by Cooper Green. The County sold these licenses in two separate transactions for a combined purchase price of over $160,000.

**2.     Sales of Non-Essential Properties**

The County has worked actively and judiciously during the Case to identify opportunities to sell or otherwise dispose of County-owned property that is not essential to the County's operations and for which commercially reasonable purchase offers are made. Since the Petition Date, the

116

County has sold its interests in several real estate holdings, with the proceeds from such sales approximating $2.6 million. During that same time period, the County has sold at auction various motor vehicles and equipment, the sales proceeds from which have exceeded $800,000. These sales offer very limited, short-term relief to the County's General Fund problems, providing the County with modest additional revenues to help fund the provision of critical County services.

**Q.    Efforts to Obtain General Fund Legislation**

**1.    Postpetition Efforts to Obtain General Fund Relief**

In 2012, a legislative effort was made by the County to obtain unrestricted General Fund revenues to replace the revenues previously generated by the Occupational Tax. The County's effort resulted in the introduction of several bills that sought to authorize the levy by the County of a new occupational tax. Senate Bill 567 was introduced by State Senator Jabo Waggoner of Vestavia Hills and passed in the Senate on May 3, 2012. Senate Bill 567 titled "The Alabama Financially Distressed Counties Act" proposed a new occupational tax of not more than 0.5% of the wages earned by people working in the County or a sales and use tax of not more than 1.0%. If passed, Senate Bill 567 would have generated as much as $62 million in revenue for the County in its first year.

After the State Senate approved Senate Bill 567, the Alabama House of Representatives considered it. The bill was scheduled to come before the House for vote in the final day of the 2012 Regular Session. However, the Alabama House of Representatives voted instead to remove consideration of Senate Bill 567 from the calendar of final bills to be debated.

Other legislation was introduced in the House of Representatives seeking to restore the County's occupational tax in modified form. The House did not pass any of these bills. House Bill 745, a companion bill to Senate Bill 567, was proposed by Representative of Jack Williams of Vestavia Hills in April 2012. His bill proposed to authorize the County to levy and collect an estimated $62 million a year in occupational taxes, sales taxes, gasoline taxes, and other levies. The Municipal Government Committee of the House moved House Bill 745 to the full House for debate. However, the full House of Representatives never considered House Bill 745, and the legislation died. Representative Demetrius Newton of Birmingham introduced two bills to restore an occupational tax to the County – House Bill 184 and House Bill 235 – but neither of his bills received the requisite support from the County's legislative delegation. Representative Arthur Payne of Trussville authored House Bill 586, a local bill that would have applied only to the County and contemplated the levying an occupational tax of not more than 0.45 percent of the wages earned by people working in the County; however, the bill was regarded by the County's advisors and attorneys as unlikely to survive a legal challenge. Consideration of House Bill 586 was blocked by legislators representing communities outside the County, who objected to the County's collection of a tax on people who lived outside, but worked within, the County. The Regular Session ended in May 2012 without the House approving any General Fund relief to the County.

Governor Robert Bentley indicated a willingness to call a Special Session of the Alabama Legislature in 2012 to address the County's General Fund needs, but only if the County's legislative

delegation first reached agreement on a plan. The County's legislators did not reach any such agreement, so no Special Session was convened.

In 2013 the County advanced another occupational tax bill and engaged in substantive discussions with several legislators representing districts within the County regarding possible measures to enhance General Fund revenues. However, no significant efforts were undertaken by the full Alabama Legislature during the 2013 Regular Session to restore the occupational tax, to grant the County limited home rule to raise its own revenue, or to provide the County with other significant General Fund relief.

### 2. Future Prospects for General Fund Relief

The County continues to evaluate its potential legislative options for obtaining General Fund relief; however, based upon its past experiences, the County is not confident that any such authorizing legislation will be approved by the Alabama Legislature and cannot accurately predict the likelihood of any such legislation being passed in the future.

Among the options the County has considered pursuing with the Alabama Legislature are bills providing for or permitting increases in other existing County tax levies or authorizing the levy by the County of new taxes other than occupational or business license taxes, *e.g.*, additional transient occupancy taxes, additional gas taxes, additional County-wide or unincorporated area general sales and use taxes, as well as bills authorizing a vote of the County's qualified electors under Amendment No. 373 to the Alabama Constitution on the question of increasing the rate of the *ad valorem* property taxes levied for the benefit of the General Fund. Over the past few years, none of these options have been embraced by the Alabama Legislature to any material extent.

The County is uncertain whether relief may be forthcoming in future legislative sessions. The Alabama Legislature convenes annually in Regular Session beginning in the first quarter of each calendar year for a period not exceeding 30 legislative days within 120 consecutive calendar days, and meets in Special Session for shorter periods at the call of the Governor upon occasions that the Governor determines to be extraordinary. The Governor has not called, and is not expected to call, a Special Session in 2013 to address any issues concerning the County's revenue-raising authority, and the Alabama Legislature lacks the power under the Alabama Constitution to convene on its own initiative. Accordingly, the County does not expect the Alabama Legislature will reconvene until January 2014 when the next Regular Session is scheduled to begin.

### R. The County's Negotiation and Approval of the Plan Support Agreements

Throughout the Case, the County has pursued negotiations with Creditors with the aim of developing a confirmable, and preferably a consensual, chapter 9 Plan. The County's efforts have resulted in the negotiation of the Plan Support Agreements.

On February 14, 2013, the County Commission approved the Depfa Plan Support Agreement. A true and correct copy of the Depfa Plan Support Agreement is attached hereto as **<u>Exhibit 5</u>** and is incorporated herein by reference. Additional discussion of the compromises and settlements contained in the Depfa Plan Support Agreement is provided in Section V.A.2.a below.

On May 16, 2013, the County Commission approved the GO Plan Support Agreement. A true and correct copy of the GO Plan Support Agreement is attached hereto as **Exhibit 6** and is incorporated herein by reference. Additional discussion of the compromises and settlements contained in the GO Plan Support Agreement is provided in Section V.A.2.b below.

On June 4, 2013, the County Commission approved three Sewer Plan Support Agreements effective as of June 6, 2013, with the JPMorgan Parties, the Sewer Warrant Insurers, and the Supporting Sewer Warrantholders. On June 27, 2013, the County Commission approved a fourth Sewer Plan Support Agreement with the Sewer Liquidity Banks. On July 23, 2013, the County Commission approved a fifth Sewer Plan Support Agreement with LBSF. These Sewer Plan Support Agreements form the basis of the Plan's treatment of all the Sewer Debt Claims. True and correct copies of the Sewer Plan Support Agreements are attached hereto collectively as **Exhibit 7** and are incorporated herein by reference. Additional discussion of the compromises and settlements contained in the Sewer Plan Support Agreements is provided in Section V.A.1 below.

On June 27, 2013, the County Commission approved the National Plan Support Agreement. A true and correct copy of the National Plan Support Agreement is attached hereto as **Exhibit 8** and is incorporated herein by reference. Additional discussion of the compromises and settlements contained in the National Plan Support Agreement is provided in Section V.A.2.c below.

The County has limited and discrete obligations under the Depfa Plan Support Agreement, the GO Plan Support Agreement, and the National Plan Support Agreement. In contrast, the County is obligated under the Sewer Plan Support Agreements to take various actions. Without limitation, and in each case subject to all terms and conditions of the Sewer Plan Support Agreements and based on the meanings given to capitalized terms in the Sewer Plan Support Agreements, the County has agreed to:

- file and exercise all reasonable efforts to expeditiously prosecute, confirm, and consummate a chapter 9 plan of adjustment that incorporates the provisions of, and is otherwise materially consistent with, the Sewer Plan Support Agreements;

- not take any action (directly or indirectly) that is inconsistent with the Sewer Plan Support Agreements or an Acceptable Plan, or that would delay or otherwise impede approval of the Disclosure Statement or an Acceptable Plan, or the expeditious confirmation and consummation of an Acceptable Plan including consummation of the Restructuring;

- not file, support, or seek confirmation of any plan of adjustment with respect to the Sewer Warrants under Bankruptcy Code section 1129(b) unless such plan of adjustment is an Acceptable Plan;

- not commence any new Litigation against any Sewer Plan Support Party and not prosecute, and exercise all reasonable efforts to suspend, any existing Litigation against any Sewer Plan Support Party and in connection with any such Litigation, take no action inconsistent with the Restructuring contemplated by the Sewer Plan Support Agreements and an Acceptable Plan;

119

- prosecute the Disclosure Statement and an Acceptable Plan and implement all steps necessary or appropriate to obtain from the Bankruptcy Court the Confirmation Order prior to November 25, 2013, unless such date is extended by each of the Sewer Plan Support Parties in their sole and absolute discretion;

- cause the Effective Date of an Acceptable Plan to occur prior to December 20, 2013, or, if extended under the Supporting Sewer Warrantholder Plan Support Agreement, prior to December 31, 2013; and

- negotiate in good faith with the Sewer Plan Support Parties each of the definitive agreements and documents referenced in, or reasonably necessary or desirable to effectuate the transactions contemplated by an Acceptable Plan or the Restructuring.

Each of the Sewer Plan Support Agreements includes numerous interlinking "Trigger Events" that would allow some or all of the parties thereto, including the County, to terminate those agreements. Without limitation, the termination of one of the Sewer Plan Support Agreements is a basis for the termination of the other Sewer Plan Support Agreements. If one or more of the Sewer Plan Support Agreements is terminated in accordance with its terms, then it is unlikely that the County would be able to (or willing to) proceed with the Plan in its current form. All parties to the Sewer Plan Support Agreements understood and agreed that specific performance, mandamus, and injunctive relief would be the sole and exclusive sole remedies for any breach of the Sewer Plan Support Agreements, and each party further agrees to waive, and to cause each of their representatives to waive, any requirement for the securing or posting of any bond in connection with requesting such remedy.

## V.
## SETTLEMENTS UNDER THE PLAN

**A.    The Comprehensive Sewer-Related and Other Compromises and Settlements Under the Plan**

The Plan includes and is predicated on several sets of compromises and settlements between and among the County and various Creditors, most notably with respect to numerous complex and interwoven issues concerning the Sewer System and its financing. The County intends to seek approval of all such compromises and settlements in connection with confirmation of the Plan, and submits that each of the compromises and settlements is fair, reasonable, and in the best interests of the County and its Creditors.

**1.    The Disputes Resolved by the Sewer Plan Support Agreements**

The Plan contains the materials terms of the Sewer Plan Support Agreements and represents a full compromise and settlement of hotly contested claims relating to the control of, and the rates for, the Sewer System. These myriad disputes include:

- ***Who Runs the Sewer System?*** Prior to the County's bankruptcy filing, the Sewer System was under the control of the Receiver, who claimed authority to raise rates and operate the Sewer

120

System independent of the County's elected officials. The County disputed the Receiver's asserted authority to raise rates, and (upon the filing of the Case) argued that the Receiver was prohibited from interfering with the County's control of the Sewer System. The Bankruptcy Court held that the filing of the Case automatically stayed the Receiver's ability to operate the Sewer System or raise sewer rates, and denied relief from the automatic stays. The Bankruptcy Court's decision is on appeal and, with the agreement of the parties, has been stayed until January 15, 2014. Absent consummation of the Plan, the appellate court's decision could dictate who controls the Sewer System and who sets sewer rates, now and for decades into the future.

• ***How Much Does the County Owe?*** The Sewer Warrant Trustee claims that the County must repay in full over $3 billion in Sewer Warrants. The County disputes this claim, and asserts that the actual amount owed may be significantly lower. This dispute has not yet been presented to the Bankruptcy Court, and any decision by the Bankruptcy Court could result in several years of appeals in multiple appellate courts on several issues of first impression.

• ***How Much Should Sewer Service Cost?*** Last year the County Commission approved the first sewer rate increases in many years. The Sewer Warrant Trustee and certain Creditors challenged the County Commission's action, claiming that it violated applicable law and that the rates set were far too low. As more particularly described in Section IV.E above, the Sewer Warrant Trustee and such Creditors have asked the Bankruptcy Court to grant relief from stay so the Receiver can attempt to implement additional rate and revenue increases, and the County has opposed that request. The Bankruptcy Court has not yet ruled on this request, but any ruling will be appealed (potentially through multiple layers of appellate courts) and the matter could remain undecided for several years.

• ***When and How Much Should Sewer Creditors Get Paid?*** The Sewer System generates more than $150 million of gross revenue per year. The County contends that a portion of that revenue may be used to pay for necessary capital improvements to the Sewer System. The Sewer Warrant Trustee and other parties assert that all funds in excess of what the parties' prepetition contract refers to as "Operating Expenses" must be remitted in full to the Sewer Warrant Trustee each month, and that capital maintenance costs cannot be paid from System Revenues in preference to debt service. Additionally, the County contends that revenues from the Sewer System should be held in an interest-bearing account during the Case, while the holders of the Sewer Warrants assert that funds generated by the Sewer System must continue to be remitted to the Sewer Warrant Trustee monthly. In its Net Revenues Opinion, the Bankruptcy Court appeared to rule in the creditors' favor on both issues, prompting the County's appeal of those rulings to the Eleventh Circuit. With the agreement of the parties, the appeal has been stayed until January 15, 2014. If the appeal eventually were to proceed and the appellate court were to reverse the Bankruptcy Court's Net Revenues Opinion, less money (and possibly no money) would be remitted each month to creditors during the pendency of the Case. The Fee Opinion, issued by the Bankruptcy Court after the County filed its appeal of the Net Revenues Opinion, authorizes the payment of certain of the County's reasonably incurred professional fees and expenses from the System Revenues ahead of remittance of the Net Revenues to the Sewer Warrant Trustee, subject to the future resolution of objections to such payment pursued by the Sewer Warrant Trustee, if necessary. The Sewer Warrant Trustee and other parties in interest have filed a notice of appeal with respect to the Fee Opinion. Relatedly, as a result of inter-creditor disputes, the Sewer Warrant Trustee ceased making payments to warrantholders

121

effective February 1, 2013, triggering substantial additional litigation that could take years to finally resolve. In the meantime, Sewer Warrant holders may or may not be paid.

• *What Are the Rights and Priorities Among the Different Sewer Creditors?* There are many potential issues that could be raised by the County or by certain creditors regarding the rights of the sewer creditors between and among themselves with respect to distributions of sewer revenues or to property distributed under any plan. For example, an argument could be made that some or all of the claims asserted by the Sewer Warrant Insurers should be subject to contractual subordination or statutory subordination under Bankruptcy Code section 509(c). The Sewer Warrant Insurers dispute such arguments. Consequently, a non-negotiated resolution would require litigation over highly complex and unprecedented issues, which litigation would be time-consuming, costly, and contentious. Similarly, if some or all of the Sewer Debt Claims are undersecured (as alleged by the County), there is the potential for litigation over extremely complex allocative and reallocative issues arising from the fact that the Sewer Warrant Trustee used System Revenues to pay certain interest and principal maturing during the period of November 11, 2011 and January 31, 2013, in full, despite the pendency of the Case. In addition, there are other highly complex issues that could be litigated, some of which have been raised in the Declaratory Judgment Action, including (i) whether the maturity of all the Sewer Warrants may be accelerated absent the consent of the applicable Sewer Warrant Insurer, (ii) the effect of acceleration on certain rights and obligations of the County, the Sewer Warrant Trustee, and holders of the Sewer Warrants, (iii) the effect of acceleration on the application of funds under the Sewer Warrant Indenture, and (iv) the effect of acceleration on the rights and obligations of the Sewer Warrant Insurers under the Sewer Insurance Policies. Further, insurance issues could in turn require litigation in connection with complex reinsurance and related agreements between and among the Sewer Warrant Insurers. The potential exists for other litigation between and among the sewer creditors; for example, Syncora and Assured both have pending lawsuits against certain of the JPMorgan Parties, and it is possible that additional sewer creditors could sue each other or the Sewer Warrant Trustee in reaction to events in the Case or rulings in associated litigation. Any one of these intercreditor disputes could require significant litigation and take several years to resolve, and it is possible that, absent a settlement, all of these (and other) issues could be raised and pursued by the parties in interest, which could lead to series of rulings and appeals to different courts, all with the ultimate effect of delaying or inhibiting distributions to some or all holders of Sewer Debt Claims.

• *What Remedies Does the County Have Against the JPMorgan Parties and Others?* The County believes that certain of the JPMorgan Parties' agents engaged in actions that inflicted harm on the County and its inhabitants and that the JPMorgan Parties should be held accountable for those actions. The County believes that the series of settlements and significant concessions made by the JPMorgan Parties under the Plan fairly and equitably addresses the JPMorgan Parties' actions without the need for further litigation. For example, the concessions made by the JPMorgan Parties under the Plan, including through the reallocation to other holders of Sewer Warrants of a substantial portion of the Plan consideration that would otherwise be distributed to the JPMorgan Parties on a Pro Rata basis, serves to increase the recovery received by all other holders of Sewer Warrants and reduce the amount of Sewer System indebtedness following the County's emergence from chapter 9. Absent a settlement, however, the County would pursue claims for damages and might pursue other relief against the JPMorgan Parties. Among other things, the County might seek to attempt to

122

equitably subordinate or disallow all of the JPMorgan Parties' Claims in the Case under Bankruptcy Code section 510(c). The JPMorgan Parties dispute the County's contentions and undoubtedly would strongly resist any effort by the County to recover damages or equitably subordinate the JPMorgan Parties' Claims. Litigation over these issues would likely be highly-factual, requiring significant discovery and a full trial. The process of litigation at the trial level would likely take months or even several years to complete, and it is likely that there would be subsequent appeals following any ruling.

> • *Is Any of the Sewer Debt or the Existing Rates Subject to Invalidation or Undoing Under Applicable Law?* Certain third parties have purported to assert challenges to the existing sewer rates and to the claims arising under the Sewer Warrant Indenture and related documents, including challenges based on the assertion of rights by or on behalf of the County. Other parties have suggested that they may also pursue relief in respect of the existing sewer rates or to challenge some of the Sewer Debt Claims. Each of these pending and potential litigations raises complex legal issues regarding standing, the statute of limitations, and the like, while further implicating factual issues from ten or more years in the past. Resolving these issues through the trial and appellate process likely would be a costly and time-consuming process.

In short, the extant disputes concern every aspect of the Sewer System's operations and financing. Each of the matters described above is currently unsettled, and no one can predict with certainty what will ultimately be decided – or even when the final decisions will be made. There is little or no controlling authority on many of these issues. The risks of litigation are high for all parties. Litigation of sewer-related disputes during the Case has been expensive for all sides, and would continue to be expensive if the disputes were not settled under the Plan. Notably, the litigation expenses of the Sewer Warrant Trustee are paid from certain of the Sewer Warrant Indenture Funds, so further litigation could deplete those funds and eliminate their ability to be used in connection with any refinancing or for purposes of paying sewer creditors. Similarly, the Fee Opinion allows the County to pay certain of its reasonably incurred professional fees and expenses – including certain fees and expenses reasonably incurred in connection with litigation relating to the Sewer System -- from the System Revenues ahead of remittance of the Net Revenues to the Sewer Warrant Trustee, although the Fee Opinion does not resolve potential objections to payment pursued by the Sewer Warrant Trustee, and would be subject to appeal by the Sewer Warrant Trustees and other creditors. Subject to resolution of any unresolved objections and appellate proceedings, it is possible that continued litigation would reduce significantly the funds received by the Sewer Warrant Trustee for the sewer creditors' benefit during the course of such litigation.

To give effect to the comprehensive compromise and settlement contemplated by the Sewer Plan Support Agreements, Section 4.8(a) of the Plan provides that, pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, the Plan incorporates and is expressly conditioned upon the approval and effectiveness of such a compromise and settlement by and among the County and the Sewer Plan Support Parties of numerous issues related to the Sewer System, the Sewer Released Claims, and the allowance and treatment of the Sewer Debt Claims. The Plan accordingly represents a full, final, and complete compromise, settlement, release, and resolution of, among other matters, disputes and pending or potential litigation (including any appeals) regarding the following: (i) the allowability, amount, priority, and treatment of the Sewer Debt Claims; (ii) the validity or enforceability of the Sewer Warrants; (iii) the

123

valuation of the Sewer System and of the stream of net sewer revenues pledged under the Sewer Warrant Indenture; (iv) the appropriate rates that have been or can be charged to users of the Sewer System; (v) any Causes of Action or Avoidance Actions that the County has asserted or could potentially assert against the JPMorgan Parties or against other of the Sewer Plan Support Parties, including any subordination claims (including equitable subordination claims and statutory subordination claims) relating to any Sewer Debt Claims held by any of the Sewer Plan Support Parties; (vi) the Sewer Released Claims that (A) some of the Sewer Plan Support Parties have asserted or (B) the Sewer Plan Support Parties could potentially assert against other Sewer Plan Support Parties, including, in each case, any subordination claims (including equitable subordination claims and statutory subordination claims) relating to any Sewer Debt Claims held by any of the Sewer Plan Support Parties; (vii) how the Sewer Warrant Trustee has applied revenues of the Sewer System to payment of certain Sewer Debt Claims both before and during the Case, including any Causes of Action related to the reapplication to principal of any interest payments made on the Sewer Warrants during the Case or reallocation of any payments made on the Sewer Warrants both before and during the Case among the holders of various series and subseries of Sewer Warrants; (viii) the various issues raised by the Declaratory Judgment Action; (ix) the scope and extent of any liens or other property rights under the Sewer Warrant Indenture; (x) whether, and the extent to which, the County may recover from Sewer System revenues amounts actually incurred or previously paid by the County on account of professional fees prior to and during the Case; (xi) the allowance and amount of any Bank Warrant Default Interest Claims; (xii) the priority of the LBSF Periodic Payment Claim, the various issues raised by the LBSF Periodic Payment Claim, and the Sewer Warrant Trustee's treatment of and obligations with respect to that Claim; (xiii) the various issues raised by the Receivership Actions; and (xiv) other historical and potential issues associated with the Sewer System and its financing. This comprehensive compromise and settlement will be binding on the County and on all Persons who have asserted or could assert any potential Causes of Action or Avoidance Actions for or on behalf of the County in any fashion, including derivatively or directly, and in any pending or potential litigation (including any appeals) before any court or agency. This comprehensive compromise and settlement is a critical component of the Plan and is designed to provide a resolution of disputed Sewer Released Claims inextricably bound with the Plan. As such, the approval and consummation of the Plan will conclusively bind all Creditors and other parties in interest, and the releases and settlements effected under the Plan will be operative as of the Effective Date and subject to enforcement by the Bankruptcy Court from and after the Effective Date, including pursuant to the injunctive provisions of Sections 6.2 and 6.3 of the Plan. In order to give effect to this comprehensive compromise and settlement, (i) any adversary proceedings or contested matters involving Sewer Released Claims shall be dismissed effective as of the Effective Date; and (ii) in connection with the occurrence of the Effective Date, each of the County, the Sewer Plan Support Parties, and the Sewer Warrant Trustee (as applicable) shall file in other appropriate courts stipulations of dismissal among the applicable parties or motions to dismiss any pending litigation (including any appeals) commenced by the County, any of the Sewer Plan Support Parties, or the Sewer Warrant Trustee against the County or any of the Sewer Plan Support Parties with prejudice, with such dismissal to be effective on and contingent upon the occurrence of the Effective Date.

In addition, the Plan gives effect to the comprehensive sewer-related compromises and settlements by providing that under the Plan and as of the Effective Date, all Sewer Released Parties

will forever waive and release all other Sewer Released Parties from any and all Sewer Released Claims. **Moreover, the Plan provides that any Person who votes to accept the Plan or who makes or is deemed to make the Commutation Election described in Section XII.B below will be conclusively deemed to have forever waived and released all Sewer Released Parties and their respective Related Parties from any and all Sewer Released Claims.**

The sewer-related compromises and settlements under the Plan have been crafted not only to resolve all of the pending litigation involving the County, but also to eliminate the need for internecine litigation between and among the various parties holding Sewer Debt Claims. Absent the comprehensive resolution provided by the Plan, it is likely that there would be continuing litigation regarding some or all of the potential sewer-related disputes for several years.

### 2. Other Settlements

The Plan also includes other compromises and settlements that the County has reached with its Creditors.

#### a. The Depfa Plan Support Agreement

The classification and treatment of Class 2-C Claims under the Plan reflects the terms negotiated in the Depfa Plan Support Agreement. The treatment set forth in the Plan eliminates the need for litigation regarding the proper amount of interest payable on the 2005-B School Warrants and Standby School Warrant Claims held by Depfa. Under the Depfa Plan Support Agreement, the parties agreed to compromise on the New Bank Rate of interest; Depfa agreed to waive certain School Warrant Events of Default; and the County agreed to direct the Future Tax Proceeds to be used for the mandatory redemption of the Series 2005-B School Warrants held by Depfa. These compromises obviated the need for litigation regarding the Class 2-C Claims, including the proper treatment of those claims under a plan of adjustment.

#### b. The GO Plan Support Agreement

The classification and treatment of Class 5-A Claims under the Plan reflects the terms negotiated in the GO Plan Support Agreement. The treatment set forth in the Plan eliminates the need for litigation regarding the allowance of asserted Claims on account of default rate interest, the GO Banks' fees and expenses, and postpetition interest. This treatment further eliminates the need for litigation regarding the restructuring of the Series 2001-B GO Claims and the interest rate payable on that restructured debt.

The classification and treatment of Class 5-E Claims under the Plan also reflects the terms negotiated in the GO Plan Support Agreement. JPMorgan Chase and the County agreed to settle and compromise all issues associated with the GO Swap Agreement Claims through the County's payment of ten dollars ($10.00) to JPMorgan Chase, in satisfaction of an asserted general obligation Claim in the aggregate amount of $7,893,762.30, plus interest accrued thereon at the applicable rate as set forth in the GO Swap Agreement.

125

In addition, the Plan gives effect to the compromises and settlements contemplated by the GO Plan Support Agreement by providing that under the Plan and as of the Effective Date, all GO Released Parties will forever waive and release all other GO Released Parties and their respective Related Parties from any and all GO Released Claims. **Moreover, the Plan provides that any Person who votes to accept the Plan will be conclusively deemed to have forever waived and released all GO Released Parties and their respective Related Parties from any and all GO Released Claims.**

**c.      The National Plan Support Agreement**

The classification and treatment of Class 5-B, 5-C, and 5-D Claims under the Plan reflect the terms negotiated in the National Plan Support Agreement.

One important aspect of the National Plan Support Agreement relates to the County's obligations with respect to the underlying Series 2003-A GO Warrants and Series 2004-A GO Warrants that are insured by National. Consistent with the National Plan Support Agreement, the Plan provides that, as part of the settlement between National and the County, (i) the holders of the Series 2003-A GO Claims and the Series 2004-A GO Claims will retain their legal, equitable, and contractual rights under the GO Resolutions and pursuant to their warrants, provided that any GO Events of Default that occurred prior to or that were continuing on the Effective Date shall be deemed waived and of no further force or effect, without any requirement that the County take any action to cure or otherwise eliminate any such GO Events of Default; and (ii) based on such treatment and National's payment during the Case of all regularly scheduled principal and interest due on the Series 2003-A GO Warrants and on the Series 2004-A GO Warrants, the Series 2003-A GO Claims, and Series 2004-A GO Claims shall be deemed unimpaired under the Plan and accordingly the holders of such claims will not be solicited.

The treatment for Class 5-D Claims under the Plan represents a settlement and compromise of numerous potential claim allowance and priority disputes between National and the County. The Plan provides that National will receive a full recovery on the principal that National paid to holders of the Series 2003-A GO Warrants and Series 2004-A GO Warrants during the Case, which recovery is split between two payments in 2014 and 2015. The Plan provides that the County will repay approximately $8.5 million of interest that that National paid to holders of the Series 2003-A GO Warrants and Series 2004-A GO Warrants during the Case in three payments in 2025, 2026, and 2027 – these obligations will be non-interest bearing and are subject to the County's right to prepay such amounts in whole or in part using a 4.90% discount rate. Finally, the Plan provides for a compromise and settlement of the National Fees and Expenses Claims, which the County has been informed could exceed $4 million, through a single payment of $1.5 million to National on the Effective Date.

The Plan further provides that from and after the Effective Date, the GO Insurance Policies and the GO Resolutions will remain in effect, subject to all terms and conditions thereof, until the Series 2003-A GO Warrants and the Series 2004-A GO Warrants are paid in full. To the extent the County fails to make a scheduled principal or interest payment on account of the Series 2003-A GO Warrants or the Series 2004-A GO Warrants after the Effective Date, National may exercise all of its

126

rights and remedies against the County as set forth in the GO Insurance Policies and the GO Resolutions and subject to all terms and conditions thereof.

In addition, the Plan gives effect to the compromises and settlements contemplated by the National Plan Support Agreement by providing that under the Plan and as of the Effective Date, all GO Released Parties will forever waive and release all other GO Released Parties and their respective Related Parties from any and all GO Released Claims. **Moreover, the Plan provides that any Person who votes to accept the Plan will be conclusively deemed to have forever waived and released all GO Released Parties and their respective Related Parties from any and all GO Released Claims.**

### d. The Bessemer Stipulation

Finally, the classification and treatment of Class 7 Claims under the Plan reflects the terms of the Bessemer Stipulation, which was a heavily negotiated, multiparty settlement that was previously approved by the Bankruptcy Court pursuant to Bankruptcy Rule 9019.

### 3. The County Will Ask the Bankruptcy Court to Approve the Comprehensive Compromises and Settlements Under the Plan

The compromises and settlements under the Plan described above, particularly the sewer-related compromises, are integral and critical parts of the Plan; absent the approval of these compromises and settlements, the Plan could not go forward. There can be no assurance that any alternative chapter 9 plan of adjustment for the County would include the concessions by the Sewer Plan Support Parties that are an essential component of the Plan and that allow for the significantly enhanced recovery afforded to holders of Sewer Warrants under the Plan. At the Confirmation Hearing, the County will ask the Bankruptcy Court to approve all the compromises and settlements under the Plan. Under Bankruptcy Code section 1123(b)(3)(A), a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Bankruptcy Code sections 1123(b)(6) and 105(a) further allow the County to include "any other appropriate provision not inconsistent with the applicable provisions" of the Bankruptcy Code in the Plan as a method of settlement and compromise, and authorize the Bankruptcy Court to issue orders and judgments approving those provisions. Finally, Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee[13] and after notice and a hearing, the court may approve a compromise or settlement," which motion may be made on a standalone basis or in a bankruptcy plan. *See, e.g.*, *In re Texaco*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) ("Compromises may be effected separately during reorganization proceedings or in the body of the reorganization plan itself.").

For all the reasons set forth herein and to be demonstrated at the Confirmation Hearing, the County reasonably believes that the compromises and settlements set forth in the Plan clearly satisfy

---

[13] Bankruptcy Rule 9019(a)'s reference to "the trustee" means the municipal debtor in a chapter 9 case. *See* Fed. R. Bankr. P. 9001 & 11 U.S.C. § 902(5). As such, bankruptcy courts may appropriately consider and approve settlements that are reached by debtors in chapter 9 cases. *See, e.g.*, *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 453-54 (Bankr. E.D. Cal. 1999); *In re County of Orange*, 1995 Bankr. LEXIS 729, at *16-20 (Bankr. C.D. Cal. May 2, 1995).

the legal standards for a "fair and equitable" settlement – i.e., one that does not fall beneath the "lowest point in the range of reasonableness." *See, e.g.*, *Martin v. Pahiakos (In re Martin)*, 490 F.3d 1272, 1275-76 (11th Cir. 2007); *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990); *In re Tarrant*, 349 B.R. 870, 893 (Bankr. N.D. Ala. 2006); *In re Aloha Racing Found., Inc.*, 257 B.R. 83, 88 & 93 (Bankr. N.D. Ala. 2000). The compromises and settlements embodied by the Plan resolve many highly complex and uncertain issues that could take years and millions of dollars to litigate to finality. The comprehensive and final resolution of these issues under the Plan provides for a fair and equitable result and greater Distributions to the County's Creditors, and offers the County and its Sewer System a "fresh start" from a history plagued by actual and potential litigations.

If approved, the comprehensive compromises and settlements set forth in the Plan will be binding on the County and on all Persons who have asserted or could assert any potential Causes of Action or Avoidance Actions for or on behalf of the County in any fashion, including derivatively or directly, and on all Creditors concerning the Sewer Released Claims and the GO Released Claims compromised and settled under the Plan, including in any pending or potential litigation (including any appeals) before any court or agency. The approval and consummation of the Plan will conclusively bind all Creditors and other parties in interest, and the releases and settlements effected under the Plan will be operative as of the Effective Date and subject to enforcement by the Bankruptcy Court from and after the Effective Date, including pursuant to the injunctive provisions of Sections 6.2 and 6.3 of the Plan. Once approved, the compromises and settlements, along with the treatment of any associated Allowed Claims under the Plan, shall not be subject to any collateral attack or other challenge by any Person in any court or other forum from and after the Effective Date. As such, any Person who opposes the terms of any compromise and settlement set forth in the Plan must challenge such compromise and settlement prior to Confirmation of the Plan, and in connection with such challenge must demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

## VI.
## THE SEWER FINANCING PLAN

Under the terms of an amended financing plan approved by the County Commission on July 23, 2013 (the "Amended Financing Plan"[14]), subject to compliance with procedures required by state law, the County expects to generate and distribute approximately $1.836 billion on account of Allowed Class 1-A Claims, Class 1-B Claims, Class 1-C Claims, and Class 1-D Claims from gross refinancing proceeds of approximately $2.00 billion. The Amended Financing Plan is attached to this Disclosure Statement as **Exhibit 9**.

The Amended Financing Plan involves the issuance of a mix of three different types of debt securities: current interest paying warrants (approximately $1.339 billion), capital appreciation warrants (approximately $180 million), and convertible capital appreciation warrants (approximately

---

[14] The Amended Financing Plan amended a prior financing plan preliminarily approved by the County Commission on June 4, 2013 (the "Financing Plan").

$458 million). A current interest paying warrant is a debt instrument on which interest payments are made to the holders on a periodic basis. A capital appreciation warrant is a debt instrument on which the investment return on an initial principal amount is reinvested at a stated compounded rate until maturity, at which time the holder receives a single payment representing both the initial principal amount and the total investment return. A convertible capital appreciation warrant is a debt instrument with terms similar to a capital appreciation warrant for a fixed period of time, after which interest payments are made to the holders on a periodic basis. The actual amount of each such debt security may differ from what is projected in the Amended Financing Plan. The Amended Financing Plan details the projected pricing of each type of debt instrument.

In addition to the newly issued securities (totaling approximately $1.977 billion), the Amended Financing Plan contemplates the receipt of approximately $24 million as original issue premium/discount (the actual amount of which may vary), and further contemplates use of approximately $62 million in cash available from the Sewer System (i.e., from the Sewer Warrant Indenture Funds and Remaining Accumulated Sewer Revenues). These sources collectively amount to approximately $2.064 billion.

In addition to distributions of approximately $1.836 billion to the holders of Allowed Class 1-A Claims, Class 1-B Claims, Class 1-C Claims, and Class 1-D Claims under the Plan, the Amended Financing Plan contemplates a deposit into a new debt service reserve fund of approximately $198 million, an underwriters discount of approximately $13 million, the Put Consideration payable under the Put Agreement[15] in an estimated amount of approximately $13.5 million (which estimated amount is subject to the final terms of the Put Agreement as included in the Plan Supplement), and costs of issuance of approximately $2.5 million. These uses collectively amount to approximately $2.064 billion.

The Amended Financing Plan depends upon the County Commission enacting the Approved Rate Structure (Exhibit C to the Plan), which contemplates (i) an initial-year $5 increase in the residential and non-residential base charge (scaled by meter size) and 3.49% increase in non-residential volumetric charges), followed by (ii) four years of 7.89% Sewer System rate increases (residential and non-residential); and (iii) 3.49% annual Sewer System rate increases (residential and non-residential) thereafter. Changes in the market or consumption patterns between the date on which the Amended Financing Plan was adopted and the date on which it is implemented may require or permit higher or lower levels of rate increases, but in no event is the County obligated to increase rates beyond those set forth in the Amended Financing Plan.[16] That is, if market conditions

---

[15] The County is negotiating the final terms of the Put Agreement with the Supporting Sewer Warrantholders. In accordance with the Put Agreement, if the underwriter for the offering of the New Sewer Warrants can sell at least 80% of each series and maturity having the same CUSIP of the New Sewer Warrants but cannot sell the balance then the Supporting Sewer Warrantholders who assume a Put Obligation under the Put Agreement will fund, in proportion to the commitment made by each, 50% of the shortfall by accepting, in lieu of Cash, a principal amount equal to 50% of the shortfall at the lowest price offered by the underwriter to the public for each series of New Sewer Warrants that is being purchased by Supporting Sewer Warrantholders who assume a Put Obligation (with the underwriter to fund the remaining 50% of the shortfall). Once finalized, the County will file the Put Agreement as part of the Plan Supplement.

[16] Among the economic modifications made to the Financing Plan by the Amended Financing Plan are revisions to address a decline in actual or projected revenues having an economic effect that equals or exceeds the economic effect

*(FOOTNOTE CONTINUED)*

129

at the time of the financing result in borrowing costs higher than those set forth in the Amended Financing Plan, or if changes in consumption patterns have an equivalent effect, and such changes in turn necessitate higher Sewer System rates than what is specified in the Amended Financing Plan, the County has the right under the Sewer Plan Support Agreements to decline to proceed with the Amended Financing Plan and the Plan itself.

It is possible that the Amended Financing Plan will be revised one or more times before the Confirmation Hearing in light of altered market conditions and/or actual performance of the Sewer System. The Sewer Plan Support Agreements include certain provisions that may limit the County's ability to modify the Amended Financing Plan. If the County further amends the original Financing Plan, the County must provide written notice to each Sewer Plan Support Party of any amendment to the Financing Plan within one (1) business day of any such amendment and must make sure that any amendment to the Financing Plan shall be a publicly available document. If the County amends the Financing Plan in any material respect without the written approval of each Sewer Plan Support Party other than LBSF and does not rescind such amendment or obtain the written approval of each Sewer Plan Support Party regarding such amendment within fifteen (15) calendar days of receiving written notice concerning any such amendment from one or more of the Sewer Plan Support Parties other than LBSF (which written notice must be provided by the applicable Sewer Plan Support Party within seven (7) calendar days after the County provides notice of the amendments), then any of the Sewer Plan Support Parties other than LBSF may terminate the respective Sewer Plan Support Agreement by giving a second written notice within twenty (20) calendar days of the first written notice.

The County may also decline to proceed with the Amended Financing Plan and the Plan if it reasonably determines in good faith that the Plan cannot be confirmed or that the Effective Date cannot occur. Pursuant to the Sewer Plan Support Agreements, the County must confirm the economic viability of the Financing Plan (as it has been amended, including by the Amended Financing Plan) as of the date the Disclosure Statement is approved by the Bankruptcy Court and as of the date on which the Confirmation Hearing begins. As noted above, it is possible that the Amended Financing Plan will be further revised after the Disclosure Statement has been approved and distributed to Creditors, but before the Confirmation Hearing begins.

To assist with the implementation of the Amended Financing Plan, the County has selected Citigroup Global Markets, Inc. as the senior managing underwriter for the proposed New Sewer Warrants and has designated Public Resources Advisory Group as financial advisor for the proposed New Sewer Warrants.

---

that a 50 basis point increase in borrowing rates (yields) over the assumed rates (yields) utilized for purposes of the Financing Plan would have *vis-à-vis* the sewer rate structure underpinning the Financing Plan. The Amended Financing Plan fully utilizes such 50 basis point amount.

130

**VII.**
**SUMMARY OF THE PLAN**

The following is a narrative description of certain provisions of the Plan, a copy of which is attached hereto as **Exhibit 1** for reference.  This summary of the Plan is qualified in its entirety by the actual terms of the Plan.  In the event of any conflict, the terms of the Plan will control over any statement set forth in this Disclosure Statement.

The Plan is not based upon or conditioned upon any action of the Alabama Legislature.  Without limitation, the Projections underlying the Plan do not assume any enlargement of the County's ability to levy taxes or increase revenues to the General Fund.

**A.**     **Classification and Treatment of Claims Under the Plan**

The Bankruptcy Code requires that a plan divide the different claims against the debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together.   The Bankruptcy Code does not require the classification of administrative claims and certain priority claims, and they are typically denominated "unclassified claims."  Because the County is a municipality, there are no equity interests in the County.

The County believes that the classification of Claims specified in the Plan is appropriate and consistent with the requirements of the Bankruptcy Code.  The Bankruptcy Court will determine the appropriateness of the classification of the Claims under the Plan in conjunction with the hearing on confirmation of the Plan, and any dispute regarding the classification of Claims under the Plan should be raised as an objection to confirmation of the Plan.

Under Bankruptcy Code section 1124, a class of claims is "impaired" unless the plan leaves unaltered the legal, equitable, and contractual rights of the holders of claims in that class.  In addition, a class of claims is "impaired" unless the plan cures all defaults (other than those arising from the debtor's insolvency, the commencement of the bankruptcy case, or non-performance of a non-monetary obligation, which need not be cured) that occurred before or after the commencement of the case, reinstates the maturity of the claims in the class, compensates the claimants for any actual damages incurred as a result of their reasonable reliance on any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.  Except for any right to accelerate the debtor's obligations, the holder of an unimpaired claim will effectively be placed in the position in which it would have been, *inter alia*, if the debtor's case had not been commenced.

A plan must designate each separate class of claims either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan).  If a class of claims is "impaired," under the Bankruptcy Code, then the holders of claims in that class are entitled to vote to accept or to reject the plan (unless the plan provides for no distribution to the class, in which case the class is deemed to reject the plan).  If a class of claims is unimpaired, the holders of claims in that class are deemed to accept the plan and are therefore not entitled to vote on the plan.

131

The following describes specifically whether and how Claims are classified under the Plan, whether the holders thereof are entitled to vote, and the treatment accorded such Claims under the Plan.

## 1. Unclassified Claims

Certain types of Claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired, and they do not vote to accept or to reject a plan of adjustment because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Therefore, the County has *not* placed the following categories of Claims into a Class: Administrative Claims (including 503(b)(9) Claims and Cure Payments) and Professional Fee Claims.

### a. Allowance of Administrative Claims

#### i. Administrative Claims Generally

Unless otherwise expressly provided in the Plan or agreed by the County, Administrative Claims will be Allowed only if:

(A)     On or before the Administrative Claims Bar Date, the Person holding such Administrative Claim both Files with the Bankruptcy Court and serves on the County a motion requesting allowance of the Administrative Claim; and

(B)     The Bankruptcy Court enters a Final Order finding that such asserted Administrative Claim is an Allowed Claim.

The County or any other party in interest may File an objection to such motion within sixty (60) calendar days after the expiration of the Administrative Claims Bar Date, unless such time period for filing such objection is extended by the Bankruptcy Court. **THE FAILURE TO FILE A MOTION REQUESTING ALLOWANCE OF AN ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE, OR THE FAILURE TO SERVE SUCH MOTION TIMELY AND PROPERLY, SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISALLOWED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY DISTRIBUTED PURSUANT TO THE PLAN.**

#### ii. Cure Payments

Cure Payments shall be Allowed in accordance with the procedures set forth in Section 3.1(b) of the Plan.

132

### iii. 503(b)(9) Claims

Unless otherwise expressly provided in the Plan or agreed by the County, a 503(b)(9) Claim will be Allowed only if:

(A)     The 503(b)(9) Claim is Filed by the 503(b)(9) Bar Date, or is deemed timely Filed; and

(B)     If an objection to such 503(b)(9) Claim is Filed by a party in interest on or before the Claim Objection Deadline, the Bankruptcy Court enters a Final Order finding that such asserted 503(b)(9) Claim is an Allowed 503(b)(9) Claim.

**PURSUANT TO THE BAR DATE ORDER, ALL PERSONS HOLDING 503(b)(9) CLAIMS THAT DID NOT TIMELY FILE SUCH CLAIMS BY THE 503(b)(9) BAR DATE ARE FOREVER BARRED. ESTOPPED, AND ENJOINED FROM ASSERTING THOSE CLAIMS AGAINST THE COUNTY OR ITS PROPERTY.**

### b.     Treatment of Administrative Claims

### i.     Administrative Claims Generally

Unless the Person holding an Allowed Administrative Claim agrees to different treatment, or already has been paid the full amount of such Allowed Administrative Claim, the County shall pay to that Person Cash in an amount equal to the Allowed amount of such Administrative Claim, without interest, on or before the later of (A) ten (10) Business Days after the Effective Date, and (B) ten (10) Business Days after the date on which any order determining such Claim is an Allowed Administrative Claim becomes a Final Order.

### ii.     Cure Payments

Cure Payments will be made to the non-debtor parties to the subject executory contracts or unexpired leases in accordance with Section 3.1 of the Plan.

### iii.     503(b)(9) Claims

Unless the Person holding an Allowed 503(b)(9) Claim agrees to different treatment, or already has been paid the full amount of such Allowed 503(b)(9) Claim, the County shall pay to that Person Cash in an amount equal to the Allowed amount of such 503(b)(9) Claim, without interest, on or before the later of (A) ten (10) Business Days after the Effective Date, and (B) ten (10) Business Days after the date on which any order determining such Claim to be an Allowed 503(b)(9) Claim becomes a Final Order.

### c.     Professional Fees

Pursuant to Bankruptcy Code section 943(b)(3), all amounts to be paid for services or expenses in the Case or incident to the Plan must be fully disclosed to the Bankruptcy Court and must be reasonable. There shall be paid to each holder of a Professional Fee Claim in full, final, and

complete settlement, satisfaction, release, and discharge of such Claim, Cash in an amount equal to the portion of such Professional Fee Claim that the Bankruptcy Court determines is reasonable on or as soon as is reasonably practicable following the date on which the Bankruptcy Court enters an order determining reasonableness. The County, in the ordinary course of its business, and without the requirement for Bankruptcy Court approval, may pay for professional services rendered and expenses incurred following the Effective Date.

### d. Administrative Tax Claims

Notwithstanding anything to the contrary in the Plan or in the Confirmation Order, a governmental unit shall not be required to file, make, or submit a request for payment (or any document, including a bill) of an expense described in Bankruptcy Code section 503(b)(1)(B) or (C) as a condition of its being an Allowed Administrative Claim, and the County shall pay in full all Allowed Administrative Claims, including any interest related thereto, when due.

### e. No Other Priority Claims

The only category of priority Claim incorporated into a chapter 9 case through Bankruptcy Code section 901(a) are Administrative Claims allowable under Bankruptcy Code section 507(a)(2). The treatment of Allowed Administrative Claims under the Plan is described in Section 2.2(b) of the Plan. No other kinds of priority claims set forth in Bankruptcy Code section 507 are recognized or entitled to priority in chapter 9 or in this Case, but rather are treated in chapter 9 and in this Case and classified in the Plan as General Unsecured Claims.

### 2. Classified Claims

The following section identifies the Plan's treatment of the classified Claims under the Plan. All descriptions set forth in the following section are qualified in their entirety by the specific treatment provided for each of the classified Claims under the Plan.

### a. Class 1-A (Sewer Warrant Claims)

Class 1-A consists of all Sewer Warrant Claims. Class 1-A is Impaired under the Plan. Class 1-A Claims shall be Allowed on the Effective Date in an aggregate amount equal to (i) the Adjusted Sewer Warrant Principal Amount of all Sewer Warrants giving rise to Class 1-A Claims and (ii) the amount of any Reinstated Sewer Warrant Principal Payments and Reinstated Sewer Warrant Interest Payments payable under Section 4.6(a) of the Plan with respect to any Sewer Warrants giving rise to Class 1-A Claims, which Allowed Claims shall not be subject to any Causes of Action, Avoidance Action, defense, counterclaim, subordination, or offset of any kind.

Except as set forth in Section 4.9(a) of the Plan with respect to the Allowed Class 1-A Claims held by the JPMorgan Parties, each holder of an Allowed Class 1-A Claim shall receive a Distribution in one of the two amounts specified in Option 1 and Option 2 below. Such a Distribution is higher than such holder's Pro Rata share of the Distributions made to holders of all Allowed Class 1-A Claims would otherwise be as a result of (i) the reallocation of Plan consideration from the JPMorgan Parties to holders of Allowed Class 1-A Claims as part of the

134

global settlement of Sewer Released Claims against the JPMorgan Parties implemented pursuant to the Plan and (ii) the consideration provided by the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties pursuant to the Plan, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to the holders of Allowed Class 1-A Claims on account of such Claims.

The Distributions to be made to holders of Allowed Class 1-A Claims from or on behalf of the County consist of the following two components:

A.      Except as set forth in Section 4.9(a) of the Plan with respect to the Allowed Class 1-A Claims held by the JPMorgan Parties, each holder of an Allowed Class 1-A Claim shall receive the right to choose between the following two Distribution options:

Option 1: if such holder makes or is deemed to make the Commutation Election, a Distribution on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to 80% of the Adjusted Sewer Warrant Principal Amount of such holder's Sewer Warrants in full, final, and complete settlement, satisfaction, release, and exchange of all of such holder's Class 1-A Claims and of all of such holder's other Sewer Released Claims, both against the County and against any of the other Sewer Released Parties and their respective Related Parties (including against the Sewer Warrant Insurers and their respective Related Parties in respect of any of the Sewer Insurance Policies); or

Option 2: if such holder does not make or is deemed not to make the Commutation Election, (i) a Distribution on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to 65% of the Adjusted Sewer Warrant Principal Amount of such holder's Sewer Warrants in full, final, and complete settlement, satisfaction, release, and exchange of all of such holder's Class 1-A Claims; and (ii) the retention of Sewer Wrap Payment Rights, if any, against the applicable Sewer Warrant Insurer in respect of any Sewer Wrap Policies insuring such holder's Sewer Warrants, which Sewer Wrap Payment Rights shall not be waived or impaired.

B.      Regardless of the option selected, each holder of an Allowed Class 1-A Claim shall also receive on the Effective Date a Distribution of Cash on account of any applicable Reinstated Sewer Warrant Principal Payments and any applicable Reinstated Sewer Warrant Interest Payments in accordance with Section 4.6(a) of the Plan. No Distributions will be made under the Plan to any Person on account of (i) any interest in excess of the non-default rate on any Sewer Warrants after the Petition Date and (ii) any interest on interest on any Sewer Warrants after the Petition Date.

135

As described in Section 4.9(a) of the Plan, the sources of the incremental recovery to holders of Allowed Class 1-A Claims that make the Commutation Election as provided for in Section 2.3(a) of the Plan result from (i) the agreement of the JPMorgan Parties to reallocate to such holders a substantial portion of the Pro Rata share of the Distribution that otherwise would have been distributed to the JPMorgan Parties on account of the Allowed Class 1-A Claims and Allowed Class 1-B Claims held by the JPMorgan Parties as part of the global settlement of Sewer Released Claims against the JPMorgan Parties implemented pursuant to the Plan; and (ii) the consideration provided as a result of the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims on account of such Claims.

Each of the JPMorgan Parties and each Supporting Sewer Warrantholder has agreed in the applicable Sewer Plan Support Agreement to make, and shall make, the Commutation Election with respect to all Sewer Warrants held by each of the JPMorgan Parties and each Supporting Sewer Warrantholder, subject to the exceptions contained in Section 3(e) of the Supporting Sewer Warrantholder Plan Support Agreement.

As part of the global settlement implemented under the Plan, on the Effective Date the holders of Class 1-A Claims will be deemed to have assigned any and all rights of recovery on account of the Sewer Warrant Trustee's Asserted Recourse Claim to the County, without any warranty, representation, or recourse whatsoever.

With the exception of the Sewer Warrant Trustee Fee Claims, which shall be satisfied, discharged, and released in accordance with Section 4.6(b) of the Plan, no additional or other Distributions will be made under the Plan to any Person on account of any Claims with respect to the professional fees or expenses of any holder of Sewer Debt Claims. Because the Sewer Warrant Trustee Fee Claims are paid separately under Section 4.6(b) of the Plan, the Distributions under Section 2.3(a) of the Plan shall not be reduced by any deduction on account of any Sewer Warrant Trustee Fee Claims.

### b. Class 1-B (Bank Warrant Claims and Primary Standby Sewer Warrant Claims)

Class 1-B consists of all Bank Warrant Claims and (to the extent not otherwise included) all Primary Standby Sewer Warrant Claims. Class 1-B is Impaired under the Plan. Class 1-B Claims shall be Allowed on the Effective Date in an aggregate amount equal to (i) the Adjusted Sewer Warrant Principal Amount of all Bank Warrants giving rise to Class 1-B Claims; (ii) the amount of any Reinstated Sewer Warrant Interest Payments payable under Section 4.6(a) of the Plan with respect to any Bank Warrants giving rise to Class 1-B Claims; and (iii) the Bank Warrant Default Interest Settlement Payments, which Allowed Claims shall not be subject to any Causes of Action, Avoidance Action, defense, counterclaim, subordination, or offset of any kind.

136

Except as set forth in Section 4.9(a) of the Plan with respect to the Allowed Class 1-B Claims held by the JPMorgan Parties, each holder of an Allowed Class 1-B Claim shall receive a Distribution in one of the two amounts specified in Option 1 and Option 2 below. Such a Distribution is higher than such holder's Pro Rata share of the Distributions made to holders of all Allowed Class 1-B Claims would otherwise be as a result of (i) the reallocation of Plan consideration from the JPMorgan Parties to holders of Allowed Class 1-B Claims as part of the global settlement of Sewer Released Claims against the JPMorgan Parties implemented pursuant to the Plan and (ii) the consideration provided by the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties pursuant to the Plan, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to the holders of Allowed Class 1-B Claims on account of such Claims.

The Distributions to be made to holders of Allowed Class 1-B Claims from or on behalf of the County consist of the following three components:

A.     Except as set forth in Section 4.9(a) of the Plan with respect to the Allowed Class 1-B Claims held by the JPMorgan Parties, each holder of an Allowed Class 1-B Claim shall receive the right to choose between the following two Distribution options:

Option 1: if such holder makes the Commutation Election, a Distribution on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to **80%** of the Adjusted Sewer Warrant Principal Amount of such holder's Bank Warrants in full, final, and complete settlement, satisfaction, release, and exchange of all of such holder's Class 1-B Claims (including any Bank Warrant Default Interest Claims, provided that Bank Warrant Default Interest Settlements Payments, if applicable, shall be paid pursuant to component C. below) and of all of such holder's other Sewer Released Claims, both against the County and against any of the other Sewer Released Parties and their respective Related Parties; or

Option 2: if such holder does not make or is deemed not to make the Commutation Election, a Distribution (x) on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to **65%** of the Adjusted Sewer Warrant Principal Amount of such holder's Bank Warrants and (y) on the first Business Day that is at least thirty (30) calendar days after the entry of a Final Order allowing such Claims, of Cash from a reserve account to be funded on the Effective Date from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to 65% of any Allowed Bank Warrant Default Interest Claims held by such holder in full, final, and complete settlement, satisfaction, release, and exchange of all of such holder's Class 1-B Claims.

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 162 of 251

B.    Regardless of the option selected, each holder of an Allowed Class 1-B Claim shall also receive on the Effective Date a Distribution of Cash on account of any applicable Reinstated Sewer Warrant Interest Payments in accordance with Section 4.6(a) of the Plan. No Distributions will be made under the Plan to any Person on account of (i) any interest in excess of the Sewer Bank Rate on any Bank Warrants after the Petition Date and (ii) any interest on interest on any Bank Warrants after the Petition Date.

C.    In addition to the foregoing, each of the Sewer Liquidity Banks shall receive on the Effective Date a Distribution of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to such Sewer Liquidity Bank's respective specified portion of the Bank Warrant Default Interest Settlement Payments. By their acceptance of or non-objection to confirmation of the Plan, each other holder of an Allowed Class 1-B Claim shall have consented and agreed, pursuant to Bankruptcy Code section 1123(a)(4), to the Sewer Liquidity Banks' receipt of the Bank Warrant Default Interest Settlement Payments.

As described in Section 4.9(a) of the Plan, the sources of the incremental recovery to holders of Allowed Class 1-B Claims that make the Commutation Election as provided in Section 2.3(b) of the Plan result from (i) the agreement of the JPMorgan Parties to reallocate to such holders a substantial portion of the Pro Rata share of the Distribution that otherwise would have been distributed to the JPMorgan Parties on account of the Allowed Class 1-A and Allowed Class 1-B Claims held by the JPMorgan Parties as part of the global settlement of Sewer Released Claims against the JPMorgan Parties implemented pursuant to the Plan; and (ii) the consideration provided as a result of the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims on account of such Claims.

Each of the JPMorgan Parties, each Sewer Liquidity Bank, and each Supporting Sewer Warrantholder has agreed in the applicable Sewer Plan Support Agreement to make, and shall make, the Commutation Election and to waive any Bank Warrant Default Interest Claims held by such JPMorgan Party, Sewer Liquidity Bank, and Supporting Sewer Warrantholder, as applicable, with respect to all Bank Warrants held by each of the JPMorgan Parties, each Sewer Liquidity Bank, and each Supporting Sewer Warrantholder.

As part of the global settlement implemented under the Plan, on the Effective Date the holders of Class 1-B Claims will be deemed to have assigned any and all rights of recovery on account of the Sewer Warrant Trustee's Asserted Recourse Claim to the County, without any warranty, representation, or recourse whatsoever.

138

No additional or other Distributions will be made under the Plan to any Person on account of the Primary Standby Sewer Warrant Claims (to the extent not otherwise included within the Bank Warrant Claims).

With the exception of the Sewer Warrant Trustee Fee Claims, which shall be satisfied, discharged, and released in accordance with Section 4.6(b) of the Plan, no additional or other Distributions will be made under the Plan to any Person on account of any Claims with respect to the professional fees or expenses of any holder of Sewer Debt Claims. Because the Sewer Warrant Trustee Fee Claims are paid separately under Section 4.6(b) of the Plan, the Distributions under Section 2.3(b) of the Plan shall not be reduced by any deduction on account of any Sewer Warrant Trustee Fee Claims.

### c. Class 1-C (Sewer Warrant Insurers Claims)

Class 1-C consists of all Sewer Warrant Insurers Claims. Class 1-C is Impaired under the Plan. Class 1-C Claims shall be Allowed on the Effective Date in an aggregate amount, without duplication, equal to the sum of (i) the amount of the Sewer Warrant Insurers Claims, (ii) the amount of any Reinstated Sewer Warrant Principal Payments or Reinstated Sewer Warrant Interest Payments payable under Section 4.6(a) of the Plan with respect to any Sewer Warrants held by the Sewer Warrant Insurers, and (iii) the Sewer Warrant Insurers Outlay Amount, which Allowed Claims shall not be subject to any Causes of Action, Avoidance Action, defense, counterclaim, subordination, or offset of any kind.

The holders of Allowed Class 1-C Claims shall receive from or on behalf of the County on the Effective Date, in full, final, and complete settlement, satisfaction, release, and exchange of each such holder's Class 1-C Claims:

> i. an aggregate Distribution of $165,000,000 in Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof, which aggregate amount shall be distributed and allocated among the Sewer Warrant Insurers as set forth in the Sewer Warrant Insurers Agreements;

> ii. a separate aggregate Distribution of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof, which aggregate amount shall be equal to the Non-Commutation True-Up Amount attributable to all Sewer Warrants insured by each Sewer Warrant Insurer under a Sewer Wrap Policy and held by Persons that elected not to make or were deemed not to make the Commutation Election;

> iii. a payment in full from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in an amount equal to each Sewer Warrant Insurer's Covered Tail Risk, to be paid or funded pursuant to each of the Tail Risk Payment Agreements;

> iv. Distributions of Cash on account of the Reinstated Sewer Warrant Principal Payments, the Reinstated Sewer Warrant Interest Payments, and the Sewer Warrant

139

Insurers Outlay Amount, in each case if applicable and if any, in accordance with Section 4.6(a) of the Plan.

As part of the global settlement implemented under the Plan, the Sewer Warrant Insurers will be deemed to waive and release all Bank Warrant Default Interest Claims.

As part of the global settlement implemented under the Plan, on the Effective Date the holders of Class 1-C Claims will be deemed to have assigned any and all rights of recovery on account of the Sewer Warrant Trustee's Asserted Recourse Claim to the County, without any warranty, representation, or recourse whatsoever.

With the exception of the Sewer Warrant Trustee Fee Claims, which shall be satisfied, discharged, and released in accordance with Section 4.6(b) of the Plan, no additional or other Distributions will be made under the Plan to any Person on account of any Claims with respect to the professional fees or expenses of any holder of Sewer Debt Claims. Because the Sewer Warrant Trustee Fee Claims are paid separately under Section 4.6(b) of the Plan, the Distributions under Section 2.3(c) of the Plan shall not be reduced by any deduction on account of any Sewer Warrant Trustee Fee Claims.

### d. Class 1-D (Other Specified Sewer Claims)

Class 1-D consists of all JPMorgan Sewer Revenue Indemnification Claims and the LBSF Periodic Payment Claim. Class 1-D is Impaired under the Plan.

All Claims in Class 1-D will be Allowed on the Effective Date. In full, final, and complete settlement, satisfaction, release, and exchange of all Class 1-D Claims, and as part of the global settlement between the County and the Sewer Released Parties implemented pursuant to the Plan, on the Effective Date the County shall pay (i) $10.00 to JPMS and (ii) $1,250,000.00 to LBSF, in each case from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof. By its acceptance of or non-objection to confirmation of the Plan, JPMS shall have consented and agreed, pursuant to Bankruptcy Code section 1123(a)(4), to receive less favorable treatment than LBSF on account of its Allowed Class 1-D Claim.

As part of the global settlement implemented under the Plan, on the Effective Date the holders of Class 1-D Claims will be deemed to have assigned any and all rights of recovery on account of the Sewer Warrant Trustee's Asserted Recourse Claim to the County, without any warranty, representation, or recourse whatsoever.

With the exception of the Sewer Warrant Trustee Fee Claims, which shall be satisfied, discharged, and released in accordance with Section 4.6(b) of the Plan, no additional or other Distributions will be made under the Plan to any Person on account of any Claims with respect to the professional fees or expenses of any holder of Sewer Debt Claims. Because the Sewer Warrant Trustee Fee Claims are paid separately under Section 4.6(b) of the Plan, the Distributions under Section 2.3(d) of the Plan shall not be reduced by any deduction on account of any Sewer Warrant Trustee Fee Claims.

### e. Class 1-E (Sewer Swap Agreement Claims)

Class 1-E consists of all Sewer Swap Agreement Claims. Class 1-E is Impaired under the Plan.

The holders of Sewer Swap Agreement Claims shall neither receive any Distributions nor retain any property under the Plan on account of such Claims. Because no Distributions will be made to holders of Class 1-E Claims nor will such holders retain any property on account of such Claims, Class 1-E is deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g), and therefore holders of Claims in Class 1-E are not entitled to vote to accept or reject the Plan on account of such Claims.

### f. Class 1-F (Other Standby Sewer Warrant Claims)

Class 1-F consists of all Other Standby Sewer Warrant Claims. Class 1-F is Impaired under the Plan.

The holders of Other Standby Sewer Warrant Claims shall neither receive any Distributions nor retain any property under the Plan on account of such Claims. Because no Distributions will be made to holders of Class 1-F Claims nor will such holders retain any property on account of such Claims, Class 1-F is deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g), and therefore holders of Claims in Class 1-F are not entitled to vote to accept or reject the Plan on account of such Claims.

### g. Class 2-A (Series 2004-A School Claims)

Class 2-A consists of all Series 2004-A School Claims. Class 2-A is Impaired under the Plan.

All Claims in Class 2-A will be Allowed on the Effective Date; *provided, however*, that for the avoidance of doubt, any Series 2004-A School Claims subject to subordination under Bankruptcy Code section 510(b) will not be Allowed and are separately classified as Subordinated Claims. Each holder of an Allowed Class 2-A Claim will on account of such holder's Class 2-A Claim retain all of such holder's rights and interests in its Series 2004-A School Warrants, which will be repaid on the terms and conditions set forth in the School Warrant Indenture as modified by the Plan. Pursuant to Bankruptcy Code section 1123(a)(5)(F), the School Warrant Indenture shall be modified on the Effective Date in the following respects:

    i.  Subject to the County having satisfied its payment obligations in respect of the Series 2004-A School Warrants through the Effective Date, all School Warrant Events of Default under the School Warrant Indenture that occurred prior to or that were continuing on the Effective Date generally with respect to all School Warrants or with respect to the Series 2004-A School Warrants shall be deemed waived and of no further force or effect, without any requirement that the County take any action to cure or otherwise eliminate any such School Warrant Events of Default. For the avoidance of doubt, and except as otherwise provided in clause (ii) immediately below, the fact that a School Warrant Event of Default existed at any time prior to, or at the time of,

141

the Effective Date, shall not give rise to any argument or claim that any future occurrence or recurrence of such type of School Warrant Event of Default has been excused or waived (prospectively or otherwise) under the preceding sentence.

     ii.  None of the following events shall constitute School Warrant Events of Default under the School Warrant Indenture: (A) the pendency of a proceeding regarding the "Segregated Account" of Ambac in Wisconsin state court; (B) the pendency of a chapter 11 bankruptcy case regarding Ambac Financial Group Inc.; and (C) the subsequent filing of any bankruptcy case or proceeding under any other insolvency regime regarding either of Ambac or Ambac Financial Group Inc., including the appointment of any "orderly liquidation authority" under 12 U.S.C. §§ 5381-5394. For the avoidance of doubt, to the extent that School Warrant Events of Default may have occurred on or prior to the Effective Date due to the foregoing events, such School Warrant Events of Default shall be deemed waived and of no further force or effect.

     iii.  If and to the extent that Future Tax Proceeds are collected or held by the County after the Effective Date, the County shall comply with the mandatory redemption provisions of the School Warrant Indenture, but for so long as the Series 2005-B School Warrants are outstanding the County shall exercise any discretion and powers the County holds under the School Warrant Indenture to direct the School Warrant Trustee to redeem the Series 2005-B School Warrants, and not the Series 2005-A School Warrants or the Series 2004-A School Warrants, on the next applicable redemption date. In addition, notwithstanding any provision to the contrary in the School Warrant Indenture, including Section 2.1(f) of the First Supplemental Indenture, the County will not direct the School Warrant Trustee to credit any portion of the mandatory redemptions made after the Effective Date of the Series 2005-B School Warrants as against the principal amortization schedule set forth in the School Warrant Indenture (including the First Supplemental Indenture thereto) or otherwise.

To the extent necessary to give effect to the foregoing modifications, each holder of Allowed Class 2-A Claims shall be deemed to consent to the execution of the School Warrant Second Supplemental Indenture by the County and the School Warrant Trustee on the Effective Date.

On the Effective Date, or as soon thereafter as practicable, the County will release any hold on the Retained Amount, and the Retained Amount shall thereafter be available for distribution in accordance with the provisions of the School Warrant Indenture. No compensation, damages, interest, or other amounts will be Allowed or otherwise payable to any holders of Class 2-A Claims on account of the County's retention of the Retained Amount.

Any unpaid portion of the School Warrant Trustee Fee Claims shall be paid in Cash on the Effective Date to the School Warrant Trustee out of funds in the "Jefferson County Limited Obligation School Warrant Revenue Account" established under the School Warrant Indenture. Nothing in the Plan is intended to or will affect the School Warrant Trustee's rights to compensation or its lien, priorities, or any other rights under the School Warrant Indenture.

Nothing in the Plan is intended to release or affect any rights or claims that holders of Series 2004-A School Warrants or the School Warrant Trustee may have against the School Warrant Insurer; *provided, however*, that in no event shall any such rights give rise to any Claims against the

142

County or its property that are not satisfied and released by the treatment provided in the Plan for Allowed Class 2-A Claims.

### h. Class 2-B (Series 2005-A School Claims)

Class 2-B consists of all Series 2005-A School Claims. Class 2-B is Impaired under the Plan.

All Claims in Class 2-B will be Allowed on the Effective Date; *provided, however*, that for the avoidance of doubt, any Series 2005-A School Claims subject to subordination under Bankruptcy Code section 510(b) will not be Allowed and are separately classified as Subordinated Claims. Each holder of an Allowed Class 2-B Claim will on account of such holder's Class 2-B Claim retain all of such holder's rights and interests in its Series 2005-A School Warrants, which will be repaid on the terms and conditions set forth in the School Warrant Indenture as modified by the Plan. Pursuant to Bankruptcy Code section 1123(a)(5)(F), the School Warrant Indenture shall be modified on the Effective Date in the following respects:

i. Subject to the County having satisfied its payment obligations in respect of the Series 2005-A School Warrants through the Effective Date, all School Warrant Events of Default under the School Warrant Indenture that occurred prior to or that were continuing on the Effective Date generally with respect to all School Warrants or with respect to the Series 2005-A School Warrants shall be deemed waived and of no further force or effect, without any requirement that the County take any action to cure or otherwise eliminate any such School Warrant Events of Default. For the avoidance of doubt, and except as otherwise provided in clause (ii) immediately below, the fact that a School Warrant Event of Default existed at any time prior to, or at the time of, the Effective Date, shall not give rise to any argument or claim that any future occurrence or recurrence of such type of School Warrant Event of Default has been excused or waived (prospectively or otherwise) under the preceding sentence.

ii. None of the following events shall constitute School Warrant Events of Default under the School Warrant Indenture: (A) the pendency of a proceeding regarding the "Segregated Account" of Ambac in Wisconsin state court; (B) the pendency of a chapter 11 bankruptcy case regarding Ambac Financial Group Inc.; and (C) the subsequent filing of any bankruptcy case or proceeding under any other insolvency regime regarding either of Ambac or Ambac Financial Group Inc., including the appointment of any "orderly liquidation authority" under 12 U.S.C. §§ 5381-5394. For the avoidance of doubt, to the extent that School Warrant Events of Default may have occurred on or prior to the Effective Date due to the foregoing events, such School Warrant Events of Default shall be deemed waived and of no further force or effect.

iii. If and to the extent that Future Tax Proceeds are collected or held by the County after the Effective Date, the County shall comply with the mandatory redemption provisions of the School Warrant Indenture, but for so long as the Series 2005-B School Warrants are outstanding the County shall exercise any discretion and powers the County holds under the School Warrant Indenture to direct the School Warrant Trustee to redeem the Series 2005-B School Warrants, and not the Series 2005-A School Warrants or the Series 2004-A School Warrants, on the next applicable redemption date. In addition, notwithstanding any provision to the contrary in the School Warrant Indenture, including Section 2.1(f) of the First Supplemental Indenture, the County

143

will not direct the School Warrant Trustee to credit any portion of the mandatory redemptions made after the Effective Date of the Series 2005-B School Warrants as against the principal amortization schedule set forth in the School Warrant Indenture (including the First Supplemental Indenture thereto) or otherwise**.**

To the extent necessary to give effect to the foregoing modifications, each holder of Allowed Class 2-B Claims shall be deemed to consent to the execution of the School Warrant Second Supplemental Indenture by the County and the School Warrant Trustee on the Effective Date.

On the Effective Date, or as soon thereafter as practicable, the County will release any hold on the Retained Amount, and the Retained Amount shall thereafter be available for distribution in accordance with the provisions of the School Warrant Indenture.  No compensation, damages, interest, or other amounts will be Allowed or otherwise payable to any holders of Class 2-B Claims on account of the County's retention of the Retained Amount.

Any unpaid portion of the School Warrant Trustee Fee Claims shall be paid in Cash on the Effective Date to the School Warrant Trustee out of funds in the "Jefferson County Limited Obligation School Warrant Revenue Account" established under the School Warrant Indenture. Nothing in the Plan is intended to or will affect the School Warrant Trustee's rights to compensation or its lien, priorities, or any other rights under the School Warrant Indenture.

Nothing in the Plan is intended to release or affect any rights or claims that holders of Series 2005-A School Warrants or the School Warrant Trustee may have against the School Warrant Insurer; *provided, however*, that in no event shall any such rights give rise to any Claims against the County or its property that are not satisfied and released by the treatment provided in the Plan for Allowed Class 2-B Claims.

### i. Class 2-C (Series 2005-B School Claims and Standby School Warrant Claims)

Class 2-C consists of all Series 2005-B School Claims and (to the extent not otherwise included) all Standby School Warrant Claims.  Class 2-C is Impaired under the Plan.

All Claims in Class 2-C will be Allowed on the Effective Date.  Each holder of an Allowed Class 2-C Claim will on account of such holder's Class 2-C Claim retain all of such holder's rights and interests in its Series 2005-B School Warrants, which will be repaid on the terms and conditions set forth in School Warrant Indenture and the Standby School Warrant Purchase Agreement, in each case as modified by the Plan.  Pursuant to Bankruptcy Code section 1123(a)(5)(F), the School Warrant Indenture and the Standby School Warrant Purchase Agreement shall be modified on the Effective Date in the following respects:

i. Effective as of August 31, 2013, the "Bank Rate" shall be defined to mean the New Bank Rate.

ii. All School Warrant Events of Default under the School Warrant Indenture or the Standby School Warrant Purchase Agreement (including cross-defaults) that

144

occurred prior to or that were continuing on February 11, 2013, shall be deemed waived and of no further force or effect, without any requirement that the County take any action to cure or otherwise eliminate any such School Warrant Events of Default. For the avoidance of doubt, and except as otherwise provided in clause (iii) immediately below, the fact that a School Warrant Event of Default existed at any time prior to, or at the time of, February 11, 2013, shall not give rise to any argument or claim that any future occurrence or recurrence of such type of School Warrant Event of Default has been excused or waived (prospectively or otherwise) under the preceding sentence.

iii.     All School Warrant Events of Default that could result under the School Warrant Indenture or the Standby School Warrant Purchase Agreement (including cross-defaults) due to the occurrence of any of the following events during the period between February 11, 2013, and the Effective Date shall be deemed waived and of no further force or effect: (A) the pendency of the Case; (B) the pendency of a proceeding regarding the "Segregated Account" of Ambac in Wisconsin state court and the pendency of a chapter 11 bankruptcy case regarding Ambac Financial Group Inc.; and (C) the County's retention of the Retained Amount in the Jefferson County Limited Obligation Warrant Revenue Account during the pendency of the Case notwithstanding any contrary provision of the School Warrant Indenture. In addition, all School Warrant Events of Default that could result under the School Warrant Indenture or the Standby School Warrant Purchase Agreement (including cross-defaults) due to the occurrence of any of the following events during the period after the Effective Date shall be deemed waived and of no further force or effect: (x) the pendency of a proceeding regarding the "Segregated Account" of Ambac in Wisconsin state court; and (y) the pendency of a chapter 11 bankruptcy case regarding Ambac Financial Group Inc.

iv.     Provided that no School Warrant Events of Default (other than those waived pursuant to clauses (ii) and (iii) immediately above) occur under the School Warrant Indenture or the Standby School Warrant Purchase Agreement after February 11, 2013, each holder of a Class 2-C Claim shall irrevocably waive and release any claim or right to receive interest at a rate higher than the New Bank Rate for any period beginning on or after August 31, 2013, either from the County or from Ambac, including under the School Insurance Policies. For the avoidance of doubt, if any School Warrant Events of Default (other than those waived pursuant to the provisions described in clauses (ii) and (iii) immediately above) occur under the School Warrant Indenture or the Standby School Warrant Purchase Agreement after February 11, 2013, the holders of Class 2-C Claims will not be deemed to have waived any claims or rights against the County or Ambac for interest at the Base Rate plus 3.00% under the Standby School Warrant Purchase Agreement from and after the occurrence of such School Warrant Events of Default. The County will represent at the Confirmation Hearing that no School Warrant Events of Default (other than those waived pursuant to clauses (ii) and (iii) immediately above) have occurred under the School Warrant Indenture or the Standby School Warrant Purchase Agreement during the period between February 11, 2013, and the date on which the Confirmation Hearing begins and will request that the Bankruptcy Court include such a finding in the Confirmation Order.

v.     At least five (5) Business Days prior to the first interest payment date after the Effective Date, the County shall provide the True-Up Certificate to the School Warrant Trustee and direct the School Warrant Trustee: (X) to reduce the aggregate outstanding principal balance of the Series 2005-B School Warrants by an amount equal to the True-Up Amount rounded

145

down to the nearest authorized denomination of the Series 2005-B School Warrants, and (Y) to subtract the remainder of the True-Up Amount (after giving effect to the principal reduction referenced in clause (X) of this sentence) from the interest otherwise payable on such interest payment date on account of the Series 2005-B School Warrants. Holders of the Series 2005-B School Warrants shall take such actions as may be reasonably requested by the School Warrant Trustee to implement the principal reduction by the True-Up Amount as described in the Plan.

vi. If and to the extent that Future Tax Proceeds are collected or held by the County after the Effective Date, the County shall comply with the mandatory redemption provisions of the School Warrant Indenture, but for so long as the Series 2005-B School Warrants are outstanding the County shall exercise any discretion and powers the County holds under the School Warrant Indenture to direct the School Warrant Trustee to redeem the Series 2005-B School Warrants, and not the Series 2005-A School Warrants or the Series 2004-A School Warrants, on the next applicable redemption date. In addition, notwithstanding any provision to the contrary in the School Warrant Indenture, including Section 2.1(f) of the First Supplemental Indenture, the County will not direct the School Warrant Trustee to credit any portion of the mandatory redemptions made after the Effective Date of the Series 2005-B School Warrants as against the principal amortization schedule set forth in the School Warrant Indenture (including the First Supplemental Indenture thereto) or otherwise.

vii. If the County causes a remarketing of or restructuring of any of the outstanding Series 2005-B School Warrants under the School Warrant Indenture, such remarketing or restructuring shall be for no less than 100% of such outstanding Series 2005-B School Warrants and the Standby School Warrant Purchase Agreement shall be replaced or cancelled contemporaneously with the closing of such remarketing or restructuring, thereby relieving Depfa Bank PLC from its obligations to provide liquidity support with respect to the Series 2005-B School Warrants. For the avoidance of doubt, the preceding sentence is intended to prohibit the County from remarketing or restructuring a portion of the Series 2005-B Warrants and leaving the Standby School Warrant Purchase Agreement in place; further, the preceding sentence is intended to require the County to remarket or restructure the Series 2005-B School Warrants on an all or none basis

To the extent necessary to give effect to the foregoing modifications, each holder of Allowed Class 2-C Claims shall consent to the execution of the School Warrant Second Supplemental Indenture, in a form acceptable to Depfa Bank PLC, by the County and the School Warrant Trustee on the Effective Date.

On the Effective Date, or as soon thereafter as practicable, the County will release any hold on the Retained Amount, and the Retained Amount shall thereafter be available for distribution in accordance with the provisions of the School Warrant Indenture. No compensation, damages, interest, or other amounts will be Allowed or otherwise payable to any holders of Class 2-C Claims on account of the County's retention of the Retained Amount.

Any unpaid portion of the School Warrant Trustee Fee Claims shall be paid in Cash on the Effective Date to the School Warrant Trustee out of funds in the "Jefferson County Limited Obligation School Warrant Revenue Account" established under the School Warrant Indenture.

146

Nothing in the Plan is intended to or will affect the School Warrant Trustee's rights to compensation or its lien, priorities, or any other rights under the School Warrant Indenture.

### j. Class 2-D (School Policy – General Claims)

Class 2-D consists of all School Policy – General Claims. Class 2-D is Impaired under the Plan.

All Claims in Class 2-D will be Allowed on the Effective Date. Notwithstanding anything to the contrary in the School Policy – General, the School Warrant Indenture, or the Standby School Warrant Purchase Agreement, the holders of Class 2-D Claims (including, for the avoidance of doubt, the School Warrant Insurer) will consent to all modifications of the School Warrant Indenture and of the Standby School Warrant Purchase Agreement set forth in the treatment for Class 2-A Claims, Class 2-B Claims, and Class 2-C Claims.

All other legal, equitable, and contractual rights of holders of Allowed Class 2-D Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto.

### k. Class 2-E (School Surety Reimbursement Claims)

Class 2-E consists of all School Surety Reimbursement Claims. Class 2-E is Impaired under the Plan.

All Claims in Class 2-E will be Allowed on the Effective Date. Notwithstanding anything to the contrary in (i) the School Surety; (ii) that certain *Guaranty Agreement* dated as of February 2, 2005, by and between the County and Ambac; (iii) the School Warrant Indenture; or (iv) the Standby School Warrant Purchase Agreement, the holders of Class 2-E Claims (including, for the avoidance of doubt, the School Warrant Insurer) will consent to all modifications of the School Warrant Indenture and of the Standby School Warrant Purchase Agreement set forth in the treatment for Class 2-A Claims, Class 2-B Claims, and Class 2-C Claims.

All other legal, equitable, and contractual rights of holders of Allowed Class 2-E Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto.

### l. Class 3-A (Board of Education Lease Claims)

Class 3-A consists of all Board of Education Lease Claims. Class 3-A is not Impaired under the Plan.

All Claims in Class 3-A will be Allowed on the Effective Date. The legal, equitable, and contractual rights of holders of Allowed Class 3-A Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto. The holders of Board of Education Lease Warrants shall retain all of their limited payment rights and recourse against the collateral securing obligations under the Board of Education Lease Indenture. Consistent with the Board of Education Lease

147

Indenture, the County has no general liability on account of the Board of Education Lease Claims, which fact will be unaltered by the Plan. To the extent required, the County shall (i) cure any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to the Allowed Class 3-A Claims, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist; (ii) reinstate the maturity of such Allowed Class 3-A Claims as the maturity existed under the Board of Education Lease Indenture before any default, without recognition of any default rate of interest or similar penalty or charge; and (iii) otherwise leave unaltered the legal, equitable, and contractual rights with respect to such Allowed Class 3-A Claims. For the avoidance of doubt, the rights of the Board of Education Lease Trustee under the Board of Education Lease Indenture, including in respect of any unpaid Board of Education Lease Trustee Fee Claims, are unimpaired by the Plan.

### m. Class 3-B (Board of Education Lease Policy Claims)

Class 3-B consists of all Board of Education Lease Policy Claims. Class 3-B is not Impaired under the Plan.

All Claims in Class 3-B will be Allowed on the Effective Date. The legal, equitable, and contractual rights of holders of Allowed Class 3-B Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto. To the extent required, the County shall (i) cure any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to the Allowed Class 3-B Claims, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist; (ii) reinstate the maturity of such Allowed Class 3-B Claims as the maturity existed under the Board of Education Lease Indenture before any default, without recognition of any default rate of interest or similar penalty or charge; and (iii) otherwise leave unaltered the legal, equitable, and contractual rights with respect to such Allowed Class 3-B Claims.

### n. Class 4 (Other Secured Claims, including Secured Tax Claims)

Class 4 consists of all Other Secured Claims, including all Secured Tax Claims. Each Class 4 Claim shall constitute its own subclass. Class 4 is not Impaired under the Plan.

All Claims in Class 4 will be Allowed on the Effective Date. The legal, equitable, and contractual rights of holders of Allowed Class 4 Claims are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights of the County with respect thereto. Unless the holder of an Allowed Class 4 Claim in a particular Class 4 subclass agrees to other treatment, on or as soon as is reasonably practicable after the Effective Date, such holder shall receive, at the County's option: (i) Cash in the Allowed amount of such holder's Allowed Class 4 Claim; (ii) the return of the collateral securing such Allowed Class 4 Claim, without representation or warranty by or recourse against the County; or (iii) (A) the cure of any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to such holder's Allowed Class 4 Claim, without recognition of any default rate of interest or similar penalty or charge, and upon

148

such cure, no default shall exist; (B) the reinstatement of the maturity of such Allowed Class 4 Claim as the maturity existed before any default, without recognition of any default rate of interest or similar penalty or charge; and (C) its unaltered legal, equitable, and contractual rights with respect to such Allowed Class 4 Claim.

The Bankruptcy Court shall retain jurisdiction to determine the amount necessary to satisfy any Allowed Class 4 Claim for which treatment is elected under clause (i) or clause (iii) of the immediately foregoing paragraph. With respect to any Allowed Class 4 Claim for which treatment is elected under clause (i), any holder of such Allowed Class 4 Claim shall release (and by the Confirmation Order shall be deemed to release) all liens against property of the County.

### o.    Class 5-A (Series 2001-B GO Claims and Standby GO Warrant Claims)

Class 5-A consists of all Series 2001-B GO Claims and (to the extent not otherwise included) all Standby GO Warrant Claims. Class 5-A is Impaired under the Plan.

All Claims in Class 5-A will be Allowed on the Effective Date. However, with the exception of Claims on account of principal and prepetition non-default interest in the aggregate amount of $105,123,291.67 (consisting of the BLB GO Claim and the JPMorgan GO Claim), the additional settlement payments set forth in Section 2.3(o) of the Plan, and the reasonable fees and expenses of the GO Warrant Trustee, the GO Warrant Trustee and the GO Banks will waive and release all other asserted Claims in Class 5-A, including on account of default rate interest, the GO Banks' fees and expenses, and postpetition interest, which will receive no Distribution under the Plan.

On the Effective Date each holder of an Allowed Class 5-A Claim shall receive, in full, final, and complete settlement, satisfaction, release, and exchange of such holder's Series 2001-B GO Claims, the following: (1) Cash in the amount of $123,291.67, to be distributed as specified in Exhibit A to the GO Plan Support Agreement; and (2) a Pro Rata Distribution of Replacement 2001-B GO Warrants, which will be repaid on the terms set forth in the Amended and Restated GO Warrant Indentures. In addition, the County shall pay the following amounts in Cash on the Effective Date as consideration for the settlement, waiver, and release of additional prepetition Claims under the Standby GO Warrant Purchase Agreement: (i) $500,000 payable to BLB and (ii) $250,000 payable to JPMorgan Chase Bank, N.A.

The form of Confirmation Order proposed by the County will include the GO Acknowledgement with respect to the Series 2001-B GO Warrants and the Replacement 2001-B GO Warrants.

In accordance with the GO Warrant Indenture, the County shall pay all reasonable fees and expenses of the GO Warrant Trustee, including the reasonable fees and expenses of its agents and counsel, in Cash on or as soon as practicable after the Effective Date, but in any event no more than two (2) Business Days after the Effective Date. Nothing in the Plan is intended to or will affect the rights and priorities granted to the GO Warrant Trustee pursuant to Sections 12.3(b) and 13.7(b) of the GO Warrant Indenture.

149

### p.      Class 5-B (Series 2003-A GO Claims)

Class 5-B consists of all Series 2003-A GO Claims. Class 5-B is not Impaired under the Plan.

All Claims in Class 5-B will be Allowed on the Effective Date; *provided, however*, that for the avoidance of doubt, any Series 2003-A GO Claims subject to subordination under Bankruptcy Code section 510(b) will not be Allowed and are separately classified as Subordinated Claims. Each holder of an Allowed Class 5-B Claim shall retain, in full, final, and complete settlement, satisfaction, release, and exchange of such holder's Class 5-B Claims, all of such holder's legal, equitable, and contractual rights and interests under the GO Resolution 2003-A and in its Series 2003-A GO Warrants, provided that any GO Events of Default that occurred prior to or that were continuing on the Effective Date shall be deemed waived and of no further force or effect, without any requirement that the County provide any compensation or take any action to cure or otherwise eliminate any such GO Events of Default. Based on such treatment and National's payment during the Case of all regularly scheduled principal and interest due on the Series 2003-A GO Warrants, the Series 2003-A GO Claims shall be deemed unimpaired under the Plan and accordingly the holders of such Claims will not be solicited.

From and after the Effective Date and without limiting the effects of the waiver of all prior and continuing GO Events of Default under the Plan, the GO Resolution 2003-A and the GO Insurance Policies shall remain in effect, subject to all terms and conditions thereof, until the Series 2003-A GO Warrants are paid in full. The County will pay in the ordinary course the reasonable fees and costs of the GO Paying Agents to the extent unpaid but required to be paid under the GO Resolutions. To the extent the County fails to make a scheduled principal or interest payment on account of the Series 2003-A GO Warrants after the Effective Date, National may exercise all of its rights and remedies against the County as set forth in the GO Insurance Policies and the GO Resolutions and subject to all terms and conditions thereof.

The form of Confirmation Order proposed by the County will include the GO Acknowledgement with respect to the Series 2003-A GO Warrants.

### q.      Class 5-C (Series 2004-A GO Claims)

Class 5-C consists of all Series 2004-A GO Claims. Class 5-C is not Impaired under the Plan.

All Claims in Class 5-C will be Allowed on the Effective Date; *provided, however*, that for the avoidance of doubt, any Series 2004-A GO Claims subject to subordination under Bankruptcy Code section 510(b) will not be Allowed and are separately classified as Subordinated Claims. Each holder of an Allowed Class 5-C Claim shall retain, in full, final, and complete settlement, satisfaction, release, and exchange of such holder's Class 5-C Claims, all of such holder's legal, equitable, and contractual rights and interests under the GO Resolution 2004-A and in its Series 2004-A GO Warrants, provided that any GO Events of Default that occurred prior to or that were continuing on the Effective Date shall be deemed waived and of no further force or effect, without any requirement that the County provide any compensation or take any action to cure or otherwise

150

eliminate any such GO Events of Default. Based on such treatment and National's payment during the Case of all regularly scheduled principal and interest due on the Series 2004-A GO Warrants, the Series 2004-A GO Claims shall be deemed unimpaired under the Plan and accordingly the holders of such Claims will not be solicited.

From and after the Effective Date and without limiting the effects of the waiver of all prior and continuing GO Events of Default under the Plan, the GO Resolution 2004-A and the GO Insurance Policies shall remain in effect, subject to all terms and conditions thereof, until the Series 2004-A GO Warrants are paid in full. The County will pay in the ordinary course the reasonable fees and costs of the GO Paying Agents to the extent unpaid but required to be paid under the GO Resolutions. To the extent the County fails to make a scheduled principal or interest payment on account of the Series 2004-A GO Warrants after the Effective Date, National may exercise all of its rights and remedies against the County as set forth in the GO Insurance Policies and the GO Resolutions and subject to all terms and conditions thereof.

The form of Confirmation Order proposed by the County will include the GO Acknowledgement with respect to the Series 2004-A GO Warrants.

### r. Class 5-D (GO Policy Claims)

Class 5-D consists of all GO Policy Claims. Class 5-D is Impaired under the Plan.

All Claims in Class 5-D will be Allowed on the Effective Date, and National shall receive the following payments, in full, final, and complete settlement, satisfaction, release, and exchange of all Class 5-D Claims:

(i)      the County will pay $503,046.53 to reimburse National for the accrued prepetition interest that National paid under the GO Insurance Policies in April 2012 on April 1, 2014;

(ii)     the County will pay $2,880,000 to reimburse National for the principal that National paid under the GO Insurance Policies in April 2012 on April 1, 2014;

(iii)    the County will pay $2,965,000 to reimburse National for the principal that National paid under the GO Insurance Policies in April 2013 on April 1, 2015;

(iv)     as a compromise and settlement of the National Fees and Expenses Claims, the County will pay National $1,500,000 in Cash on the Effective Date;

(v)      as a compromise and settlement of the National Reimbursement Claims, including National's contention that the National Reimbursement Claims constitute a right of reimbursement to which National is entitled in accordance with the Bankruptcy Code and applicable law, the County will pay National the National Reimbursement Payments; *provided, however*, that at any time on or after Effective Date, the County shall have the option to prepay the National Reimbursement Payments in whole or in part without premium or penalty, which prepayment option is exercisable by the County paying to National an aggregate amount equal to the nominal sum of the amount of the National Reimbursement Payments that the County elects to prepay discounted to

151

present value as of the prepayment date using a discount rate of 4.90% back from the date of maturity to the prepayment date; and

(vi) The County's obligations to National under the Plan (other than with respect to payment of the National Reimbursement Payments, which obligations will bear no interest) will bear interest from and after the Effective Date until satisfied at a fixed rate equal to the Wall Street Journal prime rate on the Effective Date plus 1.65% per annum.

From and after the Effective Date, the GO Insurance Policies and the GO Resolutions will remain in effect, subject to all terms and conditions thereof, until the Series 2003-A GO Warrants and the Series 2004-A GO Warrants are paid in full. To the extent the County fails to make a scheduled principal or interest payment on account of the Series 2003-A GO Warrants or the Series 2004-A GO Warrants after the Effective Date, National may exercise all of its rights and remedies against the County as set forth in the GO Insurance Policies and the GO Resolutions and subject to all terms and conditions thereof.

The form of Confirmation Order proposed by the County will include the GO Acknowledgement with respect to the GO Insurance Policies.

### s.       Class 5-E (GO Swap Agreement Claims)

Class 5-E consists of all GO Swap Agreement Claims. Class 5-E is Impaired under the Plan.

All Claims in Class 5-E will be Allowed on the Effective Date in the aggregate amount of $7,893,762.30, plus interest accrued thereon at the applicable rate as set forth in the GO Swap Agreement. In full, final, and complete settlement, satisfaction, release, and exchange of all Class 5-E Claims, and as part of the global settlement between the County and the JPMorgan Parties implemented pursuant to the Plan, on the Effective Date the County shall pay JPMorgan Chase Bank, N.A. $10.00.

### t.       Class 6 (General Unsecured Claims)

Class 6 consists of all General Unsecured Claims. Class 6 is Impaired under the Plan.

Holders of Allowed Class 6 Claims will receive a Pro Rata Distribution from the General Unsecured Claims Pool on the GUC Payment Date.

Notwithstanding the foregoing, on the Effective Date, (i) JPMS will waive and release any and all rights to receive any Distribution under the Plan on account of the JPMorgan Asserted Recourse Indemnification Claims; (ii) the Sewer Warrant Insurers will waive and release any all rights to receive any Distribution under the Plan on account of their respective Asserted Full Recourse Sewer Claims; and (iii) no Distribution will be made under the Plan on account of the Sewer Warrant Trustee's Asserted Recourse Claim. For the avoidance of doubt, no Asserted Full Recourse Sewer Claims shall be allowed under the Plan, and the County reserves all its rights to dispute any Asserted Full Recourse Sewer Claims that are not waived and released under the Plan (including with respect to the allowance, amount, and priority of any such Claims) after the Effective Date.

152

u. **Class 7 (Bessemer Lease Claims)**

Class 7 consists of all Bessemer Lease Claims. Class 7 is Impaired under the Plan.

All Claims in Class 7 will be Allowed on the Effective Date. In full, final, and complete settlement, satisfaction, release, and exchange of the Bessemer Lease Claims, the County shall recognize and perform all of its obligations under the Bessemer Stipulation, including with respect to the New Bessemer Lease. The holders of Class 7 Claims will not receive any additional or other Distributions under the Plan beyond those that such holders receive as a result of the County's performance under the Bessemer Stipulation.

v. **Class 8 (Other Unimpaired Claims)**

Class 8 consists of all Consent Decree Claims, Deposit Refund Claims, Eminent Domain Claims, Employee Compensation Claims, Employee Indemnification Claims, OPEB Plan Claims, Pass-Through Obligation Claims, Retirement System Claims, Tax Abatement Agreement Claims, and Workers Compensation Claims. Class 8 is not Impaired under the Plan.

Notwithstanding any other term or provision of the Plan, the legal, equitable, and contractual rights of the holders of Class 8 Claims are unaltered by the Plan, and the Plan leaves unaltered the legal, equitable, and contract rights of all Persons with respect to the Other Unimpaired Claims. Without limitation, the County retains all Causes of Action, defenses, deductions, assessments, setoffs, recoupment, and other rights under applicable nonbankruptcy law with respect to any Other Unimpaired Claims.

w. **Class 9 (Subordinated Claims)**

Class 9 consists of all Subordinated Claims. Class 9 is Impaired under the Plan.

The holders of Subordinated Claims shall neither receive any Distributions nor retain any property under the Plan on account of such Claims. Because no Distributions will be made to holders of Class 9 Claims nor will such holders retain any property on account of such Claims, Class 9 is deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g), and therefore holders of Claims in Class 9 are not entitled to vote to accept or reject the Plan on account of such Claims.

B. **Treatment of Executory Contracts and Unexpired Leases**

1. **Assumption of Certain Executory Contracts and Unexpired Leases**

a. **Assumption of Agreements**

On the Effective Date the County shall assume all executory contracts and unexpired leases that are listed on the Schedule of Assumed Agreements.

The County reserves the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date (i) to delete any executory contract or unexpired lease and provide for its

153

rejection under the Plan or otherwise, or (ii) to add any executory contract or unexpired lease and provide for its assumption under the Plan. The County will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to those agreements affected by the amendment.

Unless otherwise specified on the Schedule of Assumed Agreements, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is also listed on the Schedule of Assumed Agreements.

The Confirmation Order will constitute a Bankruptcy Court order approving the assumption, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

### b. Cure Payments

Any amount that must be paid under Bankruptcy Code section 365(b)(1) to cure a default under and compensate the non-debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Schedule of Assumed Agreements. Unless the parties mutually agree to a different date, such payment shall be made in Cash, within ten (10) Business Days following the later of: (i) the Effective Date and (ii) entry of a Final Order resolving any disputes regarding (A) the amount of any Cure Payment, (B) the ability of the County to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365 with respect to a contract or lease to be assumed, to the extent required, or (C) any other matter pertaining to assumption.

Pending the Bankruptcy Court's ruling on any such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the County unless otherwise agreed by the parties or ordered by the Bankruptcy Court.

### c. Objections to Assumption/Cure Payment Amounts

Any Person that is a party to an executory contract or unexpired lease that will be assumed under the Plan and that objects to such assumption (including the proposed Cure Payment) must File with the Bankruptcy Court and serve upon parties entitled to notice a written statement and supporting declaration stating the basis for its objection. This statement and declaration must be Filed and served on the County on or before **October 21, 2013**. Any Person that fails to timely File and serve such a statement and declaration shall be deemed to waive any and all objections to the proposed assumption (including the proposed Cure Payment) of its contract or lease.

In the absence of a timely objection by a Person that is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired

154

lease, as well as a conclusive finding that the County has demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease, to the extent required.

### d. Resolution of Claims Relating to Assumed Contracts and Leases

Payment of the Cure Payment established under the Plan, by the Confirmation Order, or by any other order of the Bankruptcy Court, with respect to an assumed executory contract or unexpired lease, shall be deemed to satisfy, in full, any prepetition or postpetition arrearage or other Claim (including any Claim asserted in a Filed proof of Claim or listed on the List of Creditors) with respect to such contract or lease (irrespective of whether the Cure Payment is less than the amount set forth in such proof of Claim or the List of Creditors). Upon the tendering of the Cure Payment, any such Filed or scheduled Claim shall be disallowed with prejudice, without further order of the Bankruptcy Court or action by any Person.

### 2. Rejection of Executory Contracts and Unexpired Leases

### a. Rejected Agreements

On the Effective Date all executory contracts and unexpired leases that the County entered into on or before the Petition Date that (i) have not been previously assumed or rejected by the County and (ii) are not set forth on the Schedule of Assumed Agreements shall be rejected. For the avoidance of doubt, executory contracts and unexpired leases that have been previously assumed or assumed and assigned pursuant to an order of the Bankruptcy Court shall not be affected by the Plan. The Confirmation Order will constitute a Bankruptcy Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases to be rejected under the Plan.

### b. Rejection Bar Date

Any Rejection Damage Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served on the County by the Rejection Bar Date. Any such Claims that are not timely Filed and served will be forever barred and unenforceable against the County and its property, and Persons holding such Claims will not receive and be barred from receiving any Distributions on account of such untimely Claims.

### 3. Postpetition Contracts and Leases

Except as expressly provided in the Plan or the Confirmation Order, all executory contracts and unexpired leases that the County has entered into after the Petition Date with due authorization of the County Commission will be assumed and retained by the County and will remain in full force and effect from and after the Effective Date.

## C. Means of Execution and Implementation of the Plan

### 1. Consent Under Bankruptcy Code Section 904.

Pursuant to and for purposes of Bankruptcy Code section 904, the County consents to entry of the Confirmation Order on the terms and conditions set forth in the Plan and to entry of any

155

further orders as necessary or required to implement the provisions of the Plan or any and all related transactions.

### 2. Continued Governance of the County and the Sewer System

From and after the Effective Date, the County Commission shall continue to govern the County and shall continue to administer, control, manage, and operate the property and enterprises of the County (including the Sewer System) in accordance with the Plan, the County's constituent documents, any applicable indentures or other governing contracts, the Alabama Constitution, applicable statutes of the State of Alabama, the EPA Consent Decree, the Personnel Board Consent Decree, and other applicable laws.

### 3. Application of the Approved Rate Structure

From and after the Effective Date, the Confirmation Order shall constitute a conclusive finding and determination that the Approved Rate Structure complies with the requirements of Bankruptcy Code sections 943(b)(6) and 1129(a)(6) and applicable state law, and is appropriate, reasonable, non-discriminatory, and legally binding on and specifically enforceable against the County in accordance with the Plan and under all applicable state and federal laws. From and after the Effective Date, the County Commission shall adopt and maintain the Approved Rate Structure in accordance with the Rate Resolution and as necessary for the County to satisfy the obligations arising under the New Sewer Warrants and the New Sewer Warrant Indenture (and to otherwise comply with all applicable state and federal laws regarding the maintenance and operation of the Sewer System), including increases in sewer rates to the extent necessary to allow the timely satisfaction of the County's obligations under the New Sewer Warrants and the New Sewer Warrant Indenture (and to otherwise comply with all applicable state and federal laws regarding the maintenance and operation of the Sewer System).

### 4. Retention of Assets Generally

Except as otherwise expressly provided in the Plan, all assets and properties of the County shall be retained by the County on the Effective Date, free and clear of all Claims, liens, encumbrances, charges, and interests. From and after the Effective Date, the County may conduct its affairs and use, acquire, and dispose of any assets or property without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

### 5. Certain Transactions on the Effective Date

(a)     On the Effective Date the County shall issue the New Sewer Warrants under the New Sewer Warrant Indenture. The gross proceeds generated by the issuance of the New Sewer Warrants shall first be utilized to pay the Put Consideration.

(b)     On the Effective Date the County shall issue and deliver the Replacement 2001-B GO Warrants under the Amended and Restated GO Warrant Indentures, along with the initial payments

156

required on the Effective Date pursuant to the Replacement 2001-B GO Warrants and Section 2.3(o) of the Plan.

(c) On or before the Effective Date, the County shall enter into the Tail Risk Payment Agreements with each Sewer Warrant Insurer and on the Effective Date pay or fund in full an amount equal to each Sewer Warrant Insurer's respective Covered Tail Risk.

(d) Only if the County and the School Warrant Trustee agree that such a supplemental indenture is necessary and appropriate and agree on the form and substance of such supplemental indenture prior to the deadline for filing the Plan Supplement, on the Effective Date the County shall execute the School Warrant Second Supplemental Indenture.

## 6. Disposition of the Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, and Refinancing Proceeds

(a) As a proposed settlement incorporated into the Plan pursuant to Bankruptcy Rule 9019 of any and all Causes of Action and matters raised in or that could have been raised in the Declaratory Judgment Action, and any Causes of Action related to the reapplication to principal of any interest payments made on the Sewer Warrants during the Case or any Causes of Action related to the reallocation of any payments made on the Sewer Warrants both before and during the Case among the holders of various series and subseries of Sewer Warrants, (i) on the Effective Date, Cash in amounts equal to the Reinstated Sewer Warrant Principal Payments (without giving effect to any acceleration or any accelerated redemption schedule), the Reinstated Sewer Warrant Interest Payments, and the Sewer Warrant Insurers Outlay Amount shall be distributed by the Sewer Warrant Trustee to the applicable parties from the Accumulated Sewer Revenues, including with respect to the Sewer Warrants held by the Sewer Plan Support Parties; (ii) for purposes of Distributions under the Plan, no payments made during the Case (other than amounts used to repay Sewer Warrants at maturity or to redeem Sewer Warrants prior to maturity, including, as applicable, making regularly scheduled principal payments on the Sewer Warrants and the Reinstated Sewer Warrant Principal Payments) shall be applied or recharacterized to reduce principal; and (iii) no Distributions shall be made on account of postpetition interest accrued on any Sewer Warrants in excess of pre-default rates or, with respect to Bank Warrants, the Sewer Bank Rate.

(b) On the Effective Date the Sewer Warrant Trustee shall apply any Sewer Warrant Indenture Funds in the Sewer Warrant Trustee's possession to satisfy the Sewer Warrant Trustee Fee Claims to the extent unpaid but permitted to be paid under the Sewer Warrant Indenture and to reserve an amount equal to the Sewer Warrant Trustee Residual Fee Estimate. Any such application and reserve by the Sewer Warrant Trustee shall fully, finally, and completely satisfy, discharge, and release all Sewer Warrant Trustee Fee Claims. If and only if there is an Unused Covered Tail Risk Amount, the Sewer Warrant Trustee shall apply any Sewer Warrant Indenture Funds in the Sewer Warrant Trustee's possession to establish a reserve for Sewer Wrap Payment Rights Administration Expenses to the extent and in the amount of the Unused Covered Tail Risk Amount, which the Sewer Warrant Trustee may thereafter invest in an interest-bearing account and utilize to satisfy Sewer Wrap Payment Rights Administration Expenses as such expenses become due. The County shall have no obligation to pay, fund (including from Accumulated Sewer Revenues, Sewer Warrant Indenture Funds, or Refinancing Proceeds), or otherwise provide for any Sewer Wrap Payment

157

Rights Administration Expenses beyond the Unused Covered Tail Risk Amount and such interest as may be obtained through the Sewer Warrant Trustee's investment of the reserve established with the Unused Covered Tail Risk Amount. If the Unused Covered Tail Risk Amount is less than the Sewer Wrap Payment Rights Administration Expenses and if any applicable Sewer Warrant Insurers will not provide a source of payment for the Sewer Wrap Payment Rights Administration Expenses in excess of the Unused Covered Tail Risk Amount on terms acceptable to the Sewer Warrant Trustee, then the Sewer Warrant Trustee shall have no obligation or responsibility to perform any action that would give rise to Sewer Wrap Payment Rights Administration Expenses.

(c)     On the Effective Date, the Sewer Warrant Trustee or the County, as the case may be, shall apply the following funds in the following order for purposes of making the Distributions provided under the Plan for holders of Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D:

(1)     first, all Sewer Warrant Indenture Funds remaining after giving effect to the application permitted or required by Section 4.6(b) of the Plan,

(2)     second, all Remaining Accumulated Sewer Revenues, and

(3)     third, Refinancing Proceeds.

(d)     On the Effective Date, all Refinancing Proceeds remaining after giving effect to the usage permitted or required by Section 4.6(c) of the Plan shall be applied in accordance with the New Sewer Warrant Indenture.

**7.      Commutation Election Protocols and Effect on the Sewer Insurance Policies**

**a.      Presumptions Regarding the Commutation Election**

All holders of Claims in Class 1-A and Class 1-B that (i) do not return any Ballot by the Ballot Deadline, (ii) return a Ballot by the Ballot Deadline but do not make any election with respect to the Commutation Election, or (iii) return a Ballot by the Ballot Deadline and indicate both an election to make and an election not to make the Commutation Election, will be conclusively deemed to have made the Commutation Election; *provided, however*, that (x) any holders of the Series 2003-B-8 Sewer Warrants that either do not return a Ballot, do not indicate an election on any Ballot that is returned by the Ballot Deadline, or return a Ballot by the Ballot Deadline and indicate both an election to make and an election not to make the Commutation Election will be conclusively deemed not to have made the Commutation Election, and (y) any holders of the Series 2003-C-9 Through C-10 Sewer Warrants that are deemed to make the Commutation Election will be sent a notice pursuant to the Plan Procedures Order under which such holders will have an opportunity to rescind the deemed Commutation Election and, upon such rescission, shall be deemed not to have made the Commutation Election for all purposes under the Plan and shall have their Series 2003-C-9 Through C-10 Sewer Claims be treated in accordance with Option 2 of Section 2.3(a).

158

### b.    Plan's Effect on the Sewer Insurance Policies

As a result of the satisfaction and discharge of all Sewer Debt Claims and the cancellation of the Sewer Warrants and the Sewer Warrant Indenture under the Plan, on the Effective Date (i) the Sewer DSRF Policies and the Sewer DSRF Reimbursement Agreements will be cancelled and of no further force or effect; (ii) the Sewer Warrant Trustee will close the "Jefferson County Sewer System Debt Service Reserve Fund" under the Sewer Warrant Indenture and return any surety bonds or other documentation evidencing the Sewer DSRF Policies to the applicable Sewer Warrant Insurer; and (iii) the Sewer Wrap Policies will be cancelled and of no further force or effect except with respect to any Sewer Wrap Payment Rights, and such Sewer Wrap Policies (in the case of FGIC, as modified by any plan of rehabilitation) shall remain in full force and effect with respect to such Sewer Wrap Payment Rights.

### 8.    Compromise and Settlement of All Sewer Debt-Related Issues

(a)    Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, in consideration of the settlement and release of all Sewer Released Claims and the treatment and consideration provided under the Plan for Allowed Class 1-A, Class 1-B, Class 1-C, and Class 1-D Claims, the Plan incorporates and is expressly conditioned upon the approval and effectiveness of a comprehensive compromise and settlement by and among the County and the Sewer Plan Support Parties of numerous issues and disputes related to the Sewer System, the Sewer Released Claims, and the allowance and treatment of the Sewer Debt Claims.  As of the Effective Date, the Plan accordingly represents a full, final, and complete compromise, settlement, release, and resolution of, among other matters, disputes and pending or potential litigation (including any appeals) regarding the following: (i) the allowability, amount, priority, and treatment of the Sewer Debt Claims; (ii) the validity or enforceability of the Sewer Warrants; (iii) the valuation of the Sewer System and of the stream of net sewer revenues pledged under the Sewer Warrant Indenture; (iv) the appropriate rates that have been or can be charged to users of the Sewer System; (v) any Causes of Action or Avoidance Actions that the County has asserted or could potentially assert against the JPMorgan Parties or against other of the Sewer Plan Support Parties, including any subordination claims (including equitable subordination claims and statutory subordination claims) relating to any Sewer Debt Claims held by any of the Sewer Plan Support Parties; (vi) the Sewer Released Claims that (A) some of the Sewer Plan Support Parties have asserted or (B) the Sewer Plan Support Parties could potentially assert against other Sewer Plan Support Parties, including, in each case, any subordination claims (including equitable subordination claims and statutory subordination claims) relating to any Sewer Debt Claims held by any of the Sewer Plan Support Parties; (vii) how the Sewer Warrant Trustee has applied revenues of the Sewer System to payment of certain Sewer Debt Claims both before and during the Case, including any Causes of Action related to the reapplication to principal of any interest payments made on the Sewer Warrants during the Case or reallocation of any payments made on the Sewer Warrants both before and during the Case among the holders of various series and subseries of Sewer Warrants; (viii) the various issues raised by the Declaratory Judgment Action; (ix) the scope and extent of any liens or other property rights under the Sewer Warrant Indenture; (x) whether, and the extent to which, the County may recover from Sewer System revenues amounts actually incurred or previously paid by the County on account of professional fees prior to and during the Case; (xi) the allowance and amount of any Bank Warrant Default Interest Claims; (xii) the priority of the LBSF

159

Periodic Payment Claim, the various issues raised by the LBSF Periodic Payment Claim, and the Sewer Warrant Trustee's treatment of and obligations with respect to that Claim; (xiii) the various issues raised by the Receivership Actions; and (xiv) other historical and potential issues associated with the Sewer System and its financing.

(b)     This comprehensive compromise and settlement will be binding on the County, on all Persons who have asserted or could assert any potential Causes of Action or Avoidance Actions for or on behalf of the County in any fashion, including derivatively or directly, and on all Creditors concerning the Sewer Released Claims compromised and settled under the Plan (including as described in Section 4.8(a) of the Plan) in any pending or potential litigation (including any appeals) before any court or agency. This comprehensive compromise and settlement is a critical component of the Plan and is designed to provide a resolution of disputed Sewer Released Claims inextricably bound with the Plan. As such, the approval and consummation of the Plan will conclusively bind all Creditors and other parties in interest, and the releases and settlements effected under the Plan will be operative as of the Effective Date and subject to enforcement by the Bankruptcy Court from and after the Effective Date, including pursuant to the injunctive provisions of Sections 6.2 and 6.3 of the Plan.

(c)     In order to give effect to this comprehensive compromise and settlement, (i) any adversary proceedings or contested matters involving Sewer Released Claims shall be dismissed effective as of the Effective Date; and (ii) in connection with the occurrence of the Effective Date, each of the County, the Sewer Plan Support Parties, and the Sewer Warrant Trustee (as applicable) shall file in other appropriate courts stipulations of dismissal among the applicable parties or motions to dismiss any pending litigation (including any appeals) commenced by the County, any of the Sewer Plan Support Parties, or the Sewer Warrant Trustee against the County or any of the Sewer Plan Support Parties with prejudice, with such dismissals to be effective on and contingent upon the occurrence of the Effective Date.

### 9.     JPMorgan Reallocation of Distributions and Consideration Provided by the Sewer Warrant Insurers

a.     The Sewer Warrant Claims and Bank Warrant Claims held by the JPMorgan Parties shall be Allowed on the Effective Date in an aggregate amount equal to (i) the Adjusted Sewer Warrant Principal Amount of all Sewer Warrants held by the JPMorgan Parties and (ii) the amount of any Reinstated Sewer Warrant Principal Payments or Reinstated Sewer Warrant Interest Payments payable under Section 4.6(a) of the Plan with respect to such Sewer Warrants, and shall be classified in Class 1-A and Class 1-B, respectively. Notwithstanding the general treatment afforded to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, as part of the global settlement among the County, the JPMorgan Parties, and the other Sewer Plan Support Parties to be implemented pursuant to the Plan pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, and in consideration of the settlement and release of all Sewer Released Claims against the JPMorgan Parties as provided in the Plan, the JPMorgan Parties have agreed, subject to the terms and conditions set forth in the Plan, to make the Commutation Election with respect to all Sewer Warrants held by the JPMorgan Parties (but without receiving the higher recovery being made available to all other holders of Sewer Warrants that make or are deemed to make the Commutation Election) and to reallocate to the holders of Allowed Class

160

1-A Claims and Allowed Class 1-B Claims a substantial portion of the JPMorgan Parties' Pro Rata share of the Distribution made to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, thereby increasing the recovery received by all other holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims on account of such Claims and reducing the amount of Sewer System indebtedness following the County's emergence from chapter 9. As a result of such reallocation by the JPMorgan Parties and the contributions by the Sewer Warrant Insurers detailed below, each holder of an Allowed Class 1-A Claim or an Allowed Class 1-B Claim (other than the JPMorgan Parties) will receive, in full settlement, satisfaction, release, and exchange of such holder's Claims, a Distribution of Cash from Refinancing Proceeds and other sources of Cash in one of the two amounts specified in Option 1 and Option 2 of Sections 2.3(a) and 2.3(b) of the Plan. Such Distribution is higher than such holders' Pro Rata share of the Distribution made to all holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims as a result of (i) the reallocation of Plan consideration from the JPMorgan Parties to holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims; and (ii) the consideration provided by the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties pursuant to the Plan, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims on account of such Claims. The sources of the incremental recovery to those holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims that make the Commutation Election will be from (i) the reallocation of Plan consideration that otherwise would have been distributed to the JPMorgan Parties; and (ii) consideration provided by the Sewer Warrant Insurers (x) settling and releasing any and all of their Sewer Released Claims against the County and the JPMorgan Parties pursuant to the Plan, (y) agreeing to receive an aggregate Pro Rata Distribution on account of their Allowed Sewer Warrant Insurer Claims that is less than the Pro Rata share of the Distribution received by the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims, and (z) allowing their Pro Rata share of such reallocated consideration from the JPMorgan Parties to be made available to the holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims that make the Commutation Election on account of such Claims. The source of the Non-Commutation True-Up Amount and the Covered Tail Risk to be paid to the Sewer Warrant Insurers pursuant to Section 2.3(c) of the Plan shall also be from the reallocation of Plan consideration that otherwise would have been distributed to the JPMorgan Parties.

   **b.**  Based upon the agreements of the Supporting Sewer Warrantholders set forth in Section 5 of the Supporting Sewer Warrantholder Plan Support Agreement, which agreement was reached in order to facilitate the various settlements to be implemented pursuant to the Plan and the occurrence of the Effective Date, the JPMorgan Parties have agreed, subject to the terms and conditions set forth in the Plan and in the Supporting Sewer Warrantholder Plan Support Agreement, to reallocate and distribute to each Supporting Sewer Warrantholder a portion of the JPMorgan Parties' Cash recovery under the Plan after giving effect to the reallocations described in Section 4.9(a) of the Plan in an amount (such amount so reallocated and distributed, the "Supporting Sewer Warrantholder Directed Distribution") equal to (i) the principal amount of Eligible Sewer Warrants held by such Supporting Sewer Warrantholder as of the Distribution Record Date, multiplied by (ii)

161

3.46%; *provided*, *however*, that the total amount of Eligible Sewer Warrants shall not exceed the total set forth on Schedule 1 of the Supporting Sewer Warrantholder Plan Support Agreement on the date of execution thereof, and the aggregate amount of the Supporting Sewer Warrantholder Directed Distribution shall not exceed the product of the total set forth on Schedule 1 of the Supporting Sewer Warrantholder Plan Support Agreement multiplied by 3.46%. Subject to the terms and conditions set forth in the Plan and in the Supporting Sewer Warrantholder Plan Support Agreement, on or before the Effective Date, the JPMorgan Parties shall provide irrevocable directions to the County and the Sewer Warrant Trustee to reallocate and Distribute to each Supporting Sewer Warrantholder, instead of to the JPMorgan Parties, such Supporting Sewer Warrantholder's Pro Rata share of the Supporting Sewer Warrantholder Directed Distribution.

       **c.**      Accordingly, after giving effect to the reallocations described in Section 4.9(a) of the Plan and the Supporting Sewer Warrantholder Directed Distribution, the JPMorgan Parties shall receive, on the Effective Date, Cash in the amount of approximately 31% (approximately $375 million) of the Adjusted Sewer Warrant Principal Amount of Sewer Warrants held by the JPMorgan Parties (approximately $1.218 billion) plus a Distribution of Cash on account of any applicable Reinstated Sewer Warrant Interest Payments in accordance with Section 4.6(a) of the Plan in full, final, and complete settlement, satisfaction, release, and discharge of all Sewer Debt Claims and Sewer Released Claims held by the JPMorgan Parties. After giving effect to the concessions by the JPMorgan Parties and the Sewer Warrant Insurers described above and the settlements and releases to be implemented pursuant to the Plan, the Sewer Debt Claims held by the JPMorgan Parties and the Sewer Warrant Insurers shall not be subject to any Causes of Action, Avoidance Action, defense, counterclaim, subordination, or offset of any kind.

       **10.**     **Cancellation of Warrants and Other Documents**

       **a.**      On the Effective Date, except to the extent otherwise expressly provided in the Plan, all agreements, certificates, indentures, instruments, notes, resolutions, warrants, and other documents evidencing indebtedness of the County, and all liens, mortgages, pledges, grants, trusts, and other interests relating thereto, shall be automatically cancelled, and all obligations of the County thereunder or in any way related thereto shall be discharged. Without limitation and in addition to the provisions of Section 4.7(b) of the Plan, on the Effective Date (i) the Sewer Warrants will be discharged and cancelled, provided that such discharge and cancellation shall not modify, prejudice, or give rise to any defenses in favor of any applicable Sewer Warrant Insurer with respect to any Sewer Wrap Payment Rights; (ii) the Sewer Warrant Indenture will be cancelled and of no further force or effect other than for purposes of allowing the Sewer Warrant Trustee to calculate and make Distributions in accordance with the Plan, to seek and obtain dismissals of the Receivership Actions and other applicable pending litigation, and, if applicable, to pursue and administer the Sewer Wrap Payment Rights after the Effective Date (which, for the avoidance of doubt, will impose no cost or expense on the County beyond any Unused Covered Tail Risk Amount); (iii) the Sewer Swap Agreements will be cancelled and of no further force or effect; (iv) the Standby Sewer Warrant Purchase Agreements will be cancelled and of no further force or effect; (v) the Standby GO Warrant Purchase Agreement will be cancelled and of no further force or effect; (vi) the GO Warrant Indenture will be superseded in all respects by the Amended and Restated GO Warrant Indentures; (vii) the Series 2001-B GO Warrants will be cancelled and superseded in all respects by the Replacement 2001-B GO Warrants; and (viii) the GO Swap Agreement will be cancelled and of no

162

further force or effect. From and after the Effective Date, all Plan Support Agreements will be terminated and superseded in all respects by the Plan, except with respect to any provisions that specifically survive termination of the Plan Support Agreements in accordance with their respective terms.

      **b.** For the avoidance of doubt, the Plan will not cancel or otherwise alter any of the following documents or instruments except to the extent otherwise expressly provided in the Plan: (i) the Board of Education Lease Indenture, (ii) the Board of Education Lease Policy, (iii) the Board of Education Lease Warrants, (iv) the GO Insurance Policies, (v) the GO Resolutions, (vi) the New Bessemer Lease, (vii) the School Insurance Policies, (viii) the School Warrant Indenture, (ix) the School Warrants, (x) the Series 2003-A GO Warrants, (xi) the Series 2004-A GO Warrants, and (xii) the Standby School Warrant Purchase Agreement.

### 11. Termination of Receiver and Dismissal of Receivership Actions

      As a result of the satisfaction and discharge of all Sewer Debt Claims, as well as the cancellation of the Sewer Warrants, the Sewer Warrant Indenture, and the Sewer Insurance Policies (as applicable) under the Plan, from and after the Effective Date, the Receiver's status as receiver of the Sewer System will be terminated and of no further force or effect. On or as soon as reasonably practicable after the Effective Date, the Sewer Warrant Trustee shall pay all of the Receiver's unpaid reasonable fees (including fees of its counsel and experts) and expenses from the Sewer Warrant Indenture Funds and shall dismiss (or obtain any court orders as are necessary to dismiss) each of the Receivership Actions in their entirety and with prejudice.

### 12. Vesting of Preserved Claims

      All Preserved Claims shall be preserved and shall vest in the County on the Effective Date, but only to the extent not expressly released pursuant to the Plan, the Confirmation Order, or any other order of the Bankruptcy Court. From and after the Effective Date, the County shall retain its exclusive right, power, and duty to administer the collection, prosecution, enforcement, settlement, or abandonment of the Preserved Claims in the County's sole and absolute discretion.

### 13. Exemption From Securities Law

      **a.** The issuance of the Replacement 2001-B GO Warrants and the New Sewer Warrants are exempt from registration under the Securities Act of 1933, as amended (the "1933 Act"), and all rules and regulations promulgated thereunder. In general, securities issued by the County, such as general obligation warrants and sewer revenue warrants, are exempt from registration under section 3(a)(2) of the 1933 Act. Obligations issued by the County likewise are exempt from registration under current Alabama securities law. These exemptions from registration apply to the New Sewer Warrants and the Replacement 2001-B GO Warrants.

      **b.** The New Sewer Warrants will be publically offered. Therefore, the County intends to rely on generally applicable securities law exemptions for the offering and sale of the New Sewer Warrants, provided that the County does not expect to offer the New Sewer Warrants in states in which registration of County securities may be required by applicable state securities law, unless

163

first registered or otherwise qualified for sale in such jurisdiction. The Replacement 2001-B GO Warrants will not be publically offered but instead will be issued to the GO Banks pursuant to the Plan. The Replacement 2001-B GO Warrants and the New Sewer Warrants issued in exchange for Sewer Warrants under the Put Agreement will also be exempt from registration under federal or state securities law to the maximum extent provided under Bankruptcy Code section 1145.

      **c.** Like the exemption from registration provided to the County under section 3(a)(2) of the 1933 Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by government entities. The New Sewer Warrant Indenture and the Amended and Restated GO Warrant Indentures are each exempt from qualification under section 304(a)(4) of the Trust Indenture Act of 1939.

      **d.** Nothing in the Plan is intended to preclude the Securities and Exchange Commission from performing its statutory duties regarding any Person in any forum with proper jurisdiction.

## 14. Objections to Claims

### a. County's Exclusive Right to Object

The County shall have the right to object to the allowance of Claims as to which liability, amount, priority, classification, or status as secured or unsecured is disputed in whole or in part (except to the extent such Claims have been previously Allowed or are Allowed as set forth in the Plan). Except as otherwise provided in the Plan, the County's rights to object to, oppose, and defend against all Claims on any basis are fully preserved. Unless otherwise ordered by the Bankruptcy Court, the County shall file and serve any such objections on or before the Claims Objection Deadline. After the Effective Date, the County shall have the sole right and authority to control and effectuate the Claims reconciliation process, including to File, settle, compromise, withdraw, or litigate to judgment objections to Claims.

### b. Distributions Following Allowance

At such time as a Contingent Claim, a Disputed Claim, or an Unliquidated Claim becomes an Allowed Claim, in whole or in part, including pursuant to the Plan, the County or its agent shall distribute to the holder thereof the Distributions, if any, to which such holder is then entitled under the Plan. Such Distributions, if any, shall be made as soon as practicable after the date on which the order or judgment allowing such Claim becomes a Final Order (or such other date on which the Claim becomes an Allowed Claim, including pursuant to the Plan). Unless otherwise specifically provided in the Plan or allowed by a Final Order of the Bankruptcy Court, no interest shall be paid on Contingent Claims, Disputed Claims, or Unliquidated Claims that later become Allowed Claims.

## 15. Distributions Under the Plan

Unless otherwise provided in the Plan, the following procedures apply to Distributions.

### a. Responsibility for Making Distributions

164

The County or its designated agents, including the Indenture Trustees and the GO Paying Agents under Section 4.15(e)(iv) of the Plan, shall be responsible for distributing all Distributions made to them for the benefit of the holders of the respective underlying warrants as required under the Plan and, unless otherwise specified in the Plan, pursuant to the applicable operative documents. To the extent applicable, the County or its designated agents shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit with respect to such Distributions, and all Distributions shall be subject to such withholding and reporting requirements.

### b. No *De Minimis* Distributions

Notwithstanding anything to the contrary in the Plan, with the exception of Distributions on account of Class 1-D Claims and Class 5-E Claims, no Cash payment of less than fifty dollars ($50.00) will be made to any Person; *provided, however*, that solely with respect to Distributions from the General Unsecured Claims Pool, if the right to payment of a holder of Allowed Class 6 Claims does not exceed fifty dollars ($50.00) on the GUC Payment Date, then such holder will receive a Cash payment in an amount equal to such holder's entitlement. No consideration will be provided in lieu of the *de minimis* Distributions that are not made pursuant to Section 4.15(b) of the Plan, and the County shall be authorized and empowered to retain such *de minimis* amounts for its own benefit.

### c. No Distributions With Respect to Certain Claims

Notwithstanding anything to the contrary in the Plan, no Distributions or other consideration of any kind shall be made on account of any Contingent Claim, Disputed Claim, or Unliquidated Claim unless and until such Claim becomes an Allowed Claim, or is deemed to be such for purposes of distribution, and then only to the extent that such Claim becomes, or is deemed to be for distribution purposes, an Allowed Claim.

### d. Distributions to Holders as of the Distribution Record Date

#### i. General Principles

At the close of business on the Distribution Record Date, the claims register shall be closed, and there shall be no further changes in the record holder of any Claim. The County or any other Person responsible for making Distributions shall have no obligation to recognize any transfer of any Claim occurring or purportedly occurring after the Distribution Record Date, and shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the claims register as of the close of business on the Distribution Record Date.

#### ii. Specific Exceptions

The general principles set forth in Section 4.15(d)(i) of the Plan will not apply to Claims arising from the Board of Education Lease Warrants, the School Warrants, the Series 2003-A GO Warrants (other than any GO Policy Claims), or the Series 2004-A GO Warrants (other than any GO Policy Claims). Subject in all cases to the treatment provided under the Plan, nothing in the Plan will limit the rights of a holder of the Board of Education Lease Warrants, the School Warrants, the Series 2003-A GO Warrants, or the Series 2004-A GO Warrants to assign, sell, pledge, hypothecate, or otherwise transfer its warrants to the extent permitted by such warrants, any other applicable operative agreements, and applicable nonbankruptcy law. Subject to the terms of the applicable operative agreements and any requirements under applicable nonbankruptcy law, the County and any applicable Indenture Trustee or GO Paying Agent shall recognize and give effect to assignments, sales, pledges, hypothecations, or other transfers of the Board of Education Lease Warrants, the School Warrants, the Series 2003-A GO Warrants, or the Series 2004-A GO Warrants regardless

166

whether such assignments, sales, pledges, hypothecations, or other transfers were made or settled before, on, or after the Distribution Record Date.

### e. Delivery of Distributions; Undeliverable/Unclaimed Distributions

#### i. Delivery of Distributions in General

The County or its designated agents shall make Distributions to each holder of an Allowed Claim as follows: (A) by mail at the address set forth on the proof of Claim Filed by such holder in respect of such Allowed Claim, unless such holder has provided written notice of address change to the County; (B) by mail at the address set forth in any written notice of address change delivered to the County after the date of any related proof of Claim; (C) by mail at the address reflected in the List of Creditors if no proof of Claim is filed and the County has not received a written notice of a change of address; or (D) through the facilities of DTC for the benefit of the holders of Allowed Sewer Debt Claims. Notwithstanding the foregoing, the County shall make Distributions on account of Allowed Class 1-C Claims directly to holders of Class 1-C Claims pursuant to directions provided to the County by the Sewer Warrant Insurers, and the County and Sewer Warrant Insurers shall provide such information as is necessary in order to prevent the Sewer Warrant Trustee or DTC from making any additional or other Distributions on account of any Allowed Class 1-C Claims.

#### ii. Undeliverable and Unclaimed Distributions

If the County tenders an Undeliverable Distribution, the issuing entity may cancel the distribution check and need not re-attempt delivery, unless the County timely receives notification of the holder's new address before the deadlines described below. If the County tenders an Unclaimed Distribution, the issuer may cancel the distribution check, and need not attempt redelivery, except as otherwise provided in the Plan.

The County shall reserve the funds with respect to all Undeliverable Distributions and Unclaimed Distributions for one (1) year following the Effective Date. If the County does not receive prior to that date a written request from the holder of the applicable Allowed Claim asserting entitlement to an Undeliverable Distribution or Unclaimed Distribution and providing a current address, then the County shall be authorized and empowered to retain such funds for its own benefit.

Any holder of an Allowed Claim that does not assert in writing its entitlement to an Undeliverable Distribution or Unclaimed Distribution, by the applicable dates set forth in the foregoing paragraphs, no longer shall have any interest in or be entitled to such undelivered or unclaimed Distribution and shall be barred forever from receiving any Distributions under the Plan, or from asserting a Claim against the County or its property, and the right to such undeliverable or unclaimed Distribution will be discharged.

For the avoidance of doubt, the foregoing provisions regarding Undeliverable Distributions or Unclaimed Distributions will not apply to Distributions made on account of Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D.

167

Nothing contained in the Plan shall require the County or its designated agents to attempt to locate any holder of an Allowed Claim.

### iii.     Estimation of Certain Claims for Distribution Purposes

The County may move for a Bankruptcy Court order estimating any Contingent Claim, Disputed Claim, or Unliquidated Claim. The estimated amount of any Claim so determined by the Bankruptcy Court shall constitute the maximum recovery that the holder thereof may recover after the ultimate liquidation of its Claim, irrespective of the actual amount that is ultimately Allowed.

### iv.     Certain Distributions to be Made to the Indenture Trustees or the GO Paying Agents

#### (A)     Sewer Warrant Trustee

All Distributions to be made to or for the benefit of individual holders of Sewer Warrant Claims, Bank Warrant Claims, and Primary Standby Sewer Warrant Claims shall be made by the County in aggregate, lump-sum payments to the Sewer Warrant Trustee, and will in turn be distributed by the Sewer Warrant Trustee in accordance with the Plan and the applicable operative agreements and without any deduction or reduction on account of any unpaid expenses, fees, indemnities, or other amounts (all of which will be deemed satisfied pursuant to Section 4.6(b) of the Plan).

#### (B)     GO Warrant Trustee

All Distributions to be made to or for the benefit of individual holders of Series 2001-B GO Claims and Standby GO Warrant Claims shall be made by the County in aggregate, lump-sum payments to the GO Warrant Trustee, and will in turn be distributed by the GO Warrant Trustee in accordance with the Plan and the applicable operative agreements and without any deduction or reduction on account of any unpaid expenses, fees, indemnities, or other amounts.

#### (C)     Other Indenture Trustees and Paying Agents

With respect to all preexisting warrants that will remain outstanding under the Plan (i.e., the Board of Education Lease Warrants, the School Warrants, the Series 2003-A GO Warrants, and the Series 2004-A GO Warrants), the County will make post-Effective Date payments on account of such warrants to the applicable Indenture Trustee or GO Paying Agent, which Indenture Trustee or Paying Agent shall thereafter distribute such payments to holders of such warrants in accordance with the applicable operative agreements.

### v.     Surrender of Instruments

On the Effective Date, each holder of a certificated instrument, warrant, or note that (A) gives rise to any Sewer Debt Claims or (B) arises from or in connection with the Series 2001-B GO Warrants, the GO Warrant Indenture, the Standby GO Warrant Purchase Agreement, or the GO Swap Agreement shall be deemed to have surrendered such instrument, warrant, or note to the appropriate indenture trustee, paying agent, or designee, and as a result of such deemed surrender,

168

such instrument, warrant, or note shall be cancelled without the need for any action by such holder. On the Effective Date, each holder of a global certificated instrument, warrant, or note that is held pursuant to the book-entry system operated by DTC and that (X) gives rise to any Sewer Debt Claims or (Y) arises from or in connection with the Series 2001-B GO Warrants, the GO Warrant Indenture, the Standby GO Warrant Purchase Agreement, or the GO Swap Agreement shall be deemed to have surrendered such instrument, warrant, or note to the appropriate indenture trustee, paying agent, or designee in accordance with the Rules and Operational Arrangements of DTC, and as a result of such deemed surrender, such instrument, warrant, or note shall be cancelled without the need for any action by such holder. Upon issuance and delivery of the New Sewer Warrants and completion of Distributions required under the Plan, the Sewer Warrant Trustee shall cancel all outstanding Sewer Warrants on the records of DTC and destroy all associated original physical certificates, provided that such cancellation and destruction shall not modify, prejudice, or give rise to any defenses in favor of any applicable Sewer Warrant Insurer with respect to any Sewer Wrap Payment Rights. Upon issuance and delivery of the Replacement 2001-B GO Warrants, the GO Warrant Trustee shall cancel all outstanding Series 2001-B GO Warrants on the records of DTC and destroy all associated original physical certificates.

### f.        Full, Final, and Complete Settlement and Satisfaction

The Distributions and other treatment provided under the Plan for each holder of an Allowed Claim shall be in full, final, and complete settlement, satisfaction, discharge, and release of such holder's Claims against the County, against the County's property, or any Claims released under the Plan.

### g.        Limitations on Distributions Payable to Persons Liable to County

No Distribution will be made on account of any Claim of any Person against which the County has any affirmative Causes of Action (excluding all GO Released Claims and all Sewer Released Claims), and such Person's Claim shall be deemed to be a Disallowed Claim pursuant to the Plan, unless and until such time as all Causes of Action (excluding all GO Released Claims and all Sewer Released Claims) against that Person have been settled or resolved by a Final Order and such Person has paid the entire amount for which such Person is liable to the County.

### h.        Deemed Acceleration of the Sewer Warrants

For all purposes, including Distributions under the Plan, all series and subseries of the Sewer Warrants shall be deemed accelerated as of the Effective Date, after payment of the Reinstated Sewer Warrant Principal Payments, the Reinstated Sewer Warrant Interest Payments, and the Sewer Warrant Insurers Outlay Amount, which acceleration shall occur immediately and before any other Distribution of consideration on the Effective Date; *provided, however*, that such acceleration will not be deemed to release any of the Sewer Wrap Policies with respect to Sewer Wrap Payment Rights except as a result of any Sewer Warrant Insurer's payment of the Outstanding Amount on the applicable series or subseries of non-commuted Sewer Warrants as set forth in the last sentence of this paragraph. With respect to any series or subseries of Sewer Warrants as to which the Commutation Election is not made or deemed not to have been made, and solely to the extent that any Sewer Warrant Insurer voluntarily elects (irrespective of the terms of the applicable Sewer Wrap

169

Policy), in its sole and absolute discretion, to pay the Outstanding Amount on such series or subseries of Sewer Warrants, the Sewer Warrant Trustee shall be deemed as of the Effective Date or, if later, as of the date on which the applicable Sewer Warrant Insurer makes such election as to such series or subseries of Sewer Warrants, to have submitted a draw request under each applicable Sewer Wrap Policy in respect of the Outstanding Amount on such non-commuted series or subseries of Sewer Warrants, and each such Sewer Warrant Insurer shall be entitled (irrespective of the terms of the applicable Sewer Wrap Policy), in its sole and absolute discretion, to treat the Outstanding Amount as "Due for Payment" (as such term is defined in the applicable Sewer Wrap Policy and for purposes of such Sewer Wrap Policy) as of the Effective Date or as of such later date on which the applicable Sewer Warrant Insurer elects to pay such Outstanding Amount. Payment, as provided in the applicable Sewer Wrap Policy, of the Outstanding Amount on any series or subseries of non-commuted Sewer Warrants shall be deemed to fully discharge the applicable Sewer Warrant Insurer's obligations under the applicable Sewer Wrap Policy and to fully release all Sewer Wrap Payment Rights with respect to such Sewer Warrants.

### 16. Setoff, Recoupment, and Other Rights

Notwithstanding anything to the contrary contained in the Plan and except as otherwise agreed by the County, the County may, but shall not be required to, setoff against or recoup from any Claim and the Distributions to be made in respect of such Claim (other than with respect to Claims previously Allowed or Allowed as set forth in the Plan) any Causes of Action of any nature whatsoever that the County may have against the claimant and that is not a GO Released Claim or a Sewer Released Claim. If the County elects to so setoff or recoup, the Allowed amount of the subject Claim shall be limited to the net amount after giving effect to the County's setoff or recoupment; *provided, however*, that the claimant will be provided with written notice of the proposed setoff or recoupment at least ten (10) Business Days prior thereto; and, if the claimant files a written objection to such proposed setoff or recoupment, the County shall not proceed with the setoff or recoupment absent the withdrawal of the claimant's objection or the entry of an order overruling the objection, but the County may in all events withhold any Distributions on account of such Claim pending resolution of the claimant's objection; *provided further, however*, that neither the failure to setoff against or recoup from any Claim nor the allowance of any Claim shall constitute a waiver or release by the County of any Causes of Action the County may have against the subject claimant.

### 17. Motion Under Bankruptcy Code Section 364

The Plan constitutes a motion by the County seeking the Bankruptcy Court's approval of the incurrence of all indebtedness and extensions of credit necessary to implement the Plan pursuant to Bankruptcy Code section 364, including the offering of New Sewer Warrants under the Plan, the incurrence of any underwriting or other transaction fees to be paid at closing, and payment of the Put Consideration. Confirmation of the Plan shall constitute a conclusive determination that the protections of Bankruptcy Code section 364(e) will apply to all such indebtedness or extensions of credit to the maximum extent permitted by law. Confirmation of the Plan shall also constitute a conclusive determination that all such indebtedness or extensions of credit were extended and incurred in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

170

## 18.   The Effective Date

The Plan shall not become binding unless and until the Effective Date occurs.  The Effective Date will be a Business Day selected by the County, after consultation with the Sewer Plan Support Parties, that is on or after the date on which all of the following conditions have been satisfied as set forth below, or waived as set forth in Section 4.18(b) of the Plan.  Unless waived pursuant to Section 4.18(b) of the Plan, the Effective Date of the Plan shall not occur until each of the following conditions precedent has occurred or will occur simultaneously with the Effective Date of the Plan.

### a.   Conditions to the Effective Date

i.   The Confirmation Order shall (A) be entered and in full force and effect in form and substance acceptable to (1) the County, (2) the Sewer Plan Support Parties to the extent the relevant provisions of the Confirmation Order (or provisions excluded from the proposed Confirmation Order) would affect the rights of the applicable Sewer Plan Support Party, and (3) the GO Plan Support Parties to the extent the relevant provisions of the Confirmation Order (or provisions excluded from the proposed Confirmation Order) would affect the rights of the applicable GO Plan Support Party; and (B) not be subject to any stay;

ii.   The County shall have entered into the Closing Agreement; *provided, however*, that if any settlement payment is required to be made to the Internal Revenue Service, such payment shall be payable exclusively from Accumulated Sewer Revenues or gross Sewer System revenues received by the County; *provided further, however*, that any such settlement payment shall not reduce the aggregate consideration to be paid to holders of Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D, or any other payments described in the Plan to be paid to the Sewer Plan Support Parties;

iii.   The aggregate Tail Risk and the aggregate Covered Tail Risk shall each not exceed $25.0 million;

iv.   No Sewer Warrant Insurer will be subject to any Tail Risk on or after the Effective Date in an amount in excess of its Covered Tail Risk;

v.   The issuance of the New Sewer Warrants has closed (or will close simultaneously with the occurrence of the Effective Date), and the aggregate Refinancing Proceeds and other Cash consideration required to make the payments to (A) holders of Allowed Class 1-A Claims and Allowed Class 1-B Claims shall be available and shall have been paid under the Plan to the Sewer Warrant Trustee for Distribution in accordance with the Plan on the Effective Date; and (B) holders of Allowed Class 1-C Claims (including the Sewer Warrant Insurers Outlay Amount) shall be available and shall have been paid under the Plan to the applicable Sewer Warrant Insurer in accordance with the Plan and the Sewer Warrant Insurers Agreements on the Effective Date;

171

vi.        The Sewer Plan Support Agreements, the Sewer Warrant Insurers Agreements, and the Tail Risk Payment Agreements shall be in full force and effect and any and all payments required under (A) the Sewer Warrant Insurers Agreements shall have been made to the applicable Sewer Warrant Insurer (or are paid simultaneously with the other payments to the Sewer Warrant Insurers required under the Plan); and (B) the Tail Risk Payment Agreements and the Plan shall have been paid or placed into escrow, as the case may be, in accordance with such Tail Risk Payment Agreements;

vii.        All of the settlements, releases, and injunctions contemplated by the Plan (including the settlement and release under the Plan of the Causes of Action asserted in the Bennett Action and the Wilson Action) shall have been approved pursuant to the Confirmation Order, and any pending litigation (including any appeals) commenced by the County or any of the Sewer Plan Support Parties against any of the Sewer Plan Support Parties shall have been (or simultaneously with the occurrence of the Effective Date will be) dismissed with prejudice;

viii.        The Effective Date shall have occurred on or before December 31, 2013;

ix.        The Plan (as confirmed by the Confirmation Order), the Plan Supplement, and all other documents, instruments, agreements, writings, and undertakings required under the Plan (A) shall be in form and substance satisfactory to the County (and, to the extent required by any applicable Plan Support Agreement or the Plan, approved by the applicable Plan Support Party or Parties); (B) shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby; and (C) and, to the extent required by any applicable Plan Support Agreement or the Plan, shall be (or simultaneously with the occurrence of the Effective Date will be) effective;

x.        The Supporting Sewer Warrantholder Directed Distribution and the Put Consideration shall have been approved pursuant to the Confirmation Order and paid to the Supporting Sewer Warrantholders; and

xi.        The County, the Sewer Liquidity Banks, the Sewer Warrant Insurers, the Supporting Sewer Warrantholders, and the JPMorgan Parties shall have each acknowledged in writing (which writing may take the form of an email exchange among their respective counsel) that all conditions to the Effective Date have been satisfied or waived (or will be satisfied or waived simultaneously with the occurrence of the Effective Date).

## b.    Waiver of Conditions

The requirement that the conditions to the occurrence of the Effective Date be satisfied may be waived in whole or in part by mutual written agreement by (i) the County and each Sewer Plan Support Party (or, in the case of the Supporting Sewer Warrantholders, the "Majority Eligible Warrantholders" as defined in the Supporting Sewer Warrantholder Plan Support Agreement if such waiver may be effected by the Majority Eligible Warrantholders under the Supporting Sewer Warrantholder Plan Support Agreement) that is affected by the subject condition; or (ii) the County and each GO Plan Support Party that is affected by the subject condition, solely with respect to

172

conditions (i), (vii), and (ix). Any such waiver may be effected at any time, without advance notice, leave, or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

### c.        Effect of Failure of Conditions

In the event that the conditions to the occurrence of the Effective Date have not been timely satisfied or waived pursuant to Section 4.18(b) of the Plan, and upon notification Filed by the County with the Bankruptcy Court, (i) the Confirmation Order shall be vacated; (ii) no Distributions shall be made; (iii) the County and all Creditors shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; (iv) the County, the Plan Support Parties, the Sewer Warrant Trustee, and the School Warrant Trustee will be restored to their rights as if the Plan, the Plan Support Agreements, any Plan Term Sheets referenced therein, and the Sewer Warrant Insurers Agreements were never entered into, and all claims and defenses of the County, the Plan Support Parties, the Sewer Warrant Trustee, and the School Warrant Trustee shall be fully reserved; (v) any and all Ballots with respect to the Plan delivered by each of the Plan Support Parties shall be immediately withdrawn, and such Ballots shall be null and void for all purposes and shall not be considered or otherwise used in any manner; and (vi) all of the County's obligations with respect to Claims shall remain unchanged and nothing contained in the Plan shall constitute a waiver or release of any Causes of Action by or against the County or any other Person or to prejudice in any manner the rights, claims, or defenses of the County or any other Person in any further proceedings involving the County. Nothing in the foregoing portion of the Plan shall alter or limit any Person's rights under any Plan Support Agreement.

### d.        Notice of the Effective Date

Promptly after the occurrence of the Effective Date, the County or its agents shall mail or cause to be mailed to all Creditors a notice that informs such Creditors of (i) entry of the Confirmation Order and the resulting confirmation of the Plan; (ii) the occurrence of the Effective Date; (iii) the assumption and rejection of executory contracts and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Damage Claims; (iv) the deadline established under the Plan for the filing of Administrative Claims; and (v) such other matters as the County finds appropriate..

Case 11-05736-TBB9     Doc 1977     Filed 08/08/13     Entered 08/08/13 11:52:51     Desc
Main Document       Page 198 of 251

**D.     Exculpation of GO Released Parties, Sewer Released Parties, and the School Warrant Trustee Regarding the Bankruptcy and Plan Process**

To the maximum extent permitted by law, neither the GO Released Parties, nor the Sewer Released Parties, nor the School Warrant Trustee, nor any of their respective Related Parties shall have or incur any liability to any Person, including any holders of GO Warrants, Sewer Warrants, or School Warrants, for any act or omission occurring on or before the Effective Date in connection with, related to, or arising out of the Case, the Plan Support Agreements, the formulation, preparation, dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlements contained in the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document provided or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided, however*, that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any such act or omission occurring on or prior to the Effective Date to the extent that such act or omission is determined in a Final Order to have constituted willful misconduct or fraud.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court will be deemed conclusively not to constitute willful misconduct or fraud unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the GO Released Parties, the Sewer Released Parties, the School Warrant Trustee, and their respective Related Parties shall be entitled to rely on the advice of their respective counsel with respect to their duties and responsibilities in connection with the Case and the Plan.

**E.     Validations Under the Plan**

As set forth below, the Plan provides for binding judicial determinations and validations of the New Sewer Warrants to be issued under the Plan, of the associated Approved Rate Structure and Rate Resolution, and of the allowance of certain Sewer Debt Claims.  These binding judicial determinations and validations are integral parts of the Plan that are (i) necessary to facilitate the issuance of the New Sewer Warrants and the resulting generation of Refinancing Proceeds for the satisfaction of Sewer Debt Claims under the Plan, and (ii) a critical component of the compromises and settlements among the County and the Sewer Plan Support Parties.  Pursuant to the power granted under the Bankruptcy Code, the Plan provides and the County will request that the Confirmation Order make clear that each of these binding judicial determinations and validations under the Plan will be full, final, complete, binding, and conclusive under Alabama law as to the County and all Persons, including all Persons that could assert or purport to assert any rights by or on behalf of the County.

**1.     Validation of the New Sewer Warrants**

Pursuant Bankruptcy Code sections 944(a), 944(b)(3), 105(a), and 1123(b)(6), from and after the Effective Date, confirmation of the Plan shall be a binding judicial determination that the New Sewer Warrants, the New Sewer Warrant Indenture, the Rate Resolution, and the covenants made by the County for the benefit of the holders thereof (including the revenue and rate covenants in the New Sewer Warrant Indenture) will constitute valid, binding, legal, and enforceable obligations of the County under Alabama law and that the provisions made to pay or secure payment of such

174

obligations are valid, binding, legal, and enforceable security interests or liens on or pledges of revenues, which validation will be set forth in the Confirmation Order substantially as follows:

> The New Sewer Warrants were authorized and will be issued as of the Effective Date as a means of implementing the Plan and providing for the satisfaction of Sewer Debt Claims in accordance with the Bankruptcy Code.

> The County has the authority under the constitution and laws of the State of Alabama and the Plan to adopt the Rate Resolution, to execute, deliver and perform its obligations under the New Sewer Warrant Indenture, and to issue, execute, and deliver the New Sewer Warrants pursuant to the Plan.

> All actions and things required under the provisions of applicable law to be had and done in this proceeding preliminary to the entry of this Confirmation Order have been had and done in the manner provided by law. This Confirmation Order will be forever conclusive against, among others, the County and all taxpayers and citizens of the County.

> The indebtedness evidenced and ordered paid by the New Sewer Warrants shall be a limited obligation of the County, payable solely from the System Revenues derived from the operation of the Sewer System. The general faith and credit of the County shall not be pledged to the payment of the principal of or the interest or premium (if any) on the New Sewer Warrants, and the New Sewer Warrants shall not be general obligations of the County.

> The New Sewer Warrants shall not constitute a debt or indebtedness of the County under the provisions of Section 224 of the Constitution of the State of Alabama, as amended, because the principal of and interest on the New Sewer Warrants will be payable solely from the System Revenues derived from the operation of the Sewer System, and will not be a charge on the general credit of the County.

> The Bankruptcy Court does hereby validate and confirm all proceedings had and taken in connection with the following (i) the Plan; (ii) all covenants, agreements, provisions and obligations of the County set forth in the Plan; (iii) the Rate Resolution; (iv) all covenants, agreements, provisions, and obligations of the County set forth in the New Sewer Warrant Indenture; and (v) the New Sewer Warrants and the provisions made to pay and secure payment of such obligations. When the New Sewer Warrants have been executed and delivered in accordance with the Plan, then the New Sewer Warrants and the pledges, covenants, agreements, and obligations set forth therein and in the New Sewer Warrant Indenture shall stand validated and confirmed.

> At the time of the delivery of the New Sewer Warrants, the County is hereby directed to cause to be stamped or written on each of the New Sewer Warrants a legend substantially as follows:

175

"VALIDATED AND CONFIRMED BY JUDGMENT AND CONFIRMATION ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ALABAMA, ENTERED ON THE ___ DAY OF _____, 2013."

This validation under the Plan will be full, final, complete, binding, and conclusive as to the County and all Persons, including all Persons that could assert or purport to assert any rights by or on behalf of the County. Accordingly, the validity and enforceability of the Rate Resolution, the New Sewer Warrants, the New Sewer Warrant Indenture, and the covenants made by the County for the benefit of the holders thereof (including the revenue and rate covenants in the New Sewer Warrant Indenture) shall not be subject to any collateral attack or other challenge by any Person in any court or other forum from and after the Effective Date.

### 2. Validation of the Approved Rate Structure

Pursuant to Bankruptcy Code sections 944(a), 944(b)(3), 105(a), and 1123(b)(6), from and after the Effective Date, the Confirmation Order shall be a binding judicial determination that (i) the Approved Rate Structure is a valid provision made to pay or secure payment of the New Sewer Warrants and is appropriate, reasonable, non-discriminatory, and legally binding on and specifically enforceable against the County, in accordance with the Plan and under applicable law; and (ii) the County Commission shall adopt and maintain the Approved Rate Structure in accordance with the Rate Resolution and as necessary for the County to satisfy the obligations arising under the New Sewer Warrants and the New Sewer Warrant Indenture (and to otherwise comply with all applicable state and federal laws regarding the maintenance and operation of the Sewer System), including increases in sewer rates to the extent necessary to allow the timely satisfaction of the County's obligations under the New Sewer Warrants and the New Sewer Warrant Indenture (and to otherwise comply with all applicable state and federal laws regarding the maintenance and operation of the Sewer System). Without limitation, from and after the Effective Date, (a) the Confirmation Order shall constitute a consent decree binding upon, specifically enforceable against, and a basis for mandamus against the County, the County Commission, and all other Persons in accordance with the Plan; (b) the validity and enforceability of the Approved Rate Structure and the Rate Resolution shall not be subject to any collateral attack or other challenge by any Person in any court or other forum from and after the Effective Date; and (c) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the Approved Rate Structure and the Rate Resolution, to require the County to otherwise comply with the New Sewer Warrants and the New Sewer Warrant Indenture, and to hear and adjudicate any action or proceeding enforcing, challenging, or collaterally attacking the Approved Rate Structure or the Rate Resolution.

### 3. Validation of Allowance of Sewer Debt Claims

Confirmation of the Plan shall be a binding judicial determination that the allowance on the Effective Date of Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D is appropriate and binding on, specifically enforceable against, and a basis for mandamus against the County, the County Commission, and all other Persons in accordance with the Plan, because, among other things, the allowance of such Claims, along with treatment of those Allowed Claims under the Plan, is a necessary predicate to the issuance of the New Sewer Warrants. This validation under the Plan

176

will be full, final, complete, binding, and conclusive as to the County and all Persons, including all Persons that could assert or purport to assert any rights by or on behalf of the County. Accordingly, the validity and enforceability of the allowance of the Allowed Claims in Class 1-A, Class 1-B, Class 1-C, and Class 1-D along with the treatment of those Allowed Claims under the Plan, shall (i) moot any pending Causes of Action challenging the validity or enforceability of the Sewer Warrants or the issuance thereof, payments of principal and interest made in respect of the Sewer Warrants, or any Sewer System rates or charges established or collected by the County in connection with the issuance or the payment of debt service in respect of the Sewer Warrants, or seeking the return to the County of any payment made by the County in connection with the Sewer Warrants or any financing or other transaction regarding the Sewer System; and (ii) not be subject to any collateral attack or other challenge by any Person in any court or other forum from and after the Effective Date.

### F.    Effects of Confirmation of the Plan

#### 1.    Binding Effect

Upon the Effective Date and pursuant to Bankruptcy Code section 944(a), the Plan, the Distributions and transactions contemplated by the Plan, and the compromises and settlements contained in the Plan shall be binding upon the County, all Creditors, all special tax payers (as such term is defined in Bankruptcy Code section 902(3)), all customers and rate payers of the Sewer System, all parties in interest, and all other Persons. Confirmation of the Plan binds each holder of a Claim to all the terms and conditions of the Plan, whether or not such holder's Claim is Allowed, whether or not such holder holds a Claim that is in a Class that is Impaired under the Plan, and whether or not such holder has accepted the Plan. The County reserves all rights to seek appropriate relief against any Person under Bankruptcy Code section 1142(b) to the extent necessary for the consummation of the Plan.

#### 2.    Discharge and Injunctions

**The rights afforded in the Plan and the treatment of all Claims by the Plan shall be in exchange for and in complete settlement, satisfaction, discharge, and release of, and injunction against, all Claims of any nature whatsoever arising prior to the Effective Date against the County or its property, including any interest accrued on such Claims from and after the Petition Date.**

**Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, (a) the County and its property will be discharged and released to the fullest extent permitted by Bankruptcy Code section 944(b) from all Claims and rights that arose before the Effective Date, including all debts, obligations, demands, and liabilities, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), regardless whether (i) a proof of Claim based on such debt is Filed or deemed Filed, (ii) a Claim based on such debt is allowed pursuant to Bankruptcy Code section 502, or (iii) the holder of a Claim based on such debt has or has not accepted the Plan; (b) any judgment underlying a Claim discharged hereunder will be void; and (c) all Persons will be precluded from asserting against the County or its property, whether directly or on behalf of the County, any Claims or rights based on any**

177

act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold, or may hold a Claim that is based on any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, that otherwise arose or accrued prior to the Effective Date, or that otherwise is discharged pursuant to the Plan, will be permanently and completely enjoined from taking any of the following actions on account of any such discharged Claim (the "Permanent Injunction"): (a) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind against or affecting the County, its property, its obligations, or any of its Related Parties that is inconsistent with the Plan or the Confirmation Order; (b) attaching, collecting, enforcing, levying, or otherwise recovering in any manner any award, decree, judgment, or order against or affecting the County, its property, its obligations, or any of its Related Parties other than as expressly permitted under the Plan; (c) creating, perfecting, or otherwise enforcing in any manner any lien or encumbrance of any kind against or affecting property of the County, other than as expressly permitted under the Plan; (d) asserting any right of recoupment, setoff, or subrogation of any kind against any obligation due to the County with respect to any such discharged Claim, except as otherwise permitted by Bankruptcy Code section 553; (e) acting or proceeding in any manner, in any place whatsoever, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the discharge provisions of Bankruptcy Code section 944; and (f) taking any actions to interfere with the implementation or consummation of the Plan. The County and any other Person injured by any willful violation of the Permanent Injunction shall recover actual damages, including costs, expenses, and attorneys' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

Except as otherwise provided in the Plan, all injunctions or stays in effect in the Case under Bankruptcy Code sections 105, 362(a), or 922(a), or otherwise, on the Confirmation Date shall remain in full force and effect through and including the Effective Date.

3.    Releases and Injunctions

    a.    Sewer Releases and Injunctions.

Under the Plan and as of the Effective Date, each Sewer Released Party, on behalf of itself, and to the maximum extent permitted by law, on behalf of each of its Related Parties, in exchange for and upon receipt of the treatment and consideration set forth in the Plan for the Sewer Released Parties, including the compromises and settlements among the Sewer Released Parties implemented pursuant to the Plan, will forever waive and release all other Sewer Released Parties and their respective Related Parties from any and all Sewer Released Claims.

Under the Plan and as of the Effective Date, all Persons who voted to accept the Plan or who made or are deemed to have made the Commutation Election will be conclusively deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released and

178

discharged on their own behalf, and on behalf of any Person claiming through them, all Sewer Released Parties and their respective Related Parties from any and all Sewer Released Claims.

From and after the Effective Date, the County, any Person seeking to exercise the rights of the County (including in respect of the County's Causes of Action purportedly asserted in the Bennett Action and the Wilson Action), all Persons holding any Sewer Released Claims that are waived and released pursuant to Section 6.3(a) of the Plan, and all Persons acting or purporting to act on behalf of any Persons holding any Sewer Released Claims that are waived and released pursuant to Section 6.3(a) of the Plan, will be permanently and completely enjoined from commencing or continuing any action, directly or indirectly and in any manner, to assert, pursue, litigate, or otherwise seek any recovery on or on account of such Sewer Released Claims.

From and after the Effective Date, the Sewer Warrant Trustee, any holders of Sewer Warrants, or any other Person will be permanently and completely enjoined from pursuing any right of payment under (i) any of the Sewer DSRF Policies, which will be cancelled and of no further force or effect pursuant to Section 4.7 of the Plan; or (ii) any of the Sewer Wrap Policies with respect to any Sewer Warrant holder that made or was deemed to have made the Commutation Election, which Sewer Wrap Policies will be cancelled and of no further force or effect pursuant to Section 4.7 of the Plan; *provided, however*, that such injunction shall not enjoin any holders of Sewer Warrants that did not make or were deemed not to make the Commutation Election, or, if applicable, the Sewer Warrant Trustee on their behalf, from pursuing any Sewer Wrap Payment Rights.

b.    GO Releases and Injunctions.

Under the Plan and as of the Effective Date, each GO Released Party, on behalf of itself, and to the maximum extent permitted by law, on behalf of each of its Related Parties, in exchange for and upon receipt of the treatment and consideration set forth in the Plan for the GO Released Parties, including the compromises and settlements among the GO Released Parties implemented pursuant to the Plan, will forever waive and release all other GO Released Parties and their respective Related Parties from any and all GO Released Claims.

Under the Plan and as of the Effective Date, all Persons who voted to accept the Plan will be conclusively deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released and discharged on their own behalf, and on behalf of any Person claiming through them, all GO Released Parties and their respective Related Parties from any and all GO Released Claims.

From and after the Effective Date, the County, any Person seeking to exercise the rights of the County, all Persons holding any GO Released Claims that are waived and released pursuant to Section 6.3(b) of the Plan, and all Persons acting or purporting to act on behalf of any Persons holding any GO Released Claims that are waived and released pursuant to Section 6.3(b) of the Plan, will be permanently and completely enjoined from commencing or continuing any action, directly or indirectly and in any manner, to assert, pursue, litigate, or otherwise seek any recovery on or on account of such GO Released Claims.

179

### c. Necessity and Approval of Releases and Injunctions.

The releases and injunctions set forth in Section 6.3 of the Plan are integral and critical parts of the Plan and the settlements implemented pursuant to the Plan, the approval of such releases pursuant to the Confirmation Order is a condition to the occurrence of the Effective Date, and all Sewer Released Parties and all GO Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, Causes of Action, and other rights under the Plan.

Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases and injunctions set forth in Section 6.3 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases and injunctions are: (1) in exchange for the good and valuable consideration provided by the Sewer Released Parties, the GO Released Parties, and their respective Related Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the County and all Creditors; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the releasing parties as set forth in the Plan asserting any Claims or Causes of Action released pursuant to such release.

### 4. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Case after the Effective Date to the fullest extent provided by law, including the jurisdiction to:

(a)     Except as otherwise Allowed pursuant to the Plan or in the Confirmation Order, Allow, classify, determine, disallow, establish the priority or secured or unsecured status of, estimate, limit, liquidate, or subordinate any Claim, in whole or in part;

(b)     Resolve any motions pending on the Effective Date to assume, assume and assign, or reject any executory contract or unexpired lease to which the County is a party or with respect to which the County may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(c)     Resolve any and all other applications, motions, adversary proceedings, and other contested or litigated matters involving the County that may be pending on the Effective Date or that may be instituted thereafter in accordance with the terms of the Plan;

(d)     Ensure that all Distributions are accomplished pursuant to the provisions of the Plan;

180

(e) Enter such orders as may be necessary or appropriate to implement or consummate the Plan and all contracts, instruments, releases, and other agreements or documents entered into in connection with or related to the Plan;

(f) Resolve any and all controversies, suits, or issues that may arise in connection with the implementation, consummation, interpretation, or enforcement of the Plan or the Confirmation Order, or any Person's rights, obligations, or interests under the Plan or the Confirmation Order;

(g) Remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, the Plan, the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(h) Adjudicate any Preserved Claims;

(i) Implement and enforce the Commutation Election, and implement and enforce all settlements, releases, exculpations, and injunctions associated with the Plan;

(j) Issue injunctions, enter and implement other orders, or take any other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan or the Confirmation Order;

(k) Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason modified, reversed, revoked, stayed, or vacated;

(l) Adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any actions taken by any Person pursuant to or in furtherance of the Plan, including implementation or enforcement of the Approved Rate Structure and issuance of the New Sewer Warrants under the New Sewer Warrant Indenture, and enter any necessary or appropriate orders or relief (including mandamus) in connection with such adjudication;

(m) Hear and determine any actions brought against the County, the GO Released Parties, the Sewer Released Parties, or any of their respective Related Parties in connection with all compromises and settlements, exculpations and releases, the Plan, or the Case;

(n) Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan; and

(o) Enter an order closing the Case pursuant to Bankruptcy Code section 945(b).

If the Bankruptcy Court abstains from exercising jurisdiction, declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter, then Section 6.4 of the Plan shall have no effect upon and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

181

### G. Other Plan Provisions

#### 1. Revocation of the Plan; No Admissions

Subject to each of the Sewer Plan Support Agreements, the County reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or if the Effective Date does not occur, the Plan (and the Confirmation Order, if entered) will be null and void and inadmissible as evidence in any proceeding, and nothing contained in the Plan, the Disclosure Statement, or the Confirmation Order (if entered) will (a) be an admission by the County, any of the Plan Support Parties, the Sewer Warrant Trustee, or the School Warrant Trustee with respect to any matter set forth therein, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against the County or its property, or of any Causes of Action; or (c) prejudice in any manner the rights of any Person in any further proceedings. Nothing in Section 5.2 of the Plan shall limit the rights or remedies available to any Person under any applicable Plan Support Agreement. In addition, nothing in the Plan, the comprehensive compromise and settlement described in Section 4.8(a) of the Plan, or any other compromises and settlements implemented under the Plan shall be deemed to be an admission or evidence of wrongdoing or, except with respect to obligations created under or pursuant to the Plan, liability on the part of any GO Released Party, any Sewer Released Party, or any of their respective Related Parties.

#### 2. Modification of the Plan

Subject to the restrictions set forth in Bankruptcy Code section 942 and in each of the Sewer Plan Support Agreements, the County reserves the right to alter, amend, or modify the Plan at any time before the Confirmation Date.

#### 3. Severability of Plan Provisions

If, before the Confirmation Date, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. All rights of each Plan Support Party under the applicable Plan Support Agreement are fully reserved if any such holding, alteration, or interpretation means that the Plan is no longer an "Acceptable Plan" for purposes of the applicable Plan Support Agreement. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with Section 5.4 of the Plan, is valid and enforceable under its terms.

### 4. Inconsistencies

To the extent of any inconsistencies between the Plan, on the one hand, and the Disclosure Statement, any Plan Support Agreement, or any Ballot, on the other hand, the terms and provisions contained in the Plan shall govern.

### 5. Governing Law

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and the Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for in, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, instruments, and documents executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Alabama without giving effect to the principles of conflict of laws thereof.

### 6. Transactions on Business Days

If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

### 7. Good Faith

Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Plan Procedures Order, the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the County, all the Plan Support Parties, the Sewer Warrant Trustee, the School Warrant Trustee, the FGIC Rehabilitator, and all their respective Related Parties have acted in good faith in connection therewith.

### 8. Effectuating Documents and Further Transactions

Each of the officials and employees of the County is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and provisions of the Plan.

### 9. Sewer Warrant Trustee Residual Fee Estimate.

The County will have the right to challenge the amount of the Sewer Warrant Trustee Residual Fee Estimate by filing an action in the Bankruptcy Court within five (5) calendar days after receipt of the Sewer Warrant Trustee Residual Fee Estimate, provided that prior to filing such an action, the County will make good faith efforts to resolve any dispute with the Sewer Warrant

183

Trustee.  Any challenge by the County to the amount of the Sewer Warrant Trustee Residual Fee Estimate will be resolved by the Bankruptcy Court on an expedited basis before the Effective Date.

# VIII.
## CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.       Federal Income Tax Aspects of Plan

The implementation of the Plan may have federal, state, or local tax consequences to the County's Creditors.  As the County is a political subdivision duly organized and existing under the laws of the State of Alabama and is treated as a political subdivision of the State of Alabama for federal income tax purposes, the County believes that it will not be subject to any federal or state income tax liability from implementation of the Plan, except as specified below in Section VIII.A.2 of this Disclosure Statement.

Because individual circumstances may differ and the federal income tax consequences of a chapter 9 case are complex, this summary does not address all federal income tax consequences that may be relevant to the creditors of the County as a result of implementation of the Plan.  In addition, this summary does not address any state or local tax consequences resulting from the Plan.  Creditors of the County should consult their own tax advisors regarding the federal, state, or local income tax consequences of the Plan, including the effect, if any, applicable provisions of the Plan may have on outstanding obligations of the County the interest component of which County creditors may have treated as excludable from gross income for federal income tax purposes.

With respect to certain of the transactions that form a part of the Plan, the following information may be relevant to holders of County warrants affected thereby:

### 1.       Future Legislation Could Affect Tax-Exempt Obligations

The federal government is considering various proposals to reduce federal budget deficits and the amount of federal debt, including proposals that would eliminate or reduce indirect expenditures made through various deductions and exemptions currently allowed by the income tax laws.

The exemption for interest on tax-exempt debt is one of the indirect expenditures that could be affected by a deficit reduction initiative.  Some deficit reduction proposals would completely eliminate the exemption for interest on tax-exempt bonds.  Other proposals would place an aggregate cap on the total amount of exemption and deductions that may be claimed by a taxpayer, or a cap on the exemption for interest on tax-exempt bonds.  Changes in the rate of the federal income tax, including so-called flat tax proposals, could also reduce the value of the exemption.

Changes affecting the exemption for interest on tax-exempt obligations, if enacted, could apply to outstanding County warrants.  It is not possible to predict whether the United States Congress will adopt legislation affecting the exemption for tax-exempt obligations, with the provision of such legislation may be, whether any such legislation will be retroactive in effect, or

what effect any such legislation may have on holders of County warrants. Holders of County obligations should consult their tax advisors in the event any such legislation is enacted into law.

**2. Sewer Warrants**

**a. Negotiation of a Closing Agreement with the IRS**

Under federal tax law, the IRS is authorized to enter into written agreements with any person to settle outstanding issues with respect to any federal tax issue for any period. Absent a showing of fraud, malfeasance or misrepresentation of a material fact, matters covered by a closing agreement may not be reopened by the IRS or set aside or disregarded by a court. However, a change in federal tax law can render a settlement reached in a closing agreement moot (with respect to future tax periods only) should a specific change in law contradict the terms of a closing agreement.

In June of 2011, the IRS placed the Series 2003-B Sewer Warrants and the Series 2003-C Sewer Warrants under examination. By agreement of the County and the IRS, the examination was broadened to include all Sewer Warrants. In connection with this examination, the County and the IRS have been in discussions to resolve various potential violations of section 103 of title 26 of the United States Code (the "Internal Revenue Code") with respect to the Sewer Warrants through a closing agreement. The County has not conceded that violations of the Internal Revenue Code have occurred.

The County has negotiated the terms of a proposed Closing Agreement with the IRS. The terms of the proposed Closing Agreement require the payment of $4,500,000 to the IRS, which payment will be paid exclusively from Accumulated Sewer Revenues or gross Sewer System revenues received by the County. The proposed Closing Agreement extends to all series of the Sewer Warrants. On July 23, 2013, the County Commission approved the terms of the proposed Closing Agreement with the IRS. On July 24, 2013, the County filed with the Bankruptcy Court a motion to approve its agreement with the Sewer Warrant Trustee to pay the $4,500,000 to the IRS from the Revenue Account. If and when the Closing Agreement has been executed and delivered by both the County and the IRS, a material event notice will be provided by the County to holders of the Sewer Warrants via the Municipal Securities Rulemaking Board's Electronic Municipal Market Access ("EMMA") service. EMMA may be accessed via the internet at http://emma.msrb.org.

It is a condition to the Effective Date that the County enter into the Closing Agreement with the IRS.

**b. Payments Received During the Pendency of the County's Bankruptcy Case**

Holders of existing Sewer Warrants have received numerous debt service payments from the County on the Sewer Warrants from the date the County defaulted under the Sewer Warrant Indenture. Because the Plan involves paying the existing Sewer Warrants with the proceeds of New Sewer Warrants in an aggregate principal amount that is less than the amount currently outstanding on the Sewer Warrants, the holders of the Sewer Warrants will not recover 100% of the principal amount of the Sewer Warrants they hold.

185

Although the Sewer Warrant Indenture provides that payments made post-default are to be allocated first to interest when no acceleration has been declared by the Sewer Warrant Trustee, the IRS may not recognize that allocation for tax purposes. Instead, the IRS has determined[17] in analogous rulings that all payments received in settlement of a tax-exempt obligation of an insolvent debtor post-default, when the holder is receiving a lesser principal amount than originally invested, may be characterized as a return of principal, and not interest, which could affect such holder's basis in its holdings. This characterization of post-default debt service may be applicable to holders of the Sewer Warrants and those holders should consult their tax advisors to determine if such characterization is appropriate.

### c. Refunding of Sewer Warrants

Pursuant to the Plan, the existing Sewer Warrants will be refunded with the proceeds of the New Sewer Warrants and canceled, except for certain Sewer Warrants held by certain Supporting Sewer Warrantholders, which warrants may be exchanged for New Sewer Warrants if the option available under the Put Agreement is utilized. Under generally applicable federal tax principles, either transaction may be a realization event for the holders of the existing Sewer Warrants. Holders of existing Sewer Warrants should consult their tax advisors to determine the appropriate amount of gain or loss applicable to their holdings on the Effective Date.

### d. Payments to Non-Commuting Holders of Sewer Warrants

The Plan provides for a Commutation Election with respect to the Sewer Warrants, as described in Section XII.B of this Disclosure Statement. Holders of Class 1-A Claims and Class 1-B Claims who elect, or are deemed to elect, to retain their existing rights under the applicable Sewer Wrap Policy may receive future payments from the applicable Sewer Warrant Insurer on the terms provided in the applicable policy. The IRS has determined in published revenue rulings that interest paid by an insurance company on behalf of an issuer of tax-exempt obligations is excludable from gross income of the holders of such obligations. These IRS rulings were not issued in the context of a debtor in bankruptcy and a plan under the Bankruptcy Code that discharges the underlying obligations of the debt issuer, as will be the case with respect to the Sewer Warrants. Neither the County nor the Sewer Warrant Insurers make any representation about the tax-exempt status of the interest portion of payments under applicable Sewer Wrap Policies made to holders who elect not to make the Commutation Election, or are deemed not to make the Commutation Election. Such warrantholders should consult their tax advisors to determine the tax treatment of any such payments.

---

[17] These conclusions were reached in private letter rulings, which according to the Internal Revenue Code, may not be cited or used as precedent. *See* 26 U.S.C. § 6110(k)(3). However, such rulings are instructive as they may provide evidence of the IRS's approach in similar situations.

186

3. **Holders of the Series 2001-B GO Warrants**

   a. **Exchange of Series 2001-B GO Warrant**

Pursuant to the Plan, the existing Series 2001-B GO Warrants will be exchanged for the Replacement 2001-B GO Warrants. Under generally applicable federal tax principles, this exchange will constitute a realization event for the holders of the existing Series 2001-B GO Warrants. Holders of existing Series 2001-B GO Warrants should consult their tax advisors to determine the appropriate amount of gain or loss applicable to their holdings.

   b. **Tax Status of Replacement 2001-B GO Warrants**

The exchange of the Series 2001-B GO Warrants by the County under the Plan effectively constitutes a refinancing of the Series 2001-B GO Warrants, as the Replacement 2001-B GO Warrants contain significantly modified terms, such as interest rate and amortization schedule , from those provided for by the Series 2001-B GO Warrants. Upon exchange, the existing Series 2001-B GO Warrants will be cancelled under the Plan.

Although the County expects that, under existing law, interest on the Replacement 2001-B Warrants will be excluded from gross income for federal income tax purposes, the tax status of the Replacement 2001-B Warrants cannot be determined as of the date of this Disclosure Statement. The County expects to cause an opinion of nationally recognized bond counsel addressing the tax status of the Replacement 2001-B Warrants to be delivered with the Replacement 2001-B Warrants on the Effective Date. Recipients of the Replacement 2001-B Warrants should refer to such opinion for more information on the tax status of the Replacement 2001-B Warrants.

4. **Holders of the Other Outstanding County Warrants**

Confirmation of the Plan will not have an effect on the tax status of the Series 2003-A GO Warrants, the Series 2004-A GO Warrants, or the Board of Education Lease Warrants.

As of the date of this Disclosure Statement, the County does not expect that confirmation of the Plan will have an effect on the tax status of the Series 2004-A School Warrants, Series 2005-A School Warrants, or Series 2005-B School Warrants; however, the County remains in negotiations with respect to potential amendments to the School Warrant Indenture the nature and extent of which cannot be currently determined, including whether such amendments will occur at all. Holders of the Series 2004-A School Warrants, Series 2005-A School Warrants, and Series 2005-B School Warrants should consult their tax advisors as of the Effective Date to determine the effect of transactions described in the Plan on those series of County obligations.

**THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CHARACTERISTICS OF THE PLAN IS NOT INTENDED TO BE EXHAUSTIVE. ALL CREDITORS OF THE COUNTY SHOULD CONSULT THEIR OWN TAX ADVISORS FOR COMPLETE INFORMATION REGARDING THE EFFECT OF THE PLAN ON AN INDIVIDUAL CREDITOR'S FEDERAL, STATE, AND LOCAL TAX LIABILITY (IF ANY)**

187

GENERATED BY THE TRANSACTIONS APPLICABLE TO SUCH CREDITOR TO BE UNDERTAKEN PURSUANT TO THE PLAN.

## IX.
## CERTAIN CONSEQUENCES UNDER THE FEDERAL SECURITIES LAW

### A.    Registration of Securities

In general, securities issued by the County, such as general obligation warrants and sewer revenue warrants, are exempt from the registration requirements of the 1933 Act under section 3(a)(2) of the 1933 Act.  Furthermore, any insurance issued to guarantee warrants of the County, such as the School Policy – General or the Sewer Wrap Policies, although separate securities from the warrants they insure, are likewise granted an exemption from registration under section 3(a)(8) of the 1933 Act.  Obligations issued by the County likewise are exempt from registration under current Alabama securities law.

In addition to exemptions provided to local governments such as the County under the 1933 Act, section 1145(a)(1) of the Bankruptcy Code provides an exemption to all kinds of debtors from the registration requirements of the 1933 Act and from any requirements arising under state securities laws in conjunction with the offer or sale of securities of the debtor under a plan of adjustment where such securities are issued to a creditor of the debtor.  The Bankruptcy Code provides that certain creditors which are deemed "underwriters" within the meaning of the Bankruptcy Code may not resell obligations of a debtor which they receive pursuant to a plan of adjustment without registration.  Since obligations of the County are exempt from registration under generally applicable securities law, this exception is not relevant to securities of the County, although the provisions of Bankruptcy Code section 1145 which suspend operation of state securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code.  Creditors of the County who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Because the New Sewer Warrants are not being issued directly to Creditors of the County in connection with the Plan, but will be publicly offered, the County intends to rely on generally applicable securities law exemptions for the offering and sale of the New Sewer Warrants.  The County does not expect to offer the New Sewer Warrants in states where registration of County securities may be required by applicable state securities law, unless first registered.  The Replacement 2001-B GO Warrants will not be publicly offered but instead will be issued to the GO Banks pursuant to the Plan.  The Replacement 2001-B GO Warrants and the New Sewer Warrants issued in exchange for Sewer Warrants under the Put Agreement also will be exempt from registration under federal or state securities law to the maximum extent provided under Bankruptcy Code section 1145.  The remainder of the County's publicly traded securities will not be exchanged, reoffered or refinanced by the Plan, and therefore, the County does not expect implementation of the Plan to implicate federal securities laws with respect to those obligations.  Holders of the County's publicly traded securities not specifically mentioned in this paragraph should consult qualified counsel to determine if any state securities laws may be implicated in connection with the Plan.

188

Like the exemption from registration provided the County under section 3(a)(2) of the 1933 Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by government entities. Therefore, each trust indenture securing repayment of the County's existing Sewer Warrants or its Series 2001-B GO Warrants is exempt from qualification under section 304(a)(4) of the Trust Indenture Act. Likewise, the New Sewer Warrant Indenture and the Amended and Restated GO Indenture will be exempt from qualification under section 304(a)(4) of the Trust Indenture Act.

## B.    Market Disclosure

### 1.    Initial Offering

Although exempt from registration, securities issued by the County are subject to the anti-fraud provisions of federal securities laws. Section 10(b) of the 1934 Act and Rule 10b-5 promulgated by the SEC under the 1934 Act generally prohibit fraud in the purchase and sale of securities. Therefore, each publicly offered sale of County obligations typically is accompanied by an offering document that is referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decision whether to purchase the securities being offered. Bankruptcy Code section 1125(d) provides that the adequacy of any disclosure to creditors and hypothetical investors typical of holders of claims in the case is not subject to principles of any otherwise applicable non-bankruptcy law, rule, or regulation, which includes the federal securities laws. Instead, section 1125(d) provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of the County and to hypothetical investors in obligations of the County through a disclosure statement such as this document.

However, as described in the Plan, the New Sewer Warrants will be issued to provide cash to pay the holders of the existing Sewer Warrants, which, in exchange therefor, will be retired. In connection with the sale of the New Sewer Warrants in a public offering, the County will prepare an Official Statement for the New Sewer Warrants. That document will be made publicly available prior to the Effective Date.

### 2.    Continuing Disclosure

Publicly offered securities of the County generally are subject to the requirements of Rule 15c2-12 (the "Rule") promulgated by the SEC under the 1934 Act unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issuer of municipal securities, such as the County. The Rule will apply to the issuance and sale of the New Sewer Warrants by the County, and the County intends to comply with the Rule by delivering a continuing disclosure undertaking in customary form contemporaneously with the delivery of the New Sewer Warrants.

The delivery of the Replacement 2001-B GO Warrants pursuant to the Plan is not covered by the Rule because the Replacement 2001-B GO Warrants are proposed to be issued in exchange for the existing Series 2001-B GO Warrants without involvement of an underwriter, as defined in the

189

Rule. However, the County intends to voluntarily execute and deliver, for the benefit of the holders of the Replacement 2001-B GO Warrants, a new continuing disclosure undertaking (the "Replacement 2001-B CDA") containing certain disclosure obligations. The Replacement 2001-B CDA will be delivered on the Effective Date.

# X.
# FINANCIAL INFORMATION AND PROJECTIONS

## A.  Audited Financial Statements

The County's most recent audited financial statements are the 2011 Audited Financial Statements attached hereto as **Exhibit 2**. Audited financial statements for prior fiscal years are available for inspection on the County's website at http://jeffconline.jccal.org/investorrelations/DocumentManager/library/audits/.

The County's outside accountants currently are auditing the County's financial statements for the fiscal year ending September 30, 2012. The County does not know when that audit will be completed. Once completed, the County will post its September 30, 2012 audited financial statements on the website referenced immediately above.

## B.  Financial Projections

The County believes that the Plan meets the feasibility requirement set forth in Bankruptcy Code section 943(b)(7). In connection with the development of the Plan and for the purposes of determining whether the Plan would satisfy the feasibility standard, the County has analyzed its ability to perform its financial obligations under the Plan while maintaining sufficient liquidity and capital resources to provide services to its constituents and community in accordance with its legal obligations. The County's financial projections for the Sewer System are provided in the Amended Financing Plan. The County also has prepared cash flow projections for its General Fund (the "General Fund Projections") and for the Education Tax (the "Education Tax Projections"). The Amended Financing Plan, the General Fund Projections, and the Education Tax Projections (collectively, the "Projections") are attached hereto respectively as **Exhibits 9, 10, and 11**, and each is incorporated herein by reference.

The Projections were prepared by the County with the assistance of its professionals to present the anticipated impact of the Plan. The Projections all assume that the Plan will be confirmed before and implemented on the Effective Date in accordance with its stated terms. In addition, the Projections and the Plan are premised upon other assumptions, including the anticipated future performance of the County, general economic and business conditions, no material changes in the laws and regulations applicable to the operation of municipalities such as the County, and other matters largely or completely outside of the County's control.

Each of the Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth in the Disclosure Statement, the Plan, the Plan Supplement, the Projections themselves, the historical financial information for the County contained or referenced

herein, and other information submitted to the Bankruptcy Court during the course of the County's Case.

The County believes that the Projections are reasonable based on the information currently available to it and its professionals and that the Plan is feasible. Unanticipated events and circumstances may affect the County's actual financial results, and those actual results may vary materially from the Projections. The risks relating to the Plan and the Projections are discussed in greater detail in Article XI below. Because of these uncertainties and risks, the County cannot make any representation regarding the accuracy of the Projections or the ability of the County to achieve the projected results.

## XI.
## RISKS AND OTHER FACTORS TO CONSIDER

The County's ability to perform its obligations under the Plan is subject to various factors and contingencies, some of which are described in this section. The following discussion summarizes only some of the material risks associated with the Plan and the County, and is not exhaustive. Moreover, this section should be read in connection with the Plan and the other disclosures contained throughout this Disclosure Statement.

**PRIOR TO VOTING TO ACCEPT OR TO REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD, WITH THEIR OWN ADVISORS, READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT AND THE PLAN. THE RISKS ASSOCIATED WITH THE PLAN AND THE COUNTY MUST BE CAREFULLY CONSIDERED WHEN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN.**

### A.    Bankruptcy Considerations

#### 1.    Parties in Interest May Object to the County's Classification of Claims

Bankruptcy Code section 1122 provides that a plan may place a claim in a particular class only if the claim is substantially similar to the other claims in that class. The County believes that the classification of holders of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the classes established under the Plan each encompass Claims that are substantially similar to similarly classified Claims. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    Failure to Obtain Confirmation of the Plan

Bankruptcy Code sections 943(b) and 1129 (in its incorporated parts) set forth the requirements for confirmation of a chapter 9 plan, and require the Bankruptcy Court to make a series of specified, independent findings. There can be no assurance that the Bankruptcy Court will find that the Plan meets all of these requirements and confirm the Plan. If the Plan is not confirmed, it is unclear what Distributions, if any, holders of Allowed Claims would receive with respect to their

191

Allowed Claims.  If the Plan is not confirmed, it is possible that a party could request and the Bankruptcy Court could decide that the Case should be dismissed under Bankruptcy Code section 930.

Subject to the restrictions set forth in Bankruptcy Code section 942 and in each of the Sewer Plan Support Agreements, the County reserves the right to alter, amend, or modify the Plan at any time before the Confirmation Date.  Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a Distribution to the Class affected by the modification of a lesser value than currently provided in the Plan or no Distribution whatsoever under the Plan.

### 3.  Non-Consensual Confirmation

In the event that any impaired class of claims does not accept, or is deemed to reject, a chapter 9 plan, the Bankruptcy Court may nevertheless confirm the plan under the procedure for non-consensual confirmation (or "cramdown"), which is described in Section XIV.E of this Disclosure Statement.  Because Classes 1-E, 1-F, and 9 are deemed to reject the Plan, these requirements must be satisfied with respect to these Classes.  The County believes that the Plan will satisfy the requirements for non-consensual confirmation.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 4.  The County May Object to the Amount or Classification of Claims

Except as otherwise provided in the Plan, the County reserves the right to object regarding liability, amount, priority, classification, or status as secured or unsecured with respect to any Claim, in whole or in part.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim.

### 5.  The Effective Date Might Not Occur

Even if the Bankruptcy Court confirms the Plan, the Plan shall not become binding until the Effective Date occurs.  The Effective Date is the first Business Day on which the conditions set forth in Section 4.18(a) of the Plan have been satisfied or waived pursuant to Section 4.18(b) of the Plan. Among these conditions to the Effective Date of the Plan is the successful marketing and sale of the New Sewer Warrants and the generation of sufficient Refinancing Proceeds therefrom to enable the County to fulfill its obligations under the Plan.  The ability to market the New Sewer Warrants successfully will depend upon market conditions and other factors that are not within the County's control, including the interest rates prevailing in the market at the time the New Sewer Warrants are offered, which interest rates may be higher than the interest rates that are assumed to be prevailing in the Amended Financing Plan.  Other conditions to the Effective Date relate to the amount of the Tail Risk, notably that the Tail Risk and Covered Tailed Risk may each not exceed $25 million in the aggregate and that each Sewer Warrant Insurer will not be subject to any Tail Risk on or after the Effective Date in an amount in excess of its respective Covered Tail Risk. Whether these conditions are satisfied will depend upon the aggregate amount of Commutation Elections made or deemed to be made by the holders of the Sewer Warrants pursuant to the Plan.  If too many holders of Sewer

192

Warrants do not make or are deemed not to make the Commutation Election, then the Plan will not become effective as the Tail Risk will exceed those limitations. There can be no assurances whether the conditions to the Effective Date will be timely satisfied or waived, or whether and when the Effective Date will occur.

### 6. The County May Withdraw or Modify the Plan

Subject to each of the Sewer Plan Support Agreements, the County reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or if the Effective Date does not occur, the Plan (and the Confirmation Order, if entered) will be null and void and inadmissible as evidence in any proceeding, and nothing contained in the Plan, this Disclosure Statement, or the Confirmation Order (if entered) will (a) be an admission by the County, any of the Plan Support Parties, the Sewer Warrant Trustee, or the School Warrant Trustee with respect to any matter set forth herein or therein, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against the County or its property, or of any Causes of Action; or (c) prejudice in any manner the rights of any Person in any further proceedings.

Additionally, subject to the restrictions set forth in Bankruptcy Code section 942 and in each of the Sewer Plan Support Agreements, the County reserves the right to alter, amend, or modify the Plan at any time before the Confirmation Date.

### B. Risks Relating to Making or Declining to Make the Commutation Election

The Plan provides holders of Class 1-A and Class 1-B Claims with an option to choose whether to, among other things, commute their insurance or to retain insurance (to the extent insurance is applicable to such claimant's Sewer Warrants), as described in Section XII.B hereof. Once the Plan is confirmed and the Effective Date occurs, holders of Class 1-A and Class 1-B Claims who returned a Ballot declining to make the Commutation Election or who were deemed not to make the Commutation Election will receive under the Plan from or on behalf of the County a Cash Distribution of only sixty-five percent (65%) of the Adjusted Sewer Warrant Principal Amount of the Sewer Warrants they hold, rather than the eighty percent (80%) Cash Distribution that will be paid under the Plan from or on behalf of the County to those holders who make or are deemed to make the Commutation Election. Holders of Class 1-A and Class 1-B Claims who decline or are deemed not to make the Commutation Election will retain their rights after the Effective Date to look to the Sewer Warrant Insurer that issued the applicable Sewer Wrap Policy for additional recovery with respect to the unpaid amounts of principal and interest on their Sewer Warrant Claims in accordance with the terms and conditions of such Sewer Wrap Policy. There are risks, however, to recovering such amounts.

The ability of a non-commuting holder of a Sewer Warrant Claim to recover on account of Sewer Wrap Payment Rights is subject to the collection risk associated with its applicable Sewer Warrant Insurer. The holders of Sewer Warrant Claims should investigate the financial condition of each applicable Sewer Warrant Insurer prior to determining whether to make the Commutation Election under the Plan. Holders of Sewer Warrant Claims are advised that FGIC, which insures approximately $1.6 billion of the Sewer Warrants, has been placed in a rehabilitation proceeding in

New York state court (the "FGIC Rehabilitation Proceeding").  The Superintendent of Financial Services of the State of New York, solely in his capacity as Rehabilitator of FGIC (the "FGIC Rehabilitator"), has concluded that FGIC *will not* have sufficient assets to pay policy claims in full.[18] The FGIC Rehabilitator filed, and the New York State Court approved, a plan of rehabilitation for FGIC (the "FGIC Rehabilitation Plan").[19]  The County is of the opinion that the amount of any policy claim that the non-commuting holder of a FGIC-insured Sewer Warrant Claim might have under the FGIC Rehabilitation Plan with respect to such FGIC-insured Sewer Warrant Claim should be calculated only after taking into account any Distribution that such holder received from or on behalf of the County pursuant to its chapter 9 Plan.  The County further understands that the FGIC Rehabilitation Plan, once effective, provides for payment to policyholders of a cash payment percentage ("CPP") of permitted policy claims, estimated initially to be 17.25% (subject to adjustment by the FGIC Rehabilitator on or before the effective date of the FGIC Rehabilitation Plan).[20]  The FGIC Rehabilitator estimates that additional payments may be made on policy claims throughout FGIC's 40 year expected wind down period, but that the average ultimate recovery to policyholders will be approximately 27% to 30% (inclusive of the initial estimated 17.25% recovery) of each permitted policy claim on a net present value basis, using discount rates of 20% and 10%, respectively.[21]  Moreover, the County understands that, pursuant to the FGIC Rehabilitation Plan, such amounts (other than the initial CPP) would be paid by FGIC in periodic installments over a long period of time.  As such, the County believes it is highly likely that the retention of rights under Sewer Wrap Policies issued by FGIC would result in a smaller recovery to holders of Sewer Warrants (with such recovery being received over a longer period of time) than would be received by such holders if they instead made the Commutation Election.  Based on the foregoing, the County believes that it would be rational for every holder of FGIC-insured Sewer Warrants to make the Commutation Election under the Plan and receive an additional 15% Cash Distribution on the Effective Date.  Holders of Sewer Warrants should refer to the terms of the FGIC Rehabilitation Plan and consult with their own advisors as to the effect of such plan.

In addition, although the County has no reason to believe that Syncora is currently unable to meet its obligations under the applicable Sewer Wrap Policies, in April 2009, the New York Insurance Department issued an order (the "1310 Order") stating that, without limiting its power to institute rehabilitation or liquidation at an earlier date, Syncora must take such steps as contemplated by Syncora's plan to remediate its policyholders' surplus deficit and restore its minimum surplus to policyholders, which required Syncora to complete a remediation plan sufficient to meet its

---

[18] *See Disclosure Statement for Plan of Rehabilitation for Financial Guaranty Insurance Company*, at p. 2, *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (N.Y. Sup. Ct. filed Sept. 27, 2012).

[19] All discussions and descriptions of the FGIC Rehabilitation Plan contained herein are for summary purposes only and are qualified in their entirety by the terms of the FGIC Rehabilitation Plan.

[20] *See Plan Approval Order, In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (N.Y. Sup. Ct. June 11, 2013).

[21] *See Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation, In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (N.Y. Sup. Ct. filed Dec. 12, 2012).

minimum statutory policyholder surplus requirements and address previously announced short and medium term liquidity issues. Syncora completed that remediation plan in July 2010, and the 1310 Order was withdrawn.

Future events could occur that could give rise to payment or other counterparty risks with respect to each of the Sewer Warrant Insurers. Such risks would attach to the rights retained by any holder of Sewer Warrants that does not make or is deemed not to make the Commutation Election, and the County can make no guarantee that any holder would be able to realize any particular level of recovery from any Sewer Warrant Insurer.

Also, although Section 4.15(h) of the Plan provides that the Sewer Warrants will be deemed accelerated as of the Effective Date, this deemed acceleration of the Sewer Warrants does not mean that the Sewer Warrant Insurers are then obligated to pay off all principal on the non-commuted Sewer Warrants in full on an accelerated basis. Instead, the Sewer Warrant Insurers will simply have the right, *in their sole and absolution discretion* (irrespective of the terms of the applicable Sewer Wrap Policy), to pay off such principal on an accelerated basis at a date of their choosing. The Sewer Warrant Insurers are under no obligation to do so, however, and may decide instead to continue to pay scheduled debt service on such Sewer Warrants as and when it comes due and owing pursuant to the applicable Sewer Wrap Policy. In most cases, the scheduled maturity of the applicable Sewer Warrants occurs in 2041 or 2042. Moreover, in FGIC's case, even if FGIC were to elect to give effect to such deemed acceleration of the Sewer Warrants under the County's chapter 9 Plan, the County understands that FGIC could only initially pay a small portion of such accelerated claims under the terms of the FGIC Rehabilitation Plan and likely would never pay the balance in full.

Furthermore, there may be collection or other risks associated with the retention of rights under the applicable Sewer Wrap Policies. For example, although the County would expect that the Sewer Warrant Insurers would honor claims made by a policyholder under the Sewer Wrap Policies (to the extent the Sewer Warrant Insurers were legally permitted and financially able to do so) without the need for a holder of Sewer Warrants to make demand or initiate litigation, a Sewer Warrant Insurer might nevertheless dispute its obligation to pay claims to particular holders (including with respect to the amount and timing of any obligations, as well as with respect to the standing of individual holders to pursue claims). As such, it is possible that a holder not making the Commutation Election might need to engage its own counsel at its own expense or incur other expenses in order to realize on any rights that such holder retains by not making the Commutation Election. Once again, there are potential future risks associated with declining or being deemed not to make the Commutation Election that will not exist for all the holders of Sewer Warrants that make the Commutation Election.

On the other hand, holders of Sewer Warrant Claims that make or were deemed to make the Commutation Election will receive on the Effective Date (which, under the terms of the Plan, shall be no later than December 31, 2013) from or on behalf of the County under the Plan a Cash Distribution of eighty percent (80%) of the Adjusted Sewer Warrant Principal Amount of the Sewer Warrants they hold. Holders of Sewer Warrant Claims who make or are deemed to make the Commutation Election will release the Sewer Released Parties and their respective Related Parties

from any and all Sewer Released Claims and will not be entitled to receive any amounts or make any claims under any of the insurance policies covering their Sewer Warrants.

## C. Risks Associated with the County

The risks described above in Section XI.A titled "Bankruptcy Considerations" are risks relating to the County's ability to obtain Confirmation of its Plan and to consummate the transactions described in the Plan on the Effective Date. Other risk factors may affect the County's ability to perform its obligations under the Plan after the Effective Date. The following discussion is not an exhaustive list of those risks and does not reflect the relative importance of those risks. It is possible that risk factors not discussed herein may become material in the future.

### 1. Risks Applicable to the County Generally

#### a. Control by the Alabama Legislature

Alabama counties, including the County, have no home rule authority except as specifically granted by the Alabama Legislature. As a result, the County is subject to the total control of the Alabama Legislature, which in the past has restricted the County's access to revenues and declined to adopt proposed County legislation.

The Plan is not based upon or conditioned upon any action of the Alabama Legislature. Without limitation, the Projections underlying the Plan do not assume any enlargement of the County's ability to levy taxes or increase revenues to the General Fund.

#### b. County Credit May be Viewed Negatively By Market

Purchasers of New Sewer Warrants, recipients of the Replacement 2001-B GO Warrants, or holders of existing GO Warrants and School Warrants may encounter limited market acceptance of County credit upon any attempt to sell County debt obligations, making sales at or near par potentially difficult. Holders of County debt after the Effective Date may not be able to sell debt they hold for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of obligations before a potential purchaser would be willing to purchase County debt of any kind. There can be no assurance that a secondary market will exist for any County debt.

#### c. Lack of Population Growth

The County has experienced population changes that can best be described as stagnant or slightly declining. According to the 1980 U.S. Census, the County reached its peak population with 671,324 residents. This number declined to 651,525 in 1990, increased to 662,047 in 2000 and declined again to 658,466 in 2010. In addition to its inability to increase tax rates, the lack of steady population growth experienced by the County over the last 30 years limits the County's ability to grow tax revenues or increase the number of sewer customers it serves.

Case 11-05736-TBB9   Doc 1977   Filed 08/08/13   Entered 08/08/13 11:52:51   Desc
Main Document    Page 221 of 251

### d. Risks with Respect to Tax Exemption for Interest Payments on County Obligations

The continued exemption from taxation for interest payments on County debt obligations is contingent on the County's compliance (and, in the case of the Bessemer Lease Warrants, the PBA's compliance in addition to the County's compliance) with federal tax laws applicable to such obligations. The County has covenanted to comply with all such obligations. Any failure to comply with these requirements could cause interest on the affected County obligation to be deemed not excludable from gross income for federal income tax purposes as of the date of issuance of the obligation, or as of some later date.

No assurances can be given that federal legislation will not be introduced and enacted which could adversely affect the exclusion of interest on obligations of the County the interest on which is currently exempt from gross income for federal income taxation or the tax treatment of certain owners of tax-exempt obligations of the County as a result of the receipt of such interest. None of the County's outstanding debt obligations contains, and the New Sewer Warrants and the Replacement 2001-B GO Warrants will not contain, any provision for an increase in the rate of interest applicable to such obligations or for the mandatory redemption of such obligations, in the event the interest thereon should become includable in gross income for federal income taxation after their date of issuance, whether in whole or in part.

In addition, proposed, pending or future tax legislation, administrative actions taken by tax authorities, or court decisions, whether at the federal or state level, may adversely affect the tax-exempt status of the interest on County debt obligations. Future legislation could directly or indirectly reduce or eliminate the value of certain deductions and exclusions, including the benefit of the exclusion of tax-exempt interest on County debt obligations from gross income for federal income tax purposes. Any such proposed legislation, actions, or decisions, whether or not enacted, taken or rendered, could also adversely affect the value and liquidity of County debt obligations. Creditors of the County should consult their own tax advisors regarding the forgoing matters.

### 2. General Fund Risks

### a. Inability to Increase Tax Rates

As discussed above in Section III.A.11, the County generally lacks authority under Alabama law to increase revenues on its own initiative and is dependent upon the Alabama Legislature for the approval of any new or increased taxes to be levied by the County. Although the County's ability to raise revenues to support its General Fund is limited, state and federally-mandated expenditures for justice, health and welfare programs continue to increase. Meanwhile, state and federal funds available to fund such mandated programs generally have remained stagnant or decreased.

In proposing its Plan, the County has assumed that the Alabama Legislature will not approve either the increase of any existing taxes currently levied by the County or the imposition of any new taxes by the County, including any occupational tax. The County's projections also make assumptions about future increases in the costs of the County performing its mandatory obligations.

197

If County revenues are less than its total obligations, the County's ability to perform its obligations under the Plan could be jeopardized.

### b. Additional Earmarking of Existing Revenue Sources

As discussed above in Section III.A.11, the Alabama Legislature has the ability to "earmark" certain County revenue sources. An "earmark" restricts the use of tax revenues for limited, specific purposes generally determined by the legislative body imposing the restriction. The County generally disfavors the earmarking of its revenue sources as it limits the County Commission's ability to exercise its judgment as to the best use of County resources. The County has tried to convince the Alabama Legislature to remove earmarks from certain of the County's remaining revenue sources, but the County legislative delegation, as a body, has declined so far. Therefore, no action was taken. Although the County is hopeful that the Alabama Legislature will not place additional earmarks on the County's existing revenue sources, additional earmarks nevertheless could be adopted over the opposition of the County. The imposition of additional earmarks on County tax revenue could have an adverse effect on the County's ability to perform its obligations under the Plan.

### c. Fluctuations in *Ad Valorem* Tax Collections

The General Fund of the County depends, to a significant degree, on *ad valorem* tax collections. In the past, the system of *ad valorem* taxation in Alabama has been under revision by constitutional amendments, legislation, and court orders relating to the reappraisal of taxable property, reclassification of taxable property, variation of assessment ratios, and limitations on the expected increase in *ad valorem* taxes resulting from reappraisal and proposals respecting current use valuations. Because of additional revisions that may be made to the system of *ad valorem* taxation in Alabama, the County cannot predict what effect past or future revisions may have on the future collections of *ad valorem* taxes in the County.

There can be no assurance that the total assessed value of taxable property in the County will remain at its present level. Adverse trends in the economy of the County could adversely affect property values and the collection of *ad valorem* taxes. Future population trends affecting the County may also have an adverse effect on the County's ability to grow its *ad valorem* tax revenue.

### 3. Risks Relating to the New Sewer Warrants

### a. The New Sewer Warrants are Limited Obligations

The New Sewer Warrants will not be general obligations of the County or a charge against the general credit or taxing powers of the County, the State of Alabama, or any political subdivision of the State of Alabama. Instead, the New Sewer Warrants will be limited obligations of the County payable solely from and secured by a pledge and assignment of the gross revenues from the operation of the Sewer System.

The sufficiency of the gross revenues from the operation of the Sewer System to pay debt service on the New Sewer Warrants, to pay operating expenses of the Sewer System, and to make

198

capital expenditures necessary to maintain or expand the Sewer System may be affected by events and conditions relating to, among other things, population and employment trends, weather conditions, and political and economic conditions in the County, the nature and extent of which are not currently determinable.

### b. The Interim Rate Structure and Its Impact on Sewer Revenues

The Interim Rate Structure adopted by the County Commission became effective on March 1, 2013. The Interim Rate Structure increased many of the rates charged for services provided by the Sewer System and made other material changes to the Sewer System's billing system. The County believes the Interim Rate Structure has been implemented effectively and that the Sewer System's customers are being billed currently in accordance with the Interim Rate Structure. However, during the period of time the Interim Rate Structure has been in effect, the Sewer System has not generated the amount of revenues the County had projected prior to its implementation. The County attributes these lower than expected Sewer System revenues to changes in customer consumption patterns and to unseasonably wet and cold weather during the first six months of 2013.

The Sewer System Projections predict that the implementation of and adherence to the Interim Rate Structure and the Approved Rate Structure will generate sufficient revenues to service the debt obligations on the New Sewer Warrants, pay operating expenses, and to provide for a certain level of capital improvements to the Sewer System. Those financial projections are premised upon various assumptions about usage of the Sewer System's services and, particularly, the response its customers may have to increasing charges for services. The County believes that its assumptions regarding the impact that the implementation of and adherence to the Interim Rate Structure and the Approved Rate Structure on future sewer revenues are reasonable; however, the nature and extent of the Interim Rate Structure or the Approved Rate Structure's effect on the Sewer System's revenues are not currently determinable.

### c. The EPA Consent Decree and Other Compliance Obligations

The County has complied and continues to comply with its commitments and obligations under the EPA Consent Decree. Although five of the Sewer System's basins have been released from the EPA Consent Decree, four other basins have not. The County's financial projections for the Sewer System are premised upon reasonable estimates for the continued cost of complying with the terms of the EPA Consent Decree. There can be no assurance that the actual cost of compliance will not exceed the County's estimates, however, nor can any assurances be given that the County will be able to comply fully with its remaining obligations under the EPA Consent Decree.

### d. Additional Regulatory Requirements

Periodically, the federal or state government imposes additional regulatory requirements upon operators of public sanitary sewer systems. The timing and impact of such future regulatory action cannot be predicted with certainty, and the impact of such action on the accuracy of the financial projections for the Sewer System contained in the Amended Financing Plan currently cannot be determined.

199

### e.    Additional Sewer Indebtedness

The New Sewer Indenture is expected to permit the County to issue or incur additional indebtedness secured on a parity of lien with respect to the gross revenues of the Sewer System as that provided in favor of the New Sewer Warrants. Such indebtedness would increase debt service requirements and could adversely affect debt service coverage on the New Sewer Warrants or could adversely affect the ability of the County to meet operating expenses or to pay for necessary capital improvements. The New Sewer Indenture will contain specific conditions that the County must meet prior to issuing additional parity obligations under the New Sewer Indenture.

### 4.    Risks Relating to the School Warrants

### a.    School Warrants are Limited Obligations

The School Warrants are not general obligations of the County or a charge against the general credit or taxing powers of the County, the State of Alabama, or any political subdivision of the State of Alabama. The School Warrants are limited obligations of the County payable solely from and secured by a pledge and assignment of the Education Tax and certain amounts held in designated funds created under the School Warrant Indenture.

The sufficiency of the Education Tax proceeds to pay debt service on the School Warrants may be affected by events and conditions relating to, among other things, population and employment trends and economic conditions in the County, the nature and extent of which currently are not determinable.

### b.    Online Commerce and Other Factors Contributing to Erosion of Tax Base

The amount of Education Tax revenues is subject to increase or decrease due to (i) increases or decreases in the dollar volume of taxable sales within the County, (ii) legislative changes relating to the Education Tax, which may include changes in the scope of taxable sales, and (iii) other factors that may be beyond the control of the County, including, but not limited to, the continuing increased use of electronic commerce and other internet-related sales activity that has had an adverse effect upon the amount of Education Tax revenues.

Federal law currently prohibits states and municipalities from levying and collecting sales taxes on internet sales. Although products purchased from internet retailers are not exempt from use taxation, taxpayer compliance is low, and the County has no effective means of enforcing use tax law, especially given the financial restraints imposed upon it. On May 6, 2013, the United States Senate passed the Marketplace Fairness Act (Senate Bill 743) which, if enacted, would allow states to require online retailers to collect sales and use taxes without a physical presence nexus requirement. The United States House has referred the Senate bill to the House Committee on the Judiciary. The County cannot predict the likelihood of the Marketplace Fairness Act, or similar legislation, being enacted. In the meantime, online sales remain exempt from sales taxes.

5. **Risks Relating to the New Bessemer Lease**

    a. **Right of County Not to Renew the New Bessemer Lease**

The County may elect not to renew the New Bessemer Lease for a successive one-year term at the end of any fiscal year of the County. However, pursuant to the terms of the New Bessemer Lease and the Bessemer Stipulation, the County has covenanted that if any office or storage space in the facilities subject to the New Bessemer Lease shall become vacant after acquisition or construction thereof, then neither the County nor any officer, department or agency of the County may thereafter enter into any lease or rental agreement for additional office or storage space or renew any existing lease or rental agreement for office or storage space in or about the municipality where such leased facilities are located until after all such vacant space in the leased facilities shall have been filled. Additionally, the County has covenanted in the New Bessemer Lease and the Bessemer Stipulation that, so long as the Bessemer Lease Warrants are outstanding and rental payments under the New Bessemer Lease remain to be paid, the County will not relocate the County's Bessemer courthouse or jail to any alternative facility unless the New Bessemer Lease is expressly amended to provide that such alternative facility made a part of the leased premises thereunder. The parties agreed that these covenants shall survive the termination of the New Bessemer Lease.

If the County elects not to renew the New Bessemer Lease for a successive one-year term prior to the payment in full of the Bessemer Claims, it is possible that the facilities financed by the Bessemer Lease Warrants could not be sold for an amount sufficient to satisfy in full the Bessemer Claims or be re-let for sufficient rentals to make the regularly-scheduled debt service payments on account of the Bessemer Lease Warrants. If such event occurs, then no assurances can be given that sufficient funds will be available from the PBA to satisfy in full the Bessemer Lease Warrants.

    b. **Other Risk Factors Discussed in the Official Statement relating to the Bessemer Lease Warrants Issued by the PBA**

The PBA issued an official statement in connection with its issuance of the Bessemer Lease Warrants. That official statement included a discussion of risk factors relating to such warrants. Among the risk factors discussed by the PBA therein was the tax-exempt status of the Bessemer Lease Warrants and the possibility that the tax status of such warrants could be affected by post-issuance events. The County is not the issuer of the Bessemer Lease Warrants and has no knowledge of any such post-issuance events that have adversely affected or may have adversely affected the tax-exempt status of such warrants; however, as discussed in such official statement, this has been and remains a risk factor with respect to such Bessemer Lease Warrants. Any party with an interest in any of the Bessemer Lease Warrants is encouraged to refer to such official statement of the PBA for the discussion of this risk factor contained therein.

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 226 of 251

### D. Additional Factors to Be Considered

#### 1. The County Has No Duty to Update

The statements contained in this Disclosure Statement are made by the County as of July 29, 2013, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The County has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 2. No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the County, the Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement and any other Plan solicitation materials that accompany this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should be relied upon by you at your own risk in arriving at your decision.

#### 3. Claims Could Be More Than Projected

The Allowed amount of Claims in Classes (including Class 6 General Unsecured Claims) could be significantly more than projected, which could, in turn, cause the ratable value of Distributions to be reduced substantially.  In addition, certain Claims may accrue postpetition interest such that delays in Distributions could reduce the Distributions available for other Creditors.

**NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS BUSINESS, LEGAL, OR TAX ADVICE.  EACH CREDITOR AND OTHER PARTY IN INTEREST SHOULD CONSULT HIS, HER, OR ITS OWN LEGAL COUNSEL AND ACCOUNTANTS OR FINANCIAL ADVISORS AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING HIS, HER, OR ITS CLAIMS.  THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN OR OBJECT TO CONFIRMATION OF THE PLAN.**

202

# XII.
# VOTING AND ELECTION PROCEDURES

**A.      Solicitation of Votes with Respect to the Plan**

      **1.      The County Will Solicit Votes From Holders of Claims in Classes 1-A, 1-B, 1-C, 1-D, 2-A, 2-B, 2-C, 2-D, 2-E, 5-A, 5-D, 5-E, 6, and 7**

      The County believes that the Classes on the following chart are Impaired and will receive Distributions under the Plan and, therefore, will solicit votes on the Plan from holders of Claims in these Classes (collectively, the "Voting Classes"):[22]

| Class | Description |
|-------|-------------|
| Class 1-A | Sewer Warrant Claims |
| Class 1-B | Bank Warrant Claims and Primary Standby Sewer Warrant Claims |
| Class 1-C | Sewer Warrant Insurers Claims |
| Class 1-D | Other Specified Sewer Claims |
| Class 2-A | Series 2004-A School Claims |
| Class 2-B | Series 2005-A School Claims |
| Class 2-C | Series 2005-B School Claims and Standby School Warrant Claims |
| Class 2-D | School Policy – General Claims |
| Class 2-E | School Surety Reimbursement Claims |
| Class 5-A | Series 2001-B GO Claims and Standby GO Warrant Claims |
| Class 5-D | GO Policy Claims |
| Class 5-E | GO Swap Agreement Claims |
| Class 6 | General Unsecured Claims |
| Class 7 | Bessemer Lease Claims |

---

[22] Holders of Claims in Classes 1-A and 1-B are also permitted to make certain elections with respect to the Plan, as discussed in Sections 2.3(a), 2.3(b), and 4.7 of the Plan, as well as in Section XII.B hereof.

2. **Classes 3-A, 3-B, 4, 5-B, 5-C, and 8 Will Be Deemed to Accept the Plan, While Classes 1-E, 1-F, and 9 Will Be Deemed to Reject the Plan**

The Plan provides that legal, equitable, and contractual rights of holders of Allowed Class 3-A Claims (Board of Education Lease Claims), Allowed Class 3-B Claims (Board of Education Policy Lease Claims), Allowed Class 4 Claims (Other Secured Claims, including Secured Tax Claims), Allowed Class 5-B Claims (Series 2003-A GO Claims), Allowed Class 5-C Claims (Series 2004-A GO Claims), and Allowed Class 8 Claims (Other Unimpaired Claims) are unaltered by the Plan, provided that all such Claims shall remain subject to any and all defenses, counterclaims, setoff or recoupment rights of the County with respect thereto. Accordingly, such Claims are not Impaired by the Plan, are deemed to accept the Plan, and thus will not receive Ballots.

Any party that disputes the County's characterization of its Claim as not Impaired may request a finding of impairment from the Bankruptcy Court in order to obtain the right to vote, but such party must promptly take action to request such a finding and arrange for the Bankruptcy Court to hold a hearing and adjudicate such request no later than seven (7) calendar days prior to the Ballot Deadline (*i.e.*, no later than September 30, 2013).

Holders of Class 1-E Claims (Sewer Swap Agreement Claims), Class 1-F Claims (Other Standby Sewer Warrant Claims), and Class 9 Claims (Subordinated Claims) shall neither receive any Distributions nor retain any property under the Plan on account of such Claims. Therefore, these classes of Claims are deemed to reject the Plan, and the holders of such Claims will not receive Ballots.

3. **Voting Rights with Respect to Contingent Claims and Unliquidated Claims**

If a Claim for which a proof of Claim has been timely filed is (a) marked or identified as Contingent or Unliquidated on its face or (b) does not otherwise specify a fixed or liquidated amount, then, in accordance with the Plan Procedures Order, such Contingent or Unliquidated Claim will be temporarily allowed for voting purposes in the amount of $1.00. If a Claim has been estimated or otherwise allowed for voting purposes by an order of the Bankruptcy Court, or by an agreement between the County and the Creditor estimating or otherwise allowing a Claim for voting purposes, then, in accordance with the Plan Procedures Order, such Claim will be temporarily allowed for voting purposes in the amount so estimated or allowed by the Bankruptcy Court. If the automatic stay has been modified by an order of the Bankruptcy Court at least fifteen (15) calendar days before the Ballot Deadline to permit a Claim to be adjudicated, in whole or in part, in another court (including an appellate court), then such Claim will be temporarily allowed in the amount of $1.00.

4. **Voting Rights with Respect to Disputed Claims**

If, among other things, the County has Filed an objection to or request for estimation of a Claim on or before September 13, 2013, then, in accordance with the Plan Procedures Order, such Claim will be temporarily allowed or disallowed for voting purposes in accordance with the relief

204

sought in the objection. If an objection does not identify the proposed amount of a Claim (e.g., if the Claim remains subject to estimation or liquidation), then such Claim will be temporarily allowed in the amount of $1.00. If such objection seeks to disallow the Claim in full and such objection is not resolved prior to September 13, 2013, such Claim will be temporarily disallowed for voting purposes.

**5.      Solicitation, Balloting, Tabulation, Notices, and Confirmation Procedures**

On August 7, 2013, after due notice and a hearing, the Bankruptcy Court entered its *Order Approving: (a) the Form, Scope, and Nature of Solicitation, Balloting, Tabulation, and Notices with Respect to the "Chapter 9 Plan of Adjustment for Jefferson County, Alabama (Dated July 29, 2013)"; and (b) Related Confirmation Procedures, Deadlines, and Notices* [Docket No. 1975] (the "Plan Procedures Order"). The Plan Procedures Order sets forth, among other things, the procedures pursuant to which votes and certain elections with respect to the Plan will be solicited and tabulated. The County and its designated agents shall solicit and tabulate the votes and elections with respect to its Plan in accordance with the procedures approved in the Plan Procedures Order.

**6.      Ballot Record Date**

The Ballot Record Date for determining which Creditors are entitled to vote on and make elections under the Plan is **August 6, 2013**. Therefore, only those Creditors in a Class entitled to vote on the Plan (in accordance with the provisions of the Plan and the Plan Procedures Order) and holding Claims against the County as of the Ballot Record Date are entitled to vote on the Plan and make elections with respect to the Plan.

**7.      Ballots**

If your Claim is not classified in one of the Voting Classes, you are **not** entitled to vote on the Plan and you will not receive a Ballot. If your Claim is in a Voting Class and you are otherwise eligible to vote on the Plan, you will receive a Ballot with respect to that Claim.

In voting to accept or to reject the Plan, please use only the Ballot sent to you with this Disclosure Statement, and please carefully read the voting instructions on the Ballot for an explanation of the applicable voting and election procedures and deadlines.

If, after reviewing this Disclosure Statement, you believe that you hold an Impaired Claim and that you are entitled to vote on the Plan, or if you are a holder of a Claim in one of the Voting Classes and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning this Disclosure Statement, any exhibit hereto, the Plan, or the voting procedures in respect thereof, please contact the Ballot Tabulator by email at JeffersonCountyInfo@kccllc.com, or by telephone at (866) 967-0677, or by mail at Jefferson County Ballot Processing, c/o Kurtzman Carson Consultants LLC, (Attention: Jefferson County Ballot Processing), 2335 Alaska Avenue, El Segundo, CA 90245, or by accessing the website of the Ballot Tabulator at www.jeffersoncountyrestructuring.com. The cost of additional copies must be paid by the person ordering them.

Please note that counsel for the County cannot and will not provide Creditors or other third parties with any legal advice, including advice regarding how to vote on the Plan or the effects of confirmation of the Plan.

### 8. Ballot Deadline

**In order to vote to accept or to reject the Plan or to make an election with respect to the Commutation Election, your Ballot must be completed and returned to the Ballot Tabulator so that it is actually received by the Ballot Tabulator no later than 5:00 p.m. prevailing Central time, on October 7, 2013 (the "<u>Ballot Deadline</u>"). If your Ballot is not timely received by the Ballot Tabulator, it will <u>not</u> be counted. Ballots sent by facsimile or by email will <u>not</u> be accepted by the Ballot Tabulator and will not be counted in tabulating votes accepting or rejecting the Plan or tabulating Commutation Elections under the Plan. Neither Ballots received after the Ballot Deadline, nor Ballots returned directly to the County, the County's counsel, or the Bankruptcy Court rather than to the Ballot Tabulator, shall be counted in connection with confirmation of the Plan or any Commutation Elections under the Plan.**

**If you are instructed by an Institutional Nominee to return your Ballot to the Institutional Nominee, then you must return such Ballot to the Institutional Nominee by the deadline (if any) set by such Institutional Nominee so that such Institutional Nominee may process your Ballot and return it to the Ballot Tabulator by the Ballot Deadline. If your Ballot is not returned, or if you are required to return your Ballot to an Institutional Nominee and your Ballot is not received by such Institutional Nominee by the deadline (if any) set by such Institutional Nominee, or if your Ballot is otherwise received by the Ballot Tabulator after the Ballot Deadline, your Ballot will not be counted and, if you are a holder of a Class 1-A Claim or a Class 1-B Claim, depending upon which series or subseries of Sewer Warrants you hold, you may be deemed to have made the Commutation Election in accordance with the terms of the Plan**

**DO NOT RETURN YOUR WARRANTS, SECURITIES, OR ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

Any executed Ballot that is timely received but does not indicate either an acceptance or a rejection of the Plan or indicates both an acceptance and a rejection of the Plan shall be deemed to constitute an acceptance of the Plan.

It is important that holders of Claims exercise their rights to vote to accept or reject the Plan. **Even if you do not vote to accept the Plan, you will be bound by it if, among other things, it is accepted by the requisite holders of Claims.** The amount and number of votes required for confirmation of the Plan are computed, in part, on the basis of the total amount of Claims actually voting to accept or reject the Plan.

**With respect to Commutation Elections under the Plan, subject to the exceptions noted below, if you hold Claims in Class 1-A or Class 1-B and you either (a) do not return your Ballot by the Ballot Deadline, (b) return your Ballot by the Ballot Deadline but do not make any election with respect to the Commutation Election, or (c) return a Ballot by the Ballot**

206

Deadline and indicate on such Ballot both an election to make and an election not to make the Commutation Election, then you will be conclusively deemed to have made the Commutation Election. Notwithstanding the foregoing, any holders of the Series 2003-B-8 Sewer Warrants that either (i) do not return a Ballot, (ii) do not indicate an election on any Ballot that is returned by the Ballot Deadline, or (iii) return a Ballot by the Ballot Deadline and indicate both an election to make and an election not to make the Commutation Election will be conclusively deemed not to have made the Commutation Election. Additionally, notwithstanding the foregoing, any holders of the Series 2003-C-9 Through C-10 Sewer Warrants that are deemed to make the Commutation Election because they either (1) do not return a Ballot, (2) do not indicate an election on any Ballot that is returned by the Ballot Deadline, or (3) return a Ballot by the Ballot Deadline and indicate both an election to make and an election not to make the Commutation Election, will be notified by their Institutional Nominee of their right to rescind such Commutation Election by providing timely written notice thereof to their Institutional Nominee in accordance with the procedures established by the Plan Procedures Order. For the avoidance of doubt, holders of the Series 2003-C-9 Through C-10 Sewer Warrants that affirmatively checked the applicable box on their respective Ballot indicating whether or not they were making the Commutation Election will not be given this opportunity to rescind their elections.

**THE COUNTY BELIEVES THAT PROMPT CONFIRMATION AND IMPLEMENTATION OF THE PLAN ARE IN THE BEST INTERESTS OF THE COUNTY AND ITS CREDITORS AND SUPERIOR TO ANY POTENTIALLY FEASIBLE ALTERNATIVE. THE COUNTY RECOMMENDS THAT HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN. THE COUNTY ALSO RECOMMENDS THAT HOLDERS OF ALL ALLOWED CLASS 1-A CLAIMS (SEWER WARRANT CLAIMS) AND CLASS 1-B CLAIMS (BANK WARRANT CLAIMS AND PRIMARY STANDBY SEWER WARRANT CLAIMS) MAKE THE COMMUTATION ELECTION BY CHECKING THE BOX LABELED "MAKE COMMUTATION ELECTION (OPTION 1)" ON THEIR BALLOTS; PROVIDED, HOWEVER, THAT WITH RESPECT TO THOSE CLASS 1-A CLAIMS IN THE AGGREGATE OUTSTANDING PRINCIPAL AMOUNT OF APPROXIMATELY $62 MILLION THAT ARE ON ACCOUNT OF SERIES 2003-B-8 SEWER WARRANTS, THE COUNTY MAKES NO RECOMMENDATION TO SUCH HOLDERS REGARDING THE COMMUTATION ELECTION, BUT REQUESTS THAT SUCH HOLDERS ALSO EVALUATE THOROUGHLY THE INFORMATION CONTAINED HEREIN (INCLUDING, WITHOUT LIMITATION, SECTIONS XI.B AND XII.B OF THIS DISCLOSURE STATEMENT) AND DECIDE WHETHER TO MAKE THE COMMUTATION ELECTION.**

B.      **The Commutation Election**

A key feature of the Plan is the Commutation Election that the Plan makes available to all holders of Allowed Claims in Classes 1-A and 1-B. The ability of the Plan to go effective and, therefore, the amount of consideration available under the Plan for all holders of Sewer Warrant Claims, Bank Warrant Claims, and (to the extent not otherwise included) Primary Standby Sewer Warrant Claims is dependent on and varies materially based on whether those Creditors make or are deemed to make the Commutation Election.

207

The following discussion provides more detail regarding the Commutation Election, the procedures associated with the Commutation Election, the Rescission of Deemed Election, and the County's position regarding why holders of Sewer Warrant Claims should make the Commutation Election. The Commutation Election or deemed Commutation Election is independent of the Holder's vote to accept or reject the Plan.

The JPMorgan Parties, the Supporting Sewer Warrantholders, and the Sewer Liquidity Banks have all agreed to make the Commutation Election in accordance with and subject to the terms of their respective Sewer Plan Support Agreements. The JPMorgan Parties, the Supporting Sewer Warrantholders, and the Sewer Liquidity Banks collectively hold in excess of $2.2 billion of the outstanding principal amount of the Sewer Warrants.

### 1. What Is the Commutation Election?

The Commutation Election is one of the two options offered to holders of Sewer Warrants as alternative treatments under the Plan. The Commutation Election is available irrespective of whether a holder votes to accept or reject the Plan.

Any Person who makes or is deemed to make the Commutation Election (which is referenced herein from time to time, and on the applicable Ballots, as "Option 1") and, if applicable, does not rescind the Commutation Election, is electing to unconditionally commute, waive, and forever release, discharge, and forgo three things, in each case to the extent applicable to the Sewer Warrants held by such Person, in exchange for a Distribution by the County of an additional fifteen (15) cents (i.e., 80 cents rather than 65 cents) on the dollar on account of such Person's Allowed Class 1-A or 1-B Claim:

> (1) any and all rights (if any) against the applicable Sewer Warrant Insurer insuring such holder's Sewer Warrants to receive any payments from or on account of such Sewer Warrant Insurer's Sewer Wrap Policies,

> (2) any and all Bank Warrant Default Interest Claims (except with respect to the Bank Warrant Default Interest Settlement Payments), and

> (3) any and all other Claims or Causes of Action against the County, against any of the Sewer Released Parties, or against any of their respective Related Parties.

The relevance of some or all of these three items may differ by series of Sewer Warrants.[23] As discussed in Section XI.B above, a material consideration for holders of certain Sewer Warrants is that FGIC, the insurer of $1.6 billion of the Sewer Warrants, is itself in a rehabilitation proceeding in New York state court. The FGIC Rehabilitation Proceeding is discussed in Section XI.B above. As discussed in greater detail in Section XI.B above, the FGIC Rehabilitation Plan approved in the

---

[23] For example, Syncora submits that it has performed all of its obligations under the Syncora Settlement Agreement to the holders of Bank Warrants. Certain of the holders of Bank Warrants dispute this contention. This dispute is resolved under the Plan.

208

FGIC Rehabilitation Proceeding provides for payment to policyholders of only a fraction of their permitted policy claims over an extended period of time.[24] With respect to non-commuting holders of Sewer Warrants insured by FGIC, the County is of the opinion that the amounts of their permitted policy claims under the FGIC Rehabilitation Plan should be calculated only after taking into account the amount of the Distributions these non-commuting holders receive under the County's Plan, meaning that any payment they may receive under the FGIC Rehabilitation Plan should be a fraction of their "deficiency claim" remaining after receipt of the Distribution paid to them under the County's Plan.

Also, although the Bank Warrant Claims include Bank Warrant Default Interest Claims, the holders of other Claims are not entitled to seek payment of any interest accruing prepetition on their Sewer Warrants at a "default" rate of interest, because no default rate exists and all non-default interest was timely paid. Each holder of Sewer Warrants should consult with its own advisors to determine which of the three items listed above that must be commuted, waived, and released as part of the Commutation Election are applicable to its Sewer Warrants.

In exchange for granting the above described releases, each holder of Sewer Warrants that makes or is deemed to make the Commutation Election and, if applicable, does not rescind the Commutation Election, will receive under the Plan a Distribution on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof, in *an amount equal to 80% of the Adjusted Sewer Warrant Principal Amount of such holder's Sewer Warrants* in full, final, and complete settlement, satisfaction, release, and exchange of all of such holder's Claims, both against the County and against any of the Sewer Released Parties and their respective Related Parties (including against the Sewer Warrant Insurers and their respective Related Parties in respect of any of the Sewer Insurance Policies and with respect to any Sewer Warrant Default Interest Claims).

In contrast, each holder of Sewer Warrants that does not make or is deemed not to make the Commutation Election and, if applicable, does not rescind the Commutation Election, will retain all rights against the applicable Sewer Warrant Insurer in respect of any Sewer Wrap Policies insuring such holder's Sewer Warrants, but will only receive under the Plan a Distribution on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof, in *an amount equal to 65% of (x) the Adjusted Sewer Warrant Principal Amount of such holder's Sewer Warrants and (y) the amount of any Allowed Bank Warrant Default Interest Claims held by such holder* in full, final, and complete settlement, satisfaction, release, and exchange of all of the holder's Claims against the County.

Thus, the option to make or not make the Commutation Election essentially offers a choice between receiving (1) **80 cents** in Cash on every dollar of Adjusted Sewer Warrant Principal Amount of a holder's Sewer Warrants immediately on the Effective Date, in exchange for the commutation, waiver, and release of rights against the applicable Sewer Warrant Insurer in respect of any Sewer Wrap Policies insuring such holder's Sewer Warrants and the release of claims against all the Sewer Released Parties and their respective Related Parties; *or* (2) only **65 cents** on every

---

[24] *See supra* notes 16, 18 and 19.

209

dollar of (x) the Adjusted Sewer Warrant Principal Amount of a holder's Sewer Warrants on the Effective Date, and (y) the amount of any Allowed Bank Warrant Default Interest Claims held by such holder. Regardless of the option selected or deemed to be selected, each holder of an Allowed Class 1-A Claim or an Allowed Class 1-B Claim shall also receive on the Effective Date a Distribution of Cash on account of any applicable Reinstated Sewer Warrant Principal Payments and any applicable Reinstated Sewer Warrant Interest Payments in accordance with Section 4.6(a) of the Plan.

Numerous Creditors have already committed themselves to make the Commutation Election. The holders of all Allowed Class 1-B Claims (Bank Warrant Claims and Primary Standby Sewer Warrant Claims) have committed to make the Commutation Election and to vote in favor of confirmation of the Plan, subject to the terms of their Plan Support Agreements. Additionally, holders of Allowed Class 1-A Claims (Sewer Warrant Claims) representing over 75% of the dollar amount of Allowed Class 1-A Claims have also committed to vote in favor of confirmation of the Plan and to make the Commutation Election, subject to the terms of their respective Plan Support Agreements.

### 2. What Are the Procedures Whereby One Can Make or Will Be Deemed to Have Made the Commutation Election or, If Applicable, Can Rescind a Deemed Commutation Election?

In the Plan Procedures Order, the Bankruptcy Court approved certain procedures regarding both the Commutation Election and the associated Rescission of Deemed Election that is available to certain holders of the Series 2003-C-9 Through C-10 Sewer Warrants.

#### a. Commutation Election Procedures

The Commutation Election is described on the Ballot being sent to beneficial holders of Sewer Warrants. The Commutation Election will be available to, and may be made by, only those beneficial holders of Sewer Warrants that hold such Sewer Warrants as of the Ballot Record Date. The Commutation Election results will be tallied by the Ballot Tabulator contemporaneously with the tabulation of votes to accept or reject the Plan.

The Ballots for each series of Sewer Warrants include a pair of boxes on which each holder of Sewer Warrants may indicate its choice to make or not make the Commutation Election by checking the appropriate box. In addition to checking the appropriate box and timely returning the applicable Ballot in accordance with the instructions that are on such Ballot and that may be provided by the applicable Institutional Nominee, the following actions are necessary with respect to the Commutation Election so that the Ballot Tabulator and the County are able to administratively track who has made or not made the Commutation Election and to administer the procedures relating to the Rescission of Deemed Election:

- All holders of the Bank Warrant Claims, Series 1997-A Sewer Claims, Series 2001-A Sewer Claims, Series 2002-A Sewer Claims, Series 2002-C-1 & C-5 Sewer Claims, Series 2003-A Sewer Claims, Series 2003-B-1 Sewer Claims, and Series 2003-C-1 Through C-8 Sewer Claims, that return a Ballot by the Ballot Deadline with an indication

210

under Item 3 of the Ballot to "DO NOT MAKE COMMUTATION ELECTION (OPTION 2)", will be instructing their Institutional Nominee to "tender" their Sewer Warrants into the election account established at DTC for that purpose in order for the election to be effective.

- All holders of the Series 2003-B-8 Sewer Claims that return a Ballot by the Ballot Deadline with an indication under Item 3 of the Ballot to "MAKE COMMUTATION ELECTION (OPTION 1)", will be instructing their Institutional Nominee to "tender" their Sewer Warrants into the election account established at DTC for that purpose.

- All holders of the Series 2003-C-9 Through C-10 Sewer Claims that return a Ballot by the Ballot Deadline with an indication under Item 3 of the Ballot to either "MAKE COMMUTATION ELECTION (OPTION 1)" **or** "DO NOT MAKE COMMUTATION ELECTION (OPTION 2)", will be instructing their Institutional Nominee to "tender" their Sewer Warrants into the election account established at DTC for that purpose.

Except to the extent set forth in the next sentence with respect to the particular series of Sewer Warrants described therein, all holders of Class 1-A Claims or Class 1-B Claims that (i) do not return any Ballot by the Ballot Deadline, (ii) return a Ballot by the Ballot Deadline but do not make any election with respect to the Commutation Election, or (iii) return a Ballot by the Ballot Deadline and indicate both an election to make and an election not to make the Commutation Election, ***will be conclusively deemed to have made the Commutation Election.*** Notwithstanding the immediately preceding sentence, (a) any holder of the Series 2003-B-8 Sewer Warrants that either does not return a Ballot, does not indicate an election on any Ballot that is returned by the Ballot Deadline, or returns a Ballot by the Ballot Deadline and indicates both an election to make and an election not to make the Commutation Election will be conclusively deemed ***not*** to have made the Commutation Election; and (b) any holders of the Series 2003-C-9 Through C-10 Sewer Warrants that are deemed to make the Commutation Election because they either do not return a Ballot, do not indicate an election on any Ballot that is returned by the Ballot Deadline, or return a Ballot by the Ballot Deadline and indicates both an election to make and an election not to make the Commutation Election will be notified by their Institutional Nominee of their right to rescind such deemed Commutation Election (the "Rescission of Deemed Election") as discussed further below.

If any holder of Class 1-A or Class 1-B Claims casts more than one Ballot regarding the same Sewer Warrants before the Ballot Deadline, then the latest-dated properly executed Ballot received by the Ballot Tabulator before the Ballot Deadline will be deemed to reflect the voter's intent with respect to the Commutation Election and, thus, will supersede any other Ballots with respect to the Commutation Election.

Holders of Class 1-A or Class 1-B Claims who make the Commutation Election must do so with respect to all of their Sewer Warrants within a particular series or subseries and may not split their making of the Commutation Election within the same series or subseries, if applicable, of Sewer Warrants, and thus if a holder of Class 1-A or Class 1-B Claims casts a Ballot purporting to split its Commutation Election with respect to a particular series or subseries of Sewer Warrants, in part to make the Commutation Election and in part not to make the Commutation Election, that Ballot shall not be counted and such holder shall be deemed to have made the Commutation Election

211

as to all Sewer Warrants within a particular series or subseries based on the conclusive presumptions set forth above (subject, only in the case of the Series 2003-C-9 Through C-10 Sewer Warrants, to the subsequent making of the Rescission of Deemed Election). Holders may, however, make different elections with respect to the Commutation Election in respect of different series or subseries of Sewer Warrants on their respective separate Ballots.

If conflicting elections or "over-elections" are submitted by an Institutional Nominee with respect to the making of the Commutation Election by such Institutional Nominee's beneficial holders, then the County or the Ballot Tabulator shall use reasonable efforts to reconcile discrepancies with the Institutional Nominee.

The transfer of any Sewer Warrants after the Ballot Deadline shall not constitute "cause" or otherwise provide a basis under Bankruptcy Rule 3018(a) for the transferee of such Sewer Warrants to change the effects, including any deemed effects, with respect to the Commutation Election as a result of a Ballot returned by the transferor. **Such transferee shall be bound by the Commutation Election made or not made (or deemed to be made or not made) by the transferor.**

Sewer Warrant Claims may not be withdrawn from the election account after your Institutional Nominee has tendered them at DTC. Once your Sewer Warrants have been tendered, no further trading will be permitted with any Sewer Warrant Claims held in the election account. If the Plan is not confirmed, DTC will, in accordance with its customary practices and procedures, return all Sewer Warrants held in the election account to the applicable Institutional Nominee for credit to the account of the underlying beneficial owner.

### b.    Rescission of Deemed Election Procedures

The Plan includes a Rescission of Deemed Election that is available **only** to Creditors that (a) held Claims with respect to the Series 2003-C-9 Through C-10 Sewer Warrants as of the Ballot Record Date and (b) would otherwise be deemed to have made the Commutation Election because they either do not return a Ballot, do not indicate an election on any Ballot that is returned by the Ballot Deadline, or return a Ballot by the Ballot Deadline and indicates both an election to make and an election not to make the Commutation Election ("Deemed Commuting Holders"). Deemed Commuting Holders that satisfy these two requirements will receive a Rescission of Deemed Election Notice through their Institutional Nominee, which (i) will inform them of their option to effect the Rescission of Deemed Election and (ii) will include a form to allow the Deemed Commuting Holders to make the Rescission of Deemed Election. Deemed Commuting Holders that wish to effect the Rescission of Deemed Election will be instructed to fully execute the Rescission of Deemed Election form as soon as practicable after the Ballot Deadline and to forward copies of such Rescission of Deemed Election form to their Institutional Nominee in sufficient time to allow such Institutional Nominee in turn to process and deliver the Rescission of Deemed Election to the Ballot Tabulator, to the County, and to Assured, so that the Rescission of Deemed Election form is actually received by each of them on or before **November 5, 2013 at 5:00 p.m. (prevailing Central time)** (the "Rescission Deadline").

The Rescission of Deemed Election Notice will be disseminated only to Deemed Commuting Holders that (i) held such Claims as of the Ballot Record Date and (ii) would otherwise be deemed to

212

have made the Commutation Election. The Rescission of Deemed Election will be available only with respect to the Commutation Election and will not affect any votes on the Plan or any other releases or certifications that the Deemed Commuting Holders may have effected through the execution of Ballots. Holders of Series 2003-C-9 Through C-10 Sewer Warrants that affirmatively checked the applicable box on their respective Ballot indicating whether or not they were making the Commutation Election on or before the Ballot Deadline will not receive the Rescission of Deemed Election Notice and will not be permitted to exercise any Rescission of Deemed Election.

If you make the Rescission of Deemed Election, your Institutional Nominee must "tender" your Sewer Warrant Claims into the election account established at DTC for that purpose. Sewer Warrant Claims may not be withdrawn from the election account after your Institutional Nominee has tendered them at DTC. Once your Sewer Warrant Claims have been tendered no further trading will be permitted with any Sewer Warrant Claims held in the election account. If the Plan is not confirmed, DTC will, in accordance with its customary practices and procedures, return all Sewer Warrant Claims held in the election account to the applicable Institutional Nominee for credit to the account of the underlying beneficial owner.

Any Person that makes the Rescission of Deemed Election with respect to its Series 2003-C-9 Through C-10 Sewer Warrants will receive the treatment set forth in Option 2 of Section 2.3(a) of the Plan – i.e., (i) a Distribution on the Effective Date of Cash from Refinancing Proceeds, Remaining Accumulated Sewer Revenues, the Sewer Warrant Indenture Funds, or a combination thereof in ***an amount equal to 65% of the Adjusted Sewer Warrant Principal Amount of such holder's Sewer Warrants*** in full, final, and complete settlement, satisfaction, release, and exchange of all of such holder's Class 1-A Claims; and (ii) the retention of Sewer Wrap Payment Rights, if any, against the applicable Sewer Warrant Insurer in respect of any Sewer Wrap Policies insuring such holder's Sewer Warrants, which Sewer Wrap Payment Rights shall not be waived or impaired.

### 3. What Is the County's Position on the Commutation Election?

The County strongly encourages all holders of Sewer Warrants to independently analyze the desirability of making or not making the Commutation Election based on each holder's specific circumstances. Nevertheless, the County's view and recommendation is that all holders of Allowed Class 1-A and Class 1-B Claims should make the Commutation Election on their Ballots; provided, however, with respect to Allowed Class 1-A Claims in the aggregate outstanding principal amount of approximately $62 million that are on account of Series 2003-B-8 Sewer Warrants, the County makes no recommendation to such holders regarding the Commutation Election, but requests that such holders also evaluate thoroughly the information contained herein, decide whether to make such Commutation Election. **The discussion below provides the reasoning behind the County's views and recommendations, all of which is the County's opinion alone and has not been endorsed or approved by any other Person, including any of the Sewer Warrant Insurers and the Sewer Warrant Trustee.**

***First***, although the economic analysis is potentially quite complicated, with the possible exception of the Series 2003-B-8 Sewer Claims that arise from Sewer Warrants maturing in February 2014, 2015, and 2016, the County's opinion is that making the Commutation Election would be an economically rational decision for the holders of Sewer Warrants even if one ignores

213

the collection and credit risk that may be associated with retaining insurance claims against the Sewer Warrant Insurers. Using what are, in the County's opinion, reasonable assumptions about discount rates, future interest rates, and the timing and amount of future interest and principal payment obligations on the Sewer Warrants, and assuming for illustrative purposes a holder of an Allowed Class 1-A Claim is entitled to receive a Distribution under the Plan on account of an Adjusted Sewer Warrant Principal Amount of $1.00, a comparison of the net present value of that holder receiving 15 cents today (i.e., obtaining the incremental consideration available by making the Commutation Election and being paid 80 cents on the $1.00 Adjusted Sewer Warrant Principal Amount instead of taking the 65 cents paid to holders who do not make the Commutation Election) versus potentially receiving 35 cents over time (i.e., obtaining deferred payment from the applicable Sewer Warrant Insurer through the scheduled maturity of the applicable Sewer Warrants, which in most cases occurs in 2041 or 2042[25]) suggests that it would be better to receive 80 cents today by making the Commutation Election than to wait years to receive the remaining unpaid amounts on the applicable series of Sewer Warrants over a period that could exceed 28 years. Based on this economic analysis,[26] a holder of Sewer Warrants could reasonably conclude that to make the Commutation Election is the superior economic alternative.

    ***Second***, the County's opinion is that there are potentially significant collection, credit, and other risks associated with retaining claims against the Sewer Warrant Insurers. The County has described some of these risks in Section XI.B above titled "*Risks Relating to Making or Declining the Commutation Election*". If you are a holder of Class 1-A Claim or a Class 1-B Claim, you are urged to read Section XI.B above thoroughly and to take into account the risks described therein as you decide whether to make or decline the Commutation Election.

    ***Third***, the Plan will succeed only if a sufficient number of Sewer Warrant holders make the Commutation Election. It is a condition to the Effective Date that the aggregate Tail Risk remaining for the Sewer Warrant Insurers after giving effect to the Commutation Election not exceed $25.0 million, because no Sewer Warrant Insurer shall incur Tail Risk that is not Covered Tail Risk. Thus, if the holders of more than $125 million in aggregate principal amount of Sewer Warrants do not make the Commutation Election, these conditions to the Effective Date will not occur and, unless

---

[25] Section 4.15(h) of the Plan provides that all series of the Sewer Warrants shall be deemed accelerated as of the Effective Date, which shall occur immediately before the distribution of consideration on the Effective Date, *provided, however*, that such acceleration will not be deemed to release any of the Sewer Wrap Policies with respect to Sewer Wrap Payment Rights except as a result of any Sewer Warrant Insurer's payment of the Outstanding Amount on the applicable series or subseries of non-commuted Sewer Warrants as set forth in the last sentence of this paragraph. Thus, each Sewer Warrant Insurer has the option to voluntarily elect, in its sole and absolute discretion (irrespective of terms of the applicable Sewer Wrap Policy) to pay accelerated principal on such Sewer Warrants; however, there is no guarantee that any of the Sewer Warrant Insurers will do this. Moreover, even if FGIC were to elect to give effect to such acceleration, the County understands that, pursuant to the FGIC Rehabilitation Plan, FGIC can only initially pay a portion of such accelerated claim and likely never will pay such claim in full.

[26] Differing assumptions about discount rates, interest rates, and other factors may be appropriate for each series or subseries of Sewer Warrants and based on each individual holder's circumstances, including risk preferences and views about the future. Although relevant, the economic analysis summarized in the text above is illustrative only and should not be relied on by any holder of Sewer Warrants in determining whether to make or not to make the Commutation Election.

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 239 of 251

they are waived by mutual written agreement by the County and by any Sewer Plan Support Party that is affected, the Plan will not become effective or be consummated. Although the County believes that this condition to the Effective Date should be satisfied through sufficient holders making or being deemed to make the Commutation Election, a failure to satisfy the condition and resulting failure of the Plan to go effective and be consummated could return all parties to fend for themselves in numerous pending and highly uncertain litigations. *See* Section III.E and Article IV above for a discussion of the prepetition and postpetition litigation concerning the Sewer Warrants, and Article V above for a discussion of the global settlement of such disputes. The ultimate outcome of a litigation-driven or other non-consensual resolution of the Case likely would be substantially decreased recoveries for *all* holders of Sewer Warrants – i.e., recoveries that are far less than the Distributions available under the Plan, and that are realized at a date that is potentially years in the future. Thus, it is in the collective interest of all holders of Sewer Warrants that as many holders as possible make the Commutation Election so that the Plan can succeed.

*Fourth*, in recognition of the benefits provided under the Plan and the Commutation Election, numerous holders of Class 1-A Claims and Class 1-B Claims have committed themselves already to make the Commutation Election under the Plan. The holders of all Allowed Class 1-B Claims (Bank Warrant Claims and Primary Standby Sewer Warrant Claims) have committed to make the Commutation Election and to vote in favor of confirmation of the Plan, subject to the terms of their respective Plan Support Agreements. Additionally, holders of Allowed Class 1-A Claims (Sewer Warrant Claims) representing over 75% of the dollar amount of Allowed Class 1-A Claims have also committed to vote in favor of confirmation of the Plan and to make the Commutation Election, subject to the terms of their respective Plan Support Agreements.

In summary, the Commutation Election provides the certainty of receiving 80 cents on every dollar of Adjusted Sewer Warrant Principal Amount of a holder's Sewer Warrants immediately on the Effective Date and avoids the various risks and uncertainties that may be associated with retaining and pursuing claims against the applicable Sewer Warrant Insurers. Moreover, if the Commutation Election is not made or deemed to be made by the holders of sufficient Sewer Warrants, then the conditions to the Effective Date will not be satisfied, and all holders of Sewer Warrants could ultimately receive a far lower recovery than is offered under the Plan. For these reasons, **the County recommends that holders of Allowed Class 1-A Claims (Sewer Warrant Claims) and Class 1-B Claims (Bank Warrant Claims and Primary Standby Sewer Warrant Claims) make the Commutation Election on their Ballots; provided, however, with respect to those Class 1-A Claims in the approximate outstanding principal amount of $62 million that are on account of Series 2003-B-8 Sewer Warrants, the County makes no recommendation to such holders regarding the Commutation Election, but requests that such holders also evaluate thoroughly the information contained herein (including, without limitation, Sections XI.B and XII.B of this Disclosure Statement) and decide whether to make the Commutation Election.** The County makes no representations or warranties with respect to the foregoing analysis and urges holders of Sewer Warrants to analyze the Commutation Election based on their own specific circumstances and in consultation with their respective advisors.

### C.     Requests for Additional Information

Any interested party desiring further information with respect to the Plan or seeking an additional copy of this Disclosure Statement should contact the Ballot Tabulator by email at JeffersonCountyInfo@kccllc.com, or by telephone at (866) 967-0677, or by mail at Jefferson County Ballot Processing, c/o Kurtzman Carson Consultants LLC, (Attention: Jefferson County Ballot Processing), 2335 Alaska Avenue, El Segundo, CA 90245, or by accessing the website of the Ballot Tabulator at www.jeffersoncountyrestructuring.com. The cost of additional copies must be paid by the person ordering them. Please note that counsel for the County cannot and will not provide Creditors or other third parties with any legal advice, including advice regarding how to vote on the Plan or the effects of confirmation of the Plan.

All pleadings and other papers Filed in this Case may be inspected free of charge during regular court hours at the Office of the Clerk, United States Bankruptcy Court, 505 20th Street North, Room 412, Birmingham, Alabama 35203-2111. Documents may be accessed for a fee through the Bankruptcy Court's "PACER" electronic records system at https://ecf.alnb.uscourts.gov, and certain documents pertaining to the Case are available without charge on the website of the County's Claims Agent at www.jeffersoncountyrestructuring.com.

### XIII.
### ALTERNATIVES TO THE PLAN

The County has evaluated numerous alternatives to the Plan. After studying these alternatives, the County has concluded that the Plan, incorporating the compromises and settlements integrated in the Plan, including the concessions which result in the increased Distributions provided herein, is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (A) an alternative chapter 9 plan proposed by the County,[27] and (B) dismissal of the County's bankruptcy Case.

### A.     Alternative Plan of Adjustment

If the Plan is not confirmed, the County could attempt to formulate a different plan. Such a plan might involve many different provisions for adjusting the County's indebtedness. Prosecution of an alternative plan would necessarily involve delay, uncertainty, and additional expense.

There is no assurance that the County could formulate and propose an acceptable alternative plan of adjustment. The settlements with the County's Creditors that are the foundation of the Plan are time-sensitive, requiring the Plan to become effective no later than December 31, 2013. At this juncture, the County does not believe it could propose an alternative plan that would preserve the favorable settlements the County has negotiated with its Creditors and be confirmed and become effective within this time frame. Moreover, the Amended Financing Plan for the County's issuance

---

[27] Under Bankruptcy Code section 941, only the municipal debtor may file a plan for the adjustments of debts in a chapter 9 case. Creditors may not propose plans in chapter 9 cases.

216

of the New Sewer Warrants assumes that the Plan will be confirmed and substantially consummated on or before December 31, 2013, and that market conditions with respect to rates and yields for the issuance and sale of such warrants will improve throughout this period. Were the County to pursue an alternative plan of adjustment, the attendant delay would subject the County and its Amended Financing Plan to additional market risk, including potential interest rate increases, which could jeopardize the County's ability to refinance or restructure its obligations in the amounts and on the terms proposed under the Plan.

As noted herein, since 2008, in consultation with its professionals and after substantial negotiation with its Creditors, the County has explored various alternatives to restructure its debts. The Plan is the culmination of those years of analysis and negotiations. The County believes that the Plan enables Creditors to realize the most value under the circumstances and that there is no better, feasible alternative chapter 9 plan of adjustment available to the County and its Creditors.

## B. Dismissal of the County's Case

If the Plan or an alternative chapter 9 plan of the County is not confirmed, the County could elect or the Bankruptcy Court could determine to dismiss the County's Case for "cause" under Bankruptcy Code section 930(a). In addition, if the Plan is not confirmed and the Bankruptcy Court were to conclude that the County cannot confirm an alternative plan as a matter of law, then it is possible that the Bankruptcy Court could conclude that dismissal of the Case is mandatory under Bankruptcy Code section 930(b). The County reserves all its rights in the event that any Person seeks to dismiss the Case.

Dismissal of the Case would return the County, its Creditors, and its constituents to the highly litigious, chaotic, and uncertain environment they all confronted prior to the Petition Date. Upon dismissal of the Case, the automatic stay of all litigation pending as of the Petition Date would terminate. With respect to the State Court Receivership Action, the County anticipates the Receiver would resume its efforts initiated prepetition to raise rates precipitously for services provided by and through the Sewer System. The Receiver's rate-raising attempts would be challenged not only by the County, but also most likely by various rate payers as well as the Alabama Attorney General, on grounds the Receiver lacks legal and legislative authority to raise sewer rates unilaterally and the rates proposed by the Receiver are unreasonable and discriminatory. The ensuing legal battles would be contentious, prolonged, uncertain and expensive, and would likely be renewed each time the Receiver proposed any additional rate increases over the course of its tenure.

Other contentious prepetition litigation regarding the Sewer Debt Claims and the Sewer System, such as the Wilson Action, the Syncora Lawsuit, the Assured Lawsuit, and the JPMorgan Lawsuit, would also resume in earnest if the County's Case were dismissed. Like the State Court Receivership Action, these lawsuits would be hotly contested by all parties involved, both at the trial and appellate court levels. Neither the County, nor any of the other litigants, would be assured of success in these lawsuits.

Meanwhile, upon a dismissal of the Case, the County expects that holders of unsecured Claims against the County, including the holders of GO Warrant Claims and trade Claims, would pursue legal action against the County Commission to try to compel the County to pay their

217

respective Claims from the General Fund. Given the County Commission's inability to raise revenues, these collection efforts could significantly and adversely affect the County's ability to provide fundamental public services to the County's constituents and to operate within a balanced budget as required by state law. Because of these uncertainties, the County can offer no estimate of what recovery, if any, Creditors would receive if the Case were dismissed.

<h1 style="text-align:center">XIV.<br>CONFIRMATION OF THE PLAN</h1>

**Because the law with respect to confirmation of a chapter 9 plan of adjustment is complex, Creditors concerned with issues regarding confirmation of the Plan should consult with their own attorneys or financial advisors.** The following discussion is intended solely for the purpose of providing basic information concerning certain confirmation issues. Many separate legal requirements must be met before the Bankruptcy Court may confirm the Plan. Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by the requisite number of creditors, whether the Plan is in the "best interests" of creditors, and whether the plan is "feasible." These requirements, however, are not the only requirements for confirmation, and the Bankruptcy Court will not confirm the Plan unless and until it determines that the Plan satisfies all applicable requirements, including requirements not referenced in this Disclosure Statement. The County cannot and does not represent that the discussion contained below is a complete summary of the law on this topic.

### A. Necessary Votes

Under the Bankruptcy Code, a bankruptcy court may confirm a plan if at least one class of impaired claims has voted to accept that plan (without counting the votes of any "insiders" whose claims are classified within that class) and if certain statutory requirements are met both as to non-consenting members within a consenting class and as to dissenting classes.

A Class of Claims has accepted the Plan only when the holders of at least a majority in number and at least two-thirds in dollar amount of the Allowed Claims actually voting in that Class vote to accept the Plan.

### B. The "Best Interests" Test

Regardless of whether the Plan is accepted by each impaired Class of Claims, the Bankruptcy Court also must determine that the Plan is in the "best interests of creditors" pursuant to Bankruptcy Code section 943(b)(7).

There are very few legal authorities defining what constitutes the "best interests of creditors" under chapter 9 of the Bankruptcy Code. The leading bankruptcy treatise, however, provides the following explanation:

> The concept should be interpreted to mean that the plan must be better than the alternative that creditors have. *In the chapter 9 context, the alternative is dismissal of the case,* permitting every creditor to fend for itself in the race to obtain the

218

mandamus remedy and to collect the proceeds. Clearly, such a result is chaos, especially in those cases where the debt burden of the municipality is too high to support on the taxes that the lands of the municipality will bear or the taxes or fees that the inhabitants or the users of municipal services will pay. However, since the test is designed to protect the dissenting minority of a class that has accepted the plan, one must not be so carried away with the potentially adverse consequences of the alternative to a chapter 9 plan that one reaches the conclusion that any plan is better than the alternative. A plan that makes little or no effort to repay creditors over a reasonable period of time may not be in the best interest of creditors. . . .

The other extreme is equally to be avoided. An interpretation of the best interest of creditors test that required the municipality to devote all resources available to the repayment of creditors equals or exceeds the fair and equitable standard, which is a higher standard than the best interest test. Creditors cannot expect that all excess cash go to the payment of their claims. ***The debtor must retain sufficient funds with which to operate and to make necessary improvements in and to maintain its facilities.*** The courts must find a middle ground between those extremes, and must apply the test to require a reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case. On this basis of a flexible standard, creditors can hope to receive a reasonable recovery in a chapter 9 case, and the municipality can retain sufficient tax revenues to provide the services that its inhabitants require. The municipal debtor is not required to meet too strict a standard, and the plan can go forward with the consent of all classes of creditors. The court must also temper its examination into the debtor's ability to pay with due regard for the debtor's exercise of its political and governmental powers.

6 COLLIER ON BANKRUPTCY ¶ 943.03[7][a] (16th ed. rev. 2012) (footnotes omitted; emphasis added).

In addition, the County believes that the "best interest" test does not require a creditor-specific inquiry. Rather, the plain language of the statute contemplates that the test invites an examination of how dismissal of the Case would affect the County's creditor body as a whole. Specifically Bankruptcy Code section 943(b)(7) requires the Plan to be in the "best interests of ***creditors***," not in the individual interest of each individual creditor viewed in isolation. 11 U.S.C. § 943(b)(7) (emphasis added); *cf.* 11 U.S.C. § 1129(a)(7)(A)(ii) (requiring an analysis of what "each holder of a claim or interest" would receive in a chapter 7 case); *see also generally In re Connector 2000 Ass'n*, 447 B.R. 752, 765-66 (Bankr. D.S.C. 2011) (finding that chapter 9 plan was in the best interests of creditors and was feasible because "the Plan affords ***all creditors*** the potential for the greatest economic return from Debtor's assets," particularly in light of "the complex nature of this Case" (emphasis added)).

Put simply, in the chapter 9 context, the "best interests of creditors" standard means that treatment under the Plan must be better for the County's Creditors generally than the only alternative available, which is dismissal of the Case. Dismissal permits every creditor to fend for itself in the proverbial "race to the courthouse," armed only with its state law rights, since a municipality such as the County is not eligible under the Bankruptcy Code for a court-supervised liquidation under chapter 7 of the Bankruptcy Code.

219

The County submits that the Plan is in the best interests of all Creditors because significant payments will be made to all Impaired Classes entitled to vote under the Plan, including Class 6 General Unsecured Claims. The Plan provides that holders of Allowed Class 6 General Unsecured Claims will receive a Pro Rata Distribution from the $5,000,000 General Unsecured Claims Pool to be created and funded under the Plan. In contrast, in the absence of the financial adjustments contemplated by the Plan, the County's Creditors, including the holders of General Unsecured Claims in particular, would be left to fend for themselves. Even the swiftest of creditors would likely find its ability to collect on a judgment stymied by the inability of the County to pay substantial amounts and by creditors' inability to attach or execute on property of the County under Alabama law. In addition, outside of a bankruptcy proceeding, the County may be unable to fund necessary capital expenditures of the Sewer System from the Sewer System's revenues, which could require that the County pay for such expenses from the General Fund or from the Bridge and Public Building Fund. Such a result would likely leave the County's general creditors, including those with rights in the context of the application of Section 215 of the Alabama Constitution with respect to the proceeds of the Special Tax, significantly worse off than those same Creditors will be under the Plan. Also, many of the disputes that are resolved under the Plan with respect to the Sewer Debt Claims (both longstanding and of a more recent vintage) would be intractable and potentially unresolvable outside of bankruptcy. Put simply, the County's situation is one fraught with enormous complexity, uncertainty, and potential for delayed or eradicated recoveries for all Creditors. Only the bankruptcy process offers the tools to build a solution to many of these problems, and solving these problems benefits all of the County's Creditors.

In short, the County simply cannot afford to make meaningful distributions to many of its Creditors – including holders of Sewer Debt Claims and general Creditors – absent the debt relief afforded by the Plan, and dismissal of the Case could well result in unprecedented chaos, with Creditors receiving far less than proposed by the Plan. The avoidance of a highly uncertain and volatile result, with all the attendant costs and delays, easily renders the Plan one that is in the best interests of creditors for purposes of Bankruptcy Code section 943(b)(7).

## C.    Feasibility

Bankruptcy Code section 943(b)(7) also requires that the Plan be feasible. To satisfy the requirement that the Plan be feasible, the County must demonstrate the ability to make the payments required under the Plan and still maintain its operations at the levels that it deems necessary to the continued viability of the County.

The County submits that the Plan is feasible. As set forth more fully in Section X.B above, the Projections foresee a sustainable matching of the County's revenues and expenses, including the obligations created by or modified in the Plan.

## D.    Compliance with Other Applicable Provisions of the Bankruptcy Code

In addition to the foregoing, the Bankruptcy Court must find that the Plan complies with various other applicable provisions of the Bankruptcy Code, including the following:

1.    the Plan must comply with the provisions of the Bankruptcy Code made applicable by Bankruptcy Code sections 103(e) and 901 (11 U.S.C. § 943(b)(1));

2.    the Plan must comply with the provisions of chapter 9 (*id.* § 943(b)(2));

3.    all amounts to be paid by the County or by any person for services or expenses in the Case or incident to the Plan must be fully disclosed and be reasonable (*id.* § 943(b)(3));

4.    the County must not be prohibited by law from taking any action necessary to carry out the Plan (*id.* § 943(b)(4));

5.    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan must provide that on the Effective Date each holder of a Claim of a kind specified in Bankruptcy Code section 507(a)(2) (*i.e.*, Administrative Claims) will receive on account of such Claim cash equal to the Allowed amount of such Claim (*id.* § 943(b)(5)); and

6.    any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the Plan must be obtained, or such provision must be expressly conditioned on such approval (*id.* § 943(b)(6)).

The County believes that the Plan complies with each of these requirements.

## E.    Cramdown

The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of adjustment that is not accepted by all Impaired Classes if at least one Impaired Class of Claims accepts the Plan and the so-called "cramdown" provisions set forth in Bankruptcy Code section 1129(b)(l), (b)(2)(A), and (b)(2)(B) are satisfied. Based on the Plan Support Agreements and other settlements negotiated by the County, the County anticipates that several Impaired Classes of Claims will accept the Plan, including Classes 1-A, 1-B, 1-C, 1-D, 2-C, 5-A, 5-D, 5-E, and 7, thereby permitting a potential cramdown, if necessary, of the remaining Impaired Classes under the Plan.

The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of Bankruptcy Code section 943(b), it (a) is "fair and equitable," and (b) does not discriminate unfairly with respect to each Class of Claims that is Impaired under and has not accepted the Plan.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured Class of Claims will receive payment in full for its Allowed Claims, no holder of Allowed Claims in any Class junior to that Class may receive or retain any property on account of such Claims. With respect to a dissenting Class of secured Claims, the "fair and equitable" standard requires, among other things, that holders of such Claims (i) retain their liens and receive deferred cash payments with a value as of the Effective Date equal to the value of their interest in property or (ii) otherwise receive the "indubitable equivalent" of their secured

221

claims. The "fair and equitable" standard also has been interpreted to prohibit any Class senior to a dissenting Impaired Class from receiving more than 100% of its Allowed Claims under the Plan.

The County believes that, if necessary, the Plan satisfies the "fair and equitable" standard and therefore may be "crammed down" over the dissent of certain Classes based upon the treatment or alternative treatment proposed for such Classes. More specifically,

- With respect to Class 1-E, the Sewer Swap Agreement Claims are secured by a lien that is subordinate to the lien securing the Sewer Warrant Claims and certain other Claims under the Sewer Warrant Indenture. Because the Sewer Warrant Claims are receiving substantially less than a full recovery under the Plan and because the value of the collateral securing those Claims is less than the amount of the Claims, the subordinated liens are underwater and the associated nonrecourse Sewer Swap Agreements Claims are not allowable claims under the Bankruptcy Code. *See* 11 U.S.C. §§ 502(b)(1), 506(a), 506(d) & 927. Accordingly, the Plan properly provides that Class 1-E Claims will neither receive any Distributions nor retain any property under the Plan on account of such Claims, and the Plan can be confirmed notwithstanding the deemed rejection of the Plan by Class 1-E. *See* 11 U.S.C. § 1129(b)(2)(A)(i) & (iii).

- With respect to Class 1-F, the Other Standby Sewer Warrant Claims are secured by a lien that is subordinate to the lien securing the Sewer Warrant Claims, the Primary Standby Sewer Warrant Claims, and certain other Claims under the Sewer Warrant Indenture. Because the Sewer Warrant Claims and the Primary Standby Sewer Warrant Claims are receiving substantially less than a full recovery under the Plan and because the value of the collateral securing those Claims is less than the amount of the Claims, the subordinated liens are underwater and the associated nonrecourse Other Standby Sewer Warrant Claims are not allowable claims under the Bankruptcy Code. *See* 11 U.S.C. §§ 502(b)(1), 506(a), 506(d) & 927. Accordingly, the Plan properly provides that Class 1-F Claims will neither receive any Distributions nor retain any property under the Plan on account of such Claims, and the Plan can be confirmed notwithstanding the deemed rejection of the Plan by Class 1-F. *See* 11 U.S.C. § 1129(b)(2)(A)(i) & (iii).

- With respect to Class 2-A, the Series 2004-A School Claims will continue to be secured by the liens granted under the School Warrant Indenture and applicable law, and holders of those Claims will receive payment in full under their Series 2004-A School Warrants in an amount totaling at least the allowed amount of those Claims and of a value of at least the value of the interest in property under the School Warrant Indenture and applicable law. As such, the Plan can be confirmed even if Class 2-A does not accept the Plan. *See* 11 U.S.C. § 1129(b)(2)(A)(i).

- With respect to Class 2-B, the Series 2005-A School Claims will continue to be secured by the liens granted under the School Warrant Indenture and applicable law, and holders of those Claims will receive payment in full under their Series 2005-A School Warrants in an amount totaling at least the allowed amount of those Claims and of a value of at least the value of the interest in property under the School Warrant Indenture and

222

applicable law. As such, the Plan can be confirmed even if Class 2-B does not accept the Plan. *See* 11 U.S.C. § 1129(b)(2)(A)(i).

- With respect to Class 2-D, the Plan largely leaves unaltered the legal, equitable, and contractual rights with respect to School Policy – General Claims, including any associate liens and rights to payment, and accordingly can be confirmed even if Class 2-D does not accept the Plan. *See* 11 U.S.C. § 1129(b)(2)(A)(i), (b)(2)(A)(iii) & (B)(2)(i).

- With respect to Class 2-E, the Plan largely leaves unaltered the legal, equitable, and contractual rights with respect to School Surety Reimbursement Claims, including any associate liens and rights to payment, and accordingly can be confirmed even if Class 2-E does not accept the Plan. *See* 11 U.S.C. § 1129(b)(2)(A)(i), (b)(2)(A)(iii) & (B)(2)(i).

- With respect to Class 6, no holder of any Claim junior to the General Unsecured Claims will receive or retain under the Plan any property on account of such junior Claim. Accordingly, the Plan can be confirmed even if Class 6 does not accept the Plan. *See* 11 U.S.C. § 1129(b)(2)(B)(ii).

- With respect to Class 9, the holders of Subordinated Claims possess payment or lien rights that are subordinated to other Creditors which are receiving less than full recovery under the Plan, and thus the Subordinated Claims are "out of the money" and entitled to no distribution. In addition, no holder of any Claim junior to any Subordinated Claim will receive or retain under the Plan any property on account of such junior Claim. Accordingly, the Plan can be confirmed even if Class 9 does not accept the Plan. *See* 11 U.S.C. § 1129(b)(2)(A)(i), (b)(2)(A)(iii) & (b)(2)(B).

The County does not believe that the Plan discriminates unfairly against any Class that may not accept or otherwise consent to the Plan. More specifically,

- With respect to Class 1-E, no Class of equal rank shall receive any Distributions or retain any property under the Plan on account of Claims in such Class, and thus there is no prospect of unfair discrimination against Class 1-E Claims.

- With respect to Class 1-F, no Class of equal rank shall receive any Distributions or retain any property under the Plan on account of Claims in such Class, and thus there is no prospect of unfair discrimination against Class 1-F Claims.

- With respect to Class 2-A, all Classes of equal rank shall receive similar or identical treatment under the Plan on account of Claims in such Class, and thus there is no prospect of unfair discrimination against Class 2-A Claims.

- With respect to Class 2-B, all Classes of equal rank shall receive similar or identical treatment under the Plan on account of Claims in such Class, and thus there is no prospect of unfair discrimination against Class 2-B Claims.

223

- With respect to Class 2-D, all Classes of equal rank shall receive similar or identical treatment under the Plan on account of Claims in such Class, and thus there is no prospect of unfair discrimination against Class 2-D Claims.

- With respect to Class 2-E, all Classes of equal rank shall receive similar or identical treatment under the Plan on account of Claims in such Class, and thus there is no prospect of unfair discrimination against Class 2-E Claims.

- With respect to Class 6, no Class of equal rank shall receive any Distributions or retain any property under the Plan on account of Claims in such Class, and thus there is no prospect of unfair discrimination against Class 6 Claims. Notably, the treatment of Claims in Classes 5-A, 5-B, 5-C, and 5-D under the Plan is not unfairly discriminatory vis-à-vis Class 6 because General Unsecured Claims do not enjoy any rights in the context of the application of section 215 of the Alabama Constitution with respect to the proceeds of the Special Tax, and that material difference in nonbankruptcy rights justifies the separate classification and differing treatment of Claims in Classes 5-A, 5-B, 5-C, and 5-D under the Plan.

- With respect to Class 9, no Class of equal rank shall receive any Distributions or retain any property under the Plan on account of Claims in such Class, and thus there is no prospect of unfair discrimination against Class 9 Claims.

**As noted above, with respect to any Impaired Class of Claims that fails or is deemed not to accept the Plan, the County requests that the Bankruptcy Court confirm the Plan by "cramdown" in accordance with Bankruptcy Code sections 1129(b)(1), (b)(2)(A), and (b)(2)(B). The County also has reserved the right to modify the Plan to the extent, if any, that confirmation of the Plan under Bankruptcy Code sections 943(b) and 1129(b) requires such modifications.**

## F.     Confirmation Hearing and Process for Objections to Confirmation

The Bankruptcy Code requires that the Bankruptcy Court hold a hearing regarding whether the County has fulfilled the confirmation requirements of Bankruptcy Code section 943(b). The Confirmation Hearing has been scheduled to begin on **November 12, 2013, at 9:00 a.m.** (prevailing Central time) before the Honorable Thomas B. Bennett, United States Bankruptcy Court, Robert S. Vance Building, 1800 5th Avenue North, Birmingham, Alabama 35203. This Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Case.

Any party in interest in the Case – including any Creditor that voted (or was deemed to have voted) to accept or to reject the Plan – may File an objection to or a statement in support of confirm Objections, if any, to the confirmation of the Plan must (a) be in writing; (b) be in the English language; (c) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (d) state with particularity the basis and nature of any objection to the Plan; (e) include any evidence in support of any objection; and (f) be filed, together with proof of

224

Case 11-05736-TBB9    Doc 1977    Filed 08/08/13    Entered 08/08/13 11:52:51    Desc
Main Document    Page 249 of 251

service, with the Bankruptcy Court and served on the County and the Special Notice Parties so that they are actually received no later than **October 7, 2013 at 4:00 p.m. (prevailing Central time)**. **IF ANY OBJECTION TO CONFIRMATION OF THE PLAN IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO CONFIRMATION OF THE PLAN AND MAY NOT BE HEARD AT THE CONFIRMATION HEARING.**

The County and other parties in interest will have the opportunity to file their respective responses to objections to confirmation of the Plan, if any, on or before **November 5, 2013**, and the County shall file and serve the Plan Ballot Summary, the County's documentary evidence in support of confirmation of the Plan, and any supplement to the County's omnibus reply to any objections to confirmation of the Plan on or before **November 8, 2013**.

Information about the Plan solicitation procedures, and additional copies of the Plan, Disclosure Statement, Disclosure Statement Order, the approved forms of Ballots, the Plan Procedures Motion, and the Plan Procedures Order, are available at www.jeffersoncountyrestructuring.com. Copies of the Plan, Disclosure Statement, Disclosure Statement Order, the approved forms of Ballots, the Plan Procedures Motion, and the Plan Procedures Order are available upon request by contacting KCC either by email at JeffersonCountyInfo@kccllc.com, or by telephone at (866) 967-0677, or by mail at Jefferson County Ballot Processing, c/o Kurtzman Carson Consultants LLC, (Attention: Jefferson County Ballot Processing), 2335 Alaska Avenue, El Segundo, CA 90245. Copies of the Plan, the Disclosure Statement, the Disclosure Statement Order, the Plan Procedures Motion, and the Plan Procedures Order are also available for review and download at the Bankruptcy Court's website, www.alnb.uscourts.gov. Alternatively, these documents may be accessed through the Bankruptcy Court's "PACER" website, https://ecf.alnb.uscourts.gov. A PACER password and login are needed to access documents on the Court's "PACER" website. A PACER password can be obtained at http://www.pacer.gov.

## XV.
## RECOMMENDATION AND CONCLUSION

**For the reasons more fully set forth above, the County believes that Plan confirmation and implementation are superior to any potentially feasible alternative. <u>Accordingly, the County recommends and urges all Creditors who hold Impaired Claims entitled to vote on the Plan to vote to accept the Plan by checking the box marked "Accept" on their Ballots.</u> The County also recommends that holders of Allowed Class 1-A Claims (Sewer Warrant Claims) and Class 1-B Claims (Bank Warrant Claims and Primary Standby Sewer Warrant Claims) make the Commutation Election on their Ballots; provided, however, with respect to those Class 1-A Claims in the approximate outstanding principal amount of $62 million that are on account of Series 2003-B-8 Sewer Warrants, the County makes no recommendation to such holders regarding the Commutation Election, but requests that such holders also evaluate thoroughly the information contained herein (including, without limitation, Sections XI.B and XII.B of this Disclosure Statement) and decide whether to make the Commutation Election. <u>The County urges all Creditors, after marking on their Ballots their votes and, if applicable, their decisions regarding the Commutation Elections, to return those Ballots as directed on their respective Ballots.</u>**

225

DATED AS OF:  August 8, 2013                    **JEFFERSON COUNTY, ALABAMA**

By:  W.D. Carrington
Its:  County Commission President


Filed by:

/s/ J. Patrick Darby
**BRADLEY ARANT BOULT CUMMINGS LLP**
J. Patrick Darby
Jay R. Bender
Jennifer H. Henderson
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 521-8000
Facsimile:  (205) 521-8500
Email: pdarby@babc.com, jbender@babc.com,
    jhenderson@babc.com

*-and-*

**KLEE, TUCHIN, BOGDANOFF & STERN LLP**
Kenneth N. Klee (*pro hac vice*)
Lee R. Bogdanoff (*pro hac vice*)
David M. Stern (*pro hac vice*)
Robert J. Pfister (*pro hac vice*)
Whitman L. Holt (*pro hac vice*)
1999 Avenue of the Stars, Thirty-Ninth Floor
Los Angeles, California 90067
Telephone:  (310) 407-4000
Facsimile:  (310) 407-9090
Email:  kklee@ktbslaw.com, lbogdanoff@ktbslaw.com,
    dstern@ktbslaw.com, rpfister@ktbslaw.com,
    wholt@ktbslaw.com

*Counsel for Jefferson County, Alabama*

226